Omar C. Jadwat*
Lucas Guttentag*
Tanaz Moghadam*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
Telephone:    (212) 549-2660
Facsimile:    (212) 549-2654
ojadwat@aclu.org
lguttentag@aclu.org
tmoghadam@aclu.org

Linton Joaquin*
Karen C. Tumlin*
Nora A. Preciado*
Melissa S. Keaney*
Vivek Mittal*
Ghazal Tajmiri*
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
Telephone:    (213) 639-3900
Facsimile:    (213) 639-3911
joaquin@nilc.org
tumlin@nilc.org
preciado@nilc.org
keaney@nilc.org
mittal@nilc.org
tajmiri@nilc.org

Thomas A. Saenz*
Cynthia Valenzuela Dixon*
Victor Viramontes*
Gladys Limón*
Nicholás Espíritu*
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Telephone:    (213) 629-2512
Facsimile:    (213) 629-0266
tsaenz@maldef.org
cvalenzuela@maldef.org
vviramontes@maldef.org
glimon@maldef.org
nespiritu@maldef.org


Attorneys for Plaintiffs
Additional Co-Counsel on Subsequent Pages

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| FRIENDLY HOUSE; SERVICE EMPLOYEES INTERNATIONAL UNION; SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 5; UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION; ARIZONA SOUTH ASIANS FOR SAFE FAMILIES; SOUTHSIDE PRESBYTERIAN CHURCH; ARIZONA HISPANIC CHAMBER OF COMMERCE; ASIAN CHAMBER OF COMMERCE OF ARIZONA; BORDER | No. CV 10-1061<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**CLASS ACTION** |

ACTION NETWORK; TONATIERRA
COMMUNITY DEVELOPMENT
INSTITUTE; MUSLIM AMERICAN
SOCIETY; JAPANESE AMERICAN
CITIZENS LEAGUE; VALLE DEL SOL,
INC.; COALICION DE DERECHOS
HUMANOS; ANDREW ANDERSON;
VICKI GAUBECA; C.M., a minor; LUZ
SANTIAGO; JIM SHEE; JOSE ANGEL
VARGAS; JESUS CUAUHTEMOC
VILLA; JOHN DOE #1; JANE DOE #1;
and JANE DOE #2,

                        Plaintiffs,

        v.

MICHAEL B. WHITING, Apache County
Attorney, in his official capacity;
EDWARD G. RHEINHEIMER, Cochise
County Attorney, in his official capacity;
DAVID W. ROZEMA, Coconino County
Attorney, in his official capacity; DAISY
FLORES, Gila County Attorney, in her
official capacity; KENNY ANGLE,
Graham County Attorney, in his official
capacity; DEREK D. RAPIER, Greenlee
County Attorney, in his official capacity;
SAM VEDERMAN, La Paz County
Attorney, in his official capacity;
RICHARD M. ROMLEY, Maricopa
County Attorney, in his official capacity ;
MATTHEW J. SMITH, Mohave County
Attorney, in his official capacity;
BRADLEY CARLYON, Navajo County
Attorney, in his official capacity;
BARBARA LAWALL, Pima County
Attorney, in her official capacity; JAMES
P. WALSH, Pinal County Attorney, in his
official capacity; GEORGE SILVA, Santa
Cruz County Attorney, in his official
capacity; SHEILA S. POLK, Yavapai
County Attorney, in her official capacity;
JON R. SMITH, Yuma County Attorney, in
his official capacity; JOSEPH DEDMAN
JR., Apache County Sheriff, in his official
capacity; LARRY A. DEVER, Cochise
County Sheriff, in his official capacity;
BILL PRIBIL, Coconino County Sheriff, in
his official capacity; JOHN R. ARMER,
Gila County Sheriff, in his official
capacity; PRESTON J. ALLRED, Graham
County Sheriff, in his official capacity;

| | |
|---|---|
| 1 | STEVEN N. TUCKER, Greenlee County Sheriff, in his official capacity; DONALD |
| 2 | LOWERY, La Paz County Sheriff, in his official capacity; JOSEPH ARPAIO, |
| 3 | Maricopa County Sheriff, in his official capacity; TOM SHEAHAN, Mohave |
| 4 | County Sheriff, in his official capacity; KELLY CLARK, Navajo County Sheriff, |
| 5 | in his official capacity; CLARENCE W. DUPNIK, Pima County Sheriff, in his |
| 6 | official capacity; PAUL BABEU, Pinal County Sheriff, in his official capacity; |
| 7 | TONY ESTRADA, Santa Cruz County Sheriff, in his official capacity; STEVE |
| 8 | WAUGH, Yavapai County Sheriff, in his official capacity; and RALPH OGDEN, |
| 9 | Yuma County Sheriff, in his official capacity, |
| 10 | |
| 11 | Defendants. |

Defendants.

Daniel J. Pochoda (SBA No. 021979)
Anne Lai** (SBA No. 172162)
ACLU FOUNDATION OF ARIZONA
77 E. Columbus Street, Suite 205
Phoenix, Arizona  85012
Telephone:   (602) 650-1854
Facsimile:   (602) 650-1376
dpochoda@acluaz.org
alai@acluaz.org

Cecillia D. Wang*
Harini P. Raghupathi*
AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
    IMMIGRANTS' RIGHTS
    PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone:   (415) 343-0775
Facsimile:   (415) 395-0950
cwang@aclu.org
hraghupathi@aclu.org

Nina Perales*
Ivan Espinoza-Madrigal*
MEXICAN AMERICAN LEGAL
    DEFENSE AND EDUCATIONAL
    FUND
110 Broadway Street, Suite 300
San Antonio, Texas 78205
Telephone:   (210) 224-5476
Facsimile:   (210) 224-5382
nperales@maldef.org
iespinoza@maldef.org

Julie A. Su*
Ronald Lee*
Yungsuhn Park*
Connie Choi*
Carmina Ocampo*
ASIAN PACIFIC AMERICAN
    LEGAL CENTER, a member
    of Asian American Center for
    Advancing Justice
1145 Wilshire Blvd., Suite 200
Los Angeles, California 90017
Telephone:   (213) 977-7500
Facsimile:   (213) 977-7595
jsu@apalc.org
rlee@advancingequality.org
ypark@apalc.org
cchoi@apalc.org
cocampo@apalc.org

Chris Newman*
Lisa Kung*
NATIONAL DAY LABOR ORGANIZING
    NETWORK
675 S. Park View Street, Suite B
Los Angeles, California 90057
Telephone:   (213) 380-2785
Facsimile:   (213) 380-2787
newman@ndlon.org
kung@ndlon.org

Daniel R. Ortega, Jr. (SBA No. 005015)
ROUSH, MCCRACKEN, GUERRERO,
    MILLER & ORTEGA
1112 E. Washington Street
Phoenix, Arizona  85034
Telephone:   (602) 253-3554
Facsimile:   (602) 340-1896
danny@rmgmo.com

Laura D. Blackburne*
NATIONAL ASSOCIATION
    FOR THE ADVANCEMENT
    OF COLORED PEOPLE (NAACP)
4805 Mt. Hope Drive
Baltimore, Maryland 21215
Telephone:   (410) 580-5700
lblackburne@naacpnet.org

*Attorneys for Plaintiffs*

1

2     Bradley S. Phillips*[†]                    Susan T. Boyd*[†]
      Paul J. Watford*[†]                       Yuval Miller*[†]
3     Joseph J. Ybarra*[†]                      MUNGER, TOLLES & OLSON LLP
      Elisabeth J. Neubauer*[†]                 560 Mission Street, 27th Floor
4     MUNGER, TOLLES & OLSON LLP[†]             Los Angeles, California  90071-1560[†]
      355 South Grand Avenue, 35th Floor        Telephone:   (415) 512-4000
5     San Francisco, California 94105-2907      Facsimile:   (415) 512-4077
      Telephone:   (213) 683-9100               *Susan.Boyd@mto.com*
6     Facsimile:   (213) 687-3702               *Yuval.Miller@mto.com*
      *Brad.Phillips@mto.com*
7     *Paul.Watford@mto.com*
      *Joseph.Ybarra@mto.com*
8     *Elisabeth.Neubauer@mto.com*

9         [†]*Attorneys for all plaintiffs except Service Employees International Union, Service
          Employees International Union, Local 5, United Food and Commercial Workers
10            International Union, and Japanese American Citizens League*

11    *Application for admission *pro hac vice* forthcoming
      **Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# PRELIMINARY STATEMENT

1.    This action challenges Arizona Senate Bill 1070, as amended ("SB 1070"), a comprehensive set of state immigration laws expressly intended to "discourage and deter the unlawful entry and presence of aliens and economic activity by persons unlawfully present in the United States." SB 1070 proclaims and implements an immigration policy of "attrition through enforcement" for the State of Arizona. The legislation creates an array of new state-law criminal offenses relating to immigration and imposes sweeping requirements on state and local law enforcement officers to investigate alleged immigration violations and to arrest and detain persons suspected of immigration violations. The law was signed by Governor Janice Brewer on April 23, 2010, and is scheduled to go into effect on July 28, 2010.

2.    SB 1070 attempts to create a legal regime regulating and restricting immigration and punishing those whom Arizona deems to be in violation of immigration laws. It is an impermissible encroachment into an area of exclusive federal authority and will interfere and conflict with the comprehensive federal immigration system enacted by Congress and implemented through a complex web of federal regulations and policies. According to law enforcement officials in Arizona and elsewhere, SB 1070 will cause widespread racial profiling and will subject many persons of color—including countless U.S. citizens, and non-citizens who have federal permission to remain in the United States—to unlawful interrogations, searches, seizures and arrests.

3.    SB 1070 is unconstitutional. It violates the Supremacy Clause and core civil rights and civil liberties secured by the United States Constitution, including the First Amendment right to freedom of speech and expressive activity, the Fourth Amendment right to freedom from unreasonable searches and seizures, and the Equal Protection Clause guarantee of equal protection under the law.

1     4.     The plaintiffs in this action will suffer serious violations of their constitutional

2     rights and civil liberties if SB 1070 goes into effect.  The named plaintiffs bring this

3     action on behalf of themselves and a class of all others similarly situated to obtain

4     preliminary and permanent injunctive relief and a declaration that SB 1070 violates the

5     U.S. and Arizona Constitutions.

6                                    **JURISDICTION AND VENUE**

7     5.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343

8     over Plaintiffs' claims under the U.S. Constitution, as well as under 42 U.S.C. §§ 1981

9     and 1983.  The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201

10    and 2202. The Court has jurisdiction over Plaintiffs' state-law claim under 28 U.S.C. §

11    1367.

12    6.     Venue is proper in this District under 28 U.S.C. § 1391(b).  All Defendants are

13    sued in their official capacity and their official places of business are all located within

14    this District.  All of the events giving rise to this Complaint occurred within this District.

15                                             **PARTIES**

16                                  **Organizational Plaintiffs**

17    7.     Plaintiff Friendly House is a non-profit organization whose mission is to foster

18    excellence in the community by serving the educational and human service needs of its

19    residents.  It provides comprehensive services to about 40,000 families, youth, and

20    children each year and numerous direct services in several program areas, including

21    immigration, family, youth, and adult services, workforce development, home care

22    services, and charter school education.  Among other immigration services, Friendly

23    House assists applicants for asylum and victims and witnesses of crime who are eligible

24    for visas.  The clients served by Friendly House include citizens, non-citizens, and racial

25    minorities, including Latinos.  SB 1070 will force Friendly House to divert scarce

26    resources from critical programs in order to educate and assist individuals affected by SB

1070.  Friendly House's mission and organizational goals will also be negatively impacted by SB 1070 because its staff will have a harder time encouraging clients to seek services in its various program areas to the extent that they involve interacting with government agencies and police.  Friendly House also fears that its current and prospective clients will be deterred from seeking immigration relief because local law enforcement will continue to stop and detain them, notwithstanding their application for relief, on the basis that they do not have any registration documents that are acceptable under SB 1070.

8.     Plaintiff Service Employees International Union ("SEIU") is one of the largest labor organizations in the world, representing 2.2 million working men and women who work primarily in the public sector and in the janitorial, health services, long-term care, and security industries.  Many of SEIU's members are recent immigrants to the United States and many of its members come from racial minority groups.  SEIU has long called for and worked toward comprehensive reform of U.S. immigration laws.  Another priority for SEIU is fighting discrimination against minorities, women and other groups in the workplace and in society in general.  In Arizona, SEIU has three affiliates: SEIU/Workers United Western Regional Joint Board; National Association of Government Employees; and Plaintiff Service Employees International Union, Local 5 ("SEIU Arizona").  Together, these three affiliates have approximately 2,300 members spanning every county in the state, about 40 percent of whom are Latino and some of whom are other racial minorities.  SEIU works in partnership with SEIU Arizona and other groups to combat discrimination and mobilize for immigration reform at the national level.  SB 1070's impact on already distressed county and municipal budgets will harm SEIU's members to the extent that it will result in further pay cuts, furloughs, and layoffs.  Furthermore, some of SEIU's Latino members or their families have already been subjected to stops by local law enforcement where they have been asked to produce proof of immigration status.  SEIU is concerned that its minority members will be even more likely to be stopped,

detained, arrested, and questioned by state and local police after SB 1070 goes into effect. This will cause hardship for members of SEIU.  In addition, SEIU is concerned that members and potential members will be fearful to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by the police under SB 1070.  This will significantly impact the ability of SEIU to protect its existing members and to organize new members.  SEIU joins this lawsuit to preserve its ability to organize new members and to protect the rights and interests of its members and prospective members.

9.     Plaintiff Service Employees International Union, Local 5 ("SEIU Arizona"), is a labor union and an affiliate of Plaintiff SEIU.  SEIU Arizona represents state, county, and municipal public service employees and has 1,800 members in Arizona, including members in every county throughout the state.  Approximately one-quarter of SEIU Arizona's membership is Latino, and its membership also includes other racial minorities. The primary mission of SEIU Arizona is to organize, represent, and empower employees in Arizona.  In addition, SEIU Arizona works in partnership with SEIU and other groups to combat discrimination and mobilize for immigration reform at the national level.  SB 1070's impact on already distressed county and municipal budgets will harm SEIU Arizona's members to the extent that it will result in further pay cuts, furloughs, and layoffs.  Furthermore, some of SEIU Arizona's Latino members or their families have already been subjected to stops by local law enforcement where they have been asked to produce proof of immigration status.  SEIU Arizona is concerned that its minority members will be even more likely to be stopped, detained, arrested, and questioned by state and local police after SB 1070 goes into effect.  This will cause hardship for members of SEIU Arizona.  In addition, SEIU Arizona is concerned that members and potential members will be fearful to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of

1   being stopped by the police under SB 1070.  This will significantly impact the ability of

2   SEIU Arizona to protect its existing members and to organize new members.  SEIU

3   Arizona joins this lawsuit to preserve its ability to organize new members and to protect

4   the rights and interests of its members and prospective members.

5        10.   Plaintiff United Food and Commercial Workers International Union

6   ("UFCW") represents more than 1.3 million workers, primarily in the retail, meatpacking,

7   food processing, and poultry industries.  Within the State of Arizona there are more than

8   21,000 UFCW-represented workers, whose employers include retail food and non-food

9   retail, hospital services, meat packing and food processing, parking services, and legal aid

10   services.   The UFCW represents workers who comprise a range of races and ethnicities,

11   with varying degrees of English proficiency, including substantial numbers of Latinos.

12   The UFCW's mission is to better the terms and conditions of employment for all workers

13   it represents and thereby better the lives of their families and communities.  The UFCW

14   accomplishes its mission through organizing, collective bargaining, and representation of

15   employees.  These core activities require freedom of association and communication

16   between the union and the employees and among the employees at the worksite and in the

17   community, activities protected by the United States Constitution and federal labor law.

18   If SB 1070 is allowed to go into effect it will impose direct harm to UFCW's core mission

19   and representational obligations by subjecting UFCW members to unlawful questioning,

20   arrest and detention by state and local law enforcement officers; deterring UFCW-

21   represented workers from attending and participating in UFCW activities; and reducing

22   UFCW's ability to effectively advocate on behalf of the employees it represents.

23        11.   Plaintiff Arizona South Asians For Safe Families ("ASAFSF") is an

24   organization based in Scottsdale, Arizona whose mission is to increase awareness of

25   domestic violence and provide support services to victims of domestic violence in the

26   South Asian community in Arizona.  Established in 2004, ASAFSF's services include

1    providing family advocacy and safety-planning support to domestic violence victims

2    through a toll-free helpline as well as direct services to victims in the form of financial

3    assistance for child care, rent, lawyers' fees, transportation, and emergent personal needs.

4    ASAFSF's family advocates often transport victims to court and to medical and legal

5    appointments.  ASAFSF also engages in community education, which includes hosting

6    small group meetings with community members.  The majority of ASAFSF's clients are

7    immigrant women, many of whom are eligible for federal immigration relief through the

8    Violence Against Women Act ("VAWA"), the Trafficking and Violence Protection Act

9    ("TVPA"), or asylum procedures.  SB 1070 will interfere with the organization's essential

10   mission of providing support services to victims of domestic violence.  First, ASAFSF

11   staff and volunteers will be at imminent risk of prosecution under SB 1070's transporting

12   provisions.  Second, ASAFSF will have to re-allocate its very limited resources to ensure

13   that its clients feel safe reporting their experiences to law enforcement or while being

14   transported by ASAFSF advocates.  Third, people will not come to its community

15   meetings for fear of being stopped, interrogated, and arrested under SB 1070.  ASAFSF

16   believes its clients will be afraid of approaching law enforcement to report crimes or

17   interact with government officials because their appearance, limited English ability, and

18   accents could be used by the police to question their authorization to be in the United

19   States.  Plaintiff ASAFSF also fears that local law enforcement will stop and detain clients

20   who have applied for immigration relief under the VAWA, the TVPA, or through the

21   asylum procedures, because they do not have any registration documents that are

22   acceptable under SB 1070, and that potential clients will be discouraged from seeking

23   these services.  ASAFSF's clients and potential clients will be placed at greater risk of

24   physical and mental injury due to SB 1070.

25        12.   Plaintiff Southside Presbyterian Church ("Southside") is a religious institution

26   based in Tucson, Arizona, whose mission is is to serve God through worship and sacrament,

and by following the Bible's admonition to "do justice, love mercy, and walk humbly with . . . God." Southside's members and leaders believe that the church has been called—in fact, commanded—by God to welcome and serve all people.  Southside follows the admonition in Hebrews 13:2:  "Be not forgetful to entertain strangers, for by this some have entertained angels unawares." Southside serves the homeless, the day laborers, its low income neighbors, its own parishioners, and others without regard to race, gender, national origin, religion, or immigration status. Southside's community is largely comprised of low-income Latino and Native Americans families, although it also includes Caucasians and African Americans.  Southside operates a homeless program, a Samaritan program through which parishioners provide assistance for individuals who are in distress in the desert, and an on-premises day laborer center.  The day laborers who participate in Southside's program help run the center and solicit temporary employment by visibly gathering at a public sidewalk outside the church and signaling their availability for work to potential employers.  In addition, some of Southside's religious leaders, staff, and volunteers frequently—and without knowledge of, or regard to, immigration status— transport parishioners and others to religious activities and to medical facilities; they would thus be at risk of being prosecuted pursuant to SB 1070's transporting and harboring provisions.  SB 1070's criminal prohibitions infringe on Southside's ability to carry out its religious mission to serve all God's people.  Furthermore, Southside depends on its good relationships with police, social workers, and other city and state employees to safeguard church premises and its parishioners, but Southside staff and volunteers fear that these relationships will change after SB 1070 goes into effect.  Southside staff and volunteers will be hesitant to approach law enforcement and other authorities to report crimes or speak out as witnesses to crimes because the appearance, native language, and limited English ability of the community members served by Southside can be used by the police to question their authorization to be in the United States and to investigate

1    Southside staff and volunteers for potential violations of SB 1070.  SB 1070 will frustrate

2    the mission of Southside and divert limited resources to educating and assisting

3    community members who will be affected by SB 1070.

4         13.   Plaintiff Arizona Hispanic Chamber of Commerce ("AZHCC") is an

5    association of Latino-owned businesses located throughout the state of Arizona that seek

6    to support, promote, and foster business, cultural, and educational relationships between

7    chamber members and the general public.  In addition to serving as a public advocate for

8    its members, AZHCC offers seminars, workshops, marketing, and promotions, as well as

9    networking and sponsorship opportunities for its corporate and community partners.

10   AZHCC has more than 350 business members with employees, many of whom are

11   Latinos, including U.S. citizens, non-citizens, monolingual Spanish speakers, limited

12   English-proficient speakers and individuals who speak English with Mexican and other

13   Spanish-language accents.  Because of their appearance, traditional cultural practices, and

14   limited English proficiency, some members of AZHCC and/or their employees fear they

15   will be subject to investigation or unwarranted arrest under Arizona SB 1070.  AZHCC

16   members, like all small business owners in Arizona and nationwide, rely on local and state

17   law enforcement to keep their companies safe and some AZHCC members would be

18   deterred from approaching law enforcement to report criminal activity committed against

19   them or others out of fear that the provisions of SB 1070 would subject AZHCC members

20   to unwarranted questioning, detention or arrest.  AZHCC members also include non-profit

21   organizations who serve immigrant populations, including noncitizens that do not have

22   federal authorization to be in the United States.  The provisions of SB 1070 create new

23   criminal penalties for certain immigrants and non-immigrants associating with immigrants

24   and will cause considerable confusion for AZHCC's members and other members of the

25   general business community about their potential criminal liability under SB 1070.

26   AZHCC will suffer financial hardship because it will have to divert already limited

resources from the association's normal activities to educate and inform these groups resulting from the confusion surrounding SB 1070.  Finally, since many of AZHCC's members heavily rely on a U.S.-born minority consumer base that will be reluctant to patronize businesses for fear that they could be harassed by local law enforcement, AZHCC will have to divert resources from other activities to inform and educate this group as well to counter the economic harm caused by SB 1070.

14.   Plaintiff Asian Chamber of Commerce of Arizona ("ACC") is an Arizona organization that brings together a network of Asian-owned businesses throughout the state that seek to support, promote and foster business, cultural and educational relationships between chamber members and the general public. ACC has over 90 organizational members.  ACC members and their employees, many of whom are also of Asian descent, include U.S. citizens and non-citizens, individuals born in the U.S. and recent immigrants, monolingual non-English speakers, limited English-proficient speakers, and individuals that speak English with an accent. ACC members also include non-profit organizations who serve immigrant populations, including non-citizens who do not have federal authorization to remain in the United States. ACC members often rely on law enforcement to keep their businesses safe and would be deterred from approaching law enforcement to report criminal activity committed against them or others out of fear that SB 1070 would subject ACC members to detention, questioning, or arrest.  The provisions of SB 1070 that create new criminal penalties for certain immigrants and persons associating with immigrants will cause considerable confusion for ACC's members and other members of the general business community about their potential criminal liability under SB 1070.  ACC will have to divert its limited resources to addressing this confusion and fear. Finally, since many of its member organizations rely heavily on a minority consumer base that will become reluctant to patronize businesses for fear that they could be harassed by local law enforcement, ACC will have to divert

resources from other activities to address the considerable confusion and complaints surrounding SB 1070.

15.   Plaintiff Border Action Network ("BAN") is a statewide membership organization devoted to protecting the human rights and dignity of immigrant and border communities.  BAN builds the political and social capacity of its constituency through grassroots organizing, leadership development, policy advocacy, and educational activities.  BAN has over 1,000 members distributed across 6 Arizona counties.  The great majority of BAN's membership is Latino.  In addition, BAN has some members who are day laborers who solicit work on public sidewalks and corners.  Some of BAN's members, including its day laborer members, do not have permission to work or remain in the United States.  Other BAN members are legal residents or U.S. citizens, and some live in families of mixed immigration status and nationality.  BAN is concerned that its members will be stopped, detained, or arrested under SB 1070 due to their appearance or lack of acceptable documents.  BAN's own mission will be frustrated by SB 1070.  Its staff frequently buses members to events and organizational functions without regard to their passengers' immigration status, and they are concerned that this could subject them to prosecution under SB 1070.  In addition, BAN will have to divert significant resources to a public education campaign to inform its members about their rights and responsibilities under the new law and address their fears and concerns.  Finally, some of BAN's members have already expressed a desire to leave the state; SB 1070 will make it harder for its staff to maintain its membership base and to recruit new members.

16.  Plaintiff Tonatierra Community Development Institute ("Tonatierra") is a nonprofit community-based organization in Phoenix, Arizona that advocates for the cultural, educational, and economic development needs of the indigenous community in Arizona.  Some of the families it works with are members of indigenous American Indian tribes who fear that they will be stopped and questioned under SB 1070 if they are not

carrying tribal identification cards.  In addition, Tonatierra operates a day laborer center called Centro Macehualli.  The mission of Centro Macehualli is to empower workers and protect them from exploitation.  Day laborers who gather at Centro Macehualli are hired by homeowners, small businesses, and construction contractors as independent contractors or employees for temporary work such as gardening, cleaning, child care, moving, and construction.  Centro Macehualli does not condition membership and access to its services on immigration status.  As such, the Center is open to both citizen and non-citizen day laborers.  SB 1070 would frustrate Centro Macehualli's mission by criminalizing the expressive activity of members who are not authorized by the federal government to work in the United States and chilling the expressive activity of members who are authorized to work.  Due to SB 1070, members of Centro Macehualli are refraining, out of fear of prosecution, from indicating their need and availability for work in public areas.

17.   Plaintiff Muslim American Society ("MAS") is a charitable, religious, social, cultural, and educational organization with an advocacy arm called the MAS Freedom Foundation ("MASF").  Part of MAS's mission is to protect the civil rights and liberties of American Muslims.  The mission of MASF is to integrate and empower the American Muslim community through civic education, participation, community outreach, and coalition building.  MAS and MASF have an office and chapter in Phoenix, Arizona, with over 30 members ("MAS-AZ"), who are also members of MAS.  Some of MAS-AZ's members are immigrants who will be subjected to profiling based on their foreign appearance and clothing, such as headscarves.  SB 1070 will thwart the organizational mission of MAS, as MAS-AZ members have already indicated that they will be afraid to attend town hall meetings and its immigration clinic after SB 1070.  MAS's mission to provide community education to the Muslim American community in Arizona will also be thwarted because its target audience will be too afraid to attend meetings and organized activities and events.  In addition, MAS-AZ will have to shift scarce organizational

1    resources to create new educational materials to protect its members from SB 1070, rather

2    than spend these resources on other areas.

3        18.   Plaintiff Japanese American Citizens League ("JACL") is a membership

4    organization founded in 1929 that works to advance the civil rights of Japanese

5    Americans and others who are victimized by injustice and bigotry.  JACL's Arizona

6    chapter ("JACL AZ") has over 300 members, including non-citizen immigrants as well as

7    U.S. citizens and racial minorities.  To advance its mission, JACL AZ sponsors public

8    education events, holds membership meetings, conducts outreach to teachers and schools,

9    and works to preserve the history of the Gila and Poston WWII Japanese American

10   concentration camps.  JACL AZ collaborates with local city and community agencies to

11   host a monthly senior center.  Some JACL AZ members who seek assistance through or

12   participate in its programs lack authorization to remain in the United States; others have

13   only an H1-B visa.  JACL believes that even its U.S. citizen members will be profiled

14   under SB 1070.  JACL fears that SB 1070 will create fear and confusion, especially for its

15   elderly who were imprisoned in Japanese internment camps.  In addition, JACL AZ will

16   need to spend its scarce organizational resources and employ its mostly volunteer staff to

17   create new educational materials to respond to SB 1070.

18       19.   Plaintiff Valle del Sol, Inc. is a non-profit organization that has served the

19   Maricopa County community since 1970.  Valle del Sol helps thousands of individuals

20   each year by providing extensive behavioral health and social services.  The agency

21   provides counseling, substance abuse treatment, prevention services, case management,

22   adult education, advocacy, leadership development, and services for seniors. Valle del

23   Sol's programs address the increasing social and community needs related to family,

24   substance abuse, civic engagement, cultural diversity, and behavioral health problems.  As

25   one of the largest Latino behavioral health and social service organizations in Maricopa

26   County, Valle del Sol's culturally diverse, bilingual staff provides a wide array of

programs and services for the entire family.  Its mission and the people it serves will be directly affected by SB 1070.   Valle del Sol serves a diverse mixture of populations a majority of whom are Latinos.  SB 1070 will force Valle del Sol to divert scarce resources from critical programs in order to educate and assist individuals affected by SB 1070.  Furthermore, SB 1070 will thwart the mission and organizational goals of Valle del Sol by deterring its clients from seeking the organization's services because the clients fear interrogation, detention, and arrest under the provisions of SB 1070.   Because the agency's name is in Spanish, there exists a fear by staff that on that basis alone, Valle del Sol may be a target under the provisions of SB 1070.

20.   Coalición de Derechos Humanos ("Derechos Humanos") is a grassroots community-service organization based in Tucson, Arizona, whose mission is to promote human rights in the U.S.-Mexico border region.  Since 1992, Derechos Humanos has furthered its mission by organizing public education campaigns on issues related to immigration, conducting citizenship workshops for lawful permanent residents and immigrant refugees, and hosting intake clinics through which the organization assists community members—including racial minorities and non-citizen immigrants—who experience law enforcement, workplace, landlord/tenant, and housing discrimination problems.  Derechos Humanos offers its services without regard to whether the person is authorized by the federal government to be present in the United States.  Derechos Humanos has already been forced to suspend most of its work relating to community education on border deaths and leadership development to respond to inquiries from the community about SB 1070.  The fear and confusion created by SB 1070 has also resulted in a dramatic drop in attendance at workshops and events.  Community members served by Derechos Humanos are afraid to take steps to protect their rights when it means any interaction with government officials, including trying to protect their rights through the state courts.  SB 1070 will frustrate the mission of Derechos Humanos and divert limited

resources to educating and assisting community members who will be affected by SB 1070.

**Individual Plaintiffs**

21.   Plaintiff Andrew Anderson is a citizen of Jamaica currently residing in Phoenix, Arizona.  In March 2010, after being placed in deportation proceedings, a federal immigration judge granted Mr. Anderson withholding of removal, a form of relief under federal immigration law that would allow Mr. Anderson to stay in the United States because his life or freedom would be in danger if he returned to Jamaica.  Currently, the only form of identification that Mr. Anderson carries is a Jamaican driver's license.  The only documentation of his permission to be in the United States is a single piece of paper reflecting the order of the U.S. Immigration Court.  Mr. Anderson fears that he will be stopped by state or local law enforcement officers pursuant to SB 1070 because he looks or sounds foreign, and that he will be detained under SB 1070 for failure to carry registration documents.

22.   Plaintiff Vicki Gaubeca is a resident of Las Cruces, New Mexico.  She is Latina, born in Mexico, and is a U.S. citizen.  Ms. Gaubeca frequently drives from her home to Tucson, Arizona to visit family members. Ms. Gaubeca also visits Arizona for work.  When she travels in Arizona, Ms. Gaubeca passes through Cochise, Maricopa, Pima, Santa Cruz, and Yavapai counties.  Ms. Gaubeca is a licensed New Mexico driver. The State of New Mexico does not require "proof of legal presence," as that term is used by SB 1070, when issuing driver's licenses.  Thus, Ms. Gaubeca fears that if SB 1070 goes into effect, she could be pulled over by a police officer in Arizona and detained because her New Mexico driver's license will not be accepted to dispel suspicion that she is "unlawfully present" in the United States.  Ms. Gaubeca is also wary of speaking

1    Spanish in the presence of Arizona law enforcement officers because it may give rise to

2    suspicion that she is unlawfully present as that term is used in SB 1070.

3        23.   Plaintiff C.M., a minor,[1] is a resident of Gilbert, Arizona and a freshman in

4    high school.  She is originally from Haiti and, due to the recent earthquake there, has been

5    granted Temporary Protected Status in the United States.  C.M. is 15 years old but is often

6    told that she looks 18.  C.M. does not carry any documents proving that she has

7    permission to be in the United States.  However, she recently asked her mother to obtain

8    an Arizona non-driver's identification for her after she learned about SB 1070.  She was

9    afraid that she would be stopped and questioned about her immigration status due to her

10   dark skin and the fact that she speaks a foreign language.  She is nervous about speaking

11   Haitian Creole with her friends and believes that it could get her in trouble with the police

12   under SB 1070.

13       24.   Plaintiff Luz Santiago is a pastor for a church in Mesa, Arizona.  She is a U.S.

14   citizen, Latina, and fluent in Spanish.  Approximately 80 percent of her congregation

15   lacks authorization by the federal government to remain in the United States.   In her role

16   as a pastor, Ms. Santiago provides transportation and shelter to members of her

17   congregation on a daily basis, including those members who are not authorized by the

18   federal government to remain in the United States.  Ms. Santiago assists members of her

19   congregation by driving them to court, doctor's appointments, urgent care, the grocery

20   store, and school.  Once a month, she also transports the youth in her congregation to

21   spiritual outings.  Ms. Santiago also provides shelter to persons who seek sanctuary in her

22   church and runs a food bank that does not screen for authorization by the federal

23   government to remain in the United States.  Ms. Santiago fears for the well-being of

24   vulnerable congregation members who could be stopped, detained, arrested, and

25

26       [1] C.M. is a minor and does not waive the protection of Rule 5.2(a) of the Federal
Rules of Civil Procedure.  Therefore, only her initials shall be listed in any filing made in
connection with this case.  *See* Fed. R. Civ. P. 5.2(a)(3).

questioned under SB 1070.  In addition, she believes that people will stop seeking help from the food bank because of SB 1070.  Ms. Santiago is concerned that she could be subject to prosecution under the transporting and harboring provisions of SB 1070 for performing work that is central to her role as a religious leader.

25.  Plaintiff Jim Shee is an elderly resident of Litchfield Park, Arizona.  He is a U.S. citizen of Spanish and Chinese descent, is fluent in Spanish, and has lived in Arizona his entire life.  Over the past month, Mr. Shee has been stopped twice by local police in Arizona and asked to produce identification documents.  On or about April 6, 2010, Mr. Shee was stopped and questioned on the way to his birthday party by a City of Phoenix police officer who demanded to see his "papers."  He was not given a citation.  On or about April 16, 2010, Mr. Shee was stopped by a highway patrol officer with the Arizona Department of Public Safety in Yuma, Arizona.  The officer made a U-turn, activated his emergency lights, stopped Mr. Shee and asked to see his "papers."  If SB 1070 goes into effect, Mr. Shee fears that he will be at even greater risk of being stopped and questioned by Arizona law enforcement officials based on his appearance.  He fears that he will be detained because he will be unable to prove to an officer that he is a U.S. citizen.  Mr. Shee does not wish to carry his passport with him at all times because he is afraid of losing it.

26.  Plaintiff Jose Angel Vargas is a resident of Phoenix, Arizona and is a lawful permanent resident of the United States.  He speaks Spanish fluently but not English.  Mr. Vargas is a member of Tonatierra's Centro Macehualli.  He has lawfully and peacefully solicited work at Centro Macehualli and on public street corners.  Mr. Vargas would like to continue soliciting work in public places; however, he is very worried that he will be detained by the police under SB 1070 due to his Latino appearance, the fact that he cannot communicate with a police officer in English, and because he solicits work alongside others who do not have authorization to work in the United States.  He was already

arrested for trespassing once before in Arizona, in March 2009, while soliciting work on a corner near 25th Street and Bell Road in North Phoenix.  While the charges were dropped shortly thereafter, Mr. Vargas continues to be fearful of encounters with the police.

27.   Plaintiff Jesús Cuauhtémoc Villa is currently an anthropology student at Arizona State University in Tempe, Arizona.  He is a U.S. citizen and Latino.  Because Mr. Villa is a resident of New Mexico and because his parents and extended family still live in that State, he travels back and forth between Arizona and New Mexico about twice a year.  When driving between states and while traveling in Arizona, he visits Gila, Yavapai, Coconino, Maricopa and Navajo Counties.  As a full-time student, Mr. Villa is not required to possess an Arizona driver's license; he only possesses a New Mexico driver's license.  New Mexico does not require "proof of legal presence," as that term is used in SB 1070, when issuing driver's licenses.  Because Mr. Villa does not regularly carry his passport, social security card, or birth certificate with him out of fear that he could lose these documents, he believes that under SB 1070, state and local law enforcement will stop him based on his ethnicity and detain him because his driver's license is not adequate to prove his citizenship.

28.   Plaintiff John Doe #1 is a resident of Phoenix, Arizona.  He is Chinese and a lawful permanent resident of the United States.  He received his permanent resident status in 2008 after being granted asylum on the basis of political persecution by the government of the People's Republic of China.  John Doe #1 has spent the last three years building a new life here and currently works as a waiter in a Chinese restaurant.  John Doe #1 speaks Chinese and his English is very limited.   If SB 1070 goes into effect, he fears that he will be stopped by state or local law enforcement officers and questioned about his immigration status on the basis of his Asian appearance and accent.  John Doe #1 is afraid of interacting with government officials in his native language because it could prompt them to question him about his authorization to be in the United States.  John Doe #1 also

understands that he will be detained if he is stopped without his green card.  Due to his experience as a victim of official persecution, this possibility is extremely distressing to John Doe #1.

29.   Plaintiff Jane Doe #1 is a resident of Phoenix, Arizona.  She is of South Asian descent and speaks Urdu and very limited English.  Several years ago, in her home country, Jane Doe #1 was kidnapped, sexually abused, and physically assaulted.  When she sought medical and legal assistance, the hospital and police refused to investigate the case.  Jane Doe #1 and her family were forced to leave her village out of fear for their safety and because they were blacklisted from employment opportunities.  She believes all of this occurred because she is Roman Catholic.  Although Jane Doe #1 is preparing an application for asylum based on the religious persecution she experienced as a Christian in a predominantly Muslim country, she does not currently have a registration document. She is afraid that she will be stopped and detained by a state or local law enforcement officer pursuant to SB 1070 due to her Asian appearance and the fact that she speaks a foreign language and has an accent.  Because of her negative experience with law enforcement in the past, this causes Jane Doe #1 a great deal of stress.

30.   Plaintiff Jane Doe #2 is a resident in a transitional housing program in Phoenix, Arizona.  She is originally from Haiti and came to the United States in 2002. While she was living with her father in New York, he began abusing her.  Years later, when she was placed in deportation proceedings, a federal immigration judge granted her permission to stay in the United States pursuant to the VAWA.  Jane Doe #2 is dark-skinned and speaks with a noticeable Haitian accent.  She has no form of identification and no documentation of her permission to remain in the United States except for the order of the immigration judge in her case.  Jane Doe #2 fears that she will be stopped by law enforcement at a bus stop or on the street and questioned about her immigration status under SB 1070, and that she will be detained because she does not have a registration

document.  A negative police encounter would impair Jane Doe #2's ability to recover from the trauma of her abuse.

### **Defendants**

31.  Defendant Michael B. Whiting is the County Attorney of Apache County, Arizona.  According to Arizona law, the "county attorney is the public prosecutor of the county and shall . . . conduct, on behalf of the state, all prosecutions for public offenses."  Arizona Revised Statutes ("A.R.S.") § 11-532(A).  As such, Defendant Whiting is responsible for the enforcement of SB 1070 within Apache County.  Defendant Whiting is sued in his official capacity.

32.  Defendant Edward G. Rheinheimer is the County Attorney of Cochise County, Arizona.  As such, Defendant Rheinheimer is responsible for the enforcement of SB 1070 within Cochise County.  Defendant Rheinheimer is sued in his official capacity.

33.  Defendant David W. Rozema is the County Attorney of Coconino County, Arizona.  As such, Defendant Rozema is responsible for the enforcement of SB 1070 within Coconino County.  Defendant Rozema is sued in his official capacity.

34.  Defendant Daisy Flores is the County Attorney of Gila County, Arizona.  As such, Defendant Flores is responsible for the enforcement of SB 1070 within Gila County.  Defendant Flores is sued in her official capacity.

35.  Defendant Kenny Angle is the County Attorney of Graham County, Arizona.  As such, Defendant Angle is responsible for the enforcement of SB 1070 within Graham County.  Defendant Angle is sued in his official capacity.

36.  Defendant Derek D. Rapier is the County Attorney of Greenlee County, Arizona.  As such, Defendant Rapier is responsible for the enforcement of SB 1070 within Greenlee County.  Defendant Rapier is sued in his official capacity.

1    37.   Defendant Sam Vederman is the County Attorney of La Paz County, Arizona.

2    As such, Defendant Vederman is responsible for the enforcement of SB 1070 within La

3    Paz County.  Defendant Vederman is sued in his official capacity.

4    38.   Defendant Richard M. Romley is the County Attorney of Maricopa County,

5    Arizona.  As such, Defendant Romley is responsible for the enforcement of SB 1070

6    within Maricopa County.  Defendant Romley is sued in his official capacity.

7    39.   Defendant Matthew J. Smith is the County Attorney of Mohave County,

8    Arizona.  As such, Defendant Matthew Smith is responsible for the enforcement of SB

9    1070 within Mohave County.  Defendant Matthew Smith is sued in his official capacity.

10   40.   Defendant Bradley Carlyon is the County Attorney of Navajo County,

11   Arizona.  As such, Defendant Carlyon is responsible for the enforcement of SB 1070

12   within Navajo County.  Defendant Carlyon is sued in his official capacity.

13   41.   Defendant Barbara LaWall is the County Attorney of Pima County, Arizona.

14   As such, Defendant LaWall is responsible for the enforcement of SB 1070 within Pima

15   County.  Defendant LaWall is sued in her official capacity.

16   42.   Defendant James P. Walsh is the County Attorney of Pinal County, Arizona.

17   As such, Defendant Walsh is responsible for the enforcement of SB 1070 within Pinal

18   County.  Defendant Walsh is sued in his official capacity.

19   43.   Defendant George Silva is the County Attorney of Santa Cruz County,

20   Arizona.  As such, Defendant Silva is responsible for the enforcement of SB 1070 within

21   Santa Cruz County.  Defendant Silva is sued in his official capacity.

22   44.   Defendant Sheila S. Polk is the County Attorney of Yavapai County, Arizona.

23   As such, Defendant Polk is responsible for the enforcement of SB 1070 within Yavapai

24   County.  Defendant Polk is sued in her official capacity.

25

26

45.   Defendant Jon R. Smith is the County Attorney of Yuma County, Arizona.  As such, Defendant Smith is responsible for the enforcement of SB 1070 within Yuma County.  Defendant Jon Smith is sued in his official capacity.

46.   Defendant Sheriff Joseph Dedman, Jr. is the County Sheriff of Apache County, Arizona. According to Arizona law, the "sheriff shall . . . arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense." A.R.S. § 11-441. As such, Defendant Dedman is responsible for the enforcement of SB 1070 within Apache County. Defendant Dedman is sued in his official capacity.

47.   Defendant Sheriff Larry A. Dever is the County Sheriff of Cochise County, Arizona. As such, Defendant Dever is responsible for the enforcement of SB 1070 in Cochise County. Defendant Dever is sued in his official capacity.

48.   Defendant Sheriff Bill Pribil is the County Sheriff of Coconino County, Arizona. As such, Defendant Pribil is responsible for the enforcement of SB 1070 within Coconino County. Defendant Pribil is sued in his official capacity.

49.   Defendant Sheriff John R. Armer is the County Sheriff of Gila County, Arizona. As such, Defendant Armer is responsible for the enforcement of SB 1070 within Gila County. Defendant Armer is sued in his official capacity.

50.   Defendant Sheriff Preston J. Allred is the County Sheriff of Graham County, Arizona. As such, Defendant Allred is responsible for the enforcement of SB 1070 within Graham County. Defendant Allred is sued in his official capacity.

51.   Defendant Sheriff Steven N. Tucker is the County Sheriff of Greenlee County, Arizona. As such, Defendant Tucker is responsible for the enforcement of SB 1070 within Greenlee County. Defendant Tucker is sued in his official capacity.

52.   Defendant Sheriff Donald Lowery is the County Sheriff of La Paz County, Arizona. As such, Defendant Lowery is responsible for the enforcement of SB 1070 within La Paz County. Defendant Lowery is sued in his official capacity.

53.   Defendant Sheriff Joseph Arpaio is the County Sheriff of Maricopa County, Arizona. As such, Defendant Arpaio is responsible for the enforcement of SB 1070 within Maricopa County. Defendant Arpaio is sued in his official capacity.

54.   Defendant Sheriff Tom Sheahan is the County Sheriff of Mohave County, Arizona. As such, Defendant Sheahan is responsible for the enforcement of SB 1070 within Mohave County. Defendant Sheahan is sued in his official capacity.

55.   Defendant Sheriff Kelly Clark is the County Sheriff of Navajo County, Arizona. As such, Defendant Clark is responsible for the enforcement of SB 1070 within Navajo County. Defendant Clark is sued in his official capacity.

56.   Defendant Sheriff Clarence W. Dupnik is the County Sheriff of Pima County, Arizona. As such, Defendant Dupnik is responsible for the enforcement of SB 1070 in Pima County. Defendant Dupnik is sued in his official capacity.

57.   Defendant Sheriff Paul Babeu is the County Sheriff of Pinal County, Arizona. As such, Defendant Babeu is responsible for the enforcement of SB 1070 within Pinal County. Defendant Babeu is sued in his official capacity.

58.   Defendant Sheriff Tony Estrada is the County Sheriff of Santa Cruz County, Arizona. As such, Defendant Estrada is responsible for the enforcement of SB 1070 in Santa Cruz County. Defendant Estrada is sued in his official capacity.

59.   Defendant Sheriff Steve Waugh is the County Sheriff of Yavapai County, Arizona. As such, Defendant Waugh is responsible for the enforcement of SB 1070 within Yavapai County. Defendant Waugh is sued in his official capacity.

60.   Defendant Sheriff Ralph Ogden is the County Sheriff of Yuma County, Arizona. As such, Defendant Ogden is responsible for the enforcement of SB 1070 within Yuma County. Defendant Ogden is sued in his official capacity.

## FACTUAL ALLEGATIONS
### History and Intent of SB 1070

61.   On April 19, 2010, the Arizona Legislature enacted SB 1070, a comprehensive system of state laws whose purpose is to "make attrition through enforcement the public policy of all state and local government agencies in Arizona" and to deter and punish "the unlawful entry and presence of aliens."  SB 1070 creates several new state criminal immigration offenses as well as criminal procedures relating to the investigation, seizure, and detention of persons suspected of federal immigration violations.  The full text of SB 1070 is attached hereto as Exhibit 1 and incorporated by reference.

62.   In enacting SB 1070, Arizona decided to express its dissatisfaction with federal immigration policy by legislating in an area reserved for the federal government.

63.   On April 23, 2010, Governor Janice Brewer signed SB 1070 into law.  In her signing statement, the Governor said that SB 1070 "represents another tool for our state to use as we work to solve a crisis we did not create and the federal government has refused to fix."   Statement by Governor Janice K. Brewer (Apr. 23, 2010), *available at* http://azgovernor.gov/dms/upload/PR_042310_StatementByGovernorOnSB1070.pdf. Governor Brewer also criticized "decades of federal inaction and misguided policy...." *Id.*

64.   On April 30, 2010, Governor Brewer signed into law House Bill 2162 ("HB 2162"), which further amends sections of the A.R.S. created by SB 1070.  The full text of HB 2162 is attached hereto as Exhibit 2 and incorporated by reference.

65.   In her signing statement on HB 2162, the Governor again indicated that SB 1070 is intended to empower the State of Arizona to take the place of the federal

government in regulating immigration, stating that "[t]he federal government's failure requires us to act."  Statement by Governor Janice K. Brewer (Apr. 30, 2010), *available at* http://azgovernor.gov/dms/upload/PR_043010_StatementGovBrewer.pdf.

66.   The sponsors of SB 1070 intended for it to create a statewide regulation of immigration.  SB 1070's author, State Senator Russell Pearce, has touted SB 1070 as a means to achieve the "self-deportation" of undocumented immigrants in the state. *Lawmaker Wants Special Session to Enact AZ Style Immigration Law*, KLAS-TV-CBS NEWS, May 3, 2010, *available at* http://www.8newsnow.com/Global/story.asp? S=12419197.  Another sponsor of SB 1070, State Representative David Gowan, stated that SB 1070 was needed because "[t]he federal government has failed in helping this state seal its borders."  Jeffrey Kaye, *U.S. Congress and Arizona Deliver One-Two Punch to Immigrants*, THE HUFFINGTON POST, Apr. 15, 2010, *available at* http://www. huffingtonpost.com/jeffrey-kaye/us-congress-and-arizona-d_b_538369.html.

67.   The enactment of SB 1070 was surrounded by a racially charged debate over the wisdom of adopting such a law.  In the weeks leading up to passage of the bill, protestors and advocates on both sides of the issue held rallies, issued statements, debated in national media, and bombarded the Governor's office with e-mails and phone calls. Alia Beard Rau and Ginger Rough, *Ariz. Lawmakers Pass Toughest Illegal Immigration Law in U.S.*, ARIZ. REPUBLIC, Apr. 19, 2010, *available at* http://www.azcentral.com/ news/articles/2010/04/19/20100419arizona-immigration-bill-passes.html #ixzz0njXHPCzs.

68.   "We are going to look like Alabama in the '60s," declared State Representative Bill Konopnicki, Republican of Yuma.  Randal Archibold, *Immigration Bill Reflects a Firebrand's Impact*, N.Y. TIMES, Apr. 19, 2010, *available at* http://www.nytimes.com/ 2010/04/20/us/20immig.html.

69.   Arizona State Senator Richard Miranda asserted, "This bill . . . leads to a greater possibility of racial profiling. This is not just if you are Latino or Hispanic — anyone of color may be subject to racial profiling."  Robert Miranda, *Ariz. Law Unfair to Latinos, Hispanics*, DAILY 49ER, May 2, 2010, *available at* http://www.daily49er.com/opinion/ariz-law-unfair-to-latinos-hispanics-1.2256742.

70.   The sponsor of SB 1070, Senator Russell Pearce, has sponsored legislation across a broad range of subjects that are related to issues of race and national origin in Arizona, including a recently-enacted bill intended to ban the Raza Studies program in the Tucson Unified School District.  Mary Jo Pitzl, *Arizona Bill Targets Ban on Ethnic Studies*, ARIZ. REPUBLIC, May 1, 2010, *available at* http://www.azcentral.com/news/articles/2010/05/01/20100501arizona-bill-bans-ethnic-studies.html.  In 2006, Senator Pearce drew fire for racially insensitive remarks and distributing an article from a white separatist group and a link to that group's website.  To his supporters, Mr. Pearce forwarded an email that accused the media of promoting "a world in which every voice proclaims the equality of the races [and] the wickedness of attempting to halt the flood of nonwhite aliens pouring across the borders."  *Ariz. Lawmaker In Hot Water Over Article*, CHARLESTON GAZETTE & DAILY MAIL, Oct. 12, 2006.

71.   Senator Pearce has called for reinstatement of a program of mass deportation of Mexicans and Mexican Americans, declaring:  "We know what we need to do.  In 1953, Dwight D. Eisenhower put together a task force called 'Operation Wetback.'  He removed, in less than a year, 1.3 million illegal aliens.  They must be deported."  Sarah Lynch, *Pearce calls on Operation Wetback for Illegals*, EAST VALLEY TRIBUNE, Sept. 29, 2006.  Mr. Pearce has admitted feeling uncomfortable with the way society is changing in Arizona, and attributed a rise in violent crime to Mexicans' and Central Americans' "way of doing business."  He described the arrival of immigrants in Arizona as an attack by foreigners:  "I will not back off until we solve the problem of this illegal invasion.

1   Invaders, that's what they are. Invaders on the American sovereignty and it can't be

2   tolerated." Ted Robbins, *The Man Behind Arizona's Toughest Immigrant Laws*,

3   NATIONAL PUBLIC RADIO, May 19, 2008, *available at* http://www.npr.org/templates/

4   story/story.php?storyId=88125098.

5       72.   Following signing of the bill by Governor Brewer, the largest newspaper in

6   Tucson lamented that SB 1070 was "a law that portrays the state as a place hostile to any

7   kind of non-white person."  Editorial, *Law Creates Fear, Undermines Public Safety*, Ariz.

8   Daily Star, May 7, 2010, *available at* http://azstarnet.com/news/opinion/editorial/

9   article_59a4769c-cc60-5618-873a-9e083c643e99.html.

10      73.   SB 1070 has caused racial tensions because it is widely understood that it is

11  motivated by and will result in discrimination against Latinos and other racial minorities

12  in Arizona on the basis of their race and national origin.

13

14                      **Key Provisions of SB 1070**

15  ***Requirement to investigate, determine, and punish status***

16      74.   SB 1070's numerous provisions create a comprehensive state-law system of

17  immigration regulation and enforcement that will: (1) require police to investigate and

18  determine who may remain in the United States; (2) erect a state immigration registration

19  and punishment scheme by creating state crimes and criminal penalties relating to alien

20  registration, immigration status, and work authorization; and (3) require police to arrest

21  and detain individuals and transfer them to federal authorities based merely on a belief

22  that they have violated federal civil immigration laws, when state and local officers are

23  not competent to make such a determination or authorized to make it under federal law.

24      75.   SB 1070 requires Arizona police, Arizona jails, and Arizona courts to detect,

25  adjudge, punish, and facilitate the deportation of individuals who, in Arizona's view, are

26  not entitled to remain in the United States.  SB 1070 makes Arizona a legal island within

1  the United States with separate immigration rules that do not apply in the other 49 states

2  and that are contrary to and inconsistent with the federal Immigration and Nationality Act

3  ("INA"), 8 U.S.C. §§ 1101 *et seq.*, and federal implementing regulations and policies, 8

4  C.F.R. §§ 100.1 *et seq.*

5      76.  SB 1070's attempt to create Arizona-specific laws and enforcement

6  mechanisms relating to immigration is an impermissible attempt to regulate immigration.

7      77.  SB 1070's immigration regime also fundamentally conflicts with federal

8  immigration law and legislates in fields occupied by such law.

9      78.  SB 1070 as amended compels police officers to make immigration status

10  determinations and to detain individuals based on a "reasonable suspicion" standard that is

11  unworkable and cannot be applied by state and local officers; that requires impermissible

12  reliance on race, national origin, and language; and that impermissibly burdens and

13  interferes with the rights of lawful permanent resident immigrants and citizens in the State

14  of Arizona.

15      79.  As amended by HB 2162, Section 2 of SB 1070 creates a new section of the

16  A.R.S., § 11-1051, which requires a police officer who has conducted a "lawful stop,

17  detention or arrest . . . in the enforcement of any other law or ordinance of a county, city

18  or town or [the State of Arizona]" to make a "reasonable attempt" to determine the

19  immigration status of the person who has been stopped, detained or arrested, whenever

20  "reasonable suspicion exists that the person is an alien and is unlawfully present."  A.R.S.

21  § 11-1051(B).

22      80.  The new statute, as amended by HB 2162, also requires that "[a]ny person who

23  is arrested shall have the person's immigration status determined before the person is

24  released."  A.R.S. § 11-1051(B).  This section requires the continued detention of an

25  individual even if the sole reason for detention is status verification.

26

81.   Section 2 of SB 1070 also authorizes officers to detain and transport a person who is determined by the officer to be an unauthorized immigrant to a federal facility, including a facility outside the officers' jurisdiction, upon receiving verification from federal authorities that the person is "unlawfully present." A.R.S. § 11-1051(D).  This section does not require an officer to have any other justification under state law to detain the individual.

82.   Section 2 of SB 1070 imposes a standard that is unworkable and preempted by federal law.  The law requires state or local officers to attempt to determine immigration status, which must be determined through a federal administrative system applying complex federal statutes and regulations, and which is based upon historical facts about an individual that are not observable by an officer in the field.

83.   Section 2 imposes an impermissible restriction and burden on speech by chilling the usage of words, accents, gestures, and other expressive speech.

84.   Specifically, Section 2 restricts, suppresses, burdens, and chills speech, expressive conduct, and the right to petition the government—including particularly the courts and law enforcement authorities—because the law exposes speakers to scrutiny, detention, and/or arrest based on the identity of the speakers and the content of their speech, including the speaker's appearance, associations, and the language or accent being used by the speaker, for purposes of determining whether the speaker is "unlawfully present" or has committed a "public offense that makes [him or her] removable."  Both citizens and non-citizens may be chilled from communicating with the courts and law enforcement officials out of fear that they will be detained and/or arrested pursuant to SB 1070.

85.   For example, Plaintiff John Doe #1 is a resident of Phoenix, Arizona, and a legal permanent resident.  His English proficiency is extremely limited and he speaks

English with a noticeable accent.  He fears that he will be targeted pursuant to SB 1070 based on the language in which he expresses himself.

86.   Section 2 impermissibly vests in police officers unbridled discretion to base their "reasonable suspicion" that a "person is an alien and is unlawfully present" on the content of the person's expressive conduct.  Nothing in Section 2 forbids a police officer from developing a "reasonable suspicion" that a person "is an alien" and/or "is unlawfully present" based solely on that person's gestures, language, accent, clothing, English-word selection, failure to communicate in English, and/or other expressive conduct—all of which is pure speech protected by the First Amendment.  Indeed, Section 2 invites a police officer to decide that a person is "an alien" because the person "acts" foreign or fails to "act" American—or to decide that a person is "unlawfully present" because the person "acts" like someone from a country the officer believes to be a source of "unlawfully present" immigrants.

87.   SB 1070 functions as an impermissible prior restraint on speech because a speaker wishing to avoid being stopped, questioned, detained, arrested, jailed, and/or threatened with civil or criminal liability must be prepared to prove that he or she is not "unlawfully present" or cease engaging in protected speech and expressive conduct.

88.   Section 2 permits warrantless seizures of individuals without probable cause that they have committed crimes.

89.   Section 2 authorizes the warrantless search of an individual in any setting, including the individual's home.

90.   Section 2 furthermore permits local and state law enforcement officials to seize and detain individuals, pending determination of their immigration status, without providing for any process to ensure the constitutionality of the detention and seizure.

91.   SB 1070 similarly interferes with the rights of out-of-state citizens to travel freely in Arizona because it subjects them to prolonged stops, arrest, and detention pending a determination of their immigration status.

92.   For example, drivers licensed in the neighboring state of New Mexico, which does not require proof of "legal presence" before issuing driver's licenses, will not be able to prove their authorization to remain in the United States readily if pulled over in Arizona.

### *Arrest, detention, and transfer provisions*

93.   Section 6 of SB 1070 amends Arizona's state law on warrantless arrests, A.R.S. § 13-3883, to allow for the warrantless arrest of a person when an officer has probable cause to believe that the person has committed "any public offense that makes the person removable from the United States."  A.R.S. § 13-3883(A)(5).  This provision requires local law enforcement officers to do what they are not equipped or authorized to do:  make determinations about which "public offenses" make immigrants "removable" from the United States, determine an alleged offender's immigration status, and make warrantless arrests solely for suspected violations of civil immigration laws, without regard to whether the federal government has authorized any such arrest or detention.

94.   Section 6 of SB 1070 permits warrantless arrests by a state or local officer based on a standard that is unworkable and preempted by federal law.  Whether an individual is "removable from the United States" is determined through a federal administrative system and application of complex federal statutes and regulations, and is based upon historical facts about an individual.  This determination cannot be made by a state or local law enforcement officer.

95.   Section 6 provides no explanation or other sufficient guidance for individuals as to the meaning of "public offense that makes the person removable from the United

1   States."  This provision will cause warrantless seizures of individuals without probable

2   cause that they have committed crimes.

3       96.    The broad sweep of Section 6 which allows for warrantless arrests of any

4   person whom a law enforcement officer suspects of having committed a "public offense

5   that makes the person removable from the United States" fails to provide minimal

6   guidelines to govern law enforcement in who they can and cannot arrest.

7       97.    Section 6 authorizes the warrantless arrest of an individual in any setting,

8   including the individual's home.

9       98.    Section 6 furthermore permits local and state law enforcement officials to

10  detain and transport individuals to federal facilities in the state, without providing for any

11  process to ensure the constitutionality of the detention.

12  ***New state criminal provisions relating to immigration status and to work authorization***

13      99.    Section 3 of SB 1070, as amended by HB 2162, enacts a state immigration

14  registration and penalty scheme in an area that Congress has exclusively regulated.  SB

15  1070 conflicts with federal law and enforcement priorities, burdens the enforcement of

16  federal law and is an obstacle to federal immigration enforcement and prosecution

17  policies.  Specifically, SB 1070 creates a new state criminal offense of "willful failure to

18  complete or carry an alien registration document."  A.R.S. § 13-1509.  The primary

19  element of the offense is that the person "is in violation of 8 United States Code section

20  1304(e) or 1306(a)," federal statutes that impose certain requirements that non-citizens

21  register with the federal government and carry registration documents.  Under SB 1070,

22  the first offense is deemed a Class 1 misdemeanor, punishable by a fine of up to $100 and

23  up to 20 days of jail time.  A.R.S. § 13-1509(H).  Subsequent offenses are punishable by

24  up to 30 days of jail time.  *Id.*

25      100. The purpose of the state registration provision is to punish immigrants with

26  incarceration or to compel the initiation of federal immigration removal proceedings

1    without regard to federal determinations and policies.  State Senator Russell Pearce, chief

2    sponsor of SB 1070, has stated that this provision of SB 1070 is intended to give law

3    enforcement officers an additional means by which to "hold an illegal alien under state

4    law if need be or just call ICE and turn them over to ICE."  *See* Message From Sen.

5    Russell Pearce (Mar. 24, 2010), *available at* http://www.maricopagop.org/2010/03/

6    24/legislative-alert-hb-2632-and-sb1070/#more-1962.

7          101. Section 5 of SB 1070 defines new state crimes based on the solicitation and

8    performance of work by individuals who lack federal work authorization.  A.R.S. § 13-

9    2928.  This section makes it a Class 1 misdemeanor for anyone who attempts to hire or

10   pick up day laborers to work at a different location, if the driver is impeding the normal

11   flow of traffic.  A.R.S. § 13-2928(A).  This section also makes it a misdemeanor offense

12   for a worker to get into a car if it is impeding traffic.  A.R.S. § 13-2928(B).  The statute

13   also makes it a state crime for a person who "is unlawfully present in the United States

14   and who is an unauthorized alien to knowingly apply for work, solicit work in a public

15   place or perform work as an employee or independent contractor in this state."  A.R.S. §

16   13-2928(C).

17         102. Section 5 of SB 1070 creates a content-based regulation of protected speech.

18         103. Section 5 prohibits and regulates speech soliciting "*work* in a public place"

19   (emphasis added) through verbal or nonverbal communication by a gesture or nod,

20   making it a crime for certain individuals to do so, while speech of a different content, even

21   if expressed in the same time, place, and manner, is not so proscribed.

22         104. Section 5 prohibits the expression of availability to work in any "public place,"

23   including traditional public fora such as public streets, sidewalks, and parks.

24         105. Section 5 fails to define what constitutes "work," covering such innocuous

25   activity as artists offering to paint portraits in a public park and students conducting a car-

26   wash.  Section 5 contains an impermissibly vague definition of "solicit" as it includes all

verbal communication without qualification and brings within its reach "nonverbal communication by a gesture or nod."  Section 5 also requires that the "communication . . . indicate to a reasonable person that a person is willing to be employed," which is so vague as to be unenforceable, and could criminalize conduct, such as waving to a friend, which is not, in fact, soliciting work.

106. Arizona does not have a compelling or significant governmental interest in regulating speech and expression in the content-based manner employed by SB 1070.  Nor is SB 1070 the least restrictive means to further any such interest.

107. Section 5 also makes it unlawful for a person who is "unlawfully present" in the United States and who is unauthorized to work to solicit work in a public place or to knowingly apply for work regardless of whether any employment or business relationship is entered into.

108. Since the work of day laborers is by definition temporary and informal, day laborers and the contractors who hire them do not find each other through conventional advertising of availability.  Rather, day laborers signal their availability for work by visibly gathering in public areas such as sidewalks or parking lots and gesturing to potential employers.

109. Many persons, including members of Tonatierra's Centro Macehualli, persons who participate in Southside's day laborer program, members of Border Action Network, and Plaintiff Jose Vargas have previously expressed their desire, need, and availability for employment to persons in vehicles on the street, while peacefully standing on a public way, and have obtained lawful employment performing services such as gardening, moving, and light construction.  These individuals and other day laborers wish to continue to engage in such expressive activity on sidewalks and other public areas in Arizona to indicate their need and availability to work.  Indeed, for many, day labor is a critical, and oftentimes the only available means to obtain work.  However, individuals fear doing so

1   in the same manner as they have in the past because A.R.S. §§ 13-2928(C) and (D)

2   subject them to the danger of arrest, fines, and other penalties should they engage in such

3   expression.

4          110. Section 5 of SB 1070 also creates several new state criminal laws prohibiting

5   the transporting, moving, concealing or harboring of unauthorized immigrants.  A.R.S. §§

6   13-2929(A)(1) and (2).  This section also makes it a crime to "encourage or induce an

7   alien to come to or reside in [Arizona]" with knowledge or reckless disregard of the fact

8   that "such coming to, entering or residing in this state is or will be in violation of law."

9   A.R.S. § 13-2929(A)(3).  A person who violates these provisions would be subject to a

10  class 1 misdemeanor and a fine of at least $1,000 with additional penalties where the

11  offense involves ten or more immigrants.  A.R.S. § 13-2929(D).

12         111. In addition, under section 10 of SB 1070, any means of transportation will be

13  impounded if it is deemed to have been used in connection with violations of the

14  harboring statute.  A.R.S. § 13-2929(B).

15         112. The transportation, harboring, and encouragement provisions of SB 1070

16  provide no explanation or other sufficient guidance for individuals as to what actions will

17  be deemed "in furtherance of illegal presence" or "that the immigrant has entered or

18  remained in the United States illegally."

19

20

21

22

23

24

25

26

***Coercion of state and local police***

113. Section 2 of SB 1070, as amended, creates a private right of action for any person to sue a city, town, or county "that adopts or implements a policy that limits or restricts the enforcement of federal immigration laws to less than the full extent permitted by federal law."  This provision requires state and local law enforcement agencies to prioritize immigration over many competing law enforcement activities and thus strips agencies of their discretion to exercise considered judgment about how best to ensure public safety.

## Comprehensive Federal Immigration System

114. The federal government has exclusive power over immigration matters.  The U.S. Constitution grants the federal government the power to "establish a uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3.  In addition, the Supreme Court has held that the Federal government's power to control immigration is inherent in the nation's sovereignty.

115. The U.S. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the INA.  *See* 8 U.S.C. § 1101 *et seq.*  This extensive statutory scheme leaves no room for supplemental state laws.

116. The federal government has also issued numerous regulations, policies, and procedures interpreting the provisions of the INA and has established a large and complex administrative apparatus to carry out its mandates.

117. The INA carefully calibrates the nature (criminal or civil) and degree of penalties applicable to each possible violation of its terms.

118. The INA contains complex and exclusive procedures for determining immigration and citizenship status, deciding whether the civil provisions of the

immigration laws have been violated, and determining whether an individual may lawfully be removed from the United States.

119. Under federal law, there is no single, readily ascertained category or characteristic that establishes whether a particular person may or may not remain in the United States.  The answer to that question is a legal conclusion that can only be reached through the processes set forth in the INA and may depend on the discretionary determinations of federal officials.

120. There are many non-citizens who are present in the United States without formal permission who lack the "registration document" mandated by SB 1070, yet would not be removed if placed in federal removal proceedings.  For example, an individual may be eligible for some form of immigration relief, such as asylum, adjustment of status, or withholding of removal.  Some of these individuals are known to the federal government; others will not be identified until they are actually placed in proceedings by the federal government and their cases are adjudicated.

121. Federal immigration agencies such as ICE or U.S. Customs and Border Protection do not and cannot determine whether a particular person may remain in the United States, or whether a particular person has committed a "public offense" that would make the person "removable," without going through the procedures set forth in the INA. Federal agencies similarly do not and cannot determine definitively, in response to a demand from a state or local official, whether an individual is "unlawfully present" or has "authorization to remain in the United States" as those phrases are used in SB 1070.  The databases searched in response to these queries are not set up to make final determinations of whether an individual has federally authorized immigration status.  These agencies can only determine whether they believe a non-citizen may be *charged* with deportability. Such a prosecutorial decision is not a determination of the individual's "immigration status," which entails a complex administrative process.  The phrase "immigration status"

1   is usually used to refer to a number of categories defined by the INA for classifying

2   individuals, not the ultimate question of whether an individual may remain in the United

3   States.

4          122.  Furthermore, determining whether or not a person is a citizen of the United

5   States can be a complex and counterintuitive process.  U.S. citizens are not required to

6   carry documentary proof of their citizenship.  There is no national database that contains

7   information on every U.S. citizen.  Some people are actually unaware of their U.S.

8   citizenship because they may have acquired U.S. citizenship at birth by operation of law

9   due to their parents' citizenship, despite not being born in the United States.  *See, e.g.*,

10  INA § 322, 8 U.S.C. § 1433.  Others automatically obtained citizenship when their parents

11  became naturalized U.S. citizens.  *See, e.g.*, INA § 320, 8 U.S.C. § 1431.

12         123. SB 1070's creation of a state immigration system fundamentally conflicts with

13  the INA's statutory scheme, impermissibly encroaches on the federal government's

14  exclusive power to regulate immigration, and will lead to erroneous determinations by

15  state and local officials.

16         124. Moreover, SB 1070 conflicts with and is preempted by provisions of the INA

17  that set forth comprehensive federal schemes addressing: (1) alien registration; (2)

18  transportation and harboring; (3) work authorization and sanctions for unauthorized work;

19  and (4) arrest authority for immigration violations.

20  ***Federal registration system***

21         125. The INA includes a national alien registration system that displaces and

22  preempts state alien registration laws.

23         126. The federal alien registration scheme requires certain non-citizens to register

24  with the federal government and to carry proof of this registration with them.  8 U.S.C. §§

25  1302, 1306(a), and 1304(d)-(e).  Specifically, the INA requires every non-citizen in the

26  United States over the age of 14 who has been in the United States for over 30 days to

apply for registration with the federal government.  8 U.S.C. § 1302(a).  Once registered, non-citizens are given a "certificate of alien registration or an alien registration receipt card," the form and issuance of which are to be prescribed in "regulations issued by the Attorney General."  8 U.S.C. § 1304(d).  Non-citizens over the age of 18 who willfully fail to carry these documents face fines or prison time of up to 30 days.  8 U.S.C. § 1304(e).  Non-citizens who willfully fail to register face fines or prison time of up to six months.  8 U.S.C. § 1304(a).

127. The federal registration scheme has been in place since 1940 and was designed to create a single, uniform, national scheme.

128. The preemptive effect of the federal alien registration scheme was expressly recognized by the President of the United States when the scheme was created and has been expressly upheld by the Supreme Court.

129. The federal regulation implementing 8 U.S.C. §§ 1302, 1304, and 1306 prescribes as "evidence of registration" specific forms for compliance.  *See* 8 C.F.R. § 264.1.  The list, however, has not been kept up to date with current federal forms and procedures.  As a result, there are categories of noncitizens who have applied for immigration benefits or whose presence in the United States is otherwise known to federal immigration agencies but who do not have registration documents that are valid under the regulation.

130. Many of the changes that have been made to the INA since the enactment of the registration provisions reflect Congress's decision to focus on and prioritize immigration enforcement against those immigrants who commit serious criminal offenses.  Targeting immigrants convicted of serious crimes, rather than those who may be in violation of the registration provisions, is the principal priority of federal immigration officers.

*Federal transportation provision*

131. The INA also establishes criminal penalties for the transporting and harboring of certain non-citizens.  *See* 8 U.S.C. §§ 1324(a)(1)-(2).  Violations of these provisions carry fines and prison terms ranging from five years to life.  *Id.*

132. The federal courts are engaged in an ongoing process of interpreting the statutory language in 8 U.S.C. § 1324(a) and determining the reach of the federal prohibitions therein.  Arizona law enforcement officers are neither trained nor equipped to have a detailed and current understanding of these interpretations.

133. Arizona courts are not required to interpret the language in SB 1070 regarding transportation and harboring consistently with the federal courts' interpretation of similar language in federal law.

134. SB 1070's transportation and harboring provisions require Arizona's courts, as a prerequisite to finding a violation, to determine whether an alien "has come to, entered, or remains in the United States in violation of the law" or whether an alien's entry "will be in violation of law" as those terms are used in 8 U.S.C. § 1324(a).

*Federal employment authorization and sanctions system*

135. The INA contains a comprehensive scheme to regulate the employment of aliens that reflects a careful balance between multiple objectives, including the desire to reduce unauthorized employment, to protect workers against discrimination, and to impose manageable standards on employers and workers.  The comprehensiveness of that federal scheme has been recognized by the Supreme Court.

136. Congress chose to regulate alien employment in the INA by focusing on employers.  Employers are required to verify the employment authorization of applicants on Form I-9, and employers who knowingly employ unauthorized workers are subject to civil penalties or criminal penalties if the violation is sufficiently severe.  Federal law does

1    not impose fines or criminal penalties on unauthorized workers simply for working

2    without authorization.

3        137. Arizona's decision to criminalize unauthorized employment despite

4    Congress's choice of other means to address such conduct directly conflicts with federal

5    law.

6    ***Federal restrictions on arrest authority***

7        138. State and local police have no general authority to enforce federal immigration

8    law.  Federal law specifically authorizes state officers to assist in immigration

9    enforcement only in narrowly defined circumstances and otherwise reserves immigration

10   enforcement authority to the federal government.

11       139. Section 1357(g) of Title 8 of the U.S. Code allows the federal government to

12   "enter into a written agreement with a State, or any political subdivision" to carry out

13   "function[s] of an immigration officer in relation to the investigation, apprehension, or

14   detention of aliens in the United States."  8 U.S.C. § 1357(g).  These agreements are

15   commonly referred to as "287(g) agreements" after the section of the INA in which they

16   are codified.  However, such agreements may be entered into only if the federal

17   government determines the state officers are "qualified to perform a function of an

18   immigration officer," *id.*, and the federal government must train and supervise officers

19   who are authorized under such an agreement.  Nine agencies in Arizona have current

20   agreements pursuant to this statutory provision.

21       140. SB 1070 explicitly grants state and local law enforcement officers authority to

22   make immigration determinations, arrests, and investigations without and outside of the

23   authority provided by a 287(g) agreement, even with respect to those agencies in Arizona

24   that have a 287(g) agreement.

25       141. The other provisions in federal law authorizing state or local immigration

26   enforcement are also carefully constrained.  State and local police are authorized to make

1    arrests for certain immigration crimes—smuggling, transporting, or harboring *criminal*

2    *aliens*, and illegal entry by a previously deported felon.  8 U.S.C. §§ 1103(a)(10), 1252c.

3    Another provision, 8 U.S.C. § 1103(a)(10), allows the Attorney General to authorize "any

4    State or local law enforcement officer" to enforce immigration laws upon certification of

5    "an actual or imminent mass influx of aliens," but no such certification has occurred.

6         142. Congress's intent that state and local officers are generally prohibited from

7    enforcing immigration laws is clear both from the statutory scheme and from the

8    statements of its members.

9         143. Even as to federal immigration officers, the INA and associated regulations

10   contain significant restrictions on the circumstances in which warrantless arrests may be

11   made and the procedures that are required following such arrests.  8 U.S.C. §§ 1357(a),

12   (d); 8 C.F.R. §§ 287.1-287.3, 287.5, 287.8, 287.10.

13

14                       **SB 1070 Interferes with Federal Interests**

15        144. Federal officials at the very highest levels oppose SB 1070 as interfering with

16   federal governmental interests.

17        145. Janet Napolitano, the immediate past governor of Arizona and current U.S.

18   Secretary of Homeland Security, said, "The Arizona immigration law will likely hinder

19   federal law enforcement from carrying out its priorities of detaining and removing

20   dangerous criminal aliens."  *Divisive Ariz. Immigration Bill Signed Into Law*, CBS/AP,

21   Apr. 23, 2010, *available at* http://www.cbsnews.com/stories/2010/04/23/politics/

22   main6426125.shtml.

23        146. SB 1070 also has created serious foreign relations issues for the U.S.

24   government.  U.S. Secretary of State Hillary Clinton noted that the government of Mexico

25   issued a travel advisory for its citizens traveling in Arizona and that SB 1070 had the

26   potential to upset U.S.-Mexico diplomatic efforts on drug enforcement in the border

region.  Alicia Mundy, *Hillary Clinton Migrates into Arizona Law Controversy*, WALL STREET J. (online edition), May 2, 2010, *available at* http://blogs.wsj.com/washwire/2010/05/02/hillary-clinton-migrates-into-arizona-law-controversy/.   Mexican President Felipe Calderón stated that SB 1070 will "seriously affect[ ]" trade and political ties with Arizona. *FCH Condemns Anti-Immigrant Law*, THE NEWS, Apr. 27, 2010, *available at* http://thenews.com.mx/articulo/fch-condemns-anti-immigrant-law-10427.  The Foreign Secretary of Mexico, Patricia Espinosa, also said that SB 1070 will affect U.S.-Mexico relations and "obligates the Mexican government to reconsider the viability and usefulness of cooperation agreements that have been developed with Arizona."  Erin Kelly, *Arizona Immigration Law Revives Calls for Federal Action on Reform*, ARIZ. REPUBLIC, Apr. 24, 2010, *available at* http://www.azcentral.com/arizonarepublic/news/articles/2010/04/24/20100424arizona-immigration-bill-federal-action.html.

147. Like Mexico, the government of El Salvador has issued a travel advisory for its nationals traveling to Arizona.  *See* Jonathan Cooper & Paul Davenport, *Lawsuits Target New Arizona Immigration Law*, ASSOCIATED PRESS, Apr. 29, 2010, *available at* http://www.msnbc.msn.com/id/36853483/ns/us_news-crime_and_courts/.

148. Guatemala's Foreign Relations Department decried SB 1070 in a statement saying "it threatens basic notions of justice."  *See Civil Rights Groups Fight Ariz. Immigration Law*, ASSOCIATED PRESS, Apr. 24, 2010, *available at* http://www.msnbc.msn.com/id/36735281.

**SB 1070 Promotes Racial Profiling and Endangers Minority Communities**

149. Janet Napolitano stated that SB 1070 "is a very difficult bill to enforce in a racially neutral way."  Eric Zimmerman, *Justice Dept. May Challenge Arizona Law*, THE HILL, Apr. 27, 2010, *available at* http://thehill.com/blogs/blog-briefing-room/news/94631-justice-dept-may-challenge-to-ariz-law-in-court.  According to Napolitano, "I think it does and can invite racial profiling."  Jake Tapper, *Napolitano:*

*Arizona Law "Bad for Law Enforcement"*, ABC NEWS: POLITICAL PUNCH, May 2, 2010, *available at* http://blogs.abcnews.com/politicalpunch/2010/05/napolitano-arizona-law-bad-for-law-enforcement.html.

150. Attorney General Eric Holder further criticized SB 1070, saying, "I think we could potentially get on a slippery slope where people will be picked on because of how they look as opposed to what they have done, and that is, I think, something that we have to try to avoid at all costs." *Holder: Feds May Sue Over Arizona Immigration Law*, CNN, May 9, 2010, *available at* http://www.cnn.com/2010/POLITICS/05/09/holder.arizona. immigration/index.html.  Attorney General Holder also stated that implementation of SB 1070 will lead to "a situation where people are racially profiled, and that could lead to a wedge drawn between certain communities and law enforcement, which leads to the problem of people in those communities not willing to interact with people in law enforcement, not willing to share information, not willing to be witnesses where law enforcement needs them."  *Id.*

151. Many prominent law enforcement and elected officials in Arizona have condemned SB 1070 on the grounds that it will lead to rampant racial profiling, divert resources from law enforcement work, keep immigrants and other people of color from reporting crimes to police, and ultimately diminish community safety.

152. Former Governor Napolitano said, "With the strong support of state and local law enforcement, I vetoed several similar pieces of legislation as governor of Arizona because they would have diverted critical law enforcement resources from the most serious threats to public safety and undermined the vital trust between local jurisdictions and the communities they serve." *Divisive Ariz. Immigration Bill Signed Into Law*, CBS/AP, Apr. 23, 2010, *available at* http://www.cbsnews.com/stories/2010/04/23/ politics/main6426125.shtml.

153. The Arizona Association of Chiefs of Police opposed SB 1070, stating that SB 1070 "will negatively affect the ability of law enforcement agencies across the state to fulfill their many responsibilities in a timely manner." *See* Press Release, Arizona Association of Chiefs of Police, AACOP Statement on Senate Bill 1070, *available at* http://www.leei.us/main/media/AACOP_STATEMENT_ON_SENATE_bILL_1070.pdf.

154. Pima County Sheriff Clarence Dupnik has warned that the law will lead to racial profiling. He stated, "[i]f I tell my people to go out and look for A, B, and C, they're going to do it. They'll find some flimsy excuse like a tail light that's not working as a basis for a stop, which is a bunch of baloney." *See The Dupnik Rebellion: Pima's Top Cop Says 'No' to SB 1070*, KGUN-ABC NEWS, Apr. 27, 2010, *available at* http://www.kgun9.com/Global/story.asp?S=12386648.

155. Chief John Harris of the Sahuarita Police Department, who is the current president of the Arizona Association of Chiefs of Police, cautioned that "victims may not report crimes to his officers" as a result of SB 1070. *See* Dan Whitcomb, *Arizona Police Chief Criticizes Immigration Law*, REUTERS, Apr. 30, 2010, *available at* http://www.reuters.com/article/idUSTRE63T5G220100430; *see also* Nathan Thornburg, *Arizona Police Split on Immigration Crackdown*, TIME.COM, Apr. 30, 2010, *available at* http://www.time.com/time/nation/article/0,8599,1986080,00.html

156. Phil Gordon, the Mayor of Phoenix, stated that SB 1070 "unconstitutionally co-opts our police force to enforce immigration laws that are the rightful jurisdiction of the federal government." Phil Gordon, *Not in My State: Anti-Immigration Law Doesn't Reflect the Beliefs of Arizona's People*, WASH. POST, Apr. 24, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/04/23/ AR2010042304469.html.

157. The policies and practices of the Maricopa County Sheriff's Office ("MCSO") demonstrate that SB 1070 cannot be enforced without improperly singling out racial and

1    ethnic minorities, including many U.S. citizens and persons authorized by the federal

2    government to be present in the U.S., for stops, interrogations, arrests, and detentions.

3          158. Maricopa County Sheriff Arpaio has publicly stated that his own agency has

4    been doing what he believes SB 1070 mandates.  MSNBC NEWS, April 26, 2010,

5    available at http://www.youtube.com/watch?v=UHfOBUDzoPo.  Three years ago, Sheriff

6    Arpaio announced that MCSO was becoming "a full fledged anti-illegal immigration

7    agency."  Judi Villa and Yvonne Wingett, *Sheriff Unveils Migrant Hotline*, ARIZ.

8    REPUBLIC, Jul. 21, 2007, *available at* http://www.azcentral.com/arizonarepublic/

9    local/articles/0721hotline0721.html.

10         159. According to MCSO training materials, the fact that an individual has no

11   English skills or speaks English poorly is a factor indicating that an individual is not

12   "lawfully present" in the United States.  Alia Beard Rau and Mary Jo Pitzl, *Momentum*

13   *Built Over Years Led to Immigration Law,* ARIZ. REPUBLIC, May 9, 2010, *available at*

14   http://www.azcentral.com/arizonarepublic/news/articles/2010/05/09/20100509immigratio

15   n-law-momentum.html (training video on right hand panel); *see also* J.J. Hensley, *New*

16   *Law Could Encourage Immigration Sweeps*, ARIZ. REPUBLIC, May 1, 2010, *available at*

17   http://www.azcentral.com/arizonarepublic/local/articles/2010/05/01/20100501phoenix-

18   joe-arpaio-crime-sweep.html (describing training video).

19         160. As part of its focus on immigration enforcement, MCSO has systematically

20   used pretextual stops to investigate immigration, targeting Latinos.  Since 2007, the

21   agency has instituted a policy of identifying day laborers and persons appearing to be

22   Latino whom deputies should investigate for potential immigration violations, and then

23   developing probable cause for a traffic violation to stop them.

24         161. A comprehensive investigation by the Arizona Republic found that during

25   eight MCSO so-called "crime suppression operations" studied, MCSO deputies engaged

26   in selective enforcement of the traffic law, and that the majority of drivers and passengers

1 arrested were Latino even in predominantly White areas.  Daniel Gonzalez, *Sheriff's*

2 *Office Says Race Plays No Role in Who Gets Pulled Over*, ARIZ. REPUBLIC, Oct. 5, 2008,

3 *available at* http://www.azcentral.com/news/articles/2008/10/05/20081005arpaio-

4 profiling1005.html.

5      162. As a result of evidence of a pattern and practice of civil rights violations,

6 MCSO is currently the subject of a civil rights investigation by the U.S. Department of

7 Justice.

8      163. Demonstrating that the intent of SB 1070, as amended by HB 2162, is to

9 enable pretextual stops and arrests for the purpose of immigration enforcement, State

10 Senator Russell Pearce inadvertently circulated an email on April 28, 2010 which

11 explained one provision of HB 2162 as follows:  "When we drop out 'lawful contact' and

12 replace it with 'a stop, detention, or rest [*sic*], in the enforcement a violation of any title or

13 section of the Arizona code' we need to add 'or any county or municipal ordinance.' This

14 will allow police to use violations of property codes (i.e. cars on blocks in the yard) or

15 rental codes (too many occupants of a rental accommodation) to initiate queries as well."

16 Gabriel Winant, *E-Mail Reveals Arizona Law Was Designed To Maximize Harassment*,

17 SALON, May 3, 2010, *available at* http://www.salon.com/news/politics/war_room/

18 2010/05/03/arizona_kobach_profiling.  SB 1070 was intended to create opportunities for

19 officers to determine which members of the community should be investigated as to their

20 immigration status first, and then to develop a pretextual reason to stop them for some

21 other violation of state or local law second.

22

23                     **CLASS ACTION ALLEGATIONS**

24      164. The Individual Plaintiffs bring this action on behalf of themselves and all other

25 persons similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).

26 The class, as proposed by Plaintiffs, consists of all persons:

(a) who as a result of their race or national origin are or will be subject to stop, detention, arrest or questioning about their immigration or nationality status or required to produce documentation of that status, pursuant to a provision of SB 1070; or

(b) who are or will be deterred from soliciting employment in a public place or performing work as an employee or independent contractor by § 5 of SB 1070; or

(c) who are or will be deterred from using their customary language, accent, or other expressive conduct, or from approaching government officials to obtain redress because of the provisions of SB 1070; or

(d) who are or will be deterred from living, associating, worshiping, or traveling with immigrants in Arizona because of the provisions of SB 1070; or

(e) who are or will be deterred from traveling into or through the State of Arizona because of the provisions of SB 1070.

165. The requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(2) are met in that the class is so numerous that joinder of all members is impracticable.

166. There are questions of law and fact common to the proposed class, including: (1) whether SB 1070 is preempted by the U.S. Constitution and federal law; (2) whether SB 1070 deprives racial and national origin minorities of the equal protection of the laws within the meaning of the Fourteenth Amendment of the U.S. Constitution; (3) whether SB 1070 violates the First Amendment of the U.S. Constitution; (4) whether SB 1070 violates the Fourth Amendment of the U.S. Constitution and Article 2, Section 8 of the Arizona Constitution; (5) whether SB 1070 is impermissibly vague and violates due process of law; and (6) whether SB 1070 infringes on the right to travel of members of the proposed class.  These questions predominate over any questions affecting only the Individual Plaintiffs.

1    167. The claims of the Individual Plaintiffs are typical of the claims of the proposed

2    class.

3    168. All of the Individual Plaintiffs will fairly and adequately represent the interests

4    of all members of the proposed class because they seek relief on behalf of the class as a

5    whole and have no interests antagonistic to other members of the class.  The Individual

6    Plaintiffs are also represented by *pro bono* counsel, including the ACLU of Arizona, the

7    ACLU Foundation Immigrants' Rights Project, the Mexican American Legal Defense and

8    Educational Fund, the National Immigration Law Center, the Asian Pacific American

9    Legal Center (a member of the Asian American Center for Advancing Justice), the

10   National Day Laborer Organizing Network, the National Association for the

11   Advancement of Colored People, and Munger, Tolles & Olson LLP, who have extensive

12   expertise in class action litigation, including litigation regarding the rights of immigrants.

13   Finally, Defendants have acted and will act on grounds generally applicable to the class in

14   executing their duties to enforce SB 1070, thereby making appropriate final injunctive

15   relief with respect to the class as a whole.

16

17                **DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS**

18   169. An actual and substantial controversy exists between Plaintiffs and Defendants

19   as to their respective legal rights and duties.  Plaintiffs contend that they face an imminent

20   threat of harm if SB 1070 is enforced, and that SB 1070 violates the U.S. Constitution,

21   federal law, and state law.  Defendants are obligated to enforce SB 1070 unless it is found

22   to be illegal.

23   170. In violating Plaintiffs' rights under the U.S. Constitution, federal law, and state

24   law, Defendants have acted and will be acting under color of law.

25   171. If allowed to go into effect, SB 1070 will cause irreparable injury to Plaintiffs.

26

172. Plaintiffs have no plain, speedy, and adequate remedy at law against SB 1070 other than the relief requested in this Complaint.

173. Article IV, part 1, § 1(3) of the Arizona Constitution provides that "no act passed by the legislature shall be operative for ninety days after the close of the session of the legislature enacting such measure," except certain specifically designated "emergency measures." The legislative session during which SB 1070 and HB 2162 were enacted ended on April 29, 2010. Accordingly, the effective date of SB 1070 is July 28, 2010.

174. If SB 1070 goes into effect and is not enjoined, Plaintiffs will suffer irreparable harm as alleged above.

175. SB 1070 will require persons in the state to carry immigration registration documents under state law to avoid detention, arrest, and possible prosecution. In addition, SB 1070 will cause the investigation, detention, harassment, and arrest of numerous persons of color in Arizona, including members of Plaintiffs UFCW, BAN, Tonatierra, SEIU, SEIU Arizona, MAS, and JACL, as well as Individual Plaintiffs Andrew Anderson, Vicki Gaubeca, C.M., Luz Santiago, Jim Shee, Jose Vargas, Jesús Cuauhtémoc Villa, John Doe #1, Jane Does #1-2, and members of the plaintiff class.

176. In addition, SB 1070 will thwart the mission of and subject to criminal prosecution numerous service and business organizations, including Plaintiffs Friendly House, ASASF, AZHCC, Valle del Sol, and Derechos Humanos.

177. In doing the things alleged in this Complaint, defendants will deny plaintiffs' rights secured by the U.S. Constitution, federal law, and state law.

178. Defendants' implementation of SB 1070 will constitute an official policy of their respective jurisdictions.

179. Plaintiffs are entitled to a declaration that SB 1070 is unconstitutional on its face and to an order preliminarily and permanently enjoining its enforcement.

# CAUSES OF ACTION

## COUNT ONE

### SUPREMACY CLAUSE; 42 U.S.C. § 1983

180. The foregoing allegations are repeated and incorporated as though fully set forth herein.

181. The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding.

182. The Supremacy Clause mandates that federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

183. SB 1070 is void in its entirety because it attempts to bypass federal immigration law and to supplant it with a state policy of "attrition through enforcement," in violation of the prohibition on state regulation of immigration.

184. SB 1070 conflicts with federal laws and policies, usurps powers constitutionally vested in the federal government exclusively, attempts to legislate in fields occupied by the federal government, imposes burdens and penalties on legal residents not authorized by and contrary to federal law, and unilaterally imposes burdens on the federal government's resources and processes, each in violation of the Supremacy Clause.

## COUNT TWO

## EQUAL PROTECTION; 42 U.S.C. § 1983

185. The foregoing allegations are repeated and incorporated as though fully set forth herein.

186. The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

187. SB 1070 was enacted with the purpose and intent to discriminate against racial and national origin minorities, including Latinos, on the basis of race and national origin.

188. SB 1070 impermissibly and invidiously targets Plaintiffs who are racial and national origin minorities, including Latinos, residing or traveling in Arizona and subjects them to stops, detentions, questioning, and arrests because of their race and/or national origin.

189. SB 1070 impermissibly deprives Plaintiffs who are racial and national origin minorities, including Latinos, residing or traveling in Arizona of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

190. Section 3 of SB 1070 impermissibly discriminates against non-citizen Plaintiffs on the basis of alienage and deprives them of the equal protection of the laws within the meaning of the Fourteenth Amendment to the U.S. Constitution.

## COUNT THREE

## FIRST AMENDMENT; 42 U.S.C. § 1983

191. The foregoing allegations are repeated and incorporated as though fully set forth herein.

192. The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably

1   to assemble, and to petition the Government for a redress of grievances."  The First

2   Amendment's guarantees are applied to the States through the Fourteenth Amendment.

3       193. Both Section 2 and Section 5 of SB 1070 are unconstitutional restrictions of

4   rights guaranteed by the First Amendment.

5

6   **COUNT FOUR**

7   **FOURTH AMENDMENT; 42 U.S.C. § 1983**

8       194. The foregoing allegations are repeated and incorporated as though fully set

9   forth herein.

10      195. The Fourth Amendment to the U.S. Constitution prohibits "unreasonable

11  searches and seizures."  The Fourth Amendment's guarantees are applied to the States

12  through the Fourteenth Amendment.

13      196. Section 2 of SB 1070, as amended by Section 3 of HB 2162, requires that

14  officers conduct unreasonable seizures of individuals in violation of the Fourth

15  Amendment.

16      197. Sections 2 and 6 of SB 1070 provide for warrantless seizures of individuals in

17  the absence of probable cause that they have committed crimes, in violation of the Fourth

18  Amendment.

19      198. Section 2 of SB 1070 authorizes officers to detain individuals without lawful

20  authority and transport individuals into federal custody, in violation of the Fourth

21  Amendment.

22

23  **COUNT FIVE**

24  **VIOLATION OF ARTICLE II, § 8 OF THE ARIZONA CONSTITUTION**

25      199. The foregoing allegations are repeated and incorporated as though fully set

26  forth herein.

1    200. Article 2, Section 8 of the Arizona Constitution provides: "No person shall be

2    disturbed in private affairs...without authority of law."

3    201. SB 1070 violates the Arizona Constitution's guarantee by requiring that

4    officers conduct investigatory stops without reasonable suspicion of criminal activity.

5    202. In addition, SB 1070 provides for warrantless seizures of individuals in the

6    absence of probable cause that they have committed crimes.

7    203. Moreover, SB 1070 extends this broad, warrantless arrest authority to the

8    context of an individual's home.

9

10                                    **COUNT SIX**

11                          **DUE PROCESS; 42 U.S.C. § 1983**

12    204. The foregoing allegations are repeated and incorporated as though fully set

13    forth herein.

14    205. The Fourteenth Amendment to the U.S. Constitution provides: "No State shall

15    . . . deprive any person of life, liberty, or property, without due process of law . . . ."

16    206. Section 2 of SB 1070 permits state and local law enforcement officials to seize,

17    detain, and transfer individuals without appropriate procedures, thereby depriving

18    Plaintiffs of their liberty without due process of law.  Furthermore, the terms "reasonable

19    suspicion," "reasonable attempt," "unlawful presence" and "determine the immigration

20    status" are vague and fail to provide meaningful guidance to law enforcement officers

21    implementing this provision.  This creates an unacceptable risk of arbitrary and

22    discriminatory enforcement.

23    207. Section 6 of SB 1070 is vague and violates due process.  The terms "public

24    offense" and "removable" do not provide meaningful standards and vest officers with

25    unbridled discretion to make arbitrary and discriminatory arrests.

26

208. SB 1070's provision that makes it unlawful for any person who is "in violation of a criminal offense" to transport, move, conceal or harbor an immigrant, shield an immigrant from detection, or attempt to do any of the same, is vague and violates due process. The terms "in furtherance of illegal presence" and "that the immigrant has entered or remained in the United States illegally" are vague and ambiguous and fail to provide sufficient notice of what is prohibited in order to allow individuals to conform their conduct to the requirements of the law and prevent arbitrary and discriminatory enforcement.

**COUNT SEVEN**

**PRIVILEGES AND IMMUNITIES; RIGHT TO TRAVEL; 42 U.S.C. § 1983**

209. The foregoing allegations are repeated and incorporated as though fully set forth herein.

210. The Privileges and Immunities Clause of the U.S. Constitution, art. IV, § 2, cl. 1, provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

211. The Fourteenth Amendment to the U.S. Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

212. Both provisions prevent states from infringing upon the right to travel, including the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in another state, without a rational or compelling justification.

213. Section 2 of SB 1070 subjects those U.S. citizens who appear to a law enforcement officer to possibly be "unlawfully present in the United States" to investigation and detention pending a determination of immigration status if they do not present an identification document deemed acceptable by the State of Arizona.

214. SB 1070 thus interferes with the rights of such out-of-state citizens to travel freely through the State of Arizona without being stopped, interrogated, and detained.

## COUNT EIGHT
### SECTION 1981; 42 U.S.C. § 1983

215. The foregoing allegations are repeated and incorporated as though fully set forth herein.

216. Section 1981 of Title 42 of the United States Code guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property." Section 1981 also provides that all persons "shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

217. Section 1981 prohibits discrimination under color of state law on the basis of alienage, national origin, and race.

218. SB 1070 impermissibly discriminates against persons within the State of Arizona on the basis of alienage and national origin and race.

## **PRAYER FOR RELIEF**

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

    a.    Assume jurisdiction over this matter;

    b.    Declare that SB 1070 is unconstitutional in its entirety;

    c.    Enjoin Defendants from enforcing SB 1070;

    d.    Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other expenses pursuant to 28 U.S.C. § 1988; and

1    e.    Grant such other relief as the Court may deem appropriate.

2

3    Dated this 17th day of May, 2010

4                                        By:    /s/ Anne Lai

5                                               Anne Lai
                                                ACLU FOUNDATION OF ARIZONA
6                                               77 E. Columbus Street, Suite 205
                                                Phoenix, Arizona  85012
7
                                                *On behalf of Attorneys for Plaintiffs*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26