1  ALBERT M. FLORES

2  ALBERT M. FLORES LAW OFFICE

3  337 N 4th Ave
   Phoenix, AZ 85003
   Telephone: (602) 271-0070
4  *amflegal@aol.com*
   Attorney No. 005653

5

6  HENRY L. SOLANO*
   CARLA GORNIAK*

7  CHRISTOPHER R. CLARK*
   DEWEY & LEBOEUF LLP

8  1301 Avenue of the Americas
   New York, NY 10019
9  Telephone: (212) 259-8000
   Facsimile: (212) 632-0162
10 *hsolano@DL.com*
   *cgorniak@DL.com*
11 *crclark@DL.com*

12 *Counsel for Amicus Curiae*

13 *Application for admission *pro hac vice* forthcoming.

14

15                UNITED STATES DISTRICT COURT

16                    DISTRICT OF ARIZONA

17

18 Friendly House, *et al.*,

19          Plaintiffs,                 CASE NO. CV-10-01061-MEA

20     v.
                                        **LODGED: Proposed Brief Of
21                                      The United Mexican States As
   Michael B. Whiting, *et al.*,        *Amicus Curiae* In Support Of
22                                      Plaintiffs Attached**
          Defendants.
23

24

25                            - i -

ALBERT M. FLORES
ALBERT M. FLORES LAW OFFICE
337 N 4th Ave
Phoenix, AZ 85003
Telephone: (602) 271-0070
*amflegal@aol.com*
Attorney No. 005653

HENRY L. SOLANO*
CARLA GORNIAK*
CHRISTOPHER R. CLARK*
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 259-8000
Facsimile: (212) 632-0162
*hsolano@DL.com*
*cgorniak@DL.com*
*crclark@DL.com*

*Counsel for Amicus Curiae*

*Application for admission *pro hac vice* forthcoming.

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Friendly House, *et al.*, | CASE NO. CV-10-01061-MEA |
| Plaintiffs, | |
| v. | **BRIEF OF THE UNITED MEXICAN STATES AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS** |
| Michael B. Whiting, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    SB 1070 Impedes International Relations; There Needs to Be One Cohesive, Consistent and Controlling United States Voice . . . . . . . . . . . . . . 3

        A.  SB 1070 Will Severely Hinder Trade and Tourism Between Mexico and Arizona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.  SB 1070 Derails Efforts Towards Comprehensive Immigration Reform . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.  SB 1070 Obstructs International Collaboration to Combat Drug-Trafficking Organizations and Drug-Related Violence . . . . . . . . . . . . . . . 8

    II.   Mexico's Has a Legitimate Interest Protecting Its Citizens' Rights Under the U.S. Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.  SB 1070's Results in Racial Profiling Reminiscent of African-American Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.  SB 1070's Harmful Effects Lead to Dangerous Harms Spanning From Physical Violence to Promotion of Negative, Ill-Conceived Stereotypes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

APPENDIX A: INDEX OF CITED AUTHORITIES

APPENDIX B: CERTIFICATE OF SERVICE

- ii -

1

### INTEREST OF THE *AMICUS CURIAE*

2

3    The United Mexican States ("Mexico") respectfully submits this *amicus curiae*

4    brief to express its grave concerns over Arizona Senate Bill 1070, 49th Leg., 2nd Reg.

5    Sess., Ch. 113 (Az. 2010), as amended ("SB 1070"), and to underscore the importance of

6    declaring SB 1070 unconstitutional in its entirety.

7    Mexico seeks to ensure that its bilateral diplomatic relations with the United States

8    of America ("U.S." or "United States") are transparent, consistent and reliable, and not

9    frustrated by individual U.S. states' actions, in particular the Arizona Defendants herein.

10   SB 1070 substantially impacts Mexico, its officials and citizens, by inappropriately

11   burdening the uniform and predictable sovereign-to-sovereign relations, opening the door

12   to divergent requirements among the different states, and with respect to the national

13   government.

14   Under Article 5(a) of the Vienna Convention on Consular Relations, to which both

15   countries are signatories, Mexico has a right to protect the interests of its nationals within

16   the limits of international law.[2] Mexico seeks to assure that its citizens, present in the

17   United States, are accorded the human and civil rights granted under the U.S.

18   Constitution; having therefore a substantial and compelling interest in protecting its

19   citizens and ensuring that their ethnicity is not used as basis for state-sanctioned acts of

20   discrimination, including the inequitable application of civil and criminal laws and state's

21   law enforcement powers. SB 1070 creates an imminent threat of state-sanctioned bias or

22

23

24   _____

25   [2] Vienna Convention on Consular Relations art. 5, Apr. 24, 1963, 596 U.N.T.S. 261.

- 1 -

1   discrimination, resulting not only in individual injury, but also in broader social and

2   economic harms to its citizens, undermining Mexico–U.S. relations.

3        The enactment of SB 1070 has been closely followed at the highest levels of the

4   Mexican government and throughout Mexican society. The issues raised herein are of

5   great importance to the people of Mexico, including the almost twenty million Mexican

6   workers, tourists and students lawfully admitted to the United States throughout 2009,

7   those already present or who will similarly be admitted to the U.S in the future, and the

8   countless millions affected by international trade, immigration policies and drug violence.

9        The government of Mexico respectfully submits that SB 1070 adversely impacts

10   the bilateral relations between Mexico and the United States, as well as law abiding

11   Mexican citizens and other people of Latin-American descent present in Arizona as

12   argued by Plaintiffs.

13

14                              **SUMMARY OF ARGUMENT**

15        Through the enactment of SB 1070, Arizona has taken action that decisively

16   departs from the collective immigration policy of the United States for the purpose of

17   imposing Arizona's own independent and conflicting set of requirements. Such action

18   directly and indirectly interferes with the bilateral economic, immigration and security

19   policies of Mexico and the U.S. federal government. Thus, SB 1070 raises substantial

20   challenges to the bilateral diplomatic relations between Mexico and the U.S.

21        In addition, Mexico is gravely concerned that SB 1070 will lead to disparate

22   treatment among Mexican nationals in the U.S., as well as disparate treatment as

23   compared to U.S. citizens. This disparate treatment will be in the form of racial profiling

24

25                                         - 2 -

and detentions of Mexican citizens without regard to whether they have taken any actions or exhibited any behavior indicating they are guilty of a crime or "unlawfully present" in the U.S.

## ARGUMENT

### I. SB 1070 Impedes International Relations; There Needs to Be One Cohesive, Consistent and Controlling United States Voice

"The Federal Government, representing as it does the collective interests of the [fifty] states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties."[3] Through SB 1070, Arizona imposes its own independent and conflicting requirements. Arizona does this despite specific provisions of federal immigration law that permit Arizona to assist with the enforcement of immigration law after receiving federal approval and appropriate training to ensure constitutionality.[4] Arizona's unilateral action burdens Mexico enormously by forcing its officials and citizens to respond to divergent requirements imposed by the different divisions of the U.S. government. In order to conduct effective diplomatic relations with the U.S., countries such as Mexico need and depend on transparent, consistent and reliable bilateral negotiations. *Amicus* cannot effectively collaborate with the United States on a sovereign basis to address inherently international matters such as immigration, trade and security, if U.S. political subdivisions establish their own requirements that conflict not only with each other but also with the efforts, priorities and commitments of the U.S. federal government.

---

[3] *Hines v. Davidowitz,* 312 U.S. 52, 63 (1941); *see also* Meissner Decl. ¶¶ 13-14 (asserting that States' interventions frustrate the federal government's ability to achieve its objectives).
[4] *See* 8 U.S.C. § 1357(g) (2006).

SB 1070 adversely impacts U.S. relations with foreign countries, directly interfering with the U.S. Department of State's ability to conduct foreign affairs and policy.[5] As conveyed by U.S. Secretary of State Hillary Clinton, although SB 1070 is not yet in effect, it is already straining U.S.–Mexico relations.[6] Mexico's ambassador to the U.S. Arturo Sarukhan explains that SB 1070 "threatens to poison the well from which our two nations have found and should continue to find inspiration for a joint future of prosperity, security, tolerance and justice."[7]

### A. SB 1070 Will Severely Hinder Trade and Tourism Between Mexico and Arizona

One area of great concern to Mexico relates to the repercussions of SB 1070 on trade and commercial relations with the United States. Growth in U.S. trade with Latin America has historically outpaced that of all other regions.[8] Mexico is the third largest trading partner of the United States and the second purchaser of U.S. exports.[9] The interaction of labor markets, tourism, business travel, and student migration between the

---

[5] Meissner Decl. ¶¶ 32–33.

[6] *See Meet the Press with Secretary Clinton* [Transcript] (May 2, 2010), *available at* http://secretaryclinton.wordpress.com/2010/ 05/02/meet-the-press/.

[7] Instituto Cultural Mexicano, *Entrega de los premios Ohtli*, at 3 (May 4, 2010), www.ime.gob.mx/documentos/Entrega_Ohtlis.doc; CNN, *U.S., Mexican Presidents Say Key Issues Must be Tackled Together* (May 20, 2010), http://www.cnn.com/2010/US/05/19/ mexico.president.visit/index.html. *See also* Lowenthal Decl. ¶ 10.

[8] J. F. Hornbeck, *U.S.-Latin America Trade: Recent Trends and Policy Issues*, Congressional Research Service, at 1 (Sept. 3, 2009), *available at* http://www.fas.org/sgp/crs/row/98-840.pdf.

[9] M. Angeles Villarreal, *U.S.-Mexico Economic Relations: Trends, Issues, and Implications*, Congressional Research Service, at 1 (Mar. 31, 2010), *available at* http://www.fas.org/sgp/crs/row/ RL32934.pdf.

- 4 -

countries is widespread and of great importance to both economies.[10] A University of

California study estimates that immigration into the United States over the 1990–2006

period increased U.S. economic efficiency, resulting in a 2.86% real wage increase for

the average U.S. worker.[11] In particular, each day approximately 65,000 Mexicans are

admitted into Arizona; and each day they spend an average of $7.35 million in its stores,

restaurants, hotels and other businesses.[12]

SB 1070 poses a threat to this mutually beneficial trade between the two nations.

As discussed in more detail in Section II, if SB 1070 takes effect, Mexican citizens will

be afraid to visit Arizona for work or pleasure out of concern that they will be subject to

unlawful police scrutiny and detention.

To enhance the benefits of economic trade and collaboration, the United States

and Mexico have pursued trade liberalization through collaborative multilateral, regional

and bilateral negotiations, resulting in advantageous multi-faceted economic relationships

(*e.g.* North American Free Trade Agreement).[13] Diplomacy is crucial to such

negotiations. SB 1070 impedes collaboration by pushing "nations that work together and

trade" to "mutual recrimination, which has been so useless and damaging in previous

---

[10] Press Release, The White House, *Remarks by President Obama and President Calderón of Mexico at Joint Press Availability* (May 19, 2010), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-obama-and-president-calder-n-mexico-joint-press-availability. *See also* Tamar Jacoby, *Immigration Nation*, 85 Foreign Affairs 50, 54-58 (2006).

[11] Giovanni Peri, *The Impact of Immigrants in Recession and Economic Expansion*, University of California Davis, at 10 (June 2010), *available at* http://www.migrationpolicy.org/pubs/Peri-June2010.pdf.

[12] Vera Pavlakovich-Kochi and Alberta H. Charney, *Mexican Visitors to Arizona*, Economic and Business Research Center (Dec. 2008), *available at* http://ebr.eller.arizona.edu/research/ mexican_visitors_to_ arizona_2007_08.pdf.

[13] Hornbeck, *supra* note 8, at 5; Villarreal, *supra* note 9, at 16-18.

- 5 -

times."[14] Strained diplomatic ties substantially impede the ability of the U.S. and Mexico to collaboratively develop, enhance and maintain commercial ties critical to their economies.

**B.  SB 1070 Derails Efforts Towards Comprehensive Immigration Reform**

With over eleven million nationals in the U.S., Mexico has a significant interest in U.S. comprehensive immigration reform. The United States is equally interested in Mexico's involvement. In fact, one of the five immigration principles of the Obama administration is to collaborate with Mexico.[15]

Immigration was a principal topic discussed by the presidents of Mexico and the U.S. in their May 19, 2010 meeting. As President Barack Obama acknowledged, both countries share a responsibility to address the issue. Among the responsibilities, he noted Mexico's efforts to create jobs and the United States' efforts to "fix our broken immigration system[.]"[16] Both presidents expressed their belief that SB 1070 is a "misdirected effort" to address immigration concerns, and that collaboration among the two federal governments is essential to ensure that immigration reform "does not have an adverse impact on the economies of [the border] regions."[17]

---

[14] Press Release, The White House, *Remarks by President Calderón of Mexico at Official Arrival Ceremony* (May 19, 2010), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-calder-n-mexico-official-arrival-ceremony. *See also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 770 (2004) (removing blockade to cross-border trucking); and Villarreal, *supra* note 9, at 20-24 (discussing Mexico-U.S. trade issues).

[15] The White House, *Immigration* (last visited June 10, 2010), http://www.whitehouse.gov/issues/immigration.

[16] *Remarks by Presidents Obama and Calderón*, *supra* note 10.

[17] *Id.*

The effects of U.S.–Mexico migration to labor markets, tourism, business travel, and education is of great importance to both the U.S. and Mexico.[18] Mexican citizens comprised the highest percentage (12%) of the 163 million non-immigrants legally admitted into the United States in 2009, including tourists, business travelers, specialty workers and students.[19] Furthermore, as noted by President Obama, the countries also profit from the intellectual exchange.[20]

Immigration policy is crucial to the communities of the 2000-mile U.S.–Mexico border. As noted by President Obama, "there are enormous flows of trade and tourists and people along the border region; the economies are interdependent[.]"[21] In addition to immigration, law enforcement policies are critical to border areas highly susceptible to drug-related violence. Accordingly,

> [r]ecognizing the importance of securing and facilitating the lawful flow of goods, services, and people between their countries[,] [u]nderstanding that joint and collaborative administration of their common border is critical to transforming management of the border to enhance security and efficiency[, and u]nderstanding that law enforcement coordination between the Participants is essential to preventing crime and to disrupting and dismantling transnational criminal organizations[,]"

on May 19, 2010, *amicus* and the United States entered into the Declaration by The Government Of The United States Of America and The Government Of The United Mexican States Concerning Twenty-First Century Border Management to express their

---

[18] *Id. See also*, Jacoby, *supra* note 10, at 54-58 (noting that foreign labor has complemented, not competed with, the U.S. labor force).
[19] Randall Monger and MacReadie Barr, *Nonimmigrant Admissions to the United States: 2009*, Department of Homeland Security Office of Immigration Statistics (April 2010), *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/ni_fr_2009.pdf.
[20] *Remarks by Presidents Obama and Calderón, supra* note 10 (highlighting Calderón's U.S. education).
[21] *Id.*

- 7 -

1  commitment to strengthen collaboration to enhance economic exchange, lawful travel,

2  and to dismantle criminal organizations.[22]

3      It is due to the social, economic, intellectual and security benefits of international

4  collaboration, that the United States federal government and Mexico recognize the

5  importance of comprehensive immigration reform.[23] Through SB 1070, Arizona

6  impinges upon the US-Mexico bilateral agenda and obstructs the bi-national

7  collaboration to tackle immigration and border problems, while preserving the benefits of

8  economic and intellectual exchange. SB 1070 institutes an independent state system of

9  immigration enforcement that not only derails bilateral economic, social and security

10 efforts, but imperils the U.S. federal government's efforts at a comprehensive solution for

11 immigration policy. Mexico cannot effectively cooperate or engage in meaningful

12 bilateral relations with the U.S. when states are permitted to interfere with the sovereigns'

13

14 bilateral efforts.

15          **C. SB 1070 Obstructs International Collaboration to Combat Drug-
             Trafficking Organizations and Drug-Related Violence**

16

17     For over thirty years, the war against drug-trafficking organizations has been a

18 critical issue for the U.S. and Latin American governments.[24] Recently, the fight against

19

20 [22] Press Release, The White House, *Declaration by The Government Of The United
   States Of America and The Government Of The United Mexican States Concerning
21 Twenty-First Century Border Management* (May 19, 2010), *available at*
   http://www.whitehouse.gov/the-press-office/declaration-government-united-states-
22 america-and-government-united-mexican-states-c.
   [23] *Remarks by Presidents Obama and Calderón, supra* note 10.
23 [24] Clare Ribando Seelke, Liana Sun Wyler and June S. Beittel, *Latin America and
   the Caribbean: Illicit Drug Trafficking and U.S. Counterdrug Programs*,
24 Congressional Research Service (Feb. 3, 2010), *available at*
   http://assets.opencrs.com/rpts/R41215_ 20100430.pdf; *see also* Steven E. Hendrix,
25
   - 8 -

Mexican drug-trafficking organizations has taken the spotlight. Approximately seven thousand people were killed by drug-related violence in Mexico in the past year;[25] 31% took place in the border State of Chihuahua.[26] The current and previous U.S. administrations have recognized the shared responsibility for drug-related violence, and determined that "it is absolutely critical that the United States joins as a full partner in dealing with this issue."[27] As numerous scholars highlight, "without changes in U.S. drug policy, efforts to combat DTOs [drug-trafficking organizations] or to address Mexico's own growing domestic demand for drugs will be futile."[28]

To this end, following extensive negotiations between the U.S. and Mexico, the Merida Initiative was announced on October 22, 2007. This initiative is a training and equipment bilateral cooperation package intended to collaboratively strengthen the counter-narcotic efforts of both governments.[29] In connection with the Merida Initiative, former U.S. President George W. Bush stated: "The United States is committed to this joint strategy to deal with a joint problem. I would not be committed to dealing with this if I wasn't convinced that President Felipe Calderón had the will and the desire to protect

---

*The Merida Initiative for Mexico and Central America*, 5 Loy. U. Chi. Int'l L. Rev 107, 108-09 (2007-2008).
[25] David A. Shirk, *Drug Violence in Mexico: Data and Analysis from 2001-2009*, Trans-Border Institute, at 1 (Jan. 2010), *available at* http://www.justiceinmexico.org/resources/pdf/drug_violence.pdf.
[26] *Id.* at 2, 6-7.
[27] *Id.* at 13; Tom Baldwin, *Barack Obama Arrives in Mexico Amid Drugs Violence*, Times, at 1-3 (Apr. 17, 2009), *available at* http://www.timesonline. co.uk/tol/news/world/us_and_americas/article6108394.ece.
[28] Shirk, *supra* note 25, at 12.
[29] Hendrix, *supra* note 24, at 109-10, 112; Clare Ribando Seelke, Mark P. Sullivan and June S. Beittel, *Mexico-U.S. Relations*, Congressional Research Service, at 14 (Feb. 3, 2010), *available at* http://www.hsdl.org/?view&doc= 19141&coll=public.

his people from narco-traffickers."[30] Cooperation under the Merida Initiative has made great strides, leading the United States and Mexico to successfully make over a thousand arrests, including top-members of multiple drug-trafficking organizations, as well as to intelligence-sharing, and strengthening the implementation of weapon tracing and cash seizure initiatives.[31]

As the U.S. and Mexico attempt to strengthen trust and collaboration among bi-national federal, state and local law enforcement to attack drug-trafficking organizations and drug-related violence, SB 1070 threatens the U.S.–Mexico efforts by straining and encumbering bilateral collaboration. Moreover, SB 1070 will further obstruct international goals to control drug-related violence by raising a very real risk of reducing crime-reporting in Arizona, including by Mexican nationals,[32] thereby impeding law enforcement's efforts to continue making arrests and seizures on both sides of the border. Former U.S. President Bush's opinion – regarding the U.S.'s inability to unilaterally commit to a project – is a sentiment shared on both sides of the border. Mexico equally cannot in good faith negotiate and collaborate with the United States without certainty

---

[30] *Id.* at 113.

[31] Roberta S. Jacobson, *U.S.-Mexico Security Cooperation*, Statement Before the U.S. House of Representatives Committee on Foreign Affairs (May 27, 2010), *available at* http://www.state.gov/p/wha/rls/rm/2010/142297.htm; Seelke, *Mexico-U.S. Relations, supra* note 29, at 1-6, 13-20.

[32] *See* Phillip Atiba Goff, Liana Maris Epstein, Chris Burbank, and Tracie L. Keesee, *Deputizing Discrimination?*, The Consortium for Police Leadership in Equity (May 3, 2010) (on file with authors) (analyzing the chilling effects on crime reports of a Utah statute permitting state law enforcement to identify and detain individuals whose immigration status may be in question); *see also* Chris Burbank, Phillip Atiba Goff, and Tracie L. Keesee, *Policing Immigration: A Job We Do Not Want*, HUFFINGTON POST (June 7, 2010), *available at* http://www.huffingtonpost.com/chief-chris-burbank/policing-immigration-a-jo_b_602439.html.

- 10 -

that the bilateral efforts will not be obstructed by divergent political subdivisions, like

Arizona. This interference with federal policies is of particular concern in U.S. border

states including Arizona, which play a significant operations role regarding the Merida

Initiative's goal of controlling weapons traffic into Mexico.[33]

"[T]he interest of the cities, counties and states, no less than the interests of the

people of the whole nation, imperatively requires that federal power in the field affecting

foreign relations be left entirely free from local interference."[34] For this reason, James

Madison expressed: "If we are to be one nation in any respect, it clearly ought to be in

respect to other nations."[35] As a foreign nation, Mexico has a compelling interest in

maintaining its bilateral relations based on respect for the constitutional law of the United

States, and in the invalidation of SB 1070.

## II. Mexico Has a Legitimate Interest Protecting Its Citizens' Rights Under the U.S. Constitution

The Mexican government respectfully submits that history demonstrates the state

sanctioned actions, like SB 1070, violate the basic tenets of the U.S. Constitution that

guaranteeing freedom, liberty and equal protection of the law. Sovereign actions by the

United States against minority populations at perceived times of threat have proven

unwarranted.  For example, the actions taken toward African-Americans during and prior

---

[33] *See e.g.*, Amanda Lee Meyers, *Officials: Phoenix Gun Dealer Sold to Mexican Drug Cartels*, Seattle Times (May 6, 2008), *available at* http://seattletimes. nwsource.com/html/nationworld/2004396644_apguntraffickingbust.html (describing arrest of gun shop owner in Phoenix who knowingly sold firearms to Mexican drug-trafficking organizations).

[34] *Hines v. Davidowitz*, 312 U.S. at 63.

[35] The Federalist No. 42 (James Madison) (concerning regulation of intercourse with foreign nations); *see also* The Federalist No. 4 (John Jay) (concerning dangers from foreign force and influence).

- 11 -

to the Civil Rights movement underscore the potential harm and lasting negative effects of SB 1070.

Discriminatory and biased legal enforcement have adverse legal, social, economic and political implications, and underline Mexico's legitimate interest in assuring that its citizens are not deprived of protection under the U.S. Constitution and not subjected to hostile attitudes or action by U.S. society. As of 2008, there were 11.4 million Mexican-born individuals living in the United States, 5.4% of them live in Arizona.[36]  Moreover, the Ninth Circuit acknowledged in 2000 that "[t]he Hispanic population of the nation and of the Southwest and Far West in particular, has grown enormously — at least five-fold in the four [border] states referred to in the Supreme Court's decision [Arizona, California, New Mexico and Texas]."[37]  In fact, recent preliminary demographic information establishes that minorities represent more that fifty percent of the population in Hawaii, New Mexico, California and Texas, making use of race and ethnicity as a law enforcement factor inappropriate.[38]

Alongside these demographic changes, the 9th Circuit also noted that there have been "significant changes in the law restricting the use of race as a criterion in government decision-making," with the court concluding that the "use of race and

---

[36] Aaron Terrazas & Jeanne Batalova, Migration Policy Institute, *Frequently Requested Statistics on Immigrants and Immigration in the United States* (2009), http://www.migrationinformation.org/ feature/display.cfm?ID=747#3b.
[37] *United States v. Montero-Camargo*, 208 F.3d 1122, 1133 (9th Cir. 2000). The court pointed out that race "may be considered when the suspected perpetrator of a specific offense has been identified as having such an appearance." *Id.* at 1134 n.22.
[38] Hope Yen, *Minority Population Growing, Census Says*, Associated Press (June 11, 2010), *available at* http://www.boston.com/news/nation/washington/articles/ 2010/06/11/minority_population_growing_census_says/.

ethnicity for such purposes has been severely limited."[39]  The Court further opined that

even at border check stops, "at this point in our nation's history, and given the continuing

changes in our ethnic and racial composition, Hispanic appearance is, in general, of such

little probative value that it may not be considered as a relevant factor where particularize

or individualized suspicion is required…[to be used] in determining which particular

individuals among the vast Hispanic populace should be stopped by law enforcement

officials on the lookout for illegal aliens.[40]  Given the public rhetoric by the Arizona

Governor and other state officials, together with the implied reference in A.R.S. Sec. 11-

1051(B), sending an impermissible impression of U.S. and Arizona Constitutional

support for using race and ethnicity pursuant to SB 1070, Mexico is rightfully concerned

for the civil rights of its citizens in Arizona.  Until *Montero-Camargo*, as late as 2000,

U.S. Border Patrol agents impermissibly used Hispanic appearance as a singularly

sufficient basis to stop Hispanics for immigration purposes.

### A. SB 1070's Results in Racial Profiling Reminiscent of African-American Discrimination

SB 1070 gives local officers *carte blanche* authority to stereotype and to rely on

the popular perception that appearances of "foreign-ness" are justifiable means for

disparate treatment. These "[n]egative stereotypes are further promulgated because

profiling prompts more investigations, which will inevitably result in more arrests and

convictions of members of the targeted group."[41] Commentators note that immigration

---

[39] *Montero-Camargo*, 208 F.3d at 1143 (citing *Adarand Constructors v. Pena*, 515 U.S. 200 (1995); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).
[40] *Id.* at 1134.
[41] *See* John Dwight Ingram, *Racial and Ethnic Profiling*, 29 T. Marshall L. Rev 55, 76 (2003).

enforcement, especially in the Southwest, regularly imposes indignities on U.S. citizens and lawful immigrants of Mexican ancestry not also imposed on the white, non-Hispanic population.[42]

Mexico is justifiably concerned that stereotypes and bias will be used by law enforcement as state sanctioned.  When Arizona Governor Jan Brewer was asked what criteria will be used as reasonable suspicion of a person's legal status in the U.S., she focused on the physical appearance of "illegal immigrants," stating:

> I do not know what an illegal immigrant looks like.  I can tell you that there are people in Arizona that assume they know what an illegal immigrant looks like. I don't know if they know that for a fact or not, but I know that if AZPosts [Arizona Peace Officers] gets themselves together, works on this law, puts down the description that the law will be enforced civilly, fairly and without discriminatory points to it.[43]

Giving state police the authority to simply create a description of what an illegal immigrant looks like is plainly racial profiling, which is why Mexico is concerned.[44] This inevitably will lead to casting an overbroad net in the pursuit of "illegal immigrants," with individuals being stopped based on appearance.

This unfair and disproportionate targeting of Hispanics and Latin-Americans in immigration enforcement is similar to that witnessed by young African-American males in criminal law enforcement. One federal judge has analogized the dangers of racial profiling in immigration (border patrol enforcement) to the experience of *driving while black*: "How is this practice distinguishable from the former practice of Southern peace

---

[42] *Id.*
[43] CNN Wire Staff, *Arizona Governor Signs Immigration Bill*, CNN, Apr. 24, 2010, *available at* http://www.cnn.com/2010/POLITICS/04/23/ obama.immigration/index.html.
[44] *See Montero-Camargo*, 208 F.3d 1122.

- 14 -

1   officers who randomly stopped black pedestrians to inquire, 'Hey, boy, what are you

2   doin' in this neighborhood?'."[45]

3   **B.  SB 1070's Harmful Effects Lead to Dangerous Harms Spanning From**
     **Physical Violence to Promotion of Negative, Ill-Conceived Stereotypes**
4

5        Finally, Mexico, as a sovereign, needs to protect its people. SB 1070 endangers

6   this goal. First, as demonstrated by New York City's experience in the mistaken shooting

7   deaths of two black men, Amadou Diallo and Sean Bell, and the brutal torture of a third

8   black man, Abner Louima, one small mishap of racial profiling by law enforcement can

9   lead to public outcry and distrust of law enforcement by local communities.[46]

10  Additionally, racial profiling by law enforcement may encourage private organizations or

11  citizens to target Mexican citizens, as seen when armed ranchers in Douglas, Arizona

12  used unjustified force to arrest Hispanic persons crossing their land.[47]

13       Second, SB 1070 promotes negative, ill-conceived stereotypes about "Mexican

14  appearance." The statute gives untrained local officials the authority to determine who

15  fits "Mexican appearance" and who does not. By sanctioning pre-textual detainment  and

16  questioning of Hispanics or Latin Americans perceived to be "illegal aliens", the bill

17  creates a social and political hotbed for further acts of discrimination or rights abrogation,
18

19  [45] *United States v. Zapata-Ibarra*, 223 F.3d 281, 285 (5th Cir. 2000) (Wiener, J.,
    dissenting). *See* Joan W. Howarth, *Representing Black Male Innocence*, 1 J. Gender,
20  Race & Just. 97, 106 (1997). "The stereotype that all Latino's are 'foreigners' of
    suspicious immigration status influences immigration law." Similarly, "the deeply
21  imbedded idea of a frightening Black man has some influence on every person in
    America, including every person in the criminal justice system. Each stage of [the
22  American] criminal justice process reflects and reinforces the 'knowledge' that Black
    male means criminal."
23  [46] *See* Kevin R. Johnson, *How Did You Get to be Mexican? A White/Brown Man's
    Search for Identity* 46 (1999).
24  [47] *See* Smita P. Nordwall & Elliot Blair Smith, *Mexico Threatens to Sue Arizona
    Ranchers*, USA Today, May 3, 2000 at 19A.
25
                                        - 15 -

perpetuating the cycle of exclusion.[48] For example, "[m]ost [persons of Mexican ancestry] are of dark complexion with black hair . . . [b]ut many are blond, blue-eyed and 'white', while others have red hair and hazel eyes."[49] Furthermore, when aligned with other drastic measures, such as the recently enacted bill intended to ban the multicultural studies program in the Tucson Unified School District, it becomes unavoidable to see that Arizona's legislative efforts constitute a discriminatory policy. SB 1070's discriminatory objective runs against the fundamental rights of people living in the United States.

## CONCLUSION

For the foregoing reasons, *amicus curiae* respectfully requests that this Court declare SB 1070 unconstitutional in its entirety.

Respectfully submitted,

**Albert M. Flores**

ALBERT M. FLORES
ALBERT M. FLORES LAW OFFICE
337 N 4th Ave
Phoenix, AZ 85003
Telephone: (602) 271-0070

**Dewey & LeBoeuf LLP**

HENRY L. SOLANO
CARLA GORNIAK
CHRISTOPHER R. CLARK
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 259-8000

*Counsel for Amicus Curiae*

---

[48] Eli J. Kay-Oliphant, Comment, *Considering Race in American Immigration Jurisprudence*, 54 Emory L.J. 681, 708 (2005).
[49] *See* Julian Samora & Patricia Vandel Simon, *A History of the Mexican-American People* 8 (rev. ed. 1993).

- 16 -

1

## APPENDIX A

2

## INDEX OF CITED AUTHORITIES

3

**CASES**

4

*Adarand Constructors v. Pena*, 515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) . . . . . . . . . . . . . . . . . . . . 13

5

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 6

6

*Hines v. Davidowitz,* 312 U.S. 52 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11

7

*United States v. Montero-Camargo*, 208 F.3d 1122 (9th Cir. 2000) . . . . . . . . . . . 12-14

*United States v. Zapata-Ibarra*, 223 F.3d 281 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . 15

8

**STATUTE AND TREATY**

9

8 U.S.C. § 1357(g) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10

Vienna Convention on Consular Relations art. 5, Apr. 24, 1963, 596 U.N.T.S.
261 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

11

**OTHER AUTHORITIES**

12

Aaron Terrazas & Jeanne Batalova, *Migration Policy Institute, Frequently Requested
Statistics on Immigrants and Immigration in the United States*
13

(2009), http://www.migrationinformation.org/feature/display.cfm?ID=747
#3b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

14

Amanda Lee Meyers, *Officials: Phoenix Gun Dealer Sold to Mexican Drug
15

Cartels*, Seattle Times (May 6, 2008), *available at* http://seattletimes.
nwsource.com/html/nationworld/2004396644_apguntraffickingbust.html . . . . . . 11

16

Clare Ribando Seelke, Liana Sun Wyler and June S. Beittel, *Latin America
17

and the Caribbean: Illicit Drug Trafficking and U.S. Counterdrug
Programs*, Congressional Research Service (Feb. 3, 2010), *available at*
18

http://assets.opencrs.com/rpts/R41215_ 20100430.pdf . . . . . . . . . . . . . . . . . . . 8

Clare Ribando Seelke, Mark P. Sullivan and June S. Beittel, *Mexico-U.S.
19

Relations*, Congressional Research Service, at 14 (Feb. 3, 2010), *available
at* http://www.hsdl.org/?view&doc=119141&coll=public . . . . . . . . . . . . . . . . 9, 10

20

CNN, *U.S., Mexican Presidents Say Key Issues Must be Tackled Together*
21

(May 20, 2010), http://www.cnn.com/2010/US/05/19/mexico.president.
visit/ index.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

22

CNN Wire Staff, *Arizona Governor Signs Immigration Bill*, CNN, Apr. 24,
2010, *available at* http://www.cnn.com/2010/POLITICS/04/23/obama.
23

immigration/index.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

24

25

Chris Burbank, Phillip Atiba Goff, and Dr. Tracie L. Keesee, *Policing Immigration: A Job We Do Not Want*, Huffington Post (June 7, 2010), *available at* http://www.huffingtonpost.com/chief-chris-burbank/policing-immigration-a-jo_b_602439.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

David A. Shirk, *Drug Violence in Mexico: Data and Analysis from 2001-2009*, Trans-Border Institute, at 1 (Jan. 2010), *available at* http://www. justiceinmexico.org/resources/pdf/drug_violence.pdf . . . . . . . . . . . . . . . . . . . . . 9

Eli J. Kay-Oliphant, Comment, *Considering Race in American Immigration Jurisprudence*, 54 Emory L.J. 681, 708 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The Federalist No. 4 (John Jay) (concerning dangers from foreign force and influence) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

The Federalist No. 42 (James Madison) (concerning regulation of intercourse with foreign nations) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Giovanni Peri, *The Impact of Immigrants in Recession and Economic Expansion*, University of California Davis 10 (June 2010), available at http://www.migrationpolicy.org/pubs/Peri-June2010.pdf . . . . . . . . . . . . . . . . . . 5

Hope Yen, *Minority Population Growing, Census Says*, Associated Press (June 11, 2010), *available at* http://www.boston.com/news/nation/washington/ articles/2010/06/11/minority_population_growing_census_says/ . . . . . . . . . . . . 12

Instituto Cultural Mexicano, *Entrega de los premios Ohtli* 3 (May 4, 2010), www.ime.gob.mx/documentos/Entrega_Ohtlis.doc . . . . . . . . . . . . . . . . . . . . . . . . 4

J. F. Hornbeck, *U.S.-Latin America Trade: Recent Trends and Policy Issues*, Congressional Research Service 1 (Sept. 3, 2009), *available at* http://www.fas.org/sgp/crs/row/98-840.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Joan W. Howarth, *Representing Black Male Innocence*, 1 J. Gender, Race & Just. 97, 106 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

John Dwight Ingram, *Racial and Ethnic Profiling*, 29 T. Marshall L. Rev 55, 76 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Julian Samora & Patricia Vandel Simon, *A History of the Mexican-American People* 8 (rev. ed. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kevin R. Johnson, *How Did You Get to be Mexican? A White/Brown Man's Search for Identity* 46 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

M. Angeles Villarreal, *U.S.-Mexico Economic Relations: Trends, Issues, and Implications*, Congressional Research Service, at 1 (Mar. 31, 2010), *available at* http://www.fas.org/sgp/crs/row/ RL32934.pdf . . . . . . . . . . . . . . . . 4-6

*Meet the Press with Secretary Clinton* [Transcript] (May 2, 2010), *available at* http://secretaryclinton.wordpress.com/2010/ 05/02/meet-the-press/ . . . . . . . . . . 4

Phillip Atiba Goff, Liana Maris Epstein, Chris Burbank, and Tracie L. Keesee, *Deputizing Discrimination?*, The Consortium for Police Leadership in Equity (May 3, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Press Release, The White House, *Declaration by The Government Of The United States Of America and The Government Of The United Mexican States Concerning Twenty-First Century Border Management* (May 19, 2010), *available at* http://www.whitehouse.gov/the-press-office/ declaration-government-united-states-america-and-government- united-mexican-states-c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Press Release, The White House, *Remarks by President Calderón of Mexico at Official Arrival Ceremony* (May 19, 2010), *available at* http://www.whitehouse.gov/the-press-office/remarks-president-calder-n- mexico-official-arrival-ceremony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Press Release*, The White House, *Remarks by President Obama and President Calderón of Mexico at Joint Press Availability* (May 19, 2010), *available at* http://www.whitehouse.gov/the-press-office/ remarks-president-obama-and-president-calder-n-mexico-joint-press- availability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-8

Randall Monger and MacReadie Barr, *Nonimmigrant Admissions to the United States: 2009*, Department of Homeland Security Office of Immigration Statistics (April 2010), *available at* http://www.dhs.gov/ xlibrary/ assets/ statistics/publications/ni_fr_2009.pdf . . . . . . . . . . . . . . . . . . . . 7

Roberta S. Jacobson, *U.S.-Mexico Security Cooperation*, Statement Before the U.S. House of Representatives Committee on Foreign Affairs (May 27, 2010), *available at* http://www.state.gov/p/wha/rls/rm/2010/ 142297.htm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Smita P. Nordwall & Elliot Blair Smith, *Mexico Threatens to Sue Arizona Ranchers*, USA Today, May 3, 2000 at 19A . . . . . . . . . . . . . . . . . . . . . . . . 15

Steven E. Hendrix, *The Merida Initiative for Mexico and Central America*, 5 LOY. U. CHI. INT'L L. REV 107, 108-09 (2007-2008) . . . . . . . . . . . . . . . . . . . 8, 9

Tamar Jacoby, *Immigration Nation*, 85 Foreign Affairs 50, 54-58 (2006) . . . . . . . 5, 7

Tom Baldwin, *Barack Obama Arrives in Mexico Amid Drugs Violence*, Times, at 1-3 (Apr. 17, 2009), *available at* http://www.timesonline.co.uk/tol/ news/ world/us_and_americas/article6108394.ece . . . . . . . . . . . . . . . . . . . . . . . 9

Vera Pavlakovich-Kochi and Alberta H. Charney, *Mexican Visitors to Arizona*, Economic and Business Research Center (Dec. 2008), *available at* http://ebr.eller.arizona.edu/research/ mexican_visitors_to_arizona_2007 _ 08.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

The White House, *Immigration* (last visited June 10, 2010), http://www.whitehouse.gov/issues/immigration . . . . . . . . . . . . . . . . . . . . . . . . . 6

# APPENDIX B

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2010, a copy of the attached *amicus curiae* brief was served by U.S. Mail and/or electronically transmitted (to recipients where e-mail addressed were on file) to the following parties and to other *amici curiae*:

**Omar C. Jadwat**
**Lucas Guttentag**
**Tanaz Moghadam**
American Civil Liberties Union
Foundation Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654

**Linton Joaquin**
**Karen C. Tumlin**
**Nora A. Preciado**
**Melissa S. Keaney**
**Vivek Mittal**
**Ghazal Tajmiri**
National Immigration Law Center
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
Telephone: (213) 639-3900
Facsimile: (213) 639-3911

**Cecillia D. Wang**
**Harini P. Raghupathi**
American Civil Liberties Union
Foundation Immigrants' Rights Project
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950
**Daniel J. Pochoda**
**Anne Lai**
ACLU Foundation of Arizona
77 E. Columbus Street, Suite 205
Phoenix, Arizona 85012
Telephone: (602) 650-1854
Facsimile: (602) 650-1376

**Daniel R. Ortega, Jr.**
Roush, McCracken, Guerrero, Miller &
Ortega
1112 E. Washington Street
Phoenix, Arizona 85034
Telephone: (602) 253-3554
Facsimile: (602) 340-1896

 **Thomas A. Saenz**
**Cynthia Valenzuela Dixon**
**Victor Viramontes**
**Gladys Limon**
**Nicholas Espiritu**
Mexican American Legal Defense and
Educational Fund
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266

**Nina Perales**
**Ivan Espinoza-Madrigal**
Mexican American Legal Defense and
Educational Fund
110 Broadway Street, Suite 300
San Antonio, Texas 78205
Telephone: (210) 224-5476
Facsimile: (210) 224-5382

**Julie A. Su**
**Ronald Lee**
**Yungsuhn Park**
**Connie Choi**
**Carmina Ocampo**
Asian Pacific American Legal Center,
a member of Asian American Center for
Advancing Justice
1145 Wilshire Blvd., Suite 200
Los Angeles, California 90017
Telephone: (213) 977-7500
Facsimile: (213) 977-7595

**Chris Newman**
**Lisa Kung**
National Day Labor Organizing
Network
675 S. Park View Street, Suite B
Los Angeles, California 90057
Telephone: (213) 380-2785
Facsimile: (213) 380-2787

**Bradley S. Phillips**
**Paul J. Watford**
**Joseph J. Ybarra**
**Elisabeth J. Neubauer**
Munger, Tolles & Olson LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

**Laura D. Blackburne**
**National Association for the**
Advancement of Colored People
(NAACP)
4805 Mt. Hope Drive
Baltimore, Maryland 21215
Telephone: (410) 580-5700

**Susan Traub Boyd**
**Yuval Miller**
Munger, Tolles & Olson LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

**Joseph David Young**
Snell & Wilmer LLP
1 Arizona Ctr.
400 E. Van Buren
Phoenix, AZ 85004
Telephone: (602) 382-6258

**Britt Wesley Hanson**
Office of Cochise County Attorney
PO Drawer CA
Bisbee, AZ 85603
520-432-8700
Fax: 520-432-8778
Email: bhanson@cochise.az.gov

**Jean E Wilcox**
Coconino County Attorneys Office
110 E Cherry St
Flagstaff, AZ 86001
928-779-6518
Fax: 928-779-5618
Email: jwilcox@coconino.az.gov

**Bryan B Chambers**
**June Ava Florescue**
Gila County Attorneys Office
1400 E Ash St
Globe, AZ 85501
928-425-3231
Fax: 928-425-3720
Email: bchambers@co.gila.az.us

**Kenneth Andrew Angle**
Graham County Attorneys Office
800 W Main St
Safford, AZ 85546
928-428-3620
Fax: 928-428-7200
Email: kangle@graham.az.gov

**Michael William McCarthy**
Greenlee County Attorney
PO Box 1717
Clifton, AZ 85533
928-865-4108
Fax: 928-865-4665
Email: mmccarthy@co.greenlee.az.us

**Robert Glenn Buckelew**
La Paz County Attorney
1008 Hopi Ave
Parker, AZ 85344
928-669-4969
Email: gbuckelew@co.la-paz.az.us

**Bruce P White**
**Anne Cecile Longo**
MCAO Division of County Counsel
222 N Central Ave
Ste 1100
Phoenix, AZ 85004-2926
602-506-5269
Fax: 602-506-6083
Email: longoa@mcao.maricopa.gov

**Robert Alexander Taylor**
Mohave County Attorneys Office
PO Box 7000
Kingman, AZ 86402-7000
928-753-0770
Fax: 928-753-4290
Email: robert.taylor@co.mohave.az.us

**Lance B Payette**
Navajo County Attorney
PO Box 668
Holbrook, AZ 86025
928-524-4002
Fax: 928-524-4244
Email:
lance.payette@navajocountyaz.gov

**Daniel S Jurkowitz**
Pima County Attorneys Office
32 N Stone Ave
Ste 2100
Tucson, AZ 85701
520-740-5750
Fax: 520-740-5600
Email: Daniel.Jurkowitz@pcao.pima.gov

**Chris Myrl Roll**
**Joe A Albo , Jr**
Pinal County Attorneys Office
PO Box 887
Florence, AZ 85232
520-866-6271
Fax: 520-866-6521
Email: Chris.Roll@co.pinal.az.us

1

**Sean Aloysius Bodkin**
Law Office of Sean Bodkin
4620 E Via Dona Rd
Cave Creek, AZ 85331
480-528-3095
Email: sean.bodkin@azbar.org

**Jack Hamilton Fields**
Yavapai County Attorneys Office
255 E Gurley St
3rd Floor
Prescott, AZ 86301
928-771-3338
Fax: 928-771-3375
Email: jack.fields@co.yavapai.az.us

2

3

4

5

6

**George Jacob Romero**
Yuma County Attorneys Office
250 W 2nd St
Yuma, AZ 85364
928-817-4300
Email: YCAttyCivil@yumacountyaz.gov

**Maria R Brandon**
**Thomas P Liddy**
Maricopa County
Official of Special Litigation Services
234 N Central Ave
Ste 4400
Phoenix, Az 85004
602-372-3852
Fax: 602-506-1416
Email: brandonm@mail.maricopa.gov

7

8

9

10

11

12

**Christopher Arthur Munns**
**Isaiah Fields**
**Mary Ruth O'Grady**
**Mary Ruth O'Grady**
Office of the Attorney General
1275 W Washington St
Phoenix, AZ 85007
602-542-7997
Fax: 602-364-3202
Email: christopher.munns@azag.gov

**John J Bouma**
**Joseph G Adams**
Snell & Wilmer LLP
400 E Van Buren
Phoenix, AZ 85004-0001
602-382-6000
Fax: 602-382-6070
Email: jbouma@swlaw.com

13

14

15

16

17

18

**Joseph Andrew Kanefield**
Office of Governor Janice K Brewer
1700 W Washington St
9th Floor
Phoenix, AZ 85007
602-542-1586
Fax: 602-542-7602
Email: jkanefield@az.gov

**Robert Arthur Henry**
Snell & Wilmer LLP
1 Arizona Ctr
400 E Van Buren
Phoenix, AZ 85004-0001
602-382-6259
Fax: 602-382-6070
Email: bhenry@swlaw.com

19

20

21

22

23

24

25

**Andrea Sheridan Ordin** ,
**Jennifer AD Lehman**
**Lawrence L Hafetz** ,
Office of Los Angeles County Counsel
648 Kenneth Hahn Hall of
Administration
500 W Temple St
Los Angeles, CA 90012
213-974-1801
Fax: 213-626-7446
Email: aordin@counsel.lacounty.gov

**Gregory N Pimstone** ,
**Joanna S McCallum**
**Lydia Mendoza**
**Ronald G Blum**
**Sirena Castillo**
Manatt Phelps & Phillips LLP
11355 W Olympic Blvd
Los Angeles, CA 90064
310-312-4000
Fax: 310-312-4224
Email: gpimstone@manatt.com

**Christopher Baird Dupont**
Trautman Dupont PLC
1726 N 7th St
Phoenix, AZ 85006
602-344-0038
Fax: 602-374-2913
Email: dupontlaw@cox.net

  */s/: Christopher R. Clark*
 Christopher R. Clark