1  Omar C. Jadwat (admitted *pro hac vice*)
   Lucas Guttentag (admitted *pro hac vice*)
2  Tanaz Moghadam (admitted *pro hac vice*)
   AMERICAN CIVIL LIBERTIES UNION
3  FOUNDATION IMMIGRANTS'
   RIGHTS PROJECT
4  125 Broad Street, 18th Floor
   New York, New York 10004
5  Telephone: (212) 549-2660
   Facsimile: (212) 549-2654
6  *ojadwat@aclu.org*
   *lguttentag@aclu.org*
7  *tmoghadam@aclu.org*

8  Linton Joaquin (admitted *pro hac vice*)
   Karen C. Tumlin(admitted *pro hac vice*)
9  Nora A. Preciado (admitted *pro hac vice*)
   Melissa S. Keaney (admitted *pro hac vice*)
10 Vivek Mittal (admitted *pro hac vice*)
   Ghazal Tajmiri (admitted *pro hac vice*)
11 NATIONAL IMMIGRATION LAW
   CENTER
12 3435 Wilshire Boulevard, Suite 2850
   Los Angeles, California 90010
13 Telephone: (213) 639-3900
   Facsimile: (213) 639-3911
14 *joaquin@nilc.org*
   *tumlin@nilc.org*
15 *preciado@nilc.org*
   *keaney@nilc.org*
16 *mittal@nilc.org*
   *tajmiri@nilc.org*

   Thomas A. Saenz (admitted *pro hac vice*)
   Cynthia Valenzuela Dixon (admitted *pro hac vice*)
   Victor Viramontes (admitted *pro hac vice*)
   Gladys Limón (admitted *pro hac vice*)
   Nicholás Espíritu (admitted *pro hac vice*)
   MEXICAN AMERICAN LEGAL
   DEFENSE AND EDUCATIONAL FUND
   634 S. Spring Street, 11th Floor
   Los Angeles, California 90014
   Telephone: (213) 629-2512
   Facsimile: (213) 629-0266
   *tsaenz@maldef.org*
   *cvalenzuela@maldef.org*
   *vviramontes@maldef.org*
   *glimon@maldef.org*
   *nespiritu@maldef.org*

   *Attorneys for Plaintiffs*
   *Additional Co-Counsel on Subsequent Pages*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Friendly House; *et al.*, | CASE NO.  CV-10-01061-MEA |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT** |
| v. | |
| Michael B. Whiting; *et al.*, | **(ORAL ARGUMENT REQUESTED)** |
| Defendants. | |

Daniel J. Pochoda (SBA No. 021979)
Anne Lai** (SBA No. 172162)
ACLU FOUNDATION OF ARIZONA
77 E. Columbus Street, Suite 205
Phoenix, Arizona 85012
Telephone: (602) 650-1854
Facsimile: (602) 650-1376
dpochoda@acluaz.org
alai@acluaz.org

Cecillia D. Wang (admitted *pro hac vice*)
Harini P. Raghupathi (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 343-0775
Facsimile: (415) 395-0950
cwang@aclu.org
hraghupathi@aclu.org

Nina Perales (admitted *pro hac vice*)
Iván Espinoza-Madrigal*
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL
FUND
110 Broadway Street, Suite 300
San Antonio, Texas 78205
Telephone: (210) 224-5476
Facsimile: (210) 224-5382
nperales@maldef.org
iespinoza@maldef.org

Julie A. Su (admitted *pro hac vice*)
Ronald Lee*
Yungsuhn Park (admitted *pro hac vice*)
Connie Choi*
Carmina Ocampo (admitted *pro hac vice*)
ASIAN PACIFIC AMERICAN
LEGAL CENTER, a member
of Asian American Center for
Advancing Justice
1145 Wilshire Blvd., Suite 200
Los Angeles, California 90017
Telephone: (213) 977-7500
Facsimile: (213) 977-7595
jsu@apalc.org
rlee@advancingequality.org
ypark@apalc.org
cchoi@apalc.org
cocampo@apalc.org

Chris Newman*
Lisa Kung*
NATIONAL DAY LABOR
ORGANIZING NETWORK
675 S. Park View Street, Suite B
Los Angeles, California 90057
Telephone: (213) 380-2785
Facsimile: (213) 380-2787
newman@ndlon.org
kung@ndlon.org

Laura D. Blackburne*
NATIONAL ASSOCIATION
FOR THE ADVANCEMENT
OF COLORED PEOPLE (NAACP)
4805 Mt. Hope Drive
Baltimore, Maryland 21215
Telephone: (410) 580-5700
lblackburne@naacpnet.org

Daniel R. Ortega, Jr. (SBA No. 005015)
ROUSH, MCCRACKEN, GUERRERO,
MILLER & ORTEGA
1112 E. Washington Street
Phoenix, Arizona 85034
Telephone: (602) 253-3554
Facsimile: (602) 340-1896
danny@rmgmo.com

1    Bradley S. Phillips+ (admitted *pro hac*          Susan Traub Boyd+ (admitted *pro hac*
     *vice*)                                                *vice*)
2    Paul J. Watford+ (admitted *pro hac vice*)       Yuval Miller+ (admitted *pro hac vice*)
     Joseph J. Ybarra+ (admitted *pro hac vice*)      MUNGER, TOLLES & OLSON LLP+
3    Elisabeth J. Neubauer+ (admitted *pro hac*       560 Mission Street
     *vice*)                                                Twenty-Seventh Floor
4    MUNGER, TOLLES & OLSON LLP+                       San Francisco, CA  94105-2907
     355 South Grand Avenue                           Telephone:   (415) 512-4000
5    Thirty-Fifth Floor                               Facsimile:    (415) 512-4077
     Los Angeles, CA  90071-1560                      Susan.Boyd@mto.com
6    Telephone:   (213) 683-9100                      Yuval.Miller@mto.com
     Facsimile:    (213) 687-3702
7    Brad.Phillips@mto.com
     Paul.Watford@mto.com
8    Joseph.Ybarra@mto.com
     Elisabeth.Neubauer@mto.com
9
       +*Attorneys for all plaintiffs except Service Employees International Union, Service
10       Employees International Union, Local 5, United Food and Commercial Workers
              International Union, and Japanese American Citizens League*
11
     *Application for admission *pro hac vice* forthcoming
12   **Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND ................................................................................................. 3

    A.   ARIZONA SB 1070 ..................................................................................... 3

    B.   FEDERAL IMMIGRATION LAW .............................................................. 5

III. THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION
    THAT BARS ENFORCEMENT OF SB 1070 ...................................................... 9

    A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............. 9

        1.   SB 1070 VIOLATES THE SUPREMACY CLAUSE .................... 9

            a.   SB 1070 IS AN UNCONSTITUTIONAL
               "REGULATION OF IMMIGRATION" ............................. 10

            b.   SB 1070 IS PREEMPTED BY FEDERAL
               IMMIGRATION STATUTES AND REGULATIONS ...... 15

        2.   SB 1070 VIOLATES THE CONSTITUTIONAL RIGHT TO
            TRAVEL ......................................................................................... 24

        3.   SB 1070 VIOLATES THE FIRST AMENDMENT ..................... 28

            a.   A.R.S. § 13-2928(C) VIOLATES THE FIRST
               AMENDMENT ................................................................... 28

            b.   A.R.S. § 13-2928 (A) AND (B) ALSO VIOLATE
               THE FIRST AMENDMENT ................................................ 30

    B.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE
        PRELIMINARY INJUNCTION IS NOT GRANTED ............................. 32

    C.   THE PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC
        INTEREST .................................................................................................. 36

    D.   THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF
        PLAINTIFFS ............................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ACLU of Nevada v. City of Las Vegas,*
466 F.3d 784 (9th Cir. 2006) ............................................................31

*AFL v. Chertoff,*
552 F. Supp. 2d 999 (N.D. Cal. 2007) ..................................................40

*Am.-Arab Anti-Discrimination Comm. v. Reno,*
70 F.3d 1045 (9th Cir. 1995) ..............................................................29

*Am. Trucking Ass'ns, Inc. v. City of L.A.,*
559 F.3d 1046 (9th Cir. 2009) ............................................................32

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ........................................................................29

*Attorney Gen. of N.Y. v. Soto-Lopez,*
476 U.S. 898 (1986) .....................................................................25, 27

*Austin v. New Hampshire,*
420 U.S. 656 (1975) ........................................................................27

*Berger v. City of Seattle,*
569 F.3d (9th Cir. 2009) .............................................................29, 31, 32

*Burson v. Freeman,*
504 U.S. 191 (1992) ........................................................................28

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
447 U.S. 557 (1980) ........................................................................30

*Chamber of Commerce v. Candelaria*
("S.G. LAWA Br."), No. 90-115 (U.S.) ................................................20

*Chicanos Por La Causa, Inc. v. Napolitano,*
558 F.3d 856 (9th Cir. 2009) ............................................................20

*Chy Lung v. Freeman,*
92 U.S. 275 (1875) ......................................................................12, 14

*Cincinnati v. Discovery Network,*
507 U.S. 410 (1993) .....................................................................29, 31

1

2

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*City of Tucson v. Arizona*,
 No. 10-CV-249 (D. Ariz. May 26, 2010) ..........................................................7, 27

*Coalition for Humane Immigrant Rights of Los Angeles v. Burke*,
 No. 98-CV-4863, 2000 WL 1481467 (C.D. Cal. Sept. 12, 2000) ....................28, 30

*Comite de Jornaleros de Glendale v. City of Glendale*,
 No. 04-CV-3521 (C.D. Cal. May 13, 2005) ....................................................28, 29

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
 475 F. Supp. 2d 952 (C.D. Cal. 2006) ............................................................28, 29

*Crosby v. Nat'l Foreign Trade Council*,
 530 U.S. 363 (2000).........................................................................................17, 20

*DeCanas v. Bica*,
 424 U.S. 351 (1976).........................................................................................10, 11

*Dominguez v. Schwarzenegger*,
 596 F.3d 1087 (9th Cir. 2010) ...............................................................................33

*Dunn v. Blumstein*,
 405 U.S. 330 (1972)................................................................................................25

*Elrod v. Burns*,
 427 U.S. 347 (1976)................................................................................................36

*Foti v. City of Menlo Park*,
 146 F.3d 629 (9th Cir. 1998) ...........................................................................29, 31

*Freightliner Corp. v. Myrick*,
 514 U.S. 280 (1995)................................................................................................10

*Galvin v. Hay*,
 374 F.3d 739 (9th Cir. 2004) .................................................................................32

*Garrett v. City of Escondido*,
 465 F. Supp. 2d 1043 (S.D. Cal. 2006)..................................................................24

*Geier v. Am. Honda Motor Co.*,
 529 U.S. 861 (2000)................................................................................................10

*Gonzales v. Peoria*,
 722 F. 2d 468 (9th Cir. 1983) ................................................................................22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Henderson v. Mayor of the City of N.Y.*,
92 U.S. 259 (1875)........................................................................................12, 14

*Hines v. Davidowitz*,
312 U.S. 52 (1941)........................................................................................ passim

*Jornaleros Unidos de Baldwin Park v. City of Baldwin Park*,
No. 07-CV-4135 (C.D. Cal. July 17, 2007)..........................................................28

*Kinney v. Int'l Union of Operating Eng'rs, Local 150*,
994 F.2d 1271 (7th Cir. 1993) ............................................................................36

*League of United Latin Am. Citizens v. Wilson*,
908 F. Supp. 755 (C.D. Cal. 1995) .....................................................................14

*Lopez v. Town of Cave Creek*,
559 F. Supp.2d 1030 (D. Ariz. 2008) ......................................................28, 30, 36

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001)...........................................................................................30

*Monterey Mech. Co. v. Wilson*,
125 F.3d 702 (9th Cir. 1997) ..............................................................................32

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)...........................................................................................33

*Moser v. FCC*,
46 F.3d 970 (9th Cir. 1995) ................................................................................32

*Murillo v. Musegades*,
809 F. Supp. 487 (W.D. Tex. 1992).....................................................................37

*Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*,
743 F.2d 1365 (9th Cir. 1984) ............................................................................40

*Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*,
913 F.2d 1350 (9th Cir. 1990) ............................................................................19

*Padilla v. Kentucky*,
130 S.Ct. 1473 (2010).........................................................................................13

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973)...........................................................................................30

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Plyler v. Doe*,
457 U.S. 202 (1982)..................................................................................11, 13, 29

*Pro-Choice Network of W.N.Y. v. Project Rescue W.N.Y.*,
799 F. Supp. 1417 (W.D.N.Y. 1992).........................................................35

*Republic of Panama v. Air Panama Internacional, S.A.*,
745 F. Supp. 669 (S.D. Fla. 1988).............................................................39

*Republican Party of Minn. v. White*,
536 U.S. 765 (2002).........................................................................................29

*Saenz v. Roe*,
526 U.S. 489 (1999).................................................................................25, 26

*Save Strawberry Canyon v. Dep't of Energy*,
No. 08-CV-03494, 2009 WL 1098888 (N.D. Cal. Apr. 22, 2009)........32

*Shapiro v. Thompson*,
394 U.S. 618 (1969).........................................................................................25

*Sierra Forest Legacy v. Rey*,
577 F.3d 1015 (9th Cir. 2009) .......................................................................9

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984) ....................................................................40

*Takahashi v. Fish & Game Comm'n*,
334 U.S. 410 (1948)..........................................................................................11

*Toll v. Moreno*,
458 U.S. 1 (1982)....................................................................................11, 15

*Truax v. Raich*,
239 U.S. 33 (1915).............................................................................................10

*Underwager v. Channel 9 Australia*,
69 F.3d 361 (9th Cir. 1995) ..........................................................................29

*Villas at Parkside Partners v. City of Farmers Branch*,
577 F. Supp. 2d 858 (N.D. Tex. 2008) ....................................................33

*Villas at Parkside Partners v. City of Farmers Branch*,
Nos. 08-cv-1551, 03-cv-1615, 2010 WL 1141398 (N.D. Tex. Mar. 24, 2010).....12, 13, 17, 36

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989)........................................................................................................30

*Winters v. Natural Resources Defense Council, Inc.,*
   129 S. Ct. 365 (2008)...................................................................................................9, 32

*Wis. Dep't of Indus. v. Gould Inc.,*
   475 U.S. 282 (1986)........................................................................................................17

*World Wide Rush, LLC v. City of L.A.,*
   No. 08-56454, ___ F.3d ___, 2010 WL 2089520 (9th Cir. May 26, 2010)...........................30

*Yniguez v. Arizonans for Official English,*
   69 F.3d 920 (9th Cir. 1995) (en banc) ...............................................................................38


**FEDERAL STATUTES**

8 U.S.C. §§ 1101 *et seq.*.............................................................................................2, 5, 15

8 U.S.C. § 1103 .............................................................................................................9, 21

8 U.S.C. § 1182 ................................................................................................................14

8 U.S.C. § 1252c ..............................................................................................................23

8 U.S.C. § 1255 ................................................................................................................20

8 U.S.C. § 1304(e) ..................................................................................................... passim

8 U.S.C. § 1306(a) ..................................................................................................... passim

8 U.S.C. § 1324 ......................................................................................................... passim

8 U.S.C. § 1324a................................................................................................................6, 19

8 U.S.C. § 1324b................................................................................................................6, 19

8 U.S.C. § 1324c ..............................................................................................................20

8 U.S.C. § 1357 ......................................................................................................... passim

DHS Appropriations Act of 2010, Pub. L. No. 111–83, 123 Stat. 2142 (2009).........................8, 9

Immigration Reform and Control Act of 1986 ("IRCA") ..............................................................6

# TABLE OF AUTHORITIES
(continued)

Page(s)

STATE STATUTES

625 ILL. COMP. STAT. § 5/6-101 ................................................................26

625 ILL. COMP. STAT. § 5/6-112 ................................................................27

A.R.S. § 11-1051 ........................................................................... passim

A.R.S. § 13-1509 ........................................................................... passim

A.R.S. § 13-2906 ...............................................................................32

A.R.S. § 13-2928 ........................................................................... passim

A.R.S. § 13-2929 ................................................................................4

A.R.S. § 13-3883 ............................................................................4, 13

A.R.S. § 28-905 ................................................................................32

A.R.S. § 28-3169 ...............................................................................26

ALA. CODE § 32-6-1 .............................................................................26

ALA. CODE § 32-6-9(a) ..........................................................................27

ALASKA STAT. § 28.15.011 .......................................................................26

ALASKA STAT. § 28.15.131 .......................................................................27

C.C.A.N. 5649, 5661 ..........................................................................6, 19

CAL. VEH. CODE § 12500(b) ......................................................................26

CAL. VEH. CODE § 12951(a) ......................................................................27

COL. REV. STAT. § 42-2-101(1) ...............................................................26, 27

CONN. GEN. STAT. § 14-36 .......................................................................27

CONN. GEN. STAT. § 14-36(a) ....................................................................26

IND. CODE § 9-24-1-1 ...........................................................................26

IND. CODE § 9-24-13-3 ..........................................................................27

LA. REV. STAT. ANN. § 32:402(A)(B) .............................................................26

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3    LA. REV. STAT. ANN. § 32:411..................................................................................27

4    N.M. STAT. ANN. § 66-5-9(B)..................................................................................26

5    N.M. STAT. ANN. § 66-5-16 ..............................................................................26, 27

6    S.C. CODE ANN. § 56-1-20.......................................................................................26

7    S.C. CODE ANN. § 56-1-190.....................................................................................27

8    UTAH CODE ANN. § 53-3-207(7)(a).........................................................................26

9    UTAH CODE ANN. § 53-3-217 ...........................................................................26, 27

10   WASH. REV. CODE 46.20.001....................................................................................26

11   WASH. REV. CODE 46.20.015....................................................................................27

12   WASH. REV. CODE 46.20.035(3)...............................................................................26

13   WYO. STAT. ANN. § 31-7-106...................................................................................26

14   WYO. STAT. ANN. § 31-7-116...................................................................................27

15

16

17   **FEDERAL RULES**

18   Federal Rule of Civil Procedure 65 ..............................................................................1

19

20   **FEDERAL REGULATIONS**

21   8 C.F.R. § 264.1 .......................................................................................................17

22   8 C.F.R. § 274a.1 .........................................................................................6, 19, 29

23   8 C.F.R. § 287.3 .......................................................................................................21

24   8 C.F.R. § 287.5 .......................................................................................................21

25

26   **STATE REGULATIONS**

27   N.M. ADMIN. CODE § 18.19.5.12 ..............................................................................26

28

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**CONSTITUTIONAL PROVISIONS**

Ariz. Const. Art. 4, Part 1 § 1(3)........................................................................................3

U.S. Const., Art. VI, cl. 2................................................................................................10


**LEGISLATIVE MATERIALS**

Arizona House Bill 2162, 49th Leg., 2nd Reg. Sess., Ch. 211 (Az. 2010)......................................1

Arizona Senate Bill 1070, 49th Leg., 2nd Reg. Sess., Ch. 113 (Az. 2010) .....................................1

H.R. Rep. No. 99-682(I), 99th ........................................................................................19

Pub. L. No. 99-603, H.R. Rep. No. 99-682(I), 99th .........................................................6

1    Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Friendly House, *et al.*

2    ("Plaintiffs") hereby move for a preliminary injunction enjoining all Defendants from

3    enforcing Arizona Senate Bill 1070.[1]

4    **I.    INTRODUCTION**

5    Arizona recently enacted what its Governor candidly describes as the State's "new

6    immigration laws"[2]—Arizona Senate Bill 1070, 49th Leg., 2nd Reg. Sess., Ch. 113 (Az.

7    2010) as amended by Arizona House Bill 2162, 49th Leg., 2nd Reg. Sess., Ch. 211 (Az.

8    2010) (hereinafter "SB 1070").[3]   As proponents of the law have explained, SB 1070 is

9    intended to help Arizona "seal its borders" and deter and punish "the unlawful entry and

10   presence of aliens."  Arizona, however, does not have the power to regulate immigration,

11   and it does not have the right to decide whether or how its border (which includes an

12   international border of the United States) will be "sealed" or whether or how non-U.S.

13   citizens will be deterred from or punished for entering this country.  Those are powers

14   and functions reserved exclusively to the federal government, which draws its authority

15   from all 50 states and is responsible for this nation's foreign affairs.

16   SB 1070 represents an unprecedented attempt by a single state to regulate

17   immigration, thereby undermining the federal government's plenary authority in this area

18   and creating disparities among states in the treatment of non-citizens.  Under SB 1070, in

19   Arizona and not in any other state:

20   ▪    A non-citizen may be criminally prosecuted in the state courts for failing to

21        carry proof of federal immigration registration, even though the federal

22        alien registration system is obsolete in key respects.

23   ▪    Police officers are required to detain a person if they "reasonably suspect"

24        that the person is "unlawfully present" in the United States—a mandate

25   ───────────────

26   [1] Plaintiffs note that they have filed a Motion to Transfer with the Honorable Susan R.
     Bolton because this case is related to an earlier filed case currently pending before Judge
     Bolton.  (Dkt. 36.)

27   [2] *See* Boyd Decl., Ex. 1.

28   [3] Full text of these provisions are attached as Exhibits A and B to the Boyd Decl.

1    inconsistent with federal immigration policy and dependent on an

2    immigration term that is ripped out of context.

3    ▪    Police officers may make warrantless arrests if they believe a person has

4    committed a public offense that makes the person "removable from the

5    United States"—an exceptionally complex federal-law determination.

6    ▪    Employers and workers may be criminally prosecuted in the state courts for

7    communicating about work—even work that federal immigration law does

8    not prohibit.

9    ▪    Police officers may deprive residents of certain states of their right to travel

10    in Arizona, by detaining and questioning them but not similarly-situated

11    residents of Arizona or other states.

12    Arizona's "new immigration law" is unconstitutional for multiple reasons.

13    Plaintiffs here present three: (1) SB 1070 is preempted by federal law, both because it

14    constitutes the "regulation of immigration," which is reserved exclusively to the federal

15    government, and because it conflicts with the comprehensive federal system of

16    immigration regulation codified in the Immigration and Nationality Act ("INA"), 8

17    U.S.C. §§ 1101 *et seq.*; (2) SB 1070 violates the fundamental right to travel because it

18    burdens the right of residents of other states to travel in Arizona free of fear of unjustified

19    detention or arrest; and (3) SB 1070 violates the First Amendment because it criminalizes

20    and chills protected speech on the basis of its content.

21    Unless enjoined in its entirety, SB 1070 will cause immediate and irreparable

22    injury to Plaintiffs, class members, and the public interest.  Among other harms, Plaintiffs

23    will be subjected to an unlawful state immigration scheme; unwarranted detention and

24    arrest based on the unbridled discretion of Arizona police officers; discrimination based

25    on race, and national origin, and infringement of their right to travel and right to freedom

26    of speech.  Further, the public interest will be served if SB 1070 is preliminarily enjoined

27    until its constitutionality can be fully and finally adjudicated.  Absent such an injunction,

28    SB 1070 will immediately displace the federal government's exclusive authority over

1   immigration, burden and drain federal resources, undermine the enforcement of other

2   criminal laws in Arizona by wasting scarce law enforcement resources and deterring non-

3   citizens from contacting and cooperating with law enforcement, and interfere with the

4   foreign relations of the United States, particularly this nation's relationship with Mexico.

5   **II.     BACKGROUND**

6        On April 23, 2010, Governor Janice Brewer signed into law SB 1070, a

7   comprehensive system of state laws expressly intended to deter and punish "the unlawful

8   entry and presence of aliens."  SB 1070, § 1.  Section 1 declares that "[t]he provisions of

9   this act are intended to work together to discourage and deter the unlawful entry and

10  presence of aliens and economic activity by persons unlawfully present in the United

11  States."  *Id.*  On April 30, 2010, Governor Brewer signed HB 2162, which amends SB

12  1070 but retains that law's core provisions and intent.  Unless enjoined, SB 1070, as

13  amended, will take effect on July 29, 2010.  *See* Ariz. Const. Art. 4, Part 1 § 1(3).

14       As Governor Brewer acknowledged when signing SB 1070, it is intended to

15  "solve a crisis . . . [that] the federal government has refused to fix."  Boyd Decl., Ex. 2.

16  Arizona State Representative David Gowen, a SB 1070 proponent, likewise explained

17  that the law was needed because "[t]he government has failed in helping [Arizona] seal

18  its borders."  *Id.*, Ex. 3 at 2; *see also id.*, Ex. 4 (statement by SB 1070 author, State

19  Senator Russell Pearce, that SB 1070 will facilitate the "self-deportation" of "illegal

20  immigrants").

21       **A.     ARIZONA SB 1070**

22       SB 1070 is an integrated and comprehensive set of immigration regulations,

23  operating through a combination of new state law crimes and related law enforcement

24  mandates.  These provisions are based, in significant part, on state law classifications of

25  non-citizens that find no counterpart in federal law.  *See* Cooper Decl. ¶¶ 5–13.

26       SB 1070 creates a number of new Arizona state law crimes relating to

27  immigration.  Chief among these is a state criminal provision authorizing the arrest and

28  punishment of persons that the State determines to be in violation of the federal alien

1    registration statute.  SB 1070, § 3, as amended; Arizona Revised Statute ("A.R.S.") § 13-

2    1509(A), (F) (making it a state crime to "complete or carry an alien registration document

3    . . . in violation of 8 United States Code section 1304(e) and 1306(a)").  The statute does

4    not apply to a person who "maintains authorization from the federal government to

5    remain in the United States"—a category of persons not defined in SB 1070 and without

6    any counterpart in federal law.  *See* A.R.S. § 13-1509(F); Cooper Decl. ¶ 10.

7         SB 1070 also criminalizes work and the solicitation of work by those persons

8    "lacking federal work authorization."  *See* SB 1070, § 5, A.R.S. § 13-2928(A) (making it

9    a crime to "attempt to hire or hire and pick up passengers for work" if the motor vehicle

10   "blocks or impedes the normal movement of traffic"); A.R.S. § 13-2928(B) (making it a

11   crime to "enter a motor vehicle that is stopped" in order to be "hired by an occupant of

12   the motor vehicle" if the motor vehicle "blocks or impedes the normal movement of

13   traffic"); A.R.S. § 13-2928(C) (prohibiting any individual "unlawfully present" to work

14   or solicit work).[4]

15        SB 1070 also creates various new state law enforcement procedures and mandates

16   relating to immigration.  For example, under SB 1070, police officers may make

17   warrantless arrests where they have probable cause to believe that the person has

18   committed "any public offense that makes the person removable from the United States."

19   SB 1070, § 6, as amended; A.R.S. § 13-3883(A)(5).  Similarly, any police officer who

20   has conducted a "lawful stop, detention or arrest . . . in the enforcement of any other law

21   or ordinance of a county, city or town or [the State of Arizona]" *must* make a "reasonable

22   attempt" to determine the immigration status of the person who has been stopped,

23   detained, or arrested, whenever "reasonable suspicion exists that the person is an alien

24

25   ――――――――――
     [4]  SB 1070 criminalizes a myriad of other conduct as well.  *See, e.g.*, SB 1070, § 5 as
26   amended by HB 2162; A.R.S. § 13-2929(A)(3) (making it a crime for individuals to
     "[e]ncourage or induce an alien to come to or reside in [Arizona]" while "in violation of a
27   criminal offense"); A.R.S. § 13-2929(A)(1) & (2) (making it a crime to transport, move,
     conceal, harbor or shield aliens in furtherance of their illegal presence in the United
28   States while "in violation of a criminal offense").

and is unlawfully present."  SB 1070, § 2, as amended; A.R.S. § 11-1051(B).[5]  Further, prior to releasing any person who has been arrested, police must determine the person's immigration status and must detain the arrested person until such status is verified.[6]  SB 1070, § 2, as amended; A.R.S. § 11-1051(B).

In short, the provisions of SB 1070 "work together," SB 1070, § 1, to create an integrated set of tools aimed at investigating, detaining, arresting, and punishing those whom *Arizona* deems to be present in the State without federal legal authorization, even when the federal government does not.  *See* Meissner Decl. ¶¶ 9, 19–23.

### B.     FEDERAL IMMIGRATION LAW

Long before the Arizona Legislature enacted SB 1070, the U.S. Congress created a system of federal laws regulating and enforcing immigration, which are codified in the INA.  *See* 8 U.S.C. §§ 1101, *et seq*.  A review of selected provisions of the INA and their implementing regulations demonstrates the comprehensive nature of this legislative scheme.

In 1940, Congress enacted the Alien Registration Act, which is now incorporated into the INA with minor adjustments not relevant here.  *See* 8 U.S.C. §§ 1304(e) and 1306(a).  Those provisions require that non-citizens eighteen years of age and over carry a certificate of alien registration or alien registration receipt card issued to them by the U.S. Attorney General.  *Id.*  The federal registration law was intended specifically to displace and preempt state alien registration laws.  When signing the 1940 Act, President Roosevelt explained:

---

[5]  A driver's license is presumed to rebut the reasonable suspicion that an individual is "unlawfully present" only if issued by Arizona or another state that "requires proof of legal presence in the United States."  SB 1070 § 2, as amend, A.R.S. § 11-1051(B)(4).

[6]  SB 1070 establishes a scheme that will result in detention and arrest of U.S. citizens or persons with federal permission to remain in the United States whose identity documents have been stolen, lost, or misplaced.  *See* Boyd Decl., Ex. 10 (Excerpts of Arizona House Military Affairs and Public Safety Hearing (03/31/2010), at 29:01 (statement by State Senator Pearce confirming that, under SB 1070, "if you don't have that indicia on you that's required by law, you will be taken into custody potentially . . . .  I need to go through a process to determine who you really are and that you have a right to be in the country legally").

> The only effective system of control over aliens in this
> country must come from the Federal Government alone.  This
> is as true from a practical point of view as it is from a legal
> and constitutional point of view. . . . [A]ttempts by the States
> or communities to deal with the problem individually will
> result in undesirable confusion and duplication.

Boyd Decl., Ex. 15 (Statement by President Roosevelt on Signing the Alien Registration Act, June 29, 1940, THE PUBLIC PAPERS AND ADDRESSES OF FRANKLIN D. ROOSEVELT at 274-75 (MacMillan Co. 1941)).

In 1986, Congress enacted the Immigration Reform and Control Act of 1986 ("IRCA"), which is incorporated into the INA at 8 U.S.C. §§ 1324a and 1324b.  IRCA added, for the first time, comprehensive immigrant employment regulations, prohibiting employers from knowingly employing an unauthorized alien or from hiring employees without verifying employment status through what is commonly known as the "I-9" process.  8 U.S.C. § 1324a(a)(1).  Non-compliant employers face a graduated system of sanctions.  8 U.S.C. §§ 1324a(e)(4), 1324a(f).

In enacting IRCA, Congress exempted from federal sanction certain types of casual hires, such as day laborers.  Pub. L. No. 99-603, H.R. Rep. No. 99-682(I), 99th Cong., 2nd Sess. 1986, 1986 U.S.C.C.A.N. 5649, 5661, *available at* 1986 WL 31950 ("[i]t is not the intent of this Committee that sanctions would apply in the case of casual hires . . .").  Thus, certain categories of work do not require verification of employment under federal law.  *See* 8 C.F.R. § 274a.1(f), (h), (j).  Congress also limited criminal sanctions and monetary penalties for unauthorized work to employers, not workers.  *See* 8 U.S.C. § 1324a; Cooper Decl. ¶¶ 22–23.  *See also* § III.A.1.b.2, *infra*.

Federal immigration law has also produced myriad regulations governing immigration classifications, removability, and related issues, as well as a complex administrative process for making the relevant determinations.  Cooper Decl. ¶ 14 (noting "intricate federal statutory and regulatory provisions" governing immigration-related determinations).  The complexity of this statutory and regulatory scheme is compounded by the broad discretion exercised by federal officials.  *Id*. ¶¶ 14, 18.  Many individuals

cannot be easily classified under this system; indeed, persons who may lack any formal immigration status may still be allowed to remain in the United States. *Id.* ¶¶ 15–20. The classifications used in SB 1070 are not congruent with those in federal law. *Id.* ¶¶ 6–13.

Because of these complications, federal authorities cannot provide fast, easy, or accurate answers to questions relating to whether a person is "unlawfully present" or "removable" or "maintains authorization . . . to remain in the United States" in the manner contemplated by SB 1070, §§ 2–3, 5–6.  Cooper Decl. ¶¶ 6–13.  As the City of Tucson has averred, "the United States Border Patrol cannot guarantee that it can respond to every local law enforcement request to verify an individual's status," and "Customs Enforcement agents will not be able to respond with an immediate verification of the immigration status of every person who receives a criminal misdemeanor citation."  Boyd Decl. Ex. 20 *Escobar v. Brewer*, No. 10-CV-249 (D. Ariz. Apr. 29, 2010) (Cross-cl. and Answer ("Tucson Cross-Comp."), ¶¶ 43–44; *see also* Boyd Decl., Ex. 26 (statement by John Morton, head of U.S. Immigration and Customs Enforcement ("ICE") that his agency would not necessarily act upon referrals of suspected illegal immigrants from Arizona officials).[7]

The federal government has set national enforcement priorities reflecting the deliberate judgment of the Executive Branch, mandates set by Congress, and the strategic

---

[7]  SB 1070 nevertheless requires that local law enforcement agencies routinely pose such questions to federal immigration officers. *See* SB 1070, as amended, §§ 2(B), 3(F), 5(C), 6(A)(5). *See also* Meissner Decl. ¶ 22; Boyd Decl., Ex. 20, Tucson Cross-Comp. at ¶ 38, estimating that SB 1070 will require Tucson officers alone to make more than 30,000 additional inquiries per year).  This flood of requests will hamper and drain federal resources and priorities. *See* Meissner Decl. ¶ 7 (statement by prior INS Commissioner that SB 1070 has the potential to "fundamentally undermine and subvert" federal immigration enforcement efforts).  Indeed, Secretary of DHS Janet Napolitano stated, "The Arizona immigration law will likely hinder federal law enforcement from carrying out its priorities of detaining and removing dangerous criminal aliens."  Boyd Decl., Ex. 9 at 2.  Moreover, cities such as Tucson "will be required to incarcerate persons who would have been released at the time of citation pending federal verification of the person's immigration status." *Id.,* Ex. 20.  Tucson Cross-Comp. at ¶ 45. *See* Boyd Decl., Ex. 10, at 16:31 (statements of State Senator Pearce during Mar. 31, 2010 hearing indicating the desire for "a state law" so that local officials can "keep" individuals for immigration related offenses rather than referring them to ICE.

1  coordination of different mechanisms to effectuate these priorities.  *See* Meissner Decl.

2  ¶¶ 15–24.  In particular, Congress has directed that the Secretary of the U.S. Department

3  of Homeland Security ("DHS") "prioritize the identification and removal of aliens

4  convicted of a crime by the severity of that crime."  DHS Appropriations Act of 2010,

5  Pub. L. No. 111–83, 123 Stat. 2142, 2149 (2009).  This focus on dangerous criminals is

6  not new.  *See* Meissner Decl. ¶¶ 17–18; Boyd Decl., Ex. 6 (July 21, 2008 statement by

7  Phoenix, Arizona ICE official, Katrina S. Kane, that, "[b]y focusing our resources on

8  programs that identify *criminal* aliens for removal from the United States, we are

9  succeeding in our mission to keep foreign-born *criminals* off of the streets in Arizona").[8]

10     Federal officers are specially trained to make inquiries in the field and to prioritize

11  investigation and arrests according to federal priorities.  *See* Boyd Decl., Ex. 8 (Julie

12  Myers, Assistant Secretary for ICE, Memorandum on Prosecutorial and Custody

13  Discretion dated Nov. 7, 2007, stating that "[f]ield agents and officers are not only

14  authorized by law to exercise discretion . . . but are expected to do so in a judicious

15  manner at *all stages of the enforcement process*" including in deciding "whom to stop,

16  question and arrest"); Meissner Decl. ¶ 19.  In contrast, SB 1070's mandatory

17  enforcement provisions require blanket enforcement without reference to such discretion.

18  *See* III.A.1.b.3, *infra*.

19     In light of these complexities, the federal government has carefully limited the role

20  of state and local officers in immigration enforcement.  In 1996, Congress authorized

21  DHS to enter into specific, written agreements with local law enforcement agencies to

22  operate as authorized by DHS in those memoranda of understanding ("MOU").  8 U.S.C.

23  § 1357(g).  To participate in this program, local officers must receive adequate training,

24  and adhere to federal law in performing immigration functions.  *Id.* § 1357(g)(2).  Most

25  importantly, local officers "shall be subject to the direction and supervision of the

26  Attorney General."  *Id.* § 1357(g)(3).  Thus, the local police remain under federal

27

28  [8] Unless otherwise indicated, in this memorandum all emphases are added.

- 8 -

1   authority and supervision and can act in accordance with enforcement goals set by the

2   federal government.  Meissner Decl. ¶¶ 25–31.  *See* DHS Appropriations Act of 2010,

3   Pub. L. No. 111–83, 123 Stat. 2142, 2149 (2009) (barring the use of funds to continue "a

4   delegation of law enforcement authority . . . if the Department of Homeland Security

5   Inspector General determines that the terms of the agreement governing the delegation of

6   authority have been violated").[9]  Indeed, in October 2009, the federal government

7   modified its MOU with Maricopa County, Arizona as a result of disagreement with

8   Sheriff Joseph Arpaio's enforcement methods and priorities.  *See* Boyd Decl., Ex. 27.

9       SB 1070, by contrast, imposes none of these limitations on local enforcement,

10  usurping federal authority in this area.

### III.    THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION THAT BARS ENFORCEMENT OF SB 1070

11

12      Four factors must be established to prevail on a motion for a preliminary

13  injunction:  (1) there must be a likelihood of success on the merits; (2) it must be likely

14  irreparable harm will be suffered if preliminary relief is not granted; (3) the balance of

15  equities must tip in favor of an injunction; and (4) a preliminary injunction must be in the

16  public interest.  *See Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009)

17  (citing *Winters v. Natural Resources Defense Council, Inc.*, 129 S. Ct. 365, 374 (2008)).

18  All four factors are established here.

### A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

19

20  #### 1.    SB 1070 VIOLATES THE SUPREMACY CLAUSE

21      The Supremacy Clause, U.S. Const., Art. VI, cl. 2, forbids any state "regulation of

22  immigration."  *DeCanas v. Bica*, 424 U.S. 351, 353-54 (1976).  A state law regulating

23  immigration is void, whether or not Congress has enacted comparable federal statutory

24

25  [9]  Outside of MOU agreements, state and local police may make arrests for certain immigration *crimes*, such as smuggling, transporting, or harboring certain aliens, or for

26  illegal entry by deported felons.  8 U.S.C. §§ 1324(c) and 1252c.  Further, 8 U.S.C. § 1103(a)(10) permits the U.S. Attorney General to authorize local authorities to enforce

27  immigration laws, but only upon certification of an "actual or imminent mass influx of aliens."  No such certification has occurred.  Finally, any state or agent may "cooperate"

28  with the U.S. Attorney General.  8 U.S.C. § 1357(g)(10)(B).

1    provisions.  This flat prohibition on state regulation of immigration is required because

2    immigration regulation is "unquestionably *exclusively* a federal power."  *Id.* at 354; *see*

3    *also id.* at 355 (federal "constitutional power" to regulate immigration preempts state law

4    "whether latent or exercised"); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("[t]he authority to

5    control immigration . . . is vested solely in the Federal Government").

6          In addition to prohibiting state regulation of immigration, the Supremacy Clause

7    invalidates any state law that is expressly or impliedly preempted by federal statutes and

8    regulations.  *See DeCanas*, 424 U.S. at 356-65.  Under federal preemption principles,

9    state legislation is preempted "when the scope of a statute indicates that Congress

10   intended federal law to occupy a field exclusively, or when state law is in actual conflict

11   with federal law."  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 899 (2000) (internal

12   citation omitted) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)); *see*

13   *also DeCanas*, 424 U.S. at 356-65 (considering regulation of immigration and field

14   preemption claims, but remanding for conflict preemption analysis).

15         SB 1070 violates the Supremacy Clause for two independent reasons.  First, it is

16   an unconstitutional encroachment on the federal government's exclusive power to

17   regulate immigration.  Second, SB 1070 conflicts with, and is, therefore, preempted by,

18   federal immigration laws and regulations.

19                    a.    SB 1070 IS AN UNCONSTITUTIONAL "REGULATION
                            OF IMMIGRATION"
20
21         The "determination of who should or should not be admitted into the country, and

     the conditions under which a legal entrant may remain," constitute direct "regulation of
22
     immigration" which is reserved exclusively for the federal government.  *DeCanas*, 424
23
     U.S. at 355.  As the U.S. Supreme Court has further explained, "determining what aliens
24
     shall be admitted to the United States, the period they may remain, regulation of their
25
     conduct before naturalization, and the terms and conditions of their naturalization," are
26
     matters reserved exclusively to the federal government.  *Toll v. Moreno,* 458 U.S. 1, 11
27
     (1982) (citing *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948)); *see also*
28

1  *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (states may not engage in "classification of

2  aliens").  Unless a state law involving immigration primarily addresses legitimate local

3  concerns and has only a "purely speculative and indirect impact on immigration," it is

4  invalid under the Supremacy Clause.  *DeCanas*, 424 U.S. at 355-56.  SB 1070 is plainly

5  invalid under these standards.

6      *First*, SB 1070 is a brazen and improper usurpation of the federal government's

7  constitutional role in immigration regulation.  Section 1 of SB 1070 makes that intent

8  plain: "[t]he legislature declares that the intent of this act is to make attrition through

9  enforcement the public policy of all state and local government agencies in Arizona."

10  "Attrition through enforcement" is an immigration policy that some advocates have urged

11  the federal government to adopt, but it is not federal policy.  *See* Boyd Decl., Ex. 16,

12  Mark Krikorian, *Downsizing Illegal Immigration: A Strategy of Enforcement Through*

13  *Attrition*, Center for Immigration Studies (May, 2005).  SB 1070's provisions "are

14  intended to work together to discourage and deter the unlawful entry and presence of

15  aliens and economic activity by persons unlawfully present in the United States."  SB

16  1070, § 1.  Governor Brewer further asserted at its signing that SB 1070 addresses a

17  problem that "the federal government has refused to fix."  *See* Boyd Decl., Ex. 2.

18      The *sole* purpose of SB 1070 is thus to affect the entry and presence, *DeCanas*,

19  424 U.S. at 355, of those whom Arizona deems to be "unlawful," or, put another way, to

20  "regulat[e] their conduct," *Toll*, 458 U.S. at 11.  Indeed, SB 1070 does not even purport

21  to target an area of local concern separate from immigration policy, *DeCanas*, 424 U.S. at

22  355, but instead openly seeks to implement Arizona's immigration policy choices

23  because of disagreement or disappointment with the federal government.  That is plainly

24  unconstitutional: in our federal system, Arizona may not overrule the federal

25  government's immigration policy or unilaterally correct its perceived failures.

26      *Second*, SB 1070 has more than an "incidental and speculative" impact on

27  immigration.  The law subjects non-citizens in Arizona to a new and distinct set of

28  immigration rules, crimes, enforcement officials, interpretations, and procedures that do

1   not exist or apply in other states.[10]  Among other things, non-citizens in Arizona, but not

2   elsewhere, are subject to: (1) additional state law penalties, including incarceration, for

3   violations of immigration registration provisions; (2) indiscriminate and repeated

4   interception, interrogation, and state law detention *even if* they comply with federal

5   regulation provisions; (3) state officials' judgments—independent of federal law,

6   regulation, or policy—about what immigration violations justify arrest and/or

7   prosecution; and (4) state criminal penalties for work that is not criminalized by the

8   comprehensive federal scheme regulating immigrant employment.  These provisions

9   dictate the conduct of and increase the burden on non-citizens in Arizona and thus

10  unlawfully alter the conditions under which they may remain.

11          Thus, SB 1070 directly regulates immigration by imposing additional "conditions"

12  on entering or remaining in the United States.  Such state or local laws repeatedly have

13  been struck down as unconstitutional.  *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 281

14  (1875) (statute regulating arrival of passengers from foreign port); *Henderson v. Mayor*

15  *of the City of N.Y.*, 92 U.S. 259 (1875) (same); *Villas at Parkside Partners v. City of*

16  *Farmers Branch*, Nos. 08-cv-1551, 03-cv-1615, 2010 WL 1141398, at *16 (N.D. Tex.

17  Mar. 24, 2010) ("*Farmers Branch II*") (ordinance requiring non-citizens to demonstrate

18  immigration status prior to renting housing).

19          *Third*, SB 1070 regulates immigration by impermissibly authorizing and requiring

20  state officials to classify non-citizens into statuses that are not defined or readily

21  ascertained under federal law.  "The States enjoy no power with respect to the

22  classification of aliens."  *Plyler*, 457 U.S. at 225; *see also Farmers Branch II*, 2010 WL

23  1141398 at *14.  SB 1070 repeatedly violates this rule.  For example, SB 1070 allows the

24

_____

25  [10]  The burdens of this regime fall on "legal entrants" as well as those who have not
    entered the country legally, for two reasons.  First, many persons who are lawful

26  permanent residents or are otherwise permitted to remain in the United States will be
    burdened by Arizona's unique immigration system, including especially its registration

27  and interrogation provisions.  Second, some individuals who lawfully enter the country
    subsequently fail to maintain their immigration status.  SB 1070 does not distinguish such

28  legal entrants from other individuals who currently lack status.

1   warrantless arrest of any "person [who] has committed any public offense that makes the

2   person removable from the United States." A.R.S. § 13-3883(A)(5).  Determining which

3   "offenses" make a person removable from the United States under federal law is,

4   however, famously difficult and complex.  *See Padilla v. Kentucky,* 130 S.Ct. 1473, 1483

5   (2010) ("[t]here will . . . undoubtedly be numerous situations in which the deportation

6   consequences of a particular [crime] are unclear or uncertain"); Cooper Decl. ¶¶ 11–12.

7   Federal law does not envision or accommodate state and local police making warrantless

8   arrests based on these complex legal determinations.

9        SB 1070 also uses terms that have no counterpart in federal immigration law.

10  SB 1070's registration scheme exempts from liability "a person who maintains

11  authorization from the federal government to remain in the United States." A.R.S. § 13-

12  1509(F).  The INA contains no list or definition of the categories of persons the federal

13  government deems authorized to remain in the United States.[11]  *See* Cooper Decl. ¶ 10.

14  SB 1070 also refers to "an alien . . . unlawfully present in the United States," A.R.S. §

15  11-1051(B)-(D), and "a person who is unlawfully present in the United States," *Id.* § 13-

16  2928(C).  In the INA, the term "unlawfully present in the United States" does not identify

17  a set of individuals.  Instead, this term is used and defined only to calculate time periods

18  relevant to re-entry bars that apply to certain persons who previously were in the United

19  States; is explicitly restricted to that context; and depends on factors that cannot be

20  observed by an officer, such as whether the person "has a bona fide application for

21  asylum pending under section 1158 of this title." 8 U.S.C. § 1182(a)(9)(B)(ii) (defining

---

22  [11]  Nor is there any clear way to apply this provision of SB 1070 consistently with the
23  INA.  Many non-citizens are present in the United States without formal permission but
    would not be removed if placed in federal removal proceedings, including many
24  individuals who have legitimate asylum claims which have not yet been adjudicated.  In
    one sense, such persons do not "maintain authorization" to remain here because they do
25  not have a formally recognized immigration status.  Nevertheless, the federal government
    is aware of their presence, does not remove them, and will eventually formally grant them
26  status, so they arguably maintain at least implicit authorization to remain.  *See* Cooper
    Decl. ¶¶ 14-20.  *See also Plyler*, 457 U.S. at 240 n.6 (Powell, J., concurring) ("it is
27  impossible for a State to determine which aliens the Federal Government will eventually
    deport, which the Federal Government will permit to stay, and which the Federal
28  Government will ultimately naturalize"); *id.* at 236 (Blackmun, J., concurring).

1   unlawful presence "[f]or purposes of this paragraph"); Cooper Decl. ¶ 8 (former INS

2   General Counsel explaining "unlawful presence" statute).  Where, as here, state or local

3   regulations utilize "classification provisions" not supported by federal law, those

4   regulations are invalid as a direct and "impermissible regulation of immigration."

5   *League of United Latin Am. Citizens v. Wilson*, 908 F. Supp. 755, 768-70 (C.D. Cal.

6   1995).

7        *Fourth*, SB 1070 has already had, and will continue to have, a direct, non-

8   speculative effect on precisely those national interests that federal exclusivity in this area

9   is designed to protect.  In striking down previous state immigration legislation on

10  constitutional-preemption grounds, the U.S. Supreme Court cited the "hypothetical"

11  concern that "a . . . [state official] may bring disgrace upon the whole country, the enmity

12  of a powerful nation, or the loss of an equally powerful friend."  *Chy Lung*, 92 U.S. at

13  279; *see also Hines v. Davidowitz*, 312 U.S. 52, 63-64 & n.9-12 (1941) (quoting *Chy

14  Lung*, 92 U.S. at 279); *Henderson*, 92 U.S. at 273 (preempted state law "belongs to that

15  class of laws which concern the exterior relation of this whole nation with other nations

16  and governments").

17       In this case, such concerns are far from "hypothetical."  U.S. Secretary of State

18  Clinton and Mexican President Felipe Calderon have already stated that SB 1070 is

19  straining U.S.–Mexico relations.  Boyd Decl., Exs. 11-13.  Abraham F. Lowenthal, an

20  international relations expert who specializes in U.S.–Latin American relations, confirms

21  that the law will "significantly impair the relations of Mexico with the United States, the

22  activities and opinions of Mexicans, officials and the general public, toward the United

23  States, and the capacity of US Government officials to conduct constructive relations

24  with Mexico in the national interest of the United States and its citizens."  Lowenthal

25  Decl. ¶ 10.  Professor Lowenthal further explains that SB 1070 makes it "far more

26  difficult" for the United States to conduct foreign policy with Mexico.  *Id.* at ¶ 13.  Doris

27  Meissner, who, as the head of the federal immigration agency, was intimately involved in

28  managing the interaction between immigration issues and foreign affairs, concurs that SB

1070 will "have an impact on U.S. relations with foreign countries" and that "Arizona is
directly interfering with the formulation and execution of immigration policy by the
Executive Branch, including with the essential role played by the Department of State in
exercising its responsibilities for the conduct of the nation's foreign affairs and foreign
policy." Meissner Decl. ¶¶ 32–33.

As the U.S. Supreme Court stated in *Hines*, "[e]xperience has shown that
international controversies of the gravest moment . . . may arise from real or imagined
wrongs to another's subjects inflicted, or permitted, by a government."  312 U.S. at 64.
That possibility looms large here.

For all of the reasons stated above, SB 1070 is an impermissible, direct regulation
of immigration.

b.      SB 1070 IS PREEMPTED BY FEDERAL IMMIGRATION
STATUTES AND REGULATIONS

SB 1070 must also be invalidated for the separate reason that it conflicts with the
comprehensive federal immigration system created by the INA, 8 U.S.C. § 1101 *et seq*.
In the INA, Congress set forth a comprehensive system of immigration laws, regulations,
procedures, and policies under which the federal government regulates the exact topics
addressed by SB 1070: "the unlawful entry and presence of aliens and economic activity
by persons unlawfully present in the United States."  SB 1070, § 1.  SB 1070, in its
entirety, conflicts with this comprehensive system.  The INA does not allow or leave
room for the creation of state schemes, such as SB 1070, in which multiple provisions
work together to create a comprehensive immigration control system that applies only in
a single state.  *See Toll*, 458 U.S. at 13 n.18 (state law relating to immigration only
appropriate where "Congress *intended* that the States be allowed" to legislate in that area)
(emphasis in original); *see also* Meissner Decl. ¶ 9 ("SB 1070 would establish an
immigration enforcement regime separate and distinct from that of the federal
government.  Based on my experience, implementing the Arizona law would have direct

- 15 -

1   and profound adverse consequences on the proper administration of the immigration laws

2   by the federal government.").

3       Examination of some specific provisions of SB 1070 further reinforces that the

4   statute conflicts with federal law and is preempted.[12]

5                   (1)    REGISTRATION PROVISIONS

6       SB 1070, § 3, as amended, states that, "in addition to any violation of federal law,"

7   a person is guilty of an Arizona state law crime if he or she fails to "complete or carry an

8   alien registration document . . . in violation of 8 United States Code section 1304(e) and

9   1306(a)."  A.R.S. § 13-1509(A), (F).  Among other penalties, violation of this provision

10   may result in incarceration.  A.R.S. § 13-1509(H).

11       Through section 3, SB 1070 legislates in an area that the Supreme Court has

12   explicitly declared off-limits to the states.  In *Hines v. Davidowitz*, the Court found the

13   federal alien registration provisions—incorporated into the INA, including at 8 U.S.C. §§

14   1304(e) & 1306(a)—broadly preemptive and concluded that the provisions invalidated a

15   Pennsylvania alien registration statute.  312 U.S. at 68-69, 74.  Over the objection that

16   "compliance with the state law does not preclude or even interfere with the Act of

17   Congress" and "is harmonious with it," *id.* at 81, 79 (Stone, J., dissenting), the Court

18   found that federal law manifests a "purpose" to provide for "one uniform national

19   registration system, . . . free from the possibility of inquisitorial practices and police

20   surveillance," beside which the Pennsylvania law could not stand.  *Hines*, 312 U.S. at 74.

21   For the same reasons, SB 1070 is preempted by the federal alien registration system.

22       Defendants may assert that the state registration provisions are not preempted

23   because they are consistent with federal law.  But any such assertion would be both

24   legally and factually wrong.  As a legal matter, even laws that "complement the federal

25   [alien registration] law [and] enforce additional or auxiliary regulations" are preempted.

26   _____

27   [12]  We do not exhaustively catalog here all the ways in which SB 1070 conflicts with
   federal law.  For example, the Act's creation of new and distinct immigration categories
   plainly conflicts with federal statutory law as well as violating the prohibition on

28   "regulation of immigration."

1  *Hines*, 312 U.S. at 66-67; *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363,

2  379-80 (2000) ("conflict is imminent when two separate remedies are brought to bear on

3  the same activity") (punctuation and citations omitted); *Wis. Dep't of Indus. v. Gould*

4  *Inc.*, 475 U.S. 282, 286-87 (1986) (invalidating state statute that imposed additional

5  sanction on companies that violated federal law); *Farmers Branch II*, 2010 WL 1141398

6  at *18 ("a local regulation may not—though it may share a common goal with the federal

7  government—interfere with Congress's chosen methods").

8       As a factual matter, SB 1070 goes well beyond simply "complementing" or

9  "enforcing" federal registration provisions.  *First*, SB 1070 applies *additional penalties* to

10 non-citizens in Arizona when they are found (by Arizona state courts) to have violated

11 the registration provisions of 8 U.S.C. §§ 1304(e) and 1306(a).  These state criminal

12 penalties are in conflict with federal law.  This is particularly glaring because the federal

13 government rarely prosecutes registration violations.  *See* Boyd Decl., Ex. 5 (Bureau of

14 Justice Services statistics showing only 30 such prosecutions in 15 years).  Indeed, the

15 statutes referenced in SB 1070 specifically rely on federal regulations that have not been

16 kept up-to-date with federal practices.  *See* 8 C.F.R. § 264.1.  As the former General

17 Counsel of ICE's predecessor agency states, "Arizona is creating a ground of state

18 criminal liability based purely on a violation of two provisions of federal law . . . that

19 have become practically and effectively obsolete and unenforceable."  Cooper Decl. ¶ 27.

20 "[T]he regulations . . . are woefully out-of-date . . .  [T]he document list in the applicable

21 regulations . . . does not reflect current immigration law."  *Id.* ¶ 28.  In addition, "the list

22 omits many documents that individuals who have permission to be present in the United

23 States or are otherwise known to the immigration authorities may have."  *Id.* ¶ 29.

24 Plaintiffs Jane Doe 1 and Anderson are both in this predicament.  Jane Doe 1 Decl. ¶ 5;

25 Anderson Decl. ¶ 5.

26      SB 1070 thus selects a single "provision that has long been obsolete and widely

27 regarded by the federal authorities, at the very highest levels, to be practically impossible

28 to enforce and of extremely limited value as an immigration enforcement tool," Cooper

1   Decl. ¶ 25, out of a much broader panoply of federal immigration control restrictions and,

2   by elevating it to a priority for systematic enforcement, turns it to a purpose neither

3   intended by Congress nor approved by the Executive.[13]

4       *Second*, SB 1070's intertwined provisions that *require* local authorities to

5   investigate immigration status at every turn will—especially when coupled with the

6   registration provisions—bring about exactly the state of affairs that the U.S. Supreme

7   Court found intolerable: subjecting non-citizens to "indiscriminate and repeated

8   interception and interrogation by public officials" and "the possibility of inquisitorial

9   practices and police surveillance." *Hines*, 312 U.S. at 65-66, 76.  This outcome is

10  contrary to the national interest in uniformity in treatment of non-citizens with respect to

11  their immigration status in the United States.  *See* Meissner Dec. ¶ 11 ("it is critical to

12  have a single, coordinated federal system").

13      *Third*, SB 1070 allows local officials to detain and prosecute non-citizens under

14  state law authority for violation of federal immigration law rather than turning them over

15  to federal authorities, by whom they would be highly unlikely to be charged for a

16  registration crime.  As State Senator Pearce explained, one of the purposes of the

17  provision is to give law enforcement officers an additional means by which to "hold an

18  illegal alien under state law if need be," as an alternative to "just call[ing] ICE and

19  turn[ing] them over to ICE."  *See* Boyd Decl., Ex. 17, Message From State Senator

20  Russell Pearce (Mar. 24, 2010).  That expansion of Arizona's authority again interferes

21  with the national interest in uniformity in the enforcement of federal immigration law.

22      *Fourth*, as with other parts of SB 1070, and as discussed previously, the

23  registration provisions require state officials to make immigration determinations using

24  classifications that have no counterparts in federal law.

25

26

27  ---

[13] Furthermore, Arizona's prosecution of its new registration crime could affect non-citizens' rights within the federal immigration system by adversely affecting their ability
28  to seek future immigration benefits.

1

(2)   CRIMINALIZATION OF UNAUTHORIZED
WORKERS

2

3      SB 1070's employment provisions likewise conflict with federal law.  The federal

4   system includes neither civil fines nor criminal penalties for workers who seek or

5   perform unauthorized work.  In adding IRCA, 8 U.S.C. §§ 1324a-1324b, to the INA,

6   Congress adopted a federal policy of applying civil fines and criminal penalties for

7   unauthorized employment to employers rather than workers.  *See Nat'l Ctr. for*

8   *Immigrants' Rights, Inc. v. INS*, 913 F.2d 1350, 1368 (9th Cir. 1990), *rev'd on other*

9   *grounds*, 502 U.S. 183 (1991) ("While Congress initially discussed the merits of fining,

10   detaining or adopting criminal sanctions against the *employee,* it ultimately rejected all

11   such proposals . . . Instead, it deliberately adopted sanctions with respect to the *employer*

12   only.  Congress quite clearly was willing to deter illegal immigration by making jobs less

13   available to illegal aliens but not by incarcerating or fining aliens who succeeded in

14   obtaining work.") (emphasis in original).

15      Moreover, Congress chose to exempt certain economic arrangements from

16   employment regulation.  In particular, employers are not required to verify work

17   authorization documents for casual domestic workers or independent contractors.  *See* 8

18   C.F.R. §§ 274a.1(f), (h), (j).[14]  Further, while declining to create any general civil fines or

19   criminal liability for performing unauthorized work, Congress chose instead to create

20   more narrowly targeted immigration-law consequences for certain non-citizens and

21   sanctions for specific forms of worker misconduct, including civil penalties for various

22   forms of document fraud.  *See* 8 U.S.C. § 1324c.[15]

23   ─────────────────────
[14]   This is consistent with the legislative history.  *See* H.R. Rep. No. 99-682(I), 99th
24   Cong., 2nd Sess. 1986, 1986 U.S.C.C.A.N. 5649, 5661 ("It is not the intent of this
Committee that sanctions would apply in the case of casual hires (i.e., those that do not
25   involve the existence of an employer/employee relationship).").

[15]   The immigration consequences of unauthorized work are complex.  For some
26   nonimmigrants, unauthorized work would violate the conditions of their status.  In
addition, having engaged in unauthorized work is a bar to the benefit of adjustment of
27   status for many, but not all, immigrants.  *See* 8 U.S.C. §§ 1255(a) and (c); *see also*
Cooper Decl. ¶¶ 22-23.  The limited and nuanced nature of these federal law
28   consequences highlights the extent of the conflict between the broad criminalization of

SB 1070 stands in direct conflict with federal law regulating the employment of non-citizens.  Section 5 of SB 1070 makes it an Arizona state law crime "for a person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state."  A.R.S. § 13-2928(C).  Thus, SB 1070 applies criminal penalties to employees, precisely as Congress chose *not* to do in federal law, and expressly regulates "work as an . . . independent contractor," which Congress chose to *exempt* from the federal employer sanctions scheme.  Thus, SB 1070 directly "conflicts with federal law at a number of points by penalizing individuals and conduct that Congress has explicitly exempted or excluded from sanctions."  *Crosby*, 530 U.S. at 378.

Recent litigation regarding the Legal Arizona Workers Act ("LAWA") does not address the issues raised in this case.  The ongoing LAWA litigation explores whether states and localities are authorized by the savings clause in 8 U.S.C. § 1324a(h)(2) to impose licensing sanctions on employers who hire unauthorized workers.  *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009), *pet. for cert. pending*, No. 09-115 (U.S.) (finding that the LAWA comes within the savings clause); *but see* Boyd Decl., Ex. 18, Br. *Amicus Curiae* of the United States, *Chamber of Commerce v. Candelaria* ("S.G. LAWA Br."), No. 90-115 (U.S.) at 10, 14-15 (concluding that § 1324a(h)(2) preempts LAWA).  Section 1324a(h)(2)'s savings clause is not at issue here.  *Accord* S.G. LAWA Br. at 8 n.2 (noting that SB 1070 is not at issue in LAWA litigation).

### (3)     MANDATORY LOCAL IMMIGRATION QUESTIONING AND ARREST

By requiring thousands of untrained state and local law enforcement officers to enforce all manner of immigration violations—under threat of civil damages if they fall short of the maximum amount of enforcement deemed possible by private litigants (A.R.S. § 11-1051(G))—SB 1070 conflicts with federal law, which carefully assigns

work in SB 1070 and the federal scheme.

1    arrest authority to designated categories of officials, requires warrantless arrests to be

2    followed by specific procedures, and delineates a very narrow role for state and local

3    officials in immigration enforcement.

4           Federal law specifically defines the types of enforcement activity that federal

5    immigration agents may engage in and the particular classes of agents that are

6    empowered to undertake each type of enforcement activity. *See* 8 U.S.C. § 1357(a)(1)

7    (interrogation authority); (a)(2) (arrest authority); *see also* 8 C.F.R. § 287.5(a)(1)

8    (designating officers with interrogation authority); (b) (designating officers with authority

9    to patrol border); (c) (designating officers with arrest authority and noting training

10   requirements). Federal law also requires that, when federal immigration agents make a

11   warrantless arrest for an immigration violation, the individual arrested be provided with

12   certain procedural protections. *See* 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.3.

13          Federal law authorizes state and local police to make immigration-related arrests

14   only in specific situations. State and local police may make arrests for certain

15   immigration *crimes*—smuggling, transporting or harboring certain aliens, and illegal

16   entry by deported felons. 8 U.S.C. §§ 1324(c), 1252c. The U.S. Attorney General may

17   authorize "any state or local enforcement officer" to enforce immigration laws upon

18   certification of "an actual or imminent mass influx of aliens." *See* 8 U.S.C. § 1103(a)(10)

19   (no such certification saves SB 1070). Under 8 U.S.C. § 1357(g)(10)(B), any state agent

20   may "cooperate with the Attorney General" in immigration enforcement activities.

21   Finally, 8 U.S.C. § 1357(g)(1) allows the federal government to enter into written

22   agreements with state or local agencies in order to allow designated officers to exercise

23   delegated immigration enforcement authority in certain, clearly specified circumstances.

24   Such agreements contain numerous procedural safeguards to ensure that deputized

25   officers enforce immigration policy *consistently* with federal policies and procedures.

26   *See, e.g.*, 8 U.S.C. § 1357(g)(2) (requiring that deputized local officers receive adequate

27   training and adhere to federal law in performing immigration functions); *id.* at

28   § 1357(g)(3) (deputized officers "shall be subject to the direction and supervision of the

1   Attorney General").  *See also* Meissner Dec. ¶¶ 25–30 (describing federal control and

2   primacy in cooperative enforcement activities).  Thus, the federal government has

3   restricted immigration enforcement by states and localities to very specific and narrow

4   circumstances and retains the power to rescind that authority.  The broad range of

5   authority that Arizona has accorded itself in SB 1070 is in conflict with federal law.

6          Defendants may argue that the Ninth Circuit's decision in *Gonzales v. Peoria*, 722

7   F. 2d 468 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. De La Vina,*

8   199 F.3d 1037 (9th Cir. 1999), authorizes enforcement activity under SB 1070.  But

9   *Gonzales* allowed police to make arrests only for federal immigration *crimes*, and it

10  specifically did not approve enforcement of *civil* provisions that lead to removability—

11  which SB 1070 purports to authorize and require under §§ 2 and 6.  *Gonzales*, 722 F.2d at

12  474-75 ("We assume that the civil provisions of the [INA] . . . constitute such a pervasive

13  regulatory scheme, as would be consistent with the exclusive federal power over

14  immigration.").  *Gonzales* also does not authorize or contemplate the creation of state

15  immigration crimes such as SB 1070's registration and employment provisions; rather,

16  the case involved arrests for violations of federal criminal laws, followed by referrals to

17  the U.S. Border Patrol.  *Id.* at 473 (discussing evolution of City of Peoria's policies).

18  Finally, even as to arrests for federal immigration crimes, the *Gonzales* court emphasized

19  that such arrests may only be allowed if they "do not impair federal regulatory interests"

20  and evaluated the authority issue in light of the state of the INA at that time.  *Id.* at 474-

21  75.  In this case, there is ample evidence of interference with federal regulatory interests,

22  *see* § III.A.1.b.3 *infra,* and the INA has changed significantly since 1983, with the

23  addition of numerous federal immigration crimes and specific provisions dealing with

24  state and local arrest authority noted above.  *E.g.*, 8 U.S.C. §§ 1357(g)(1), 1252c.

25         SB 1070 conflicts with federal law's allocation of immigration enforcement

26  authority to state and local officers.  It requires interrogation and detention by *every* state

27  or local officer in Arizona where there is "reasonable suspicion" of "unlawful presence";

28  where police believe that an individual has "committed any public offense that makes the

1   person removable from the United States"; and where there is suspicion that one of SB

2   1070's new, Arizona-only immigration crimes has been committed.  It makes a mockery

3   of the care that Congress and the federal government took to ensure that immigration

4   enforcement is undertaken only by designated, qualified officers under federal control

5   and accompanied by procedures to protect the rights of those under suspicion.

6                    (4)      BURDEN ON FEDERAL RESOURCES

7          Arizona's state policy of immigration enforcement directly burdens, and conflicts

8   and interferes with, the enforcement resources and priorities of the federal government.

9          The federal government has limited immigration enforcement resources.[16]

10  Immigration statutes and regulations invest federal officials with considerable discretion

11  in how best to use these resources—including discretion regarding whether an individual

12  or group of individuals should be arrested, detained, or charged.  *See* Boyd Decl., Ex. 8,

13  Julie Myers, Assistant Secretary for ICE, Memorandum on Prosecutorial and Custody

14  Discretion dated Nov. 7, 2007 ("Field agents and officers are not only authorized by law

15  to exercise discretion . . . but are expected to do so in a judicious manner at *all stages of*

16  *the enforcement process.*"); *id.* Doris Meissner memorandum at 2 ("deciding whom to

17  stop, question, and arrest" is a matter of federal discretion).  Consistent with its

18  discretionary authority, the federal government sets priorities for immigration

19  enforcement in order to "focus on maximizing its impact under appropriate principles,

20  rather than devoting resources to cases that will do less to advance these overall

21  interests," and to accommodate uniquely federal interests, including foreign affairs

22  concerns.  *Id.*, Ex. 8 at 4.  *See also* Meissner Decl. ¶ 12 ("the immigration system is

23  allocated scarce resources that must be distributed according to coherent national

24  priorities").

25

26  _____

27  [16] For example, in 2008, a unit of ICE set up to respond to requests for assistance by local
    Arizona police officers received 1,283 calls for assistance. Boyd Decl., Ex. 6 at 1.  By
    contrast, there are more than 12,000 state and local law enforcement officers in the State
28  of Arizona.  *Id.*, Ex. 28, Census of State and Local Law Enforcement Agencies (2004).

1   SB 1070's indiscriminate, overbroad, and unauthorized approach to immigration

2   conflicts and interferes with the federal government's ability to effectively prioritize

3   immigration enforcement.  Numerous officials, including DHS Secretary Janet

4   Napolitano, have expressed concern that SB 1070 will interfere with federal enforcement

5   priorities.  *See* Boyd Decl., Ex. 9 at 2 (Secretary Napolitano statement that "[t]he Arizona

6   immigration law will likely hinder federal law enforcement from carrying out its

7   priorities of detaining and removing dangerous criminal aliens").  As former INS

8   Commissioner Meissner explains in her declaration, SB 1070 creates "a direct obstacle to

9   the ability of the federal government to achieve its priorities and control over

10  immigration."  Meissner Decl. ¶ 15; *see generally id.* ¶¶ 15–23.

11      SB 1070 will unilaterally impose burdens on federal resources, which will be

12  taken up responding to queries, arrests, and attempted transfers from Arizona police.  *See*

13  *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006) (local

14  ordinance targeting "illegal aliens" "will likely place burdens on the Departments of

15  Justice and Homeland Security that will impede the functions of those federal agencies").

16  Former INS commissioner Doris Meissner details many of these burdens in her

17  declaration.  *See* Meissner Decl. ¶¶ 8, 21–24.

### 2.     SB 1070 VIOLATES THE CONSTITUTIONAL RIGHT TO TRAVEL

18
19      The U.S. Supreme Court has long "recognized that the nature of our Federal

20  Union and our constitutional concepts of personal liberty unite to require that all citizens

21  be free to travel throughout the length and breadth of our land uninhibited by statutes,

22  rules, or regulations which unreasonably burden or restrict this movement."  *Shapiro v.*

23  *Thompson*, 394 U.S. 618, 629 (1969), *overruled on other grounds by Edelman v. Jordan*,

24  415 U.S. 651 (1974).  Although the Supreme Court has declined to isolate any single

25  constitutional provision as the source of the right to travel, it has repeatedly held that the

26  right is fundamental.  *Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986).[17]

27

---

28  [17]  The right to travel has been alternatively derived from the Privileges and Immunities Clause of Article IV, § 2; the Equal Protection Clause; the Commerce Clause; and the

SB 1070 impermissibly inhibits and restricts the right to travel by subjecting drivers from certain states to discriminatory treatment by Arizona law enforcement officers.  *See* A.R.S. § 11-1051(B).  The Act will subject certain out-of-state drivers to increased scrutiny and pressure them to carry additional documentation, impermissibly burdening their right to travel freely throughout Arizona.  *Id.*

A state law infringes on the right to travel if it uses "'any classification which serves to penalize the exercise of that right'" even in an "indirect manner," *Soto-Lopez,* 476 U.S. at 903 (plurality opinion) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 340 (1972)), or treats residents of other states as "unfriendly alien[s]" rather than "welcome visitor[s]," *Saenz v. Roe*, 526 U.S. 489, 500 (1999).  If either condition is met, the law must be analyzed under strict scrutiny and invalidated unless the state satisfies the "heavy burden of proving that it has selected a means of pursuing a compelling state interest which does not impinge unnecessarily on constitutionally protected interests." *Soto-Lopez*, 476 U.S. at 911; *accord id.* at 906; *Saenz*, 526 U.S. at 499; *Shapiro*, 394 U.S. at 634.

SB 1070, on its face, penalizes out-of-state drivers' exercise of the right to travel if their home states have not adopted the same policies for issuing driver licenses as those used in Arizona.  The Act requires a law enforcement officer to verify an individual's immigration status whenever the officer has a "reasonable suspicion" that the person is "unlawfully present" in the United States.  A.R.S. § 11-1051(B).  It affords a *presumption* that a person is "not unlawfully present" if she presents a "valid Arizona driver license" or "a federal, state or local government issued identification" that "requires proof of legal presence in the United States before issuance." *Id.*  Some states—currently New Mexico, Utah, and Washington—issue driver licenses without requiring proof of federal immigration status.[18]  Under SB 1070, Arizonans can use their driver licenses to dispel

Privileges and Immunities clause of the Fourteenth Amendment.  *See id.*

[18]  N.M. Stat. Ann. § 66-5-9(B) (1978); N.M. Admin. Code § 18.19.5.12(D) (allowing foreign national to obtain driver license with federal tax identification number and valid foreign passport or Matrícula Consular card); Utah Code Ann. § 53-3-207(7)(a)

1    reasonable suspicion that they are "unlawfully present," but out-of-state drivers,

2    including New Mexico drivers such as Plaintiffs Gaubeca and Villa, cannot use their

3    valid New Mexico driver licenses for the same purpose.  Instead, these out-of-state

4    drivers will be subjected to additional scrutiny by Arizona law enforcement officers.

5    Such drivers will effectively be required to carry a birth certificate, passport, or other

6    documentation to supplement their driver licenses while driving or traveling in Arizona.

7    This is a significant burden, particularly because there is no similar requirement in any

8    other state.  If SB 1070 is allowed to take effect, it will inhibit residents of these states

9    from traveling to Arizona and unreasonably restrict their travel through the state.

10        The Act treats out-of-state drivers as "unfriendly aliens" rather than "welcome

11   visitors" by imposing burdens that Arizona residents do not face and that are not present

12   in any other state.  *Saenz*, 526 U.S. at 499.  Every state requires drivers to have a valid

13   driver license to operate a motor vehicle.  *See*, *e.g.*, A.R.S. § 28-3169(A).[19]  Many states,

14   including Arizona, impose penalties for drivers that fail to produce a valid driver license

15   when stopped by law enforcement.  *Id.* ("On demand of a justice of the peace, a police

16   officer or a field deputy or inspector of the department, a licensee shall display the

17   [driver] license.").[20]  As a result, many drivers routinely carry only a driver license with

18

19   ────────────────────────

20   (allowing issuance of driving privilege card without verification of immigration status);
     WASH. REV. CODE 46.20.035(3) (allowing use of "other available documentation," on a
     discretionary basis, for issuance of driver license); Boyd Decl., Ex. 19, Proof of Identity

21   and Residence, Washington Dep't of Licensing (allowing issuance of driver license if
     resident provides valid foreign passport or other identification document).

22   [19]  *See also, e.g.,* N.M. STAT. ANN. § 66-5-16 (1978); UTAH CODE ANN. § 53-3-217;
     WASH. REV. CODE 46.20.001; ALA. CODE § 32-6-1(2010); ALASKA STAT. § 28.15.011

23    (2010); CAL. VEH. CODE § 12500(b) (1994); COL. REV. STAT. § 42-2-101(1) (2000);
     CONN. GEN. STAT. § 14-36(a) (2007); 625 ILL. COMP. STAT. § 5/6-101 (1970); IND. CODE

24   § 9-24-1-1 (2004); LA. REV. STAT. ANN. § 32:402(A)(B) (2002); S.C. CODE ANN. § 56-1-
     20 (1959); WYO. STAT. ANN. § 31-7-106 (2000).

25   [20]  *See, e.g.*, N.M. STAT. ANN. § 66-5-16 (1978); UTAH CODE ANN. § 53-3-217; WASH.

26   REV. CODE 46.20.015; ALA. CODE § 32-6-9(a) (1997); ALASKA STAT. § 28.15.131
     (2010); CAL. VEH. CODE § 12951(a) (2008); COL. REV. STAT. § 42-2-101(3); CONN.

27   GEN. STAT. § 14-36 (2007); 625 ILL. COMP. STAT. § 5/6-112 (1970); IND. CODE § 9-24-
     13-13 (2004); LA. REV. STAT. ANN. § 32:411(2005); S.C. CODE ANN. § 56-1-190 (1994);

28   WYO. STAT. ANN. § 31-7-116 (2000).

1    them as identification when they travel between states.[21]  *See* Gaubeca Decl. ¶¶ 6–7; Villa

2    Decl. ¶¶ 4–5.  Under SB 1070, drivers from states like New Mexico will be penalized

3    with prolonged questioning and the risk of detention *even if* they present a valid state

4    driver license.  *See Soto-Lopez*, 476 U.S. at 907 ("Even temporary deprivations of very

5    important benefits and rights can operate to penalize migration.").  In fact, the City

6    Attorney of Tucson, Arizona concedes that the law will force Tucson to "require[e]

7    additional proof of citizenship or lawful status" from drivers from New Mexico and other

8    states that do not verify immigration status when issuing driver licenses.  Boyd Decl., Ex.

9    20, *City of Tucson v. Arizona*, No. 10-CV-249 (D. Ariz. May 26, 2010) (Answer and

10   Cross-Claim at 12, ¶ 50).  This discriminatory treatment impermissibly burdens the right

11   to travel for these out-of-state drivers and falls far short of treating them as "welcome

12   visitors."

13        SB 1070 further violates the right to travel because it pressures other states to

14   legislate or retaliate in response to the Act so that their citizens are not detained by

15   Arizona law enforcement.  *See Austin v. New Hampshire*, 420 U.S. 656, 666-67 (1975)

16   (explaining that such pressure "compounds" the constitutional violation).  By creating a

17   discriminatory classification for drivers from certain states, SB 1070 interferes with those

18   states' sovereign power to regulate issuance of their own driver licenses.[22]  This

19   interference will be particularly pronounced in neighboring states such as New Mexico,

20   whose residents often travel to Arizona.[23]

21

22   _____

[21] Travelers using any form of transportation often carry only a driver's license as their
identity document.  *See, e.g.,* Transportation Security Administration, ID Requirements
23   for Airport Checkpoints, indicating that a state driver license meets TSA identity
requirements for airport checkpoints in all 50 states).

24   [22] SB 1070 burdens the ability of every state except Arizona to enact driver
documentation policies akin to those in New Mexico, Utah, and Washington.  *See id.*
25   (holding a New Hampshire statute unconstitutional and finding it especially burdensome
because of the risk that it would affect other states' lawmaking).

26   [23] In fact, Senator Jeff Bingaman of New Mexico wrote to Attorney General Holder
expressing concerns that his constituents would be unduly burdened by the
27   implementation of SB 1070.  Boyd Decl., Ex. 14, Ltr. to Attorney General Holder from
Sen. Bingaman (Apr. 29, 2010).

28

1   SB 1070's differential treatment of licensed drivers based on their states' driver

2   license policies cannot withstand strict scrutiny because it is not narrowly tailored to its

3   stated purpose (*i.e.*, "to discourage and deter the unlawful entry and presence of aliens

4   and economic activity by persons unlawfully present in the United States," SB 1070, § 1)

5   even assuming *arguendo* that purpose is a compelling state interest.  The Act penalizes

6   *all* licensed drivers from affected states, including U.S. citizens and non-citizens with

7   permission to be in the U.S., and subjects them to scrutiny and detention to which drivers

8   from Arizona and other states are not subject.  This sort of discrimination violates the

9   constitutional right to travel.

10               **3.      SB 1070 VIOLATES THE FIRST AMENDMENT**

11          Section 5 of SB 1070, A.R.S. § 13-2928, makes it a state crime for certain non-

12   citizens to communicate their willingness to engage in day labor while on a "street,

13   roadway or highway," or in any "public place."  These are "quintessential public forums"

14   that have "'by long tradition . . . been devoted to assembly and debate.'"  *Burson v.*

15   *Freeman*, 504 U.S. 191, 196-97 (1992) (citations omitted).  The First Amendment

16   requires that the State overcome strict scrutiny for content-based regulation and

17   intermediate scrutiny for content-neutral regulation of speech in a public forum.  Section

18   13-2928 cannot meet either test.  Indeed, similar statutes regulating speech about day

19   labor have uniformly been struck down in the Ninth Circuit. [24]

20                    a.      A.R.S. § 13-2928(C) VIOLATES THE FIRST
                             AMENDMENT
21

22          A.R.S. § 13-2928(C) makes it "unlawful for a person who is unlawfully present in

23   the United States and who is an unauthorized alien" to "solicit work in a public place."[25]

---

24   [24] *Lopez v. Town of Cave Creek*, 559 F. Supp.2d 1030 (D. Ariz. 2008); *Jornaleros*
     *Unidos de Baldwin Park v. City of Baldwin Park*, No. 07-CV-4135 (C.D. Cal. July 17,

25   2007) (Boyd Decl., Ex. 21); *Comite de Jornaleros de Redondo Beach v. City of Redondo*
     *Beach*, 475 F. Supp. 2d 952 (C.D. Cal. 2006); *Comite de Jornaleros de Glendale v. City*

26   *of Glendale*, No. 04-CV-3521 (C.D. Cal. May 13, 2005) (Boyd Decl., Ex. 22); *Coalition*
     *for Humane Immigrant Rights of Los Angeles v. Burke*, No. 98-CV-4863, 2000 WL

27   1481467, at *10 (C.D. Cal. Sept. 12, 2000)

28   [25] Section 13-2928(C)'s attempt to limit the speech prohibition to only people who are
     "unlawfully present" and who do not have "authorization" to work does not derail this

1    This portion of § 13-2928(C) is content-based because "by its very terms" it singles out

2    solicitation speech, a "particular content for differential treatment." *Berger v. City of*

3    *Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009).  Moreover, it is content-based because "a

4    law enforcement officer must [examine a] message to determine if [it] is exempted from

5    the ordinance." *Foti v. City of Menlo Park*, 146 F.3d 629, 636 (9th Cir. 1998); *see also*

6    *Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993); *Comite de Jornaleros de*

7    *Glendale*, No. 04-CV-3521, attached as Boyd Decl., Ex. 22.   Such content-based

8    regulations are presumptively unconstitutional.  *See Ashcroft v. ACLU*, 542 U.S. 656, 660

9    (2004).  Therefore, A.R.S. §13-2928(C) "is valid only if it serves a compelling

10   government interest in the least restrictive manner possible." *Berger*, 569 F.3d at 1052;

11   s*ee also Republican Party of Minn. v. White,* 536 U.S. 765, 774-75 (2002).  Here, the

12   State's purported interest in banning certain people from communicating their willingness

13   to engage in day labor is not a compelling government interest, and the law's sweeping

14   prohibition is in any event unsupportable because it prohibits protected and peaceful

15   solicitations of independent contracting work and temporary, informal work that are

16   permissible under federal law.  *See Berger*, 569 F.3d at 1052-53.

17          Even examined as a content-neutral regulation (which it is not), A.R.S. § 13-2928

18   is unconstitutional because it burdens substantially more speech than is necessary to

19   further any significant governmental interest.  *See Ward v. Rock Against Racism*, 491

20   U.S. 781, 799 (1989).   Because the Act bans certain individuals from "solicit[ing] work,"

21   it is not narrowly tailored to serve any government interest.  *See Lopez*, 559 F. Supp. 2d

22   at 1035.  Moreover, to further any legitimate traffic or safety concern, the Defendants

23   _____

24   analysis, indeed, this further refinement of the proscribed speech only renders the
     discrimination more profound.  The First Amendment protects all persons, including
     "aliens residing in this country." *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d

25   1045, 1063-64 (9th Cir. 1995), *rev'd on other grounds*, 525 U.S. 471 (1999*); see also
     Underwager v. Channel 9 Australia*, 69 F.3d 361, 365 (9th Cir. 1995) ("[T]here is no

26   expressed limitation as to whom the right to free speech applies."); *Comite de Jornaleros
     de Redondo Beach*, 475 F. Supp. 2d at 952 (Boyd Decl., Ex. 23.); *Plyler*, 457 U.S. at 210.

27   Moreover, the work sought by Plaintiff day laborers consists of temporary, informal work
     such as gardening, construction, moving, and handy-work, which is permitted under

28   federal law.  *See* 8 C.F.R. § 274a.1(f), (h), (j); Enrique Decl. ¶¶ 13, 17.

1   need only enforce existing safety or traffic laws that do not illegally infringe on speech.

2   *Id.* Nothing in the subsection makes any effort to tailor the speech ban to situations

3   where traffic or public safety might be compromised. Moreover, the provision's impact

4   will be exceptionally broad. Because law enforcement officers will not be able to

5   determine the federal immigration status of the speaker, any person wishing to express

6   her willingness to engage in day labor may be chilled from engaging in such speech. *See*

7   *Burke*, 2000 WL 1481467 at *8.[26]

8           b.      A.R.S. § 13-2928 (A) AND (B) ALSO VIOLATE THE
                    FIRST AMENDMENT
9

10          A.R.S. § 13-2928 (A) and (B) are also content-based regulations because liability

11  under these sections accrues only when individuals engage in speech about day labor.

12  These sections make it unlawful for a person in a vehicle "to attempt to hire or hire" day

13  laborers and similarly makes it unlawful for a person to enter a car "in order to be hired."

14  A.R.S. §13-2928 (A) and (B). The crimes have additional elements relating to blocking

15  traffic and whether the car at issue is stopped, but those additional elements do not

16  obscure that the law selectively regulates speech about work. *See ACLU of Nevada v.*

17  *City of Las Vegas*, 466 F.3d 784, 793, (9th Cir. 2006). Thus, regardless of the manner in

18  _____

19  [26] Even if deemed a restriction solely of commercial speech, *see, e.g.*, *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 385 (1973), SB 1070's

20  prohibition on the solicitation of work nonetheless violates the First Amendment. Under the *Central Hudson* test, which is applicable to restrictions that target uniquely

21  commercial harms, A.R.S. § 13-2928(C) is unconstitutional because it fails to directly advance a substantial government interest and is more extensive than necessary. *See*

22  *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). As indicated above, the Act bans communication about work that is lawful under federal law

23  and therefore does not advance any substantial government interest. *Supra* § III.A.1.b.2. The Act is unnecessarily overbroad because it bans completely a particular category of

24  speech from occurring in all public places throughout the state. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 562-63 (2001) ("[t]he uniformly broad sweep of the

25  geographical limitation demonstrates a lack of tailoring"). In addition, a regulation of commercial speech may be unconstitutional if, like SB 1070, it discriminates based on

26  the message expressed and thereby "undermine[s] the government's asserted interest in the regulation as a whole." *World Wide Rush, LLC v. City of L.A.*, No. 08-56454, ___

27  F.3d ___, 2010 WL 2089520, at *7 (9th Cir. May 26, 2010), attached as Boyd Decl., Ex. 29. As courts reviewing similar ordinances banning speech about day labor have noted,

28  such overbroad restrictions fail to survive intermediate scrutiny. *Supra* note 24.

- 30 -

1  which a person communicates her willingness to work—whether through signs, gestures,

2  words, or any combination of those—the speech would violate A.R.S. § 13-2928.

3       Persons can impede traffic without running afoul of A.R.S. §§ 13-2928 (A) and

4  (B) in order to communicate with and pick up a homeless person seeking shelter, a

5  neighbor to whom they are offering a ride, or a political candidate seeking to canvass

6  elsewhere; they are subjected to criminal penalties for impeding traffic only when the

7  content of their communication is work.  *Cf. ACLU of Nevada*, 466 F.3d at 794 (illegal

8  regulation discriminated based on content).  There is no way for an officer to enforce

9  these statutes without determining the content of the message being conveyed between a

10  driver and passenger.  *Foti*, 146 F.3d at 636.  Further, "[a] regulation is content-based if .

11  . . the underlying purpose of the regulation is to suppress particular ideas." *Berger*, 569

12  F.2d at 1051.  Here, the legislative record confirms that these provisions were enacted to

13  suppress speech about day labor and were not concerned with the regulation of

14  communications about any other subject, which might equally implicate traffic flow or

15  safety.[27]  Indeed, here "the very basis for the regulation is the difference in content . . . ."

16  *Discovery Network*, 507 U.S. at 429.  A.R.S. § 13-2928 (A) and (B) can meet neither

17  strict nor intermediate scrutiny because existing traffic laws are sufficient to serve any

18  legitimate traffic or safety goals.  There are numerous state and local laws readily

19  available to Defendants that address traffic flow and public safety issues caused by the

20  interference with traffic.  *See e.g.*, A.R.S. § 28-905 ("A person shall not open a door on a

21  motor vehicle unless it . . . can be done without interfering with the movement of other

22  

23  ───────────────

[27] The antecedent to §§ 13-2928 (A) and (B) is HB 2042, titled "unlawful roadside solicitation of employment," which was duplicated into and heard concurrently with SB

24  1070.  The testimony of HB 2042's sponsor, State Representative Kavanagh, evidences that these provisions sought to suppress day labor solicitation.  Boyd Decl., Ex. 24,

25  Kavanagh testimony Feb. 24, 2010 ("No one benefits from roadside solicitation of day labor" and there are "other ways decent people can get jobs, and certainly standing on the

26  street like a hooker isn't one of them."); Boyd Decl., Ex. 31, Jan. 21, 2010 House Judiciary Comm. hearing (testifying that the law is necessary because "large

27  congregations of almost exclusively men hang[] around in communities, [and it] is a problem—it's unsightly, it's intimidating, especially to people on the street, particularly

28  women. . . .").

1    traffic."); *see also* A.R.S. §§ 13-2906(A); 28-871(A); 28-704(A); 28-873(A).

2    Consequently, "[t]he availability of obviously less restrictive" existing Arizona traffic

3    safety laws demonstrate that A.R.S. §§ 13-2928 (A) and (B) "burden[] substantially more

4    speech than is necessary to achieve [their] purposes." *Galvin v. Hay*, 374 F.3d 739, 753

5    (9th Cir. 2004).[28]  Further, given these flaws, the law cannot meet strict scrutiny.  *Berger*,

6    569 F.3d at 1052.  Finally, these sections are under-inclusive, as they target only speech

7    about work, and not other types of speech that would create the same traffic and safety

8    problems.  Therefore, A.R.S. §§ 13-2928 (A) and (B) are unconstitutional under both a

9    content-based and content-neutral analysis.

10       **B.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE**
             **PRELIMINARY INJUNCTION IS NOT GRANTED**

11

12       Plaintiffs and class members will suffer irreparable harm if SB 1070 is not

13   enjoined.  *Winter*, 129 S. Ct. at 375 (injunction appropriate where irreparable harm

14   "likely").  In the first place, being subjected to an unconstitutional law such as SB 1070

15   itself constitutes irreparable injury.  *See Monterey Mech. Co. v. Wilson*, 125 F.3d 702,

16   715 (9th Cir. 1997) ("an alleged constitutional infringement will often alone constitute

17   irreparable harm"); *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1058-59

18   (9th Cir. 2009) ("the constitutional violation alone, coupled with the damages incurred,

19   can suffice to show irreparable harm").[29]

20       This principle applies to Supremacy Clause violations as well as other

21   constitutional violations.  *E.g.*, *Dominguez v. Schwarzenegger*, 596 F.3d 1087 (9th Cir.

22   2010); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992); *Villas at*

23   *Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008)

24   ───────────────────────
     [28] For the same reasons, the law also fails any commercial speech inquiry.  *See Moser v.*
25   *FCC*, 46 F.3d 970, 973 (9th Cir. 1995) (commercial speech test and intermediate scrutiny
     test closely relate).

26   [29]  Under the Ninth Circuit's sliding scale analysis, an injunction should issue in this case
     because Plaintiffs have shown at least "serious merits questions and . . . a probability,
27   indeed virtual certainty, of irreparable injury and that the equities tipped sharply in favor
     of relief."  *Save Strawberry Canyon v. Dep't of Energy*, No. 08-CV-03494, 2009 WL
28   1098888, at *2-3 (N.D. Cal. Apr. 22, 2009).

("A party may be irreparably injured in the face of the threatened enforcement of a preempted law."). Enforcement of SB 1070 will subject Plaintiffs to unlawful arrests and detentions while local officials attempt to determine their federal immigration status. *See* Boyd Decl., Ex. 20, Tucson Cross-Comp. at 10-11.[30]

Plaintiffs will also suffer irreparable harm as a result of SB 1070 with respect to their interactions with law enforcement. The Plaintiffs in this lawsuit represent a wide array of individuals and organizations in Arizona and its neighboring state of New Mexico. Many of these Plaintiffs are, or represent, racial and national origin minorities and individuals who speak foreign languages or have accents. *See, e.g.*, Anderson Decl. ¶ 2; Jane Doe 1 Decl. ¶ 1; Enrique Decl. ¶ 3, 5–6; Hansen Decl. ¶ 4; Gaubeca Decl. ¶ 2; Ibarra Decl. ¶ 5; Medina Decl. ¶ 5; Vargas Decl. ¶ 2; Villa Decl. ¶ 2. These plaintiffs will be subject to unlawful racial profiling and additional police scrutiny if SB 1070 is implemented. *See* Gascón Decl. ¶¶ 18–20; Gonzalez Decl. ¶¶ 16–17; Granato Decl. ¶ 16.

In addition, plaintiffs or those they represent will curtail their public activities once the law is in effect out of fear that they will be subject to unlawful questioning, arrest, or detention by local law enforcement officials due to their "foreign" appearance or because they speak a foreign language. *See, e.g.*, Anderson Decl. ¶ 6; Jane Doe 1 Decl. ¶ 5; Enrique Decl. ¶ 3; Hansen Decl. ¶ 6; Medina Decl. ¶ 6; Vargas Decl. ¶ 7; Villa Decl. ¶¶ 2, 8. Out of fear of law enforcement, plaintiffs will also be afraid of having any contact with law enforcement, including reporting crimes or serving as witnesses. *See* Ibarra Decl. ¶ 12 ("SB 1070 will cause many of our clients or prospective clients to not report that they are victims of crime out of fear that contact with Arizona state law enforcement will subject them to detention, arrest and possible deportation."); *see also*

---

[30] In *Escobar* (No. CV 10-249), a case challenging the legality of SB 1070 also pending before this Court, Defendant City of Tucson has filed a cross claim against co-defendant State of Arizona alleging that ICE agents will not be able to respond with an immediate verification of the immigration status of every person who receives a criminal misdemeanor citation within the City of Tucson and State of Arizona, which means that the City of Tucson will be required to incarcerate persons who would otherwise have been released at the time of citation, while waiting for federal verifications. Boyd Decl., Ex. 20, Tucson Cross-Comp. at 10.

1   Anderson Decl. ¶ 8; Jane Doe 1 Decl. ¶ 6; Gascón Decl. ¶¶ 9–10; Gonzalez Decl. ¶¶ 12–

2   13, 18; Granato Decl. ¶¶ 9–10; Medina Decl. ¶ 7.  Some Plaintiffs who do not possess

3   any registration documents that they could show to avoid detention by local police are in

4   heightened peril.  Anderson Decl. ¶¶ 4–5 (Plaintiff only possesses a court document

5   reflecting grant of withholding of removal); Jane Doe 1 Decl. ¶¶ 4–5 (Plaintiff does not

6   possess any registration document in connection with pending asylum application).

7        The organizational Plaintiffs in this lawsuit will suffer irreparable harm if SB 1070

8   is implemented, because they will need to divert organizational resources to address their

9   members' or clients' concerns about the law.  Ibarra Decl. ¶¶ 12, 17, 20; Hansen Decl.

10   ¶ 6; Medina Decl. ¶¶ 10–15.  SB 1070 also poses a direct threat to the mission of these

11   Plaintiff organizations.  Ibarra Decl. ¶ 15 ("staff will have a harder time encouraging our

12   clients to seek services in our various program areas" due to the law's implementation);

13   *see also id.* at ¶¶ 14, 16; Hansen Decl. ¶ 6; Medina Decl. ¶¶ 10–15.

14        Law enforcement officials in Arizona arrest and release individuals on criminal

15   misdemeanor charges routinely; SB 1070 would require determinations of immigration

16   status under federal law in every such instance.  A.R.S. § 11-1051(B); *see also* Boyd

17   Decl., Ex. 20, Tucson Cross-Comp. at 8 (the City of Tucson made 36,821 arrests and

18   releases in 2009 that would now require detention until verification of status).  All

19   Plaintiffs would be harmed by the diversion of federal resources to responding to Arizona

20   state officials' requests for determination of status.  Meissner Decl. ¶¶ 15–19; Gascon

21   Decl. ¶ 14; Boyd Decl., Ex. 20, Tucson Cross-Comp. at 8.  This is not a case involving a

22   limited, technical violation of the Supremacy Clause, but a violation with significant, far-

23   reaching implications.

24        SB 1070's impingement on the constitutional right to travel constitutes further

25   irreparable harm.  Plaintiffs Vicki Gaubeca and Jesús Cuauhtémoc Villa are both Latino,

26   naturalized U.S. citizens and residents of New Mexico.  Gaubeca Decl. ¶ 2; Villa Decl.

27   ¶¶ 2–3.  Plaintiff Gaubeca often travels to Arizona for work and to visit loved ones, and

28   Plaintiff Villa is a student enrolled at Arizona State University in Tempe, Arizona, who

1  travels frequently between New Mexico and Arizona to visit family and friends.

2  Gaubeca Decl. ¶¶ 3–5, 10; Villa Decl. ¶¶ 2–3, 8.  Both Plaintiffs Gaubeca and Villa use a

3  New Mexico driver license as their primary form of identification.  Gaubeca Decl. ¶ 6;

4  Villa Decl. ¶ 4.  Solely because New Mexico does not require proof that an individual has

5  permission to remain in the U.S. when issuing a driver license, under SB 1070 Plaintiffs

6  Gaubeca and Villa would be unable to use the identification carried by travelers from the

7  overwhelming majority of other states in the Union to dispel an Arizona law enforcement

8  officer's suspicion that they are "unlawfully present" in the U.S.[31]  Plaintiffs Gaubeca,

9  Villa and similarly situated people will suffer irreparable harm due to the limitation on

10  their freedom of movement in the country.  *See Pro-Choice Network of W.N.Y. v. Project*

11  *Rescue W.N.Y.*, 799 F. Supp. 1417, 1428 (W.D.N.Y. 1992) (holding alleged violation of

12  right to travel constitutes irreparable injury), *aff'd in part, rev'd in part on other grounds*

13  *sub nom. Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357 (1997).

14  The First Amendment violations in A.R.S. § 13-2928 constitute further irreparable

15  harms to Plaintiffs.  Individuals with the will and ability to work in Arizona will be

16  subject to criminal sanctions for communicating about this subject in a public forum.

17  A.R.S. § 13-2928(C).  Like the members of Plaintiff Tonatierra, citizens and non-citizens

18  alike will be chilled from lawfully seeking work for fear of prosecution under SB 1070's

19  overbroad speech prohibitions.  Enrique Decl. ¶¶ 16–19 (members with permission to

20  live and work in the U.S. are "afraid to solicit work in public spaces . . . [or] even wave

21  their hands in public or do anything that could be interpreted as soliciting work"); Vargas

22  Decl. ¶¶ 2, 4, 6–8 (lawful permanent resident now "afraid to stand with other men on the

23  corner and solicit work").

24  "The loss of First Amendment freedoms, for even minimal periods of time,

25  unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

26  Indeed, this Court has previously found irreparable injury with respect to a similar ban on

27

28

[31]  U.S. Senator Jeff Bingaman of New Mexico has expressly requested federal review of SB 1070 because of the significant harms to his constituents.  Boyd Decl., Ex. 14.

speech related to day labor passed by the town of Cave Creek, Arizona.  *See Lopez*, 559
F. Supp. 2d at 1036 (enjoining city ordinance that prohibited standing on a street to solicit
employment from the occupant of any vehicle).  The result should be no different here.

Plaintiffs would be further harmed by the loss of employment opportunities that
flow from this unconstitutional denial of free speech, magnifying the imminent
irreparable harms posed by SB 1070.  Loss of employment opportunities is not a purely
economic harm, particularly for individuals whose families rely on such work.  *See id.*
("Plaintiffs, as day laborers, face not only the loss of First Amendment freedoms, but also
the loss of employment opportunities necessary to support themselves and their
families."); *see also Kinney v. Int'l Union of Operating Eng'rs, Local 150*, 994 F.2d
1271, 1279 (7th Cir. 1993) (personal costs of being unnecessarily unemployed is
irreparable harm).

## C.    THE PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST

The interests of Plaintiffs and the public are aligned in favor of a preliminary
injunction.  In this case, the same violations that would irreparably harm Plaintiffs would
concurrently harm the public interest.  Absent an injunction, the public will face
enforcement of a statutory scheme that not only violates the constitutional provisions
described above but presents grave risk of other harms to the public interest.

The enforcement of a state statutory scheme that is preempted by federal law will
necessarily harm the public.  *See Farmers Branch II*, 2010 WL 1141398 at *19-20 ("the
public interest favor[s] preserving the uniform application of federal immigration
standards").  SB 1070 would mandate that Arizona state officials investigate the
immigration status of individuals reasonably suspected of being "unlawfully present"
when they are not capable of making such determinations, Boyd Decl., Ex. 20, Tucson
Cross-Comp. at 8; divert state and local law enforcement resources away from current
priorities; and cause the diversion of federal immigration resources to answer countless
inquiries from Arizona law enforcement officials.  Meissner Decl. ¶¶ 15–19.  This new

scheme threatens federal priorities with respect to immigration enforcement and would establish Arizona as a legal island with different rules from those of every other state in the country—an island where prolonged detentions that are neither required nor authorized under federal law will be the norm.

SB 1070 is likely to result in widespread discrimination against racial and national origin minorities, given the fact that law enforcement officers are required under SB 1070 to make a judgment, by sight and sound, about an individual's permission to remain in the U.S.  Numerous experts with extensive experience in law enforcement agree that these provisions are vague and unworkable and will inevitably lead to racial profiling and unlawful detentions.  Granato Decl. ¶ 16; Gonzalez Decl. ¶ 16.  Indeed, police chiefs from across the country conclude no amount of training will "prevent officers from resorting to using racial and ethnic appearance to form the requisite suspicion" or "sufficiently prepare officers to enforce SB 1070 in a uniform manner."  Gonzalez Decl. ¶ 17; Granato Decl. ¶ 8.  The likelihood that racial profiling will be employed is increased by the fact that law enforcement officials risk being sued by private parties who believe that Arizona city and county officials have not enforced the law strictly enough.  *See* A.R.S. § 11-1051(G).  Given the near-certainty of these harms, it is unquestionably in the public interest to prevent these widespread constitutional violations.  *See Murillo v. Musegades*, 809 F. Supp. 487, 498 (W.D. Tex. 1992) ("public interest will be served by protection of Plaintiffs' constitutional rights" in case where the majority of Hispanic population within a geographic area, would be subjected to "illegal stops, questioning, detentions, frisks, arrests, searches, and further abuses" by local law enforcement).  Thus, a preliminary injunction will prevent the enforcement of a law that includes criminal provisions which "cannot be enforced in a race neutral manner."  Gascon Decl. ¶¶ 18–20; *see also* Boyd Decl., Ex. 30, Jonathan J. Cooper, *Ariz. Immigration Law Divides Police Across US*, ASSOCIATED PRESS (May 17, 2010) (Phoenix, Arizona Police Chief Jack Harris stating that SB 1070 will make it "very difficult not to profile").

1    Moreover, because of the inevitable fear that law enforcement officials will use

2    race or national origin in making discretionary determinations under SB 1070, members

3    of minority groups will be discouraged from engaging in protected speech and expressive

4    activity that may be perceived as "alien" or foreign.  For example, members of minority

5    groups will feel chilled from speaking any language other than English, or speaking with

6    an accent, due to fear that such speech would spark the interest of a law enforcement

7    officer.  Choice of language, however, has been described by the Ninth Circuit as "pure

8    speech" protected by the First Amendment.  *Yniguez v. Arizonans for Official English*, 69

9    F.3d 920, 936 (9th Cir. 1995) (*en banc*), *vacated on other grounds sub nom. Arizonans*

10   *for Official English v. Arizona*, 520 U.S. 43 (1997).  *See* Anderson Decl. ¶ 6; Jane Doe 1

11   Decl. ¶ 5.  Racial minorities in Arizona will thus be faced with the Hobson's choice of

12   suppressing their constitutionally protected speech or risking the possibility of being

13   stopped, questioned, detained, and arrested.

14   SB 1070 will, as noted, also deter individuals from interacting with law

15   enforcement, regardless of their immigration status, thus compromising public safety.  SB

16   1070 will undermine trust between the police and community members, for whom a

17   routine encounter with law enforcement will become a federal immigration investigation.

18   Gonzalez Decl. ¶¶ 12–13, 18; Granato Decl. ¶¶ 9–10; Gascon Decl. ¶¶ 9–10.  According

19   to Tucson Police Chief Roberto Villaseñor, "when you enact legislation that makes any

20   subset of that community feel like they are being targeted specifically or have concerns

21   about coming forward and talking to the police, that damages our capability to obtain

22   information to solve the crimes that we need to work with."  Boyd Decl., Ex. 32, Huma

23   Khan, *Police Chiefs Slam Arizona Immigration Law*, ABC NEWS (May 26, 2010).

24   Further, SB 1070 will make some communities more vulnerable to crime.  Granato Decl.

25   ¶ 14 (noting that immigrant victims of domestic violence are made more vulnerable by

26   SB 1070); Gascon Decl. ¶ 12 ("criminal element" in Arizona is "emboldened" by SB

27   1070).  Increased fear of local law enforcement in immigrant communities will threaten

28   the safety of all Arizona communities and police officers.

1   The diversion of scarce law enforcement resources to conduct immigration

2   enforcement will further negatively impact public safety as officers spend more time

3   handling immigration status investigations.  Gonzalez Decl. ¶ 14; Gascón Decl. ¶¶ 9–13.

4   *See also* Boyd Decl., Ex. 33, Stephen Lemons, *Sheriff Ralph Ogden of Yuma County*

5   *Speaks Out on the Cost of SB 1070*, PHOENIX NEW TIMES BLOGS (Apr. 12, 2010).  SB

6   1070 diverts limited financial and human resources from addressing serious and violent

7   crimes to the task of enforcing federal immigration laws.  Gonzalez Decl. ¶ 14; Gascón

8   Decl. ¶ 14; Boyd Decl., Ex. 20, Tucson Cross-Comp. at 13.

9   Implementation of SB 1070 will cause harms that extend well beyond Arizona's

10   borders.  A preliminary injunction will mitigate the detrimental effect that SB 1070 has

11   on international relations, particularly between the United States and Mexico.  Lowenthal

12   Decl. ¶¶ 10–11.  In remarks to President Obama, Mexican President Felipe Calderon

13   stated that SB 1070 threatens to return the two countries to "mutual recrimination, which

14   has been so useless and damaging in previous times."  Boyd Decl., Ex. 12.  Strained

15   diplomatic ties, such as those resulting from SB 1070, have far-reaching adverse effects

16   on the nation's economy, federal and state governments' ability to collaborate with

17   foreign governments on issues such as drug and border enforcement and trade, and more

18   broadly the ability of the U.S. to maintain peaceable relations with its neighbors.

19   Preserving diplomatic relations with foreign governments is obviously in the public's

20   interest.  *See Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669,

21   675 (S.D. Fla. 1988) (concluding that "buttress[ing] the foreign policy of the United

22   States" serves the public interest).

23   Finally, an injunction against Arizona's encroachment on federal immigration

24   authority will help ensure that other piecemeal and inconsistent immigration standards—

25   carrying with them similar harms to individuals and the public interest—are not

26   implemented by other state and local bodies while the legality of SB 1070 is being

27   adjudicated.  The proponents of nearly a dozen "copycat" laws are waiting for the

28   outcome of this litigation to decide whether to propose their own immigration

enforcement schemes.  *See* Boyd Decl., Ex. 25, Jeremy Duda, *Immigration Blueprint*, ARIZONA CAPITOL TIMES (May 7, 2010).  It is in the public's interest to prevent further harms from spreading across the country while the Court evaluates the serious constitutional issues raised by this case.

### D.   THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF PLAINTIFFS

Any harm to Defendants from the grant of a preliminary injunction is minimal, because Plaintiffs ask only for the status quo to be maintained while the significant constitutional challenges to SB 1070 are resolved.  As described above, the irreparable harms facing Plaintiffs without a preliminary injunction are overwhelming, and courts frequently find the equities favor an injunction to preserve the status quo in just such a situation.  *See AFL v. Chertoff*, 552 F. Supp. 2d 999, 1006-07 (N.D. Cal. 2007); *Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*, 743 F.2d 1365, 1368 (9th Cir. 1984) (agreeing with district court's conclusion that irreparable harm to plaintiffs outweighed harm to government from delay in implementing regulation).  Indeed, the preservation of the status quo in the face of widespread and significant irreparable harms is precisely the purpose of any preliminary injunction.  *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).  Plaintiffs do not seek a "mandatory" injunction: Defendants will not be required to change their practices, policies or procedures, as SB 1070 is a newly passed law that has not yet taken effect.  Plaintiffs seek merely to prevent Defendants from implementing a law that is constitutionally suspect in order to prevent broad irreparable harms to Plaintiffs and the public.  As such, the equities tip sharply in favor of the grant of a preliminary injunction.

Respectfully Submitted,

Dated this 4th day of June, 2010.

/s/ Nina Perales
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND

/s/ Omar C. Jadwat
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS' RIGHTS PROJECT

/s/ Karen C. Tumlin
NATIONAL IMMIGRATION LAW CENTER

/s/ Anne Lai
ACLU FOUNDATION OF ARIZONA

/s/ Julie A. Su
ASIAN PACIFIC AMERICAN LEGAL CENTER

/s/ Susan T. Boyd
MUNGER, TOLLES & OLSON LLP

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on June 4, 2010, I electronically transmitted the attached
document to the Clerk's Office using the CM/ECF System for filing, and transmittal of a
3    Notice of Electronic Filing to the following ECF registrants:

4

5    Mary R. O'Grady                      *Attorneys for proposed Defendant-*
     Solicitor General                    *Intervenor State of Arizona*

6    Christopher A. Munns
     Assistant Attorney General
7    1275 West Washington Street
     Phoenix, Arizona 85007-2997
8    Telephone: (602) 542-3333
9    Mary.OGrady@azag.gov
     Christopher.Munns@azag.gov
10
     John J. Bouma (#001358)              *Attorneys for proposed Defendant-*
11   Robert A. Henry (#015104)            *Intervenor Janice K. Brewer,*
     Joseph G. Adams (#018210)            *Governor of The State of Arizona*
12   SNELL & WILMER L.L.P.
     One Arizona Center
13   400 E. Van Buren
     Phoenix, AZ 85004-2202
14   Phone: (602) 382-6000
     Fax: (602) 382-6070
15   jbouma@swlaw.com
     bhenry@swlaw.com
16   jgadams@swlaw.com

17   Joseph A. Kanefield (#015838)        *Attorneys for proposed Defendant-*
     Office of Governor Janice K. Brewer  *Intervenor Janice K. Brewer,*
18   1700 W. Washington, 9th Floor        *Governor of The State of Arizona*
     Phoenix, AZ 85007
19   Telephone: (602) 542-1586
     Fax: (602) 542-7602
20   jkanefield@az.gov

21   Lance B. Payette                     *Attorneys for Defendants Bradley*
22   Deputy County Attorney               *Carlyon and Kelly Clark*
     Navajo County Attorney's Office
23   P. 0. Box 668
     Holbrook, AZ 86025-0668
24   Telephone: (928) 524-4002
     Lance.Payette@NavajoCountyAZ.gov

25   ///

26   ///

27   ///

28

-42-

1        I hereby certify that on June 4, 2010, I served the attached document by U.S. Mail
2    on the following, who are not registered participants of the CM/ECF System:

3    Mr. Kenny Angle                          Mr. Preston Allred
     Graham County Attorney                   c/o Legal Liaison
     800 West Main Street                     Graham County Sheriff
4    Safford, AZ 85546                        523 10th Avenue
                                              Safford, AZ 85546
5
     Mr. John R. Armer                        Mr. Larry A. Dever
6    c/o Legal Liaison                        c/o Legal Liaison
     Gila County Sheriff                      Cochise County Sheriff
7    1400 East Ash Street                     205 North Judd Drive
     Globe, AZ 85501                          Bisbee, AZ 85603
8
     Mr. Joseph M. Arpaio                     Mr. Clarence Dupnik
9    c/o Legal Liaison                        c/o Legal Liaison
     Maricopa County Sheriff                  Pima County Sheriff
10   100 West Washington                      1750 E. Benson Highway
     Phoenix, AZ 85003                        Tucson, AZ 85714
11
     Mr. Paul Babeu                           Mr. Tony Estrada
12   c/o Legal Liaison                        c/o Legal Liaison
     Pinal County Sheriff                     Santa Cruz County Sheriff
13   971 Jason Lopez Circle                   1250 N. Hohokam Drive
     Florence, AZ 85132                       Nogales, AZ 85621
14
     Mr. Jon R. Smith                         Ms. Daisy Flores
15   Yuma County Attorney                     Gila County Attorney
     250 West 2nd Street, Suite G             1400 East Ash Street
16   Yuma, AZ 85364                           Globe, AZ 85501
17   Ms. Barbara LaWall                       Mr. Edward G. Rheinheimer
     Pima County Attorney                     Cochise County Attorney
18   32 North Stone Avenue, Suite 1400        150 Quality Hill Road, 2nd Floor
     Tucson, AZ 85701                         Bisbee, AZ 85603
19
     Mr. Donald Lowery                        Mr. Richard M. Romley
20   c/o Legal Liaison                        Maricopa County Attorney
     La Paz County Sheriff                    301 West Jefferson Street, Suite 800
21   1109 Arizona Avenue                      Phoenix, AZ 85003
     Parker, AZ 85344
22
     Mr. Joseph Dedman, Jr.                   Mr. Matthew J. Smith
23   c/o Legal Liaison                        Mohave County Attorney
     Apache County Sheriff                    315 North 4th Street
24   370 South Washington                     Kingman, AZ 86401
     St. Johns, AZ 85936
25
     Mr. Ralph Ogden                          Mr. George Silva
26   c/o Legal Liaison                        Santa Cruz County Attorney
     Yuma County Sheriff                      2150 North Congress Drive, Suite 201
27   141 S. 3rd Avenue                        Nogales, AZ 85621
     Yuma, AZ 85364
28

1   Ms. Sheila Polk                     Mr. Steven N. Tucker
    Yavapai County Attorney             c/o Legal Liaison
2   2830 North Commonwealth Drive       Greenlee County Sheriff
    Suite 106                           223 Fifth Street
3   Camp Verde, AZ 86322                Clifton, AZ 85533

4   Mr. Bill Pribil                     Mr. Sam Vederman
    c/o Legal Liaison                   La Paz County Attorney
5   Coconino County Sheriff             1320 Kofa Avenue
    911 E. Sawmill Rd.                  Parker, AZ 85344
6   Flagstaff, AZ 86001

7   Mr. Derek Rapier                    Mr. Steve Waugh
    Greenlee County Attorney            c/o Legal Liaison
8   223 Fifth Street                    Yavapai County Sheriff
    Clifton, AZ 85533                   255 E. Gurley Street
9                                       Prescott, AZ 86301

10  Mr. Michael B. Whiting              Mr. James Walsh
    Apache County Attorney              Pinal County Attorney
11  245 W. 1st South                    30 North Florence Street, Building D
    St. Johns, AZ 85936                 Florence, AZ 85132
12
    Mr. David Rozema                    Mr. Tom Sheahan
13  Coconino County Attorney            c/o Legal Liaison
    110 East Cherry Avenue              Mohave County Sheriff
14  Flagstaff, AZ 86001                 600 W. Beale Street
                                        Kingman, AZ 86402
15

16                                      /s/Robyn E. Bird
                                              Robyn E. Bird
17

18

19

20

21

22

23

24

25

26

27

28