John J. Bouma (#001358)
Robert A. Henry (#015104)
Joseph G. Adams (#018210)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
Phone: (602) 382-6000
Fax: (602) 382-6070
jbouma@swlaw.com
bhenry@swlaw.com
jgadams@swlaw.com

Joseph A. Kanefield (#015838)
Office of Governor Janice K. Brewer
1700 W. Washington, 9th Floor
Phoenix, AZ  85007
Telephone: (602) 542-1586
Fax: (602) 542-7602
jkanefield@az.gov

*Attorneys for Intervenor Defendant Janice K. Brewer,
    Governor of the State of Arizona*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Friendly House, et al.<br><br>                    Plaintiffs,<br><br>v.<br><br>Michael B. Whiting, Apache County Attorney, in his official capacity, et al.,<br><br>                    Defendants. | No. CV-10-1061-PHX-JWS<br><br>**INTERVENOR DEFENDANT GOVERNOR BREWER'S MOTION TO DISMISS** |

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11638899

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 2

I.   BACKGROUND OF SB 1070 ............................................................................... 2

    A.   SECTION 2 ......................................................................................... 2

    B.   SECTION 3 ......................................................................................... 3

    C.   SECTION 5 ......................................................................................... 3

    D.   SECTION 6 ......................................................................................... 3

II.  PLAINTIFFS LACK STANDING (RULE 12(B)(1)) ............................................. 4

    A.   THE INDIVIDUAL PLAINTIFFS FAIL CONSTITUTIONAL STANDING REQUIREMENTS .................... 4

        1.   PLAINTIFFS' ALLEGED FEARS OF CIVIL RIGHTS VIOLATIONS ............................................. 4

        2.   SB 1070 DOES NOT "CHILL" THE INDIVIDUAL PLAINTIFFS FROM EXERCISING THEIR FIRST AMENDMENT RIGHTS ............................................. 5

        3.   THE INDIVIDUAL PLAINTIFFS' ALLEGED FEAR OF PROSECUTION ............................................ 6

    B.   ASSOCIATIONAL STANDING ......................................................... 7

        1.   ALLEGATIONS OF HARM TO MEMBERS ..................... 7

        2.   IMPACT ON MEMBERS' EXPRESSIVE ACTIVITIES ............................................................. 8

        3.   ALLEGED FEAR OF PROSECUTION UNDER A.R.S. § 13-2929 .......................................... 8

        4.   ALLEGED ECONOMIC HARM ......................................... 9

        5.   DISTRESSED COUNTY AND MUNICIPAL BUDGETS ................................................................ 9

    C.   THE ORGANIZATIONAL PLAINTIFFS ..................................... 10

    D.   PLAINTIFFS HAVE NOT SATISFIED PRUDENTIAL STANDING REQUIREMENTS ...................... 11

III. FAILURE TO STATE A CLAIM (RULE 12(B)(6)) ................................. 12

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

# TABLE OF CONTENTS
## (continued)

Page

A. PLAINTIFFS' CONSTITUTIONAL CHALLENGES FAIL BECAUSE PLAINTIFFS CANNOT ESTABLISH THAT SB 1070 IS UNCONSTITUTIONAL IN ALL OF ITS APPLICATIONS ........................................................................... 12

    1. FEDERAL LAW DOES NOT PREEMPT SB 1070 ........... 12

        i. SB 1070 IS NOT A "REGULATION OF IMMIGRATION." ............................................... 13

        ii. FEDERAL LAW DOES NOT OCCUPY THE FIELD ....................................................................... 14

        iii. SB 1070 DOES NOT CONFLICT WITH FEDERAL LAW ....................................................... 15

            a. SB 1070 DOES NOT INTERFERE WITH FEDERAL INTERESTS ..................... 15

            b. SB 1070 CONCURRENTLY ENFORCES THE DOCUMENTATION PROVISIONS OF FEDERAL LAW ............. 15

            c. SB 1070 CONCURRENTLY ENFORCES THE HARBORING AND TRANSPORTING PROVISIONS OF FEDERAL LAW .................................... 16

            d. FEDERAL LAW DOES NOT PREEMPT SB 1070'S PROHIBITION AGAINST PERSONS UNLAWFULLY PRESENT APPLYING FOR OR SOLICITING WORK .................................... 17

            e. FEDERAL LAW DOES NOT IMPOSE RESTRICTIONS ON LAW ENFORCEMENT OFFICERS' ARREST AUTHORITY .................................................. 18

    2. PLAINTIFFS HAVE NOT ALLEGED AN EQUAL PROTECTION VIOLATION ............................................. 20

    3. SB 1070 DOES NOT VIOLATE EITHER THE FOURTH AMENDMENT OR ARTICLE II, SECTION 8 OF THE ARIZONA CONSTITUTION ......... 21

        i. INVESTIGATION INTO A PERSON'S IMMIGRATION STATUS IN CONNECTION WITH A LAWFUL STOP, DETENTION, OR ARREST ....................................................... 22

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

**TABLE OF CONTENTS**
(continued)

Page

ii.    WARRANTLESS SEIZURES THAT
SECTIONS 2 AND 6 AUTHORIZE ........................ 22

iii.    AUTHORIZATION TO TRANSPORT A
PERSON UPON CONFIRMATION THAT
THE PERSON IS UNLAWFULLY PRESENT
IN THE UNITED STATES ...................................... 23

iv.    THE ALLEGED REQUIREMENT THAT
OFFICERS "CONDUCT INVESTIGATORY
STOPS WITHOUT REASONABLE
SUSPICION OF CRIMINAL ACTIVITY." ............. 24

4.    THE FOURTEENTH AMENDMENT'S DUE
PROCESS CLAUSE ............................................................ 24

i.    SB 1070 INCORPORATES THE REQUISITE
PROCEDURAL PROTECTIONS ............................ 24

ii.    SB 1070 IS SUFFICIENTLY CLEAR AND
DEFINITE .................................................................. 25

5.    RIGHT TO TRAVEL .......................................................... 28

B.    PLAINTIFFS' REMAINING CONSTITUTIONAL
CHALLENGES FAIL BECAUSE SB 1070 IS BASED ON
ESTABLISHED AND CONSTITUTIONALLY
PERMISSIBLE PRINCIPLES ........................................................ 29

1.    PLAINTIFFS' FIRST AMENDMENT CLAIM ................. 29

i.    SECTION 2 OF SB 1070 ......................................... 29

ii.    SECTION 5 OF SB 1070 ......................................... 31

C.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM
UNDER 42 U.S.C. § 1981 ................................................................ 33

IV.    CONCLUSION ........................................................................................ 33

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Pursuant to Fed. R. Civ. P. 12(b)(1) and (6), Intervenor Defendant Janice K.

2   Brewer ("Governor Brewer") moves to dismiss plaintiffs' Complaint because plaintiffs do

3   not have standing to assert these claims and because plaintiffs have failed to state a claim

4   upon which relief can be granted.  Plaintiffs lack standing because they have not alleged,

5   and cannot allege, the requisite real and immediate threat of harm from enforcement of the

6   "Support Our Law Enforcement and Safe Neighborhoods Act," as amended ("SB 1070"

7   or the "Act").  Instead, plaintiffs speculate about potential future harm that is too

8   attenuated, as a matter of law, to establish a cognizable case or controversy.

9   Plaintiffs' Complaint also fails to state a claim upon which relief can be granted.

10   SB 1070 is *not* preempted by federal law.  SB 1070 primarily codifies (and mandates the

11   enforcement of) *existing* federal law in the State of Arizona.  And SB 1070 only requires

12   state and local law enforcement personnel to assist in the enforcement of this existing

13   federal law in limited specific circumstances.[1]  Plaintiffs' rhetoric aside, SB 1070

14   substantively tracks and codifies crimes and procedures that currently exist under well-

15   established case law and federal immigration law.

16   There can be no dispute that SB 1070 can be applied in a constitutional manner.

17   And, at this stage, the Court must presume that Arizona's law enforcement officers will do

18   so.  Plaintiffs' allegations essentially amount to an abstract fear that SB 1070 *may* be

19   implemented in a manner that violates the Fourth Amendment (searches and seizures), the

20   Fourteenth Amendment (due process and equal protection), the Privileges and Immunities

21   Clause (*e.g.,* the right to travel), or various other federal or state constitutional provisions

22   (*e.g.,* the First Amendment).  In short, plaintiffs' allegations regarding SB 1070's

23   constitutionality arise entirely out of hypothetical, speculative, future *potential* scenarios

24   where the law is not applied and enforced according to its terms and such misapplication

25   of the law causes actual harm.  This, however, is neither the forum nor the time to be

26   making these types of challenges.

---

27
28   [1] For example, when a person is already being investigated for unlawful activity, there
exists "reasonable suspicion" that the person is in the country unlawfully, and it is
"practicable" for the law enforcement officer to investigate this issue further.

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   BACKGROUND OF SB 1070

In this action, various organizational plaintiffs and individuals ask the Court to enjoin defendants from enforcing Sections 2, 3, 5, and 6 of SB 1070.  However, as explained in greater detail below, these four statutory provisions merely incorporate well-established and constitutionally permissible standards for both law enforcement activities and legislative action.

### A.   Section 2

Section 2 of SB 1070 requires law enforcement officials or agencies of the state to make a *reasonable* attempt, when *practicable*, to determine a person's immigration status during a "lawful stop, detention or arrest" *if* there is a reasonable suspicion "that the person is an alien and is unlawfully present in the United States."[2]  Section 2 thus provides that an inquiry regarding a person's immigration status shall be made when a law enforcement officer has reasonable suspicion to believe that a person: (1) is engaged in unlawful activity; (2) is an alien; *and* (3) is in the country unlawfully.[3]  Section 2 requires officers to confirm a person's immigration status prior to the person's release *only if* the person has been arrested.[4]  Upon confirmation that a person in the custody of a state law enforcement agency is also unlawfully present in the United States, Section 2 authorizes the agency to transport the person to a federal facility or point of transfer.

Significantly, Section 2 *expressly prohibits* law enforcement officials from "consider[ing] race, color or national origin in implementing [its] requirements . . . except

---

[2] A lawful stop or brief detention requires "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989).  A prolonged detention or arrest requires probable cause. *Muehler v. Mena*, 544 U.S. 93, 101 (2005).

[3] Even if these prerequisites are satisfied, SB 1070 does not require law enforcement officers to make such an inquiry if doing so will hinder or obstruct an investigation.

[4] A law enforcement officer can confirm a person's immigration status simply by calling the U.S. Immigration and Customs Enforcement ("ICE") – even during a routine traffic stop.  *See United States v. Soriano-Jarquin*, 492 F.3d 495, 497 (4th Cir. 2007); *United States v. Rodriguez-Arreola*, 270 F.3d 611, 614 (8th Cir. 2001).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

to the extent permitted by the United States or Arizona Constitution," and requires that law enforcement officers implement its provisions "in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens."[5]

### B.    Section 3

Section 3 provides that, "[i]n addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 [U.S.C. §§] 1304(e) or 1306(a)." Violations of this statute (A.R.S. § 13-1509(H)) involve the same penalties that federal statutes (8 U.S.C. §§ 1304(e) or 1306(a)) already impose.

### C.    Section 5

Section 5 establishes a Class 1 misdemeanor for an occupant of a motor vehicle to attempt to hire or pick up passengers for work if the motor vehicle would be blocking or impeding the normal movement of traffic, and likewise prohibits a person from entering such a vehicle under these circumstances. Section 5 further establishes that it is unlawful for a person who is not lawfully present in the United States to knowingly apply for or solicit work in a public place. Finally, Section 5 also makes it unlawful for a person, while in violation of a criminal offense, to transport or move aliens *in furtherance of the aliens' illegal presence*, or to conceal, shield, or harbor aliens who are in violation of federal immigration laws, or to encourage an alien to come to this state if the person knows or recklessly disregards that doing so would be a violation of law.[6]

### D.    Section 6

Section 6 permits a law enforcement officer to arrest a person without a warrant if the officer has probable cause to believe that "the person to be arrested has committed any public offense that makes the person removable from the United States." A.R.S. § 13-

---

[5] The U.S. Supreme Court has made it clear that a person's "Mexican descent," does not constitute "a reasonable belief that [the person is an] alien[]," much less that the person is in the country unlawfully. *United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975).

[6] Exceptions apply for emergency services and child protective services.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   3883(A)(5).  8 U.S.C. § 1227 sets forth the offenses that make a person removable.

2   ## II.   PLAINTIFFS LACK STANDING (RULE 12(B)(1))

3   The Court's standing analysis "involves both constitutional limitations on federal-

4   court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S.

5   490, 498 (1975).  Here, plaintiffs do not have standing under either of these components.[7]

6   ### A.   The Individual Plaintiffs Fail Constitutional Standing Requirements

7   To have standing, a plaintiff must allege facts that demonstrate "an injury in fact –

8   an invasion of a legally protected interest which is (a) concrete and particularized, and (b)

9   actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504

10  U.S. 555, 560 (1992) (internal quotations and citation omitted).[8]  When standing is based

11  on an injury that may occur "at some indefinite future time, and the acts necessary to

12  make the injury happen are at least partly within the plaintiff's own control," a "high

13  degree of immediacy" is required. *Id.* at 564, n.2.

14  Here, the individual plaintiffs' allegations of threatened harm fail because plaintiffs

15  have not: (1) "articulated concrete plans to violate" the Act; (2) alleged that the

16  government issued a "specific warning" or threat of its intent to prosecute the plaintiffs

17  under the Act; and (3) been prosecuted under the Act in the past. *San Diego County Gun*

18  *Rights Comm. v. Reno*, 98 F.3d 1121, 1126-29 (9th Cir. 1996).

19  ### 1.   Plaintiffs' Alleged Fears of Civil Rights Violations[9]

20  Several individual plaintiffs allege that they "fear" they will be stopped based upon

21  their appearance or because of their language or speaking style.  Compl. ¶¶ 21-23, 25-

22  ---

[7] Without standing, plaintiffs are seeking an improper advisory opinion.  It has long been
23  settled that "the federal courts established pursuant to Article III of the Constitution do not
render advisory opinions." *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75,
24  89 (1947).  "[T]he rule against advisory opinions implements the separation of powers
prescribed by the Constitution and confines federal courts to the role assigned them by
25  Article III." *Flast v. Cohen*, 392 U.S. 83, 96 (1968).

26  [8] A plaintiff must also demonstrate that there is "a causal connection between the injury
and the conduct complained of" and that it is "'likely,' as opposed to merely 'speculative,'
27  that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560-61; *see
also City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

28  [9] The plaintiffs' standing claims and arguments are addressed in the following sections
broken down by the nature of their alleged injuries.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

29.[10]  However, SB 1070 does not permit – indeed it expressly prohibits – the conduct

these plaintiffs allegedly fear.  Specifically, SB 1070 provides that law enforcement

officials and agencies "may **not** consider race, color or national origin in implementing the

requirements of this subsection except *to the extent permitted by the United States or*

*Arizona Constitution*.  A.R.S. § 11-1051(B) (emphasis added).[11]

The individual plaintiffs also do not allege facts that would support the three

prongs of the *San Diego County* test.  None of the individual plaintiffs has alleged a

"concrete plan" to violate a "law or ordinance of a county, city or town or this state" that

would open the door to a potential inquiry by a law enforcement officer into their

immigration status.  Nor have any individual plaintiffs alleged that they have received a

specific threat that they will be prosecuted under the Act.[12]  Finally, the individual

plaintiffs do not, and cannot, satisfy the third prong of the *San Diego County* test because

plaintiffs have not been prosecuted under the Act in the past.[13]

### 2.   SB 1070 Does Not "Chill" the Individual Plaintiffs from Exercising their First Amendment Rights

Several individual plaintiffs allege that the Act will chill their First Amendment

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

---

[10] One of the plaintiffs also "fears that she will be stopped by law enforcement at a bus stop or on the street and questioned about her immigration status" for no discernable reason at all.  Compl. ¶ 30 (Jane Doe #2).

[11] SB 1070 further mandates that the law "shall be implemented in a manner consistent with federal laws regulating immigration, *protecting the civil rights of all persons*."  A.R.S. § 11-1051(L) (emphasis added). And the Act does not authorize a stop, detention or arrest solely for purposes of verifying immigration status, and specifically prohibits implementation of the law in a manner that offends the civil rights of "all persons."

[12] *See also O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) (courts "assume that [plaintiffs] will conduct their activities within the law and so avoid prosecution and conviction").

[13] A few plaintiffs attempt to rely upon past experiences to establish standing.  Jim Shee, for example, asserts that he "has been stopped twice by local police in Arizona and asked to produce identification documents," Compl. ¶ 25, but does not allege that the prior stops were unconstitutional or otherwise violated his rights.  Rather, Mr. Shee speculates that, *if* SB 1070 is implemented against him in the future, he will be unable to prove that he is a citizen because he "does not wish to carry his passport with him at all times because he is afraid of losing it." *Id.*  Because Mr. Shee's allegations reference routine traffic stops, however, it appears that he holds a valid Arizona driver's license and is therefore entitled to a presumption of lawful presence in the United States under A.R.S. § 11-1051(B).

1  rights to free speech.[14]  The Supreme Court, however, has found that "[a]llegations of a

2  subjective 'chill' are not an adequate substitute for a claim of specific present objective

3  harm or a threat of specific future harm." *Laird v. Tatum,* 408 U.S. 1, 13-14 (1972).[15]   In

4  this case, the individual plaintiffs' subjective fears that they will be targeted for

5  prosecution based on their language "fall[s] far short of the 'genuine threat' required to

6  support this theory of standing" and is "too generalized and nonspecific to support a

7  complaint."  *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1380

8  (D.C. Cir. 1984).[16]

9              **3.      The Individual Plaintiffs' Alleged Fear of Prosecution**

10          Plaintiff Luz Santiago alleges that she "is concerned that she could be subject to

11  prosecution under the transporting and harboring provisions of SB 1070" because she

12  "provides transportation and shelter to members of her congregation … including

13  members who are not authorized by the federal government to remain in the United

14  States."  Compl. ¶ 24.  These allegations do not provide her with standing because she has

15  not alleged a real and immediate threat of harm.

16          SB 1070 makes it unlawful to "transport or move or attempt to transport or move

17  an alien in this state, ***in furtherance of*** the illegal presence of the alien in the United

18  States," or to "conceal, harbor or shield or attempt to conceal, harbor or shield an alien

19  from detection in any place in this State."  A.R.S. § 13-2929(A)(1) and (2) (emphasis

20  added).  Ms. Santiago alleges that she intends to provide "transportation and shelter."

21  _____

22  [14] For example, Vicki Gaubeca alleges that she is "wary of speaking Spanish in the
    presence of Arizona law enforcement officers."  Compl. ¶ 22.  C.M. claims "[s]he is

23  nervous about speaking Haitian Creole with her friends and believes that it could get her
    in trouble with the police."  Compl. ¶ 23.

24  [15] In order to amount to an injury, the chilling effect must arise from "an objectively
    justified fear of real consequences, which can be satisfied by showing a credible threat of

25  prosecution or other consequences following from the statute's enforcement."  *D.L.S. v.
    Utah,* 374 F.3d 971, 975 (10th Cir. 2004); *see also Lyons*, 461 U.S. at 107, n.8 ("It is the

26  *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the
    plaintiff's subjective apprehensions.") (emphasis in original).

27  [16] Plaintiffs' abstract allegations also, again, ignore the express safeguards in A.R.S. § 11-
    1051, instead presupposing that the Act will be implemented in a manner that violates

28  their rights, which is expressly prohibited.

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  Under the terms of SB 1070, however, providing these services is not unlawful so long as

2  (1) she is not already herself "in violation of a criminal offense" and (2) she is not

3  attempting to "conceal, harbor, or shield" these persons from detection or transporting

4  these persons "in furtherance of" their continued unlawful presence.

5       **B.    <u>Associational Standing</u>**

6       To establish associational standing, an organization "must allege that its members .

7  . . are suffering immediate or threatened injury as a result of the challenged action of the

8  sort that would make out a justiciable case had the members themselves brought suit."

9  *Warth*, 422 U.S. at 511 (citation omitted).[17]

10      **1.    Allegations of Harm to Members**

11      Some of the plaintiff-organizations allege that their members will be stopped,

12  detained or arrested because of their appearance or limited English speaking ability.

13  Compl. ¶¶ 7-20.  However, there is no basis for finding that the individual members of

14  each organization have concrete plans to violate the Act, nor are there allegations that

15  members face "a 'genuine threat of imminent prosecution.'"  *San Diego County*, 98 F.3d

16  at 1127.  SB 1070 subjects an individual to a potential inquiry into his or her immigration

17  status only when that person is first stopped, detained or arrested in the enforcement of a

18  separate law and a reasonable suspicion exists that the person is not only an alien but also

19  unlawfully present in the United States.  A.R.S. § 11-1051(B).[18]

20      Furthermore, "[t]he acts necessary to make plaintiffs' injury . . . materialize are

21  almost entirely within the plaintiffs' own control."  *San Diego County*, 98 F.3d at 1126.

22  And the Act provides safeguards against profiling by mandating that implementation of

23

24  [17] *See also San Diego County*, 98 F.3d at 1130-31 (organizations have associational standing to sue on behalf of their members only if: "(a) their members would otherwise

25  have standing to sue in their own right; (b) the interests [they] seek to protect are germane to their purpose; and (c) neither the claim asserted nor the relief requested requires the

26  participation of individual members in the lawsuit") (citation omitted).

27  [18] The plaintiff organizations have also not alleged any facts to indicate that their members may be subject to the reasonable suspicion inquiry.  *See San Diego County*, 98 F.3d at

28  1127 (complaint insufficient to establish standing for a threatened prosecution when it did "not specify any particular time or date on which plaintiffs intend to violate the Act.").

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

the Act be done in a manner such that "race, color or national origin" may be considered only to the extent allowed by the United States and Arizona Constitutions and consistent with the civil rights of all persons.  A.R.S. § 11-1051(B), (L).

### 2.    Impact on Members' Expressive Activities

Plaintiffs SEIU and SEIU Arizona express "concern" that their members "will be fearful to attend rallies, demonstrations, and union meetings or to engage in leafleting or other traditional labor activities because of the possibility of being stopped by the police under SB 1070."  Compl. ¶¶ 8-9.[19]  However, these plaintiff-organizations have alleged only a "subjective chill" rather than an objectively justified fear of real consequences that their members will be arrested or detained by the police based on their expressions of speech.  *D.L.S.,* 374 F.3d at 975; *see also Laird*, 408 U.S. at 13-14.  Accordingly, plaintiffs' allegations of harm are merely subjective and speculative, and their Complaint constitutes nothing more than a "generalized grievance" against the State's statutory scheme.  *See United Presbyterian Church,* 738 F.2d at 1382.

### 3.    Alleged Fear of Prosecution Under A.R.S. § 13-2929

Some of the plaintiff organizations that transport or provide shelter to aliens allege that they have "concern" that their members may be subject to prosecution under SB 1070.[20]  As explained above with respect to the individual plaintiff who alleged similar concern (see Section A.3, above), these concerns are insufficient to establish a concrete

---

[19] UFCW similarly alleges that SB 1070 will adversely affect its members' freedom of association rights "by subjecting UFCW members to unlawful questioning, arrest and detention."  Compl. ¶ 10.  The organizational plaintiffs also assert that "members of Tonatierra Community Development Institute, Centro Macehualli, persons who participate in Southside Presbyterian Church's day laborer program, [and] members of Border Action Network . . . . have previously expressed their desire, need, and availability for employment to persons in vehicles on the street, … [and now] fear doing so in the same manner as they have in the past because A.R.S. §§ 13-2928(C) and (D) subject them to the danger of arrest, fines, and other penalties should they engage in such expression."  Compl. ¶ 109.

[20] Compl. ¶¶ 11 (ASAFSF "staff and volunteers will be at imminent risk of prosecution under SB 1070's transporting provisions."), 12 (Southside's religious leaders, staff and volunteers will "be at risk of being prosecuted pursuant to SB 1070's transporting and harboring provisions."), ¶ 15 (BAN's staff "buses members to events and organizational functions without regard to their passengers' immigration status.").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  injury for purposes of standing.[21]

### 4.    Alleged Economic Harm

Some of the plaintiff organizations contend that SB 1070 will cause economic harm to their members' businesses, which "heavily rely on a U.S.-born minority consumer base that will be reluctant to patronize businesses for fear they could be harassed by local law enforcement."  Compl. ¶¶ 13-14.  However, the types of harm arising from speculation about the future economic harm that depend on what third-party consumers may or may not do are insufficient to establish standing.  In any case, it would be difficult to demonstrate that SB 1070 would be a material cause of any reduction in business and consequent economic harm.  *See San Diego County*, 98 F.3d at 1130 ("plaintiffs fail[ed] to demonstrate that their alleged economic injury [was] fairly traceable to the [challenged statute]" when other statutes and outside factors may have influenced the degree of economic harm.").  There are numerous other regulations, federal and state, as well as the ongoing economic downturn, which may influence the level of business activity seen by plaintiff-organizations' members.

### 5.    Distressed County and Municipal Budgets

SEIU and SEIU Arizona allege that SB 1070 will harm their members by having a negative "impact on already distressed county and municipal budgets" resulting in "further pay cuts, furloughs, and layoffs."  Compl. ¶¶ 8-9.  Such allegations are so wrought with speculation that they cannot form the basis of a concrete and particularized injury-in-fact for purposes of standing.  SEIU and SEIU Arizona's entire argument is premised on their sole belief that SB 1070 creates a drain on county and municipal

---

[21] Again, the relevant provisions of SB 1070 make it unlawful to "transport or move or attempt to transport or move an alien in this state, *in furtherance of* the illegal presence of the alien in the United States," or to "conceal, harbor or shield or attempt to conceal, harbor or shield an alien from detection in any place in this State."  A.R.S. § 13-2929(A)(1)-(2) (emphasis added).  Transporting individuals, without more, does not run afoul of this section.

Snell & Wilmer
—— L.L.P. ——
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   financial resources, which may or may not turn out to be the case.[22]

2   ## C.   The Organizational Plaintiffs

3   "[A]n association may have standing in its own right to seek judicial relief from

4   injury to itself and to vindicate whatever rights and immunities the association itself may

5   enjoy." *Warth*, 422 U.S. at 511.  To properly establish organizational standing, an

6   organization must satisfy the injury-in-fact standing requirement,[23] and can do so by

7   establishing that the challenged conduct: (1) frustrates the organization's mission; and (2)

8   requires the organization to divert or expend resources in a manner other than in

9   furtherance of the organization's goals.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363,

10  379 (1982); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, __ F.3d

11  __, 2010 WL 2293200 (9th Cir. June 9, 2010).  The organization must allege a "concrete

12  and demonstrable injury to the organization's activities … [that] constitutes far more than

13  simply a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455

14  U.S. at 379 (citation omitted).

15  Unlike in *Havens* and the Ninth Circuit's recent decision in *Redondo Beach*, the

16  plaintiff-organizations in this case do not satisfy either prong of the organizational injury

17  analysis.   None of the organizations have alleged facts sufficient to establish that the Act

18  adversely impacts their mission, nor have they diverted resources in a manner that

19  establishes a "concrete and demonstrable injury."[24]  *See id.*

20  ———————————

21  [22] SEIU and SEIU Arizona assume, for example, that counties or cities will address these
    hypothetical budget deficits, if they ever occur, by pursuing austerity measures as opposed
22  to raising revenues.

23  [23] *E. Ky. Welfare Rights Org. v. Simon*, 426 U.S. 26, 40 (1976) ("Our decisions makes
    clear that an organization's abstract concern with a subject that could be affected by an
24  adjudication does not substitute for the concrete injury required by Article III.").

25  [24] In fact, some of the plaintiff-organizations asserting organizational standing allege that
    one of their primary missions is to educate their members or the general public, yet, at the
26  same time, these plaintiffs allege that SB 1070 will impair their stated purpose by,
    ironically, requiring them to educate and inform the public.  *See* Compl. ¶¶ 7, 13, 15, 17-
27  20.  Without other allegations of harm, these plaintiffs do not state a concrete injury to
    their activities.  *See Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434
28  (D.C. Cir. 1995) (an organization "cannot convert its ordinary program costs into an
    injury in fact").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    Some of the organizational plaintiffs allege that they will be required to divert

2  resources to address SB 1070.   These plaintiffs speculate that a diversion of resources

3  will be necessary at some point in the future to educate and pacify their members and the

4  public.  *See* Compl. ¶¶ 7, 11-12, 14-15, 17-20.  However, absent a direct diversion of

5  resources to address specific instances of racially discriminatory conduct (*Havens*) or

6  enforcement of an ordinance (*Redondo Beach*) against the plaintiff-organizations'

7  members, plaintiffs have failed to allege an injury-in-fact sufficient to confer

8  organizational standing.[25]

9           **D.      Plaintiffs Have Not Satisfied Prudential Standing Requirements**

10    Prudential standing requirements also weigh strongly against the Court exercising

11  jurisdiction in this case.  "Beyond [the] 'minimum constitutional [standing] mandate,'…

12  the Supreme Court has developed, as a prudential matter of self-governance, certain 'other

13  limits on the class of persons who may invoke the courts' decisional and remedial

14  powers.'"  *City of S. Lake Tahoe v. Cal. Tahoe Reg. Planning Agency*, 625 F.2d 231, 234

15  (9th Cir. 1980) (quoting *Warth*, 422 U.S at 499).  These prudential principles prohibit

16  courts from considering generalized grievances and claims on behalf of third parties.

17  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454

18  U.S. 464, 474-75 (1982).

19    These considerations weigh against the exercise of jurisdiction here, where

20  plaintiffs allege general concern about the Act rather than a specific, concrete injury.

21  Even if plaintiffs sufficiently allege an actual injury, courts should refrain "from

22  adjudicating 'abstract questions of wide public significance' which amount to 'generalized

23  grievances,' pervasively shared and most appropriately addressed in the representative

24  branches."  *Id.* (quoting *Warth*, 422 U.S. at 499-500).  In general, a plaintiff "must assert

---

25  [25] In addition, from a prudential perspective, plaintiff-organizations' assertion that they
26  have standing based upon the speculative assertion that resources may be diverted to
    educate members about a new law is alarming and untenable.  If such a standard is
27  adopted, any entity that opposes new legislation may assert standing to contest new
    legislation based solely upon an unsupported allegation that it will, at some point in the
28  future, expend its resources to educate its members or the public in general about a new
    law that is contrary to that organizations' stated mission or purpose.

Snell & Wilmer
— L.L.P.—
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499 (holding that plaintiffs did not have standing to assert constitutional claims attacking a city zoning ordinance); *see also Valley Forge*, 454 U.S. at 474.

The issues plaintiffs raise in this lawsuit are simply – and essentially – generalized grievances, based upon abstract questions that have not been refined by a concrete dispute between two adversarial parties. Such abstract allegations epitomize the type of generalized grievance that this Court should avoid addressing. *Valley Forge*, 454 U.S. at 472 (generalized grievances should not "be resolved … in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.").

## III.   FAILURE TO STATE A CLAIM (RULE 12(B)(6))

### A.   Plaintiffs' Constitutional Challenges Fail Because Plaintiffs Cannot Establish that SB 1070 Is Unconstitutional In *All* of Its Applications

A pre-enforcement challenge to the constitutionality of a statute seeks to invalidate the statute on its face. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). When considering a facial challenge, the court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449-50; *United States v. Raines*, 362 U.S. 17, 22 (1960) ("The . . . power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined.").[26]

### 1.   Federal Law Does **Not** Preempt SB 1070

"Federal preemption can be either express or implied." *Chicanos Por La Causa,*

---

[26] Facial challenges are disfavored because they: (1) "often rest on speculation;" (2) "run contrary to the fundamental principle of judicial restraint" with respect to constitutional challenges; and (3) "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 450-51.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

*Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009) ("*CPLC*").  A preemption analysis, however, **begins** "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947)).

Here, plaintiffs do not assert an express preemption claim.  Rather, Plaintiffs assert implied preemption claims – namely that SB 1070 allegedly "conflicts with" federal law, operates in a "field occupied by the federal government," or constitutes an impermissible "regulation of immigration."  Compl. ¶¶ 183-84.

In the immigration context, implied preemption exists only: (1) if a statute falls into the narrow category of a "regulation of immigration"; (2) if Congress expressed "the clear and manifest purpose" of completely occupying the field and displacing all state activity; or (3) if the state regulation conflicts with federal laws, such that it "stands as an obstacle to the accomplishment … of the full purposes and objectives of Congress." *De Canas v. Bica*, 424 U.S. 351, 355, 357, 363 (1976).

i.      SB 1070 is not a "regulation of immigration."

In *De Canas*, the Supreme Court explained that a "regulation of immigration" is a statute that defines "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."  424 U.S. at 355.  The Supreme Court "has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power." *Id.* Thus, following the *De Canas* Court's holding, the Ninth Circuit held that federal law does not preempt the Legal Arizona Workers Act because "the act does not attempt to define who is eligible or ineligible to work under [federal] immigration laws," but, instead, "is premised on enforcement of federal standards as embodied in federal immigration law." *CPLC,* 558 F.3d at 866.

Here, no part of SB 1070 addresses the admission, authorization or deportation of aliens from the United States.  Plaintiffs' sole contentions to the contrary are their vague

1  and conclusory allegations that SB 1070's enactment of "Arizona-specific laws"

2  constitutes a regulation of immigration and that SB 1070 "attempts to bypass federal

3  immigration law" based on SB 1070's stated policy of "attrition through enforcement."

4  Compl. ¶¶ 76, 183.  However, plaintiffs are confusing *enforcement* of federal immigration

5  regulations (which SB 1070 seeks to accomplish) with *enactment* of Arizona-specific

6  "regulation of immigration" (which federal law would preempt).  *De Canas*, 424 U.S. at

7  355.  Because SB 1070 "is premised on enforcement of federal standards as embodied in

8  federal immigration law," and *not* creating any new requirements that a lawfully present

9  alien must satisfy, SB 1070 simply does not intrude upon the federal government's

10 exclusive power to regulate immigration.  *See CPLC*, 558 F.3d at 866.

11          ii.       Federal law does not occupy the field

12         Field preemption exists only upon "a demonstration that complete ouster of state

13 power—including state power to promulgate laws not in conflict with federal laws—was

14 'the clear and manifest purpose of Congress.'"  *De Canas*, 424 U.S. at 357-58.  The

15 Supreme Court has already addressed and rejected the plaintiffs' allegations that the

16 Immigration and Nationality Act ("INA") is so comprehensive that it allows no room for

17 any state legislation in the field.  Compl. ¶¶ 77, 184; *De Canas*, 424 U.S. at 357-58

18 ("[Respondents] fail to point out, and an independent review does not reveal, any specific

19 indication in either the wording or the legislative history of the INA that Congress

20 intended to preclude even harmonious state regulation touching on aliens in general, or the

21 employment of illegal aliens in particular.") (internal citations omitted).[27]

22         Here, it is also clear that no field preemption exists because multiple federal

23 statutes expressly *invite* state and local police onto the field.  *See*, *e.g.*, 8 U.S.C. §

24 1357(g)(10) (acknowledging the power of state and local police to make immigration

25 

26 _____
[27] *See also Lynch v. Cannatella*, 810 F.2d 1363, 1371 (5th Cir. 1987) ("No statute
   precludes other federal, state, or local law enforcement agencies from taking other action

27 to enforce this nation's immigration laws.").  Similarly, in *In re Jose C.*, 198 P.3d 1087,
   (Cal. 2009), the California Supreme Court found that federal law did not preempt a

28 California statute that permitted its state courts to declare a juvenile a ward of the court for
   violation of any state or federal law, including immigration laws.

Snell & Wilmer

L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   arrests).[28]

2                      iii.    SB 1070 does not conflict with federal law

3       "[C]onflict preemption exists when 'compliance with both State and federal law is

4   impossible, or when the state law stands as an obstacle to the accomplishment and

5   execution of the full purposes and objectives of Congress.'" *Ariz. Contrs. Ass'n v.*

6   *Napolitano*, 2007 U.S. Dist. LEXIS 96194, at *39 (D. Ariz. Dec. 21, 2007), *aff'd sub nom.*

7   *CPLC*, 558 F.3d 856 (quoting *Mich. Canners & Freezers Ass'n Inc. v. Agric. Mktg. &*

8   *Bargaining Bd.*, 467 U.S. 461, 469 (1984)).  Plaintiffs allege that SB 1070 interferes with

9   federal interests and that an actual conflict exists between federal law and SB 1070 with

10  respect to registration, transportation, and harboring, work authorization, and state and

11  local law enforcement officers' arrest authority.  However, an analysis of SB 1070 in

12  connection with plaintiffs' claims demonstrates that plaintiffs are misconstruing or

13  misapplying the Act.

14                  **a.      SB 1070 does not interfere with federal interests**

15      Plaintiffs assert that SB 1070 conflicts with "federal government interests."

16  Compl. ¶¶ 144-46.  However, the question in any implied conflict preemption analysis is

17  whether the state law "stands as an obstacle to the accomplishment … of the full purposes

18  and objectives of Congress."[29]  SB 1070 is not only consistent with federal objectives, but

19  it expressly (and in effect) serves to *reinforce* existing federal laws.  *See* 8 U.S.C. §§

20  1304(e), 1306(a), 1324(a)(1)(A), 1324a.  In the words of Judge Learned Hand, "it would

21  be unreasonable to suppose that [the federal government's] purpose was to deny itself any

22  help that the states may allow."  *Marsh v. United States*, 29 F.2d 172, 174 (2d Cir. 1928).

23

24

25  _____

26  [28] *See also* 8 U.S.C. § 1373(c) (requiring the federal government to respond to inquiries by
    state and local police officers seeking to verify the immigration status of any alien); 8
27  U.S.C. § 1644 (prohibiting restrictions on state and local government entities in "sending
    to or receiving from the Immigration and Naturalization Service information regarding the
    immigration status, lawful or unlawful, of an alien in the United States.").

28  [29] *De Canas*, 424 U.S. at 363; *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

*b.     SB 1070 concurrently enforces the documentation provisions of federal law*

Plaintiffs allege that A.R.S. § 13-1509(A) "conflicts with federal law and enforcement priorities." Compl. ¶ 99.  This provision, however, *precisely conforms* to federal law: "In addition to any violation of federal law, a person is guilty of willful failure to complete or carry an alien registration document if the person is in violation of 8 United States Code Section 1304(e) or 1306(a)." A.R.S. § 13-1509(A).[30]  A.R.S. § 13-1509(A), (H) further impose the *same* misdemeanor penalties as federal law imposes for violations of 8 U.S.C. § 1304(e) – a maximum fine of $100 and a maximum imprisonment of 30 days.  "Where state enforcement activities do not impair federal regulatory interests *concurrent enforcement activity is authorized*." *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir. 1983) (emphasis added), *overruled on other grounds by Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999)).  Where "[f]ederal and local enforcement have identical purposes," preemption does not occur. *Id.*  Because A.R.S. § 13-1509(A) prohibits precisely the same conduct that is prohibited by 8 U.S.C. §§ 1304(e) and 1306(a), Arizona law and federal law are in concurrence.[31]

*c.     SB 1070 concurrently enforces the harboring and transporting provisions of federal law*

Plaintiffs also suggest that A.R.S. § 13-2929 (which prohibits the transporting and harboring of aliens who are unlawfully present in the United States) is preempted by federal law.  Plaintiffs notably do not identify an actual conflict.  *See* Compl. ¶¶ 131-34. Plaintiffs allege only that "federal courts are engaged in an ongoing process of

[30] 8 U.S.C. § 1304(e) requires every alien eighteen years of age and over to "at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card." 8 U.S.C. § 1306(a) imposes penalties upon any "alien required to apply for registration and to be fingerprinted in the United States who willfully fails or refuses to make such application or to be fingerprinted."

[31] *See also Ariz. Contractors Ass'n*, 2007 U.S. Dist. LEXIS 96194, at *39 (rejecting a similar preemption claim against the Legal Arizona Workers Act based on its holding that the Act constituted "harmonization with federal law, not conflict" which was "simply the result of the concurrent enforcement activity in our federal system where Congress has specifically preserved state authority").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

interpreting the [nearly identical] statutory language in 8 U.S.C. § 1324(a)," and "Arizona law enforcement officers are neither trained nor equipped to have a detailed understanding of these provisions." Compl. ¶ 132. This allegation fails for at least three reasons. First, "it has always been understood that the several states are independent sovereigns possessing inherent police power to criminally punish conduct inimical to the public welfare, even when that same conduct is also prohibited under federal law." *In re Jose C.*, 198 P.3d at 1094 (citing cases); *see also Heath v. Alabama*, 474 U.S. 82, 93 (1985).

Second, the language of A.R.S. § 13-2929(A) mirrors 8 U.S.C. § 1324(a)(1)(A). Both prohibit: (1) "transport[ing] or mov[ing] or attempt[ing] to transport or move" an alien who is unlawfully present in the United States; (2) "conceal[ing], harbor[ing] or shield[ing]" such an alien; and (3) "encourag[ing] or induc[ing]" such an alien to come to the United States or Arizona. A.R.S. § 13-2929(A)(1)-(3); 8 U.S.C. § 1324(a)(1)(A).[32]

Third, federal courts' jurisdiction of all causes, civil and criminal, arising under federal immigration law, *see* 8 U.S.C. § 1329, is not exclusive. Both the Ninth Circuit and this Court have recognized that a state court may consider an alien's immigration status in the adjudication of a violation of state law. *CPLC*, 558 F.3d at 868.[33]

### d.      *Federal law does not preempt SB 1070's prohibition against persons unlawfully present applying for or soliciting work*

Plaintiffs allege that federal law preempts SB 1070's provision imposing criminal penalties upon aliens unlawfully present in the United States who knowingly apply for,

---

[32] *See, e.g., State v. Flores*, 218 Ariz. 407, 413 (App. 2008) (finding that 8 U.S.C. § 1324(a)(1)(A)(ii) did not preempt A.R.S. § 13-2319 because "Arizona may prosecute and punish a person who knowingly transports illegal aliens within its borders for profit or commercial purpose . . . just as the federal government may prosecute and punish a person who knowingly or recklessly transports such illegal aliens within the United States under its laws.") (citing *Abbate v. United States*, 359 U.S. 187, 194-95 (1959)); *see also Arizona v. Barragan-Sierra*, 219 Ariz. 276, 287 (Ariz. Ct. App. 2008) ("Arizona's enforcement of its human smuggling law is compatible with the federal enforcement of its counterpart, serving the same purpose.").

[33] *See also Ariz. Contractors Ass'n v. Candelaria*, 534 F. Supp. 2d 1036, 1054 (D. Ariz. 2008) (finding that the Arizona Legal Workers Act's "adjudicatory procedures do not conflict with federal law merely because a State Superior Court judge and a federal administrative law judge could disagree about the evidence"); *In re Jose C.*, 198 P.3d at 1097 (finding that 8 U.S.C. § 1329 does not preempt state court jurisdiction).

*Snell & Wilmer*
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    solicit, or perform work in a public place.  Compl. ¶¶ 135-37.  Specifically, plaintiffs

2    allege that Congress' failure to impose similar sanctions necessarily precludes states from

3    doing so.  *See* Compl. ¶ 136.  As set forth above, however, Congress has *not* occupied the

4    field of "regulation touching on aliens in general, or the employment of illegal aliens in

5    particular."  *See De Canas*, 424 U.S. at 357-58.  In this instance, for example, Congress

6    has only issued some regulations pertaining to *employers* of illegal aliens.  "A mere

7    difference between state and federal law is not conflict."  *Ariz. Contractors Ass'n*, 2007

8    U.S. Dist. LEXIS 96194, at *25.  Because, as plaintiffs concede, Congress has not

9    imposed criminal sanctions (or set forth any regulations at all) pertaining to *employees*

10   who are unlawfully present in the United States, no actual conflict exists between SB

11   1070 and federal law.  Moreover, Congress has made clear its intent to preempt only

12   "law[s] imposing civil or criminal sanctions ... upon those who employ ... unauthorized

13   aliens."  8 U.S.C. § 1324a(h)(2).

### e.    *Federal law does not impose restrictions on law enforcement officers' arrest authority*

16        Plaintiffs' allegations that federal law preempts SB 1070 with respect to state and

17   local law enforcement officers' arrest authority contradict express provisions of the INA

18   and well-established law.  First, plaintiffs allege that 8 U.S.C. § 1357(g) allegedly

19   "authorizes state officers to assist in immigration enforcement only in narrowly defined

20   circumstances." Compl. ¶¶ 138-39.  This allegation misconstrues the scope of authority

21   granted to local law enforcement officers under a § 1357(g) agreement, which essentially

22   deputizes the officers to perform any or all of function of federal immigration officers.

23   SB 1070, in contrast, requires only that Arizona's law enforcement officers *assist* the

24   federal government in the identification and apprehension of persons in violation of

25   federal immigration laws.  *See* A.R.S. § 11-1051.[34]

26   ───────────────
     [34] Significantly, 8 U.S.C. § 1357(g)(10) provides: "Nothing in this subsection shall be
27   construed to require an agreement under this subsection in order for any officer or
     employee of a State or political subdivision of a State… to cooperate with the Attorney
28   General in the identification, apprehension, detention, or removal of aliens not lawfully
     present in the United States."

Second, plaintiffs allege that federal law preempts SB 1070 because "state and local officers are generally prohibited from enforcing immigration laws." Compl. ¶ 142. It is well-settled, however, that "state and local police officers [have] implicit authority within their respective jurisdictions 'to investigate and make arrests for violations of federal law, including immigration laws.'" *United States v. Santana-Garcia*, 264 F.3d 1188, 1194 (10th Cir. 2001) (quoting *United States v. Vasquez-Alvarez*, 176 F.3d 1294, 1295 (10th Cir. 1999)).[35]

Third, plaintiffs allege that SB 1070's amendment to A.R.S. § 13-3883 (which authorizes warrantless arrests for "any public offense that makes a person removable from the United States") is preempted because it would require local law enforcement officers to determine an alien's removability on the spot, which, plaintiffs allege, "they are not equipped or authorized to do." Compl. ¶¶ 93-96. In fact, SB 1070 prevents Arizona's law enforcement officers from independently determining a person's immigration status and requires them instead to refer all status determinations to the federal government pursuant to 8 U.S.C. § 1373(c).[36] *See* A.R.S. § 11-1051(B) ("The person's immigration status shall be verified with the federal government pursuant to 8 United States Code Section 1373(c)."); *see also* A.R.S. §§ 11-1051(E), 13-1059(B), 13-2929(D).[37]

Fourth, plaintiffs allege that SB 1070 would conflict with congressional objectives because "[f]ederal immigration agencies … do not and cannot determine whether a particular person may remain the United States … without going through the procedures

---

[35] *See also Gonzales*, 722 F.2d at 474 ("[L]ocal police are not precluded from enforcing federal statutes. ... Federal and local enforcement have identical purposes—the prevention of the misdemeanor or felony of illegal entry."); *Rodriguez-Arreola*, 270 F.3d at 613; *Soriano-Jarquin*, 492 F.3d at 500-01.

[36] 8 U.S.C. § 1373(c) requires the INS to "respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual." This Court has specifically held that Arizona's use of the inquiry process of 8 U.S.C. § 1373(c) serves to deflect any such conflict preemption claim. *See Ariz. Contractors Ass'n*, 2007 U.S. Dist. LEXIS 96194, at *39 ("Importantly, the State defers to the federal government's response to a lawful request under 8 U.S.C. § 1373(c) to make this determination. . .").

[37] Moreover, A.R.S. § 13-3883(A) does not purport to specify procedures that must be followed at the time of arrest, but simply defines the categories of legal violations for which a warrantless arrest may be made.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

set forth in the INA." Compl. ¶ 121. Federal law, though, mandates that the federal government provide to state and local authorities, upon request, the "immigration status, *lawful or unlawful*, of any individual." 8 U.S.C. § 1373(a) (emphasis added). Further, several courts, including this one, have previously considered and rejected this argument. *See Candelaria*, 534 F. Supp. 2d at 1052 ("Plaintiffs are mistaken that the only way to verify whether an alien is unauthorized is through a federal deportation hearing. Rather, the federal government allows the states to verify a person's immigration status in relation to work authorization using § 1373."), *aff'd sub nom. CPLC*, 558 F.3d 856.[38]

## 2. Plaintiffs Have Not Alleged an Equal Protection Violation

Plaintiffs allege that SB 1070 violates the Equal Protection Clause in two respects. First, plaintiffs allege that SB 1070 "impermissibly and invidiously targets Plaintiffs who are racial and national origin minorities." Compl. ¶¶ 188-89. Four separate provisions of SB 1070, however, expressly prohibit law enforcement officials from "consider[ing] race, color or national origin in implementing the requirements of this subsection except to the extent permitted by the United States or Arizona Constitution." A.R.S. § 11-1051(B); *see also* A.R.S. §§ 13-1509(C); 13-2928(D); 13-2929(C). Also, A.R.S. § 11-1051(L) requires that the statute "be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens." Nothing in the language of SB 1070 authorizes or permits discrimination on the basis of race or national origin.

To establish that a facially neutral law is unconstitutional under the Equal Protection Clause, plaintiffs must show that the law: (1) has a racially disproportionate impact *and* (2) a racially discriminatory intent or purpose. *See Hunter v. Underwood*, 471 U.S. 222, 227 (1985). Here, plaintiffs assume that SB 1070 will have a discriminatory impact based on the alleged opinions of various politicians. Compl. ¶¶ 149-52. Plaintiffs'

---

[38] *See also United States v. Atandi*, 376 F.3d 1186, 1188 (10th Cir. 2004) ("Atandi was illegally or unlawfully present in this country as of May 2002 because he had been authorized to be here as a student but failed to satisfy the conditions of his student status. The fact that he had not yet been ordered removed is not relevant to the question of whether or not his presence in the United States was then authorized.").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

——— L.L.P. ———

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   Complaint contains no factual allegations that would establish that the Arizona

2   Legislature had a racially discriminatory *intent or purpose* in enacting SB 1070.  Further,

3   with respect to enforcement, speculation that an officer *might* inexplicably disobey the

4   terms of the law has no place in a facial challenge.  Rather, it must be assumed that law

5   enforcement officers will implement SB 1070 in a constitutional manner.  *See Panama*

6   *Refining Co. v. Ryan*, 293 U.S. 388, 446 (1935) ("Every public officer is presumed to act

7   in obedience to his duty . . ."); *see also United States v. Booker*, 543 U.S. 220, 280 (2005)

8   ("[In] facial invalidity cases . . . we ought to presume whenever possible that those

9   charged with writing and implementing legislation will and can apply 'the statute

10   consistently with the constitutional command.'") (quoting *Time, Inc. v. Hill,* 385 U.S. 374,

11   397 (1967)).

12   Second, plaintiffs allege that SB 1070 violates the Equal Protection Clause because

13   it "impermissibly discriminates against non-citizen Plaintiffs on the basis of alienage."

14   Compl. ¶ 190.  Governor Brewer recognizes that the Arizona Legislature intended SB

15   1070 to have a disparate impact on aliens who are unlawfully present in the United States.

16   But that does not render SB 1070 unconstitutional under the Equal Protection Clause.  As

17   the Supreme Court has observed, "undocumented status is not irrelevant to any proper

18   legislative goal. Nor is undocumented status an absolutely immutable characteristic since

19   it is the product of conscious, indeed unlawful, action."  *Plyler v. Doe*, 457 U.S. 202, 220

20   (1982).  To justify the use of unlawful status "as a criterion for its own discriminatory

21   policy, the State must demonstrate that the classification is reasonably adapted to '*the*

22   *purposes for which the state desires to use it.*'"  *Id.* at 226 (quoting *Oyama v. California*,

23   332 U.S. 633, 664-65 (1948)).  Here, SB 1070 is plainly rationally related to the stated

24   purpose of "discourage[ing] and deter[ing] the unlawful entry and presence of aliens and

25   economic activity by persons unlawfully present in the United States."  SB 1070, § 1.

26   **3.   SB 1070 Does Not Violate Either the Fourth Amendment or**
        **Article II, Section 8 of the Arizona Constitution**

27

28   Plaintiffs allege that SB 1070 violates the Fourth Amendment and Article II,

1    Section 8 of the Arizona Constitution[39] because SB 1070 allegedly provides for

2    impermissible investigatory stops, detention and transportation, and warrantless seizures.

3    Compl. ¶¶ 88-98, 195-203.  The fatal flaw in these claims here is that plaintiffs'

4    allegations establish only a *potential* that SB 1070's challenged provisions *could* be

5    applied in an unconstitutional manner.  This is insufficient to sustain a facial attack.

      i.      <u>Investigation into a person's immigration status in connection with a lawful stop, detention, or arrest</u>

8    First, the Supreme Court has specifically held that a police officer may inquire into

9    a person's immigration status in connection with an investigation for another violation of

10   law *regardless* of whether the officer has reason to believe that the person is in the

11   country unlawfully.  *See Muehler*, 544 U.S. at 101 (finding that "officers did not need

12   reasonable suspicion to ask [the defendant] for her name, date and place of birth, or

13   immigration status" because the inquiry did not prolong the investigation).  Likewise,

14   "[a]sking questions is an essential part of police investigations.  In the ordinary course a

15   police officer is free to ask a person for identification without implicating the Fourth

16   Amendment."  *Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004).[40]

      ii.      <u>Warrantless seizures that Sections 2 and 6 authorize</u>

18   Section 2 permits arrests only "in the enforcement of any other law or ordinance of

19   a county, city or town of this state."  Significantly, Section 2 does not expand or modify

20   officers' arrest authority.  Likewise, Section 6 permits an officer to arrest a person *only if*

21   the officer has probable cause to believe that the person has committed a public offense

22   that makes the person removable from the United States.  *See* A.R.S. § 13-3883(A)(5).

23   The commission of a public offense that makes a person removable from the United States

---

[39] Article II, Section 8 of the Arizona Constitution states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

[40] Because the provisions of SB 1070 come into play only after "any lawful stop, detention or arrest made by a law enforcement official … in the enforcement of any other law or ordinance of a county, city or town of this state where reasonable suspicion exists that the person is an alien and is unlawfully present in the United States," A.R.S. § 11-1051, the Act's requirements are even *less* intrusive than the conduct the Supreme Court expressly found constitutional in *Muehler*.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

will often involve the commission of a crime.  *See* 8 U.S.C. § 1227.  Because plaintiffs do not, and cannot, dispute that a warrantless arrest is proper if probable cause exists that the person to be arrested has committed a crime, it cannot be disputed that Section 6 can be applied in a constitutional manner.  As a result, Section 6 cannot be struck down in a facial challenge.  *See Wash. State Grange*, 552 U.S. at 449.

Further, state and local law enforcement officers already have the authority to investigate and make arrests for violations of federal immigration laws.  *See*, *e.g.*, *Vasquez-Alvarez*, 176 F.3d at 1296; 8 U.S.C. § 1357(g)(10) (expressly recognizing law enforcement officers' authority to assist the federal government in the "apprehension, detention, or removal of aliens not lawfully present in the United States").[41]

### iii.   Authorization to transport a person upon confirmation that the person is unlawfully present in the United States

Section 2 provides that "a law enforcement agency may securely transport an alien whom the agency has received verification is unlawfully present in the United States and who is in the agency's custody to a federal facility in this state or to any other point of transfer into federal custody that is outside the jurisdiction of the law enforcement agency."  *See* A.R.S. § 11-1051(D).  Thus, SB 1070 authorizes law enforcement officers to transport aliens to the federal government *only* upon confirmation of the alien's unlawful presence in the United States.  Because law enforcement officers already have the inherent authority to make arrests for violations of federal immigration laws, *see Vasquez-Alvarez*, 176 F.3d at 1296, this provision does not run afoul of the Fourth Amendment.

---

[41] Even if Section 6 could result in a warrantless arrest for a civil violation of federal immigration laws, that does not render Section 6 unconstitutional.  "[T]he lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution."  *Ker v. State of Cal.*, 374 U.S. 23, 37 (1963); *see also Miller v. United States*, 357 U.S. 301, 305 (1958).  SB 1070's amendment to A.R.S. § 13-3883 provides that authorization with respect to civil violations of immigration law.

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1

2

       iv.    <u>The alleged requirement that officers "conduct investigatory stops without reasonable suspicion of criminal activity."</u>

3  Plaintiffs allege that SB 1070 violates Article II, Section 8 of the Arizona

4  Constitution because SB 1070 allegedly requires "investigatory stops without reasonable

5  suspicion of criminal activity." Compl. ¶ 201. Nothing in the text of SB 1070, however,

6  permits (much less requires) that officers conduct investigatory stops without reasonable

7  suspicion of criminal activity, nor do plaintiffs identify any provision of SB 1070 that

8  purportedly does so.

9      **4.    The Fourteenth Amendment's Due Process Clause**

10  Plaintiffs allege that SB 1070 violates the Due Process Clause of the Fourteenth

11  Amendment because Section 2 allegedly "permits state and local law enforcement

12  officials to seize, detain, and transfer individuals without appropriate procedures" and

13  contains vague terms, which create an unacceptable risk of arbitrary and discriminatory

14  enforcement. Compl. ¶¶ 206-08.

15      i.    <u>SB 1070 incorporates the requisite procedural protections</u>

16  "The fundamental requirement of due process is the opportunity to be heard 'at a

17  meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333

18  (1976). "It has been said so often by [the Supreme Court] and others as not to require

19  citation of authority that due process is flexible and calls for such procedural protections

20  as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

21  Therefore, even assuming plaintiffs can establish a liberty interest, the question still

22  remains as to what process is due. *Id.*

23  Plaintiffs' allegation that Section 2 of SB 1070 fails to provide the appropriate

24  procedures ignores the fact that A.R.S. § 11-1051, as amended by Section 2, is only

25  triggered when there is: (1) a *lawful* "stop, detention or arrest" by a law enforcement

26  official or agency of the state *and* (2) reasonable suspicion exists "that the person is an

27  alien *and* is unlawfully present in the United States." (emphasis added). SB 1070 does not

28  purport to give the state law enforcement official or agency authority to determine the

person's immigration status, and it does not alter the procedural requirements that the federal government has already put into place to regulate immigration and to determine the lawful or unlawful status of aliens.  Rather, the Act expressly provides that the immigration status is to be determined by the federal government, pursuant to 8 U.S.C. § 1373(c).  *See* A.R.S § 11-1051(B).  Moreover, consistent with federal law and established precedent, SB 1070 encourages state and local authorities to cooperate with the federal government in the enforcement of federal immigration laws.  *See, e.g.*, 8 U.S.C. § 1357(g)(10).  Not only does the Act include procedural safeguards that identify the procedures that are required in order to engage in the cooperative enforcement of immigration laws, but it defers to well-established federal immigration procedures that are not, and cannot be, challenged in the present case or otherwise. [42]

## ii.   SB 1070 is sufficiently clear and definite

A statute is not unconstitutionally vague where it is set out in terms which an ordinary person, exercising ordinary common sense, can sufficiently understand. *Broadrick*, 413 U.S. at 608.[43]  There will always be "conjure[d] up hypothetical cases" in which the meaning of terms will be in question.  *Grayned*, 408 U.S. at 112.  However, "a speculative, hypothetical possibility does not provide an adequate basis to sustain a facial challenge."  *CPLC*, 558 F.3d at 866.

Despite the plain language of SB 1070, and notwithstanding the well-established standards for determining whether a statute is unconstitutionally vague (at the pre-enforcement stage and otherwise), plaintiffs allege that eight terms in SB 1070 are somehow vague and, thus, that they violate due process.  Compl. ¶¶ 206-08.  Governor

---

[42] Plaintiffs, for example, concede that the federal government has issued numerous regulations, policies, and *procedures* interpreting the INA's provisions.  Compl. ¶ 116.

[43] *See also Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (discussing that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."); *see also Associated Builders & Contractors, Saginaw Valley Area Chapter v. Director, Dept. of Consumer & Industry Servs.*, 705 N.W.2d 509, 517 (Mich. App. 2005) ("A statute is sufficiently definite if its meaning can be fairly ascertained by reference to judicial interpretations, the common law, dictionaries, treatises, or the commonly accepted meanings of words.").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1   Brewer will address each of these challenges in turn.

2       ***Reasonable suspicion:*** The "reasonable suspicion" standard is well-established and

3   requires that specific, articulable facts exist "which, together with objective and

4   reasonable inferences, form a basis for suspecting that" the person stopped, detained, or

5   arrested is an alien *and* unlawfully present in the United States.  *Hernandez-Alvarado*, 891

6   F.2d at 1416; *State v. Teagle*, 217 Ariz. 17, 23, 170 P.3d 266, 272 (App. 2008) ("By

7   definition, reasonable suspicion is something short of probable cause.").

8       ***Reasonable attempt:*** The term "reasonable" is commonly understood to mean

9   "[f]air, proper or moderate under the circumstances."  Black's Law Dictionary 1379 (9th

10  ed. 2009).  Likewise, an "attempt" is commonly understood to be "[t]he act or an instance

11  of making an effort to accomplish something, esp. without success."  *Id*. at 146.  In

12  addition to its generic and common usage, the phrase "reasonable attempt" is used

13  throughout Arizona statutes.  *See, e.g.*, A.R.S. §§ 15-763.01 ("A public agency cannot

14  determine the whereabouts of a parent, after having made reasonable attempts."); 23-787

15  ("[T]here has been no reasonable attempt to repay the indebtedness during that period").

16      ***Unlawful presence:*** The language of SB 1070 matches the terminology of federal

17  law, which refers to an "alien not lawfully present in the United States" or an "alien

18  unlawfully present in the United States."  *See, e.g.*, 8 U.S.C. § 1229a(c)(2) (stating that, in

19  a deportation proceeding, the alien has the burden of establishing that he or she "is

20  lawfully present in the United States"); 8 U.S.C. § 1357(g)(10) (discussing state and local

21  cooperation "with the Attorney General in the identification, apprehension, detention, or

22  removal of aliens not lawfully present in the United States"); 8 U.S.C. § 1182(a)(9)(B)(ii)

23  ("[A]n alien is deemed to be unlawfully present in the United States if . . .").  Moreover,

24  the Ninth Circuit has discussed "unlawful presence" and found that a reasonable officer

25  could have interpreted the phrase to "remain[ ] unlawfully in this country," as meaning

26  "an alien's unlawful presence in this country is itself a crime."  *Martinez v. Holder*, Case

27  No. 06-75778, 2010 WL 2055675, at *2 (9th Cir. May 25, 2010).

28      ***Determine the immigration status:*** SB 1070 provides that "an alien's immigration

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

status may be determined by: (1) A law enforcement officer who is authorized by the federal government to ascertain an alien's immigration status [or] (2) [ICE] or the United States Customs and Border Protection pursuant to 8 [U.S.C. §] 1373(c)." *See* A.R.S. § 11-1051(E).  Further, 8 U.S.C. § 1373(c) requires that the Immigration and Naturalization Service ("INS") respond to federal, state or local government agencies seeking to verify or ascertain the citizenship or immigration status of an individual.

**Public offense:** There are two fatal flaws with plaintiffs' allegation that the term "public offense" in A.R.S. § 13-3883(A)(5) is vague.  First, the term, when read in conjunction with the clause that immediately follows it, provides sufficient clarity as to its meaning.  In particular, "a peace officer, without a warrant, may arrest a person if the office has probable cause to believe:  . . . the person to be arrested has committed any public offense *that makes the person removable from the United States*." A.R.S. § 13-3883(A)(5) (emphasis added).  Second, A.R.S. § 13-105(26) defines "public offense" as:

> [C]onduct for which a sentence to a term of imprisonment or of a fine is provided by any law of the state in which it occurred or by any law, regulation or ordinance of a political subdivision of that state and, if the act occurred in a state other than this state, it would be so punishable under the laws, regulations or ordinances of this state or of a political subdivision of this state if the act had occurred in this state.

**Removable:** The term "removable," which refers to the process of removing an alien from the United States for violations of federal immigration law, is well established and understood in the area of immigration law.  *See* 8 U.S.C. § 1101, *et seq.*[44]

**In furtherance of the illegal presence:**  "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).  Section 5 of SB 1070 contains restrictions related to the transportation of aliens "in furtherance of the illegal presence" of the alien in the United States.  Based upon its ordinary and common meaning, the phrase "in furtherance of the illegal presence"

---

[44] *See also* 8 U.S.C. § 1229a(e)(2) (defining "removable").  As SB 1070 makes clear, the federal government – not Arizona's law enforcement officers – determines immigration violations and whether an alien is "removable."

1   specifies that such action must be in furtherance of the unlawful presence of the alien.

2   Similarly, 8 U.S.C. § 1324(a)(1)(A)(ii) also uses the term "in furtherance" in the section

3   providing criminal penalties for persons who engage in certain conduct.

4        ***That the alien has come to, has entered or remains in the United States illegally***:

5   Section 5 provides that it is unlawful (provided other conditions are met) if a person

6   knows or recklessly disregards the fact that an "alien has come to, has entered or remains

7   in the United States in violation of the law."  Presumably, this is the phrase plaintiffs

8   reference in their allegation.  *See* Compl. ¶ 208.  Likewise, this phrase references an

9   alien's unlawful status and mirrors 8 U.S.C. § 1324(a)(1)(A)(ii), which provides criminal

10  penalties for individuals who "knowing or in reckless disregard of the fact *that an alien*

11  *has come to, entered, or remains in the United States in violation of law*, transports, or

12  moves or attempts to transport or move such alien within the United States by means of

13  transportation or otherwise, in furtherance of such violation of law."  (emphasis added)

14       **5.    Right to Travel**

15       SB 1070 does not impermissibly interfere with plaintiffs' right to travel.  The

16  Privileges and Immunities Clause of Article IV, § 2 of the U.S. Constitution provides that

17  "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens

18  in the several States."  Similarly, the Privileges and Immunities Clause of the Fourteenth

19  Amendment also applies only to U.S. citizens and provides that "[n]o State shall make or

20  enforce any law which shall abridge the privileges or immunities of citizens of the United

21  States."  U.S. Const. amend. 14.  Notably, "[d]iscrimination on the basis of out-of-state

22  residency is a necessary element for a claim under the Privileges and Immunities Clause."

23  *Russell v. Hug*, 275 F.3d 812, 821 (9th Cir. 2002) (quoting *Gianni v. Real*, 911 F.2d 354,

24  357 (9th Cir. 2002)).[45]

25

26

27  [45] "If a state statute or regulation imposes identical requirements on residents and
    nonresidents alike and it has no discriminatory effect on nonresidents, it does not violate
28  the Privileges and Immunities Clause."  *Tolchin v. Sup. Ct. of N.J.*, 111 F.3d 1099, 1111
    (3d Cir. 1997).

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer
——— L.L.P. ———
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Plaintiffs' right to travel argument underscores their fundamental misunderstanding of SB 1070. Plaintiffs allege that "Section 2 of SB 1070 subjects those U.S. citizens who appear to a law enforcement officer to possibly be 'unlawfully present in the United States' to investigation and detention pending a determination of immigration status if they do not present an identification document deemed acceptable by the State of Arizona." Compl. ¶ 213. In fact, however, Section 2 of SB 1070 requires that a reasonable attempt be made, when practicable, only *after* a lawful stop, detention or arrest, and *after* the determination is made that reasonable suspicion exists that the person is an alien *and* is unlawfully present in the United States, to determine the immigration status of the person. Significantly, the law does not treat out-of-state U.S. citizens differently than it treats U.S. citizens who are Arizona residents.[46] There is no line drawn between residents and nonresidents under the Act, and the Act is, of course, not intended to discourage nonresidents from coming to Arizona. Plaintiffs therefore have not, and cannot, identify any discriminatory treatment mandated by the statute.[47]

**B.   Plaintiffs' Remaining Constitutional Challenges Fail Because SB 1070 Is Based on Established and Constitutionally Permissible Principles**

**1.   Plaintiffs' First Amendment Claim**

i.   Section 2 of SB 1070

Plaintiffs allege that Section 2 of SB 1070 impermissibly "suppresses, burdens, and

---

[46] There are situations in which a state may restrict a citizen's right to travel. *Jones v. Helms*, 452 U.S. 412, 419 (1981) (upholding a Georgia law that provides that a parent who willfully and voluntarily abandons his or her minor child is guilty of a misdemeanor, but a parent who does so and then leaves the state is guilty of a felony.). "Most obvious is the case in which a person has been convicted of a crime within a State. He may be detained within that State, and returned to it if he is found in another State. Indeed, even before trial or conviction, probable cause may justify an arrest and subsequent temporary detention." *Id.*

[47] Moreover, SB 1070 offers the presumption that an individual, whether in-state or out-of-state, is *not* an alien if the person provides to the law enforcement officer (1) a valid Arizona driver license; (2) a valid Arizona nonoperating identification license; (3) a valid tribal enrollment card or other form of tribal identification; *or* (4) any valid *United States federal, state or local government issued identification*, if the entity requires proof of legal presence in the United States before issuance. A.R.S. § 11-1051(B)(4) (emphasis added).

chills speech." Compl. ¶¶ 83-87.[48] Plaintiffs apparently contend that individuals who are stopped for violations of the law will be subject to scrutiny, detention, and/or arrest based on that individual's appearance, language, or accent, and that this conduct will result in a chilling of speech. However, courts have already recognized the authority of state and local authorities to "investigate and make arrests for violations of federal immigration laws." *Vasquez-Alvarez*, 176 F.3d at 1296; *see also Santana-Garcia*, 264 F.3d at 1193.[49] Indeed, it is already well-established that law enforcement officers may inquire into the immigration status of individuals whom they reasonably suspect are unlawfully present in the United States.[50] Section 2 of SB 1070, in short, merely codifies existing law, and does not objectively justify the chilling of an individual's speech.[51] The chilling alleged in plaintiffs' Complaint is merely a "subjective chill," and does not arise from "an objectively justified fear of real consequences." *Laird,* 408 U.S. at 13-14; *D.L.S.*, 374 F.3d at 975.[52] Accordingly, the directives set forth in Section 2 of SB 1070 are not the "type that would chill a person of ordinary firmness from continuing to engage in the

---

[48] Specifically, plaintiffs challenge A.R.S.§ 11-1051(B), which states that for any lawful stop, detention or arrest by a law enforcement official, if "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States, a reasonable attempt shall be made, when practicable, to determine the immigration status of the person."

[49] Indeed, in *United States v. Salinas-Calderon*, 728 F.2d 1298, 1301 (10th Cir. 1984) the court held that after a lawful stop, the officer had probable cause to make a warrantless arrest for violation of federal immigration laws as a result of: (1) the language barrier; (2) defendants' alien status and failure to produce either a driver's license or green card; and (3) the presence of six adult males from Mexico in the bed of the pickup, none of whom had identification or a green card.

[50] *See also Martinez-Medina,* 2010 WL 2055675 (sheriff's encounter with non-English speaking petitioners, in which he asked about their travel plans, requested their identification, and questioned them about their immigration status, was not a seizure and did not violate petitioners' constitutional rights).

[51] Discussions occurring between a law enforcement officer and a suspect during an investigative detention are already subject to constraints that do not trigger First Amendment concerns. Most notably, Miranda warnings, although they encourage suspects not to speak, do not violate a suspect's constitutional rights.

[52] *See also Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 801 (1984) ("[T]here must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties . . . .").

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    protected speech."[53]  *Eaton v. Meneley,* 379 F.3d 949, 954 (10th Cir. 2004).

2                    ii.    Section 5 of SB 1070

3           Plaintiffs allege that Section 5 of SB 1070 creates a content-based regulation of

4    protected speech for individuals who wish to express their willingness to work by way of

5    verbal and nonverbal communication in violation of the First Amendment.  Compl. ¶¶

6    101-10, 191-93.  Just days ago, however, the Ninth Circuit rejected a nearly identical

7    challenge to a similar ordinance banning the solicitation of day labor in streets.  *See*

8    *Redondo Beach*, 2010 WL 2293200.[54]  The Ninth Circuit found this very type of

9    ordinance (or law, in this instance) to be a valid time, place, or manner restriction.  *Id.* at

10   *1.

11          SB 1070 is also a reasonable time, place, or manner restriction.  First, Section 5 is

12   content-neutral because it serves as a restriction on the *act* of solicitation, the purpose of

13   which is to support a legitimate government concern, and is not aimed at any particular

14   message, idea, or form of speech.  *Id.* at *5-6; *see also Ward,* 491 U.S. at 791.  Section 5

15   is aimed narrowly at barring acts of solicitation for work directed towards the occupants

16   of vehicles that are stopped on a street, roadway, or highway.  *Cf. Redondo Beach*, 2010

17   WL 2293200, at *6-7.  Notably, by tailoring SB 1070 to solicitation of work from the

18   occupants of vehicles, the statute does not violate the principle of content neutrality:

19   "[W]e are bound by our determination in *ACORN* that the Phoenix ordinance was content

20   neutral because it was aimed narrowly at barring acts of solicitation directed toward the

21   _____

22   [53] Ostensibly in an attempt to support plaintiffs' argument that SB 1070 "chills" speech, plaintiffs also briefly allege that Section 2 of SB 1070 functions as an impermissible prior

23   restraint on speech.  Plaintiffs, however, cannot state a claim on the prior restraint theory because SB 1070 does not function as a "prior restraint."  As the Supreme Court has

24   explained, "the regulations we have found invalid as prior restraints have 'had this in common: they gave public officials the power to deny use of a forum in advance of actual

25   expression.'"  *Ward v. Rock Against Racism,* 491 U.S. 781, 795 n.5 (1989) (citation omitted).  Here, nowhere does SB 1070 grant public officials the authority to deny the use

26   of a forum in advance of an individual's actual expression – and nowhere have plaintiffs alleged that SB 1070 grants public officials such authority.

27   [54] The ordinance at issue in *Redondo Beach* provided as follows: "It shall be unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment,

28   business, or contributions from an occupant of any motor vehicle."  *Id.* at *2.

Snell & Wilmer
— L.L.P. —
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

occupants of vehicles . . . and was not related to any particular message or content of speech." *Id.* (citing *ACORN v. Phoenix*, 798 F.2d 1260, 1267, 1273 (9th Cir. 1986)).

Section 5 of SB 1070 serves a significant governmental interest in promoting traffic flow and safety. *Id.* at *2, *8 (ordinance was properly designed to address city's significant problem with workers soliciting temporary employment from sidewalks, which had created traffic and safety hazards).[55]  Notably, solicitations demanding an immediate response from drivers are more disruptive to traffic flow than the "oral advocacy of ideas, or even the distribution of literature." *ACORN*, 798 F.2d at 1268-69.  Because SB 1070 merely prohibits in-person demands that require an immediate response from vehicle occupants, but allows the distribution of literature to those same occupants, Section 5 is narrowly tailored to meet the government's legitimate traffic and safety concerns. *Id.*

Finally, Section 5 of SB 1070 allows ample alternative channels for communication because it does not, for example, prohibit the distribution of literature to occupants of vehicles, and also allows a range of solicitation methods for work, such as solicitation on the sidewalk from pedestrians, canvassing door-to-door, telephone campaigns, or direct mail. *Id.* at 1271; *see also Redondo Beach,* 2010 WL 2293200, at *11.  In short, Section 5 "has not banned the only effective means to communicate with prospective employers, who can be reached in safer and less disruptive ways than by soliciting drivers in the street." *Redondo Beach,* 2010 WL 2293200, at *12.[56]

---

[55] *See also Schenck v. Pro-Choice Network of W. N.Y.,* 519 U.S. 357, 376 117 S. Ct. 855 (1997) (recognizing government's substantial interest in "promoting the free flow of traffic on streets and sidewalks"); *see also ACORN*, 798 F.2d at 1269 ("orderly flow of motorized traffic is a major concern in congested urban areas").

[56] Plaintiffs further seek to enjoin SB 1070 on First Amendment grounds because they allege the following terms in Section 5 are vague: (1) "work," (2) "solicit," and (3) "communication . . . that would indicate to a reasonable person that a person is willing to be employed." Compl. ¶ 105.  Plaintiffs' allegations in this regard must fail because courts may not "invalidate an ordinance for vagueness based on these sorts of hypertechnical, imaginative interpretations and hypothetical concerns." *Redondo Beach,* 2010 WL 2293200, at *13.  The terms of Section 5 that plaintiffs challenge are, in fact, words of "common understanding," and this Court must therefore reject plaintiffs' speculative vagueness challenges. *Cal. Teachers Ass'n v. State Bd. of Educ.,* 271 F.3d 1141, 1151-53 (9th Cir. 2001).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1

### C.    Plaintiffs Have Failed to State a Claim Under 42 U.S.C. § 1981

Plaintiffs allege that SB 1070 violates 42 U.S.C. § 1981 because it "impermissibly discriminates against persons within the state of Arizona on the basis of alienage and national origin and race."  Compl. ¶ 218.  To establish a claim under Section 1981, plaintiffs must allege facts supporting that (1) they are members of a racial minority; (2) defendants had an intent to discriminate against plaintiffs on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute.  *Morris v. Office Max, Inc.,* 89 F.2d 411 (7th Cir. 1996); *Brown v. City of Oneonta, N.Y.,* 221 F.3d 329, 339 (2d Cir. 2000).  Here, plaintiffs have failed to properly plead the second element of a Section 1981 claim – namely, that defendants have acted with the *intent* to discriminate against plaintiffs on the basis of their race.  *McKenzie v. City of Milpitas,* 738 F. Supp. 1293, 1301 (citing *Gen. Bldg. Contractors Assoc., Inc. v. Penn.,* 458 U.S. 375, 391 (1982)).

Plaintiffs' broad and speculative allegations aside, they have simply failed to state a claim of discrimination under Section 1981, where SB 1070, on its face, expressly prohibits the consideration of race, color, or national origin in its enforcement: "A law enforcement official or agency of this state or a county, city, town or other political subdivision of this state may not consider race, color or national origin in implementing the requirements of this subsection except to the extent permitted by the United States or Arizona Constitution."  A.R.S. § 11-1051(B).  Moreover, once again, A.R.S. § 11-1051(L) requires that SB 1070 "be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens."  Plaintiffs, therefore, have not alleged, and cannot allege, a valid Section 1981 claim.

### IV.    CONCLUSION

For the foregoing reasons, Intervenor Defendant Governor Brewer requests that the Court dismiss plaintiffs' Complaint.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1    Respectfully submitted this 18th day of June, 2010.

2                                    SNELL & WILMER L.L.P.

3

4                        By  s/John J. Bouma
                             John J. Bouma
5                            Robert A. Henry
                             Joseph G. Adams
6                            One Arizona Center
                             400 E. Van Buren
7                            Phoenix, AZ  85004-2202

8                            and

9

10                       By  s/Joseph A. Kanefield *with permission*
                             Joseph A. Kanefield
11                           Office of Governor Janice K. Brewer
                             1700 W. Washington, 9th Floor
12                           Phoenix, AZ  85007

13                           *Attorneys for Intervenor Defendant Janice K. Brewer,*
                             *Governor of the State of Arizona*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11638899                              34

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on June 18, 2010, I electronically transmitted the foregoing

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants on record.

5

6

s/John J. Bouma

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28