John J. Bouma (#001358)
Robert A. Henry (#015104)
Joseph G. Adams (#018210)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
Phone: (602) 382-6000
Fax: (602) 382-6070
jbouma@swlaw.com
bhenry@swlaw.com
jgadams@swlaw.com

Joseph A. Kanefield (#015838)
Office of Governor Janice K. Brewer
1700 W. Washington, 9th Floor
Phoenix, AZ  85007
Telephone: (602) 542-1586
Fax: (602) 542-7602
jkanefield@az.gov

*Attorneys for Intervenor Defendants Janice K. Brewer, Governor of the State of Arizona, and the State of Arizona*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Friendly House, et al.<br><br>   Plaintiffs,<br><br>v.<br><br>Michael B. Whiting, Apache County Attorney, in his official capacity, et al.,<br><br>   Defendants,<br><br>and<br><br>Janice K. Brewer, Governor of the State of Arizona, in her official capacity; and the State of Arizona,<br><br>   Intervenor Defendants. | No. CV-10-1061-PHX-SRB<br><br>**INTERVENOR DEFENDANTS' RESPONSE TO *AMICUS CURIAE* BRIEFS FILED IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

Intervenor Defendants Janice K. Brewer ("Governor Brewer") and the State of Arizona hereby respond to the *Amicus Curiae* briefs filed in support of plaintiffs' Motion for Preliminary Injunction.[1] While most of the issues raised by the *Amici* have been raised by plaintiffs and have been addressed in prior briefing, Governor Brewer and the State of Arizona submit this single response for the purpose of addressing specific concerns and misconceptions raised by the *Amici* about the "Support Our Law Enforcement and Safe Neighborhoods Act," as amended ("SB 1070" or the "Act"). In particular, (1) SB 1070 expressly prohibits discrimination and racial profiling and its implementation will not result in unlawful stops, detentions, or arrests; (2) SB 1070 is designed to improve the public safety and concerns that it will harm the public safety are unfounded; and (3) the policies of other countries do not dictate the constitutionality of state legislation.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  SB 1070 EXPRESSLY PROHIBITS DISCRIMINATION AND RACIAL PROFILING**

Certain *Amici* contend that law enforcement officers lack training or expertise necessary to implement the Act, that there is an absence of objective standards or guidelines regarding "reasonable suspicion," and that it is impossible to have "reasonable suspicion" that a person is unlawfully present in this country without improperly relying on race, color, or national origin.[2] These arguments ignore the constitutional safeguards and protections that already exist, and the well-defined criteria upon which officers make

---

[1] The following *Amicus Curiae* briefs were filed or lodged: International Longshore and Warehouse Union (doc. 283) ("ILWU Brief"); Anti-Defamation League (doc. 284) ("ADL Brief"); Lawyers' Committee for Civil Rights Under Law (doc. 290) ("LCCR Brief"); Legal Momentum (doc. 294) ("LM Brief"); United Mexican States (doc. 299) (joined by Columbia (doc. 369), Guatemala (doc. 371), Nicaragua (doc. 373), Paraguay (doc. 375) and El Salvador (doc. 377) ("UMN Brief"); Arizona Attorneys for Criminal Justice (doc. 336, lodged) ("AACJ Brief"); Asian American Institute, et al. (doc. 340) ("AAI Brief"); County of Santa Clara, California, et al. (doc. 341) ("CSC Brief"); National Counsel of La Raza, et al. (doc. 344) ("NCLR Brief"); Tohono O'odham Nation (doc. 387) ("TON Brief"); American Immigration Lawyers Association (doc. 354, lodged) ("AIMA Brief"); and American Bar Association (doc. 356, lodged) ("ABA Brief").

[2] *See, e.g.*, AACJ Brief at 1, 6-9; AAI Brief at. 1-4; AILA Brief at 3-4; CSC Brief at 5-7; ILWU Brief at 3-6; NCLR Brief at 7-9; TON Brief at. 4-7.

lawful stops, detentions, and arrests.

As a preliminary matter, SB 1070 repeatedly prohibits officers from engaging in racial profiling in implementing the Act. *See* A.R.S. §§ 11-1051(B), 13-1509(C), 13-2928(D), 13-2929(C). SB 1070 also provides that the law must "be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens." *See* A.R.S. § 11-1051(L). Officers receive adequate training as to the prohibition against racial profiling and the "reasonable suspicion" standard and can effectively implement the "reasonable suspicion" standard without relying on factors such as race, color and national origin.

### A.  Officers Are Sufficiently Trained Not to Engage in Racial Profiling

The Arizona Peace Officer Standards and Training Board ("AzPOST") directly addresses concerns that the Act may lead to racial profiling. *See* Defs. Resp. to Pls. Mot. for Prelim. Inj., Braddock Decl. Ex. 30 (doc. 329).[3] In its officer training, AzPOST explains that racial profiling is <u>not</u> permitted, and further emphasizes the requirement that officers never engage in such conduct:

> Each and every one of you [police officers] will now carry the reputation for the entire Arizona law enforcement community with you every day. Frankly, critics of this law believe that Arizona officers cannot be trusted with this kind of authority. They doubt your professionalism. They doubt your integrity, and they doubt your ethics. That doubt is unfair and unearned. Each of you took an oath, and each of you signed an ethical pledge, and each of you knows what is required of you.
> 
> . . .
> 
> Officers are trained from the time they enter the Arizona Police Academy, through in-service training provided by AZ POST, and from training provided by their local departments. Racial profiling does not constitute a lawful stop and is not an element of a lawful stop.

*Id*. at 6.

All Arizona law enforcement officers are trained regarding the prohibition against racial profiling. *See* Bolton Decl. ¶ 8; Glover Decl. ¶ 5; Vasquez Decl. ¶ 5; Gafvert Decl.

---

[3] Unless otherwise noted, all exhibits referenced in this response are attached to the Intervenor Defendants' Response to Plaintiffs' Motion for Preliminary Injunction, filed July 13, 2010.

- 2 -

¶¶ 4, 6. Arizona officers do not engage in racial profiling, and they recognize that racial profiling is not permitted. Gafvert Decl. ¶¶ 7, 13 ("I . . . have never racially profiled anyone, and would not tolerate racial profiling by any officers I work with in the Mesa Police Department."); Vasquez Decl. ¶ 9 ("I do not understand SB 1070 to authorize racial profiling or to permit me to violate any person's constitutional rights."); Glover Decl. ¶ 20 ("In no uncertain terms, Mesa Police Officers who I know will not engage in or tolerate racial profiling."). Further, officers do not believe that SB 1070 will increase the likelihood of racial profiling. Bolton Decl. ¶ 21; Glover Decl. ¶ 20 ("If anything, the passing of Senate Bill 1070 will result in our officers being hypersensitive to making sure that race and ethnicity are never used as the basis for reasonable suspicion."). The contention that law enforcement officers will choose to disregard their training, their oath and the protections afforded by the Constitution is unwarranted.

### B.   Officers Can and Have Properly Implemented the Reasonable Suspicion Standard in a Lawful Manner

Even though the *Amici* contend that the "reasonable suspicion" standard is unworkable unless it is based on race, ethnicity, language proficiency, and national origin,[4] the Supreme Court has already identified factors that may, in the totality of the circumstances, provide the individualized "reasonable suspicion" that a person is an illegal alien. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975). For example, the following factors may impact the reasonable suspicion determination: (1) the characteristics of the area in which officers encounter a vehicle, its proximity to the border, the usual patterns of traffic on the particular road, and previous experience with alien traffic; (2) information related to recent unlawful border crossings in the area and the driver's behavior, including erratic driving or obvious attempts to evade officers; (3) aspects of the vehicle, including if the vehicle appears to be heavily loaded, contains an extraordinary number of passengers or persons trying to hide; or (4) other factors an officer may assess in light of the officer's experience in detecting illegal entry and

---

[4] *See, e.g.*, CSC Brief at 6-7.

- 3 -

smuggling. *Id*. at 884-85.[5]

Further, the AzPOST training identifies a non-exhaustive list of factors that may create reasonable suspicion that an individual encountered during a lawful stop, detention, or arrest is an alien unlawfully present in the United States, including:

- The individual or individuals seem out of place at the location encountered.
- If asked, several [individuals] may lack a reasonable explanation as to their presence at the location or appear to have no definite sense of purpose or direction, in other words, look lost or uncomfortable in the surroundings.
- Dress. Depending on where the lawful encounter occurs, the manner of dress can be a factor to consider. When encountered during a lawful stop, are the individuals dressed consistent with weather conditions. If anyone appears to be wearing multiple layers of clothing or long sleeve shirts in a hot climate, this might be an indication of their recent arrival in the area. Small bags might be visible in the vehicle or residence not common to the area and are often used to carry extra clothing or basic necessities.
- Demeanor. Their suspicions might be heightened if they observe any or all of those present making efforts to avoid eye contact or communication, segregate themselves, blend in or attempt to leave the area.
- An officer will consider factors that an individual encountered is not familiar with the area, cannot provide a current address or time that they have resided at that location.
- If the person claims to be a foreigner but legally in the United States, they should have some knowledge how, where and when they obtained their Visas and entered the United States.

Braddock Decl. Ex. 30 at 21-22.

None of these factors single out anyone based on race, ethnicity, or background. The fears of certain *Amici* that the law provides law enforcement officers with no choice but to rely on racial profiling are unfounded. *See, e.g.*, ABA Brief at 7-8; AACJ Brief at

---

[5] *See also United States v. Soto-Cervantes*, 138 F.3d 1319, 1324 (10th Cir. 1998) (discussing that officers had reasonable suspicion to justify the detention of defendant until the arrival of the INS agent). Notably, the federal government *also* utilizes the "reasonable suspicion" standard when there is suspicion that an individual may be an illegal alien. *See, e.g.*, *United States v. Magana*, 797 F.2d 777, 780-82 (9th Cir. 1986) (holding INS officers conducted a lawful stop and inquiry into the immigration status of occupants of a truck after observing the truck had devices known to be characteristic of smuggling vehicles and the driver repeatedly diverted his eyes when in contact with the officers); *United States v. Bautista-Silva*, 567 F.3d 1266, 1269 (11th Cir. 2009) (holding a border patrol agent, while on patrol in a corridor known for human smuggling in South Florida, had reasonable suspicion to stop a vehicle and question the occupants regarding their immigration status).

6-9; AAI Brief at 1-4; AILA Brief at 2-4; CSC Brief at 5-7; UNM Brief at 8-9.

### C. SB 1070 Will Not Result in Unlawful Stops, Detentions, or Arrests

SB 1070 does not, as the *Amici* claim, establish a "crime" of refusing to answer police questions. *See* AACJ Brief at 4. Law enforcement officers will continue to be guided by the Fourth Amendment requirements and precedent that dictate the scope and duration of lawful detentions, stops, and arrests.[6] In the case of a consensual encounter whereby an officer questions an individual about his or her identity or citizenship, a person always has the right to walk away and refuse to answer. *INS v. Delgado,* 466 U.S. 210, 212-21 (1984) ("interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure"). Further, when an encounter becomes a custodial interrogation into an individual's criminal violation of immigration laws, it is clear that officers must provide that individual with his Miranda warnings and notify him of his "right to remain silent." *Chavez-Raya v. INS,* 519 F.2d 397, 402 (7th Cir. 1975) (discussing that the "lack of Miranda warnings would render an alien's statement, made during a custodial interrogation, inadmissible in a criminal prosecution for violation of the immigration laws"). The concerns about Miranda warnings[7] are unfounded, as AzPOST has made clear that "if the person is in custody for purposes of *Miranda*, he or she may not be questioned about immigration status until after the reading and waiver of *Miranda* rights." Braddock Decl. Ex. 30 at 14. As such, SB 1070 does not infringe upon a person's right to remain silent.

---

[6] "Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment." *Hiibel v. Sixth Judicial District Court of Nevada,* 542 U.S. 177, 185 (2004); *see also Muehler v. Mena,* 544 U.S. 93, 101 (2005) (discussing that the Supreme Court has repeatedly held that mere police questioning does not constitute a seizure). "An officer may make an investigatory stop if he is aware of specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that [a] particular person is engaged in criminal activity." *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989). If the officer has probable cause of an immigration violation, it provides an independent basis to detain the person. *See*, *e.g.*, *Martinez v. Nygaard*, 831 F.2d 822, 828 (9th Cir. 1987).

[7] *See* AACJ Brief at 2-3.

## II. SB 1070 ENHANCES PUBLIC SAFETY WITHOUT COMPRISING THE REPORTING OF CRIMES

The *Amici* speculate that SB 1070 will create a "climate of fear" and that the law will result in the underreporting of crime by individuals who are concerned they will be questioned about their immigration status.[8] However, it is the mistaken and distorted interpretations of SB 1070 that people fear, and oftentimes, the unwarranted criticism is made by individuals who have not yet even read the law. *See, e.g.*, Defs. Resp. to Pls. Mot for Prelim. Inj., *United States v. Arizona*, No. 10-CV-01413, (D. Ariz. July 20, 2010), ECF No. 64 (lodged) (hereinafter "Defs. Resp. to U.S."), Reich Decl. ¶ 24 ("Not only has SB 1070 been distorted by local politicians in Latin America and the media, including Univision and CNN (Spanish), but it has not been fully explained to the international community by US authorities."); *see also* Defs. Resp. to U.S., Adams Decl. Ex. 21 (discussing Eric Holder expressing concerns about the bill, despite having only "glanced at the bill"). Indeed, at least one of the *Amici* (the ILWU) relies on the prior version of SB 1070, not the current version that was amended by HB 2162 and signed into law by Governor Brewer.[9]

The *Amici* presuppose that SB 1070 will undermine federal protections, such as the Violence Against Women Act of 1994 ("VAWA"), for immigrant women and their children who are the victims of abuse and other crimes. *See* LM Brief at 4-5. However, Arizona police officers recognize that they can only inquire into a person's immigration status if "[the officers] have first stopped them after having reasonable suspicion that they have committed or are about to commit a crime and, if [the officers] also have independent reasonable suspicion that the person is unlawfully present." Glover Decl. ¶ 26 ("I cannot find any provision in Senate Bill 1070 that gives a local law enforcement

---

[8] *See, e.g.*, AAI Brief at 5-7; ABA Brief at 7; ADL Brief at 4-7; CSC Brief at 7-9; LM Brief at 1-2, 5-7.

[9] *See* ILWU Brief at 3. The ILWU contends A.R.S. § 11-1051(B) provides for questioning persons about their immigration status in the context of "any lawful contact made" by law enforcement. This language was amended to read "any lawful stop, detention or arrest."

- 6 -

1  officer any authority to ever question a witness or a victim of a crime about their
2  immigration status."); *see also* A.R.S. § 11-1051(B) (requiring investigation into
3  immigration status only with the requisite reasonable suspicion, following a lawful stop,
4  detention, or arrest, *when practicable* and *if* it does not hinder or obstruct an
5  investigation).

6  In fact, the notion that victims and witnesses will be unwilling to come forward to
7  report crimes, out of fear of their perceived immigration status and the perceived scrutiny
8  when in contact with the police, is a misguided attempt to demonize SB 1070.[10] The
9  *Amici* fail to acknowledge that law enforcement officers can, even prior to SB 1070,
10 investigate a person's immigration status if there is reasonable suspicion that the person is
11 unlawfully present in the country.[11] For example, in states such as New Mexico, which
12 the *Amici* reference, "[a]bsent a policy not to inquire into immigration status, state law
13 enforcement officers routinely ask people about their immigration status." Defs. Resp. to
14 U.S., Vaughan Decl. ¶ 27.[12] Moreover, *Amici* are incorrect that individuals will be
15 detained "solely because they are not carrying identification." *See* ABA Brief at 7. No
16 provision of SB 1070 permits an officer to detain anyone on such a basis.

17 Finally, the argument that SB 1070 will "usurp" scarce federal and state resources
18 is without merit. *See* CSC Brief at 3-4. The "vigorous enforcement" policy and intent to

---

[10] *See, e.g.,* AAI Brief at 5-7; ADL Brief at 4-5.

[11] To the extent the *Amici* advance a narrow view on law enforcement officers' authority to arrest persons who are unlawfully present in the United States, the Ninth Circuit recently held that decisions from the Supreme Court and Tenth Circuit support the proposition that probable cause of unlawful presence can, standing alone, provide a sufficient basis for an arrest. *See Martinez-Medina v. Holder*, No. 06-75778, 2010 WL 2055675 (9th Cir. May 25, 2010).

[12] *See also*, *United States v. Santana-Garcia*, 264 F.3d 1188, 1193 (10th Cir. 2001) ("We noted just recently that state law enforcement officers within the Tenth Circuit 'have the general authority to investigate and make arrests for violations of federal immigration laws,' and that federal law as currently written does nothing 'to displace ... state or local authority to arrest individuals violating federal immigration laws.'"); *United States v. Moya-Matute*, 559 F. Supp. 2d 1189, 1206 (D. N.M. 2008) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)) ("Investigative detention with reasonable suspicion of illegal alienage is permissible so long as the detention does not last any longer than necessary to determine whether the individual is an alien illegally in the United States.").

1  carry out Congress' objectives by "enforc[ing] the immigration laws to the fullest extent,
2  including the detection and deportation of illegal aliens", is not just rhetoric.  *See* Exec.
3  Order 12989 (Feb. 13, 1996); Exec. Order 13465 (June 6, 2008).  Indeed, "LESC was set
4  up for the express purpose of responding to queries from other law enforcement
5  agencies."  Defs. Resp. to U.S., Vaughan Decl. ¶ 44.  Even if Arizona agencies submit
6  double the current amount of queries to LESC, it will not push the total number of queries
7  close to the limits of the LESC capacity.  *Id.* at ¶¶ 50-51.

8       As the *Amici* explain, the federal government is statutorily required to respond to
9  local governments seeking verification of citizenship.  *See* CSC Brief at 3-4; *see also* 8
10  U.S.C. § 1373(c).  This routine inquiry is not a complicated one, and the fear that it will
11  create a significant burden on the government or a delay in detention of citizens is
12  unsubstantiated.  *See* Cramer Decl. ¶ 18 (discussing that the United States Immigrations
13  and Customs Enforcement's Law Enforcement Support Center . . . can generally
14  determine a person's immigration status in a matter of minutes); *see also* Defs. Resp. to
15  U.S., Vaughan Decl. ¶ 27 ("[T]he determination of whether a person is in the U.S.
16  illegally is often fast and straightforward."); Gafvert Decl. ¶ 11; Judd Decl. ¶¶ 5-10.

17       Notably, SB 1070 is intended to *improve* public safety.[13]  Criminal aliens make up
18  more than 17% of Arizona's prison population, and criminal justice system assets, that
19  could be used to target criminals and protect the community, are being diverted to matters
20  related to illegal aliens.  *See* Dolny Decl.; *see also* Braddock Decl. Ex. 14, at 4.

---

[13] Braddock Decl., Ex. 2, at 9:29 (Sen. Pearce) (describing the purpose of the legislation as allowing police officers to do their jobs), 46:47 (Mark Spencer) (describing numerous incidents of serious violence against Phoenix police officers by illegal aliens), 53:18 (Sen. Rios) (acknowledging concern about human smuggling, the drug trade, the coyotes and the dangerous crime associated with them that is coming to Phoenix); Braddock Decl., Ex. 6, at 2:17:56 (Sen. Pearce) (stating that 60% of the homicides in Phoenix involve illegal aliens; illegal aliens are responsible for between 21 and 27% of all felony sentences; one-third of Arizona's federal prison population are illegal aliens; and that the largest most violent gangs in America are made up of illegal aliens).

### III. INTERNATIONAL PUBLIC OPINION DOES NOT DICTATE THE CONSTITUTIONALITY OF SB 1070

Public criticism in foreign relations "is part of the normal conduct of diplomatic relations." Defs. Resp. to U.S., Reich Decl. at ¶ 15 ("In short, the US can expect to be criticized – whether valid or not – with or without SB 1070.") "On any given day, the US is going to take action that some foreign governments find objectionable." *Id*. at ¶ 16. The United States routinely takes positions that are both popular and, at times, very unpopular, and it will continue to do so. *Id.* at ¶ 34.

Public opinion is not determinative of whether state or federal law is constitutional. "[T]he views of foreign governments and people are important considerations but they do not drive the decisions made by the State Department." *Id*. at ¶ 29; *see also* Mot. for Leave to File Proposed Brief *Amici Curiae* of Members of the United States Congress, *United States v. Arizona*, No. 10-CV-01413, (D. Ariz. July 20, 2010), ECF No. 65 (bringing "to this Court's attention the fact that Congress has plenary power over immigration law, and that the Executive's power to enforce federal immigration law does not confer the power to preempt state immigration enforcement by choosing, for foreign policy or other reasons, to selectively enforce the laws.").[14] Indeed, "[w]hether a deprivation of constitutional rights has occurred is not dependent upon the subjective feelings or beliefs of a plaintiff," or in this case, of the *Amici*. *Tigrett v. Rector & Visitors of Univ. of Virginia,* 290 F.3d 620, 628 (4th Cir. 2002) (holding that in order to properly maintain a due process claim, the plaintiff must have been deprived of a constitutionally protected liberty or property interest).

Moreover, SB 1070 operates as the cooperative enforcement of federal immigration laws throughout all of Arizona. S.B. 1070 § 1. SB 1070 substantively tracks and codifies crimes and procedures that currently exist under well-established federal immigration law. The subjective opinions of the *Amici* should have absolutely no impact on the constitutionality of SB 1070.

---

[14] *See, e.g.*, UMS Brief at 1.

## IV. CONCLUSION

SB 1070 is constitutional and the issues raised by the *Amici* are not relevant to the determination of plaintiffs' Motion for Preliminary Injunction. For the foregoing reasons, Governor Brewer and the State of Arizona respectfully submit that the *Amici* have not presented any reason to grant plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted this 21st day of July, 2010.

SNELL & WILMER L.L.P.

By s/John J. Bouma
John J. Bouma
Robert A. Henry
Joseph G. Adams
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202

and

By s/Joseph A. Kanefield *with permission*
Joseph A. Kanefield
Office of Governor Janice K. Brewer
1700 W. Washington, 9th Floor
Phoenix, AZ  85007

*Attorneys for Intervenor Defendants State of Arizona and Janice K. Brewer, Governor of the State of Arizona*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2010, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants on record.

s/John J. Bouma

11766570