1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Friendly House, et al.,                )    No. CV 10-1061-PHX-SRB
                                            )
10              Plaintiffs,                 )    **ORDER**
                                            )
11  vs.                                     )
                                            )
12                                          )
    Michael B. Whiting, et al.,             )
13                                          )
                Defendants.                 )
14                                          )
                                            )
15  _____ )

16

17          At issue are Defendants Pinal County Sheriff Paul Babeu and Pinal County Attorney

18  James P. Walsh's Motion to Dismiss Plaintiffs' Complaint ("Pinal Cnty. Defs.' MTD") (Doc.

19  204), Defendant Sheriff Joseph Arpaio's Motion to Dismiss ("Arpaio MTD") (Doc. 205), and

20  Intervenor Defendant Governor Janice K. Brewer's Motion to Dismiss ("Brewer MTD")

21  (Doc. 238). The Court also addresses Plaintiffs' Motion for Preliminary Injunction ("Pls.'

22  Mot.") (Doc. 235) and Request for Order on Pending Motion ("Pls.' Req.") (Doc. 430).

23  **I.      BACKGROUND**

24          The Arizona Legislature enacted a set of statutes and statutory amendments in the

25  form of Senate Bill 1070, the "Support Our Law Enforcement and Safe Neighborhoods Act,"

26  2010 Arizona Session Laws, Chapter 113, which Governor Brewer signed into law on April

27  23, 2010. Seven days later, the Governor signed into law a set of amendments to Senate Bill

28

1070 in the form of House Bill 2162, 2010 Arizona Session Laws, Chapter 211.[1] S.B. 1070 had an effective date of July 29, 2010. On July 28, 2010, the Court entered a preliminary injunction in the related case *United States v. Arizona*, CV 10-1413-PHX-SRB. (*See United States v. Arizona*, CV 10-1413-PHX-SRB, Doc. 87, Order Granting Prelim. Inj. ("USA Order").) In the USA Order, the Court preliminarily enjoined certain provisions of S.B. 1070. (*Id.* at 4.)

Plaintiffs challenge S.B. 1070 in its entirety.[2] (Compl. ¶ 183, Prayer for Relief ¶ b.) Plaintiffs also raise specific challenges to Sections 2, 3, 5, and 6 of S.B. 1070. (Compl. ¶¶ 180-218.) Section 2 of S.B. 1070 adds Arizona Revised Statute ("A.R.S.") § 11-1051, which requires law enforcement officials to check a person's immigration status under certain circumstances. Plaintiff principally contests the constitutionality of Subsection 2(B) of S.B. 1070, which requires officers to make a reasonable attempt, when practicable, to determine an individual's immigration status during any lawful stop, detention, or arrest where reasonable suspicion exists that the person is unlawfully present in the United States. A.R.S. § 11-1051(B). Subsection 2(B) also provides that all persons who are arrested must have their immigration status verified prior to release. *Id.*

Section 3 of S.B. 1070 adds A.R.S. § 13-1509, which provides that "a person is guilty

---

[1] In this Order, unless otherwise specified, the Court refers to Senate Bill 1070 and House Bill 2162 collectively as "S.B. 1070," describing the April 23, 2010, enactment as modified by the April 30, 2010, amendments.

[2] As noted in the USA Order, the Court cannot "declare an entire statute unconstitutional if the constitutional portions can be severed from those which are unconstitutional." *State v. Ramsey*, 831 P.2d 408, 413 (Ariz. Ct. App. 1992) (citing *State v. Prentiss*, 786 P.2d 932, 937 (Ariz. 1989)). In determining whether potentially unconstitutional provisions of S.B. 1070 may be severed from the remainder of the enactment, the primary concern is legislative intent. *See id.* at 715-16 (citing *City of Mesa v. Killingsworth*, 394 P.2d 410, 413 (Ariz. 1964)). Section 12(A) of S.B. 1070 demonstrates that the Arizona Legislature intended the provisions of the enactment to be severable in order to preserve the constitutional provisions of the Act. S.B. 1070, § 12(A). The Court will not ignore S.B. 1070's severability clause or the obligation to preserve the constitutional provisions of a state legislative enactment. The Court thus evaluates the constitutionality of the individual provisions of S.B. 1070 challenged by Plaintiffs.

of willful failure to complete or carry an alien registration document if the person is in violation of [8 U.S.C. §§] 1304(e) or 1306(a)," federal statutes that require aliens to carry documentation of registration and penalize the willful failure to register. *Id.* § 13-1509(A).

Section 5 of S.B. 1070 adds two provisions to the Arizona Criminal Code, A.R.S. §§ 13-2928 and 13-2929. A.R.S. § 13-2928(A) makes it unlawful for an occupant of a motor vehicle that is stopped on a street, roadway, or highway and is impeding traffic to attempt to hire a person for work at another location. Similarly, A.R.S. § 13-2928(B) provides that it is unlawful for a person to enter a motor vehicle in order to be hired if the vehicle is stopped on a street, roadway, or highway and is impeding traffic. A.R.S. § 13-2928(C) provides that it is unlawful "for a person who is unlawfully present in the United States and who is an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state." A.R.S. § 13-2929 makes it unlawful for a person, knowing or in reckless disregard of the fact that an alien is unlawfully present in the United States, who is in violation of a criminal offense to: (1) transport or move or attempt to transport or move the alien in Arizona in furtherance of the alien's unlawful presence in the United States; (2) conceal, harbor, or shield or attempt to conceal, harbor, or shield the alien from detection in Arizona; or (3) encourage or induce the alien to come to or live in Arizona. *Id.* § 13-2929(A)(1)-(3).

Finally, Section 6 of S.B. 1070 amends A.R.S. § 13-3883 to permit an officer to arrest a person without a warrant if the officer has probable cause to believe that "the person to be arrested has committed any public offense that makes the person removable from the United States." *Id.* § 13-3883(A)(5).

Plaintiffs filed the instant suit as a class action on May 17, 2010, asserting six causes of action under 42 U.S.C. § 1983 for violations of the following provisions of the United States Constitution: (Count 1) the Supremacy Clause; (Count 2) the Equal Protection Clause; (Count 3) the First Amendment; (Count 4) the Fourth Amendment; (Count 6)  the Due Process Clause; and (Count 7) the Right to Travel under the Privileges and Immunities Clause. (Compl. ¶¶ 198, 204-214.) Plaintiffs also claim that S.B. 1070 violates Article II, §

1   8 of the Arizona Constitution (Count 5) and 42 U.S.C. § 1981 (Count 8). (*Id.* ¶¶ 199-203,

2   215-18.) Defendants Babeu and Walsh, Defendant Arpaio, and Intervenor Defendant Brewer

3   now move to dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure

4   12(b)(1) and 12(b)(6), arguing that Plaintiffs lack standing and have failed to state a claim

5   upon which relief may be granted.[3]

6   **II.   LEGAL STANDARDS AND ANALYSIS**

7       **A.   Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)**

8           **1.   Standing**

9       The Pinal County Defendants, Defendant Arpaio and Intervenor Defendant Brewer

10   move to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1),

11   arguing that Plaintiffs do not have standing to bring this action. (Pinal Cnty. Defs.' MTD at

12   4-6; Arpaio MTD at 2-5; Brewer MTD at 4-12.) "Article III of the Constitution limits the

13   judicial power of the United States to the resolution of [c]ases and [c]ontroversies, and

14   Article III standing . . . enforces the Constitution's case-or-controversy requirement." *Hein*

15   *v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007) (internal quotations and

16   citations omitted). An analysis of standing requires an examination of "whether the particular

17   plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468

18   U.S. 737, 752 (1984). "'[A] plaintiff must demonstrate standing for each claim he seeks to

19   press' and 'for each form of relief' that is sought." *Davis v. F.E.C.*, 128 S. Ct. 2759, 2769

20   (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)); *see also Oregon*

21   *v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009). Where claims are raised by one

22   plaintiff who has standing, the court need not determine whether other plaintiffs asserting the

23

---

24       [3] Defendants Babeu, Walsh and Arpaio also argue that Plaintiffs' claims are not ripe

25   for adjudication. (Pinal Cnty. Defs.' MTD at 6-7; Arpaio MTD at 5-7.) In addition, Defendant Arpaio asserts that designation of the suit as a class action is inappropriate.

26   (Arpaio MTD at 9-10.) Defendants Babeu and Walsh also assert that Plaintiffs have failed to plead a short and plain statement of the claim as required by Federal Rule of Civil

27   Procedure 8 and that Plaintiffs lack standing to bring claims against Babeu and Walsh

28   specifically. (Pinal Cnty. Defs.' MTD at 3-6.)

same claims also have standing. *See, e.g.*, *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 607 F.3d 1178, 1183 (9th Cir. 2010); *see also Bates v. UPS, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) ("In a class action, standing is satisfied if at least one named plaintiff meets the requirements.").[4]

In evaluating standing, courts must accept all material allegations in the complaint as true and construe the complaint in favor of the plaintiff. *Graham v. FEMA*, 149 F.3d 997, 1001 (9th Cir. 1998) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). The plaintiff has the burden of establishing standing and must "'allege[] such a personal stake in the outcome of the controversy' as to warrant [the] invocation of federal-court jurisdiction and . . . justify exercise of the court's remedial powers." *Warth*, 422 U.S. at 498-99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

In order to have standing pursuant to Article III, a plaintiff must show (1) an "injury in fact" that is concrete and particularized and actual or imminent (not conjectural or hypothetical); (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009). Even when the constitutional

---

[4] The Court notes that there is some authority suggesting that this limitation on standing analysis applies only to appellate review. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 918 n.6 (9th Cir. 2004) (noting that "on remand, when the district court enters the appropriate injunctive relief against enforcement of the statute, it may need to decide whether Planned Parenthood is a proper plaintiff . . . [because] [o]nly a proper party to an action can enforce an injunction that results from a final judgment"); *see also Town of Southold v. Town of E. Hampton*, 406 F. Supp. 2d 227, 235 n.5 (E.D.N.Y. 2005). However, appellate courts generally have the same obligation to address standing as the trial courts, and several district courts have applied this limited standing analysis at the trial court level. *See Sierra Club v. El Paso Props., Inc.*, No. 01-cv-02163-BNB-MEH, 2007 WL 45985, at *3 (D. Colo. Jan. 5, 2007) (collecting cases). At this stage in this putative class action, the standing inquiry is required to establish this Court's jurisdiction. The Court has jurisdiction to consider the merits of Plaintiffs' claims if at least one Plaintiff has standing to bring each claim.

1   minima of standing are present, prudential concerns may impose additional limitations. *Elk*

2   *Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). Prudential standing

3   limitations embody "'judicially self-imposed limits on the exercise of federal jurisdiction'"

4   and include "'the general prohibition on a litigant's raising another person's legal rights, the

5   rule barring adjudication of generalized grievances more appropriately addressed in the

6   representative branches, and the requirement that a plaintiff's complaint fall within the zone

7   of interests protected by the law invoked.'" *Id.* at 12 (quoting *Allen*, 468 U.S. at 750-51); *see*

8   *also Alaska Right to Life Political Action Comm. v. Feldman*, 504 F.3d 840, 848-49 (9th Cir.

9   2007).

10          An organization has standing "to seek judicial relief from injury to itself and to

11   vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S.

12   at 511. "An organization may establish a sufficient injury in fact if . . . a challenged statute

13   or policy frustrates the organization's goals and requires the organization 'to expend

14   resources in representing clients they otherwise would spend in other ways.'" *Redondo*

15   *Beach*, 607 F.3d at 1183 (quoting *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration*

16   *Review*, 959 F.2d 742, 748 (9th Cir. 1992)); *see also Havens Realty Corp. v. Coleman*, 455

17   U.S. 363, 379 (1982). Where a statute "perceptibly impair[s]" an organization's ability to

18   provide the services the organization was formed to provide, "there can be no question that

19   the organization has suffered [an] injury in fact. Such concrete and demonstrable injury to

20   the organization's activities–with the consequent drain on the organization's

21   resources–constitutes far more than simply a setback to the organization's abstract social

22   interests." *Havens*, 455 U.S. at 379. An organization also has "associational standing" to

23   bring suit on behalf of its members "when its members would otherwise have standing to sue

24   in their own right, the interests at stake are germane to the organization's purpose, and

25   neither the claim asserted nor the relief requested requires the participation of individual

26   members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528

27   U.S. 167, 181 (2000) (*citing Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343

28   (1977)).

Plaintiffs assert various injuries arising from the future operation and enforcement of S.B. 1070. (Compl. ¶¶ 7-30.) "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citation omitted). However, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Id.* (internal quotation and citation omitted). Similarly, "'it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [a criminal] statute that he claims deters the exercise of his constitutional rights.'" *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). In order to have standing to challenge a criminal statute prior to the statute's enforcement, a plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that a "credible threat" of prosecution exists. *Id.*; *see also San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996).

### a.    Injury in Fact

Plaintiffs must have standing to bring each claim asserted. *See Davis*, 128 S. Ct. at 2769 (citing *DaimlerChrysler*, 547 U.S. at 352). In order to have standing to bring a particular claim, Plaintiffs must allege an injury in fact arising from the challenged conduct. *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (noting that "standing is not dispensed in gross" and that "'a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject'" (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)). The Court evaluates the alleged injuries as they relate to the asserted claims.

### i.    Civil Rights Violations (Counts 2, 4-6, 8)

Plaintiffs assert various claims for violations of their civil rights arising from the enforcement and operation of S.B. 1070 as written. Several organizations allege injuries on their own behalf, asserting that S.B. 1070 will impair their ability to pursue their organizational missions. (Compl. ¶¶ 7-20 (alleging injuries to the organizational missions of

Plaintiffs Friendly House, Service Employees International Union ("SEIU"), Service Employees International Union Local 5 ("SEIU Arizona"), United Food and Commercial Workers International Union ("UFCW"), Arizona South Asians for Safe Families ("ASAFSF"), Southside Presbyterian Church ("Southside"), Arizona Hispanic Chamber of Commerce ("AZHCC"), Asian Chamber of Commerce ("ACC"), Border Action Network ("BAN"), Tonatierra Community Development Institute ("Tonatierra"), Muslim American Society ("MAS"), Japanese American Citizens League ("JACL"), Valle del Sol, and Coalicion de Derechos Humanos ("Derechos Humanos")).) Governor Brewer argues that the organizational Plaintiffs have not "alleged facts sufficient to establish that [S.B. 1070] adversely impacts their mission, nor have they diverted resources in a manner that establishes a 'concrete and demonstrable injury.'" (Brewer MTD at 10 (quoting *Havens*, 455 U.S. at 379).)

Plaintiffs allege that several of the organizational Plaintiffs' missions involve promoting and protecting immigrant and minority rights, preventing discrimination, and educating and providing assistance to immigrant or minority populations. (*See, e.g.*, Compl. ¶ 7 (asserting that Plaintiff Friendly House is a non-profit organization that provides immigration services, including assistance with asylum applications); *id.* ¶ 20 (stating that Plaintiff Derechos Humanos's mission is to promote human rights in the U.S.-Mexico border region); *id.* ¶¶ 12, 16 (asserting that Plaintiffs Southside and Tonatierra operate day laborer centers).) Plaintiffs assert that S.B. 1070 will frustrate the missions of the organizational Plaintiffs in several ways.

First, Plaintiffs allege that several Plaintiff organizations will have to divert resources, or already have diverted resources, in order to educate and assist community members affected by S.B. 1070 and address the fear and confusion created by S.B. 1070. (*See, e.g.*, *id.* ¶¶ 12, 14, 17-19; *id.* ¶ 20 (alleging that Plaintiff "Derechos Humanos has already been forced to suspend most of its work relating to community education . . . to respond to inquiries from the community about S.B. 1070").) Plaintiffs also allege that S.B. 1070 will create fear and confusion, harming several of the organizational Plaintiffs' missions by deterring clients and

1   members from participating in the organizations' programs out of fear of being stopped under

2   S.B. 1070. (*Id.* ¶¶ 7-11, 13, 17-20.) In addition, the organizational Plaintiffs assert that the

3   potential for criminal prosecutions will deter participation by members and frustrate their

4   organizational purpose. (*Id.* ¶ 11 (alleging that Plaintiff ASAFSF's volunteers face an

5   imminent risk of prosecution and that this risk harms ASAFSF's mission); *id.* ¶ 12 (alleging

6   that Southside employees and volunteers would be at risk of prosecution while performing

7   their work in furtherance of Southside's mission); *id.* ¶ 15 (alleging that, as a result of the

8   risk of criminal prosecutions, Plaintiff BAN will have to divert resources to educate members

9   about their rights and responsibilities under the law and address fears and concerns).)

10  Plaintiffs also allege that S.B. 1070 will frustrate the organizational purpose of day laborer

11  centers by criminalizing the expressive activity of members who are not authorized to work

12  and chilling the expressive activity of members who are authorized to work. (*Id.* ¶ 16.)

13  Finally, Plaintiffs allege that S.B. 1070 will deter business, cause economic harm within the

14  state, and make it more difficult for some organizations to retain members as a result of

15  members leaving the state. (*Id.* ¶¶ 13-15.)

16       The Complaint contains sufficient allegations that S.B. 1070 "perceptibly impair[s]"

17  the ability of the organizational Plaintiffs to provide the services that the organizations were

18  formed to provide, and, as a result, "there can be no question that the organization[s] ha[ve]

19  suffered [an] injury in fact." *See Havens*, 455 U.S. at 379. While Governor Brewer correctly

20  points out that, for the most part, the organizational Plaintiffs' allegations involve threats of

21  future harm, the threat of future harm is sufficiently imminent. *See Babbitt*, 442 U.S. at 298

22  ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a

23  direct injury as a result of the statute's operation or enforcement . . . . [and] does not have to

24  await the consummation of threatened injury to obtain preventive relief. If the injury is

25  certainly impending that is enough." (internal quotation and citation omitted)).

26       The harms alleged by the organizational Plaintiffs do not result from any hypothetical

27  unlawful enforcement or application of S.B. 1070. The alleged harm to the organizational

28  Plaintiffs will occur if S.B. 1070 goes into effect, regardless of how it is enforced or applied.

The organizations allege that they will have to divert resources to educate and assist members, staff, and clients faced with the purportedly unconstitutional S.B. 1070. (Compl. ¶¶ 12, 14, 17-20.) Similarly, Plaintiffs allege that S.B. 1070 will deter clients and members from participating in the organizational Plaintiffs' programs. (*See id.* ¶¶ 7-11, 13, 17-20.) In order to continue providing services to their clientele, these organizations would presumably have to divert resources to reach the same individuals. (*See id.* ¶¶ 12, 14, 17-19.) In addition, Plaintiffs allege that Plaintiff Derechos Humanos "has already been forced to suspend most of its work relating to community education on border deaths and leadership development to respond to inquiries from the community about S.B. 1070." (*Id.* ¶ 20.) The organizational Plaintiffs have sufficiently alleged that the civil rights violations they claim will result from S.B. 1070 will require, or have already required, them to divert resources and that the violations will injure their organizational missions. Plaintiffs have alleged a sufficient injury in fact for purposes of standing to raise their civil rights claims (Counts 2, 4-6, 8).

### ii.     First Amendment (Count 3)

Plaintiffs' allegations of injury to their First Amendment rights include two distinct injuries. First, Plaintiff Tonatierra alleges that it operates a day laborer center and that S.B. 1070's provisions prohibiting the solicitation of employment frustrate its mission "to empower workers and protect them from exploitation" by preventing day laborers from expressing their ability to work. (*Id.* ¶ 16.) Plaintiffs' allegations are sufficient to support an injury in fact. Where an organization's mission is to assist and protect clients in performing a specific activity, the organization's mission is "perceptibly impaired" by a statute criminalizing or chilling the clients' activity. *See Havens*, 455 U.S. at 379; *see also Redondo Beach*, 607 F.3d at 1183 (finding an organization whose mission was to strengthen and expand the work of day laborers had standing to challenge an ordinance preventing the solicitation of work). Here, Tonatierra alleges that its mission is to protect and assist day laborers and that S.B. 1070's regulation of employment solicitation frustrates this mission. Plaintiff Tonatierra has alleged a sufficient injury in fact resulting from an alleged First Amendment violation. *See Redondo Beach*, 607 F.3d at 1183.

Second, the Complaint also alleges that individual Plaintiffs and members of the organizational Plaintiffs are afraid to speak a foreign language or accented English around law enforcement officers and that this fear results in a chilling of their First Amendment rights. (*See, e.g.*, *id.* ¶¶ 8-9, 13, 22, 23.) These allegations are not sufficiently imminent for purposes of standing. In the First Amendment context, self-censorship is "a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). However, "[t]he potential plaintiff must have 'an actual and well-founded fear that the law will be enforced against [him or her]' [and] such a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003) (quoting *Am. Booksellers*, 484 U.S. at 393). In addition, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). Here, S.B. 1070 does not purport to limit the rights of individuals to speak. Plaintiffs' allegations are of only a "subjective chill" and do not give rise to an injury in fact resulting from a First Amendment violation for standing purposes.

### iii.   Right to Travel (Count 7)

Individual Plaintiffs Vicki Gaubeca and Jesus Cuauhtemoc Villa also allege that, as residents of New Mexico possessing only New Mexico driver's licenses, they face an imminent threat of detention pursuant to S.B. 1070 because their driver's licenses do not dispel reasonable suspicion of unlawful presence. (Compl. ¶¶ 22, 27.) Subsection 2(B) of S.B. 1070 provides for a presumption of lawful presence where an individual can provide identification from any state or local government that "requires proof of legal presence in the United States before issuance." A.R.S. § 11-1051(B). Plaintiffs allege that New Mexico does not require such proof prior to issuing identification. However, Plaintiffs Gaubeca and Cuauhtemoc Villa do not allege that they will be deterred from traveling to or in Arizona. (*See* Compl. ¶¶ 22, 27.) Rather, both Plaintiffs allege only that they believe or fear that they could be detained after being pulled over "because [their] New Mexico driver's license will

1   not be accepted to dispel suspicion that [they are] 'unlawfully present' in the United States."

2   (*Id.* ¶ 22; *see also id.* ¶ 27.) An injury in fact cannot be based on a "chain of speculative

3   contingencies." *Lee v. Oregon*, 107 F.3d 1382, 1388 (1997). In order for the alleged injury

4   to arise, Plaintiffs would have to be lawfully stopped by a law enforcement officer, the

5   officer would then have to develop reasonable suspicion that Plaintiffs were unlawfully

6   present in the United States, and then the stop would have to result in an unlawful detention.

7   This hypothetical chain of events is too speculative to support an injury in fact for purposes

8   of standing on a claim for violations of the right to travel. Defendants' Rule 12(b)(1) Motions

9   to Dismiss are granted as to Plaintiffs' right to travel claim (Count 7).

10                                   **b.    Causation**

11          The alleged injury in fact must also be fairly traceable to the challenged action. *Lujan*,

12   504 U.S. at 560. Plaintiffs' alleged injuries arise from the impact that Sections 2, 3, 5 and 6,

13   have on the Plaintiffs. (*See* Compl. ¶¶ 7-30.) Defendants do not argue that the alleged injuries

14   are not fairly traceable to the provisions of S.B. 1070. Plaintiffs' Complaint contains

15   adequate allegations making the alleged injuries fairly traceable to the enactment and

16   enforcement of S.B. 1070.

17                                   **c.    Redressability**

18          Finally, Plaintiffs' alleged injuries would likely be redressed by a favorable decision.

19   *See Lujan*, 504 U.S. at 561. Relief preventing the enforcement of S.B. 1070 or declaring S.B.

20   1070 unconstitutional would alleviate the organizational Plaintiffs' alleged injuries.

21                          **d.    Prudential Standing Considerations**

22          Prudential standing limitations prevent courts from looking at generalized grievances,

23   claims brought on behalf of third-parties, and claims that do not fall within the zone of

24   interests protected by the law invoked. *Newdow*, 542 U.S. at 12. Governor Brewer argues

25   that Plaintiffs "allege general concern about [S.B. 1070] rather than a specific, concrete

26   injury" and that the Court should "refrain 'from adjudicating abstract questions of wide

27   public significance which amount to generalized grievances, pervasively shared and most

28   appropriately addressed in the representative branches." (Brewer MTD at 11 (quoting *Valley*

1   *Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464,

2   475 (1982) (internal quotations and citations omitted)).) The organizational Plaintiffs allege

3   injuries specific to their organizational missions. (*See* Compl. ¶¶ 7-20.) The alleged injuries

4   are not "pervasively shared" by the public. *See Valley Forge*, 454 U.S. at 475. In addition,

5   the alleged injuries giving rise to standing are injuries suffered by the organizational

6   Plaintiffs. The claims are not impermissibly asserted on behalf of third-parties.[5]

7                    **2.      Ripeness**

8           Defendants Babeu, Walsh, and Arpaio also argue that Plaintiffs' Complaint is not ripe

9   for adjudication. (Pinal Cnty. Defs.' MTD at 6-7; Arpaio MTD at 5-7.) Ripeness has both

10  constitutional and prudential components. *Portman v. Cnty. of Santa Clara*, 995 F.2d 898,

11  902 (9th Cir. 1993). "The constitutional component of ripeness overlaps with the 'injury in

12  fact' analysis for Article III standing . . . [and] [w]hether framed as an issue of standing or

13  ripeness, the inquiry is largely the same: whether the issues presented are 'definite and

14  concrete, not hypothetical or abstract.'" *Wolfson v. Brammer*, No. 09-15298, 2010 WL

15  3191159, at *7 (9th Cir. Aug. 13, 2010) (quoting *Thomas v. Anchorage Equal Rights*

16  *Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)); *see also Getman*, 328 F.3d at 1093-94

17  (noting that in many cases, the analysis of ripeness and standing are the same). Analysis of

18  the prudential component weighs "the fitness of the issues for judicial decision and the

19  hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387

20  U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99,

21

22          [5] Defendants Babeu and Walsh also argue "the [C]omplaint alleges no facts specific

23  to either Pinal County Sheriff Babeu or Pinal County Attorney Walsh to establish that any
    of the . . . [P]laintiffs have met the standing requirements." (Pinal Cnty. Defs.' MTD at 5.)

24  Officials with a direct role in the enforcement of challenged provisions are proper defendants
    in a suit challenging the validity of a legislative enactment. *Wasden*, 376 F.3d at 919-20. As

25  the Pinal County Sheriff and County Attorney, Defendants Babeu and Walsh will be tasked
    with enforcing S.B. 1070. Plaintiffs here seek an injunction prohibiting this enforcement, and

26  it is appropriate to seek such an injunction against officials with a direct role in enforcement.
    *See id.* The organizational Plaintiffs' allegations of injury are sufficient to sustain claims

27  against officials tasked with enforcing S.B. 1070.

28

1    105 (1977).

2         Here, the Court has already determined that Plaintiffs have alleged definite and

3    concrete injuries. Plaintiffs have also satisfied the prudential component of ripeness. "A

4    claim is fit for decision if the issues raised are primarily legal, do not require further factual

5    development, and the challenged action is final." *Standard Alaska Prod. Co. v. Schaible*, 874

6    F.2d 624, 627 (9th Cir. 1989). Plaintiffs assert that S.B. 1070 is unconstitutional on its face;

7    the issues raised are primarily legal and do not require further factual development.

8    Moreover, "[t]o meet the hardship requirement, a litigant must show that withholding review

9    would result in direct and immediate hardship and would entail more than possible financial

10   loss." *Winter v. Cal. Med. Review, Inc.*, 900 F.2d 1322, 1325 (9th Cir. 1990) (internal

11   quotation and citation omitted). The organizational Plaintiffs allege that they will be subject

12   to an organizational injury as a result of the enforcement of an unconstitutional enactment

13   if S.B. 1070 goes into effect. (*See* Compl. ¶¶ 7-11, 13, 17-20.) These are sufficient

14   allegations of hardship for the purposes of ripeness.

15         **B.    Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

16              **1.    Standard for Dismissal**

17         Plaintiffs assert causes of action for violations of: (1) the Supremacy Clause;[6] (2) the

18   Equal Protection Clause; (3) the First Amendment; (4) the Fourth Amendment; (5) Article

19   II, § 8 of the Arizona Constitution; (6) the Due Process Clause; (7) the Right to Travel; and

20   (8) 42 U.S.C. § 1981. (Compl. ¶¶ 180-218.) Defendants Brewer, Arpaio, Babeu and Walsh

21   ("Defendants") move to dismiss all eight causes of action, asserting that Plaintiffs have failed

22   to state a claim for which relief can be granted. The Court addresses each of Plaintiffs' claims

23   in turn.

24         The Federal Rules of Civil Procedure require "only 'a short and plain statement of the

25   claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice

26

27   _____

28        [6] The Court does not address Plaintiffs' claim alleging a violation of the supremacy
     clause as the Court already thoroughly addressed this issue in the USA Order.

of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also* Fed. R. Civ. P. 8(a)(2). Thus, dismissal for insufficiency of a complaint is proper if the complaint fails to state a claim on its face. *Lucas v. Bechtel Corp.*, 633 F.2d 757, 759 (9th Cir. 1980). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). A Rule 12(b)(6) dismissal for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) insufficient facts to support a cognizable legal claim. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

In determining whether an asserted claim can be sustained, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994). This presumption applies only to facts and "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that 'recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). However, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1952). In other words, the complaint must contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Twombly*, 550 U.S. at 556.

**2.      Equal Protection Clause and 42 U.S.C. § 1981 (Counts 2 and 8)**

Plaintiffs allege that S.B. 1070 violates their rights under the Equal Protection Clause (Count 2) and 42 U.S.C. § 1981 (Count 8). (Compl. ¶¶ 185-90, 215-18.) Plaintiffs assert that

S.B. 1070 "was enacted with the purpose and intent to discriminate against racial and national origin minorities, including Latinos, on the basis of race and national origin." (*Id.* ¶ 187.) Plaintiffs also allege that S.B. 1070 "impermissibly and invidiously targets Plaintiffs who are racial and national origin minorities . . . and subjects them to stops, detentions, questioning, and arrests because of their race and/or national origin," and that Section 3 of S.B. 1070 "impermissibly discriminates against non-citizen Plaintiffs on the basis of alienage and deprives them of the equal protection of the laws." (*Id.* ¶ 190.) Plaintiffs similarly allege that S.B. 1070 "impermissibly discriminates against persons within the State of Arizona on the basis of alienage and national origin and race" in violation of 42 U.S.C. § 1981. (*Id.* ¶ 218.)

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall deny to any person . . . the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985) (internal quotation and citation omitted). Similarly, 42 U.S.C. § 1981 prohibits discrimination under color of state law based on race, "ancestry[,] or ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see also Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (noting that "when Congress enacted § 1981, it intended 'race' to be defined broadly, to cover discrimination against ethnic groups" (citing *Al-Khazraji*, 481 U.S. at 613)). Where a plaintiff alleges that facially neutral legislation is unconstitutional in violation of the Equal Protection Clause and also that he or she is entitled to relief under 42 U.S.C. § 1981, the claims are "indistinguishable . . . and the analysis is the same . . . . [because] [u]nder either theory, the [plaintiff] must prove [he or she is] deprived of equal protection of the laws, which requires a showing of discriminatory intent." *Hispanic Taco Vendors of Wash. v. City of Pasco*, 994 F.2d 676, 679 n.3 (9th Cir. 1993). The Court addresses the sufficiency of Plaintiffs' Equal Protection Clause and § 1981 claims together.

Generally, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."

*Cleburne*, 473 U.S. at 440; *see also United States v. Flores-Villar*, 536 F.3d 990, 997 (9th Cir. 2008). However, under the Equal Protection Clause, certain classifications, including classifications based on race, alienage, and national origin, are subject to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest. *Cleburne*, 473 U.S. at 440. Classifications that appear neutral but are a pretext for racial discrimination are also subject to strict scrutiny. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (noting that strict scrutiny applies to "a classification that is ostensibly neutral but is an obvious pretext for racial discrimination" (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1915)); *see also Valeria v. Davis*, 307 F.3d 1036, 1039 (9th Cir. 2002) (noting that "governmental actions . . . that are facially neutral but motivated by discriminatory racial purpose . . . are subject to strict scrutiny"). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also Hispanic Taco Vendors*, 994 F.2d at 679-80.

Here, Plaintiffs assert that "racial discrimination was a motivating factor for [S.B.] 1070's enactment." (Pls.' Resp. to Mots. to Dismiss ("Pls.' Resp.") at 37; Compl. ¶ 187.) In addition, Plaintiffs assert that Section 3 of S.B. 1070 explicitly discriminates on the basis of alienage. (Compl. ¶ 190; Pls.' Resp. at 38-39.) Plaintiffs allege that it is "widely understood that [S.B. 1070] is motivated by . . . discrimination against Latinos and other racial minorities in Arizona on the basis of their race and national origin." (Compl. ¶ 73.) Plaintiffs also allege that Arizona State Senators made statements indicating that S.B. 1070 was likely to result in increased discrimination and racial profiling.[7] (*See* Compl. ¶¶ 68-69.) Similarly, Plaintiffs allege that the sponsor of S.B. 1070 has a history of making racially insensitive remarks and sponsoring legislation in Arizona related to race and national origin. (*Id.* ¶¶ 70-71.) Finally,

---

[7] "[W]hen the adverse consequences of a law upon an identifiable group are . . . inevitable . . . a strong inference that the adverse effects were desired can reasonably be drawn." *Feeney*, 442 U.S. at 279 n.25.

1    Plaintiffs also allege that, on its face, S.B. 1070 targets and discriminates against minorities.

2    (*Id.* ¶¶ 188, 190, 218.) The Complaint contains adequate allegations that race, alienage, or

3    national origin discrimination was a motivating factor in the enactment of S.B. 1070.[8] Race,

4    alienage and national origin are so rarely relevant to the achievement of a legitimate state

5    interest that laws grounded in such considerations are subject to strict scrutiny. *Cleburne*, 473

6    U.S. at 440. For the purposes of a challenge under Rule 12(b)(6), the Complaint contains

7    "non-conclusory 'factual content,'" from which the Court can draw "reasonable inferences

8    . . . [that are] plausibly suggestive of a claim entitling the plaintiff to relief." *Moss*, 572 F.3d

9    at 969 (quoting *Iqbal*, 129 S. Ct. at 1952). Governor Brewer's Motion to Dismiss Plaintiffs'

10   Equal Protection and § 1981 claims is denied.

11                   **3.      The First Amendment (Count 3)**

12          Plaintiffs challenge three provisions of S.B. 1070 on First Amendment grounds (Count

13   3), asserting that S.B. 1070 infringes on Plaintiffs' freedom of speech by restricting

14   employment solicitation speech and chilling the first amendment rights of non-English

15   speakers and individuals who speak English with an accent. (Compl. ¶¶ 84-85, 109, 159,

16   192-93.) First, Plaintiffs assert that A.R.S. § 13-2928(A) and (B), which prohibit the act of

17   hiring and being hired by the occupant of a motor vehicle, infringes on day laborers' First

18   Amendment right to free speech. (*Id.* ¶¶ 16, 101-06, 193.) Plaintiffs also challenge A.R.S.

19   § 13-2928(C), which makes it "unlawful for a person who is unlawfully present in the United

20   States and who is an unauthorized alien to knowingly apply for work, solicit work in a public

21   place or perform work as an employee or independent contractor in this state." (*Id.* ¶¶ 101-

22   09, 193 (citing A.R.S. § 13-2928(C)).) Finally, Plaintiffs assert that Section 2 of S.B. 1070

23   infringes on the First Amendment rights of non-English speakers. (*Id.* ¶¶ 8-9, 13, 22-23, 83-

24   87, 159.)

25          The First Amendment guarantees that "Congress shall make no law . . . abridging the

26

27          [8] While S.B. 1070 also contains provisions prohibiting the consideration of race, color,
     and national origin, A.R.S. § 11-1051(B), these provisions, standing alone, are not sufficient
28   to insulate against Plaintiffs' Equal Protection Clause and § 1981 claims.

freedom of speech." U.S. Const. amend. I.[9] However, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" *Redondo Beach*, 607 F.3d at 1184 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

### a.    Section 5: A.R.S. § 13-2928(A) and (B)

Section 5 of S.B. 1070 makes it unlawful for "an occupant of a motor vehicle that is stopped on a street, roadway, or highway and is impeding traffic to attempt to hire a person for work at another location" and for "a person to enter a motor vehicle in order to be hired if the vehicle is stopped on a street, roadway, or highway and is impeding traffic." A.R.S. §13-2928(A), (B). Plaintiffs assert that "Section 5 of S.B. 1070 creates a content-based regulation of protected speech" by prohibiting and regulating speech soliciting work. (Compl. ¶¶ 102-03.)

Solicitation is a "form of expression that consists of both expressive content and associated conduct or acts." *Redondo Beach*, 607 F.3d at 1184. "[R]estrictions on acts of solicitation that were passed to support legitimate government concerns unrelated to suppressing any particular message are content neutral." *Id.* at 1185 (citing *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 794 & n.10 (9th Cir. 2006); *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009)). However, "[a] restriction aimed at conduct does not satisfy this content neutrality test . . . when the restriction 'by its very terms, singles out particular content for differential treatment.'" *Id.* at 1186 (quoting *Berger*, 569 F.3d at 1051).

In *Redondo Beach*, the Ninth Circuit Court of Appeals found that an ordinance making it "unlawful for any person to stand on a street or highway and solicit, or attempt to solicit, employment, business, or contributions from an occupant of any motor vehicle" was

---

[9] "The Fourteenth Amendment makes this limitation applicable to the states." *City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994).

1   a valid, content neutral regulation of speech. 607 F.3d at 1184-93. The *Redondo Beach* court

2   found that the ordinance at issue was "aimed at acts of on-the-spot solicitation" and regulated

3   "broad categories of expression which [did not] require an officer to make . . . a substantive

4   evaluation of a speaker's message." *Id.* at 1188. A.R.S. § 13-2928(A) and (B) are

5   considerably narrower than the Redondo Beach ordinance. Unlike the Redondo Beach

6   ordinance, S.B. 1070 regulates only solicitation related to employment rather than a broad

7   category of solicitation. *See* A.R.S. § 13-2928(A), (B). Importantly, S.B. 1070's provisions

8   are directed only at employment solicitation and not more broadly at the *act* of solicitation.

9   *See ACLU of Nev.*, 466 F.3d at 794 (noting that "[a]lthough courts have held that bans on the

10  act of solicitation are content-neutral, we have not found any case holding that a regulation

11  that separates out words of solicitation for differential treatment is content-neutral" (citation

12  omitted)).

13          A.R.S. § 13-2928(A) and (B) are content-based regulations of speech because the

14  provisions "differentiate[] based on the content of speech," prohibiting only the solicitation

15  of employment. *See id.* at 793-94 (finding that an ordinance prohibiting handbills requesting

16  financial or other assistance but permitting handbills with other content was a "content-based

17  distinction because it single[d] out certain speech for differential treatment based on the idea

18  expressed" (internal quotation and citation omitted)); *see also Berger*, 569 F.3d at 1051

19  (finding that an ordinance that prohibited street performers from soliciting donations but did

20  not prohibit the performers from communicating other messages was a content-based

21  regulation of speech). As a content-based regulation, A.R.S. § 13-2928(A) and (B) is only

22  valid if it "serves a compelling government interest in the least restrictive manner possible."

23  *Berger*, 569 F.3d at 1053. Plaintiffs have sufficiently stated their claim of a First Amendment

24  violation. Therefore, the Motions to Dismiss Plaintiffs' First Amendment challenge to A.R.S.

25  § 13-2928(A) and (B) are denied.

26                      **b.      Section 5: A.R.S. § 13-2928(C)**

27          Section 5 of S.B. 1070 also adds A.R.S. § 13-2928(C), which makes it unlawful for

28  "a person who is unlawfully present in the United States and who is an unauthorized alien

to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor in this state." Plaintiffs cannot state a claim for violations of the First Amendment based on A.R.S. § 13-2928(C). The Supreme Court has held that individuals who were not authorized to work did not have a right to backpay. *Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137, 151 (2002) (noting that "allowing . . . [an] award of backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy"). Likewise, individuals who are unlawfully present in the United States and unauthorized to work do not have a right to solicit work. *Cf. id.* Plaintiffs' First Amendment challenge to A.R.S. § 13-2928(C) is dismissed.

### c.   Section 2 of S.B. 1070

Section 2 of S.B. 1070 requires law enforcement officers to make a reasonable attempt, when practicable, to determine the immigration status of a person where the officer has lawfully stopped, detained, or arrested the individual and the officer has reasonable suspicion that the person is an alien and is unlawfully present in the United States. A.R.S § 11-1051(B). As discussed above, Plaintiffs lack standing to assert that Section 2 will chill the speech of individuals who do not speak English or who speak English with an accent. *See Laird*, 408 U.S. at 13-14.

### 4.   The Due Process Clause (Count 6)

Governor Brewer moves to dismiss Plaintiffs' due process claim, Count Six of the Complaint. (Brewer MTD at 24-28.) Plaintiffs allege that Section 2 of S.B. 1070 violates the Fourteenth Amendment's guarantee of procedural due process. (Compl. ¶ 206 (alleging that Section 2 "permits state and local law enforcement officials to seize, detain, and transfer individuals without appropriate procedures, thereby depriving Plaintiffs of their liberty without due process of law").). Plaintiffs further allege that Sections 2, 5, and 6 of S.B. 1070 are void for vagueness and point in particular to eight terms or phrases that they claim are impermissibly vague. (*See id.* ¶¶ 206-08.)

### a.   Procedural Due Process

"The Fourteenth Amendment's Due Process Clause protects persons against

deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Subsection 2(B) of S.B. 1070 directs police officers to make a reasonable attempt to determine the immigration status of any person who is lawfully stopped, detained, or arrested when the officer has reasonable suspicion that the person might be in the U.S. unlawfully. A.R.S. § 11-1051(B). Subsection 2(B) also states, "Any person who is arrested shall have the person's immigration status determined before the person is released." *Id.* Section 6 of S.B. 1070 permits a police officer to make a warrantless arrest if the officer has probable cause to believe that "the person to be arrested has committed any public offense that makes the person removable from the United States." *Id.* § 13-3883(A)(5). Although Governor Brewer states, "even assuming Plaintiffs can establish a liberty interest," she does not make any arguments regarding the nonexistence of a liberty interest. (Brewer MTD at 24.) Arrest and detention are classic examples of liberty interests protected by the Due Process clause. *See, e.g.*, *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (observing that the plaintiff's interest was "the most elemental of liberty interests–the interest in being free from physical detention by one's own government" (citations omitted)).

Once it is established that a liberty interest is at stake, the Court turns to the question of what process is due to people affected by S.B. 1070. The Supreme Court has held, "Because the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,' we generally have declined to establish rigid rules and instead have embraced a framework to evaluate the sufficiency of particular procedures." *Wilkinson*, 545 U.S. at 224 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The factors to be considered were set out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Regarding the first and third factors, Plaintiffs' liberty interests here are "weighty," as is Arizona's interest in promoting the safety and welfare of its citizens. *See Landon v. Plasencia*, 459 U.S. 21, 34 (1982). Plaintiffs focus primarily on the second factor, the risk of an erroneous deprivation, arguing that because a person's immigration status cannot be easily observed or inferred, S.B. 1070 "invites racial profiling and compels law enforcement officers to make subjective and arbitrary decisions as to whom to single-out for immigration-related investigation based solely on appearance, race, ethnicity, language, accent, or national origin." (Pls.' Resp. at 32.)

Plaintiffs have stated a claim that Subsection 2(B) of S.B. 1070 violates their right to procedural due process on its face. S.B. 1070 contains no meaningful procedural safeguards against erroneous deprivations of liberty, and immigration status is not something that is easily ascertainable. A person who is lawfully present in the U.S. may look and act the same way as a person who does not have permission to be in the country, and Plaintiffs' allegations of "subjective and arbitrary" detention decisions by law enforcement agents are plausible. For the purposes of a challenge under Rule 12(b)(6), the Complaint contains "non-conclusory 'factual content,'" from which the Court can draw "reasonable inferences . . . [that are] plausibly suggestive of a claim entitling the plaintiff to relief." *Moss*, 572 F.3d at 969 (quoting *Iqbal*, 129 S. Ct. at 1952). Governor Brewer's Motion is denied as to Plaintiffs' procedural due process claim.

### b. Vagueness

Governor Brewer also challenges Plaintiffs' allegation that Sections 2, 5, and 6 of S.B. 1070 contain unconstitutionally vague terms. (Brewer MTD at 25-28.) "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). There are two ways in which a law may be invalidated on account of vagueness: "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City*

- 23 -

1  *of Chi. v. Morales*, 527 U.S. 41, 56 (1999) (citing *Kolender v. Lawson*, 461 U.S. 352, 357

2  (1983)). Plaintiffs assert that S.B. 1070 contains terms "that are 'so vague and standardless

3  that it leaves the public uncertain as to the conduct it prohibits.'" (Pls.' Resp. at 33 (quoting

4  *City of Chi.*, 527 U.S. at 56).) The Court analyzes the challenged terms in turn.

### i.    Section 2

6      Plaintiffs allege that four terms in Section 2 are impermissibly vague: "reasonable

7  suspicion," "reasonable attempt," "unlawful presence," and "determine the immigration

8  status." (Compl. ¶ 206.) **"Reasonable suspicion"** has long been understood to mean "'a

9  particularized and objective basis' for suspecting the person stopped of criminal activity."

10  *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (quoting *United States v. Cortez*, 449

11  U.S. 411, 417-18 (1981)). The concept of reasonable suspicion is "fluid" and takes its

12  "substantive content from the particular context[]" in which it is applied. *Id.* (citing *Illinois*

13  *v. Gates*, 462 U.S. 213, 232 (1983)). Plaintiffs have not alleged any facts suggesting that

14  reasonable suspicion in S.B. 1070 is not properly interpreted as having this long-standing

15  meaning. The Court finds that Plaintiffs have not stated a claim as to this term. The Court

16  also finds that **"reasonable attempt"** is sufficiently clear as used in S.B. 1070. While the

17  language is not precise, it is not arcane, and it permits an appropriate degree of flexibility in

18  implementation and does not prevent "ordinary people [from] understand[ing] what conduct

19  it prohibits." *City of Chi.*, 527 U.S. at 56 (citing *Kolender*, 461 U.S. at 357).

20      With regard to **"unlawful presence,"** Plaintiffs argue that S.B. 1070 uses the term

21  inconsistently with its definition under federal law. (Pls.' Resp. at 33-34). Under the

22  Immigration and Nationality Act ("INA"), "an alien is deemed to be unlawfully present in

23  the United States if the alien is present in the United States after the expiration of the period

24  of stay authorized by the Attorney General or is present in the United States without being

25  admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii). The INA also sets out various exceptions

26  to time that is included in calculating a period of unlawful presence for purposes of

27  inadmissibility analysis. *See id.* § 1182(a)(9)(B)-(C). S.B. 1070 does not purport to determine

28  the length of time a person is properly considered to have been unlawfully present, but

merely that for some period, they were or are present in the U.S. without permission. Although S.B. 1070 does not contain several of the exceptions contained in the INA, this, alone, does not render the use of the phrase "unlawful presence" vague. Plaintiffs have not stated a claim that "unlawful presence," as used in Section 2, is impermissibly vague.

Plaintiffs also assert that **"determine the immigration status"** is vague. (Compl. ¶ 206.) S.B. 1070 provides that a person's "immigration status may be determined by: (1) A law enforcement officer who is authorized by the federal government to ascertain an alien's immigration status [or] (2) [t]he United States [I]mmigration and [C]ustoms [E]nforcement or [t]he United States [C]ustoms and [B]order [P]rotection pursuant to 8 [U.S.C. §] 1373(c)." A.R.S. § 11-1051(E). Section 1373(c) of Title 8 provides that federal authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." S.B. 1070 does not use the phrase "determine the immigration status" inconsistently with federal law because it states that the determination is to be made by a federal agency or federally-authorized law enforcement officer. A.R.S. § 11-1051(E). The Court concludes that "determine the immigration status" is not vague. Governor Brewer's Motion is granted as to Section 2.

### ii.      Section 5

Plaintiffs allege that two terms in Section 5 are vague: "in furtherance of illegal presence" and "that the immigrant has entered or remained in the United States illegally." (Compl. ¶ 208.) With regard to **"in furtherance of illegal presence,"** the Court finds that this phrase is not so vague as to violate the due process guarantee of the Fourteenth Amendment. The Court gives the words their ordinary meaning, *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citation omitted), and observes that a parallel provision of federal immigration law also uses the phrase "in furtherance" of illegal entry or presence in discussing criminal penalties for similar actions. *See* 8 U.S.C. § 1324(a)(1)(A)(ii).

The Court further concludes that Plaintiffs have not stated a claim that the phrase

**"that the alien has come to, has entered or remains in the United States illegally"** is unconstitutionally vague. Giving the words their ordinary meaning, this phrase is not so unclear as to not give a person of ordinary intelligence knowledge of what conduct is prohibited. Section 5 makes various actions unlawful if done by a person who knows or recklessly disregards the fact that a person "has come to, has entered or remains in the United States illegally." A.R.S. § 13-2929(A). This phrase is not vague. Like "in furtherance of illegal presence," a phrase very similar to the one in question appears in federal immigration law. *See* 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii) (providing criminal penalties for any person who, "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law," transports, moves, conceals, harbors, or shields the alien). Governor Brewer's Motion is granted as to Section 5.

### iii.    Section 6

Plaintiffs challenge two terms in Section 6: "public offense" and "removable." (Compl. ¶ 207.) In full, Section 6 of S.B. 1070 amends A.R.S. § 13-3883 to permit an officer to arrest a person without a warrant if the officer has probable cause to believe that "the person to be arrested has committed any public offense that makes the person removable from the United States." A.R.S. § 13-3883(A)(5).

**"Public offense"** is defined in Arizona state law as follows:

> [C]onduct for which a sentence to a term of imprisonment or of a fine is provided by any law of the state in which it occurred or by any law, regulation or ordinance of a political subdivision of that state and, if the act occurred in a state other than this state, it would be so punishable under the laws, regulations or ordinances of this state or of a political subdivision of this state if the act had occurred in this state.

*Id.* § 13-105(26). While Plaintiffs claim that this phrase, on its own, is vague, their real argument has to do with the way it is used in conjunction with the next phrase: "that makes the person **removable** from the United States." *Id.* § 13-3883(A)(5); (*see also* Pls.' Resp. at 34-35.) Plaintiffs argue that "there is no list of state crimes 'that make[] [a] person removable from the United States.'" (Pls.' Resp. at 34 (first alteration added).) Plaintiffs also argue that "whether a state offense makes a person 'removable' requires a complex factual and legal

1   analysis." (*Id.*) Governor Brewer asserts that both terms have definitions in federal law and

2   are intended to be applied with those meanings. (Brewer MTD at 27.)

3          The Court finds that Plaintiffs have stated a claim that Section 6 is void for vagueness.

4   Because A.R.S. § 13-3883 already provides for the warrantless arrest of a person who

5   commits a felony, misdemeanor, petty offense, or one of certain criminal violations in

6   connection with a traffic accident, the effect of Section 6 on warrantless arrest authority is

7   somewhat opaque. Whatever the goal of Section 6 was, the Court concludes that its meaning

8   is not clear from the statutory language. Crucially, there is no logical meaning for the

9   provision that avoids the problem pointed out by Plaintiffs, namely that an officer making

10  the decision to effect a warrantless arrest is unable to determine whether a public offense

11  makes a person removable from the United States.

12         Justice Alito has commented that

13         providing advice on whether a conviction for a particular offense will make an
           alien removable is often quite complex. "Most crimes affecting immigration
14         status are not specifically mentioned by the [Immigration and Nationality Act
           (INA)], but instead fall under a broad category of crimes such as *crimes
15         involving moral turpitude* or *aggravated felonies*." M. Garcia & L. Eig, CRS
           Report for Congress, Immigration Consequences of Criminal Activity (Sept.
16         20, 2006) (summary) (emphasis in original).   As has been widely
           acknowledged, determining whether a particular crime is an "aggravated
17         felony" or a "crime involving moral turpitude [(CIMT)]" is not an easy task.

18  *Padilla v. Kentucky*, 130 S. Ct. 1473, 1488 (2010) (Alito, J., concurring) (some citations

19  omitted). Within the complicated scheme of determining removability, some federal officials

20  are, under certain circumstances, authorized to change the immigration consequences of the

21  commission of a public offense and cancel or suspend the removal of an alien. *See, e.g.*, 8

22  U.S.C. §§ 1229b(a), 1253(a)(3). Ultimately, immigration court judges and federal appeals

23  court judges determine whether an alien's offense makes an alien removable. *See id.* §

24  1182(a)(2) (describing crimes that qualify as grounds for inadmissibility); *id.* § 1227(a)(2)

25  (describing crimes that qualify as grounds for deportation).

26         Plaintiffs have stated a claim that Section 6 is void for vagueness because they have

27  alleged facts sufficient to show that this provision "fail[s] to provide the kind of notice that

28  will enable ordinary people to understand what conduct it prohibits." *City of Chi.*, 527 U.S.

at 56 (citing *Kolender*, 461 U.S. at 357). Even a person with extensive experience in law enforcement and a background in immigration law might not be able to determine easily whether a public offense makes a person removable from the United States. Governor Brewer's Motion is denied as to Section 6.

> **5.      The Fourth Amendment and Article II, § 8 of the Arizona Constitution (Counts 4 and 5)**

Governor Brewer moves to dismiss Plaintiffs' claims that S.B. 1070 violates the Fourth Amendment and Article II, § 8 of the Arizona Constitution. (Brewer MTD at 21-24.) The Complaint alleges that Section 2 of S.B. 1070 requires officers to conduct unreasonable seizures of individuals and authorizes officers to detain individuals without lawful authority and transport them into federal custody, all in violation of the Fourth Amendment. (Compl. ¶¶ 196, 198.) The Complaint also alleges that Sections 2 and 6 violate the Fourth Amendment by permitting "warrantless seizures of individuals in the absence of probable cause that they have committed crimes." (*Id.* ¶ 197.) The Complaint further states that unspecified portions of S.B. 1070 violate the Arizona Constitution by "requiring that officers conduct investigatory stops without reasonable suspicion of criminal activity," permitting "warrantless seizures of individuals in the absence of probable cause that they have committed crimes," and extending "this broad, warrantless arrest authority to the context of an individual's home." (*Id.* ¶¶ 201-03.)

The Fourth Amendment protects the right to be free from unreasonable searches and seizures and states that warrants must be supported by probable cause. U.S. Const. amend. IV.[10] Article II, § 8 of the Arizona Constitution states: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Arizona courts have interpreted Article II, § 8 of the state constitution as providing broader protection against searches and seizures than the Fourth Amendment to the U.S. Constitution. *See Moulé ex rel. Moulé v. Paradise Valley Unified Sch. Dist. No. 69*, 863 F. Supp. 1098, 1102 (D. Ariz. 1994)

---

[10] The Fourth Amendment is applied to the states via the Fourteenth Amendment. *City of Ontario, Cal. v. Quon*, 130 S. Ct. 2619, 2624 (2010).

1   (citing Arizona state law), *rev'd on other grounds*, 66 F.3d 335 (9th Cir. 1995).[11]

2   ### a.   Fourth Amendment

3       Governor Brewer argues that Section 2 does not authorize unreasonable seizures in

4   violation of the Fourth Amendment because it is not unreasonable to inquire about

5   immigration status in connection with an otherwise lawful stop, detention, or arrest. (Brewer

6   MTD at 22.) The Court assumes that Plaintiffs challenge Subsection 2(B), as none of the

7   other subsections appears to significantly implicate the Fourth Amendment. The Supreme

8   Court has held that questioning by police does not constitute a discrete Fourth Amendment

9   event, such that police would need independent reasonable suspicion to ask the questions.

10  *See Muehler v. Mena*, 544 U.S. 93, 100-01 (2005). The questioning at issue in *Muehler*

11  related to immigration status, among other things. *Id.* Subsection 2(B) pertains to situations

12  in which the police have already made a *lawful* stop, detention, or arrest, and Subsection 2(B)

13  also requires reasonable suspicion of unlawful presence in the United States. This theory for

14  violation of the Fourth Amendment is unavailing.[12]

15      Plaintiffs also argue that the extension of a person's detention during the time it takes

16  _____

17  [11] Where state and federal constitutional provisions are not coterminous, courts are
    directed to attempt to avoid federal constitutional questions by instead resolving the case on

18  state constitutional grounds, if possible. *See Ellis v. City of La Mesa*, 990 F.2d 1518, 1524
    (9th Cir. 1993). Here, because the Arizona Constitution is more protective of the right to be

19  free from searches and seizures than the Fourth Amendment is, the Court begins with the
    federal analysis. If the Court were to conclude that Plaintiffs had stated a claim that S.B.

20  1070 violates Article II, § 8 of the Arizona Constitution, the federal issue would still have

21  to be addressed because the Fourth Amendment affords less protection.

22  [12] Plaintiffs argue that Subsection 2(B) applies to lawful stops and detentions for civil

23  violations as well, so subsequent questioning regarding immigration status is a violation of
    the Fourth Amendment. (Pls.' Resp. at 35.) However, Subsection 2(B) requires reasonable

24  suspicion that the person is unlawfully present, which provides an additional basis for the
    inquiry. Given the fact that investigatory questioning, on its own, does not typically implicate

25  the Fourth Amendment, the Court finds that Plaintiffs have not stated a claim that Subsection

26  2(B) violates the Fourth Amendment on this theory. *See Hiibel v. Sixth Judicial Dist. Ct.*, 542
    U.S. 177, 185 (2004) ("Asking questions is an essential part of police investigations. In the

27  ordinary course a police officer is free to ask a person for identification without implicating

28  the Fourth Amendment.")

to investigate and verify the person's immigration status makes an investigatory stop into an arrest. (Pls.' Resp. at 35-36.) The Court finds this argument more persuasive and concludes that Plaintiffs have stated a claim that Subsection 2(B) violates the Fourth Amendment because it impermissibly extends detention time for people who are stopped, detained, or arrested while their immigration status is checked if the officer has reasonable suspicion that the person is unlawfully present. Plaintiffs have alleged facts supporting a plausible inference that this extension arguably changes the encounter from an investigatory stop permitted under *Terry v. Ohio*, 392 U.S. 1, 30 (1983), into an arrest. In order to make an arrest, the Fourth Amendment requires the officer to have probable cause, a much higher standard than the reasonable suspicion required in Subsection 2(B). *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." (citations omitted)).

This reasoning also applies to the second sentence of Subsection 2(B): "Any person who is arrested shall have the person's immigration status determined before the person is released." A.R.S. § 11-1051(B). Plaintiffs have stated a claim that this requirement also violates the Fourth Amendment because they have alleged facts plausibly suggesting that it will lengthen detention time for arrestees while their immigration status is determined. Arizona law permits law enforcement officers to cite and immediately release people arrested for certain offenses. A.R.S. § 13-3903. Given that, using this procedure, people are technically "arrested" but never booked into jail or perhaps even transported to a law enforcement facility, detention time for this category of arrestee will be extended during an immigration status verification.[13]

---

[13] The Court also notes that information from another related case indicates that the number of people impacted by this procedure is substantial. (*See Escobar v. City of Tucson*, No. CV 10-249-TUC-SRB, Doc. 9, City of Tucson's Answer & Cross-cl. ("*Escobar* Answer & Cross-cl."), ¶ 38 (stating that during fiscal year 2009, Tucson used the cite-and-release procedure provided by A.R.S. § 13-3903 to "arrest" and immediately release 36,821 people).)

1    Section 6 amends A.R.S. § 13-3883 to permit officers to make warrantless arrests if

2   the officer has probable cause to believe that "the person to be arrested has committed any

3   public offense that makes the person removable from the United States." A.R.S. § 13-

4   3883(A)(5). Governor Brewer asserts that "[t]he commission of a public offense that makes

5   a person removable from the United States will often involve the commission of a crime."

6   (Brewer MTD at 22-23 (citing 8 U.S.C. § 1227).) Therefore, Governor Brewer argues, as a

7   warrantless arrest is proper if the officer has probable cause to believe that the person

8   committed a crime, Section 6 can be applied in a constitutional manner, and for purposes of

9   a facial challenge, Plaintiffs have not stated a claim. (Brewer MTD at 23.)

10    As discussed in more detail with regard to Plaintiffs' vagueness arguments, it is

11   unclear how Section 6 alters the authority officers in Arizona already have to make

12   warrantless arrests, and Plaintiffs have stated a claim that the provision is unconstitutionally

13   vague because there is no list of crimes that make a person removable from the U.S., a

14   complicated determination ultimately made by federal officials, not a state law enforcement

15   officer in the field. *See supra* Part II.B.4.b.iii. The Court finds that, for the same reason,

16   Plaintiffs have stated a claim that Section 6 violates the Fourth Amendment. Plaintiffs have

17   alleged sufficient facts suggesting that, because an Arizona law enforcement officer cannot

18   make a determination that a public offense makes the person removable from the U.S., any

19   arrest made under Section 6 would, in fact, not be based on probable cause that the public

20   offense makes the arrestee removable from the U.S. *See Devenpeck*, 543 U.S. at 152.[14]

21   Plaintiffs have stated a claim that Sections 2 and 6 violate the Fourth Amendment in that they

22   permit unconstitutional seizures and detentions. Governor Brewer's Motion is denied in this

23   regard.

24    Governor Brewer also moves to dismiss Plaintiffs' claim that Section 2 improperly

25

26    [14] The Court notes again that under other subsections of A.R.S. § 13-3883(A), officers
27   may already make warrantless arrests if they have probable cause to believe that the person
     to be arrested committed a felony, misdemeanor, petty offense, or certain criminal traffic
28   violations. *See* A.R.S. § 13-3883(A)(1)-(4).

1   authorizes state law enforcement officials to "transport individuals into federal custody."

2   (Brewer MTD at 23; *see also* Compl. ¶ 198.) Section 2 provides that

> a law enforcement agency may securely transport an alien whom the agency
> has received verification is unlawfully present in the United States and who is
> in the agency's custody to a federal facility in this state or to any other point
> of transfer into federal custody that is outside the jurisdiction of the law
> enforcement agency.

6   A.R.S. § 11-1051(D). Plaintiffs do not address this theory in their Response and cite no

7   authority stating that state law enforcement agencies may not transport  a lawfully-detained

8   person in their custody. Section 2(D) requires that verification of the person's unlawful

9   presence be obtained and that the person already be in the agency's custody before the

10  transportation occurs. Plaintiffs have not stated a claim that this provision plausibly violates

11  the Fourth Amendment. *See United States v. Means*, 252 F. App'x 830, 834 (9th Cir. 2007)

12  (unpublished) ("[Plaintiff] cites no authority holding the transportation of a lawfully detained

13  individual violates the Fourth Amendment, and we have found none."). Governor Brewer's

14  Motion is granted as to this argument.

15   **b.**     **Article II, § 8**

16  Most of Plaintiffs' arguments regarding the state constitution mirror those related to

17  the Fourth Amendment, so the Court's analysis of the federal standard applies. *See Moulé*,

18  863 F. Supp. at 1102. However, Governor Brewer also moves to dismiss Plaintiffs' state

19  constitutional claim that "S[.]B[.] 1070 violates the Arizona Constitution's guarantee by

20  requiring that officers conduct investigatory stops without reasonable suspicion of criminal

21  activity." (Brewer MTD at 24; Compl. ¶ 201.) The Complaint does not specify which

22  provision of S.B. 1070 is being challenged under this theory, or for that matter, under the

23  Arizona Constitution generally. (Compl. ¶¶ 199-203.) Assuming that this challenge relates

24  to Subsection 2(B), the Court finds that Plaintiffs have not stated a claim sufficient to

25  withstand a challenge under Rule 12(b)(6). Nowhere does Subsection 2(B) state that officers

26  may or must conduct "investigatory stops" without reasonable suspicion. Governor Brewer's

27  Motion is granted as to this theory.

28

1

### 6.    Right to Travel (Count 7)

2          The right to travel from one state to another is a fundamental right arising from

3    various clauses of the U.S. Constitution, including the Privileges and Immunities Clause of

4    Article IV and the Privileges and Immunities Clause of the Fourteenth Amendment. *Att'y*

5    *Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 901-02 (1986). As discussed above, no Plaintiff

6    has standing to assert a claim for violations of the right to travel. *See supra* Part II.A.1.a.iii.

7          **C.    Additional Challenges to Plaintiffs' Claims**

8          Defendants Babeu and Walsh also assert that Plaintiffs have failed to plead a short and

9    plain statement of the claim as required by Federal Rule of Civil Procedure 8. (Pinal Cnty.

10   Defs.' MTD at 3-4.) This argument is essentially a challenge to the sufficiency of Plaintiffs'

11   Complaint. The sufficiency of the Complaint is discussed above. *See supra* Part II.B.

12   Defendant Arpaio also asserts that "designating this action as a 'Class Action' is

13   inappropriate . . . because if [S.B.] 1070 is declared unconstitutional, it will be so for

14   everyone, not just 'class members.'" (Arpaio MTD at 9-10.) Defendant Arpaio's challenge

15   to the appropriateness of alleging these claims as a class action is without merit. As Plaintiffs

16   point out, class actions commonly challenge the constitutionality of legislation. *See, e.g.*,

17   *Plyler v. Doe*, 457 U.S. 202 (1982). Further, the appropriateness of class certification has not

18   yet been determined.

19         **D.    Plaintiffs' Motion for Preliminary Injunction**

20         Plaintiffs' Motion for Preliminary Injunction was filed on June 21, 2010. Plaintiffs

21   make three main arguments in their Motion: (1) S.B. 1070 is preempted by federal

22   immigration law (Pls.' Mot. at 9-24); (2) S.B. 1070 violates the constitutional right to travel

23   (*id.* at 24-28); and (3) S.B. 1070 violates the First Amendment (*id.* at 28-32).  The Court

24   entered a preliminary injunction in the related case *United States v. Arizona*, CV 10-1413-

25   PHX-SRB, on July 28, 2010. (*See* USA Order at 35-36.) In that Order, the Court found that

26   the United States was likely to succeed on the merits of its argument that certain portions of

27   S.B. 1070 were preempted by federal law, that the United States was likely to suffer

28   irreparable harm in the absence of injunctive relief, and that the balance of equities tipped

in the United States's favor considering the public interest. (*See id.* at 4.) Therefore, the Court preliminarily enjoined the following Sections of S.B. 1070:

Portion of Section 2 of S.B. 1070

A.R.S. § 11-1051(B):   requiring that an officer make a reasonable attempt to determine the immigration status of a person stopped, detained or arrested if there is a reasonable suspicion that the person is unlawfully present in the United States, and requiring verification of the immigration status of any person arrested prior to releasing that person

Section 3 of S.B. 1070

A.R.S. § 13-1509:   creating a crime for the failure to apply for or carry alien registration papers

Portion of Section 5 of S.B. 1070

A.R.S. § 13-2928(C):   creating a crime for an unauthorized alien to solicit, apply for, or perform work

Section 6 of S.B. 1070

A.R.S. § 13-3883(A)(5):   authorizing the warrantless arrest of a person where there is probable cause to believe the person has committed a public offense that makes the person removable from the United States

(*Id.*)

Plaintiffs in the instant matter do not substantively challenge any provisions of S.B. 1070 that were not enjoined by the Court in the USA Order, although Plaintiffs do challenge the relevant provisions on some different grounds. (*See* Hr'g Tr. 34:8-37:15, July 22, 2010; *see also* Pls.' Mot. at 3-5, 9-32.) Plaintiffs acknowledge that the Court's findings regarding the preliminary injunction entered in *United States v. Arizona*, if applied to their Motion for Preliminary Injunction, "would fully resolve Plaintiffs' request for preliminary relief." (Pls.' Req. at 1.) Plaintiffs seek a ruling on their Motion for Preliminary Injunction in order to apply the USA Order to Defendants not named in *United States v. Arizona* and to enable these Plaintiffs "to participate fully and have their voices heard in litigation in the Court of Appeals that could effectively decide many of their claims." (*Id.* at 2.) The Court finds that Plaintiffs' Motion for Preliminary Injunction is rendered moot by the preliminary injunction entered in *United States v. Arizona*. No additional provisions of S.B. 1070 are specifically challenged by these Plaintiffs, so there is nothing else to enjoin.

Further, the Court concluded *supra* that Plaintiffs' arguments regarding the

constitutional right to travel and the First Amendment challenge to A.R.S. § 13-2928(C) are unavailing. Although the Court denied Governor Brewer's Motion to Dismiss Plaintiffs' First Amendment claim against A.R.S. § 13-2928(A) and (B), Plaintiffs stated at the hearing on these Motions that they did not seek to preliminarily enjoin these provisions on First Amendment grounds. (*See* Hr'g Tr. 81:21-23 (Plaintiffs' counsel: "[I]n light of *Redondo Beach*, we would withdraw our First Amendment P.I. request with respect to subsections (a) and (b) at this time.").) Plaintiffs' preemption arguments are no different from those made by the United States in *United States v. Arizona*, which were thoroughly addressed in the USA Order.

If Plaintiffs' Motion were not moot, the Court would have found one additional theory persuasive in considering whether to enjoin Subsection 2(B) of S.B. 1070 prior to its enactment, namely the Fourth Amendment challenge. (*See* USA Order at 16 n.6 ("The Court is also cognizant of the potentially serious Fourth Amendment problems with the inevitable increase in length of detention while immigration status is determined, as raised by the plaintiffs in *Friendly House, et al. v. Whiting, et al.*, No. CV 10-1061-PHX-SRB.").) The Intervenor Defendants responded to this argument in their Response to *Amicus Curiae* Briefs Filed in Support of Plaintiffs' Motion for Preliminary Injunction ("Defs.' *Amicus* Resp.") (Doc. 402).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008) (citations omitted). *Amicus Curiae* Arizona Attorneys for Criminal Justice ("AACJ") explains in its Brief in Support of Plaintiffs' Motion for Preliminary Injunction the ways in which the mandatory immigration determination upon arrest provisions of Subsection 2(B) implicate the Fourth Amendment and lead to Plaintiffs' likelihood of success on the merits of this theory. (*See* Doc. 336, Proposed *Amicus Curiae* Br. by Ariz. Att'ys for Criminal Justice in Supp. of Pls.' Mot. ("AACJ Br.") at 3-6, 9-10; Doc. 282, Order Granting Mot. for

1    Leave to File *Amicus Curiae* Br.)[15]

2        AACJ argues that Subsection 2(B) violates the Fourth Amendment by requiring police

3    to detain people longer than constitutionally permissible in order to determine immigration

4    status. (AACJ Br. at 4-5.) Subsection 2(B) provides:

5            For any lawful stop, detention or arrest made by [an Arizona] law enforcement
             official or . . . law enforcement agency . . . in the enforcement of any other law
6            or ordinance of a county, city or town of this state where reasonable suspicion
             exists that the person is an alien and is unlawfully present in the United States,
7            a reasonable attempt shall be made, when practicable, to determine the
             immigration status of the person, except if the determination may hinder or
8            obstruct an investigation.

9    A.R.S. § 11-1051(B). Subsection 2(B) also states, "Any person who is arrested shall have the

10   person's immigration status determined before the person is released." *Id.*

11       The Court finds compelling AACJ's argument that Subsection 2(B) of  S.B. 1070

12   "transforms investigatory stops into *de facto* arrests without probable cause." (AACJ Br. at

13   9.) The Court addressed this argument above, in the context of Defendants' Motion to

14   Dismiss, finding that Plaintiffs had stated a claim sufficient to withstand a motion under Rule

15   12(b)(6), and the Court now considers whether Plaintiffs are likely to succeed on the merits

16   of this theory. The requirement that police officers make a reasonable attempt to determine

17   the immigration status of any person lawfully stopped, detained, or arrested when the officer

18   _____

19       [15] District courts have broad discretion to appoint or reject *amici curiae*. *Hoptowit v.*
20   *Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982), *abrogated in part on other grounds by Sandin v.*
     *Connor*, 515 U.S. 472 (1995). *Amici* may properly "take a legal position and present legal
21   arguments in support of it." *Funbus Sys., Inc. v. Cal. Pub. Utils. Comm'n*, 801 F.2d 1120,
     1125 (9th Cir. 1986) (citation omitted). The Ninth Circuit Court of Appeals has held, "In the
22   absence of exceptional circumstances . . . we do not address issues raised only in an amicus
23   brief." *Artichoke Joe's Grand Cal. Casino v. Norton*, 353 F.3d 712, 719 n.10 (2003) (citing
     *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993)). In this case, the Fourth Amendment
24   challenge is contained in the Complaint, has been responded to in the preliminary injunction
     context by Defendants, and is discussed purely to demonstrate that this theory would have
25   been compelling had the Court not already entered a preliminary injunction of the pertinent
26   provision on other grounds and instead engaged in a full Fourth Amendment analysis with
     regard to preliminary injunctive relief. (*See* Compl. ¶¶ 3, 194-98; Defs.' *Amicus* Resp. at 5.)
27   The Fourth Amendment challenge was also addressed by the parties in their briefing on
28   Governor Brewer's Motion to Dismiss. (*See* Brewer MTD at 21-24; Pls.' Resp. at 35-37.)

has reasonable suspicion to believe that the person is unlawfully present appears, on its face, to likely increase detention time for many people who are stopped, detained, or arrested. As AACJ points out, detaining people for the additional time necessary to make a determination of immigration status will change the encounter for many from an investigatory *Terry* stop into an arrest, for which the police officer would need to have probable cause, *not* the reasonable suspicion required by S.B. 1070. (*See id.* at 9-10); *Herring v. United States*, 129 S. Ct. 695, 698 (2009) (observing that the Fourth Amendment "usually requires the police to have probable cause or a warrant before making an arrest").

The second sentence of Subsection 2(B) states: "Any person who is arrested shall have the person's immigration status determined before the person is released." A.R.S. § 11-1051(B). This provision is mandatory ("shall") and does not pertain only to people who are arrested and booked into a jail. The Court observes that serious questions also exist as to whether this sentence violates the Fourth Amendment. *See Dunaway v. New York*, 442 U.S. 200, 212 (1979) (holding that extensions of investigatory stops beyond the scope permitted in *Terry* must be based on consent or probable cause (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975)).

Requiring Arizona law enforcement officials and agencies to determine the immigration status of every person who is arrested will, on its face, impermissibly expand the scope of detention for many arrestees because their liberty will be restricted while their status is checked. As stated above, many people each year are technically "arrested" but never booked into jail or perhaps even transported to a law enforcement facility, and detention time for this category of arrestee will inevitably be extended during an immigration status verification. (*See Escobar* Answer & Cross-cl., ¶ 38 (stating that during fiscal year 2009, Tucson used the cite-and-release procedure provided by A.R.S. § 13-3903 to "arrest" and immediately release 36,821 people).)

Since the Court previously found that the United States was likely to succeed on its challenge to this provision on preemption grounds, rendering Plaintiffs' Motion for Preliminary Injunction moot, the Court does not engage in a full preliminary injunction

analysis on Fourth Amendment grounds. However, there appear to be substantial questions as to whether Subsection 2(B) would withstand a challenge under the Fourth Amendment, and some of the facts supplied, both in this case and the related cases, suggest that Plaintiffs could demonstrate a likelihood of success on the merits of this claim.

**IT IS THEREFORE ORDERED** granting in part and denying in part the Motions to Dismiss filed by Defendants Pinal County Sheriff Paul Babeu and Pinal County Attorney James P. Walsh (Doc. 204), Defendant Maricopa County Sheriff Joseph Arpaio (Doc. 205), and Intervenor Defendant Arizona Governor Janice K. Brewer (Doc. 238).  The following of Plaintiffs' claims are dismissed for lack of standing:

- violation of the First Amendment (Count 3) only as far as Plaintiffs challenge Section 2 of S.B. 1070;

- violation of the right to travel under the Privileges and Immunities Clause (Count 7).

Plaintiffs fail to state a claim upon which relief can be granted for the following claims:

- violation of the First Amendment (Count 3) only as far as Plaintiffs challenge A.R.S. § 13-2928(C) of Section 5 of S.B. 1070;

- violation of the Due Process Clause (Count 6) only as far as Plaintiffs challenge Sections 2 and 5 of S.B. 1070 for vagueness.

Defendants' Motions to Dismiss are denied for the balance of Plaintiffs' claims.

**IT IS FURTHER ORDERED** denying as moot Plaintiffs' Motion for Preliminary Injunction (Doc. 235) and Request for Order on Pending Motion (Doc. 430).

DATED this 8th day of October, 2010.

_____
Susan R. Bolton
United States District Judge