Omar C. Jadwat (admitted *pro hac vice*)
Lucas Guttentag (admitted *pro hac vice*)
Andre Segura (admitted *pro hac vice*)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION IMMIGRANTS'
RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 549-2660
Facsimile: (212) 549-2654
*ojadwat@aclu.org*
*lguttentag@aclu.org*

Linton Joaquin (admitted *pro hac vice*)
Karen C. Tumlin (admitted *pro hac vice*)
Nora A. Preciado (admitted *pro hac vice*)
Melissa S. Keaney (admitted *pro hac vice*)
Alvaro M. Huerta (admitted pro hac vice)
NATIONAL IMMIGRATION LAW
CENTER
3435 Wilshire Boulevard, Suite 2850
Los Angeles, California 90010
Telephone: (213) 639-3900
Facsimile: (213) 639-3911
*joaquin@nilc.org*
*tumlin@nilc.org*
*preciado@nilc.org*
*keaney@nilc.org*
*huerta@nilc.org*

Thomas A. Saenz (admitted *pro hac vice*)
Victor Viramontes (admitted *pro hac vice*)
Nicholás Espíritu (admitted *pro hac vice*)
MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND
634 S. Spring Street, 11th Floor
Los Angeles, California 90014
Telephone: (213) 629-2512
Facsimile: (213) 629-0266
*tsaenz@maldef.org*
*vviramontes@maldef.org*
*nespiritu@maldef.org*

*Attorneys for all Plaintiffs Except Maria
Morales*
*Additional Co-Counsel on Subsequent Pages*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Valle del Sol, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>Michael B. Whiting, *et al.*,<br><br>Defendants. | CASE NO. CV-10-01061-PHX-SRB<br><br>**PLAINTIFFS' PROPOSED MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**(ORAL ARGUMENT REQUESTED)** |

1   Daniel J. Pochoda (SBA No. 021979)          Cecillia D. Wang (admitted *pro hac vice*)
2   James Duff Lyall (SBA No. 330045)            AMERICAN CIVIL LIBERTIES
    ACLU FOUNDATION OF ARIZONA                   UNION FOUNDATION IMMIGRANTS'
3   3707 N. 7th Street, Suite 235                RIGHTS PROJECT
    Phoenix, Arizona 85014                       39 Drumm Street
4   Telephone: (602) 650-1854                    San Francisco, California 94111
    Facsimile: (602) 650-1376                    Telephone: (415) 343-0775
5   *dpochoda@acluaz.org*                        Facsimile: (415) 395-0950
    *jlyall@acluaz.org*                          *cwang@aclu.org*
6

7   Nina Perales (admitted *pro hac vice*)       Laboni Hoq (admitted *pro hac vice*)
    MEXICAN AMERICAN LEGAL                       Yungsuhn Park (admitted *pro hac vice*)
8   DEFENSE AND EDUCATIONAL                      ASIAN PACIFIC AMERICAN
    FUND                                         LEGAL CENTER, a member
9   110 Broadway Street, Suite 300               of Asian American Center for
    San Antonio, Texas 78205                     Advancing Justice
10  Telephone: (210) 224-5476                    1145 Wilshire Blvd., Suite 200
    Facsimile: (210) 224-5382                    Los Angeles, California 90017
11  *nperales@maldef.org*                        Telephone: (213) 977-7500
                                                 Facsimile: (213) 977-7595
12                                               *lhoq@apalc.org*
                                                 *ypark@apalc.org*
13

14  Chris Newman (admitted *pro hac vice*)       Daniel R. Ortega, Jr. (SBA No. 005015)
    Jessica Karp (admitted *pro hac vice*)       ROUSH, MCCRACKEN, GUERRERO,
15  NATIONAL DAY LABOR                           MILLER & ORTEGA
    ORGANIZING NETWORK                           1112 E. Washington Street
16  675 S. Park View Street, Suite B             Phoenix, Arizona 85034
    Los Angeles, California 90057                Telephone: (602) 253-3554
17  Telephone: (213) 380-2785                    Facsimile: (602) 340-1896
    Facsimile: (213) 380-2787                    *danny@rmgmo.com*
18  *newman@ndlon.org*
    *jkarp@ndlon.org*
19
    Marita Etcubañez (admitted *pro hac          Aaron Leiderman (admitted *pro hac vice*)
20  vice*)                                       MUNGER, TOLLES & OLSON LLP+
    Jessica Chia (admitted pro hac vice)         560 Mission Street
21  ASIAN AMERICAN JUSTICE                       Twenty-Seventh Floor
    CENTER                                       San Francisco, CA  94105-2907
22  1140 Connecticut Avenue NW, Ste              Telephone: (415) 512-4000
    1200                                         Facsimile: (415) 512-4077
23  Washington, DC 20036                         *Aaron.leiderman@mto.com*
    Telephone: (202) 296-2300
24  Facsimile: (202) 296-2318
    *metcubanez@advancingequality.org*
25  *jchia@advancingequality.org*
26

27

28

1

Bradley S. Phillips+ (admitted *pro hac vice*)

2

Joseph J. Ybarra+ (admitted *pro hac vice*)

3

Benjamin J. Maro+ (admitted *pro hac vice*)

4

Lika C. Miyake+ (admitted (*pro hac vice*)

5

Margaret G. Ziegler+ (admitted *pro hac vice*)

6

MUNGER, TOLLES & OLSON LLP+

7

355 South Grand Avenue, 35th Floor
Los Angeles, CA  90071-1560

8

Telephone: (213) 683-9100
Facsimile: (213) 687-3702

9

*Brad.Phillips@mto.com*
*Joseph.Ybarra@mto.com*

10

*Benjamin.Maro@mto.com*
*Lika.Miyake@mto.com*

11

*Margaret.Ziegler@mto.com*

Stephen P. Berzon++ (admitted *pro hac vice*)
Jonathan Weissglass++ (admitted *pro hac vice*)
ALTSHULER BERZON LLP++
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
*sberzon@altshulerberzon.com*
*jweissglass@altshulerberzon.com*

Justin B. Cox (*pro hac vice pending*)
(Admitted in MD & DC)
ACLU Immigrants' Rights Project
230 Peachtree Street, NW, Suite 1440
Atlanta, GA 30303-2721
tel: (404) 523-2721, ext. 215
fax: (404) 653-0331
*jcox@aclu.org*

12

13

*+ Attorneys for all plaintiffs except Maria Morales and Service Employees International Union, Service Employees International Union, Local 5, United Food and Commercial Workers International Union, and Japanese American Citizens League*

14

15

*++ Attorneys for Service Employees International Union, Service Employees International Union, Local 5, and United Food and Commercial Workers International Union*

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page No(s)**

3

4  INTRODUCTION ……………………………………………………………….. 3

5  ARGUMENT ……………………………………………………………………….3

6  I.   Plaintiffs Are Likely To Succeed on the Merits   …………………………………3

7  A. Plaintiffs Are Likely to Prove That §2(B) Is Preempted by Federal Law and Violates the
   Fourth Amendment   …………………………………………………………………3

8
9        1.  Arizona Law Enforcement Agencies Will Extend Detentions Under § 2(B)
   ……………………………………………………………………..        5

10       2.  Plaintiffs Are Substantially Likely to Prevail on Their Claim That § 2(B) Is Preempted
   by Federal Law ………………………………………………………………… 8

11
12       3.  Plaintiffs Are Substantially Likely to Prevail on Their Claim That § 2(B)  Violates the
   Fourth Amendment ……………………………………………..………………… 8

13       4.  At a Minimum, the Court Should Certify the Question of Whether § 2(B) Authorizes
   Additional Detention to the Arizona Supreme Court ………………………..…….. 10

14
   B. Plaintiffs Are Likely to Prove That § 2(B) Violates the Equal Protection Clause.    . .. 11

15
16       1.  The Legislative History of S.B. 1070 Demonstrates a Discriminatory Intent….…… .12

17           i.  Legislators routinely relied on false or misleading evidence in promoting S.B. 1070,
   strongly suggesting that their stated reasons were pretext for unlawful
   discrimination……………………………………………………………………… 13

18
19           ii.  Legislators repeatedly conflated Latinos, Spanish-speaking individuals, and   the
   children of unauthorized immigrants with "illegal aliens," thereby demonstrating that
   their attempts to punish and harass "illegal aliens" were     also directed at these larger
20   groups…………………………………………………………………….. 17

21           iii.  Legislators' use of camouflaged racial language during the S.B. 1070 debate  is
   evidence of discriminatory intent.   ……………………………………………… 20

22
           iv.  Statements of legislators who opposed S.B. 1070 further support a finding    of
23   discriminatory intent.       …………………………………………………………… 22

24           v.  Discriminatory statements by constituents and the public influenced the legislative
   process and support a finding of discriminatory intent.   …………………………. 23

25
26       2.  S.B. 1070's Discriminatory Adverse Impact on Latinos and Mexican Nationals Weighs
   in Favor of a Finding of Discriminatory Intent…………………        …………….26

27       3.  The Historical Background and Events Leading Up to the Passage of S.B. 1070
   Demonstrate Its Racial and Anti-Mexican Animus …………………………........30

28

i

4. S.B. 1070 Departs Substantively from Established Practice.............................34

C. Plaintiffs Are Substantially Likely to Prevail on Their Claim That A.R.S. § 13-2929 Is Preempted by Federal Law.................................................................................... 36

1. A.R.S. § 13-2929 Is Field Preempted    .......................................................37

2. A.R.S. § 13-2929 Is Conflict Preempted   ................................................... 39

II.   Plaintiffs Will Suffer Irreparable Harm if the Preliminary Injunction Is Not Granted ......................................................................................................................... 41

III.   The Balance of Equities Tips Sharply In Favor of Plaintiffs ................................. 46

IV.   The Preliminary Injunction Will Serve the Public Interest   .............................47

CONCLUSION        ............................................................................................. 49

CERTIFICATE OF SERVICE        ..................................................................... 50

1

# TABLE OF AUTHORITIES

2

**Page No(s)**

3

4

**CASES**

5

*AFL v. Chertoff,*
  552 F. Supp. 2d 999 (N.D. Cal. 2007)..................................................................47

6

7

*Alliance of the Wild Rockies v. Cottrell,*
  632 F.3d 1127(9th Cir. 2011). ..................................................................Passim

8

*Am. Ins. Ass'n v. Garamendi,*
  539 U.S. 396 (2003) ..............................................................................40

9

10

*Anderson Group, LLC v. City of Saratoga Springs,*
  557 F. Supp. 2d 332 (N.D.N.Y. 2008) ..................................................24

11

*Arizona v. Johnson,*
  555 U.S. 323  (2009) ........................................................................4, 9

12

13

*Arizona v. United States,*
  No. 11-182, __ U.S. ___ (June 25, 2012)............................................Passim

14

*Arizonans for Official English v. Arizona,*
  520 U.S. 43 (1997) ..............................................................................10

15

16

*Atkins v. Robinson,*
  545 F. Supp. 852 (E.D. Va. 1982) ......................................................21

17

*Babbitt v. United Farm Workers,*
  442 U.S. 289 (1979) ............................................................................44

18

19

*Brock v. Pierce County,*
  476 U.S. 253(1986) .............................................................................13

20

*Cent. Alabama Fair Hous. Ctr. v. Magee,*
  835 F. Supp. 2d 1165 (M.D. Ala. 2011)..............................................Passim

21

22

*Chamber of Commerce of United States v. Whiting,*
  563 U.S. ___, 131 S. Ct. 1968 (2011) .................................................38

23

*City of Cleburne v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ............................................................................24

24

*Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,*
  257 F. Supp. 2d 208 (D.D.C. 2003)..................................................24-25

25

26

*Comm. Concerning Cmty. Improvement,*
  583 F.3d at 703-04..........................................................................11-12

27

28

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ........................................................................... 40

*Doe v. Village of Mamaroneck,*
  462 F. Supp. 2d 520 (S.D.N.Y. 2006) ................................................ Passim

*Farm Labor Org. Comm. v. Ohio State Highway Patrol,*
  308 F.3d 523 (6th Cir. 2002) ............................................................. 20

*Fed. Energy Admin. v. Algonquin SNG, Inc.,*
  426 U.S. 548 (1976). ......................................................................... 13

*Florida v. Royer,*
  460 U.S. 491, (1983) ......................................................................... 9

*Ganwich v. Knapp,*
  319 F.3d 1115 (9th Cir. 2003) ........................................................... 9

*Garcia v. Gloor,*
  618 F.2d 264 (5th Cir. 1980) ....................................................... 20, 31

*Garrett v. City of Escondido,*
  465 F. Supp. 2d 1043 (S.D. Cal. 2006) ............................................. 38

*Geier v. Am. HOnda Motor Co., Inc.*
  529 U.S. 861 (2000) ......................................................................... 43

*Georgia Latino Alliance for Human Rights v. Deal,*
  793 F. Supp. 2d 1317, 1336 (N.D. Ga. 2011, *appeal pending*, No. 11-13044-FF (11th
  Cir.) ............................................................................................ Passim

*Gonzalez v. Arizona,*
  677 F.3d 383 (9th Cir. 2012) ............................................................. 33

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish* ("*GNOFHAC I*"),
  641 F. Supp. 2d 563 (E.D. La. 2009) ................................................ 23

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish* ("*GNOFHAC II*"),
  648 F. Supp. 2d 805 (E.D. La. 2009) ........................................... Passim

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish* ("*GNOFHAC III*"),
  No. 06cv7185, 2011 WL 4915524 ............................................... Passim

*Hernandez v. New York,*
  500 U.S. 352 (1991) .................................................................... 20, 31

*Hunter v. Underwood,*
  471 U.S. 222 (1985) ...................................................................... Passim

*Illinois v. Caballes,*
  543 U.S. 405 (2005) ....................................................................... 4, 9

*Jolly v. Coughlin,*
  76 F.3d 468 (2d Cir. 1996) ............................................................... 43

*Keyes v. Sch. Dist. No. 1*,
  413 U.S. 189 (1973) ........................................................................ 30

*Lavan v. City of Los* Angeles,
  797 F. Supp. 2d 1005 (C.D. Cal. 2011) ........................................... 43

*Morales v. Trans World Airlines*,
  504 U.S. 374 (1992) ........................................................................ 44

*Murillo v. Musegades*, 809 F. Supp.
  487 (W.D. Tex. 1992) ..................................................................... 48

*Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*,
  743 F.2d 1365 (9th Cir. 1984) ....................................................... 47

*O'Brien v. Town of Caledonia*,
  748 F.2d 403 (7th Cir. 1984) ......................................................... 49

*Palmore v. Sidoti*,
  466 U.S. 429  (1984) ....................................................................... 24

*Reno v. Bossier Parish Sch. Bd.*,
  520 U.S. 471 (1997) ........................................................................ 26

*Resident Advisory Bd. v. Rizzo*,
  564 F.2d 126 (3d Cir. 1977) ........................................................... 24

*Rivera v. Inc. Vill. of Farmingdale*,
  784 F. Supp. 2d 133 (E.D.N.Y. 2011) ..................................... 21, 24

*San Diego Gun Rights Comm. v. Reno*,
  98 F.3d 1121 (9th Cir. 1996); .......................................................... 46

*Ruiz v. Hull*, 191 Ariz.
  441 (1998) ........................................................................................ 31

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
  739 F.2d 1415  (9th Cir. 1984). ..................................................... 47

*Smith v. Town of Clarkton*,
  682 F.2d 1055 (4th Cir. 1982) ....................................................... 21

*Tsombanidis v. West Haven Fire Dep't*,
  352 F.3d 565 (2d Cir. 2003) ........................................................... 12

*U.S. v. Alabama*,
  813 F. Supp. 2d 1282, 1336 (N.D. Ala. 2011), *appeal pending*, Nos. 11-14532, 11-14674 (11th Cir.) .............................................................................. Passim

*United States v. Arizona*,
  641 F.3d 339 (9th Cir. 2011) ........................................................... 5

*United States v. Arizona*,
  703 F. Supp. 2d 980 (D. Ariz. 2010) ............................................. 36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*United States v. Arizona*,
   No. CV10-1413-PHX-SRB (D. Az. July 6, 2010) .................................................. 34, 42

*United States v. City of Birmingham*,
   538 F. Supp. 819  (E.D. Mich. 1982) ............................................................................ 26

*United States v. Montero-Camargo*,
   208 F.3d 1122 (9th Cir. 2000) ....................................................................................... 21

*United States v. Sharpe*,
   470 U.S. 675 (1985) ........................................................................................................ 9

*United States v. South Carolina*, Nos. 2:11-cv-2958, 2:11-cv-2779, 2011 WL
   6973241 (D.S.C. Dec. 22, 2011), *appeal pending*, No. 12-1096 (4th Cir.). ............Passim

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
   429 U.S. 252 (1977) .....................................................................................................Passim

*Villas at Parkside Partners v. City of Farmers Branch*,
   701 F. Supp. 2d 835 (N.D. Tex. 2010) ........................................................................... 38

*White v. Regester*,
   412 U.S. 755  (1973) ................................................................................................ 30, 33

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7, 20 (2008) ................................................................................................ 3, 43

*Wisconsin Dept. of Indus., Labor & Human Relations v. Gould Inc.*,
   475 U.S. 282 (1986) ....................................................................................................... 40

**LEGISLATIVE MATERIALS**

Ariz. Dep't of State, 2006 Ballot Propositions - Proposition 103, *available at*
   http://www.azsos.gov/election/2006/info/pubpamphlet/english/Prop103.htm ............... 31

Debate on S.B. 1070 Before S. Pub. Safety & Human Servs. Comm.,
   Jan. 20, (2010) ............................................................................................................... 19

Final Reading of S.B. 1070, Senate Floor Session, Apr. 19, 2010 .................................... 19

H.B. 2281, 48th Leg., 2d Reg. Sess. (Ariz. 2010), *available at*
   www.azleg.gov/legtext/49leg/2r/bills/hb2281s.pdf......................................................... 32

Mary Romero & Marwah Serag, Violation of Latino Civil Rights Resulting from INS and
   Local Police's Use of Race, Culture and Class Profiling: the Case of the Chandler
   Roundup in Arizona, 52 Clev. St. L. Rev. 75 (2004). ................................................. 33

Testimony of Rep. Patterson, Debate on S.B. 1070 in House third reading, Apr. 13, 2010
   ............................................................................................................................ 23

Testimony of Rob Haney, Maricopa County Republican Party Chairman, Debate on S.B.
   1070 in Senate Public S. Pub. Safety & Human Servs. Comm. Jan. 20, 2010 .............. 25

Testimony of Sen. Aboud, Final Reading of S.B. 1070 in the Senate,
   Apr. 19, 2010 .................................................................................. 23, 29

Testimony of Sen. Gould, Final Reading of S.B. 1070 in Senate, Apr. 19, 2010 ............. 21

Testimony of Sen. Huppenthal, Final Reading of S.B. 1070 in Senate, Apr. 19, 2010 ...... 22

Testimony of Sen. Lopez, Final Reading of S.B. 1070 in the Senate,
   Apr. 19, 2010 .................................................................................. 23, 27

Testimony of Sen. Pearce, Debate on S.B. 1070 in House Military Affairs and Pub. Safety
   Committee, Mar. 31, 2010 .......................................................................... Passim

Testimony of Sen. Rios, Final Reading of S.B. 1070 in the Senate, Apr. 19, 2010 .......... 23

Testimony of Sen. Melvin, Final Reading of S.B. 1070, Sen. Floor, Apr. 19, 2010 ....... 19

Testimony Sen. Melvin, S. Pub. Safety & Human Serv. Comm. , Jan. 20, 2010 ........... 19

Ariz. Legislature's Live Proceedings,
   http://azleg.granicus.com/ViewPublisher.php?view_id=17 ........................................... 27

Arizona Senate Bill  1070 49th Leg., 2nd Reg. Sess., Ch. 113 (Ariz. 2010) .................... 34

Arizona Senate Bill.1167 47 Leg., Sess. (Ariz. 2005), *available at*
   http://www.azleg.gov/legtext/47leg/lr/bills/sb1167h.pdf ............................................ 30

**FEDERAL STATUTES**

8 U.S.C. § 1323 ..................................................................................... Passim

8 U.S.C. § 1324 ..................................................................................... Passim

8 U.S.C. § 1327 ..................................................................................... Passim

8 U.S.C. § 1324(a)(1)(A)(i), ............................................................................ 38

8 U.S.C. § 1324(a)(1)(A)(ii) ........................................................................ 38, 41

8 U.S.C. § 1324(a)(1)(C) ................................................................................ 42

**STATE STATUTES**

A.R.S. § 11-1051(B) ................................................................................... 44

A.R.S. § 12-1861 ...................................................................................... 11

A.R.S. § 11-1051(G) ................................................................................... 47

A.R.S. § 13-1003 ...................................................................................... 41

A.R.S. § 13-2929 .................................................................................................Passim

**OTHER AUTHORITIES**

20,000 in Phoenix Rally for Migrants, Ariz. Republic, Mar. 25, 2006 ............................. 18

*Acosta v. Huppenthal*,
    No. 4:10-cv-00623-AWT (D. Ariz. filed Dec. 14, 2011) (ECF No. 125-1) .................. 32

Alia Beard Rau & Ginger Rough, Ariz. Lawmakers Pass Toughest Illegal Immigration
    Law in U.S., Ariz.  Republic, Apr. 19, 2010 .................................................................... 21

Ariz. Capitol Television, Capitol Forum: Rep. Kavanagh Talks About SB 1070, June 21,
    2010, *available at* http://vimeo.com/12740392 ............................................................ 22

Brady McCombs, Fed Moves Will Limit SB 1070 Enforcement - Court Only Keeps
    Section Allowing Police to Stop Suspected Illegal Immigrants Homeland Security Will
    Not Pick Them Up Unless They Are Criminal, Ariz. Daily Star, June 26, 2012.............. 7

Brad Knickerbocker, Jan Brewer Corrects the Record on Headless Bodies in the Desert,
    Christian Science Monitor, Sept. 4, 2010 ........................................................................ 14

Civil-Rights Panel Aims at Sheriff, Ariz. Republic, Dec. 27, 2008 .................................. 29

Daniel Gonzalez, Study Rebuts Perceptions of Migrants' English Use, Ariz. Republic,
    Dec. 9, 2008 ....................................................................................................................... 31

Deborah Schurman-Kauflin, *The Dark Side of Illegal Immigration: Nearly One Million
    Sex Crimes Committed by Illegal Immigrants in the United States* (2006) .................... 17

Editorial, Resist Stampede to State Mandates for Immigration Enforcement, Trib. (Mesa,
    Ariz.), Oct. 23, 2009 .......................................................................................................... 28

E.J. Montini, Is Phoenix Really the 'Kidnapping Capital'?, Ariz. Republic,
    July 12, 2009 ...................................................................................................................... 14

Email from Sen. Pearce dated Jan 17, 2006 .................................................................... 21

Email from Sen. Pearce dated Mar. 3, 2006 .................................................................... 22

Email from Sen. Pearce dated Apr. 6, 2006 ..................................................................... 18

Email from Sen. Pearce dated Apr. 24, 2006 ................................................................... 31

Email from Sen. Pearce dated Dec. 14, 2006 ............................................................... 18-19

Email from Sen. Pearce dated Jan. 29, 2007 ...........................................................Passim

Email to Sen. Pearce dated Apr. 25, 2007 ....................................................................... 25

Email from Sen. Pearce dated May 22, 2007 ................................................................... 22

Email to Sens. Pearce & Johnson dated July 6, 2007 ...................................................... 19

Email from Sen. Pearce dated Dec. 21, 2008 ....................................................... 32

Email from Sen. Pearce dated Feb. 15, 2009 ....................................................... 18

Email from Sen. Pearce dated May 26, 2009 ....................................................... 18

Email from Sen. Pearce dated June 30, 2009 ............................................... 18-19, 28

Email from Sen. Pearce dated July 14, 2009 ....................................................... 28

Email from Sen. Pearce dated Oct. 23, 2009 ....................................................... 16

Email to Sen. Pearce dated Apr. 20, 2010 ....................................................... 26

Email to Sen. Pearce dated Apr. 28, 2010 ....................................................... 26

Email to Sen. Pearce dated July 29, 2010 ....................................................... 25

Email to Sen. Pearce dated Mar. 16, 2011 ....................................................... 25

Email from Sen. Pearce dated May 17, 2011 ....................................................... 30

Email to Sen. Pearce, Rep. Judy Burges, Rep. Tom Boone, Sen. Jack Harper, Apr. 22, 2010 ....................................................... 26

Email to Gov. Brewer & Sen. Pearce dated Apr. 21, 2010 ............................................... 33

Erin Burnett, Outfront:  Supreme Court Upholds Key Arizona Provision; Interview with Sheriff Joe Arpaio CNN television broadcast June 25, 2012) ....................................... 7-8

Jack Martin & Eric A. Ruark, Fed'n for Am. Immigration Reform, fiscal burden of illegal immigration on United States taxpayers 45 (2010) ................................................... 19-20

Daniel Gonzalez, Feds Investigate Arpaio, Ariz. Republic, Mar. 11, 2009 ...................... 29

Daniel Gonzalez, Study Rebuts Perceptions of Migrants' English Use, Ariz. Republic, Dec. 9, 2008 ........................................................................................................ 31

Gustavo Arellano, Heard Mentality, Phx New Times June 14, 2009 ............................................................................................................ 17

Jack Martin, Fed'n for Am. Immigration Reform, *Limited English Proficiency Enrollment and Rapidly Rising Costs*  (2007) ................................................................................. 20

Jeremy Duda, Immigration and Customs Enforcement: If Sheriff Arpaio Continues Sweeps, It Will Be Under State, Not Federal, Law, Ariz. Capitol Times, Oct. 16, 2009 ... 29

Jim Small, Arizona State Senator Russell Pearce: Stemming Illegal Immigration is Arizona's Top Priority, Ariz. Capitol Times, Oct. 21, 2009 ...................................... 19

JJ Hensley, Agencies Prepare to Enforce SB 1070:, Ariz. Republic, June 26, 2012 ........... 7

Majority Staff of H. Comm. on Homeland Sec. Subcomm. on Investigations, 109th Cong., A Line in the Sand: Confronting the Threat at the Southwest Border, Oct. 2006,

*available at* http://www.house.gov/sites/members/tx10_mccaul/pdf/Investigations-Border-Report.pdf........................................................................................ 16

Manuel C. Coppola, Locals Mixed on Court OK of "Show Me Your Papers" Rule, Nogales International, June 26, 2012 ..............................................................6-7

Maricopa County, Maricopa County Sheriff's Office, and Sheriff Joseph Arpaio (May 10, 2012 ........................................................................................................... 29

Marc Lacey, Rift in Arizona as Latino Class is Found Illegal, NY Times, Jan. 7, 2011.... 32

Mary Jo Pitzl, Arizona Bill Targets Ban on Ethnic Studies, Arizona Republic, May 1, 2010 ........................................................................................................................ 32

Matthew Benson, Immigration Foes Pledge New Bill, Voter Initiative, Ariz. Republic, Oct. 22, 2009 ........................................................................................................ 28

McCain Says Phoenix is the Second Kidnapping Capital in the World, St. Petersburg Times, June 27, 2010 ............................................................................................ 14

Mike Sakal, Police Unions: Immigration Bill Taxes Officers, Tribune (Mesa, Ariz.), Apr. 18, 2010 ................................................................................................................ 35

Neil Munro, Arpaio Looking for 'A Way Around' Obama Admin 'To Enforce State [immigration] Laws, The Daily Caller, June 27, 2012 ........................................ 7

Nicole Santa Cruz, Arizona Ethnic Studies Ban OKd as Law, L.A. Times, May 12, 2010, ................................................................................................................... 32

Phil Gordon, Op-Ed., Time to End Sen. Pearce's Reckless Misstatements, Ariz. Republic, June 27, 2009 ..................................................................................................... 15

Paul Giblin & Ryan Gabrielson, Third Federal Probe Launched into Sheriff's Office: ICE to Audit Immigration Enforcement Efforts, Trib. (Mesa, Ariz.), Sept. 12, 2008 ...... 29

Press Release, Sen. Pearce Demands End to Sanctuary City, 'Catch and Release' Policies, Oct. 21, 2009 .....................................................................................................27-28

Press Release, Dep't of Justice, Department of Justice Releases Investigative Findings on the Maricopa County Sheriff's Office (Dec. 15, 2011) …………………………… 29

Press Release, Dep't of Justice, Department of Justice Files Lawsuit in Arizona Against Maricopa County, Maricopa County Sheriff's Office, and Sheriff Joseph Arpaio (May 11, 2012) ……………………………………………………………………….. 29

Roberto Miranda, Ariz. Law Unfair to Latinos, Hispanics, Daily 49er, May 2, 2010 ....... 23

Robin Lubitz, Op-Ed., Expert Questions Pearce's Numbers, Ariz. Republic, June 26, 2009 .................................................................................................................... 16

Russell Pearce, Op-Ed., Let's Put an End to Illegal-Migrant Catch and Release, Ariz. Republic, June 25, 2009 .................................................................................14-15, 16

Ryan Gabrielson & Paul Giblin, Reasonable Doubt—Tribune Investigates Sheriff's Immigration Campaign: At What Cost?, Trib. (Mesa, Ariz.), July 9, 2008 .................... 29

Sarah Lynch, Pearce Calls for Deportations: Mesa Policymaker Advocates '50s Policy for Dealing with Illegals, Mesa Trib., Sept. 29, 2006 ............................................................ 34

Sean Hannity, Arizona Law Enforcement Reacts to Supreme Court Immigration Ruling, White House Response, Fox News television broadcast, June 25, 2012 ......................... 7

Stephen Lemons, One Mother's Suffering, Joe Arpaio's Bigotry, and Stories of Racial Profiling by the MCSO, Phoenix New Times Blog, Oct. 15, 2009 ................................ 29

Stephen Lemons, Russell Pearce Scores Another Win Against Hispanics, Most Local Activists Are No-Shows, Only Daniel Patterson Shines, Phoenix New Time Blogs, Feb. 25, 2010 .................................................................................................................... 15

Stephen Lemons, Russell Pearce Spews Bogus Crime Stats on CNN; SB 1070 Goes to Final Read Monday, Phoenix NewTimes Blog, Apr. 16, 2010 ...................................... 16

Stephen Lemons, The MCSO Retaliates Against a Guadalupe Activist; Plus, John Huppenthal Spews Bogus Stats During a Prejudice Party at the Arizona Capitol, Phoenix New Times Blog, Oct. 29, 2009 .................................................................... 15

Terry Greene Sterling, Russell Pearce and Other Illegal-Immigration Populists Rely on Misleading, Right-Wing Reports to Scapegoat Immigrants and to Terrify Penny-Pinched Americans, Phoenix New Times, Dec. 2, 2010 ............................................................ 19

Tim Gaynor, Arizona Police See "Difficulties" Enforcing Immigration Law, Reuters, Jun. 26, 2012 ..................................................................................................................... 35

U.S. Census Bureau, Arizona QuickFacts ....................................................................... 12

Wright & Miller: 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995) ............................................................................................................... 43

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Valle del Sol, *et al.* ("Plaintiffs") hereby move for a preliminary injunction enjoining all Defendants from enforcing § 2(B) of Arizona Senate Bill 1070 ("SB 1070"), and from enforcing A.R.S. § 13-2929, as enacted by § 5 of SB 1070.

## INTRODUCTION

In *Arizona v. United States*, the Supreme Court addressed the preemption claims that the United States brought against four sections of S.B. 1070—§§ 3, 5(C), 6, and 2(B)—in this Court. No. 11-182, __ U.S. __ (June 25, 2012) (slip op. available at http://www.supremecourt.gov/opinions/11pdf/11-182b5e1.pdf). The Supreme Court affirmed this Court's injunction against §§ 3, 5(C), and 6. On the fourth provision—§ 2(B)—the Supreme Court found that an injunction was not appropriate based on the record before it, but explicitly preserved the possibility that § 2(B) could be enjoined in another action, and identified clear boundaries that § 2(B) may not lawfully cross.

Plaintiffs brought many of the same preemption claims as the United States, including the claims that have invalidated §§ 3, 5(C), and 6. But this action involves additional claims, evidence, and irreparable injuries beyond what the Supreme Court had before it in *Arizona*. In light of those claims, evidence, and injuries and the Supreme Court's guidance in *Arizona*, Plaintiffs bring this Motion for Preliminary Injunction, which presents three issues:

*First*, Plaintiffs seek a preliminary injunction against § 2(B) of S.B. 1070 on preemption and Fourth Amendment grounds. The Supreme Court stated that if police extend detentions for status verification or other immigration purposes under § 2(B), that will "raise constitutional concerns . . . [a]nd . . . disrupt the federal framework." *Arizona*, slip op. at 2. The Court declined to "assume" that § 2(B) would be implemented in such a manner based on the record before it. *Id.* at 24. Plaintiffs here submit additional evidence demonstrating that § 2(B) will be implemented in precisely the manner that the Supreme Court deemed unconstitutional thereby irreparably harming any individuals subject to

1

illegal detentions.  Given this new evidence, Plaintiffs can establish a likelihood of success or serious questions going to the merits of these claims.  Therefore, § 2(B) can and should be preliminarily enjoined—at least until the Arizona Supreme Court definitively interprets the provision in a way that forecloses unconstitutional implementation, which it could do on certification from this Court.

*Second*, Plaintiffs seek a preliminary injunction against § 2(B) of S.B. 1070 based on their Equal Protection Clause claim.  Plaintiffs are likely to succeed in demonstrating that § 2(B) violates the Equal Protection Clause because racial or national origin discrimination was a motivating factor in its enactment.  Even though merits discovery has been stayed in this case, there is already substantial evidence in each of the categories enumerated in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), which is probative of discriminatory intent.  And while the evidence on this motion supports a finding of discriminatory intent, at this stage this Court need only find a likelihood of success or serious questions going to the merits of this claim.

*Third*, Plaintiffs seek a preliminary injunction against A.R.S. § 13-2929 on preemption grounds.  The Supreme Court's analysis of §§ 3 and 5(C) further clarifies that § 13-2929, the state harboring crime created by § 5 of S.B. 1070, is both field and conflict preempted.  Plaintiffs did not specifically seek a preliminary injunction against this portion of § 5 in their initial motion for a preliminary injunction, and the Court has not addressed field or conflict preemption challenges to this provision in either this case or in the U.S. case (No. 2:10cv1413).  Given the unanimous disapproval of similar harboring laws by other federal courts and the Supreme Court's recent decision, Plaintiffs are likely to succeed in showing that § 13-2929 is preempted.

The requested injunction would protect the individual Plaintiffs and members of Plaintiff organizations from irreparable harm, including the harms of unlawful detention and arrest under § 2(B) and § 13-2929; prosecution under § 13-2929; and the stigma

2

imposed by the racial and national origin discrimination underlying § 2(B).  These harms to individuals and organizations were not before the Supreme Court in *Arizona*.  The public interest will likewise be served by the suspension of provisions that threaten fundamental constitutional rights, disrupt the nation's ability to speak with one voice on immigration matters, and embody racial and national origin animus.  Accordingly, Plaintiffs respectfully request that the Court grant the preliminary injunction they seek.  As to § 2(B), as discussed below, Plaintiffs alternatively request that the Court grant Plaintiffs' request for certification of questions concerning § 2 to the Arizona Supreme Court and preliminarily enjoin § 2(B) pending the results of such certification.

## ARGUMENT

Ordinarily, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Where "the balance of hardships tips sharply in the plaintiff's favor," the plaintiff need only "demonstrate[] . . . that serious questions going to the merits were raised" to justify an injunction.  *Alliance of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).  Plaintiffs are entitled to a preliminary injunction under either standard.

### I.  Plaintiffs Are Likely To Succeed on the Merits

#### A.  Plaintiffs Are Likely to Prove That § 2(B) Is Preempted by Federal Law and Violates the Fourth Amendment

In *Arizona*, although the Supreme Court reversed the Ninth Circuit's ruling on § 2(B), the Supreme Court did not hold that § 2(B) is constitutional; indeed, the Court explicitly preserved the possibility that § 2(B) could be enjoined in another action. *Arizona*, slip op. at 24.  And the Supreme Court outlined the showing that would be sufficient to hold § 2(B) preempted by federal law:

Detaining individuals solely to verify their immigration status would raise

3

constitutional concerns.  *See, e.g., Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission").  And it would disrupt the federal framework to put state officers in the position of holding aliens in custody for possible unlawful presence without federal direction and supervision.  *Cf.* Part IV–C, *supra* (concluding that Arizona may not authorize warrantless arrests on the basis of removability).  The program put in place by Congress does not allow state or local officers to adopt this enforcement mechanism.

*Id.* at 22.

Thus, if § 2(B) allows detention for immigration status verification, it is preempted by federal law *and* raises other constitutional concerns.  And this Court has previously found in this case that both the first and second sentences of § 2(B) would, on their face, cause such detention, based on their plain language and the evidence in the record regarding the length of immigration status checks.  Doc #447 at 35-38.

Without addressing that finding, however, the Supreme Court indicated that "§ 2(B) could be read to avoid these concerns," because "state courts may conclude that, unless the person continues to be suspected of some crime for which he may be detained by state officers, it would not be reasonable to prolong [a] stop," *Arizona*, slip op. at 22, and one could also read the second sentence of § 2(B) "as an instruction to initiate a status check every time someone is arrested, or in some subset of those cases, rather than as a command to hold the person until the check is complete no matter the circumstances." *Id.* at 23.  In sum, on the record before the Court, "[t]here [was] a basic uncertainty about what the law means and how it can be enforced." *Id.* at 24.

In this action, and on this record, however, there is not a "basic uncertainty" regarding the implementation of § 2(B).  Plaintiffs present evidence establishing that

multiple law enforcement agencies in the state intend to enforce § 2(B) in a way that crosses the line the Supreme Court drew.  Thus, this Court need not "assume" based on the statutory language that § 2(B) will extend stops and detentions.  Instead, evidence not in the record in *Arizona* shows that § 2(B) will extend detentions and Plaintiffs are, accordingly, substantially likely to prevail on their claims that § 2(B) is preempted and that it violates the Fourth Amendment.

Because Plaintiffs also meet the remaining elements of the preliminary injunction standard, *see infra* Part II, Plaintiffs are entitled to a preliminary injunction against § 2(B). At a minimum, this Court should obtain a definitive interpretation of § 2(B) as to the detention issue by certifying relevant questions to the Arizona Supreme Court, and issue a preliminary injunction to maintain the status quo pending the Arizona Supreme Court's response.

### 1.  Arizona Law Enforcement Agencies Will Extend Detentions Under § 2(B)

The evidence establishes that, notwithstanding the Supreme Court's ruling, Arizona law enforcement will interpret § 2(B) as requiring them to extend stops and other detentions beyond when they would ordinarily conclude, solely for immigration-related purposes.  As an initial matter, while the Supreme Court held that the language of § 2(B) could conceivably be interpreted not to require extended detentions, interpreting § 2(B) to mandate detention is the most natural reading of the statute.  Indeed, that is how Arizona agencies have continued to interpret § 2(B).  Nothing in the state's newly reissued training materials on S.B. 1070 indicates that § 2(B) *cannot* be used to extend detentions solely for immigration purposes, nor do these materials set any limit on the length of time an individual can be held pending the results of immigration verification requests.  *See* Br. for Pls., *United States v. Arizona*, No. 10-1413 (Doc. 64-5, Ex. 35) (transcript of AZ POST training video); Melissa Keaney Decl. (authenticating June 25, 2012 supplemental AZ POST training) (Ex. A).  Moreover, in the short amount of time since the Supreme Court

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ruled, multiple Arizona law enforcement officials have publicly stated that implementation of § 2(B) will in fact cause officers to detain individuals for immigration status verification when they would not otherwise have been detained.[1]

    In a declaration submitted with this motion, Tucson Police Chief Roberto Villaseñor explains some of the problems posed by § 2(B) in detail, including the way that police operating under § 2(B) will extend detention solely for immigration purposes. Villaseñor Decl. ¶¶ 4-9 (Ex. D). In particular, Chief Villaseñor outlines two common scenarios in which § 2(B) will extend detentions. *Id.* ¶¶ 8-10. First, the Tucson Police Department currently makes approximately 36,000 "cite in lieu of detention" arrests per year. *Id.* ¶ 8. The Chief states that "[u]nder Section 2(B) if we cannot get immediate confirmation from federal officials of the immigration status of these suspects, we will have to extend their detentions in the field until we get a status determination from federal officials, or book them into jail to await these results. *Id.* Either situation will result in extended detention of thousands of individuals—even if it is for brief periods of time." *Id.* ¶ 9.

    Second, Chief Villaseñor expects that "status checks under Section 2(B) will operate the following way, both in my department and in other departments: once we make the request mandated under Section 2(B), we will wait to hear back from federal immigration officials before releasing the person." *Id.* ¶ 10. That too will extend detentions, especially in light of the fact that the private cause of action authorized in § 2(H) will put "Arizona law enforcement officers . . . under intense pressure to enforce the provisions of SB 1070," undermining the effectiveness of protections that putatively safeguard constitutional rights. *Id.* ¶¶ 6-7.

    Other Arizona law enforcement officials have also indicated that § 2(B) will extend

---

[1] Indeed, both this Court, *United States v. Arizona*, 703 F. Supp. 2d 980, 993-98 (D. Ariz. 2010), and the Ninth Circuit, *United States v. Arizona*, 641 F.3d 339, 346-52 (9th Cir. 2011), found that to be a natural interpretation of the statute. And, even in oral argument before the Supreme Court, the state repeatedly refused to represent that § 2(B) would not extend detentions in practice. Transcript of Oral Argument at 11, 14-15, 20, *Arizona v. United States*, No. 11-182, __ U.S. ___ (June 25, 2012).

detentions for status verification.  For example, Santa Cruz County Sheriff Antonio Estrada explained that § 2(B) "may result in detention of people while citizenship is clarified" and noted that some geographic regions in Arizona would be more susceptible to these extended detentions.  Manuel C. Coppola, Locals Mixed on Court OK of 'Show Me Your Papers' Rule, Nogales International, June 26, 2012 (Ex. B-1); *see also* Brady McCombs, Fed Moves Will Limit SB 1070 Enforcement: Court Only Keeps Section Allowing Police to Stop Suspected Illegal Immigrants Homeland Security Will Not Pick Them Up Unless They Are Criminal*, Arizona Daily Star, June 26, 2012 (Pima and Santa Cruz County Sherriffs will hold people for "a reasonable amount of time" for Border Patrol) (Ex. B-2).  *See also* JJ Hensley, Arizona Agencies Prepare to Enforce SB 1070: Ariz. Police Training Helps Identify When 'Reasonable Suspicion' Exists', Ariz. Republic, June 26, 2012 (Sergeant Tommy Thompson of the Phoenix Police Department indicating that one-hour roadside stops under § 2(B) are not out of the question) (Ex. B-3).

Indeed, at least one Arizona law enforcement official has not only indicated that stops will be prolonged, but has also indicated that he will use detentions under § 2(B) in ways that conflict with federal authority.  Cochise County Sheriff Larry Dever indicated that his agency will extend detentions for immigration purposes even as to people that "ICE or Border Patrol won't come get"; his agency will "take them to [federal authorities], dump them on their doorstep and say, you figure it out."  Sean Hannity, Arizona Law Enforcement Reacts to Supreme Court Immigration Ruling, White House Response, Fox News television broadcast, June 25, 2012 (Ex. B-4).

Finally, immediately after the Supreme Court decision, Maricopa County Sheriff Joe Arpaio indicated that he will look for ways to detain people that he suspects of violating immigration law: "[I]t will be interesting when we arrest someone . . . What will I do with them?  Dump them on the street? . . . Let them go? . . . I don't like to do that [because] that's amnesty . . . I'm going to see what other options I have."  Neil Munro, Arpaio Looking for 'A Way Around' Obama Admin To Enforce State [immigration]

Laws, The Daily Caller, June 27, 2012 (Ex. B-7).  *See also* Erin Burnett, Outfront, Supreme Court Upholds Key Arizona Provision; Interview with Sheriff Joe Arpaio, CNN television broadcast, June 25, 2012 ("So what do we [law enforcement] do?  We dump them on the streets even though they're here illegally? . . . I have a couple ideas and I'll face that issue when it comes up." (Ex. B-6).

     **2.  Plaintiffs Are Substantially Likely to Prevail on Their Claim That § 2(B) Is Preempted by Federal Law**

     Because, as explained above, § 2(B) will allow detention solely for immigration verification, *Arizona* explains that it "disrupt[s] the federal framework" and is not allowed by "the program put in place by Congress"—in other words, it is preempted.  Slip op. at 22.  The Supreme Court's disapproval of extended detention for verification under § 2(B) flows directly from its analysis sustaining the injunction against § 6, S.B. 1070's warrantless arrest provision.  In its § 6 analysis, the Supreme Court first explained that because ordinarily "it is not a crime for a removable alien to remain in the United States," "the usual predicate for an arrest is absent" if the arrest is based on "nothing more than possible removability."  *Id.* at 15-16.  Furthermore, federal law both "instructs when it is appropriate to arrest an alien during the removal process" and "specifies limited circumstances in which state officers may perform the functions of an immigration officer."  *Id.* at 16-17 (citing 8 U.S.C. §§ 1357(g)(1), 1103(a)(10), 1252c, 1324(c)).  In authorizing arrest for having "committed a public offense that makes the person removable," § 6 does not fall within any of those authorizations and "violates the principle that the removal process is entrusted to the discretion of the Federal Government."  *Id.* at 18.

     Detention solely for the purpose of obtaining immigration status verification under § 2(B) is even less justifiable than arrest under § 6 (which required at least probable cause of removability) and is even more clearly preempted under the Supreme Court's analysis.  *See id.* at 22 (citing § 6 portion of ruling and concluding that detention under § 2(B) for

status verification is barred by "[t]he program put in place by Congress").  Because, as explained above, the evidence shows that Arizona officials intend to enforce § 2(B) in a way that extends detentions solely for verification purposes, Plaintiffs are substantially likely to prevail on their preemption claim against § 2(B).

### 3. Plaintiffs Are Substantially Likely to Prevail on Their Claim That § 2(B) Violates the Fourth Amendment

In addition to being preempted, by allowing detention for immigration status verification § 2(B) also violates the Fourth Amendment.  In *Arizona*, the Supreme Court stated that such detention "would raise constitutional concerns," the Supreme Court cited two Fourth Amendment cases, *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), and *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), and quoted *Caballes*'s holding that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Arizona*, slip op. at 22.

As the Court's statement regarding "constitutional concerns" suggests, detaining individuals under § 2(B) solely for immigration status verification would violate bedrock Fourth Amendment principles.  An initially lawful "seizure becomes unlawful when it is 'more intrusive than necessary.'"  *Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003) (quoting *Florida v. Royer,* 460 U.S. 491, 504 (1983)).  Accordingly, "[t]he scope of a detention must be carefully tailored to its underlying justification," *id.* (internal quotation omitted), and a "detention must . . . last *no longer* than is necessary to effectuate the *purpose of the stop*."  *Royer*, 460 U.S. at 500 (emphasis added); *accord Johnson*, 555 U.S. at 333 (inquiries into matters unrelated to the legitimate justification for a stop may not "measurably extend the duration of the stop"); *Caballes*, 543 U.S. at 407; *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  Because "the usual predicate for an arrest is absent" where detention is "based on nothing more than possible removability," *Arizona*, slip op. at 16, detaining individuals solely for immigration investigation under § 2(B) violates the

Fourth Amendment.

Moreover, Plaintiffs here present irreparable injuries to individuals and organizations from Fourth Amendment violations that were not before the Supreme Court in *Arizona*. *Arizona*, slip op. at  19-24 (no discussion of irreparable injury or balance of hardships to individuals or organizations); *See also supra* II (discussing irreparable injury and balance of hardship specific to Plaintiffs).  In addition to establishing likelihood of success, Plaintiffs have raised "serious questions" going to the merits of their Fourth Amendment claims and have demonstrated that the balance of hardships tips sharply in their favor. *See Alliance for the Wild Rockies*, 632 F.3d at 1135.

### 4.   At a Minimum, the Court Should Certify the Question of Whether § 2(B) Authorizes Additional Detention to the Arizona Supreme Court

Plaintiffs are entitled to a preliminary injunction against § 2(B) of S.B. 1070 because law enforcement agencies will interpret the Section the same way that this Court and the Ninth Circuit have previously interpreted it—*i.e.*, as authorizing additional detention for immigration verification purposes.  Plaintiffs recognize, however, that the Supreme Court noted that the Arizona state courts have not yet provided a "definitive interpretation" of the provision, which could clearly establish that § 2(B) does *not* allow such detention in spite of its plain language. *Arizona*, slip op. at 24.  This Court can request the definitive interpretation that the Supreme Court lacked by certifying relevant questions to the Arizona Supreme Court.[2] *See Arizonans for Official English v. Arizona*,

---

[2] In the event that this Court decides to certify to the Arizona Supreme Court, Plaintiffs respectfully propose the following question: "Does § 2(B) of S.B. 1070 authorize law enforcement officers to detain an individual, including by extending an individual's detention beyond the point he or she would otherwise be released, in order to determine or verify the individual's immigration status?"  Should the Court decide to seek the guidance of the Arizona Supreme Court as to § 2(B), it would also be appropriate, as a matter of judicial economy, to certify a similar question as to § 2(D), namely: "Does § 2(D) of S.B. 1070 authorize law enforcement officers to detain an individual, including by extending an individual's detention beyond the point he or she would otherwise be released, based on 'verification' that the individual is 'unlawfully present'?"  Plaintiffs include the question regarding § 2(D) because, while not currently enjoined, it is also challenged in this

520 U.S. 43, 76 (1997) ("Certification procedure . . . allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response."); *see also* A.R.S. § 12-1861 (providing that the Arizona Supreme Court may answer questions of law certified to it by a United States District Court, where there are issues of Arizona state law that may be determinative of the cause pending with the United States District Court, and where there is no controlling precedent in the decisions of the Arizona Supreme Court and intermediate appeals courts of Arizona).

Because the statute will likely be applied in an unconstitutional manner in the absence of a definitive ruling limiting § 2(B), if the Court decides to certify, it should preliminarily enjoin § 2(B) on these grounds pending the state court's response.

**B.  Plaintiffs Are Likely to Prove That § 2(B) Violates the Equal Protection Clause**

Plaintiffs are likely to succeed on their equal protection challenge to SB 1070.  As the Supreme Court held in *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977), a plaintiff challenging a facially race-neutral law as intentionally discriminatory is not required to prove that "the challenged action rested solely on racially discriminatory purposes."  *Id.* at 265.  Rather, Plaintiffs need only show that unlawful discrimination was "a 'substantial' or 'motivating' factor behind enactment" of S.B. 1070. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).  Once Plaintiffs make a showing of discriminatory intent, the burden shifts to Defendants "to demonstrate that the law would have been enacted without this factor."  *Id.*

*Arlington Heights* identified a number of factors that constitute highly relevant and admissible circumstantial evidence of discriminatory intent.  429 U.S. at 266-68.  These factors include whether: (1) the legislative history, especially contemporaneous statements

---

litigation and presents a similar question of statutory interpretation with respect to detention as that presented by § 2(B).

[3] While this motion focuses on Section 2(B)'s discriminatory intent and disproportionate

by members of the legislature, evidences discrimination; (2) "the historical background" or "sequence of events leading up to the challenged decision" evidences discrimination; (3) the challenged decision has a disproportionate impact on a protected group; and (4) there were substantive or procedural departures from usual decision making criteria. *Id.*; *see also Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009). These factors are neither exhaustive nor mandatory, and courts consider them as a whole in determining whether discrimination was a motivating factor for enactment of the challenged law. *See Arlington Heights*, 429 U.S. at 268; *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 580 (2d Cir. 2003). It is not necessary to establish each factor to prevail on a discrimination claim. *Cent. Alabama Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1186 (M.D. Ala. 2011).

The *Arlington Heights* factors support a finding of intentional discrimination here. *Cf. Magee*, 835 F. Supp. 2d at 1197 (finding discriminatory intent motivated Alabama law resembling S.B. 1070). Discriminatory animus permeated the sequence of events leading up to the passage of S.B. 1070, informed legislators' views of the law, and ultimately suffused the entire legislation with anti-Latino and anti-Mexican bias. Key legislators relied on invented "facts" about the costs and dangers of "illegal immigration," conflated Latinos generally or certain U.S. citizen children with "illegal aliens," and used thinly veiled code words that, in context, plainly reveal a discriminatory motive. In operation, § 2(B) will disproportionately affect persons of color and especially Latinos and individuals of Mexican origin, as population estimates make clear.[3] And, the legislature intended § 2(B) to implement state-wide Maricopa County practices that had repeatedly resulted in

---

[3] While this motion focuses on Section 2(B)'s discriminatory intent and disproportionate impact on Latinos and individuals of Mexican national origin, Plaintiffs maintain that § 2(B) also discriminates against other communities of color in Arizona, including its diverse Asian American population that is fast growing and currently makes up about 3.3 percent of the state's population. U.S. Census Bureau, Arizona QuickFacts (Ex. F-6). Plaintiffs will continue to advance their equal protection claim on behalf of all communities of color as the evidence in the case develops.

racial profiling complaints and investigations.  Moreover, Arizona's decision to enact S.B. 1070 substantively departed from the legislature's usual decision-making on public safety issues by restricting police discretion and by enacting an unprecedented private citizen cause of action against police departments regarding their allocation of enforcement resources.  Plaintiffs therefore seek a preliminary injunction of § 2(B) on equal protection grounds.

**1.  The Legislative History of S.B. 1070 Demonstrates a Discriminatory Intent.**

As the Supreme Court stated in *Arlington Heights*, "contemporary statements by members of the decisionmaking body" constitute "highly relevant" circumstantial evidence of discriminatory intent.  429 U.S. at 267.  Thus, virtually every case considering an equal protection challenge to a legislative act considers the contemporaneous statements of public officials, be they in legislative debates, statements to the press, or campaign materials.  *See Magee*, 835 F. Supp. 2d at 1187 n.17 (noting that "contemporaneous statements by individual decisionmakers are relevant to determining whether race was a motivating factor for the decision," and, in fact, that "where the court's inquiry centers on finding an improper purpose, looking into legislators' motives and comments . . . . is now the norm, not the exception" (collecting cases)).  Plaintiffs need not show discriminatory motivation by every member, or by a majority, of the decision-making body.  *See Hunter*, 471 U.S. at 228.  And statements made by the sponsor or author of a law carry particular weight in establishing legislative intent.  *Brock v. Pierce County*, 476 U.S. 253, 263 (1986); *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976).

The legislative history of S.B. 1070, and in particular the statements by its cosponsors, Senator Pearce and Representative Melvin, demonstrate that racial and national origin discrimination was a motivating factor for the enactment of S.B. 1070 and § 2(B) specifically.

13

1

2

3

> **i.** **Legislators routinely relied on false or misleading evidence in promoting S.B. 1070, strongly suggesting that their stated reasons were pretext for unlawful discrimination.**

4

5

6

7

8

9

10

11

12

13

Courts routinely consider misleading statements as evidence of invidious discrimination, as it demonstrates that the stated justifications for legislation are mere pretext. *See, e.g.*, *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 549, 552 (S.D.N.Y. 2006) (holding that exaggerated, factually unsupported claims regarding the number and problems caused by targeted day laborers were "negative and stigmatizing," providing "some evidence of racism"); *Greater New Orleans Fair Hous. Action Ctr.*, 648 F. Supp. 2d 805, 814-19 (E.D. La. 2009) (evaluating the city's proffered justifications for its actions, finding them factually unsupported, and concluding that the challenged governmental action therefore was pretextual and an invidious motive could be inferred) ("*GNOFHAC II*").

14

15

16

17

18

19

Legislative supporters of SB 1070 cited false or misleading information about undocumented immigrants to justify passage of the law.  In support of S.B. 1070, legislators relied on assertions about the purported criminality or the alleged costs to Arizona due to undocumented immigration.  But, as explained below, those legislators lacked any factual support for those assertions and indeed, some of these legislators' statements were based on information that had been widely discredited.[4]

20

21

22

23

24

25

During the legislative debates, Senator Pearce and others routinely cited fabricated "statistics"—particularly about the alleged criminality of undocumented immigrants—to justify the need for S.B. 1070, though they knew that the data was misleading at best, and, in several instances, outright false.  Senator Pearce, for example, claimed that "Phoenix number two in the world in kidnappings . . . the home invasion, carjacking, [and] identity

26

27

28

---

[4] Other Arizona public officials, including Governor Jan Brewer, have similarly relied on alleged "facts" in order to support their positions on immigration.  *See* Brad Knickerbocker, Jan Brewer Corrects the Record on Headless Bodies in the Desert, Christian Science Monitor, Sept. 4, 2010 (discussing Gov. Brewer's discredited claim that headless bodies had been found in the Arizona border) (Ex. B-28).

theft capital of the nation."  Test. of Sen. Pearce, Debate on S.B. 1070 in H. Military

Affairs and Pub. Safety Comm., Mar. 31, 2010 (Ex. C-3 at 11).[5]  The claim about

kidnapping had been made before, but as Senator Pearce knew,[6] there was no factual basis

for it.  *See, e.g.*, McCain Says Phoenix is the Second Kidnapping Capital in the World, St.

Petersburg Times, June 27, 2010 (investigating the claim in depth, and finding "no

evidence that it's accurate, or even close") (Ex. B-30).  Similarly, the claims about home

invasions, carjackings and identity theft were factually unsupported and factually

unsupportable—which Senator Pearce also knew.  *See* Phil Gordon, Op-Ed., Time to End

Sen. Pearce's Reckless Misstatements, Ariz. Republic, June 27, 2009 (Ex. B-32)

(responding to a Pearce op-ed, and stating: "I know how it works for you, senator.  If you

told people the real numbers—verified by the FBI—you'd have no 'hot-button issue' and

would risk losing your political base.  But Arizonans expect and trust their elected officials

to speak the truth.").

Legislators also used false statistics about murders committed by undocumented

immigrants, with Senator Pearce claiming that "60 % of the homicides in Phoenix involve

illegal aliens," Test. of Sen. Pearce, Debate on S.B. 1070 in H. Military Affairs and Pub.

Safety Comm., Mar. 31, 2010 (Ex. C-3 at 9-10); and that "'67 percent' of law enforcement

officers killed in 'the last few years' have been murdered by illegal aliens."[7]  *Id.* Senator

Huppenthal made a similar claim at the press conference to introduce S.B. 1070, stating

---

[5] Although Arizona's legislative debates are not officially transcribed, these are archived in video form on the Arizona Legislature's website.  *See* Ariz. Legislature's Live Proceedings, http://azleg.granicus.com/ViewPublisher.php?view_id=17.  Plaintiffs have had selected portions of these official videos professionally transcribed and true and accurate copies of those transcriptions are provided as exhibits to this filing.

[6] *See* E.J. Montini, *Is Phoenix Really the 'Kidnapping Capital'?*, Ariz. Republic, July 12, 2009 (noting that the author had "left word with Pearce asking where he got his statistics [about the kidnapping claim] but he hasn't gotten back to me") (Ex. B-29).  *See also* Russell Pearce, Op-Ed., *Let's Put an End to Illegal-Migrant Catch and Release*, Ariz. Republic, June 25, 2009 ("Phoenix runs second in the world in kidnappings and third in the United States for violence.  Arizona has become the home-invasion, carjacking, identity-theft capital of the nation.  These are not statistics Arizona should be famous for.") (Ex. B-31).

[7] *See also* Stephen Lemons, Russell Pearce Scores Another Win Against Hispanics, Most Local Activists Are No-Shows, Only Daniel Patterson Shines, Phoenix New Time Blogs, Feb. 25, 2010 (Ex. B-33).

that that undocumented immigrants "ha[ve] murdered over 50 percent of [Arizona's] police officers."[8]  As the senators knew, their claims were unsupported,[9] inflammatory, and could not have been drawn from actual data because neither the Phoenix police department nor the FBI collects information on the immigration status of alleged perpetrators[10]—a fact Senator Pearce explicitly acknowledged.  *See* Email from Sen. Pearce dated Oct. 23, 2009 (concluding email by stating that "NO GOVERNMENT AGENCY TRACKS CRIMES BY ILLEGALS – NOT EVEN ATTACKS ON POLICE") (Ex. E-13).

Senator Pearce also claimed that "a congressional report out called 'Drawing a Line in the Sand' by Congressman King" indicated that "9,000 Americans each year [are] killed at the hands of illegal aliens.  25 a day, 12 by stabbing and shooting [and] 13 might be DUI-related crimes."  Test. of Sen. Pearce, H. Military Affairs and Pub. Safety Comm., Mar. 31, 2010 (Ex. C-3 at 5).  The report Senator Pearce was apparently referencing,[11] however, makes no mention of any statistics even remotely resembling those cited.  These statistics, moreover—which Pearce frequently cited[12]—are implausible on their face, as has been pointed out by the former deputy administrator of the Department of Justice's Office of Juvenile Justice and Delinquency Prevention.  Robin Lubitz, Op-Ed., Expert Questions Pearce's Numbers, Ariz. Republic, June 26, 2009 (Ex. B-36) ("[N]obody knows how many crimes are committed by illegal aliens because the information is not tracked. . .

---

[8] Stephen Lemons, The MCSO Retaliates Against a Guadalupe Activist; Plus, John Huppenthal Spews Bogus Stats During a Prejudice Party at the Arizona Capitol, Phoenix New Time Blogs, Oct. 29, 2009 (Ex. B-34).

[9] *See, e.g.*, Lemons, Russell Pearce Scores Another Win, *supra* note 7 (noting that when asked  to substantiate his claim, Pearce "could offer no source");  Lemons, MCSO Retaliates, *supra* note 8 (noting that when asked to substantiate the statistic, Senator Huppenthal was unable to do so).

[10] *See* Stephen Lemons, Russell Pearce Spews Bogus Crime Stats on CNN; SB 1070 Goes to Final Read Monday, Phoenix NewTimes Blog, Apr. 16, 2010 (Ex. B-35).

[11] Majority Staff of H. Comm. on Homeland Sec. Subcomm. on Investigations, 109th Cong., A Line in the Sand: Confronting the Threat at the Southwest Border, Oct. 2006, *available at* http://www.house.gov/sites/members/tx10_mccaul/pdf/Investigaions-Border-Report.pdf.

[12] *See, e.g.*, Pearce, Let's Put an End to Illegal-Migrant Catch and Release, *supra* note 16 (citing the same statistics, but without attributing them to any source).

. Pearce's statement that illegal aliens commit 12 murders each day by 'stabbings and shootings' would mean that they are responsible for over one-fourth of all homicides committed in the United States.  This is an amazing assertion, which leads one to suspect that Pearce is either making up data or relying on non-objective studies from biased interest groups.").

Senator Pearce also cited specious statistics regarding the number of undocumented immigrant sex offenders contained in a self-published, non-peer reviewed "study" by Violent Crimes Institute.  Test. of Sen. Pearce, H. Military Affairs and Pub. Safety Comm., Mar. 31, 2010 (Ex. C-3 at 5).  *See also* Deborah Schurman-Kauflin, *The Dark Side of Illegal Immigration: Nearly One Million Sex Crimes Committed by Illegal Immigrants in the United States* (2006) (Ex. B-45).  Here again, the implausibility of these "statistics"—which have been thoroughly debunked[13]—are obvious, and justifying any legislation on such grounds demonstrates pretext.

> **ii.     Legislators repeatedly conflated Latinos, Spanish-speaking individuals, and the children of unauthorized immigrants with "illegal aliens," thereby demonstrating that their attempts to punish and harass "illegal aliens" were also directed at these larger groups**

Particularly relevant is evidence that, in discussing the need for the challenged action, the legislative body conflated the protected group (such as Latinos or Mexicans or U.S.-citizen children of undocumented immigrants) with the ostensible target (undocumented immigrants) of the legislation.  In *Magee*, for example, the court found it

---

[13] *See, e.g.*, Gustavo Arellano, Heard Mentality, Phoenix New Times, vol. 32, issue 285 June 14, 2009 ("Schurman-Kauflin's based her findings on a 2005 Government Accountability Office survey that showed 2 percent of illegals in federal, local or state prisons had committed a sex crime.  She then applied that percentage to the illegal immigrant population at large—voilà!  Instant endemic perversity!  This statistical sleight-of-hand, however, withers by employing the very stats she uses.  GAO data for 2003 (the most recent year available) showed about 308,000 criminal aliens (legal as well as illegal immigrants) were in American prisons; they constitute about 3 percent of the nation's 12 million illegal immigrants.  If only 2 percent of incarcerated illegals committed a sex crime, then it's intellectually misleading to arrive at the 240,000 figure.") (Ex. B-37).

probative that one of the chief sponsors of the challenged legislation "conflated race and immigration status," and that such conflation was racial code supporting a finding of discriminatory intent.  835 F. Supp. 2d at 1192; *see also id.* (discussing how other supporters of the challenged legislation "frequently conflated illegal immigration and Hispanics when discussing the ills to be remedied by [the law]").

During the legislative proceedings on S.B. 1070, legislators frequently conflated "Hispanic" or "Mexican" with "undocumented," as if members of one of the former two groups were necessarily members of the last.  During a committee hearing, for example, Senator Pearce asserted that Officer Martin had been murdered by undocumented immigrants, and in an email Senator Pearce claimed that Officer Eggle had been killed by undocumented immigrants.  *See* Test. of Sen. Pearce, H. Military Affairs & Pub. Safety Comm., Mar. 31, 2010 (Exs. C-3 at 4, E-14).  Although there is evidence that Eggle was killed by Mexicans, and Martin by a Latino, there is *no* basis to conclude that the perpetrators were undocumented immigrants.  *See* Huerta Decl. (Ex. G).  Senator Pearce made the same and other race- and national origin-based assumptions in asking his fellow legislators to support SB 1070.  *Compare* Email from Sen. Pearce dated June 30, 2009 (asserting that various individuals had been killed by undocumented immigrants) (Ex. E-14) *with* Huerta Decl. (explaining that there is no evidence that several of the alleged perpetrators mentioned by Senator Pearce were undocumented) (Ex. G).

Similarly, a draft letter to be signed by Senators Pearce and Karen Johnson, decried "a huge protest march by 20,000 Hispanics," asserting without any basis other than the marchers' race that "[m]ost of the protestors are not legal citizens, legal residents, or even legal visitors in our country.  They are illegal.  They have no right to request or demand anything."  Email from Sen. Pearce dated Apr. 6, 2006 (Ex. E-15)[14].  Pearce repeated his race-based assumption several times over the years.  *See, e.g.*, Email from Sen. Pearce

---

[14] *See* Yvonne Wingett and Susan Carrol, *20,000 in Phoenix Rally for Migrants*, Ariz. Republic, Mar. 25, 2006 ("Tens of thousands of Latinos marched up and down 24th Street on Friday, protesting federal legislation that would criminalize undocumented immigrants.") (Ex. B-38).

dated May 26, 2009 (emailing an article about the arrests of Hispanic gang members with the subject line: "Hundreds of Hispanic gang members arrested in L.A. for targeting Black people (worse, is most of these Hispanic gang members are ILLEGAL aliens) Welcome to the new United States of Mexico") (Ex. E-16); Email from Sen. Pearce dated Feb. 15, 2009 (asserting that "vast majority" of Hispanic protesters were "illegal aliens") (Ex. 17); Email from Sen. Pearce dated June 20, 2006 (same) (Ex. E-18).  In another email, Senator Pearce asserted, *inter alia*: "I'm a racist because . . .  I don't want to be taxed to pay for a prison population comprised of mainly Hispanics, Latinos, Mexicans or whatever else you wish to call them . . .  I object to having to pay higher sales tax and property tax to build more schools for the illegitimate children of illegal aliens. . .  [I] want to deny citizenship to all anchor babies born in this country pre 2006 and here after . . .  I object to corporation and municipalities spending billions to translate everything in Spanish."  Email from Sen. Pearce dated Dec. 14, 2006 (Ex. E-20).

An email from a member of Senator Karen Johnson's staff to Senators Pearce and Johnson is especially blatant in conflating race and "illegal" status: it reported that "yesterday (Thursday) was the day that the landscapers come into my subdivision to cut the grass and clean up the park.  The crew has always been totally Hispanic.  Yesterday there were two men who were obviously NOT Hispanic –very white and very American looking—like college kids.  Hooray!  It looks like the illegals are starting to depart." Email to Sens. Pearce & Johnson dated Jul. 6, 2007 (Ex. E-20).

Another example of this discriminatory conflation is the repeated claim of Senator Al Melvin, who co-sponsored the bill, that "education, incarceration and medication" for undocumented immigrants cost Arizona taxpayers $2 billion per year, referring to "well documented" information on the Federation for American Immigration Reform's ("FAIR") website.[15]  *See* Test. of Sen. Melvin, Final Reading of S.B. 1070, Sen. Floor, Apr. 19, 2010 (Ex. C-6 at 15); Test. of Sen. Melvin, S. Pub. Safety & Human Serv.

---

[15] Senator Pearce made a similar claim.  *See* Email from Sen. Pearce to Legislators dated June 30, 2009 (Ex. E-14).

Comm., Jan. 20, 2010 (Ex. C-1 at 9).  But Senator Melvin did not acknowledge or explain what had been pointed out publicly by others:[16] that many of the "undocumented immigrants" he blamed for costing Arizona taxpayers billions are in fact native-born United States citizens.  Indeed, the costs associated with educating U.S.-citizen children constitute the majority of the total educational costs (60 percent of the total) Senator Melvin cited.[17]  *See* Jack Martin & Eric A. Ruark, Fed'n for Am. Immigration Reform, The Fiscal Burden of Illegal Immigration on United States Taxpayers 45 (2010). Moreover, Senator Melvin's statistics also assume, without support, that a large majority of English as a Second Language ("ESL") students "may be assumed to be children of either legal or illegal immigrants with a predominance of children of illegal aliens"—at least in part because the fact that the native language of most ESL students is Spanish.[18] *See* Jack Martin, Fed'n for Am. Immigration Reform, *Limited English Proficiency Enrollment and Rapidly Rising Costs* 2 (2007); Martin & Ruark, *supra*, at 48.[19]  Thus, the alleged "cost" of illegal immigration Melvin presented was premised, in significant part, on assumptions about the immigration status of Spanish speakers, their parents, and the cost of educating U.S. citizens.

As has been the case elsewhere, "the combination of a lack of evidence [supporting

---

[16] *See, e.g.*, Jim Small, Arizona State Senator Russell Pearce: Stemming Illegal Immigration is Arizona's Top Priority, Ariz. Capitol Times, Oct. 21, 2009 (Ex. B-39); *see also* Terry Greene Sterling, Russell Pearce and Other Illegal-Immigration Populists Rely on Misleading, Right-Wing Reports to Scapegoat Immigrants and to Terrify Penny-Pinched Americans, Phoenix New Times, Dec. 2, 2010 (Ex. B-40).

[17] FAIR has produced multiple reports on the alleged costs of undocumented immigrants to Arizona over the last several years.  *See, e.g.*, http://www.fairus.org/issue/the-costs-to-local-taxpayers-for-illegal-aliens; http://www.fairus.org/publications/the-costs-of-illegal-immigration-to-arizonans-2004 (posting 2010 and 2004 reports.  Each of these documents includes the costs associated with citizen children in costs of undocumented immigration.

[18] This attack on the use of Spanish supports the inference that the Arizona legislature considered Spanish to be a proxy for illegal immigrants and, by extension, Latinos.  *See Hernandez v. New York*, 500 U.S. 352, 371-72 (1991); *Garcia v. Gloor*, 618 F.2d 264, 268 (5th Cir. 1980); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 539-40 (6th Cir. 2002).

[19] The conflation of U.S.-born children of undocumented immigrants with undocumented immigrants themselves suggests discriminatory intent against not just undocumented immigrants, but also against a category of U.S. citizens based largely on their national origin or ethnicity.

legislative assertions] and an assumption of unlawfulness applied to Latinos that is not applied to other groups, especially when buttressed against evidence of the conflation of Latino and 'illegal immigrant,' supports an inference of discrimination." *Magee*, 835 F. Supp. 2d at 1194 n.21.

### iii. Legislators' use of camouflaged racial language during the S.B. 1070 debate is evidence of discriminatory intent.

Comments by legislators directly expressing animus based on protected status are, of course, rare, as "officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority." *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982). Courts therefore examine whether public officials have "camouflaged" invidious intent by using code words from which, in context, one can infer a discriminatory purpose. *See, e.g., id.* at 1066 (finding that statements about "undesirables," and concerns about personal safety due to "new" people were "camouflaged racial expressions"); *GNOFHAC II*, 648 F. Supp. 2d at 811 (public officials cited "influx of crime" and preserving "shared values" at public hearings, terms the court held to be "camouflaged racial expressions"); *Atkins v. Robinson*, 545 F. Supp. 852, 874 (E.D. Va. 1982) (finding statement that she "feared the projects 'would degenerate to slum-like conditions, with an abundance of crime'" to be a veiled reference to race).[20] The Ninth Circuit, too, has noted that references to crime, "unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000).

The legislative debate on S.B. 1070 was replete with racially coded language. Senator Ron Gould, for example, spoke of the need to "protect" against "foreign

---

[20] *See also Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 148-49 (E.D.N.Y. 2011) (mayoral candidate's campaign materials blamed day laborers, a predominately Latino group, for "increased gang activity," and "overcrowding"); *Mamaroneck*, 462 F. Supp. 2d at 549 (government officials stigmatized day laborers in public announcements, asserting without any basis in fact that they were not residents and accusing them of engaging in criminal activity).

invasion."[21]  Test. of Sen. Gould, Final Reading of S.B. 1070, S. Floor Sess., Apr. 19, 2010 (Ex. C-6 at 17); *see also* Email from Sen. Pearce dated Jan. 17, 2006 (urging recipients to "[p]lease forward … to all of your elected officials,"  a column that asserts, among other things, that Mexico President Vicente Fox is "more dangerous to America than Saddam Hussein" because "Fox engineers the greatest invasion of another country ever seen in the 20th and 21st centuries—without firing a shot.") (Ex. E-21); Email from Sen. Pearce dated Jan. 29, 2007 ("One look at Los Ang[e]les with its Mexican-American mayor shows you Vicente Fox's general Varigossa [sic] commanding an American city.") (Ex. E-8).  Email from Sen. Pearce dated May 22, 2007 (email to fellow legislators, inviting them to join him "in a coalition of Legislators for 'Legal Immigration,'" and including a "[g]ood article" that warns of "[a]n immigrant invasion of the United States from the Third World, as America's white majority is no longer even reproducing itself") (Ex. E-22).

Senator Huppenthal, for his part, asserted that "[w]e have seen parts of our neighborhoods nuclear bombed by the effects of illegal immigration."  Test. of Sen. Huppenthal, Final Reading of S.B. 1070, S. Floor Sess., Apr. 19, 2010 (Ex. C-6 at 11), *see also* Email from Sen. Pearce dated Mar. 3, 2006 (forwarding an article that argued that "Our sovereign nation is facing an overwhelming illegal alien invasion by an Hispanic 'migrant army' that has defied our immigration laws and sovereignty.  The invasion of America now totals 20 -23 million and rising.  Of that number, 90% are Hispanics who balkanize our cities and towns, and arrogantly corrupt our unifying national language while actively disrespecting our culture, society and country!  All this is being accomplished while our complicit government shamelessly stands by blatantly ignoring the anarchy, by allowing Mexico's human tsunami of illegal aliens to lawlessly overrun

---

[21] Leading up to S.B. 1070's passage, Senator Gould also routinely spoke in the media about immigration to Arizona as a "foreign invasion" or an "attack."  *See, e.g.*, Alia Beard Rau & Ginger Rough, Ariz. Lawmakers Pass Toughest Illegal Immigration Law in U.S., Ariz. Republic, Apr. 19, 2010 (Ex. B-41).

America.") (Ex. E-23).

Representative John Kavanagh, another sponsor of S.B. 1070, also spoke in racial code when talking about the need for the day labor provisions.  Specifically, he referred to what he perceived to be the threat and discomfort of Arizona residents from seeing "strange men" "walking around" to solicit work and likened day laborers to "hookers." Ariz. Capitol Television, Capitol Forum: Rep. Kavanagh Talks About SB 1070, June 21, 2010, *available at* http://vimeo.com/12740392 ("It causes massive disruption not only to the street but to the communities. . . .  Women were afraid to walk down the street.  All these strange men walking around.  It's a real problem. . . . I think most people recognize that most of these people are illegal aliens.  Legal residents don't have to solicit labor on the street like hookers.").

> ### iv.    Statements of legislators who opposed S.B. 1070 further support a finding of discriminatory intent.

Statements of legislators who opposed S.B. 1070–and the reactions of proponents– are also relevant in assessing the discriminatory intent of the legislature.  *See, e.g.*, *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 570 (E.D. La. 2009) ("*GNOFHAC I*") (chairperson "who voted against the ordinance, said the ordinance was racially motivated and was clearly intended to preserve the nearly all-Caucasian demographic of the parish.").  During the debate on S.B. 1070, several legislative opponents expressed strong views that S.B. 1070 would lead to racial profiling and targeting of Latinos.  *See* Test. of Rep. Patterson, Debate on S.B. 1070 in House, Apr. 13, 2010 ("We have many families in Arizona who are legal American citizens who speak Spanish, who may not look American to some people in Arizona.  This could lead to profiling and it likely will in a way that I think could be very damaging to the very relationships between the communities and law enforcement.") (Ex. C-4 at 19); Test. of Sen. Rios, Final Reading of S.B. 1070 in the Senate, Apr. 19, 2010, (stating that the bill would "scapegoat a race of people") (Ex. C-6 at 31); Test. of Sen. Aboud, Final Reading

of S.B. 1070 in the Senate, Apr. 19, 2010 (discussing the disproportionate burden on Latinos who are likely to be targeted by S.B. 1070) (Ex. C-6 at 31-32); Test. of Sen. Lopez, Final Reading of S.B. 1070 in the Senate, Apr. 19, 2010 (stating that SB 1070 "actually legalizes racial profiling" because law enforcement officers will rely on the "color of that person's skin and say 'I have reasonable suspicion that this person is here illegally'") (Ex. C-6 at 33-34); *see also* Roberto Miranda, Ariz. Law Unfair to Latinos, Hispanics, Daily 49er, May 2, 2010 (quoting Senator Richard Miranda as stating that S.B. 1070 "leads to a greater possibility of racial profiling.  This is not just if you are Latino or Hispanic—anyone of color may be subject to racial profiling") (Ex. B-42).

> **v.    Discriminatory statements by constituents and the public influenced the legislative process and support a finding of discriminatory intent.**

Racially charged or racially coded statements made by constituents in the media or during public hearings may also help to establish discriminatory intent, if there is evidence that those statements influenced legislators.  While "[p]rivate biases may be outside the reach of the law, . . . the law cannot, directly or indirectly, give them effect.  'Public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the hypothetical effects of private racial prejudice that they assume to be both widely and deeply held.'"  *Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) (citation omitted); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, and the [governmental body] may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic.") (citation omitted).  Courts therefore consider relevant evidence that the decision-making body considered and acted in response to discriminatory statements by private individuals; here, too, courts will look for racially camouflaged statements.  *See, e.g.*, *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 144 (3d Cir. 1977) (inferring improper

racial motivation from city's "sudden shift in . . . position from passive acceptance [of a low-income housing project] to active opposition, in the face of protests by demonstrators manifesting racial bias"); *Rivera v. Inc. Vill. of Farmingdale*, 784 F. Supp. 2d 133, 147-48 (E.D.N.Y. 2011) (finding that plaintiffs established a prima facie case of intentional discrimination in part based on citizens' comments on Internet and public meetings denigrating immigrants and blaming them for increased crime).[22]

There is ample evidence that S.B. 1070 was enacted in response to the discriminatory demands of private individuals.  During a public hearing on S.B. 1070, a constituent who testified claimed that S.B. 1070 was necessary because Arizona was suffering from an "invasion" of "illegal immigrants" and that unchecked immigration was "importing a culture of corruption.  It's time to stop it. Enough is enough."  Test. of Rob Haney, Maricopa Cty. Republican Party Chairman, Debate on S.B. 1070 in S. Pub. Safety & Human Serv. Comm., Jan. 20, 2010 (Ex. C-1 at 38); *see also* Email from Sen. Pearce dated Jan. 29, 2007 (email with subject line, "INVASION USA," rebutting the "myth" that "Mexico's people love the USA, respect our language and the laws of our country" by arguing "[c]orruption is a mechanism by which Mexico operates.  Its people spawn more corruption wherever they go because it is their only known way of life.") (Ex. E-8).

Arizona legislators, supporters of S.B. 1070, also received constituent emails around the time of the law's consideration and passage urging them to take action to reduce the growing Latino population in Arizona.  Many of these emails to S.B. 1070's chief sponsor, Senator Pearce, also spoke in terms of an "invasion" of "illegals" or of a "Mexican invasion."  *See, e.g.*, Email to Sen. Pearce dated Mar. 16, 2011 (Ex. E-29);

---

[22] *See also GNOFHAC II*, 648 F. Supp. 2d at 811-12 (finding public comments about increased crime and preserving "shared 'value system'" "to be nothing more than camouflaged racial expressions"); *Anderson Gr., LLC v. City of Saratoga Springs*, 557 F. Supp. 2d 332, 341 (N.D.N.Y. 2008) (holding that discriminatory intent may be reasonably inferred from evidence that governmental decision makers "bow[ed] to public opinion" and "discriminatory animus" of their constituents); *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs*, 257 F. Supp. 2d 208, 227 (D.D.C. 2003) (finding challenged decision "tainted with discriminatory intent" due to reliance on discriminatory citizen complaints).

Email to Sen. Pearce dated July 6, 2010 (Ex. E-25); Email to Sen. Pearce dated Apr. 28, 2010 (Ex. E-26); Email to Sen. Pearce dated Aug. 28, 2009 (Ex. E-27); Email to Sen. Pearce dated Apr. 25, 2007 (Ex. E-28).  Several of these emails used explicitly discriminatory language.  *See, e.g.*, Email to Sen. Pearce dated Mar. 16, 2011 ("I do not want to see our state and nation turned into a third world country") (Ex. E-29); Email to Sen. Pearce dated July 29, 2010 ("The country is at stake, in 50 years there will be no white people living here, this is an out[]right assault against white people") (Ex. E-30); Email to Sen. Pearce dated July 2, 2010 ("If this invasion continues, it is just a matter of time before . . . we will become a state in Mexico. . . . The filth, corruption disease and death will become our heritage.") (Ex. E-31); Email to Sen. Pearce dated Apr. 28, 2010 ("Our country is slowing [sic] dying and a new MEXICAN place is being born.  Going into J.C. Penny's, K-Mart and even Wal-Mart and hearing Mexican music playing just brings my blood to a boil.") (Ex. E-26); Email to Sen. Pearce, Rep. Judy Burges, Rep. Tom Boone, Sen. Jack Harper dated Apr. 22, 2010 ("Is this the United States of America or Mexico?  The opposition to SB 1070 by illegals is an outrage. . . . We want our country back." (Ex. E-32); Email to Sen. Pearce dated Apr. 20, 2010 ("[T]he City is turning into Mexico . . . . I remember when Phoenix felt clean-Now it is dirty giving the appearance of MEXICO big time!") (Ex. E-33).

> ## 2.  S.B. 1070's Discriminatory Adverse Impact on Latinos and Mexican Nationals Weighs in Favor of a Finding of Discriminatory Intent

"[I]mpact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) (citing *Arlington Heights*, 429 U.S. at 266); *see, e.g.*, *Comm. Concerning Cmty. Improvement*, 583 F.3d at 703-04 (relying on Census data to conclude that plaintiffs presented evidence creating inference of discriminatory intent); *Magee*, 835 F. Supp. 2d at 1188 (finding a disproportionate impact of a similar anti-immigrant law in Alabama on Latinos who were over-represented in the

state's non-citizen and undocumented populations).  Courts also routinely consider the foreseeability that the challenged action would have a discriminatory impact in determining whether the legislature acted based on a discriminatory intent.  *United States v. City of Birmingham*, 538 F. Supp. 819, 828 (E.D. Mich. 1982) ("Courts will consider evidence that a decision-making body took [a] certain action[] knowing it would have a discriminatory effect."), *aff'd as modified*, 727 F.2d 560 (6th Cir. 1984).

In passing S.B. 1070, legislators could foresee that enforcement of § 2(B) would disproportionately harm Latinos and Mexican nationals in Arizona because both groups make up a disproportionate share of the state's foreign-born population and the state's undocumented population.  According to the latest U.S. Census figures, approximately 67.5 percent of Arizona's foreign-born population is from Latin America, and 29 percent of the state's total population is Latino.  Preciado Decl. ¶¶ 3, 5 (Ex. F).  The Department of Homeland Security estimates that 59 percent of undocumented persons nationwide are from Mexico.  *Id.* ¶ 8.  The Pew Hispanic Center estimates that in 2008 over 90 percent of unauthorized immigrants in the state were from Mexico.  *Id.* ¶ 10.

In addition, there is clear evidence that the legislature enacted § 2(B) with the understanding that it would not be applied in a racially neutral way.  The legislature enacted S.B. 1070 in the face of testimony and evidence that § 2(B)'s standard— "reasonable suspicion" of unlawful presence—would lead to the profiling of Latinos and those who appear Mexican.  *See* Test. of Sen. Aboud, Final Reading of S.B. 1070 in the Senate, Apr. 19, 2010 (Ex. C-6 at 31-32) (discussing the disproportionate burden on Latinos who are likely to be targeted by S.B. 1070); Test. of Sen. Lopez, Final Reading of S.B. 1070 in the Senate, Apr. 19, 2010 (stating that S.B. 1070 "actually legalizes racial profiling" because law enforcement officers will rely on the "color of that person's skin and say, 'I have reasonable suspicion that this person is here illegally'") (Ex. C-6 at 33-34); *see also* Villaseñor Decl. ¶¶ 3-7 (Ex. D) (law enforcement expert stating that § 2(B) will force officers to rely on race and ethnicity and lead to accusations of racial profiling);

Gascón Decl. ¶¶ 18-20 (Doc. 235-6) (law enforcement expert stating that § 2(B) will inevitably lead to lead to racial profiling); Gonzales  Decl. ¶¶ 16-17 (Doc. 235-8) (same); Granato Decl. ¶ 15 (Doc. 236) (same).

Moreover, the legislature explicitly intended § 2(B) to codify the practices of Maricopa County Sheriff Joe Arpaio and to require every other law enforcement agency in the state to replicate his model of immigration enforcement.  At the press conference held on October 21, 2009 to introduce S.B. 1070, Senator Pearce—the law's author and principal sponsor—explained, together with Sheriff Arpaio himself, that S.B. 1070 would restore Arpaio's authority to enforce civil immigration law after the Department of Homeland Security revoked its § 287(g) task force agreement with MCSO.  *See* Press Release, Sen. Pearce Demands End to Sanctuary City, 'Catch and Release' Policies, Oct. 21, 2009 ("Pearce points to the federal government and Secretary of Homeland Security Janet Napolitano for trying to erode the progress made in Arizona with our tough and effective laws.") (Ex. B-12); *id*. ("Sheriff Joe Arpaio stated, 'This new legislation is very important given the fact that the federal government has moved to restrict my authority to enforce illegal immigration laws.  Their recent action in doing so makes this legislation even more critical to ensure that state laws are in place so I can continue to do my job.'"); *see also* Matthew Benson, Immigration Foes Pledge New Bill, Voter Initiative, Ariz. Republic, Oct. 22, 2009, at B1 (Ex. B-13).  Senator Pearce also held up Sheriff Arpaio's agency "as a model for what law enforcement should be doing."  Editorial, Resist Stampede to State Mandates for Immigration Enforcement, Trib. (Mesa, Ariz.), Oct. 23, 2009 (Ex. B-14).  Senator Pearce similarly, and repeatedly, linked S.B. 1070 with the Arpaio approach to immigration enforcement in emails seeking the support of his fellow legislators.[23]

---

[23] For example, in a June 30, 2009 email asking his fellow legislators to support his forthcoming legislation, Senator Pearce held up Sheriff Arpaio and the MCSO as a model, personally thanking "Sheriff Joe" and asserting that Arpaio and MCSO "have a proven track record of enforcing our immigration laws and not caving in to political correctness."

1

2

3

4

5

          Yet as Senator Pearce and the entire Arizona legislature knew, Arpaio's actions—

particularly his immigration enforcement initiatives, which S.B. 1070 was designed to

preserve and expand statewide—had spawned numerous federal investigations,[24]

lawsuits,[25] and countless complaints and media stories[26] regarding racial profiling and

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email from Sen. Pearce dated June 30, 2009 (Ex. E-14).  Around the same time, Pearce
sent another email that again praised the MCSO, this time to rebut the charge that his bill
could lead to racial profiling.  *See also* Email to Sen. Pearce dated July 14, 2009
(forwarding an email written or forwarded by Pearce) (Ex. E-6) (arguing that the citizen
suit provision contained in what became SB 1070 § 2(H) was necessary "to hold elected
officials personally accountable for their continued refusal to cooperate with federal
immigration laws," and asserting that Sheriff Arpaio would not object to that provision,
"because he DOES enforce immigration laws under the 287(g)").  As a result of Senator
Pearce's lobbying—which, as mentioned, explicitly invoked "Sheriff Joe" as a model—26
state representatives and 11 state senators acceded to his request to endorse S.B. 1070.  *See*
Press Release, Sen. Pearce Demands End to Sanctuary City, "Catch and Release Policies,"
Oct. 21, 2009 (Ex. B-12).
[24] *See, e.g.*, Daniel Gonzalez, Feds Investigate Arpaio, Ariz. Republic, Mar. 11, 2009
("The U.S. Justice Department has launched a civil-rights investigation of the Maricopa
County Sheriff's Office after months of mounting complaints that deputies are
discriminating in their enforcement of federal immigration laws.") (Ex. B-15); Paul Giblin
& Ryan Gabrielson, Third Federal Probe Launched into Sheriff's Office: ICE to Audit
Immigration Enforcement Efforts, Trib. (Mesa, Ariz.), Sept. 12, 2008 (Ex. B-16) ("ICE
joins the Government Accountability Office and the FBI in examining the sheriff's
immigration enforcement practices."); *see also* Press Release, Dep't of Justice,
Department of Justice Releases Investigative Findings on the Maricopa County Sheriff's
Office (Dec. 15, 2011) (reporting that the DOJ "found reasonable cause to believe that
[MCSO engaged in a] pattern or practice of unconstitutional conduct and/or violations of
federal law, including: Discriminatory policing practices including unlawful stops,
detentions and arrests of Latinos; . . . [and] Discriminatory jail practices against Latino
inmates with limited English proficiency") (Ex. B-17); Press Release, Dep't of Justice,
Department of Justice Files Lawsuit in Arizona Against Maricopa County, Maricopa
County Sheriff's Office, and Sheriff Joseph Arpaio (May 11, 2012) (Ex. B-18).
[25] *See, supra* note 5.
[26] *See, e.g.*, Stephen Lemons, One Mother's Suffering, Joe Arpaio's Bigotry, and Stories
of Racial Profiling by the MCSO, Phoenix New Times Blog, Oct. 15, 2009 (introducing "a
sequence of online profiles" of those racially profiled by the MCSO's Office) (Ex. B-19);
Ryan Gabrielson & Paul Giblin, Reasonable Doubt—Tribune Investigates Sheriff's
Immigration Campaign: At What Cost?, Trib. (Mesa, Ariz.), July 9, 2008 (reporting, as
part of a five-day investigative report, that "[t]he sheriff's 'saturation' patrols and 'crime
suppression/anti-illegal immigration' sweeps in Hispanic neighborhoods are done without
any evidence of criminal activity, violating federal regulations intended to prevent racial
profiling.") (Ex. B-20); Civil-Rights Panel Aims at Sheriff, Ariz. Republic, Dec. 27, 2008,
at B1 ("[The Arizona Civil Rights Advisory Board] is recommending that, because of
racial-profiling complaints, the Maricopa County Board of Supervisors end a contract with
the federal government that allows the county Sheriff's Office to enforce immigration
laws.") (Ex. B-21).

29

other forms of discrimination against Latinos.  Indeed, the revocation of MCSO's 287(g) task force agreement—the very development that S.B. 1070 was intended to supersede—followed the federal Department of Justice's opening of an investigation into racial profiling by MCSO and DHS's determination that "the manner in which [MCSO] conducted those sweeps was not consistent with good coordination and cooperation within the communities they were operating within."  Jeremy Duda, Immigration and Customs Enforcement: If Sheriff Arpaio Continues Sweeps, It will be Under State, Not Federal, Law, Ariz. Capitol Times, Oct. 16, 2009 (Ex. B-22).  Thus, there is substantial evidence not only that S.B. 1070, and § 2(B) in particular, will have a discriminatory impact, but that it was also enacted with knowledge and intent that it would operate in a discriminatory manner.

### 3.   The Historical Background and Events Leading Up to the Passage of S.B. 1070 Demonstrate Its Racial and Anti-Mexican Animus.

A historical background of discriminatory conduct against a protected group helps to establish discriminatory intent, "particularly if it reveals a series of official actions taken for invidious purposes."  *Arlington Heights*, 429 U.S. at 267; *Mamaroneck*, 462 F. Supp. 2d at 548 (village had been historically tolerant of day laborers until laborer population shifted from Caucasian to Latinos); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, No. 06cv7185, 2011 WL 4915524, at *3 (E.D. La. Oct. 17, 2011) (predominantly Caucasian Parish took multiple measures over six years to prevent the development of multi-unit housing).[27]

---

[27] *See also Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 207 (1973) ("The prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." (internal quotation omitted)); *White v. Regester*, 412 U.S. 755, 765-67 (1973) (holding that the "totality of circumstances," including Texas's long history of discrimination against African-Americans and Latinos in the political process, demonstrated that the election scheme was "used invidiously" to dilute minority voting strength); *GNOFHAC II*, 648 F. Supp. 2d at 809-10 (citing specific councilmembers previous introduction of ordinances that would have had or did have a racially disparate impact and that apparently were motivated, at least in part, by racial animus, as demonstrated by the pretextual justifications given for those measures).  Although some of the cases cited herein brought intentional discrimination claims under the Fair Housing Act, rather than the Equal Protection Clause,

1
2
3
4
5
6
7
8
9

   S.B. 1070 was one of numerous recent bills introduced in the Arizona legislature that target Latinos and individuals of Mexican origin.  All of these efforts have been led by Senator Pearce, the chief architect and sponsor of S.B. 1070.[28]  In 2005, the legislature passed S.B. 1167, which would have made English the official language of the state and "protect[ed] the rights of persons in [Arizona] who use English."[29]  Although vetoed by then-Governor Janet Napolitano, Pearce was successful in placing the measure on the ballot, where it was approved by the Arizona electorate.  *See* Ariz. Dep't of State, 2006 Ballot Propositions - Proposition 103, *available at* http://www.azsos.gov/election/2006/info/pubpamphlet/english/Prop103.htm.

10
11
12
13
14
15
16
17
18
19
20
21

   The English-only measure was aimed at one particular language: Spanish.  *See* Daniel Gonzalez, Study Rebuts Perceptions of Migrants' English Use, Ariz. Republic, Dec. 9, 2008 ("[Senator Pearce] said he believes a surge of Spanish-speaking immigrants threatens to turn Arizona into a bilingual state.") (Ex. B-23).[30]  As courts have long recognized, actions targeting Spanish can be a pretext for discrimination due to the "close connection between the Spanish language and a specific ethnic community."  *Farm Labor Org. Com. v. Ohio State Highway Patrol*, 308 F.3d 523, 539-40 (6th Cir. 2002); *see also Hernandez v. New York*, 500 U.S. 352, 371 (1991) (explaining that "for certain ethnic groups and in some communities, proficiency in a particular language, like skin color, should be treated as a surrogate for race" under a discriminatory intent analysis); *Gloor*, 618 F.2d at 268 ("Language may be used as a covert basis for national origin

22
23
24
25
26
27
28

the same factors are used to assess either claim.  *See, e.g.*, *Magee*, 835 F. Supp. 2d at 1185-94.
[28] *See* Email from Pearce dated May 17, 2011 ("I am State Senator Russell Pearce the author of SB1070 and almost every other bill in this state to deal with 'illegal' immigration and am a national leader in this issue.") (Ex. E-7).
[29] S.B. 1167, 47 Leg., Sess. (Ariz. 2005), *available at* azleg.state.az.us/legtext/47leg/1r/bills/sb1167h.htm.
[30] Proposition 103 was Arizona's second attempt to target Spanish speakers.  In 1988, the voters passed Proposition 106, a constitutional amendment establishing English as the official state language and requiring state employees to use English only in their jobs.  In 1998, the Arizona Supreme Court struck down Proposition 106 as violative of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  *See Ruiz v. Hull*, 191 Ariz. 441, para. 70 (1998).

discrimination.").  Moreover, there is direct evidence that the Arizona legislature generally, and Senator Pearce specifically, targeted the use of Spanish as a surrogate for race and national origin.  *See* Email from Sen. Pearce dated Jan. 29, 2007 (rebutting the "myth" that "Mexico's people . . . respect our language" and comparing the importation of Spanish speakers to "importing leper colonies and hop[ing] we don't catch leprosy") (Ex. E-8); *cf.* Email from Sen. Pearce dated Apr. 24, 2006 (sharing an article that asserts part of "destroy[ing] America" are celebrating bilingualism, with the aim of turning the United States into "an 'Hispanic Quebec'") (Ex. E-9).

In 2010, during the same session in which S.B. 1070 was passed, the Arizona legislature passed HB 2281, a bill that financially penalizes primary and secondary schools if they provide "any courses or classes that 'promote resentment toward a race or class of people,' 'are designed primarily for pupils of a particular ethnic group,' or 'advocate ethnic solidarity instead of the treatment of pupils as individuals.'"[31]  Although worded neutrally, the so-called "ethnic studies ban" was aimed at one course: the Mexican-American Studies program of the Tucson Unified School District.  *See* Nicole Santa Cruz, Arizona Ethnic Studies Ban OKd as Law, L.A. Times, May 12, 2010 (indicating that then-state Superintendent Horne said the intent of the bill was to target the Mexican American studies program) (Ex. B-24); Marc Lacey, Rift in Arizona as Latino Class is Found Illegal, N.Y. Times, Jan. 7, 2011 (same) (Ex. B-25); Mary Jo Pitzl, Ban on Ethnic Studies Passes, Arizona Republic, May 1, 2010 (same) (Ex. B-28).  State Superintendent John Huppenthal—who served as a state senator until the beginning of 2011 and voted for HB 2281's passage—admitted that the law's target was the Mexican American studies program in Tucson, and further admitted that this program is the only one to have been investigated for violation of HB 2281 by his department during his term as Superintendent.  Huppenthal Dep. at 11, 13, *Acosta v. Huppenthal*, No. 4:10-cv-00623-AWT (D. Ariz. filed Dec. 14, 2011) (ECF No. 125-1).

---

[31] H.B. 2281, 48th Leg., 2d Reg. Sess. (Ariz. 2010), *available at* www.azleg.gov/legtext/49leg/2r/bills/hb2281s.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

As Senator Pearce explained in an email responding to a constituent complaint about the then-pending measure, the "ethnic studies ban" was necessary to prevent "tax dollars . . . being used to teach hateful anti American rhetoric in our American publicly funded schools."  Email from Sen. Pearce dated Dec. 21, 2008 (Ex. E-10).  Senator Pearce enclosed in his email an overtly jingoistic article warning that Mexican American studies programs are a slippery slope toward the realization of Atzlán—i.e., the retaking (or "Reconquista") of the American Southwest by Hispanics, particularly Mexicans.  *Id.* ("[T]he Mexican government has embraced the concept of 'demographic warfare,' a reconquering of the southwestern United States through unchecked illegal immigration and by exporting its 'surplus poverty' to regain control.").  The anti-Latino and anti-Mexican animus animating HB 2281 is deep and self-evident.

Arizona's anti-Mexican and anti-Latino animus is not new; the state, unfortunately, has a long history of such discrimination.  *See* Mary Romero & Marwah Serag, Violation of Latino Civil Rights Resulting from INS and Local Police's Use of Race, Culture and Class Profiling: the Case of the Chandler Roundup in Arizona, 52 Clev. St. L. Rev. 75 (2004).  Indeed, this history of discrimination against Latinos in Arizona has been established in recent federal court litigation.  *See Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc) (noting that the district court found, in the context of a claim under Section 2 of the Voting Rights Act, "that Latinos had suffered a history of discrimination in Arizona that hindered their ability to participate in the political process fully, that there were socioeconomic disparities between Latinos and whites in Arizona, and that Arizona continues to have some degree of racially polarized voting.").[32]  This history

_____

[32] As Judge Pegerson notes, this history includes: "de jure discrimination against Latinos in Arizona [that] existed during most of the twentieth century. Just prior to 1910, Arizona voters passed a literacy law that explicitly targeted Mexicans and disqualified non-English speakers from voting in state elections. As late as the 1960s, these literacy requirements were a precondition for voting in Arizona.  After Arizona attained statehood in 1912, the new state government engaged in an anti-immigrant campaign characterized by a series of proposals aimed at restricting the political rights of Mexican immigrants' and limiting their right to work. The new Arizona constitution restricted non-citizens from working on public projects. In 1914, the Arizona legislature enacted the "eighty percent law," which stated that eighty percent of the employees in businesses that had five or more employees

1    is also relevant to the *Arlington Heights* analysis.  *See White*, 412 U.S. at 765-69 (holding

2    that the "totality of circumstances," including Texas's long history of discrimination

3    against African-Americans and Latinos in the political process, demonstrated that the

4    election scheme was "used invidiously" to dilute minority voting strength); *Hunter*, 471

5    U.S. at 229 (considering evidence that "the Alabama Constitutional Convention of 1901

6    was part of a movement that swept the post-Reconstruction South to disenfranchise

7    blacks").  It is especially relevant here because Senator Pearce, in advocating for his anti-

8    immigrant measures, has explicitly invoked that history of discrimination, for example, by

9    calling for a reinstatement of the controversial "Operation Wetback" program, which

10   targeted Mexicans for deportation.  *See* Sarah Lynch, Pearce Calls for Deportations: Mesa

11   Policymaker Advocates '50s Policy for Dealing with Illegals, Mesa Trib., Sept. 29, 2006

12   (Ex. B-27).[33]

13             **4.  S.B. 1070 Departs Substantively from Established Practice.**

14             Under *Arlington Heights*, the Court should consider whether S.B. 1070 constituted

15   a substantial departure from established practice; such departures are evidence of

16   discriminatory intent.  "Substantive departures exist when 'factors usually considered

17   important by the decision-maker strongly favor a decision contrary to the one reached."

18   *Magee*, 835 F. Supp. 2d at 1186 (quoting *Arlington Heights*, 429 U.S. at 267).  Evidence

19   that a decision-making body's challenged conduct does not further its own interests

20   supports a finding of discriminatory intent.  *GNOFHAC I*, 641 F. Supp. 2d at 574.

21             Section 2(B) radically departs from the legislature's usual deference to law

22   enforcement—removing discretion from officers in the field by requiring them to

23   investigate immigration status rather than focusing on criminal violations that threaten

24   public safety.  Section 2(B) is unprecedented.  No previous statute has required law

25

26   had to be "native-born citizens of the United States." *Gonzalez v. Arizona*, 677 F.3d 383
     (9th Cir. 2012) (Pregerson, J. concurring and dissenting in part).

27   [33] Constituent emails to Arizona government officials have also suggested a new
     "Operation Wetback." *See, e.g.*, Email to Gov. Brewer & Sen. Pearce dated Apr. 21, 2010

28   (Ex. E-11); Email to Sen. Pearce dated Jul. 9, 2007 (Ex. E-12).

enforcement officers to consider any particular fact or status about individuals whom they stop or detain in the regular course of their duties.  Villaseñor Decl. ¶ 6 (Ex.  D).  Doing so conflicts with Arizona's general policy of providing law enforcement an appropriate measure of discretion in investigating and enforcing Arizona's laws.  *Id.*  Indeed, not only does S.B. 1070 limit law enforcement's discretion generally, it redirects their efforts away from areas that the legislature generally prioritizes for law enforcement:  investigating and dealing with crimes under Arizona law, particularly those that threaten public safety.  *Id.* ¶ 2.  *See also* Villaseñor Decl. ¶¶ 2, 5-6, Ex. 9 to Plf's Mot. for Prelim. Inj., *United States v. Arizona*, No. CV10-1413-PHX-SRB (D. Az. July 6, 2010); Jack Harris Decl. ¶¶ 2, 5, Ex. 10 to Plf's Mot. for Prelim. Inj., *Arizona* (D. Az. July 6, 2010); Tony Estrada Decl. ¶ 5, Ex. 8 to Plf's Mot. for Prelim. Inj., *Arizona*, (D. Az. July 6, 2010).

Moreover, the Arizona legislature took the additional radical step of authorizing the state's residents to enforce S.B. 1070 through civil lawsuits.  S.B. 1070 § 2(H).  To Plaintiffs' knowledge, there is no comparable cause of action against law enforcement officials for failing to enforce a state-law provision in any other Arizona statute, and this provision will further impinge on law enforcement's ability to apply their own professional judgment to situations they encounter in the field.  Indeed, law enforcement officers have reacted particularly strongly to this provision, expressing significant concerns about the potential for lawsuits and the nearly impossible task of defending against assertions that their officers acted improperly in not finding requisite "reasonable suspicion" to trigger the immigration status check required by § 2(B).  Villaseñor Decl. ¶¶ 4,5,7 (Ex. D); *see also* Tim Gaynor, *Arizona Police See "Difficulties" Enforcing Immigration Law*, Reuters, Jun. 26, 2012 ("[P]olice chiefs in Arizona are concerned that requiring officers to make a 'reasonable' attempt to determine a suspect's status could lead to potentially ruinous litigation from both supporters and opponents of the law.") (Ex. B-43).

Relatedly, the potential fines that could result from such litigation threaten law

enforcement agencies' ability to control their own purses.  A representative and lobbyist for the Arizona Association of Police Chiefs has stressed that "the fallout from such a fine could be financially devastating for smaller municipalities." *See, e.g.*, Mike Sakal, Police Unions: Immigration Bill Taxes Officers, Tribune (Mesa, Ariz.), Apr. 18, 2010 ("[S.B. 1070] also allows people to file lawsuits against police agencies they believe are lax in enforcing their immigration obligations to the fullest extent permitted by federal law. Municipalities also could be fined between $1,000 to $5,000 per day") (Ex. B-44); Villaseñor Decl., filed July 6, 2010, ¶ 8 (noting that because the clock on SB 1070's $5,000 per day fee begins upon a lawsuit's filing, and because in Arizona, a lawsuit may be served up to 120 days after filing, a city could incur $600,000 in fines before even being served).

* * *

As discussed above, the evidence on this motion establishes that racial and national origin discrimination was a "substantial" or "motivating" factor behind the enactment of the S.B.1070, and § 2(B) in particular, and it is likely that Plaintiffs will be able to prevail on this claim at trial, after merits discovery.  Of course, the Court can also issue a preliminary injunction based on equal protection if it finds Plaintiffs have raised "serious questions going to the merits," and have demonstrated that a balance of hardships tips sharply in their favor.  *See Alliance for the Wild Rockies*, 632 F.3d at 1135 (citation omitted).  Under either standard, a preliminary injunction of § 2(B) on equal protection grounds is warranted.

### C.  Plaintiffs Are Substantially Likely to Prevail on Their Claim That A.R.S. § 13-2929 Is Preempted by Federal Law

In *Arizona,* the Supreme Court struck down both state criminal provisions of S.B. 1070 that were before the Court: the § 3 state registration crime and the § 5(C) state crime penalizing unauthorized work.  Slip op. at 11, 15.  Plaintiffs address here another provision of § 5, A.R.S. § 13-2929, that likewise creates a new state crime based on alleged

36

violations of federal immigration law—specifically 8 U.S.C. § 1324, the federal harboring

statute.  Although this Court previously declined to enjoin A.R.S. § 13-2929 in the federal

government's case, the federal government's challenge was based only on the dormant

commerce clause and the claim that § 13-2929 amounts to a regulation of immigration.[34]

Moreover, at the time that it ruled on the federal motion, the Court did not have the benefit

of the Supreme Court's subsequent elucidation of the relevant preemption doctrine when it

decided the motion.

Plaintiffs now respectfully request that the Court preliminarily enjoin § 13-2929 on

the grounds of field and conflict preemption.  The Supreme Court's ruling in *Arizona* and

other precedents make it clear that § 13-2929 is invalid on these grounds.[35]  Indeed, after

the Court dismissed the United States' challenge to § 13-2929 on other grounds, but before

the *Arizona* decision, three separate federal district courts have preliminarily enjoined

similar state transporting and harboring laws on the bases of conflict and/or field

preemption.  *Georgia Latino Alliance for Human Rights v. Deal*, 793 F. Supp. 2d 1317,

1336 (N.D. Ga. 2011 (hereinafter, "*GLAHR*"), *appeal pending*, No. 11-13044-FF (11th

Cir.); *United States v. Alabama*, 813 F. Supp. 2d 1282, 1336 (N.D. Ala. 2011), *appeal

pending*, Nos. 11-14532, 11-14674 (11th Cir.); *United States v. South Carolina*, Nos. 2:11-

cv-2958, 2:11-cv-2779, 2011 WL 6973241, at *22 (D.S.C. Dec. 22, 2011), *appeal

pending*, No. 12-1096 (4th Cir.).

The Court should enjoin A.R.S. § 13-2929 because—like § 3—it intrudes in a field

that the federal government has fully occupied, and because—like § 5(c) —it conflicts

with the purposes and objectives of the relevant federal law, criminalizes more conduct

---

[34] *See United States v. Arizona*, 703 F. Supp. 2d 980, 1002-04 (D. Ariz. 2010) (finding
United States was unlikely to succeed in arguing that § 13-2929 was an impermissible
regulation of immigration or that it violated the dormant commerce clause).  The
preemption challenges that Plaintiffs present here are fundamentally distinct from the
government's challenge.  Plaintiffs raise separate preemption challenges—that A.R.S. §
13-2929 impermissibly legislates in a field that has been fully occupied by Congress, and
that it conflicts with the federal statutes concerning transporting and harboring.  Opp. to
Mot. to Dismiss at 19-21 (Doc. 314).
[35] The legality of A.R.S. § 13-2929 was not before the Supreme Court in *Arizona*.

than its federal counterpart, and imposes additional penalties beyond those approved by the federal scheme.

### I.  A.R.S. § 13-2929 Is Field Preempted

The Supreme Court struck down § 3 of S.B. 1070 because federal law occupies the alien registration field.  *Arizona*, slip op. at 9-11.  Similarly, Congress has occupied the alien harboring field by enacting 8 U.S.C. § 1324, which is an integral part of Congress's comprehensive immigration law.  *GLAHR v. Deal*, 793 F. Supp. 2d 1317, 1336 (N.D. Ga. 2011) (finding that a similar provision under Georgia's law "imposes additional criminal laws on top of a comprehensive federal scheme"); *South Carolina*, 2011 WL 6973241, at *13 (8 U.S.C. § 1324 is part of federal scheme "so pervasive that it left no room in this area for the state to supplement it.").

Congress has enacted "a uniform, comprehensive scheme of sanctions," both "for those who unlawfully enter the United States" and "for third parties who aid the entry and stay of those who unlawfully enter."  *Alabama*, 813 F. Supp. 2d at 1330-31(citing and summarizing 8 U.S.C. §§ 1323, 1324, and 1327).  These provisions prohibit the knowing attempt to bring a person into the United States "at a place other than a designated port of entry or place other than as designated by the [Secretary of Homeland Security]," 8 U.S.C. § 1324(a)(1)(A)(i), and impose criminal penalties on anyone who, "knowing or in reckless disregard of the fact" that a person has unlawfully entered or remained in the United States, attempts to "transport or move" the person within the United States "in furtherance of such violation of law."  8 U.S.C. § 1324(a)(1)(A)(ii).

The provisions of 8 U.S.C. § 1324 have broad preemptive effect.  *See South Carolina*, 2011 WL 6973241, at *13; *Villas at Parkside Partners v. City of Farmers Branch*, 701 F. Supp. 2d 835, 858-59 (N.D. Tex. 2010) (holding that § 1324 preempts city ordinance forbidding rental of housing to unauthorized immigrants), *aff'd*, 675 F.3d 802 (5th Cir. 2012); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1056 (S.D. Cal. 2006) (same).

The Supreme Court recognized that Congress authorized state and local involvement in immigration enforcement only in specific, limited circumstances, including through 8 U.S.C. § 1324(c), which provides "authority to *arrest*" for violations of the federal harboring statute. *Arizona*, slip op. at 17 (emphasis added). The Court made clear, however, that states may not exceed such specific authorizations. *Id.* at 19; *see also Alabama*, 813 F. Supp. 2d at 1333-34 (noting that in this area there is no savings clause that might authorize state activity such as the one at issue in *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. ___, 131 S. Ct. 1968 (2011)). In A.R.S. § 13-2929 Arizona goes well beyond what Congress authorized with respect to harboring—arrest for the *federal* crime—by creating its own state criminal scheme.

*Arizona* explains that a state law allowing states to prosecute and punish alleged federal immigration violations fundamentally conflicts with Congress's reservation of "broad discretion" over immigration enforcement to federal officials. Slip op. at 4-5. As with alien registration, in the area of the inducement, transportation, and harboring of noncitizens, the "federal statutory directives provide a full set of standards" that were "designed as a 'harmonious whole.'" *Id.* at 10 (quoting *Hines*, 312 U.S. at 72). And as in the registration field, "[p]ermitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted." *Id.* at 11. "[T]he State would have the power to bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.*

For these reasons, even if A.R.S. § 13-2929 were identical to the federal harboring law, which it is not, it would be field preempted.

### a.  A.R.S. § 13-2929 Is Conflict Preempted

Within the past year, three federal courts have enjoined state harboring, inducing, and transporting statutes similar to § 13-2929 on conflict preemption grounds. *Alabama*, 813 F. Supp. 2d at 1334-36; *South Carolina*, 2011 WL 6973241, at *13; *GLAHR*, 793 F.

Supp. 2d at 1335-36.  A.R.S. § 13-2929 is similarly conflict preempted.  Specifically, A.R.S. § 13-2929 undermines the congressional scheme by adding additional penalties to existing federal crimes; relocating decision-making regarding the interpretation and prosecution of these crimes from the federal government to the state without ensuring uniformity; and criminalizing conduct the federal government chose not to sanction.

Arizona's harboring provisions are enforced by state police and prosecutors and interpreted by state judges, not by their federal counterparts, and decisions about when to charge a person or what penalty to seek are no longer under federal control.  A.R.S. § 13-2929 permits the state to prosecute and impose additional penalties on individuals whom the federal government has elected not to charge, or those who have already been federally charged and sentenced by a federal court.  Thus, A.R.S. § 13-2929 authorizes state officers to "use an iron fist where the President has consistently chosen kid gloves."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427 (2003).  The Supremacy Clause of the Constitution does not permit states to make that decision.  *See Arizona*, slip op. at 11 ("Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted").  Such state regulation would "disrupt this comprehensive federally controlled immigration enforcement scheme by placing state prosecutors in control of enforcement efforts under [the South Carolina provisions] and permitting state judges to interpret the harboring and transporting statutes."  *South Carolina*, 2011 WL 6973241, at *12.

Of particular relevance here, in *Arizona* the Supreme Court rejected as "unpersuasive on its own terms" the argument that a "provision [that] has the same aim as federal law and adopts its substantive standards" must survive preemption.  Slip op. at 10-11; *see also id.* at 15 ("Although § 5(C) attempts to achieve one of the same goals as federal law . . . it involves a conflict in the method of enforcement"); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379 (2000) (even if a state law shares the same goals as the federal law, "[t]he fact of a common end hardly neutralizes conflicting

means").  Under A.R.S. § 13-2929, Arizona may decide to charge an individual over whom the federal government has exercised its discretion not to prosecute.  Likewise, Arizona prosecutors may pile additional penalties on top of a federal sentence under 8 U.S.C. § 1324, effectively increasing the penalty carefully calibrated by Congress and the federal justice system.  "[T]his state framework of sanctions creates a conflict with the plan Congress put in place."  *Arizona*, slip op. at 11 (citing *Wisc. Dept. of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 286 (1986), for the proposition that "conflict is imminent whenever two separate remedies are brought to bear on the same activity" (internal quotation marks omitted)).  By imposing different and additional penalties, A.R.S. § 13-2929 impermissibly "undermines the congressional calibration of force."  *Crosby*, 530 U.S. at 380.

In addition, *Arizona* emphasizes that a small inconsistency between federal and state laws relating to immigration creates additional conflicts.  Slip op. at 11 (SB 1070 § 3 conflicts because it creates "an inconsistency between [state] and federal law with respect to penalties" by ruling out probation and pardon).  A.R.S. § 13-2929 presents an even more severe conflict than the Arizona criminal provisions considered by the Supreme Court because, in addition to potentially imposing different penalties, it prohibits a different (and broader) range of *conduct* than the federal harboring law.  A.R.S. § 13-2929 punishes encouraging or inducing undocumented individuals to come to, enter, or reside in the state of Arizona whether or not individuals enter Arizona from another state or another country.  The federal statute, in contrast, does not criminalize actions with respect to entering Arizona from another state.  *See GLAHR*, 793 F. Supp. 2d at 1334 (noting Georgia's provision was not identical to federal law because the state law prohibited "knowingly inducing, enticing, or assisting illegal aliens to enter Georgia" whereas "[o]nce in the United States, it is not a federal crime to induce an illegal alien to enter Georgia from another state"); *Alabama*, 813 F. Supp. 2d at 1334 (same).

Additionally, federal criminal harboring sanctions are not directed at unlawfully

present individuals themselves or at incidental or innocent contact, while A.R.S. § 13-2929 permits Arizona to target such persons and behavior for prosecution and imprisonment.[36] Congress chose not to penalize unauthorized immigrants' presence or movement within the country or across state lines unless other factors are present, and the federal immigration laws do not penalize transportation of these individuals in such situations. *See Alabama*, 813 F. Supp. 2d at 1334 (noting that "the corresponding federal provision in 8 U.S.C. § 1324(a)(1)(A)(ii) . . . does not extend to the smuggled or transported alien."); *South Carolina*, 2011 WL 6973241, at *15 (finding that state law making it a crime for "an unlawfully present person to allow himself or herself to be 'transported or moved' within the state or to be harbored or sheltered to avoid apprehension or detection" was preempted in part because "[t]here is no comparable federal statute, and it appears that this provision is unique in American law."). Thus, A.R.S. § 13-2929 is broader than its federal counterpart because it criminalizes more activity than the federal statute intended, in clear conflict with federal objectives.

While in one sense the Arizona statute is narrower than its federal counterpart because prosecution requires that the person must already be in violation of a separate criminal offense, *see U.S. v. Arizona*, 703 F. Supp. 2d at 1002 n.18, that alone does not cure A.R.S. § 13-2929's fundamental conflict preemption problem. As this Court has recognized, the relevant predicate offense can be something as mundane as a traffic violation or a violation of the federal harboring and transporting statute, 8 U.S.C. § 1324, itself. Order, May 29, 2012 (Doc. 682) (noting tha "[w]hile it is not clear what type of criminal violation will trigger [A.R.S. § 13-2929] it is possible that traffic violations or the violation of the federal alien smuggling statute could be sufficient to give rise to a violation of § 13-2929"); *see also GLAHR*, 793 F. Supp. 2d at 1333 n.12 (finding

---

[36] Arizona could prosecute undocumented persons for "being harbored" by reading A.R.S. § 13-2929 together with A.R.S. § 13-1003 (conspiracy), in much the same way that it already prosecutes undocumented persons for "being smuggled" by reading A.R.S. § 13-2319 (smuggling) together with § 13-1003.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Georgia's transporting and harboring law preempted in part because a violation of the federal statute could be the predicate offense).

Arizona's statute presents yet another conflict with federal law by failing to exempt certain individuals from prosecution, making its reach wider than that of its federal counterpart.  8 U.S.C. § 1324(a)(1)(C) exempts from prosecution ministers or missionaries of religious denominations, while A.R.S. § 13-2929 provides no such exemption and would allow prosecution of such individuals.  *See* A.R.S. § 13-2929(E) (exempting only child protective services personnel and first responders acting in their official capacity).  This inconsistency also supports a finding of conflict preemption.  *See South Carolina*, 2011 WL 6973241, at *13 ("the inconsistent safe harbor provisions of state and federal law result in conflict preemption."); *Alabama*, 813 F. Supp. 2d at 1331 (finding harboring and transporting state statute preempted because it "actually prohibits conduct allowed under federal law and criminalizes conduct that is lawful under federal law."); *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 899 (2000) (recognizing that "a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law.") (internal quotations and citations omitted).

Like Georgia, Alabama, and South Carolina's enjoined counterparts, A.R.S. § 13-2929 is preempted because, although it is "superficially similar to [the relevant federal statute, 8 U.S.C.] § 1324, state prosecutorial discretion and judicial interpretation will undermine federal authority to 'establish immigration enforcement priorities and strategies'" and undermine federal purposes and objectives.  *GLAHR*, 793 F. Supp. 2d at 1335 (quoting *U.S. v. Arizona*, 641 F.3d 339, 352 (9th Cir. 2011); *Alabama*, 813 F. Supp. 2d at 1335-36; *South Carolina*, 2011 WL 6973241, at *21.  For all of these reasons, Plaintiffs are likely to succeed on their claim that A.R.S. § 13-2929 conflicts with federal law and is preempted.

## II.  Plaintiffs Will Suffer Irreparable Harm if the Preliminary Injunction Is Not Granted

Plaintiffs and putative class members will suffer irreparable harm if an injunction is not granted. *Winter*, 555 U.S. at 20 (injunction appropriate where irreparable harm "likely"). The alleged deprivation of their constitutional rights are alone sufficient to establish irreparable injury from § 2(B) and A.R.S. § 13-2929.  11A Charles A. Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *see also Jolly v. Coughlin*, 76 F.3d 468, 472 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm.") (granting preliminary injunction for plaintiff alleging Eighth Amendment claims against prison officials); *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) ("The Ninth Circuit has held that 'an alleged constitutional infringement will often alone constitute irreparable harm.'") (finding irreparable harm based on likelihood of establishing violations of Fourth Amendment and Fourteenth Amendment due process rights) (citations omitted).  In addition, courts have repeatedly recognized that the enforcement of a preempted law may constitute irreparable harm, particularly where, as here, more than monetary interests are at stake.  *See, e.g.*, *United States v. Arizona*, 641 F.3d at 366; *GLAHR*, 793 F. Supp. 2d at 1340; *South Carolina*, 2011 WL 6973241, at *21; *Alabama*, 813 F. Supp. 2d at 1336; *see also Morales v. Trans World Airlines*, 504 U.S. 374, 381 (1992).

Even if this Court did not find that irreparable injury exists on the basis of the constitutional violations raised here, ample evidence exists of the irreparable harm Plaintiffs will suffer from § 2(B) and A.R.S. § 13-2929.  Section 2(B) puts Plaintiffs and class members at risk of unlawful detention and interrogation based on little more than an individual officer's "reasonable suspicion" that they are "unlawfully present in the United States."  A.R.S. § 11-1051(B).  Plaintiffs will be subject to racial profiling, additional police scrutiny, prolonged detention, and possible arrest if § 2(B) is implemented.  *See* Harris Decl., *United States v. Arizona*, No. 10-1413,  ¶ 7 (Doc. 27-10); George Gascón

Decl. ¶¶ 18–20 (Doc. 235-6); Eduardo González Decl. ¶¶ 16–17 (Doc. 235-8); Samuel

Granato Decl. ¶ 16 (Doc. 236).  Indeed, the Court already found that Plaintiffs have

alleged a "realistic danger of sustaining a direct injury as a result of . . . [the] operation or

enforcement' of [§ 2] because of their appearance and limited English-speaking ability."

Order, May 29, 2012, at 11 (*quoting Babbitt v. United Farm Workers*, 442 U.S. 289, 298

(1979)).  The Court further found that "[b]ecause § 2 applies during every lawful stop,

detention, or arrest, the Individual Plaintiffs will be subject to the allegedly

unconstitutional immigration investigations even if they are stopped only for suspicion of

a minor traffic violation and even if they have not actually committed any crime." *Id.* at 8-

9.

        In addition, Plaintiffs, and many putative class members, will curtail their public

activities if § 2(B) is allowed to take effect out of fear that they will be subject to arrest

and detention by law enforcement officials due to their appearance and limited English-

speaking ability.  *See* Vargas Decl. ¶ 7 (Doc. 236-10); C.M. Decl. ¶ 5 (Doc. 331-5); Tupac

Enrique Decl. ¶ 3 (Doc. 236-9).  Members of plaintiff organizations will also reduce going

out in public and attending organizational events out of fear that contact with law

enforcement officials could lead to interrogation and detention under § 2(B).  Joseph

Hansen Am. Decl. ¶ 6 (Doc. 314-2); Eliseo Medina Decl. ¶ 6 (Doc. 236-9).  Plaintiffs will

also be fearful of having any contact with law enforcement, including reporting crimes or

serving as witnesses.  *See* Ibarra Decl. ¶ 12 (Doc. 236-2) ("SB 1070 will cause many of

our clients or prospective clients to not report that they are victims of crime out of fear that

contact with Arizona state law enforcement will subject them to detention, arrest and

possible deportation."); *see also* Medina Decl. ¶ 7 (Doc. 236-9); Gascón Decl. ¶¶ 9–10

(Doc. 235-6); Gonzalez Decl. ¶¶ 12–13 (Doc. 235-8), 18; Granato Decl. ¶¶ 9–10 (Doc.

236).

        Moreover, Plaintiffs and putative class members are at risk of criminal prosecution

under A.R.S. § 13-2929.  The Court has already found that Plaintiff Luz Santiago "has

45

alleged a 'realistic danger of sustaining a direct injury as a result of the . . . operation or enforcement' of A.R.S. § 13-2929." Order, May 29, 2012, at 4.  As the pastor of her church, Plaintiff Santiago fears that she will face criminal sanctions because she frequently provides transportation, food, and shelter to members of her congregation who may not be authorized to remain in the United States.  Santiago Dep. at 20-21, 24-25 (Doc. 655-11). For example, Santiago has stated that she frequently drives members of her congregation to church retreats and to shop for groceries.  *Id.* at 20-21.  She also provides shelter to individuals in need.  *Id.* at 24.  Under A.R.S. § 13-2929, it is likely that Santiago would be found to do so "in reckless disregard" of the fact that some of those congregation members and individuals may be unlawfully present.  Order, May 29, 2012, at 16; *see also* Santiago Dep. at 30-31, 33.  If A.R.S. § 13-2929 is not enjoined, Santiago will continue to face the "reasonable likelihood" of criminal charges.  *See* Order, May 29, 2012, at 16.  Because Santiago intends to continue to provide transportation and shelter to members of her congregation without regard to their immigration status, *see* Santiago Dep. 58-59, she will suffer irreparable harm if A.R.S. § 13-2929 is not enjoined.  *See San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996); *see also GLAHR*, 793 F. Supp. 2d at 1340 (finding that plaintiffs would suffer irreparable harm under similar harboring provisions because they would be "subject to criminal penalties under laws that are allegedly preempted"); *Alabama*, 813 F. Supp. 2d at 1332 (same).

Organizational Plaintiffs will also suffer direct harm in the form of resource diversion, the frustration of their core mission activities, and the possibility of criminal prosecution of staff or volunteers under A.R.S. § 13-2929.  Organizational Plaintiffs have already diverted significant resources toward educating their members about the effects of S.B. 1070, including A.R.S. § 13-2929.  Jennifer Allen Decl. ¶ 12 (Doc. 314-1); Alison J. Harrington Decl. ¶¶ 8, 23 (Doc. 314-4).  A.R.S. § 13-2929 will also hinder the organizational Plaintiffs' ability to retain and recruit members because those members will curtail their own travel and participation in organizational events in order to avoid being

46

charged with violating A.R.S. § 13-2929.  Allen Decl. ¶ 13-14.  This Court has already found that "[t]he alleged harm to the organizational Plaintiffs will occur if S.B. 1070 [including A.R.S. § 13-2929] goes into effect, regardless of how it is enforced or applied." Order, Oct. 8, 2010, at 9.

In addition, Organizational Plaintiffs will suffer irreparable harm if their staff or volunteers are prosecuted under A.R.S. § 13-2929.  For example, staff from Plaintiff Border Action Network ("BAN") regularly bus members to events and organizational functions.  Allen Decl. ¶ 9.  Because BAN does not inquire into the citizenship or immigration status of the members it transports and some of these members are persons without authorization to be in the United States, "BAN staff are concerned that this could subject them to investigation under the new immigration law."  *Id.*; *see also* Pl. Ariz. South Asians for Safe Families' Answers to Intervenor Def. Governor Brewer's First Set of Interrogs. at 6-7 (indicating that ASASF volunteers often transport citizen and non-citizen domestic violence victim members to medical and legal appointments) (Ex. H). Similarly, organizational Plaintiff Southside Presbyterian Church will be irreparably harmed if its leaders, staff, parishioners, and volunteers are subjected to criminal prosecution under A.R.S. § 13-2929 for "performing work that is central to [their] faith" by providing assistance to the homeless or to immigrants in distress in the desert, or by transporting parishioners and community members to activities and medical facilities. Harrington Decl. ¶¶ 9-12, 21 (Doc. 314-4).

### III.        The Balance of Equities Tips Sharply In Favor of Plaintiffs

Any harm to the Defendants from the grant of a preliminary injunction is minimal because Plaintiffs ask only for the status quo to be maintained while the significant constitutional challenges to § 2(B) are resolved.  As described above, without a preliminary injunction, the irreparable harms facing Plaintiffs are overwhelming, and courts frequently have found that the equities favor an injunction to preserve the status quo in just such a situation.  *See, e.g.*, *Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*, 743 F.2d

1365, 1368 (9th Cir. 1984) (agreeing with district court's conclusion that irreparable harm to plaintiffs outweighed harm to government from delay in implementing regulation); *AFL v. Chertoff*, 552 F. Supp. 2d 999, 1006-07 (N.D. Cal. 2007) (same).  Indeed the preservation of the status quo in the face of potential widespread and significant irreparable harm is precisely the purpose of a preliminary injunction.  *See Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1422 (9th Cir. 1984).  Plaintiffs merely seek to prevent Defendants from implementing a law that is constitutionally suspect in order to prevent broad irreparable harm to Plaintiffs and to the public.  Thus, the equities tip sharply in favor of the grant of a preliminary injunction.

### IV.The Preliminary Injunction Will Serve the Public Interest

The interests of Plaintiffs and the public are aligned in favor of a preliminary injunction.  The same violations that would irreparably harm Plaintiffs would concurrently harm the public interest.  In fact, § 2(B) is likely to result in widespread discrimination against racial and ethnic minorities, because law enforcement would be required to assess, without sufficient training and guidance, whether there is "reasonable suspicion" that an individual is unlawfully present.

The fact that law enforcement officials risk being sued by private parties, who believe that Arizona city and county officials have not enforced the law strictly enough, increases the likelihood that racial profiling will be employed.  *See* A.R.S. § 11-1051(G); s*ee also* Villaseñor Decl. ¶¶ 4, 5, 7 (Ex. D).  This provision sends a clear directive of maximum enforcement to local law enforcement officials.  As a result, Plaintiffs and members of the public are at a substantial risk of being deprived of their constitutional rights to liberty and due process, with "no meaningful procedural safeguards against erroneous deprivations of liberty."  Order, Oct. 8, 2010, at 23.  Given the near certainty of these irreparable harms, it is unquestionably in the public interest to prevent these widespread constitutional violations.  *See Murillo v. Musegades*, 809 F. Supp. 487, 498 (W.D. Tex. 1992) (the "public interest will be served by protection of Plaintiffs'

constitutional rights" in cases where the majority of the Hispanic population within a geographic area would be subjected to "illegal stops, questioning, detentions, frisks, arrests, searches, and further abuses" by local law enforcement).

Section 2(B) will, as noted above, also deter individuals from interacting with law enforcement, thus compromising public safety.  González Decl. ¶¶ 12–13, 18 (Doc. 235-8); Granato Decl. ¶¶ 9–10 (Doc. 236); Gascón Decl. ¶¶ 9–10 (Doc. 235-6).  Section 2(B) will undermine trust between the police and community members, for whom a routine encounter with law enforcement will become a lengthy detention.  This increased fear of local law enforcement in immigrant communities will threaten the safety of all Arizona communities, as well as the safety of police officers.

Moreover, the public interest is served best when unconstitutional and preempted state laws are blocked by courts.  *See Arizona*, 641 F.3d at 366 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law . . . .  In such circumstances, the interest of preserving the Supremacy Clause is paramount." (internal quotation omitted)); *see also South Carolina*, 2011 WL 6973241, at *21 (finding that a preliminary injunction of similar harboring provisions is in the public interest); *Alabama*, 813 F. Supp. 2d at 1336 (same); *Buquer*, 797 F. Supp. 2d at 925 ("'the public has a strong interest in the vindication of an individual's constitutional rights . . . .'" (quoting *O'Brien v. Town of Caledonia,* 748 F.2d 403, 408 (7th Cir. 1984))); *GLAHR*, 793 F. Supp. 2d at 1340 (same).  As described above, § 2(B) and A.R.S. § 13-2929 are preempted by federal law.  For the foregoing reasons, the public interest weighs in favor of a preliminary injunction.


**CONCLUSION**

The Court should grant the requested injunction.


DATED this 17th day of July 2012.        Respectfully submitted,

1

2

/s/ Karen C. Tumlin

3

NATIONAL IMMIGRATION LAW

4

CENTER

5

6

/s/ Omar C. Jadwat

7

AMERICAN CIVIL LIBERTIES UNION

8

FOUNDATION IMMIGRANTS' RIGHTS

9

PROJECT

10

11

/s/ Victor Viramontes

12

MEXICAN AMERICAN LEGAL DEFENSE

13

AND EDUCATIONAL FUND

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

50

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2012, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System which will send notification of such filing to all counsel of record.

                                                         /s/ Karen C. Tumlin