1   John J. Bouma (#001358)
2   Robert A. Henry (#015104)
    Kelly A. Kszywienski (#025578)
3   SNELL & WILMER L.L.P.
    One Arizona Center
4   400 E. Van Buren
    Phoenix, AZ  85004-2202
5   Phone: (602) 382-6000
    Fax: (602) 382-6070
6   jbouma@swlaw.com
    bhenry@swlaw.com
7   kkszywienski@swlaw.com

8   Joseph Sciarrotta, Jr. (#017481)
    Office of Governor Janice K. Brewer
9   1700 W. Washington, 9th Floor
    Phoenix, AZ  85007
10  Telephone: (602) 542-1586
    Fax: (602) 542-7602
11  jsciarrotta@az.gov

12  *Attorneys for Intervenor Defendants Janice
    K. Brewer, Governor of the State of
13  Arizona, and the State of Arizona*

14

Thomas C. Horne (#002951)
Attorney General
Michael Tryon (#003109)
Senior Litigation Counsel
Evan Hiller (#028214)
Assistant Attorney General
1275 West Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542- 5025
tom.horne@azag.gov
michael.tryon@azag.gov
evan.hiller@azag.gov

*Attorneys for Intervenor Defendant the
State of Arizona*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Valle del Sol, Inc., et al. | No. CV-10-1061-PHX-SRB |
| Plaintiffs, | |
| v. | **INTERVENOR DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| Michael B. Whiting, Apache County Attorney, in his official capacity, et al., | |
| Defendants, | |
| and | |
| Janice K. Brewer, Governor of the State of Arizona, in her official capacity; and the State of Arizona, | |
| Intervenor Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY INJUNCTION AND STATUTORY INTERPRETATION STANDARDS ................................................................................. 2

II.   PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THEIR PRE-ENFORCEMENT PREEMPTION AND FOURTH AMENDMENT CHALLENGES TO SECTION 2(B) ........................................................ 2

    A.    The Supreme Court's Decision Forecloses Plaintiffs' Claims .................... 3

    B.    The Evidence Also Refutes Plaintiffs' Argument that Section 2(B) Is Likely to Be Enforced, Statewide, In an Unconstitutional Manner ............. 3

    C.    If the Court Certifies These Issues to the Arizona Supreme Court, an Interim Injunction Is Not Warranted Because the Arizona Supreme Court Must Construe Section 2(B) to Avoid Constitutional Concerns ........ 8

III.  PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THEIR PRE-ENFORCEMENT EQUAL PROTECTION CHALLENGE TO SECTION 2(B) ........................................................................................................... 8

    A.    Plaintiffs' Equal Protection Challenge to Section 2(B) Requires Plaintiffs to Establish Discriminatory Motive *and* Discriminatory Effect ...................................................................................................... 8

    B.    Plaintiffs Cannot Demonstrate that Section 2(B) Is Likely to be Applied in a Racially Discriminatory Manner ............................................... 9

        1.    Plaintiffs' "Evidence" that Section 2(B) Will Result in Racial Profiling is Entirely Speculative and Conclusory ........................... 12

        2.    The Record Overwhelmingly Refutes Plaintiffs' Assumption that Section 2(B) Will Result in Racial Profiling ........................... 17

    C.    Plaintiffs Have Not Demonstrated that the Arizona Legislature Had a Discriminatory Purpose in Enacting Section 2(B) ...................................... 19

        1.    The Historical Background and Sequence of Events Leading Up to the Challenged Decision ......................................................... 19

        2.    The Legislative History ................................................................. 23

            i.    S.B. 1070's initial consideration in the Senate .................... 23

            ii.   The House amendments to S.B. 1070 .................................. 25

            iii.  The enactment of H.B. 2162 ................................................ 27

**TABLE OF CONTENTS**
(continued)

Page

iv.    The legislative history does not support Plaintiffs' arguments regarding discriminatory intent ........................... 27

v.    The constituent e-mails upon which Plaintiffs rely are not related to S.B. 1070 ......................................... 30

3.    Procedural or Substantive Departures from Normal Practice .......... 32

4.    Whether the Impact of the Decision Bears More Heavily on One Race than Another ..................................... 33

D.    Even If Plaintiffs Could Show a Discriminatory Motive Underlying S.B. 1070, Plaintiffs' Claim Fails Because S.B. 1070 Would Have Been Enacted Without Any Improper Motive ............................ 35

IV.    PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THEIR PREEMPTION CHALLENGES TO A.R.S. § 13-2929 ........................ 36

A.    A.R.S. § 13-2929 is Not Field Preempted ................................... 36

B.    A.R.S. § 13-2929 Does Not Conflict With Any Congressional Objectives .................................................. 38

V.    PLAINTIFFS ARE NOT LIKELY TO SUFFER IRREPARABLE HARM AND AN INJUNCTION IS NOT IN THE PUBLIC INTEREST ........................ 41

VI.    CONCLUSION ................................................. 44

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Alliance for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) .................................................. 41

*Arizona v. United States*,
  132 S. Ct. 2492 (2012) ...................................................... passim

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................. 10

*Associated Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity*,
  950 F.2d 1401 (9th Cir. 1991) ................................................ 42

*Birmingham v. City of Manhattan Beach*,
  341 F.3d 939 (9th Cir. 2003) ................................................... 9

*Bradley v. United States*,
  299 F.3d 197 (3d Cir. 2002) .................................................... 9

*Cent. Ala. Fair Hous. Ctr. v. Magee*,
  835 F. Supp. 2d 1165 (M.D. Ala. 2011) ....................... 32, 33, 34

*Chavez v. Ill. State Police*,
  251 F.3d 612 (7th Cir. 2001) ............................................. 9, 11

*City of Cleburne v. Cleburne Living Ctr., Inc.*,
  473 U.S. 432 (1985) ......................................................... 9, 31

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ............................................................... 43

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
  583 F.3d 690 (9th Cir. 2009) ............................................ 33, 34

*De Canas v. Bica*,
  424 U.S. 351 (1976) ............................................................. 37

*Doe v. Village of Mamaroneck*,
  462 F. Supp. 2d 520 (S.D.N.Y. 2006) ...................................... 12

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ............................................................. 43

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*,
  308 F.3d 523 (6th Cir. 2002) ................................................. 12

*Flynt Dist. Co., Inc. v. Harvey*,
  734 F.2d 1389 (9th Cir. 1984) ................................................. 6

*Fox v. Washington*,
  236 U.S. 273 (1915) ............................................................... 3

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.*,
   128 F.3d 1074 (7th Cir. 1997) ................................. 22

*Gen. Electric Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................. 15

*Gonzales v. Arizona*,
   677 F.3d 383 (9th Cir. 2012) ................................. 22

*Green v. Baca*,
   226 F.R.D. 624 (C.D. Cal. 2005) ............................. 6

*Hathaway v. Bazany*,
   507 F.3d 312 (5th Cir. 2007) ................................. 13

*Heath v. Alabama*,
   474 U.S. 82 (1985) ................................................. 39

*Hodgers-Durgin v. De La Vina*,
   199 F.3d 1037 (9th Cir. 1999) ...................... 2, 42, 43

*Hunter v. Underwood*,
   471 U.S. 222 (1985) ............................................... 36

*Larez v. City of Los Angeles*,
   946 F.2d 630 (9th Cir. 1991) ...................... 5, 6, 28

*Lust v. Merrell Dow Pharm., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ................................. 13

*McLean v. 988011 Ontario, Ltd.*,
   224 F.3d 797 (6th Cir. 2000) ................................. 14

*McLean v. Crabtree*,
   173 F.3d 1176 (9th Cir. 1999) ............................... 9

*N.Y. State Club Ass'n v. City of New York*,
   487 U.S. 1 (1988) ................................................... 2

*Ortega-Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS,
   2011 U.S. Dist. LEXIS 148223 (D. Ariz. Dec. 23, 2011) ......... 17

*Palmore v. Sidoti*,
   466 U.S. 429 (1984) ............................................... 31

*Panama Refining Co. v. Ryan*,
   293 U.S. 388 (1935) ............................................. 2, 4

*Paramount Land Co. LP v. Cal. Pistachio Comm'n*,
   491 F.3d 1003 (9th Cir. 2007) ............................... 42

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................... 37

*Reno v. Bossier Parish Sch. Bd.*,
   520 U.S. 471 (1997) ........................................... 33, 34

*Resident Advisory Board v. Rizzo*,
    564 F.2d 126 (3d Cir. 1977) .................................................................. 19, 31

*Rivera v. Inc. Village of Farmingdale*,
    784 F. Supp. 2d 133 (E.D.N.Y. 2011) ................................................... 19, 31

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ...................................................................... 2, 4, 5, 43

*Rosenbaum v. City & Cnty. of San Francisco*,
    484 F.3d 1142 (9th Cir. 2007) .................................................................... 9

*Signeo, LLC v. Signeo Ltd.*, No. 5:11-cv-06370-PSG,
    2012 U.S. Dist. LEXIS 79356 (N.D. Cal. June 6, 2012) ............................. 6

*Skiriotes v. Florida*,
    313 U.S. 69 (1941) .................................................................................... 40

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .................................................................. 41

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) .................................................................................. 40

*Torres v. City of Madera*,
    648 F.3d 1119 (9th Cir. 2011) .................................................................... 4

*United States v. Arenas-Ortiz*,
    339 F.3d 1066 (9th Cir. 2003) ........................................................... passim

*United States v. Arizona*,
    703 F. Supp. 2d 980 (D. Ariz. 2010) ........................................................ 20

*United States v. Arizona*,
    Case No. 10-CV-01413-PHX-SRB ........................................................... 20

*United States v. Armstrong*,
    517 U.S. 456 (1996) ............................................................................... 9, 11

*United States v. Bass*,
    536 U.S. 862 (2002) ........................................................................ 11, 13, 19

*United States v. Bell*,
    86 F.3d 820 (8th Cir. 1996) ....................................................................... 9

*United States v. Brignoni-Ponce*,
    422 U.S. 873 (1975) .................................................................................. 15

*United States v. Bullock*,
    94 F.3d 896 (4th Cir. 1996) ....................................................................... 9

*United States v. Day*,
    524 F.3d 1361 (D.C. Cir. 2008) ................................................................ 13

*United States v. Lanza*,
    260 U.S. 377 (1922) .................................................................................. 39

*United States v. Manzo-Jurado,*
    457 F.3d 928 (9th Cir. 2006) ...................................................... 15

*United States v. Montero-Camargo,*
    208 F.3d 1122 (9th Cir. 2000) ..................................................... 15

*United States v. Santini,*
    656 F.3d 1075 (9th Cir. 2011) ..................................................... 13

*United States v. Turner,*
    104 F.3d 1180 (9th Cir. 1997) ..................................................... 10

*Village of Arlington Heights v. Metro. Housing Dev. Corp.,*
    429 U.S. 252 (1977) ................................................... 19, 33, 35, 36

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) ..................................................................... 42

*Washington v. Davis,*
    426 U.S. 229 (1976) ..................................................................... 19

*Wayte v. United States,*
    470 U.S. 598 (1985) ....................................................................... 9

*Williamson v. Mazda Motor of Am., Inc.,*
    131 S. Ct. 1131 (2011) ................................................................. 38

*Winnemucca Indian Colony v. United States ex rel. Dep't of the Interior,*
    837 F. Supp. 2d 1184 (D. Nev. 2011) ......................................... 41

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................... passim


**<u>STATE CASES</u>**

*Arizona v. Barragan-Sierra,*
    196 P.3d 879 (Ariz. Ct. App. 2008) ........................................... 41

*Arizona v. Flores,*
    188 P.3d 706 (Ariz. Ct. App. 2008) ............................... 38, 39, 40

*Chevron Chem. Co. v. Superior Court,*
    641 P.2d 1275 (Ariz. 1982) ........................................................... 2

*In re Appeal of Tucson Unified Sch. Dist. No. 1,* No. 11F-002-ADE
    (Office of Admin. Hr'gs. Dec. 27, 2011) (ALJ Decision) ........... 22

*Jilly v. Rayes,*
    209 P.3d 176 (Ariz. Ct. App. 2009) ............................................. 8

*Readenour v. Marion Power Shovel,*
    719 P.2d 1058 (Ariz. 1986) ........................................................... 8

## **FEDERAL STATUTES**

8 U.S.C. § 1324 ............................................................................. 38, 39, 40, 41

8 U.S.C. § 1326 ............................................................................................. 10

8 U.S.C. § 1329 ............................................................................................. 40

8 U.S.C. § 1373 ............................................................................................. 23

8 U.S.C. § 1644 ............................................................................................. 23

## **STATE STATUTES**

A.R.S. § 11-1051(H)....................................................................................... 32

A.R.S. § 13-3601(B)....................................................................................... 33

A.R.S. § 15-112(A)......................................................................................... 21

A.R.S. § 30-221 .............................................................................................. 27

A.R.S. § 41-1822(A)(3) ................................................................................... 4

A.R.S. § 41-1822(D)........................................................................................ 7

A.R.S. § 49-264 .............................................................................................. 32

A.R.S. § 11-1051(B)............................................................................... 1, 9, 17

Ariz. Const. Art. XXVII ................................................................................. 21

## **FEDERAL RULES**

Fed. R. Evid. 702 ............................................................................. 13, 14, 15, 16

## **STATE REGULATIONS**

Ariz. Admin. Code R13-4-103 .......................................................................... 7

## **OTHER AUTHORITIES**

29 Am. Jur. 2d Evidence § 143 ........................................................................ 22

Intervenor Defendants Janice K. Brewer, Governor of Arizona, and the State of Arizona (collectively, "Arizona") oppose Plaintiffs' Motion for Preliminary Injunction, ECF No. 723 ("Motion"), because Plaintiffs' arguments and evidence fall far short of meeting their burden of demonstrating a likelihood of success on their constitutional challenges to A.R.S. §§ 11-1051(B) ("Section 2(B)") and 13-2929.

Plaintiffs are not likely to prevail on their pre-enforcement preemption and Fourth Amendment challenges to Section 2(B) because those facial challenges ignore well-established interpretation doctrines and are based on the speculative theory that Arizona law enforcement officers will prolong detentions of individuals solely to verify their immigration status—a theory the Supreme Court foreclosed in *Arizona v. United States*, 132 S. Ct. 2492 (2012).  Even if the Supreme Court had not foreclosed Plaintiffs' pre-enforcement challenge to Section 2(B) on these grounds, the evidence demonstrates that Section 2(B) can and will be implemented in a constitutional manner.

Plaintiffs also are not likely to prevail on their equal protection challenge to Section 2(B) for the three independent reasons that: (1) Plaintiffs have offered no credible evidence that the implementation of Section 2(B) will have a discriminatory effect; (2) the evidence does not support a finding that the Arizona Legislature had any discriminatory purpose for enacting Section 2(B); and (3) even if Plaintiffs could establish that discrimination was a motivating factor behind S.B. 1070, Section 2(B) would have been enacted without any discriminatory motives.

Regarding Plaintiffs' preemption challenge to A.R.S. § 13-2929, Plaintiffs are not likely to prevail because Congress has not preempted the field of transporting and harboring illegal aliens and there is no conflict between A.R.S. § 13-2929 and any congressional objective.

Contrary to Plaintiffs' assertions, merely alleging a constitutional claim does not entitle them to the extraordinary remedy of injunctive relief.  Plaintiffs' Motion should be denied and, as contemplated by the U.S. Supreme Court, Section 2(B) should be allowed to go into effect.

# I.     PRELIMINARY INJUNCTION AND STATUTORY INTERPRETATION STANDARDS

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way."  *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999). "[W]hen a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with 'the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'"  *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976) (citation omitted).

Statutes passed by duly elected legislators are presumed constitutional.  *See, e.g.*, *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 17 (1988) ("[T]he burden of showing a statute to be unconstitutional is on the challenging party, *not* on the party defending the statute."); *Chevron Chem. Co. v. Superior Court*, 641 P.2d 1275, 1282 (Ariz. 1982) ("[T]here is a presumption that statutes are constitutional unless shown to be otherwise.  We will not declare an act of the legislature unconstitutional unless we are satisfied beyond a reasonable doubt that the act is in conflict with the federal or state constitutions.").  It is also presumed that public officials will enforce those statutes in a constitutional manner.  *See Panama Refining Co. v. Ryan*, 293 U.S. 388, 446 (1935).

# II.    PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THEIR PRE-ENFORCEMENT PREEMPTION AND FOURTH AMENDMENT CHALLENGES TO SECTION 2(B)

Plaintiffs ask this Court to enjoin Section 2(B) under the Supremacy Clause and the Fourth Amendment based on the theory that enforcement of Section 2(B) is likely to result in prolonged detentions.  *See* Mot. at 4 ("[I]f § 2(B) allows detention for immigration status verification, it is preempted by federal law."); *id.* at 9 ("In addition to being

preempted, by allowing detention for immigration status verification, § 2(B) also violates the Fourth Amendment."). These claims are neither legally nor factually supportable.

### A. The Supreme Court's Decision Forecloses Plaintiffs' Claims

The Supreme Court unanimously rejected the United States' pre-enforcement preemption challenge to Section 2(B) notwithstanding the arguments that, "in practice, state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status." *Arizona*, 132 S. Ct. at 2509-10. After finding that "§2(B) could be read to avoid these concerns,"[1] the Supreme Court held that "without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume § 2(B) will be construed in a way that creates a conflict with federal law." *Id.* at 2510. The Court based this conclusion on the well-established principle that, "[s]o far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts." *Id.* (quoting *Fox v. Washington*, 236 U.S. 273, 277 (1915)). Plaintiffs attempt to circumvent this ruling by arguing that the Supreme Court left the door open for another pre-enforcement preemption challenge. *See* Mot. at 4-5. The Court did no such thing. Rather, the Court held that its "opinion does not foreclose other preemption and constitutional challenges to the law as interpreted and applied *after it goes into effect*." 132 S. Ct. at 2510 (emphasis added). Thus, Plaintiffs are not *likely* to prevail on their pre-enforcement preemption and Fourth Amendment challenges to Section 2(B).

### B. The Evidence Also Refutes Plaintiffs' Argument that Section 2(B) Is Likely to Be Enforced, Statewide, In an Unconstitutional Manner

Even if the Supreme Court had not foreclosed another pre-enforcement preemption challenge to Section 2(B), Plaintiffs' argument that Arizona law enforcement officers will

---

[1] In fact, Section 2(L) expressly requires that Section 2 "shall be implemented in a manner consistent with federal laws regulating immigration, protecting the civil rights of all persons and respecting the privileges and immunities of United States citizens."

1    disregard the Supreme Court's ruling and prolong detentions under Section 2(B) fails on

2    several grounds.  <u>First</u>, Plaintiffs' argument ignores the fact that Arizona law enforcement

3    officers are bound to carry out their duties consistent with the U.S. Constitution as

4    construed by the U.S. Supreme Court.  *See*, *e.g.*, *Torres v. City of Madera*, 648 F.3d 1119,

5    1123, 1127-29 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 1032 (2012) (officers may be

6    personally liable for conduct that violates a constitutional right that is clearly established

7    by case law); Halliday Decl. ¶ 4; Gafvert Decl. ¶ 5, ECF No. 329-1; Vasquez Decl. ¶ 7,

8    ECF No. 329-1.[2]   It must be presumed that Arizona law enforcement officers will

9    implement Section 2(B) accordingly.  *See Panama Refining Co.*, 293 U.S. at 446.

10       <u>Second</u>, Plaintiffs' argument is based on what a handful of Arizona law

11   enforcement agencies *may* do, which cannot provide a basis to enjoin all law enforcement

12   officers in the State from enforcing Section 2(B).  *See*, *e.g.*, *Rizzo*, 423 U.S. at 375-76

13   (reversing the issuance of injunctive relief against Philadelphia, its mayor, and various

14   city and police officials based on "the actions of a small percentage of the police force").

15       <u>Third</u>, Plaintiffs' evidence fails to demonstrate that *any* Arizona law enforcement

16   officers will implement Section 2(B) in a manner that violates the Supremacy Clause or

17   the Fourth Amendment.  Plaintiffs rely primarily on a declaration from Chief Villaseñor

18   of the Tucson Police Department, who stated that "[b]y [his] reading of Section 2(B),

19   [his] officers are required to verify the immigration status of individuals they would

20   usually cite and release rather than booking them into jail."  Villaseñor Decl. ¶ 8;[3] Mot. at

21   6.  Villaseñor also expressly states, however, that he will *not* construe Section 2(B) in that

22   manner if there is "clear guidance to the contrary from [the Arizona Peace Officer

23   Standards and Training Board ("AzPOST")]."[4]  Villaseñor Decl. ¶ 10.  Because AzPOST

24
25   [2] *See also* Second Kszywienski Decl. Exs. I-1 & I-2 (law enforcement agency codes reflecting officers' obligation to uphold the Constitution).

26   [3] Villaseñor's statement relates to the second sentence of Section 2(B) only, and therefore cannot provide a basis to enjoin Section 2(B) in its entirety.  *See* S.B. 1070, § 12.

27   [4] AzPOST "[p]rescribe[s] reasonable minimum qualifications for officers to be appointed to enforce the laws of this state and the political subdivisions of this state and certif[ies]
28   officers in compliance with these qualifications."  A.R.S. § 41-1822(A)(3).

has since provided clear guidance, *see* E-mail from L. Mann to Agency Heads, Aug. 8, 2012 (Ex. A), Villaseñor's interpretation of Section 2(B) no longer applies.

Even if Villaseñor's declaration could support Plaintiffs' argument, the Tucson Police Department's arrest procedures demonstrate that reasonable suspicion of unlawful presence would likely preclude an officer from citing and releasing an arrestee. *See* Second Kszywienski Decl. Ex. I-3 at 6 (Order 2114.2) ("Officers shall conduct procedures to accurately identify an arrestee prior to citing and releasing the arrestee when the officer is unsure of the identity of the arrestee."); *id.* (Order 2114.3) ("Officers will consider making a physical arrest of a misdemeanant if . . . [t]he suspect cannot be satisfactorily identified . . . or by overt action or statement gives the officer probable cause to believe that the person will not appear in court.").[5]

Plaintiffs also rely on hearsay in the form of vague and unreliable media reports of alleged statements by Sheriffs Estrada, Dever, and Arpaio.  Sheriff Estrada allegedly stated that Section 2(B) "*may* result in detention of people while citizenship is clarified." Mot. at 7 (citation omitted) (emphasis added).  Even assuming Sheriff Estrada made such a statement,[6] Estrada did not say that *his* agency will prolong detentions for the purpose of verifying individuals' immigration status. *See* Pls.' Ex. B-1. Sheriff Estrada's speculation as to what *other* agencies *may* do cannot support a finding as to how those counties will, in fact, implement Section 2(B).  Sheriff Dever stated that his officers will transport unlawfully present persons to federal authorities if federal authorities are unresponsive. *See* Mot. at 7.  Sheriff Dever did not state, however, that his agency will prolong detentions of individuals to verify immigration status. *See id.*; Pls.' Ex. B-4.  Moreover, the statement Plaintiffs cite was a hyperbole only and it was taken out of context.  Dever

---

[5] These standards and procedures are common. *See*, *e.g.*, Tardy Decl. ¶¶ 4-14, ECF No. 394-1; Brown Decl. ¶ 19; Second Kszywienski Decl. Ex. I-38 at 7-8 & Ex. I-39 at 10-1.

[6] The newspaper article upon which Plaintiffs rely is a hearsay statement by the reporter, Manuel Coppola, that Sheriff Estrada, in fact, made such a statement.  *See* Mot. at 7; *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991) (holding that reporters' statements made in newspapers were hearsay because "the statements—'Gates said this!'—were offered for the truth of the matter asserted:  that Gates did in fact make the quoted statement").

Decl. ¶¶ 8-11.  Sheriff Arpaio allegedly stated that he does not want to release unlawfully present persons if federal authorities refuse to take custody and is "going to see what other options [he] has."  Mot. at 7-8; Pls.' Ex. B-7.  Nothing about this vague and speculative alleged statement, however, suggests that Sheriff Arpaio will implement *Section 2(B)* in a manner that prolongs the detention of unlawfully present persons, or even that Sheriff Arpaio will detain such persons under some other law.

Even if these media reports supported Plaintiffs' argument, they would have little probative value because they are inadmissible hearsay.  *See Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991) ("[N]ewspaper articles have been held inadmissible hearsay as to their content."); *Green v. Baca*, 226 F.R.D. 624, 638 (C.D. Cal. 2005) (finding that a *Los Angeles Times* article offered for the truth of the matter asserted "clearly constitute[d] hearsay").  Although courts have discretion to consider inadmissible evidence in the preliminary injunction context, *see Flynt Dist. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984),[7] such evidence carries less weight than admissible evidence, *Signeo, LLC v. Signeo Ltd.*, No. 5:11-cv-06370-PSG, 2012 U.S. Dist. LEXIS 79356, at *10 (N.D. Cal. June 6, 2012) ("[I]f the asserted facts 'are substantially controverted by counter-affidavits, a court should not grant [interlocutory injunctive] relief unless the moving party makes a further showing sufficient to demonstrate that he will probably succeed on the merits.'" (citation omitted)).[8]  Media reports also tend to be biased.  *See Larez*, 946 F.2d at 643 (holding that "newspaper accounts of legislative hearings lacked 'circumstantial guarantees of trustworthiness' because they might have 'been written from a biased point of view'" and that "'it is not unknown for reporters to stretch some facts or omit others.'" (citation omitted)).  The alleged Arpaio statements are

---

[7] This is because "[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial."  *Flynt*, 734 F.2d at 1394.  Because Plaintiffs have been gathering evidence to support these claims for years, *see, e.g.*, Pochoda Decl.; Granato Decl., Arizona disputes that the circumstances in this case justify Plaintiffs' substantial reliance on news articles, opinion editorials, and blogs to support their present Motion.

[8] *See also* 11 C. Wright & A. Miller, § 2949 at 218-19 ("Courts similarly give hearsay statements less credence than direct allegations.").

particularly questionable since they are from a posting on an online news and opinion website, the Daily Caller, purporting to reflect statements Sheriff Arpaio made during an alleged telephone interview.  *See* Pls.' Ex. B-7.

Fourth, there is substantial evidence to refute the argument that law enforcement officers across the State will prolong detentions under Section 2(B).  AzPOST has made clear to all agency heads that "Section 2(B) *must* be implemented consistent with the Fourth Amendment."  *See* E-mail from L. Mann to Agency Heads, Aug. 8, 2012 (Ex. A) (emphasis added).[9]  Numerous law enforcement officials have also confirmed that their agencies will implement Section 2(B) consistent with the Constitution.  *See* Halliday Decl. ¶ 8 ("I am confident that DPS Officers are trained and prepared to enforce Section 2(B) of S.B. 1070 consistent with the United States and Arizona Constitutions."); Dever Decl. ¶ 12 (stating that he and his deputies fully intend to implement Section 2(B) consistent with the Fourth Amendment and the Supreme Court's ruling); Raiss Decl. ¶ 5 (stating that the AzPOST training "has prepared [the Yavapai County Sheriff's Office], or more accurately, reinforced our prior training, to enforce Section 2(B) of S.B. 1070 within Constitutional limits"); Second Kszywienski Decl. Ex. I-4 (statement by the Chief of the Phoenix Police Department confirming the Department's intent "to enforce the law in compliance with the Supreme Court's decision").

Even the news reports upon which Plaintiffs rely refute Plaintiffs' arguments.  For example, Chief Villaseñor reportedly said that he "is under the impression that his officers will have met the law's requirement if they call immigration officers about the status of a person they suspect might be here illegally.  If a Border Patrol [agent] can't, or won't, pick the person up, they'll release the person."  Pls.' Ex. B-2 at 2.  Sheriff Dupnik reportedly said that the Supreme Court's ruling "will have no bearing on how his deputies go about their patrols" because "the department already enforces federal immigration law by referring people it suspects are here illegally to the Border Patrol."  *Id.* at 2-3.  Sergeant

---

[9] AzPOST can discipline officers who fail to comply with AzPOST's requirements.  *See* A.R.S. § 41-1822(D); Ariz. Admin. Code R13-4-103.

Thompson of the Phoenix Police Department allegedly stated that Section 2(B) is not likely to cause "much of a deviation in the way we do business" because Phoenix officers already call ICE if they "develop reasonable suspicion that [someone is] here illegally." Pls.' Ex. B-3 at 2.[10]   Even if Plaintiffs could demonstrate a possibility that a rogue officer or agency *may* implement Section 2(B) in an unconstitutional manner, that would not provide a basis for enjoining the law on its face.

## C. If the Court Certifies These Issues to the Arizona Supreme Court, an Interim Injunction Is Not Warranted Because the Arizona Supreme Court Must Construe Section 2(B) to Avoid Constitutional Concerns

If the Court decides to request a definitive interpretation of Section 2(B) from the Arizona Supreme Court, the Court should not enjoin Section 2(B) in the interim because the Arizona Supreme Court is not likely to construe Section 2(B) in the manner Plaintiffs suggest.   As stated above, Section 2(B) *can* be construed to avoid any constitutional concerns.[11]   *See Arizona*, 132 S. Ct. at 2510.   Arizona courts must "give a statute a constitutional construction when it is possible to do so." *Jilly v. Rayes*, 209 P.3d 176, 178 (Ariz. Ct. App. 2009) (citing *Readenour v. Marion Power Shovel*, 719 P.2d 1058, 1061 (Ariz. 1986)).   Accordingly, Plaintiffs are not likely to prevail on their claim that Section 2(B) will be construed in an *un*constitutional manner.

## III. Plaintiffs Are Not Likely to Prevail on Their Pre-Enforcement Equal Protection Challenge to Section 2(B)

### A. Plaintiffs' Equal Protection Challenge to Section 2(B) Requires Plaintiffs to Establish Discriminatory Motive *and* Discriminatory Effect

Plaintiffs argue that "§ 2(B) violates the Equal Protection Clause because racial or national origin discrimination was a motivating factor in its enactment." Mot. at 2.  The Equal Protection Clause requires "that all persons similarly situated should be treated

---

[10] Immigration status checks have been conducted as a matter of course at many Arizona jails since before S.B. 1070 was enacted. *See* McGlone Decl. ¶ 9. Section 2(B) would therefore have no impact on many of the persons who are booked into Arizona jails.

[11] Plaintiffs also request, in a footnote, that this Court seek guidance from the Arizona Supreme Court regarding the construction of Section 2(D). *See* Mot. at 10 n.2. That request is both procedurally improper and premature since the parties have not yet briefed issues regarding Section 2(D).

alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  Section 2(B) is a facially neutral[12] directive to Arizona law enforcement officers regarding the enforcement of the federal immigration laws.  *See* A.R.S. § 11-1051(B).  To prevail on their equal protection challenge, therefore, Plaintiffs must establish that Section 2(B) will have "a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte v. United States*, 470 U.S. 598, 608 (1985); *see also Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007) ("To prevail on its claim under the equal protection clause of the Fourteenth Amendment, a plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose."); *United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003).[13]  Plaintiffs cannot satisfy either requirement.

## B.   Plaintiffs Cannot Demonstrate that Section 2(B) is Likely to be Applied in a Racially Discriminatory Manner

To establish that implementation of Section 2(B) will have discriminatory effect, Plaintiffs must "identify a 'similarly situated' class against which the plaintiff's class can be compared."  *Rosenbaum*, 484 F.3d at 1153 (citation omitted); *United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted.").  This requirement reflects the reality that "a number of different factors influence the frequency that members of certain groups may commit crimes relative to other groups," *Arenas-Ortiz*, 339 F.3d at 1069 (citing *United States v. Turner*, 104 F.3d 1180, 1184-85 (9th Cir. 1997)), and that a mere disparity in conviction or arrest rates is insufficient to establish that a defendant was discriminated against on the basis of his or

---

[12] Section 2(B) is not racially discriminatory on its face; in fact, it expressly prohibits racial discrimination.  *See* A.R.S. § 11-1051(B).

[13] These requirements have been reaffirmed in numerous cases.  *See*, *e.g.*, *Birmingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003); *McLean v. Crabtree*, 173 F.3d 1176, 1185 (9th Cir. 1999); *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996); *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996); *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002).

her race or ethnicity.  In *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009), for example, the Supreme Court rejected a claim for invidious discrimination based on the allegation that the defendants had "arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11."  As the Supreme Court found:

> The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of Al Qaeda, an Islamic fundamentalist group.  Al Qaeda was headed by another Arab Muslim—Osama bin Laden—and composed in large part of his Arab Muslim disciples.  It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the police was to target neither Arabs nor Muslims.

*Id.* at 682.

In *Arenas-Ortiz*, the Ninth Circuit addressed a discriminatory-effect argument that is similar to the arguments Plaintiffs assert here.[14]  There, a Hispanic defendant argued that the federal government enforced 8 U.S.C. § 1326 (prohibiting re-entry after removal) in a way that discriminated against Hispanics.  *Id.* at 1068.  To establish the discriminatory-effect element of his claim, the Ninth Circuit held that Arenas-Ortiz "must show that non-Hispanic-males were not prosecuted even though they: (1) were aliens; (2) had been removed or deported from the United States; and (3) had re-entered without the consent of the Attorney General."  *Id.*  Arenas-Ortiz presented various data in an effort to demonstrate discriminatory enforcement of § 1326, including evidence that 94.5% of the defendants the local Federal Public Defender's Office represented in § 1326 prosecutions were Hispanic.  *Id.* at 1069.  Arenas-Ortiz also argued "that selective prosecution may be inferred because 94.5% of § 1326 defendants are Hispanic males, while only 89% of persons deported from the United States are Hispanic."  *Id.* at 1070.  The Ninth Circuit rejected that argument, however, finding that "[t]his statistic is probative of the treatment of similarly situated individuals only if one assumes that deported individuals of different

---

[14] Unlike in this case, however, Arenas-Ortiz had actually been subjected to the allegedly discriminatory practice.  *Arenas-Ortiz*, 339 F.3d at 1068.

ethnic origins return to the United States at relatively equal rates, and therefore that Hispanics comprise 89% of individuals illegally re-entering the United States." *Id.*

The Supreme Court has also found general statistical evidence insufficient to demonstrate the discriminatory effect of a challenged enforcement action or policy. In *United States v. Bass*, 536 U.S. 862, 863 (2002), for example, a black defendant attempted to show that the prosecutor's decision to seek the death penalty was discriminatory by presenting statistical evidence that "the United States charges blacks with a death-eligible offense more than twice as often as it charges whites." The Court found that such general statistical evidence failed to make a "credible showing" that the prosecutor's action was discriminatory because "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *Id.* at 864. Similarly, in *Armstrong*, 517 U.S. at 458, black defendants charged with certain federal drug crimes attempted to show that the U.S. Attorney's Office enforced the laws in a discriminatory way by offering a study showing that *all* of the persons the office prosecuted for similar offenses during the prior year were black. As in *Bass*, the Supreme Court found such evidence insufficient to make a "credible showing" of discriminatory enforcement because the study "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged but were not so prosecuted." *Id.* at 470.[15]

Here, Plaintiffs conspicuously fail to acknowledge that their Equal Protection claim requires them to establish that Section 2(B) will have a discriminatory effect. *See* Mot. at

---

[15] *See also Chavez*, 251 F.3d at 643-44 (finding census data insufficient to demonstrate the discriminatory effect of a police policy because census data "is widely acknowledged" to be incomplete and, even if the data were accurate, it provided insufficient information regarding the crucial inquiry—"the numbers of Hispanics and African-Americans driving on the Illinois interstate highways." Even the cases Plaintiffs cite addressing allegedly discriminatory law enforcement practices make clear that Plaintiffs must establish a discriminatory effect *and* a discriminatory purpose. *See Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (applying the *Wayte* standard to allegations of racial profiling and holding that "[t]his framework has been applied in a number of cases in this and other circuits in allegations of discriminatory police enforcement practices"); *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520, 546 (S.D.N.Y. 2006) (holding that, in the Second Circuit, plaintiffs can dispense with the requirement of identifying a similarly situated group, but only where "*the Government's differential treatment of the target group could otherwise be clearly demonstrated*").

11-36.   Plaintiffs' theory, however, is that Section 2(B) will have a "discriminatory adverse impact on Latinos and Mexican nationals."  *Id.* at 26-30.[16]   To establish that Arizona law enforcement officers will enforce Section 2(B) in a discriminatory way, Plaintiffs must demonstrate that law enforcement officers throughout Arizona *would* investigate the immigration status of a Latino or Mexican national under circumstances in which officers *would not* investigate a similarly situated person who is not Latino or Mexican.  *See*, *e.g.*, *Arenas-Ortiz*, 339 F.3d at 1068.  Plaintiffs cannot make that showing.

### 1.    Plaintiffs' "Evidence" that Section 2(B) Will Result in Racial Profiling is Entirely Speculative and Conclusory

Plaintiffs have not made a credible showing that Section 2(B) will have a discriminatory effect, much less that law enforcement officers across the state are *likely* to enforce Section 2(B) in a discriminatory way.  Plaintiffs have made no attempt to identify a similarly situated control group, nor could Plaintiffs do so in a pre-enforcement facial challenge to Section 2(B).[17]  Instead, Plaintiffs rely on general population data, conclusory assertions from several law enforcement officers, and allegations that have been made against Sheriff Arpaio regarding policies and practices in the enforcement of other laws that are unrelated to Section 2(B)—none of which supports a finding that the implementation of Section 2(B) in accordance with the AzPOST training will result in a statewide pattern and practice of racial profiling.

Plaintiffs' statistical data estimates the percentage of: (1) Latinos in Arizona; (2) Arizona's foreign-born population from Latin America; and (3) undocumented persons in Arizona who are from Mexico.  Mot. at 27; Preciado Decl. ¶¶ 3-5, 8, 10.  As in *Bass* and *Arenas-Ortiz*, these statistics are not probative of the alleged discriminatory effect of

---

[16] Plaintiffs make this assertion solely to support their argument regarding the Arizona Legislature's alleged discriminatory intent in enacting Section 2(B).  Mot. at 26-30.

[17] Plaintiffs' assumptions about the manner in which Section 2(B) *could* be implemented suffers from the same fatal flaw as their pre-enforcement preemption and Fourth Amendment challenges to Section 2(B), which is why the Supreme Court recognized that issues regarding the manner in which Section 2(B) are implemented could only be brought *after* the law goes into effect.  *See Arizona*, 132 S. Ct. at 2510.

1    Section 2(B) because the percentage of Latinos and Mexican nationals who live in

2    Arizona or violate federal immigration laws has no bearing on whether the federal

3    immigration laws are (or will be) enforced in a *discriminatory* manner.  *See Bass*, 536

4    U.S. at 863; *Arenas-Ortiz*, 339 F.3d at 1069.

5          Plaintiffs next rely on declarations by four law enforcement "experts," three of

6    whom are out-of-state: (1) the former[18] Chief of the San Francisco Police Department,

7    George Gascón (Gascón Decl. ¶ 1); (2) the former[19] Chief of the Yakima Police

8    Department, Samuel Granato (Granato Decl. ¶ 1); and (3) a retired Director of the U.S.

9    Marshals Service who served as Chief of the Tampa Police Department twenty years ago,

10   Eduardo Gonzalez (Gonzalez Decl. ¶¶ 2-3).  *See* Mot. at 27-28.  As the proponent of these

11   witnesses, Plaintiffs have "the burden of proving admissibility."  *Lust v. Merrell Dow*

12   *Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  Expert testimony must be "based on

13   sufficient facts or data, . . . the product of reliable principles and methods," and the expert

14   must "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid.

15   702; *see also United States v. Santini*, 656 F.3d 1075, 1078-79 (9th Cir. 2011) (per

16   curiam) (finding expert testimony inadmissible because the rap sheet on which the expert

17   relied "was not sufficient to form the basis of [the expert's] opinion"); *United States v.*

18   *Day*, 524 F.3d 1361, 1368-69 (D.C. Cir. 2008) (upholding trial court's exclusion of expert

19   testimony when the expert provided conclusions without factual support); *Hathaway v.*

20   *Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (upholding trial court's exclusion of a police

21   officer's expert testimony where the officer "offer[ed] little more than personal assurances

22   based on his police experience that his conclusions are so"); *McLean v. 988011 Ontario,*

23   *Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("The expert's conclusions regarding causation

24   must have a basis in established fact and cannot be premised on mere suppositions.").

25

26   ────────────────

27   [18] According to the San Francisco Police Department website, Greg Suhr is the current
     chief.  *See* Second Kszywienski Decl. Ex. I-5.

28   [19] Dominic Rizzi, Jr. is the current Chief of the Yakima Police Department.  *See* Second
     Kszywienski Decl. Ex. I-6.

The Gascón, Granato, and Gonzalez declarations fall far short of Rule 702's admissibility standards.  All of the declarants are (or were) administrators who, in May 2010, reviewed the text of S.B. 1070 and made presumptions about the manner in which Arizona law enforcement officers would implement the law.  *See* Gascón Decl.; Gonzales Decl.; Granato Decl.  None of these declarants references any personal training or experience in the enforcement of federal immigration law, any familiarity with the AzPOST training on the implementation of Section 2(B), or any familiarity with the factors federal officers rely on to develop reasonable suspicion of unlawful presence.  Although Gascón briefly served as Chief of the Mesa Police Department,[20] neither Gonzales nor Granato identifies any experience with any Arizona law enforcement officer that would inform his judgment about the manner in which Arizona law enforcement officers will investigate suspected violations of federal immigration laws.

Not only do the declarations of Gascón, Gonzales, and Granato fail to identify a sufficient factual basis for their conclusions about the enforcement of Section 2(B), but their opinions are wholly speculative and conclusory.  For example, Gascón opines that Arizona law enforcement officers "inevitably will rely upon race and ethnicity as factors in establishing reasonable suspicion of unlawful presence" because "[s]hort of actually observing an individual actually crossing the border in a surreptitious way, there are not reliable indicia that would give rise to reasonable suspicion to believe that a person is unlawfully present in the United States."  Gascón Decl. ¶ 18; *see also* Granato Decl. ¶ 15 ("Because immigration status is a legal status which cannot be observed visibly, officers will use certain racial and ethnic factors in determining who to investigate."); Gonzalez Decl. ¶ 16 ("The simple fact is that there are no sound ways for police officers to tell whether someone has lawful immigration status simply by observation.").

---

[20] For most of Gascón's tenure, it appears that Mesa had a sanctuary policy.  *See* Second Kszywienski Decl. Ex. I-7 ("Mesa's current policy does not allow police authorities to participate in the enforcement of federal immigration laws.").

These assertions contradict established precedent identifying numerous factors that give rise to reasonable suspicion of unlawful presence.[21]   *See*, *e.g.*, *United States v. Manzo-Jurado*, 457 F.3d 928, 934-36 (9th Cir. 2006) (an officer may consider several factors in evaluating whether reasonable suspicion of unlawful presence exists); *United States v. Montero-Camargo*, 208 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (listing the type of factors officers may consider in developing reasonable suspicion of unlawful presence); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85 (1975) ("Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area.").   These opinions are thus wholly unsupported and inadmissible under Fed. R. Evid. 702.  *See Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

The final declaration upon which Plaintiffs rely is the declaration of Tucson Police Chief Roberto Villaseñor.  Unlike the other declarants, Villaseñor has at least served as a law enforcement officer in Arizona and reviewed the AzPOST training.  Villaseñor Decl. ¶¶ 1, 3-4.  Like the other declarants, however, Villaseñor offers only a conclusory opinion regarding the enforcement of Section 2(B).  Villaseñor recognizes that Section 2(B) is triggered only if an officer has reasonable suspicion of unlawful presence, but opines that "[n]one of the AZ POST training materials clearly explain how officers can form reasonable suspicion of unlawful status without resorting to reliance on inappropriate factors such as race and ethnicity."  Villaseñor Decl. ¶¶ 4-5.  Nothing in Villaseñor's declaration explains *why* the AzPOST materials are unclear or insufficient, or why law enforcement officers could not develop reasonable suspicion of unlawful presence without

---

[21] Gascón's assertion also contradicts actions he took during his tenure as Chief of the Mesa Police Department.  *See* Second Kszywienski Decl. Ex. I-8 (reporting that, in July 2008, Chief Gascón laid out a new immigration policy under which "police must ask the immigration status of anyone being arrested and contact federal authorities if there's reason to believe the suspect is here illegally").

relying on inappropriate factors.  Villaseñor's opinion is also seriously undermined by Tucson Police Department General Orders, which prohibit racial profiling, *see* Second Kszywienski Decl., Ex. B-3 (Order 1310), and yet expressly contemplate circumstances in which Tucson Police Officers will develop reasonable suspicion that a person they have stopped is undocumented, *see id.* Ex. B-1 (Order 2119.1) ("If, after a person is stopped, the officer reasonably suspects that person is undocumented . . . .").  Villaseñor's statement also contradicts his statement to the press that his agency "regularly turn[s] over illegal immigrants they encounter during their patrols to Border Patrol."  Pls.' Ex. B-2.

It defies logic to suggest that Tucson law enforcement officers can develop reasonable suspicion of unlawful presence *without* Section 2(B), but could not develop such reasonable suspicion of unlawful presence if Section 2(B) is enforced.[22]  Villaseñor's declaration is therefore patently self-serving, speculative, and unreliable and does not satisfy the requirements of Fed. R. Evid. 702.  Because none of the declarations Plaintiffs have obtained from law enforcement officials meets the requirements of Fed. R. Evid. 702, the Court should not consider them.[23]

The final category of evidence upon which Plaintiffs rely to support their assertions that Section 2(B) will have a discriminatory effect are *allegations* that have been made about Sheriff Arpaio.  *See* Mot. at 28-30.  These allegations, however, do not relate to the issue before this Court—the anticipated statewide enforcement of Section 2(B).  Rather, they relate to *other* policies and practices Sheriff Arpaio has allegedly adopted that are allegedly discriminatory.  These alleged policies and practices are being litigated in another matter, *see Ortega-Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2011 U.S.

---

[22] For example, an Arizona law enforcement officer may have reasonable suspicion of unlawful presence if, during a traffic stop, the driver presents identification from another country, is unable to provide a United States address or telephone number, and cannot identify where he or she is going to or coming from.  *See* Raiss Decl. ¶¶ 11-12; Braddock Decl. Ex. 30 at 14-15, ECF No. 329-3; Brown Decl. ¶¶ 12-17.  None of these facts depends upon the race or national origin of the driver.  Villaseñor fails to explain why his officers lack the training and experience to appreciate the implication of such facts.

[23] Pursuant to LRCiv 7.2(m)(2), Arizona is not filing a separate motion to strike, but asks the Court to strike these declarations from Plaintiffs' Motion.

Dist. LEXIS 148223 (D. Ariz. Dec. 23, 2011), and are not at issue here.  This case, rather, is about the statewide implementation of Section 2(B), and the Maricopa County Sheriff's Office is only one of approximately 170 law enforcement agencies in Arizona.[24]

Plaintiffs have therefore failed to present any evidence to support a finding that Section 2(B) will be enforced *statewide* in a racially discriminatory way.

## 2. The Record Overwhelmingly Refutes Plaintiffs' Assumption that Section 2(B) Will Result in Racial Profiling

There is an abundance of evidence in the record to refute the argument that Section 2(B) will be enforced statewide in a racially discriminatory way.  First, the statute itself expressly prohibits racial profiling.  *See* A.R.S. § 11-1051(B).

Second, Governor Brewer's Executive Order requiring AzPOST to establish training for the implementation of S.B. 1070 expressly requires that the training "shall provide clear guidance to law enforcement officials regarding what constitutes reasonable suspicion, and shall make clear that an individual's race, color or national origin alone cannot be grounds for reasonable suspicion to believe any law has been violated." Braddock Decl. Ex. 34, ECF No. 329-3.  Consistent with that Order, the AzPOST training—which was provided to all law enforcement officers in the State—clearly instructs officers that S.B. 1070 prohibits racial profiling, that officers should "not rely on race or color at all in the determination of reasonable suspicion to believe that a person is in the country unlawfully," and that Ninth Circuit precedent prohibits the use of race or color in determining reasonable suspicion of unlawful presence.  *See id.* Exs. 29-32.

Third, Arizona has offered an expert opinion from someone very knowledgeable about the way in which the federal government enforces the federal immigration laws— Neville Cramer, a 26-year veteran of the U.S. Immigration and Naturalization Service and the former Chief of the Immigration Officer Academy at the Federal Law Enforcement Training Center.  Cramer Decl. ¶¶ 2-6, ECF No. 329-1.  Cramer has reviewed the AzPOST training for S.B. 1070 and opines that the training "is sufficient to train local law

---

[24] *See* Second Kszywienski Decl. Ex. I-9.

1    enforcement to implement enforcement of the bill in a race neutral manner and in a way

2    that parallels Federal enforcement of Federal Immigration law."  *Id.* ¶ 33.

3         Fourth, Arizona has offered the declarations of several Arizona law enforcement

4    officers—the people who would actually be charged with the day-to-day enforcement of

5    Section 2(B)—all of whom are fully informed about S.B. 1070 and the AzPOST training

6    and confirm that they have received sufficient training to implement S.B. 1070 in a race-

7    neutral manner.  *See* Raiss Decl. ¶¶ 13-15; Halliday Decl. ¶¶ 4-9; Dever Decl. ¶¶ 16-17;

8    Vasquez Decl. ¶¶ 5, 7, 9, 16, 27, ECF No. 329-1; Glover Decl. ¶¶ 5, 20, 23, ECF No. 329-

9    1; Gafvert Decl. ¶¶ 4-7, 13, ECF No. 329-1.

10        Fifth, there is ample evidence in the record that Arizona law enforcement officers

11   have performed the type of investigation Section 2(B) requires without any complaints

12   that the officers have done so in a racially discriminatory way.  For example, Sheriff

13   Dupnik stated that the Supreme Court's ruling regarding the constitutionality of Section

14   2(B) "will have no bearing on how his deputies go about their patrols" because "the

15   department already enforces federal immigration law by referring people it suspects are

16   here illegally to the Border Patrol."  Pls.' Ex. B-2.  During the legislative hearings on S.B.

17   1070, Dale Wiebusch testified on behalf of the League of Arizona Cities and Towns that

18   Section 2(B) was unnecessary because "[s]tatistics show that 6,500 to 7,000 illegal aliens

19   have been turned over to ICE by municipal law enforcement agencies."  Second

20   Kszywienski Decl. Ex. I-20 at 3; *see also* Pls.' Ex. C-3 at 25-26.  Mark Spencer testified

21   that, prior to 2005, the Phoenix Police Department took a proactive approach to federal

22   immigration violations and yet the Department had "a stellar record, a record of national

23   prominence when it comes to not engaging in racial profiling."  Pls.' Exs. C-1 at 33 & C-3

24   at 62.  Sheriff Dever stated that, in the 37 years he has been in law enforcement in Cochise

25   County, the County has had only one complaint of racial profiling, which was not

26   sustained.  Dever Decl. ¶ 18; *see also* Pls.' Ex. B-4 ("To suggest that [Section 2(B)]

27   would change that culture in law enforcement for a second is . . . a huge insult.").

28        Plaintiffs assert, and ask this Court to find, that under no possible circumstance will

Arizona law enforcement officers constitutionally administer S.B. 1070.  The evidence overwhelmingly refutes that assertion.  Plaintiffs have therefore failed to meet their burden of establishing a likelihood of success on their equal protection claim without any need to consider the Arizona Legislature's alleged discriminatory intent.  *See*, *e.g.*, *Bass*, 536 U.S. at 863 (summarily reversing the Sixth Circuit's order allowing the defendant to go forward on his equal protection claim and holding that the Court "need go no further in the present case than consideration of the evidence supporting discriminatory effect").

### C.   Plaintiffs Have Not Demonstrated that the Arizona Legislature Had a Discriminatory Purpose in Enacting Section 2(B)

Even should the Court choose to consider the discriminatory-purpose element of Plaintiffs' equal protection claim, Plaintiffs have not demonstrated that Section 2(B) was motivated by a discriminatory purpose.  In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the Supreme Court identified several factors courts may consider in determining whether a challenged decision was motivated by racial animus: (1) the historical background and "specific sequence of events leading up [to] the challenged decision"; (2) the legislative history; (3) procedural or substantive departures from the normal practice; and (4) whether the impact of the decision "'bears more heavily on one race than another.'"  *Id.* at 265-68 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).[25]  Consideration of these factors in this case does not support a finding that the Arizona Legislature had a discriminatory purpose for enacting S.B. 1070.

### 1.   The Historical Background and Sequence of Events Leading Up to the Challenged Decision

As this Court has recognized, the Arizona Legislature enacted S.B. 1070 "[a]gainst a backdrop of rampant illegal immigration, escalating drug and human trafficking crimes, and serious public safety concerns."  *United States v. Arizona*, 703 F. Supp. 2d 980, 985

---

[25] These factors are non-exhaustive, *see Arlington Heights*, 429 U.S. at 268, but they appear to be the factors courts have most commonly applied.  *See*, *e.g.*, *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 140-45 (3d Cir. 1977); *Rivera v. Inc. Village of Farmingdale*, 784 F. Supp. 133, 147 (E.D.N.Y. 2011).

(D. Ariz. 2010).   The Supreme Court also recognized the legitimacy of Arizona's concerns regarding the serious "problems posed to the State by illegal immigration." *Arizona*, 132 S. Ct. at 2500.  Arizona's prior briefs detail the nature and severity of the safety, environmental, and financial burdens illegal immigration has imposed on Arizona and its citizens.  *See* Intervenor Defs.' Resp. to Pls.' Mot. for Prelim. Inj. at 1-5, ECF No. 329; Defs.' Resp. to Pls.' Mot. for Prelim. Inj. at 6-9, *United States v. Arizona*, Case No. 10-CV-01413-PHX-SRB, ECF No. 74.  The facts and evidence set forth in those briefs (which Arizona incorporates herein) show that S.B. 1070 followed years of failed attempts to obtain the federal government's assistance in addressing these problems.

In 2005, for example, former Governor Janet Napolitano declared a state of emergency in Arizona's four border counties "so [she] could use state crisis funds to help combat the effects of illegal immigration in border communities."  Braddock Decl. Ex. 19, ECF No. 329-2.  Over the next several years, Arizona repeatedly pled with the federal government for assistance in dealing with the illegal immigration problem.  *See* Braddock Decl. Exs. 19-22, ECF No. 329-2.  By 2010, the safety threats in Arizona were so severe that the federal government erected signs in certain parts of Arizona that read "Danger – Public Warning Travel Not Recommended."  *See* Smith Decl., ECF No. 329-1.  Despite the widely recognized severity of the problem, federal immigration enforcement had become so lax that President Obama characterized the system as "broken," Braddock Decl. Ex. 18, ECF No. 329-2, and the union representing ICE officers issued a vote of no confidence in ICE Director John Morton and Assistant Director Phyllis Coven, *see* Second Kszywienski Decl. Ex. I-10.[26]

Notwithstanding the substantial evidence of harm caused to Arizona by illegal immigration (which Plaintiffs have never disputed) and the reality that such harms were the impetus for S.B. 1070, Plaintiffs argue that the historical background supports a finding of discriminatory intent by attempting to characterize the Arizona Legislature

---

[26] Although this occurred after S.B. 1070 was passed, it demonstrates the manner in which ICE was managed at the time the Arizona Legislature passed S.B. 1070.

(each and every member who voted for the legislation) and, in fact, the entire State, as racists against Latinos and individuals of Mexican origin.  Not only is Plaintiffs' theory inaccurate and offensive, but Plaintiffs fail to offer any credible evidence to support it.

First, Plaintiffs argue that Arizona's adoption of English as the official language of the State (Ariz. Const. Art. XXVII) was discriminatory against Latinos and Mexican nationals.  *See* Mot. at 31.  Approximately 74% of Arizona voters approved this law.  *See* Second Kszywienski Decl. Ex. I-11.  Plaintiffs cite absolutely no evidence to support a finding that the 1,114,273 persons who voted in favor of the amendment had a discriminatory purpose for doing so.[27]  Nor is there any basis to presume a discriminatory motive for adopting an official language.  Arizona is one of 31 states to adopt English as its official language.  *Id.* Ex. I-12.  Even the International Olympic Committee has adopted French and English as its official languages.  *Id.* Ex. I-13 at 1.  None of these actions was taken to discriminate against Latinos or Mexican nationals.

Second, Plaintiffs attack the Arizona Legislature's passage of H.B. 2281 in 2010, arguing that "[t]he anti-Latino and anti-Mexican animus animating HB 2281 is deep and self-evident" because the legislative debate focused on the Mexican American Studies program in Tucson ("MAS") and MAS is the only program to have been investigated for violating H.B. 2281 (codified at A.R.S. § 15-112(A)).  Mot. at 32-33.  Although Plaintiffs attack Superintendent Huppenthal in particular, *see id.*, there is, again, no evidence that Superintendent Huppenthal opposed MAS for discriminatory reasons.  As Administrative Law Judge Lewis Kowal found, the issue with MAS was not its focus on Mexican and Latino heritage, but that the MAS program "actively present[ed] material in a biased, political, and emotionally charged manner . . . promot[ed] social or political activism

---

[27] The two e-mails Plaintiffs cite, which appear to contain text and articles that Senator Pearce copied and pasted from other sources and sent to himself (*see* Mot. at 32; Pls.' Exs. E-8 & E-9), are only two of many thousands of e-mails provided to Plaintiffs in response to their public records request.  *See* Pochoda Decl. ¶ 6.  Even if these e-mails could support a finding as to Senator Pearce's personal views (which they cannot), they provide absolutely no support for the proposition that 74% of Arizona voters approved the English language amendment for a discriminatory purpose, particularly since one of the two emails (Pls.' Ex. E-9) was sent several months after the amendment's adoption.

against the white people, promot[ed] racial resentment, and advocate[ed] ethnic solidarity, instead of treating pupils as individuals."[28]  *In re Appeal of Tucson Unified Sch. Dist. No. 1*, No. 11F-002-ADE (Office of Admin. Hr'gs. Dec. 27, 2011) (ALJ Decision).   At a minimum, these findings reflect that Superintendent Huppenthal had a reasonable basis to believe that the MAS program promoted discrimination and racism.

Third, Plaintiffs argue that the entire State of Arizona supposedly has a "history of discrimination," citing a law review article about the 1997 "Chandler Roundup," which was conducted by the Tucson Border Patrol and a single Arizona police department, and a district court finding the Ninth Circuit referenced in *Gonzales v. Arizona*, 677 F.3d 383 (9th Cir. 2012) (en banc), that, approximately 100 years ago, Arizona had discriminatory voting laws.[29]   Mot. at 33 (citations omitted).   Neither of these references suggests anything about Arizona's political environment during the twenty-first century, much less the intentions of the Arizona Legislature in 2010.   More importantly, these isolated instances fall far short of establishing Plaintiffs' offensive allegation that Arizona has a history of discrimination against Latinos and Mexican nationals.

Numerous facts reflect Arizona's positive relationship with Mexico and its citizens. For example, Arizona elected a Mexican-born American, Raul Hector Castro, as Governor of the State in 1975.   Arizona has also established the Arizona-Mexico Commission, which has been in effect since 1959 as a means "to promot[e] a strong, cooperative relationship with Mexico and Latin America through advocacy, trade, networking and information."[30]   Plaintiffs have failed to provide any reasonable basis for this Court to agree with their incredible conclusion that the historical background and many events

---

[28] Some of the specific concerns Superintendent Huppenthal raised during his deposition were the MAS program's apparent idolization of Che Guevara, who "helped direct a communist death camp in Cuba," and the program's portrayal of Benjamin Franklin as a racist.  Second Kszywienski Decl. Ex. I-14 at 38:6-17.

[29] These findings are also hearsay.  *See*, *e.g.*, *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 n.6 (7th Cir. 1997) ("[C]ourts generally cannot take [judicial] notice of findings of fact from other proceedings for the truth asserted therein because the findings are disputable and usually are disputed."); 29 Am. Jur. 2d Evidence § 143.

[30] *See* Arizona-Mexico Commission, About Us, http://www.azmc.org/about/ (last visited Aug. 8, 2012).

leading up to S.B. 1070 support a finding of discriminatory intent.

## 2.      The Legislative History

The legislative history for S.B. 1070 unequivocally reflects a concern for the adverse impacts illegal immigration has had on Arizona and a desire to address those concerns in light of the federal government's inaction.

### i.      S.B. 1070's initial consideration in the Senate

S.B. 1070 was introduced by 15 senators and 22 representatives.  *See* Second Kszywienski Decl. Ex. I-15.  It was first read in the Senate on January 13, 2010.  *See id.* Ex. I-16.  On January 20, 2010, the Senate Committee on Public Safety and Human Services considered the bill, Senator Gray's proposed amendments, and testimony from various proponents and opponents.  *See id.* Ex. I-17.  Senator Pearce stated that the purpose of Section 2 was to address the sanctuary policies several law enforcement agencies had adopted (in contravention to 8 U.S.C. §§ 1373 and 1644) severely restricting officers' ability to investigate potential violations of the federal immigration laws.  *See* Pls.' Ex. C-1 at 7-8.  A representative of the Phoenix Law Enforcement Association ("PLEA"), Mark Spencer, explained the need for Section 2 by identifying eight law enforcement officers who were killed or seriously injured by illegal aliens and explaining the policy the City of Phoenix Police Department adopted to restrict its officers' communications with ICE.  *Id.* at 29-30.  Spencer also emphasized that "PLEA does not believe that skin color dictates conduct" and touted the Phoenix Police Department's "stellar record" in enforcing the law without engaging in racial profiling.  *Id.* at 31, 33.  Senator Melvin noted his support for the bill based on the substantial costs illegal immigration imposes on Arizona, stating:  "If we could solve this issue and this legislation takes us in that direction, we could in many ways almost eliminate our budget woes, these gut-wrenching billions in budget deficits.  This is directly related to reducing those costs

to Arizona taxpayers." *Id.* at 9.[31]

The Committee expressly recognized the importance of the issues and ensuring that S.B. 1070 receive "a full hearing." *Id.* at 10 (Senator Melvin) ("I think it's appropriate to make sure that everybody has an opportunity to express their views both for or against, and that we not limit public debate on this issue."), 28 (Senator Rios) ("I think your testimony and the testimony of others just kind of highlights the variety of issues that people have with this bill, and why it's important to not limit public input.").

The concerns opponents expressed regarding Section 2 primarily focused on the potential costs to the State and the federal government's exclusive authority over immigration.  *See id.* at 14, 16, 39-42.[32]  In addition, John Thomas of the Arizona Association of Chiefs of Police expressed concern about Section 2(B) being triggered for any "legitimate contact" because that term was "not defined and [is] not a term used in police training on the Fourth Amendment." *Id.* at 22.

The Committee voted to approve S.B. 1070 as amended at the conclusion of the hearing. *Id.* at 50.  On February 1, 2010, the Senate Rules Committee approved the bill. Second Kszywienski Decl. Ex. I-16.  Before presenting S.B. 1070 to the entire Senate, however, the Legislature endeavored to address the concerns expressed during the January 20, 2010 hearing by having a fiscal impact analysis prepared and by amending Section 2(B) to apply to any "lawful" contact instead of "legitimate" contact and to limit its application to circumstances in which such investigations are "practicable."  *See Id.* Exs. I-18 & I-19.  On February 15, 2010, the Senate passed the amended bill by a vote of 17-13.  *Id.* Ex. I-16.

---

[31] Plaintiffs characterize Senator Melvin's statements as "discriminatory conflation" based on their argument that the specific dollar amount Senator Melvin referenced allegedly "includes the costs associated with citizen children."  Mot. at 20.  Plaintiffs cite no source for this assertion, however, *see id.*, nor do they provide any basis to assume that Senator Melvin had any reason to question the accuracy of the figures he cited, or that Senator Melvin (or the rest of the Arizona Legislature) would have viewed S.B. 1070 differently if the annual costs of illegal immigration were "only" $1 billion, versus $2 billion.

[32]   Fernando Gonzales also expressed concern about the cost of the law enforcement training and about the impact to this Hispanic community, but his concerns related to the employer sanctions provisions, not Section 2(B). *See* Pls.' Ex. C-1 at 17-21.

ii.       The House amendments to S.B. 1070

On March 31, 2010, the Military Affairs and Public Safety Committee of the House considered S.B. 1070, including a strike everything amendment by Senator Gowan that substantially revised Section 2(B).  *See id.* Ex. I-20.  Again, Senator Pearce stated that the purpose of S.B. 1070 was to "secure our borders and enforce our laws," Pls.' Ex. C-3 at 3, and that the purpose for Section 2 was to "take the handcuffs off" law enforcement and allow them "to do their job" by notifying ICE of potential violations of the federal immigration laws, *id.* at 8 & 85 ("This doesn't expand law enforcement authority, this just gives, takes the handcuffs off them.").  Senator Pearce spoke about the need to enforce the law and the crime associated with illegal immigration, including certain instances of crimes that were committed or believed to be committed by illegal aliens, such as the murders of Robert Krentz and Officer Atkinson.  *Id.* at 3-4.[33]  Mark Spencer again echoed these concerns on behalf of PLEA, noting the particular harm illegal immigration posed to Arizona law enforcement officers and the Phoenix Latino community.   Spencer also conveyed PLEA's position that Section 2 was necessary to counteract sanctuary policies in cities such as Phoenix that restricted officers from communicating with ICE regarding possible immigration violations.  *See id.* at 60-67.

Opponents again expressed concerns regarding the possible costs to the State, *see*, *e.g.*, *id.* at 53-54, the application of Section 2(B) to victims, *see id.* at 40, 70, and the private right of action against agencies for adopting a "practice" that limits or restricts the enforcement of the federal immigration laws, *id.* at 30.   Although certain opponents expressed concern that law enforcement officers would not receive sufficient training to implement Section 2(B), *see*, *e.g.*, *id.* at 59-60, many proponents expressed confidence in law enforcement officers' ability to enforce the law.  For example, Spencer testified:  "I am confident that the citizens of Phoenix and the State of Arizona can trust law enforcement not only in Phoenix but throughout the state, of their law enforcement

---

[33] *See also* Second Kszwienski Decl. Exs. I-22 & I-23 (reporting that Robert Krentz and Officer Atkinson were believed to be killed by illegal aliens).

officers to follow the rule of law and wisely and reasonably engage ICE in the discretionary duties they have been given." *Id.* at 67. Officer Levi Bolton refuted the notion that Arizona law enforcement officers are not equipped to determine reasonable suspicion of unlawful presence, providing an example of a situation that would give rise to reasonable suspicion of unlawful presence and noting that law enforcement officers "investigate things like murders and sophisticated conspiracy crimes." *Id.* at 59-60.[34]

Following the debate, the Committee voted to approve S.B. 1070 as amended by a vote of 5-2. *See* Second Kszywienski Decl. Ex. I-16.[35] Representative Sinema explained her vote by stating: "I feel very strongly that we, as a community, we have to make certain that our officers are protected, and I think we've been neglecting our officers, the very people that are protecting us." Pls.' Ex. C-3 at 96. An unidentified Representative explained his vote by stating: "I see the destruction that comes across there from illegal immigration. And I think this will make us stronger as a state in that aspect. So with that, I do vote, Aye." *Id.* And Representative McGuire explained her vote by stating that she wants "the best legislation to provide [law enforcement officers] with the tools to do their jobs efficiently and safely." *Id.* at 93.

The House Rules Committee approved S.B. 1070 as constitutional and in proper form on April 5, 2010. *See* Second Kszywienski Decl. Ex. I-16. After a third read in the House on April 13, 2010, the House approved the floor amendments Representative Biggs proposed, including some technical corrections and an amendment to limit on investigations in Section 2(B) to circumstances in which they will not "hinder or obstruct

---

[34] This is one of the many areas in which the uncertified transcript Plaintiffs provided is unclear as to the source of the testimony. Other examples include the separate references to the Chair of the Public Safety and Human Services Committee and Senator Linda Gray, even though Linda Gray *is* the Chair (*see* Second Kszywienski Decl. Ex. I-17; Pls.' Ex. C-1 at 1), and the references to Ms. Reid in the transcript of the Military Affairs and Public Safety Committee meeting, even though there was no such member of the Committee (*see* Second Kszywienski Decl. Ex. I-20; Pls.' Ex. C-3).

[35] The transcript Plaintiffs prepared state that the vote was "5 Ayes, 10 Nays, zero voting present and one absent." Pls.' Ex. C-3 at 97. That is contrary to the meeting minutes, and clearly incorrect since S.B. 1070 was passed and the Committee has only eight members. *See* Second Kszywienski Decl. Ex. I-20.

an investigation." *See id.* Exs. I-16 & I-19.  The House then voted 35-21 to approve the amended bill.  The discussion among the representatives explaining their votes clearly focuses on illegal immigration issues and is devoid of any statement by any supporter of S.B. 1070 that could in any way be construed as discriminatory as Latinos or Mexican nationals. *See generally* Pls.' Ex. C-4 at 2-33.  On April 19, 2010, the Senate voted 17-11 to approve the amended bill. *See id.* Ex. I-16.  Governor Brewer signed S.B. 1070 into law on April 23, 2010. *Id.*

iii.     <u>The enactment of H.B. 2162</u>

H.B. 2162 was a trailer bill that was introduced in the House on February 9, 2010 to make technical corrections to A.R.S. § 30-221. *See* Second Kszywienski Decl. Ex. I-21.  H.B. 2162 was passed in the House and then transmitted to the Senate where a floor amendment was proposed to revise provisions of S.B. 1070.  The proposed amendments included several technical corrections and also revised Section 2(B) to be triggered upon a "lawful stop, detention, or arrest" rather than mere "lawful contact." *See* H.B. 2162.[36] Both the House and the Senate voted to approve H.B. 2162 on April 29, 2010. *See* Second Kszywienski Decl. Ex. I-21.  Governor Brewer signed H.B. 2162 into law on April 30, 2010. *Id.*

iv.     <u>The legislative history does not support Plaintiffs' arguments regarding discriminatory intent</u>

Plaintiffs spend 10 pages of their brief attacking the legislative history of S.B. 1070 because five of the 52 legislators who voted in favor of S.B. 1070 made statements that Plaintiffs allege were false, misleading, or discriminatory. *See* Mot. at 14-23.  The inferential leaps Plaintiffs make to support these characterizations, however, are not justified by the evidence upon which Plaintiffs rely.  For example, Plaintiffs allege that Senators Huppenthal and Gould used "camouflaged racial language during the S.B. 1070 debate," citing completely innocuous statements by Huppenthal and Gould and then

---

[36] H.B. 2162 also narrowed the circumstances in which a person can bring a private right of action and reduced the associated penalties.

inferring some racially derogatory meaning by tying those statements to e-mails from 2006 and 2007 that Senators Huppenthal and Gould neither sent nor received.  *See* Mot. at 21-23.  Plaintiffs also accuse Senator Pearce of knowingly citing false statistics because he allegedly did not return a phone call and because some opinion editorials in the *Phoenix New Times* question the accuracy of Senator Pearce's facts.  Mot. at 15-16.[37] Even if the blogs and opinion editorials Plaintiffs cite were reliable (which they are not[38]), they fail to establish the falsity of Senator Pearce's statistics, much less that Senator Pearce "knew" the statistics were false when he relayed them.[39]  Plaintiffs further rely on 33 e-mails from the thousands of e-mails they obtained from a public records request, *see* Pochoda Decl. ¶ 6, most of which are ambiguous and only two of which were sent—by constituents—during the Legislature's consideration of S.B. 1070.  *See* Pls.' Exs. E-11 & E-32; Ex. H (listing the e-mails in chronological order).  These e-mails, therefore, which Plaintiffs have woven into virtually every argument they make, are not part of the legislative history of S.B. 1070.[40]

---

[37] Plaintiffs also attack Senator Pearce's reference to a report by Congressman King.  *See* Mot. at 16.  Admittedly, the reference was confusing, but Plaintiffs' assumption that Senator Pearce was referencing a House Committee report is incorrect.  The statistics to which Senator Pearce referred appear to have been stated by Congressman King when he was a guest on the Bill O'Reilly Show.  *See* Second Kszywienski Decl. Exs. I-24 & I-40 at 5 (referencing Representative King's statistics and the House Committee report referenced in footnote 11 of Plaintiffs' Motion in the same e-mail).

[38] *See*, *e.g.*, *Larez*, 946 F.2d at 643.

[39] For example, Plaintiffs sharply criticize Senator Pearce's statement that "Phoenix [is] number two in the world in kidnappings," Mot. at 14 (citation omitted), but ignore that the statistic was reported by national news sources.  *See*, *e.g.*, Second Kszywienski Decl. Ex. I-25.  Plaintiffs also criticize Senator Pearce for citing statistics compiled by a criminal profiler, Dr. Deborah Schurman-Kauflin.  *See* Mot. at 17.  According to Plaintiffs, these statistics are "specious" because they were "debunked" by a reporter for the *Phoenix New Times*.  *Id.* at 17 & n.13.  Contrary to Plaintiffs' assertions, the fact that a *Phoenix New Times* reporter criticized the statistics compiled by a professional profiler with two post-graduate degrees does not make the "implausibility" of the statistics "obvious."  *Id.*

[40] Intervenor Defendants were able to review some but, given the time constraints, not all of the e-mails that the Arizona State Senate made available to Plaintiffs in response to their public records request.  During that cursory review, Intervenor Defendants obtained copies of a few e-mails Plaintiffs omitted from their filing.  These e-mails reflect the source of some of the facts Plaintiffs claim Senator Pearce "fabricated," Mot. at 14-16, and reinforce that Section 2 was intended to eliminate formal and informal sanctuary city policies as a means to address the illegal immigration problem, not to discriminate against Latinos or Mexican nationals.  *See* Second Kszywienski Decl. Ex. I-40.

In addition to the opinion editorials, blogs, and e-mails Plaintiffs cite, Plaintiffs contend that they have been unable to substantiate Senator Pearce's alleged belief that illegal aliens killed six Arizona law enforcement officers. *See* Mot. at 18; Huerta Decl. Specifically, Huerta claims that "although the tragic deaths of Kenneth Collings, Kris Eggle, Manuel Tapia, Robert Martin, Richard Fass, and Alexander Kirpnick were caused by Mexicans and/or Latinos, *there appears to be no basis* to assume, as Senator Pearce apparently does that any of the perpetrators were undocumented immigrants." Huerta Decl. ¶¶ 2-12 (emphasis added). As an initial matter, Senator Pearce referenced only one of these officers during the debates on S.B. 1070; Huerta pulled the remaining references from Senator Pearce's e-mails. *Id.* ¶¶ 3-4. Not only do these facts have a tenuous connection to S.B. 1070's legislative history, they fail to support a finding of discriminatory intent. There is support for the theory that Ranger Kristopher Eggle,[41] U.S. Border Patrol Agent Alexander Kirpnick,[42] and Officer Kenneth Collings[43] were killed by undocumented immigrants. Sergeant Manuel Tapia and Special Agent Richard Fass were gunned down by foreign nationals the officers were investigating for drug crimes.[44] Although it is unclear what evidence was available to Senator Pearce regarding Sergeant Tapia and Agent Fass, an assumption that armed, criminal, foreign nationals may not have been lawfully present in the United States does not, as Plaintiffs contend, reflect a general animus toward Mexican nationals.

---

[41] Second Kszywienski Decl. Ex. I-26 ("Ranger Kristopher Eggle was shot and killed while he and several U.S. Border Patrol Agents attempted to apprehended two armed, illegal aliens.").

[42] Second Kszywienski Decl. Ex. I-27 (reporting that Agent Kirpnick was killed when he confronted his assailant and three other men "attempting to smuggle 110 pounds of marijuana over the border").

[43] *Id.* Ex. I-28 (discussing cases in which "illegal aliens were accused of injuring or killing a U.S. law-enforcement officer but are believed to have fled to Mexico" and the extradition of Collings' killer from Mexico).

[44] *Id.* Exs. I-29 & I-30.

Plaintiffs also argue that the legislative history supports a finding of discriminatory intent based on statements by four legislators who opposed S.B. 1070.[45]  *See* Mot. at 23. The particular statements upon which Plaintiffs rely were made by Senator Rios, Senator Aboud, Senator Lopez, and Representative Patterson, none of whom has law enforcement training or experience and none of whom identified any factual basis for their assertions. *See* Pls.' Exs. C-4 at 19 & C-6 at 31-33.[46]  In addition to these unsubstantiated opinions, the legislators heard testimony from law enforcement officers confirming their ability to implement S.B. 1070 without racial profiling.  *See* Pls.' Exs. C-1 at 31, 33; C-3 at 59-60. And numerous other legislators expressed their confidence in Arizona law enforcement officers' ability to carry out their duties appropriately.  *See*, *e.g.*, Pls.' Exs. C-3 at 93-96.

Unfortunately, the flaws in Plaintiffs' arguments and evidence are too numerous to detail in this response, but the foregoing illustrates the general nature of Plaintiffs' assertions and the reasons why they should be given little, if any, weight.  Regardless of the manner in which Plaintiffs attempt to characterize things, the legislative history speaks for itself and does not support a finding of discriminatory intent.

v.      The constituent e-mails upon which Plaintiffs rely are not related to S.B. 1070

Plaintiffs cite nine e-mails constituents sent to Senator Pearce, *see id.* at 25-26,[47] to support their  argument that "[d]iscriminatory statements by constituents and the public influenced the legislative process," Mot. at 24.[48]  This argument has no factual or legal basis.  First, none of these e-mails was sent during the period in which the Senate

---

[45] Senator Miranda's alleged statement to the Daily 49er on May 2, 2010 (*see* Mot. at 24) is not part of the legislative history.

[46] *See* Second Kszywienski Decl. Exs. I-31, I-32, I-33, & I-34 (biographies of Senators Rios, Aboud, and Lopez and Representative Patterson).

[47] Plaintiffs list 11 e-mails, but cite Exhibits E-26 and E-29 twice.  *See* Mot. at 25-26.

[48] The only other evidence Plaintiffs cite regarding comments from Arizona constituents is testimony the Maricopa County Republican Party Chairman, Rob Haney, provided to the Senate Public Safety and Human Services Commission.  Mot. at 25.  Haney, however, referred only to an invasion of illegal immigrants, he made absolutely no references to Latinos or Mexican nationals.  *See* Ex. C-1 at 38.

considered S.B. 1070—January 13, 2010 to April 19, 2010.  *See* Second Kszywienski Decl. Ex. I-16.  Two of the e-mails substantially pre-date the first reading of S.B. 1070 in the Senate.  *See* Pls.' Exs. E-27 (dated Aug. 28, 2009) & E-28 (dated Apr. 25, 2007).  Plaintiffs offer no evidence to suggest that either of these e-mails were considered by the Senate in determining whether to enact S.B. 1070.  The remaining e-mails Plaintiffs cite were sent *after* the Senate approved S.B. 1070.  *See* Pls.' Exs. E-25, E-26, & E-29-33.  These e-mails therefore could not have "influenced the legislative process" as Plaintiffs contend.  Mot. at 24.

Second, even if these e-mails were contemporaneous with the Legislature's consideration of S.B. 1070, the cases upon which Plaintiffs rely do not support Plaintiffs' incredible inferential leap.  In *Palmore v. Sidoti*, 466 U.S. 429 (1984), for example, a state court had removed a Caucasian mother's custodial rights after she married a black man based on the court's finding that "despite the strides that have been made in bettering relations between the races in this country, it is inevitable that [the daughter] will, if allowed to remain in her present situation . . . suffer from the social stigmatization that is sure to come."  *Id.* at 431 (citation omitted).  In *City of Cleburne*, 473 U.S. at 448, the City imposed a zoning restriction on a facility for the mentally retarded and cited as one of its reasons its concern for "the negative attitude of the majority of property owners within 200 feet of the [plaintiff's] facility, as well as the fears of elderly residents of the neighborhood."  And in *Resident Advisory Board*, 564 F.2d at 144, the Third Circuit found that "a sudden shift in the City's position from passive acceptance to active opposition, in the face of protests by demonstrators manifesting racial bias, provides some indication of an improper motive or purpose."[49]  Here, by contrast, there is absolutely no

---

[49] Plaintiffs also cite *Rivera*, 784 F. Supp. 2d 133, but the *Rivera* court did not find a discriminatory motive—it found only that the plaintiffs had provided sufficient evidence to survive summary judgment on their claim that a redevelopment project violated the Fair Housing Act.  Even so, the *Rivera* plaintiffs provided far greater factual support for their argument that constituents influenced the Village's decision than Plaintiffs provide here.  *See id.* at 147-50.

1    evidence connecting the Legislature's decision to enact S.B. 1070 to any discriminatory

2    statements by constituents.

3              **3.      Procedural or Substantive Departures from Normal Practice**

4          "Substantive departures exist when 'factors usually considered important by the

5    decision-maker strongly favor a decision contrary to the one reached.'"   Mot. at 34

6    (quoting *Cent. Ala. Fair Hous. Ctr. v. Magee*, 835 F. Supp. 2d 1165, 1186 (M.D. Ala.

7    2011)).  In *Magee*, for example, the district court found that Alabama's H.B. 56 "departed

8    dramatically from the way [the State] has historically treated, indeed, prioritized the

9    treatment of, children" by requiring public schools to identify and report children who are

10   unlawfully present or whose parents are unlawfully present, thereby incentivizing the

11   undocumented parents to remove the children from public schools.  *Id.* at 1189.[50]

12         Here, Plaintiffs' argue that Section 2(B) departs from normal practice because it

13   limits law enforcement officers' discretion and therefore allegedly "conflicts with

14   Arizona's general policy of providing law enforcement an appropriate measure of

15   discretion" and "redirects their efforts away from . . . investigating and dealing with

16   crimes under Arizona law."[51]  Mot. at 35.  The impetus for Section 2, however, was that

17   certain law enforcement agencies (most notably, the Phoenix Police Department) had

18   enacted formal or informal policies *removing* law enforcement officers' discretion—in

19   violation of federal law—to contact federal authorities regarding possible immigration

20   violations.  *See* Spencer Decl. ¶¶ 6-19.  Plaintiffs' argument wholly ignores the legislative

21   history of S.B. 1070 because it does not fit with the political narrative of Plaintiffs'

22

23   [50] Plaintiffs rely on *Magee* to support many of their arguments.  *Magee*, however, is
     distinguishable from this case in numerous respects.  *See, e.g., Magee*, 835 F. Supp. 2d at
24   1169, 1184-94 (stating that the challenged statute "essentially prohibits individuals who
     cannot prove their citizenship status from staying in their manufactured homes" and
25   addressing the plaintiffs' challenge under the Fair Housing Act).

26   [51] Plaintiffs also argue that the citizen-suit provision is a substantive departure from
     normal practice, but that argument relates to Section 2(H), *see* Mot. at 35-36, A.R.S. § 11-
27   1051(H), whereas the purpose of this motion is to determine whether Plaintiffs are entitled
     to an injunction of Section 2(B).  In any event, Plaintiffs' argument is without merit.
28   Section 2(H) is not the first instance in which the Arizona Legislature has provided for
     citizen suits against state officials.  *See, e.g.*, A.R.S. § 49-264.

assertions.  Section 2 evolved throughout the legislative process in order to ensure that law enforcement officers retained "an appropriate measure of discretion."  For example, the Legislature amended Section 2(B) to limit its application to circumstances where the investigation is "practicable" and to exempt circumstances in which investigations into a person's immigration status will "hinder or obstruct an investigation."  *See* Second Kszywienski Decl. Ex. I-19.

The legislative history also contains testimony from multiple sources that non-enforcement of the federal immigration laws in Arizona had increased the instances of crime in Arizona "that threaten public safety."  *See* Pls.' Ex. C-3 at 3-4, 60-67; Mot. at 35.  And, contrary to Plaintiffs' assertions, the Legislature has limited the discretion of law enforcement officers in other contexts.  *See*, *e.g.*, A.R.S. § 13-3601(B) (requiring Arizona law enforcement officers to arrest a person in certain circumstances involving domestic violence).  Section 2(B) thus does not contain the type of substantive departures from normal practice the Supreme Court contemplated in *Arlington Heights* and Plaintiffs do not (and could not) argue that there were any procedural departures from normal practice in the consideration of S.B. 1070.

### 4.   Whether the Impact of the Decision Bears More Heavily on One Race than Another

There is no evidence that Section 2(B) will disproportionately impact Latinos or Mexican nationals who violate federal immigration laws as compared to persons of other races and national origins who violate federal immigration laws.  Plaintiffs argue that "enforcement of § 2(B) would disproportionately harm Latinos and Mexican nationals in Arizona because both groups make up a disproportionate share of the state's foreign-born population and the state's undocumented population."  Mot. at 27.  This argument is misplaced because it is based on as-applied cases in which protected groups were allegedly denied equal opportunities for housing, services, or voting rights.  *See* Mot. at 26-27; *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) (challenging a redistricting plan that allegedly diluted minorities' voting power); *Comm. Concerning Cmty.*

*Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) (challenging a tax sharing agreement between the City and County that allegedly denied Latinos an equal share of municipal services); *Magee*, 835 F. Supp. 2d at 1186 (challenging a law as applied to mobile home residents).  Where, as here, individuals in a particular class choose to violate certain laws more than persons of other classes, the disparity does not establish a "discriminatory adverse impact" on the minority class.  *See* Section III(B), *supra*.

Moreover, the cases Plaintiffs cite involve clear evidence that the challenged action denied a particular right or benefit to the minority.  *See Reno*, 520 U.S. at 475 (rejection of a proposed redistricting plan that would have created two districts with a majority of voting-age black residents); *City of Modesto*, 583 F.3d at 703 (statistical evidence showed that "the islands excluded from the [tax sharing agreement] were 71% Latino, while the islands included in the [agreement] were 48% Latino"); *Magee*, 835 F. Supp. 2d at 1194 (Latinos made up 3.2% of the population but 7% of mobile home residents).  Here, by contrast, Plaintiffs rely entirely on allegations and suppositions to support their argument that "there is clear evidence that the legislature enacted § 2(B) with the understanding that it would not be applied in a racially neutral way."  Mot. at 27.

Plaintiffs first rely on the statements Senators Aboud and Lopez made to explain why they were voting against S.B. 1070.  Mot. at 27.  Senator Aboud said that a constituent had e-mailed him and said "my family and I are going to be on a street, and the police are going to come up and demand to know what my immigration status is because I'm Hispanic."  *See* Pls.' Ex. C-6 at 31-32.  This shows only that the constituent was confused about S.B. 1070's provisions, it does not create a reasonable inference that Section 2(B) "would not be applied in a racially neutral way."  Senator Lopez was the last senator to explain her vote just before the vote closed.  *Id.* at 33-34.  Her concern about S.B. 1070 was based on her confusion as to what factors (other than race) could support reasonable suspicion of unlawful presence.  *Id.*  Since Senator Lopez has no background in either law or law enforcement,[52] her unsupported assertion that S.B. 1070 could lead to

---

[52] *See* Second Kszywienski Decl. Ex. I-33.

- 34 -

racial profiling does not support Plaintiffs' assertion that "the legislature enacted § 2(B) with the understanding that it would not be applied in a racially neutral way." Mot. at 27.

Plaintiffs next rely on the conclusory declarations Plaintiffs obtained from law enforcement officials <u>after</u> the Legislature passed S.B. 1070.  *See* Mot. at 27-28.[53]  These declarations are not probative on what the Legislature knew when it passed S.B. 1070.

Finally, Plaintiffs argue that the Legislature "intended § 2(B) to codify the practices of Maricopa County Sheriff Joe Arpaio" and infer discriminatory impact based on evidence reflecting allegations that Sheriff Arpaio's practices are discriminatory.  Mot. at 28.  The only thing Plaintiffs' evidence shows, however, is that Senator Pearce intended to follow Sheriff Arpaio's commitment to enforcing federal immigration law, versus the Phoenix Police Department's former policy of deliberate indifference to such violations.  *See, e.g.*, Pls.' Ex. C-3 at 60-64.  The evidence does *not* demonstrate that the Legislature, in the process of passing S.B. 1070, intended to codify Sheriff Arpaio's practices, and it certainly does not demonstrate that the Legislature intended to codify any allegedly discriminatory policies or practices of any law enforcement agency.[54]

As stated above, Plaintiffs' failure to demonstrate that the implementation of Section 2(B) will have a discriminatory effect is fatal to their equal protection claim.  *See* Section III(B), *supra*.  Even assuming Plaintiffs could overcome that hurdle, the foregoing demonstrates that none of the *Arlington Heights* factors supports a conclusion that the Arizona Legislature had a discriminatory purpose for enacting S.B. 1070.

> **D.     <u>Even If Plaintiffs Could Show a Discriminatory Motive Underlying S.B. 1070, Plaintiffs' Claim Fails Because S.B. 1070 Would Have Been Enacted Without Any Improper Motive</u>**

Even if Plaintiffs speculative evidence and inferential leaps were somehow

---

[53] In fact, Villasenor's declaration (Pls.' Ex. D) was signed July 16, 2012—over two years after S.B. 1070 was signed into law.

[54] Regardless of the allegations that have been made against Sheriff Arpaio, Plaintiffs have failed to demonstrate that the Legislature believed (or had reason to believe) before passing S.B. 1070 that Sheriff Arpaio was, in fact, engaging in any discriminatory policies or practices.  The articles Plaintiffs cite that were published *before* the Legislature passed S.B. 1070 reflect only *allegations* of racial profiling against Sheriff Arpaio.  Mot. at 29.

1    considered sufficient to show that Section 2(B) has a discriminatory impact and was

2    motivated by a discriminatory purpose, Plaintiffs still would not be likely to prevail on

3    their equal protection challenge to Section 2(B).  A showing that discrimination was a

4    motivating factor merely shifts the burden to Arizona to show that "the same decision

5    would have resulted even had the impermissible purpose not been considered." *Village of*

6    *Arlington Heights*, 429 U.S. at 271 n.21; *Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

7    Section 2 was developed in cooperation with PLEA as means to address, statewide, the

8    concerns PLEA raised in its efforts to change the Phoenix Police Department's sanctuary

9    policy.  Spencer Decl. ¶¶ 14-19.  As set forth above, PLEA strongly advocated in support

10   of Section 2 during the legislative hearings based on PLEA's concerns about the impact

11   sanctuary policies—formal or informal—were having on crime in Arizona.  *See*, *e.g.*, Pls.'

12   Exs. C-1 at 29-30 & C-3 at 59-67.  The legislative history also shows that several

13   legislators expressly approved S.B. 1070 as a means to address those concerns.  *See*, *e.g.*,

14   Pls.' Ex. C-3 at 93-96.  The legislative history clearly demonstrates that Section 2(B)

15   would have been enacted without considering any impermissible purpose.  Plaintiffs are

16   thus not likely to succeed on their equal protection challenge to Section 2(B) for three

17   separate reasons: (1) Plaintiffs have not shown that Section 2(B) will have a

18   discriminatory effect; (2) Plaintiffs have not shown that discrimination was a motivating

19   factor for Section 2(B); and (3) the legislative history reflects the Legislature's non-

20   discriminatory reasons for enacting Section 2(B).

21   **IV.    PLAINTIFFS    ARE    NOT    LIKELY    TO    PREVAIL    ON    THEIR**
22   **        PREEMPTION CHALLENGES TO A.R.S. § 13-2929**

23          Plaintiffs seek to enjoin A.R.S. § 13-2929—which prohibits persons from

24   transporting, moving, concealing, harboring, or shielding unlawful aliens while the person

25   is committing another criminal offense—on the grounds that the statute is allegedly field

26   preempted and conflict preempted.  *See* Mot. at 36-43.

27          **A.    A.R.S. § 13-2929 is Not Field Preempted**

28          Field preemption occurs when "Congress, acting within its proper authority, has

- 36 -

determined [the field] must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id.* (citation omitted). When considering whether a state law is preempted, however, "courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Id.* (citation omitted).

In *Arizona*, the Supreme Court held that "the Federal Government has occupied the field of alien registration" because "[f]ederal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders." *Id.* at 2502. The comprehensiveness of the alien registration scheme, however, does not support an inference that Congress has preempted the field in all areas related to immigration. To the contrary, the Supreme Court has never held that Congress has the exclusive authority to act with respect to aliens. *See*, *e.g.*, *De Canas v. Bica*, 424 U.S. 351, 358 (1976) ("[Respondents] fail to point out, and an independent review does not reveal, any specific indication in either the wording or the legislative history of the [Immigration and Nationality Act] that Congress intended to preclude even harmonious state regulation touching on aliens in general."); *see also Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("[T]he States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal.").

As Plaintiffs expressly concede, the federal government does not even contend that it has preempted the field of transporting, harboring, and concealing aliens who are unlawfully present in the United States. *See* Mot. at 37 n.34 ("The preemption challenges that Plaintiffs present here are fundamentally distinct from the government's challenge."). The government's decision not to challenge A.R.S. § 13-2929 on field preemption grounds is logical because, unlike in the field of alien registration, Arizona has broad, plenary power to protect the safety and welfare of its citizens. Arizona also has an

1    independent interest in addressing the humanitarian issues and criminal activity associated

2    with the transporting, harboring, or concealing unlawful aliens.  For example, numerous

3    law enforcement officers in Arizona have been killed or seriously injured while

4    investigating criminal activity involving illegal aliens.  *See*, *e.g.*, Glidewell Decl., ECF

5    No. 329-1; Pls.' Ex. C-1 at 29-30.  The harboring, shielding, transporting, and inducing of

6    illegal aliens in the State has also made Arizona a safe haven for terrorists, drug mules,

7    smugglers, and sex traffickers.[55]  The federal interest in this area is not so dominant that

8    Congress' power should be presumed exclusive, nor is there any indication that it was the

9    "clear and manifest purpose" of Congress to preclude states from regulating in this area.

10   *Arizona*, 132 S. Ct. at 2501.  In fact, the Arizona Court of Appeals has addressed the

11   preemptive effect of the smuggling provisions of the same federal statute Plaintiffs rely on

12   here (8 U.S.C. § 1324) and found "no indication in the INA or its history that Congress

13   intended to preclude harmonious state regulation touching on the smuggling of illegal

14   aliens in particular."  *Arizona v. Flores*, 188 P.3d 706, 711 (Ariz. Ct. App. 2008).

15   Plaintiffs are therefore not likely to prevail on their argument that A.R.S. § 13-2929 is

16   field preempted.

17        **B.    A.R.S. § 13-2929 Does Not Conflict With Any Congressional Objectives**

18        Arizona does not dispute that there are differences between A.R.S. § 13-2929 and 8

19   U.S.C. § 1324.  A mere difference between state and federal law, however, does not make

20   the state law preempted.  *See*, *e.g.*, *Williamson v. Mazda Motor of Am., Inc.*, 131 S. Ct.

21   1131, 1136-40 (2011) (finding no conflict preemption because the state law, although

22

---

23   [55] *See* Glover Decl. ¶¶ 10-13, ECF No. 329-1 (discussing his experience in combating the importation of "black tar heroin" from Mexico and the fact that 100% of the runners his

24   team has arrested for selling the heroin in Arizona have been unlawfully present in the country); Second Kszywienski Decl. Ex. I-35 (FBI statement that human trafficking

25   "facilitates the illegal movement of immigrants across borders and provides a ready source of income for organized crime groups and even terrorists"); *id.* Ex. I-36 ("Illegal

26   immigration, facilitated by wretched criminal networks, fosters sex trafficking and human smuggling"); *id.* Ex. I-37 (discussing how the terrorists responsible for the 9/11 attacks

27   lived in the United States without authorization or detection, including in Phoenix, Arizona); Braddock Decl. Ex. 24 at 29, ECF No. 329-3 (discussing ICE's arrest of Neeran

28   Zaia and Basima Sesi, who headed an organization specializing in "smuggling Iraqi, Jordanian, and Syrian Nationals").

1  different from the federal standard, did not stand as an obstacle to "an important

2  regulatory objective"). Rather, conflict preemption occurs "where 'compliance with both

3  federal and state regulations is a physical impossibility,'" or "where the challenged state

4  law 'stands as an obstacle to the accomplishment and execution of the full purposes and

5  objectives of Congress.'" *Arizona*, 132 S. Ct. at 2501 (citations omitted). The *Arizona*

6  Court found Sections 5(C) and 6 of S.B. 1070 conflict preempted based on specific

7  conflicts between *those* provisions and congressional objectives. Specifically, the Court

8  found that Section 5(C) "would interfere with the careful balance struck by Congress with

9  respect to unauthorized employment of aliens" since "the text, structure, and history of

10  [the Immigration Reform and Control Act] is that Congress decided it would be

11  inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized

12  employment." *Id.* at 2505. And the Court found Section 6 conflict preempted because

13  "[b]y authorizing state officers to decide whether an alien should be detained for being

14  removable, § 6 violates the principle that the removal process is entrusted to the discretion

15  of the Federal Government." *Id.* at 2506.

16  Again, Plaintiffs concede that the federal government has not argued that A.R.S. §

17  13-2929 stands as an obstacle to any congressional objective. *See* Mot. at 37 n.34.

18  Plaintiffs nevertheless argue that A.R.S. § 13-2929 is conflict preempted for three reasons,

19  none of which is consistent with Supreme Court precedent. First, Plaintiffs argue that

20  A.R.S. § 13-2929 "undermines the congressional scheme by adding additional penalties

21  for existing federal crimes." Mot. at 40. The *Arizona* Court expressly recognized,

22  however, that there are many instances where "a State may make violation of federal law

23  a crime." 132 S. Ct. at 2502. In fact, "the Court has uniformly held that the States are

24  separate sovereigns with respect to the Federal Government because each State's power to

25  prosecute is derived from its own 'inherent sovereignty,' not from the Federal

26  Government." *Heath v. Alabama*, 474 U.S. 82, 89 (1985); *see also United States v.*

27  *Lanza*, 260 U.S. 377, 382 (1922) ("[A]n act denounced as a crime by both national and

28  state sovereignties is an offense against the peace and dignity of both and may be

punished by each."). That a person can be prosecuted under both A.R.S. § 13-2929 and 8 U.S.C. § 1324, therefore, does not mandate a finding of preemption. *See*, *e.g.*, *Flores*, 188 P.3d at 711-12 ("[W]e find that Arizona's human smuggling law furthers the legitimate state interest of attempting to curb 'the culture of lawlessness' that has arisen around this activity by a classic exercise of its police power.").

Second, Plaintiffs argue that A.R.S. § 13-2929 conflicts with federal law by "relocating decision-making regarding the interpretation and prosecution of these crimes from the federal government to the state without ensuring uniformity." Mot. at 40. This argument is also at odds with well-established precedent. The Supreme Court has "consistently held that state courts have inherent authority, and are thus presumptively competent, to adjudicate claims arising under the laws of the United States." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). "To rebut the presumption of concurrent jurisdiction, the question is not whether any intent at all may be divined from legislative silence on the issue, but whether Congress in its deliberations may be said to have affirmatively or unmistakably intended jurisdiction to be exclusively federal." *Id.* at 462. Congress has not granted federal courts exclusive jurisdiction for violations of 8 U.S.C. § 1324. *See* 8 U.S.C. § 1329. Thus, the possibility of having state courts interpret violations of A.R.S. § 13-2929 that parallel federal laws does not support a finding that A.R.S. § 13-2929 is conflict preempted.

Third, Plaintiffs argue that A.R.S. § 13-2929 is conflict preempted because it "criminalizes conduct that the federal government chose not to sanction." Mot. at 40. The State's concurrent enforcement power, however, does not require that the state and federal laws be identical. In *Skiriotes v. Florida*, 313 U.S. 69, 74-75 (1941), for example, the Court found no preemption of a Florida statute that regulated certain fishing activities in the Gulf of Mexico even though the Florida statute imposed different restrictions than a federal statute governing the same activities. Unlike Section 3, A.R.S. § 13-2929 does not interfere with Congress' unified scheme for alien registration, and unlike Section 5(C), A.R.S. § 13-2929 does not impose criminal penalties for conduct that Congress intended

1   to exempt.[56]   A.R.S. § 13-2929 does not, therefore, stand as "an obstacle to the

2   accomplishment and execution of the full purposes and objectives of Congress."   *See*

3   *Arizona v. Barragan-Sierra*, 196 P.3d 879, 890 (Ariz. Ct. App. 2008) (finding that

4   "Arizona's enforcement of its human smuggling law is compatible with the federal

5   enforcement of its counterpart, serving the same purpose," notwithstanding the fact that

6   the state and federal statutes are not identical).

7       Because it is not impossible to comply with both A.R.S. § 13-2929 and 8 U.S.C. §

8   1324 and because A.R.S. § 13-2929 does not stand as an obstacle to any federal objective,

9   Plaintiffs are not likely to prevail on their preemption challenge to A.R.S. § 13-2929.

10  **V.   PLAINTIFFS ARE NOT LIKELY TO SUFFER IRREPARABLE HARM**

11  **AND AN INJUNCTION IS NOT IN THE PUBLIC INTEREST**

12      In addition to showing that they are likely to succeed on the merits of their claims,

13  Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of injunctive

14  relief."   *Winter*, 555 U.S. at 22.[57]   "Issuing a preliminary injunction based only on a

15  possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization

16  of injunctive relief as an extraordinary remedy that may only be awarded upon a clear

17  showing that the plaintiff is entitled to such relief."   *Id.*   "'Likely' means 'having a high

18  probability of occurring or being true.'"   *Winnemucca Indian Colony v. United States ex*

19  *rel. Dep't of the Interior*, 837 F. Supp. 2d 1184, 1189 (D. Nev. 2011) (citation omitted).

20      Plaintiffs argue that they "*will* suffer irreparable harm" if Section 2(B) is enjoined

21  because they have *alleged* constitutional violations and because they are "*at risk* of

22

---

23  [56] Ministers or missionaries of religious denominations would not be punishable under
    A.R.S. § 13-2929 unless they were engaging in a separate criminal offense at the time

24  they were transporting, harboring, sheltering, or shielding an unlawful alien.   *Compare*
    Mot. at 43 *with* A.R.S. § 13-2929.   As Plaintiffs point out, 8 U.S.C. § 1324 could not be

25  the predicate criminal offense because a minister or missionary who transports an
    unlawfully present alien would not be in violation of 8 U.S.C. § 1324.

26  [57] If Plaintiffs establish only "serious questions going to the merits," Plaintiffs must also

27  establish that the balance of hardships tips *sharply* in their favor.   *Alliance for the Wild
    Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011); *but see Winnemucca*, 837 F.

28  Supp. 2d at 1189 (questioning the validity of *Cottrell* to the extent it is inconsistent with
    *Winter* and *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009)).

unlawful detention and interrogation."   Mot. at 44 (emphasis added).   Contrary to Plaintiffs' assertions, merely alleging a constitutional claim is not sufficient to establish irreparable harm.  *See Associated Gen. Contractors of Cal., Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (finding alleged violations of the Equal Protection Clause insufficient to justify injunctive relief—even under the more liberal, pre-*Winter* standard—because the plaintiff "ha[d] not demonstrated a sufficient likelihood of success on the merits of its constitutional claims"); *Paramount Land Co. LP v. Cal. Pistachio Comm'n*, 491 F.3d 1003, 1012 (9th Cir. 2007) (reversing the district court's grant of a preliminary injunction on a First Amendment claim, holding that, "By bringing a colorable First Amendment claim, Paramount certainly raises the specter of irreparable injury. But simply raising a serious claim is not enough to tip the hardship scales").

Nor does a mere "risk" of unlawful detention entitle Plaintiffs to injunctive relief. Rather, it is Plaintiffs' burden to establish a *likelihood* (i.e., high probability) that they will suffer "*immediate* and irreparable harm."   *Hodgers-Durgin*, 199 F.3d at 1042, 1044 (emphasis added) ("In the absence of a likelihood of injury to the named plaintiffs, there is no basis for granting injunctive relief . . . ").   As set forth in Arizona's Opposition to Plaintiffs' Motion for Class Certification, none of the Individual Plaintiffs "faces an imminent threat of being stopped, detained or arrested for any offense that could trigger the provisions of Section 2(B)," and, even if one of the Individual Plaintiffs were stopped, detained, or arrested, "there is no reason an officer would have reasonable suspicion that any of the proposed representatives is unlawfully present in the United States."  Intervenor Defs.' Opp'n to Pls.' Mot. for Class Certification at 7-8, ECF No. 660.[58]   Moreover, Plaintiffs' fears are not well founded because they are inconsistent with Section 2(B)'s terms and the manner in which numerous law enforcement officials have expressly pledged to enforce it.  *See* Sections II(B) & III(B), *supra*; *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (an alleged "chilling effect" must be based on "an actual and well-founded fear that the law will be enforced against [the plaintiffs]").

---

[58] Arizona incorporates those facts and evidence here.

With respect to A.R.S. § 13-2929, Plaintiffs argue that they are likely to suffer irreparable harm because they are allegedly at risk of criminal prosecution under the statute and because the Organizational Plaintiffs are allegedly diverting resources to educate their members "about the effects of S.B. 1070, including A.R.S. § 13-2929." Mot. at 46. Again, Plaintiffs cannot establish a likelihood that they will suffer *immediate* irreparable harm. A.R.S. § 13-2929 has been in effect for over two years without any of the Individual Plaintiffs or the Organizational Plaintiffs' staff members facing criminal prosecution. Even assuming that a vague "diversion of resources" allegation would be sufficient to constitute *irreparable* harm, which it does not,[59] it is unclear how Plaintiffs could be suffering any ongoing measurable diversion of resources to educate their members about a law that has been in effect since July 29, 2010.

Weighed against Plaintiffs' speculative and hypothetical risk of harm are "important values of federalism." *Hodgers-Durgin*, 199 F.3d at 1043; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) ("[R]ecognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury which is both great and immediate."); *Rizzo*, 423 U.S. at 378 (citation omitted) ("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'" (citation omitted)). The Arizona Legislature determined that Section 2(B) and A.R.S. § 13-2929 were critical tools in the State's efforts to combat the staggering costs of illegal immigration. Following the Supreme Court's guidance regarding the application of Section 2(B) (which Plaintiffs' themselves characterize as providing "clear boundaries that § 2(B) may not lawfully cross," Mot. at 1), numerous law enforcement officials have

---

[59] The Supreme Court has held that an injury is not irreparable unless "remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

1   vowed to implement Section 2(B) consistent with constitutional requirements, and it must

2   be presumed that they will do.  The balance of equities tips decidedly in Arizona's favor.

3   **VI.    <u>CONCLUSION</u>**

4        For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction should be

5   denied in its entirety.

6

7        RESPECTFULLY SUBMITTED this 10th day of August, 2012.

8                                    SNELL & WILMER L.L.P.

9                            By s/John J. Bouma
10                               John J. Bouma
                                 Robert A. Henry
                                 Kelly A. Kszywienski
11                               One Arizona Center
                                 400 E. Van Buren
12                               Phoenix, AZ  85004-2202

13                               and

14                           By  s/Joseph Sciarrotta, Jr., *with permission*
                                 Joseph Sciarrotta, Jr.
15                               Office of Governor Janice K. Brewer
                                 1700 W. Washington, 9th Floor
16                               Phoenix, AZ  85007

17                               *Attorneys for Intervenor Defendants the State of Arizona*
                                 *and Janice K. Brewer, Governor of the State of Arizona*
18
                                 and
19
                             By  s/Michael Tryon, *with permission*
20                               Thomas C. Horne
                                 Michael Tryon
21                               Evan Hiller
                                 Attorney General
22                               1275 West Washington Street
                                 Phoenix, Arizona 85007-2926
23
                                 *Attorneys for Intervenor Defendant the State of Arizona*
24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2012, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants on record.

s/ John J. Bouma

15603986