# Exhibit F

## DECLARATION OF ROBERT BROWN

Robert Brown declares as follows:

1. The facts set forth below are of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2. I was a police officer for the Phoenix Police Department from 1985 until March, 2010 when I retired.

3. Aside from a short period of approximately three months (when I worked with a drug enforcement bureau), I was a uniformed Phoenix police officer for my entire 25-year career – a "first responder" and "beat officer," among other common descriptions.

4. For the first four years of my career (approximately), I worked in north Phoenix in the Union Hills precinct. For the last 21 years of my service (approximately), I was an officer in various precincts/areas in or near downtown or central Phoenix, assigned to various duties and tasks, including as a beat officer in and around various housing projects and working more traditional duties as a uniformed patrol officer in downtown Phoenix.

5. Throughout my career, I have patrolled on foot, on a bike, and in a squad car. My interactions with individuals and the types of scenarios that I encountered were varied and diverse, ranging from on-foot pursuits of individuals suspected of criminal activity in the housing projects to conducting traffic stops of individuals suspected of violating traffic ordinances during routine traffic patrol in downtown Phoenix.

6. I am aware that S.B. 1070 contains a provision in it that requires law enforcement officers to make a reasonable attempt to determine the immigration status of an individual when, in connection with a lawful stop, detention or arrest, that law enforcement officer develops reasonable suspicion that the person is not lawfully present in the United States, and when the inquiry into immigration status is practicable and would not hinder or obstruct an investigation.

7. I am also aware that allegations are being made in connection with the claims in this lawsuit that law enforcement officers in the field will not be able to perform their duties in connection with this provision without engaging in racial profiling or otherwise violating the constitutional rights of individuals via prolonged detentions.

8. In my experience, law enforcement officials are more than adequately trained to perform, and capable of fulfilling, their duties in connection with a provision like this without engaging in racial profiling or violating the constitutional rights of individuals. Indeed, I believe law enforcement officials or others who claim otherwise are either unfamiliar with how local law enforcement works in the field or trying to advance other political agendas or policies.

9. During any lawful stop, detention or arrest for any issue, one of the very first things that any law enforcement officer needs to do is to identify the individual or individuals with whom they are in contact.

10. There are numerous reasons why it is important, if not required, for a law enforcement officer to make this identification. For example, if the stop is a traffic stop, one of the very first things that must be determined is whether the person is carrying his or her driver's license as required by law and whether the person is otherwise lawfully operating the vehicle. Indeed, the first thing any law enforcement officer does in any traffic stop encounter, after an initial greeting, is to ask for "license, registration and proof of insurance."

11. In the traffic stop context, or otherwise, however, it is imperative for a law enforcement officer to obtain accurate identification of the individual or individuals with whom they are interacting regardless. Quite simply, a law enforcement officer needs to know whom they are dealing with. The officer needs to know if the person has any prior arrests or criminal record that need to be factored into how the officer handles the situation (e.g., prior assaults on law enforcement officers, weapons charges/convictions, felony convictions; etc.); whether the person has any warrants out for his or her arrest; if

the person has a suspended license; etc. The law enforcement officer also needs to ensure that the persons he or she is providing warnings or citations to, or arresting, are indeed who they proclaim themselves to be.

12. The process that a law enforcement officer follows to ascertain the identity of someone depends on the circumstances, but is usually very simple and straightforward. In my experience over my 25 years of service, the scenarios in which someone does not have valid identification in their possession (whether driving or not), or in which the person cannot establish who they are by providing basic information that can be readily and quickly verified are becoming rarer and rarer. The exception, which has always been the exception, relates to individuals who do not want you to know who they really are for one reason or another.

13. If the person has what appears to be a valid Arizona or state identification card or some other driver's license or identification card issued by another state, that is almost always sufficient, especially after the officer makes a quick records check to verify that the information provided is current and accurate. If the person does not have any of those forms of identification on them, however, the inquiry is still almost always very simple. Law enforcement officers will routinely ask for a full name, date of birth, address, social security number, any photo identification, or any other data that would help anyone identify oneself to anyone asking for proof of identification in any context. And with this type of information a law enforcement officer can almost always promptly verify and determine an individual's identity by running quick database checks, or by asking someone else to do so, for the officer.

14. During this identification process, a law enforcement officer sometimes develops reasonable suspicion that the person or persons with whom they are dealing may not be lawfully present in the United States. Again, how reasonable suspicion may develop varies on the circumstances of each encounter. However, in my experience, law enforcement officers almost always develop this suspicion, if not conclusion, fairly

quickly and without even seeking to ascertain this to begin with. For example, during many routine traffic stops, when the driver does not have a driver's license (as required by law to operate the vehicle), and the law enforcement officer asks why the person does not have a driver's license, the individual oftentimes simply admits that he or she cannot obtain one because he or she is not lawfully present in the United States.

15. In other instances, it becomes readily apparent early on during the process of just seeking to identify the individual that the individual is or may not be lawfully present for various other reasons. For example, the person may not be carrying or profess to having any identification (whether in their possession or not) from any state or basic information such as a social security number and an address or place of residence in the United States, which when coupled with other factors may seem particularly suspicious depending on the circumstances of the stop. The person may only have foreign identification in his or her possession or may be driving a vehicle registered in a foreign country and unable to explain the circumstances of his or her presence in the United States (for example, not even claiming to have a visa or passport or any information about their presence in the United States). The person may give the officer inconsistent or difficult to believe information about his or her identity and presence in the United States. No single factor (other than the individual's voluntary admission of unlawful presence, which is not unusual as I noted above), of course, is dispositive, but any trained officer who knows his or her assigned beat is more than capable of developing reasonable suspicion of whether someone is being forthright about who he or she is and what the reasons are for him or her being where he or she is when contacted by the officer.

16. An example of an encounter with a foreign national who is lawfully present exemplifies this point. Over my many years of service, I had numerous contacts with individuals who were citizens of other countries, including Mexico, who were here lawfully. In almost all of those instances, the individuals were carrying their passports or other forms of identification (including visas) or were otherwise able to quickly explain

the circumstances of their presence in the United States in a manner that could be verified.

17. In my experience, an officer does everything outlined above, and can do everything outlined above, without resorting to any consideration of the race, color, or national origin of the individual. Indeed, in all of my encounters in 25 years of service, I treated every individual in all encounters in the same manner, and my experience was that every other officer I worked with did the same thing. If an officer is unable to identify who someone is or otherwise ascertain what the officer needs to know for purposes of his or her interaction with someone, the officer is going to continue to make further inquiries and investigate the issues until he or she is able to develop with some certainty whom he or she is dealing with.

18. I understand that allegations are being made that implementation of a provision like Section 2(B) of S.B. 1070 will result in the prolonged detention of individuals while inquiries are being made regarding whether they are lawfully present or not. In my experience, it is very simple to make the inquiries that are necessary in the field alone to develop reasonable suspicion as to whether the person is lawfully present or not and, once such suspicion is developed, the verification process can be done quickly by contacting various federal or other authorized authorities. I am not aware of any law enforcement officer who is not sufficiently trained on how long someone can be detained for purposes of the 4th Amendment.

19. I also understand that individuals are contending that enforcement of practices such as what Section 2(B) of S.B. 1070 authorizes will result in individuals being detained when they otherwise might be eligible for a citation in lieu of detention. Allegations of this nature misunderstand how the citation in lieu of detention process works. If an individual is stopped for a misdemeanor or petty offense for which he or she may be eligible for a citation in lieu of detention, the officer will not cite and release that individual unless that person is eligible for such under the law enforcement agency's

policies and procedures for assessing whether that is appropriate. These policies and procedures include, among other things, that the officer determine whether he or she has been given sufficient information and/or documentation to ascertain the identity of an individual and whether the individual is likely to return for the court hearing. If an individual during a stop is unable to provide sufficient identification as to who he or she is and/or is not able to provide an officer with the level of comfort that he or she is likely to return for a court hearing, the officer in almost every instance will not cite and release the individual regardless.

20.  The final allegation that I understand being made regarding enforcement of provisions such as Section 2(B) is that these provisions cannot be enforced in practice without racial profiling. As a 25-year veteran law enforcement officer, I find such an allegation to be both erroneous and offensive. A law enforcement officer is able to develop reasonable suspicion as to whether an individual is or is not lawfully present during any lawful stop, detention or arrest without engaging in any consideration of the person's race, color or national origin. Law enforcement officers are not only well trained to not consider these factors as part of the investigation of issues such as this, but it is simply unnecessary to consider any of these factors as part of the process.

I declare under penalty of perjury that the foregoing is true and correct.

DATED  8/8/2012

Maricopa County, Arizona.

By _____
Robert Brown