# Exhibit I

John J. Bouma (#001358)
Robert A. Henry (#015104)
Kelly A. Kszywienski (#025578)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
jbouma@swlaw.com
bhenry@swlaw.com
kkszywienski@swlaw.com

Joseph Sciarrotta, Jr. (#017481)
Office of Governor Janice K. Brewer
1700 W. Washington, 9th Floor
Phoenix, AZ 85007
Telephone: (602) 542-1586
Fax: (602) 542-7602
jsciarrotta@az.gov

*Attorneys for Intervenor Defendants the
State of Arizona and Janice K. Brewer,
Governor of the State of Arizona*

Thomas C. Horne (#002951)
Attorney General
Michael Tryon (#003109)
Senior Litigation Counsel
1275 West Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542- 5025
tom.horne@azag.gov
michael.tryon@azag.gov

*Attorneys for Intervenor Defendant the
State of Arizona*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Valle del Sol, Inc., et al. | No. CV-10-1061-PHX-SRB |
| Plaintiffs, | **SECOND DECLARATION OF KELLY A. KSZYWIENSKI** |
| v. | |
| Michael B. Whiting, Apache County Attorney, in his official capacity, et al., | |
| Defendants, | |
| and | |
| Janice K. Brewer, Governor of the State of Arizona, in her official capacity; and the State of Arizona, | |
| Intervenor Defendants. | |

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

I, Kelly A. Kszywienski, declare as follows:

I make this declaration based upon my personal knowledge of the matters set forth below.  If called upon to do so, I could and would testify competently thereto.

1.      I am an attorney in the law firm of Snell & Wilmer L.L.P. and am one of the lawyers representing Intervenor Defendants Janice K. Brewer ("Governor Brewer") and the State of Arizona in this lawsuit.

2.      I make this declaration in support of Intervenor Defendants' Response to Plaintiffs' Motion for Preliminary Injunction.  I have personal knowledge of the facts stated herein.

3.      Attached as Exhibit I-1 are true and correct copies of the Law Enforcement Codes of Ethics for the Pima County Sheriff's Office and the Yavapai County Sheriff's Office.

4.      Attached as Exhibit I-2 is a true and correct copy of the Tucson Police Department General Orders, Code of Conduct (Nov. 9, 2011), as posted on the Tucson Police Department's website.  *See* General Orders, http://tpdinternet.tucsonaz.gov/ general_orders/general-orders.aspx.

5.      Attached as Exhibit I-3 is a true and correct copy of the Tucson Police Department General Orders, Arrest Policies (Nov. 9, 2011), as posted on the Tucson Police Department's website.  *See* General Orders, http://tpdinternet.tucsonaz.gov/general _orders/general-orders.aspx.

6.      Attached as Exhibit I-4 is a true and correct copy of the Phoenix Police Department's Statement on S.B. 1070 – English, http://www.phoenix.gov/police/sb1070_ postscotus_english.html (last visited Aug. 9, 2012).

7.      Attached as Exhibit I-5 is a true and correct copy of San Francisco Police Department: SFPD Command Staff, http://sf-police.org/index.aspx?page=1603 (last visited, Aug. 8, 2012).

8.      Attached as Exhibit I-6 is a true and correct copy of Mark Morey, *Yakima's New Top Cop, Dominic Rizzi, Jr., is Sworn in*, YAKIMA HERALD-REPUBLIC (May 7, 2012,

11:21 p.m.), http://www.yakima-herald.com/stories/2012/05/07/yakima-s-new-top-cop-dominic-rizzi-jr-is-sworn-in.

9. Attached as Exhibit I-7 is a true and correct copy of Sonu Munshi, *Mesa Clarifies Policy on Arrests of Suspected Illegal Immigrants*, EAST VALLEY TRIBUNE, July 2, 2008.

10. Attached as Exhibit I-8 is a true and correct copy of Gary Nelson, *Council OKs Police's Immigration Policy* 2, ARIZ. REPUBLIC, July 5, 2008.

11. Attached as Exhibit I-9 is a true and correct copy of the home page for the Arizona Peace Officers Standards and Training Board, http://www.azpost.state.az.us/index.htm (last visited Aug. 8, 2012).

12. Attached as Exhibit I-10 is a true and correct copy of National Council 118, Vote of No Confidence in ICE Director John Morton and ICE ODPP Assistant Director Phyllis Coven (June 25, 2010), http://www.cis.org/articles/2010/259-259-vote-no-confidence.pdf.

13. Attached as Exhibit I-11 is a true and correct copy of State of Arizona Official Canvass at 14 (Dec. 4, 2006), http://www.azsos.gov/election/2006/General/Canvass2006GE.pdf.

14. Attached as Exhibit I-12 is a true and correct copy of U.S. English, Inc., Full Texts of State Official English Laws, http://www.us-english.org/userdata/file/TextofStateOELaws.pdf (last visited Aug. 8, 2012).

15. Attached as Exhibit I-13 is a true and correct copy of the Int'l Olympic Committee Factsheet: The Olympic Movement (June 2012), http://www.olympic.org/Documents/Reference_documents_Factsheets/The_Olympic_Movement.pdf.

16. Attached as Exhibit I-14 is a true and correct copy of the Huppenthal Dep., *Acosta v. Huppenthal*, No. 4:10-cv-00623-AWT (D. Ariz. Dec. 14, 2011).

17. Attached as Exhibit I-15 is a true and correct copy of S.B. 1070 as it was introduced in the Senate.

18.     Attached as Exhibit I-16 is a true and correct copy of Bill Status Overview, S.B. 1070, http://www.azleg.gov//FormatDocument.asp?inDoc=/legtext/49leg/2r/bills/sb1070o.asp&Session_ID=93 (last visited Aug. 8, 2012).

19.     Attached as Exhibit I-17 is a true and correct copy of the Meeting Minutes from the January 20, 2010 hearing of the Senate Committee on Public Safety and Human Services.

20.     Attached as Exhibit I-18 is a true and correct copy of S.B. 1070, Fiscal Analysis, Feb. 5, 2010.

21.     Attached as Exhibit I-19 are true and correct copies of the following amendments to S.B. 1070:

   (a)   the Public Safety and Human Services Committee amendment, dated January 19, 2010;

   (b)   the Pearce Floor Amendment, dated February 10, 2010;

   (c)   the strike everything amendment of the Committee on Military Affairs and Public Safety, dated March 31, 2010; and

   (d)   the Biggs Floor Amendment, dated April 13, 2010.

22.     Attached as Exhibit I-20 is a true and correct copy of the Meeting Minutes from the March 31, 2010 meeting of the Military Affairs and Public Safety Committee.

23.     Attached as Exhibit I-21 is a true and correct copy of Bill Status Overview, H.B. 2162, http://www.azleg.gov//FormatDocument.asp?inDoc=/legtext/49leg/2r/bills/hb2162o.asp&Session_ID=93 (last visited Aug. 9, 2012).

24.     Attached as Exhibit I-22 is a true and correct copy of Randal C. Archibold, *Ranchers Alarmed by Killing Near the Border*, N.Y. TIMES, Apr. 4, 2010, *available at* http://www.nytimes.com/2010/04/05/us/05arizona.html?_r=1&pagewanted=print.

25.     Attached as Exhibit I-23 is a true and correct copy of Steve Lopez, *Death on the Beat*, TIME MAG., June 20, 1999, *available at* http://www.time.com/time/magazine/article/0,9171,27142,00.html.

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

26.     Attached as Exhibit I-24 is a true and correct copy of Fire Coalition: Criminal Alien Statistics, http://www.firecoalition.com/docs/CRIMINALALIEN STATISTICS.pdf (last visited Aug. 9, 2012).

27.     Attached as Exhibit I-25 is a true and correct copy of Brian Ross et al., *Kidnapping Capital of the U.S.A.*, ABC NEWS, Feb. 11, 2009, http://abcnews.go.com/ Blotter/story?id=6848672&page=1.

28.     Attached as Exhibit I-26 is a true and correct copy of Officer Down Memorial Page, Park Ranger Kristopher William Eggle, http://www.odmp.org/ officer/16353-park-ranger-kristopher-william-eggle (last visited Aug. 9, 2012).

29.     Attached as Exhibit I-27 is a true and correct copy of *Drug Smuggler Spared Death in '98 Killing of Border Agent*, WASH. TIMES, Nov. 24, 2000, http://www.washingtontimes.com/news/2000/nov/24/20001124-013315-4355r/print/.

30.     Attached as Exhibit I-28 is a true and correct copy of Guy Taylor, *Home a Safe Haven for Mexican Suspects; Death Penalty Halts Extradition for U.S. Crimes*, WASH. TIMES, Jan. 9, 2004, at A01.

31.     Attached as Exhibit I-29 is a true and correct copy of DEA News Release, Agustin Vasquez-Mendoza Extradited to Arizona (Jan. 29, 2005), http://www.justice.gov/ dea/pubs/pressrel/pr013105p.html.

32.     Attached as Exhibit I-30 is a true and correct copy of Fallen Officers: Sgt. Manuel H. Tapia, 41, http://www.azdps.gov/about/Fallen_Officers/Display/?o=Tapia (last visited Aug. 9, 2012).

33.     Attached as Exhibit I-31 is a true and correct copy of Arizona State Legislature, Member Page, Paula Aboud, http://www.azleg.gov/MembersPage.asp? Member_ID=119&Legislature=49&Session_ID=93 (last visited Aug. 9, 2012).

34.     Attached as Exhibit I-32 is a true and correct copy of Arizona State Legislature, Member Page, Rebecca Rios, http://www.azleg.gov/MembersPage.asp? Member_ID=114&Legislature=49&Session_ID=93 (last visited Aug. 9, 2012).

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

Snell & Wilmer

L.L.P.

LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

35.     Attached as Exhibit I-33 is a true and correct copy of Arizona State Legislature, Member Page, Linda Lopez, http://www.azleg.gov/MembersPage.asp?Member_ID=120&Legislature=49&Session_ID=93 (last visited Aug. 9, 2012).

36.     Attached as Exhibit I-34 is a true and correct copy of Arizona State Legislature, Member Page, Daniel Patterson, http://www.azleg.gov/MembersPage.asp?Member_ID=46&Legislature=49&Session_ID=93 (last visited Aug. 9, 2012).

37.     Attached as Exhibit I-35 is a true and correct copy of FBI – Human Trafficking, http://www.fbi.gov/about-us/investigate/civilrights/human_trafficking/ (last visited Aug. 9, 2012).

38.     Attached as Exhibit I-36 are true and correct copies of Concerned Women for America – Immigration and Sex Trafficking, http://www.cwfa.org/articledisplay.asp?id=13004&department=BLI&categoryid=commentary (last visited Aug. 10, 2012), and CWA Statement, Dr. Janice Shaw Crouse, *available at* http://www.cwfa.org/images/content/drcrsouehumantrafficking.pdf.

39.     Attached as Exhibit I-37 is a true and correct copy of Barry Wigmore, *War on Terror: Security Failure: 9/11: The 7 Missed Clues; How FBI and CIA Kept on Blundering*, SUNDAY MIRROR (LONDON), June 9, 2002, at 16.

40.     Attached as Exhibit I-38 is a true and correct copy of Chandler Police Department General Orders, E-10 Arrests (Feb. 26, 2010), *available at* http://www.chandlerpd.com/gos/E10arrst.pdf.

41.     Attached as Exhibit I-39 is a true and correct copy of the Pima County Sheriff's Department General Order 2007-012, Arrest, Detention, and Transportation Procedures (Feb. 18, 2011).

42.     Attached as Exhibit I-40 are true and correct copies of e-mails the Intervenor Defendants obtained from the Arizona State Senate.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 10th day of August, 2012.

Kelly A. Kszywienski

15611009

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

- 7 -

# Exhibit I-1

# Law Enforcement Code of Ethics

**As a Law Enforcement Officer**, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all people to liberty, equality, and justice.

**I will** keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others.  Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department.  Whatever I see or hear of a confidential nature, or that is confided in me in my official capacity, will be kept ever secret unless revelation is necessary in the performance of my duty.

**I will** never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions.  With no compromise for crime, and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will; never employing unnecessary force and never accepting gratuities.

**I recognize** the badge of my office as a symbol of public faith, and I accept it as a public trust to be held as long as I am true to the ethics of the police service.  I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession: law enforcement.

Revised 04/2003



## Loyalty Oath

State of Arizona, County of Pima

I,_____as a member of the Pima County Sheriff's Department, do solemnly swear  (or affirm) that I will support the Constitution of the United States and the Constitution and laws of the State of Arizona; that I will bear true faith and allegiance to the same and defend them against all enemies, foreign and domestic; and that I will faithfully and impartially discharge the duties of my position according to the best of my ability, so help me God (or so I do affirm).

## Mission Statement

As a leader in public safety, we are committed to serving with honor, courage, and integrity in the fight against crime, and to work relentlessly toward making our community safe for the people of Pima County.

## Code of Ethics

**All representatives of this agency shall abide by the following Code of Ethics:**

A

S A LAW ENFORCEMENT OFFICER, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality, and justice.

I WILL keep my private life unsullied as an example to all; remain courageously calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my agency. Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I WILL never act officiously or permit my personal feeling, prejudices, animosities or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I RECOGNIZE the badge of my office as a symbol of public faith, and will accept it as a public trust to be held so long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself to my chosen profession…law enforcement.

I WILL, as a representative of the agency, conduct myself in a manner which will not bring discredit to the agency.  I shall obey the laws of the United States, the State of Arizona, County ordinances and local laws.  I shall regulate my personal affairs which will not bring justified unfavorable criticism from my neighbors or other citizens or be involved personally in disturbances or incidents that could discredit the agency.  I will realize that I am obligated to hold the public trust by striving to act in a professional manner.  I understand I must remain constantly vigilant and aware that I am under the constant observation by the public.  For this reason, it is essential that I strive to present myself in a professional manner whether on or off duty.

# Exhibit I-2

| TUCSON POLICE DEPARTMENT GENERAL ORDERS |  | VOLUME 1 GENERAL DEPARTMENT ORDERS |
|---|---|---|
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

# 1300 CODE OF CONDUCT [CALEA 1.1.2; 26.1.1]

All members of the Police Department, whether sworn, non-sworn or volunteer, are responsible for holding themselves to a high standard in their private and professional lives.  This section of *General Orders* establishes the guidelines to which all members shall adhere.  Ethics training shall be conducted for all personnel, at a minimum, biennially.

## 1310   LAW ENFORCEMENT CODE OF ETHICS [CALEA 1.1.2]

All sworn members of the Police Department shall abide by the tenets of the *Law Enforcement Code of Ethics*:

*"As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.*

*"I will keep my private life unsullied as an example to all; maintain courageous calm in the face of dangers, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others.  Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department.  Whatever I see or hear of a confidential nature or that is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.*

*"I will never act officiously or permit personal feelings, prejudice, animosities or friendships to influence my decisions.  With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence, and never accepting gratuities.*

*"I recognize the badge of my office as a symbol of public faith, and I accept it as a public trust to be held so long as I am true to the ethics of the police service.  I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession … law enforcement."*

## 1320   DEPARTMENT VALUES [CALEA 12.2.1 a]

All members of the Department shall familiarize themselves with the stated values of the agency and shall strive to conduct all official business in a manner consistent with them.

- **Leadership**

  Each member of the organization is responsible for establishing the direction of the Department and communicating the vision at every level of the organization.  We show the way in our community by going first and guiding those who follow.  We are entrusted with caring for the spirit of the organization.



| | | |
|---|---|---|
| **TUCSON POLICE DEPARTMENT GENERAL ORDERS** | | **VOLUME 1 GENERAL DEPARTMENT ORDERS** |
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

Leadership means we:
- Lead by example
- Do the right thing
- Look for and acknowledge things done right
- Create a trusting environment where people can develop
- Are willing to go beyond traditional expectations

▪ **Service Orientation**

Each employee enhances the quality of life within our community and our department through dedicated service.

Service Orientation means we:
- Are empathetic and compassionate in dealing with people
- Treat problems as important
- Follow through on promises – if we set an expectation, we meet or exceed it
- Treat people with dignity

▪ **Integrity**

Our value as police employees depends upon the respect and confidence we earn from the community and each other.  The integrity of each individual, as well as the organization, is necessary for citizens to give us their trust.  Without this trust, we cannot expect to form a partnership with the community.

Integrity means we:
- Are honest
- Admit mistakes and take corrective actions
- Do what we say we will do
- Behave consistently with our Department values

▪ **Excellence**

We meet challenges and adversity with perseverance to attain individual and organizational goals.

Excellence means we:
- Strive for excellence in everything we do
- Are responsible and dependable
- Are accountable
- Commit to our mission and values

▪ **Fairness**

Fundamental to delivery of professional police service is the fair and equitable treatment of all individuals.  Whether it is a citizen or employee, all must be treated with dignity and respect.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | VOLUME 1 GENERAL DEPARTMENT ORDERS |
|---|---|
| **Revised:** November 9, 2011 | **1300 CODE OF CONDUCT** Issued May 2001 |

Fairness means we:
- Act consistently with our values and expectations
- Let compassion and courtesy guide our actions
- Have respect for all people, their ideas and opinions
- Apply rules, regulations and laws in an unbiased manner
- Treat others as we want to be treated

- **Teamwork**

  Teamwork is essential to the successful operation of the Department.  The team must include all employees working in partnership with each other and the community to attain our goals.

  Teamwork means we:
  - Recognize the police are the people and the people are the police
  - Foster cooperation and collaboration with the public
  - Include others in planning, decision making, and action
  - Commit to the goals, objectives and plans of the team without concern for who receives the credit or blame
  - Recognize open communication is fundamental to successful team efforts
  - Are supportive of the organization's efforts

- **Personal Responsibility**

  Each of us has a personal responsibility for the success of our community.  We respect, care about, trust and support each other.  We respect and encourage individual responsibility, while recognizing we have a right and obligation to participate in leading our community.

  Personal responsibility means we:
  - Set a positive example in our personal and professional lives
  - Seek challenges and risk success
  - Take initiative
  - Accept responsibility for our mistakes

## 1330   GENERAL RULES OF CONDUCT [CALEA 26.1.1]

This section of *General Orders* cites the rules that govern the actions of all members of the Police Department, whether sworn, non-sworn or volunteer.  Any violation of *General Orders* may be made the subject of disciplinary action against member(s) responsible for such violation.  It is understood that no rules can be established which embrace all situations in the discharge of police duties.  Some things must necessarily be left to the discretion of the individual member.  If, however, a member deviates from the rules or established procedures, the member must be able to demonstrate that the action was necessary.  The final authority on such determinations rests with the Chief of Police.

| TUCSON POLICE DEPARTMENT GENERAL ORDERS |  | VOLUME 1 GENERAL DEPARTMENT ORDERS |
| --- | --- | --- |
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

1330.1 **Applicability of Rules**

Rules of conduct shall apply to all members except where, by their nature, they are inapplicable. Failure to comply with any provisions of *General Orders* or other Department policies and procedures shall subject an employee to disciplinary action.

1330.2 **Obedience to *General Orders*, Procedures and Policies Required**

All members shall observe and obey all laws, City *Administrative Directives*, Department *General Orders*, Department procedures and policies, as well as any procedures and policies established by their Commanders.

1330.3 **Required Knowledge**

All officers shall have a working knowledge of all criminal, constitutional, and motor vehicle laws, and ordinances in force in the City of Tucson, as well as City *Administrative Directives*, Department *General Orders*, and policies and procedures of their respective divisions and bureaus, as may be appropriate to their assignment or classification.

Non-sworn employees shall have a working knowledge of all laws, City Administrative Directives, Department *General Orders*, and policies and procedures of their respective divisions and bureaus as may be appropriate to their assignment or classification.

All members are responsible for seeking and obtaining any additional information or clarification necessary in order to comply with laws, ordinances, City *Administrative Directives*, Department *General Orders*, Department policies and procedures or any other subject area with which they must be familiar.

1330.4 **General Responsibilities and Requirements**

All members shall perform their duties as required or as directed by law, the Constitutions of the United States and the State of Arizona, Department *General Orders*, Department policies and procedures, City *Administrative Directives*, or order of a superior officer. The administrative delegation of the enforcement of specialized laws and ordinances to particular units of the Department does not relieve members of other units from the responsibility for taking prompt, effective police action to enforce those laws when the occasion arises.

All members shall assist other members when asked. Such assistance shall include the utilization of any special skills or talents that a member may have. Any question as to whether the assistance is necessary for completion of a legitimate police task shall be referred to a supervisor.

1330.5 **Reporting Violations of Laws, Ordinances, *General Orders* or Policies Required**

Members having knowledge of other members violating laws, ordinances, City *Administrative Directives*, Department *General Orders,* policies or procedures, or



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 1 GENERAL DEPARTMENT ORDERS |
|---|---|---|
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

otherwise disobeying orders, whether on or off duty, shall report such violation in writing to the Chief of Police through their chain of command.

### 1330.6 Actions Taken Under Color of Authority

Any action taken by a member of the agency under color of authority subjects the member to all applicable provisions of Department *General Orders* and City *Administrative Directives.*

### 1330.7 General Standards of Expected Conduct

Members shall not engage in any conduct, whether on or off duty, which is unbecoming or detrimental to their duties, position, or the Department.  All members shall conduct their private and professional lives in such a manner as to avoid adverse reflection upon the Department or themselves as members of the Department. Members shall treat each other and all persons with whom they have contact with respect and courtesy.

### 1330.8 Expected Conduct Toward the Public [CALEA 22.2.7 a, b]

All persons having business with the Department are entitled to courteous and respectful consideration and must be given all assistance that may be proper under the rules of this Department.  All members shall remain completely impartial toward all persons coming to the attention of the Department.  Members shall politely provide their name, badge (payroll) number, and department issued identification card with their photograph to any person who requests it.  This mandate to present department identifiers does not pertain to personnel who are actively working in an undercover capacity.  Members shall not mistreat or abuse, whether physically or verbally, any prisoner or person having business with the Department.

### 1330.9 Notice to Department of Certain Activities Required

Members shall keep the Department informed of any activity, situation, or problem with which the Department would logically be concerned.  Members shall notify their supervisor in writing any time they are involved as a witness, victim, or suspect in any situation under investigation by this or any other law enforcement agency.  Members shall notify the chain of command of any address or telephone number change or change of name.  Members involved as plaintiff or defendant in any civil action resulting from their activity as a Department member shall immediately report this fact in writing to the Legal Advisor.

### 1330.10 Criminal Conduct Prohibited

Members shall not engage in any conduct, whether on or off duty, regardless of their whereabouts, which is in violation of the law.  Criminal conduct, in and of itself, is sufficient grounds for disciplinary action against a member, regardless of whether or not the member is cited, indicted, tried, and/or convicted for any particular offense.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 1 GENERAL DEPARTMENT ORDERS |
|---|---|---|
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

**1330.11  Compliance with the Code of Ethics and Department Values Required** [CALEA 1.1.2]

All officers shall abide by the standards of the Law Enforcement Code of Ethics, which is incorporated in this manual.  All members shall be familiar with and strive to model the Department's values in all actions.

**1330.12  Required Conduct and Participation in Internal Investigations**

All members are required to fully and truthfully participate in, and cooperate with, any internal investigation to which they are a party or witness.  Members shall provide (all) complete and truthful relevant information, whether specifically requested or not. Any and all acts of intentional untruthfulness and/or purposeful omission of relevant information shall be addressed under *General Order 1330.19* Untruthfulness. Members shall comply with all directions given by members of the chain of command and the Office of Internal Affairs.   All internal investigations are confidential.   Members shall not divulge any information regarding these investigations unless specifically authorized to do so.

**1330.13  Insubordination Prohibited**

No member shall be insubordinate to any superior officer or member.

**1330.14  Failure to Follow an Order** [CALEA 12.1.3]

No member shall refuse to take any properly directed action or fail to follow any lawful order or direction given by a superior officer.

**1330.15  Cowardice Prohibited**

Officers shall not shirk their duty in the face of danger.

**1330.16  Cruel, Unlawful or Improper Treatment Prohibited**

Members shall not treat any person or animal cruelly, use excessive physical force, fail to observe the Constitutional rights of any person, or neglect to take any necessary humane actions when circumstances require.

**1330.17  Gifts, Gratuities, Fees, Rewards, Loans, Etc. Prohibited**

Except as may be specifically authorized by the Chief of Police, members shall not solicit or accept, directly or indirectly, any gift, gratuity, loan, service, or fee where there is a direct or indirect connection between the solicitation and their Department membership or employment.

Except as may be specifically authorized by the Chief of Police, members shall not accept any reward for services rendered in the line of duty to the community, or to any person or agency.


Except as may be specifically authorized by the Chief of Police, members are prohibited from buying, selling or promoting anything of value from or to any complainant, suspect, witness, defendant, prisoner, or other person involved in any case which has come to their attention, or which arose out of their Department employment, in which the member has a personal involvement or connection.

### 1330.18 Endorsements

Members shall not knowingly permit their names or photographs to be used to endorse any product or service as representative of the Department without the permission of the Chief of Police.  Members shall not use or permit the use of the Department uniform, logo or badge in any unauthorized manner, or for any private purpose, without permission of the Chief of Police.

### 1330.19 Untruthfulness

A.  No member shall knowingly make an untrue statement about a fact, either orally or in writing, in connection with any investigation, assignment or inquiry.

B.  No member shall knowingly sign any false official statement or report, commit perjury, or give false testimony before any court, grand jury, board, commission, judicial or administrative hearing, or department hearing, whether or not under oath.

C.  Members are required to report completely, honestly, and accurately all facts and information pertaining to any investigation, whether criminal or administrative, or other matter of concern to the Department.

D.  This rule does not apply to an officer's questioning or interrogation of a person involved in a criminal investigation or where the officer is engaged in an approved undercover role where such misrepresentation is not inconsistent with law or accepted professional practice.

### 1330.20 Security and Confidentiality of Department Business Required

A.  **Confidentiality:**  Members shall consider the operations and official business of the Department to be confidential.  They shall not release such information to anyone not authorized to receive the information except in accordance with Department procedure.

B.  **Security of Department Records:** Members shall not reveal the contents of any Department record or file, including any electronic versions, to any person not entitled to the information.  Information shall not be released to the public or media unless authorized and then only by persons authorized to make such releases.

C.  **Department Records and Paperwork:** Members shall not steal, alter, destroy, forge, remove, copy or tamper with any kind of police record, report, citation, or document, including any electronic version, without proper authority.  Members are prohibited from retaining personal copies of official police reports and shall incorporate all notes and working files into the official record maintained in Records.


Members are prohibited from retaining copies of voice recordings, video recordings, photographs, and other similar material, whether obtained on Department or personal equipment, related to official police investigations.  This includes traffic stops, crime scenes, and all other work related duties.  All such items shall be submitted to Property and Evidence according to standard Department protocols.

D. **Tape Recording of Employees:** Members of the Department are prohibited from recording their conversation with another member (either with their knowledge or surreptitiously) except in case of an authorized criminal or administrative investigation where the labor contract provides for such tape recording, and on any departmental lines which are automatically taped (i.e. Communications). This prohibition does not include the recording of conversations between department members captured on mobile video recorders (MVRs).

Exceptions must be approved in writing by a division commander prior to any such tape recording. Violations of this policy may result in discipline up to and including termination.

## 1330.21 **Consorting Prohibited**

Members shall avoid personal associations with persons who have an open and notorious reputation in the community for criminal behavior (immediate family ties excluded), except in the discharge of their official duties and with the permission of the Chief of Police.

## 1330.22 **Maintenance of Minimum Standards Required** [CALEA 22.3.2; 33.1.2]

Members are expected to meet, maintain, and demonstrate all minimum Department standards and performance expectations at all times.  Members shall maintain all necessary certifications and meet any requirements of their position classification at all times.  Failure to maintain any required standards, certifications or requirements shall be grounds for disciplinary action up to and including termination.  Members shall attend all training sessions as required or at the direction of their supervisors or Commanders.

Sworn members shall maintain all AZPOST standards necessary to retain certified peace officer status.  Revocation of peace officer certification shall be grounds for immediate dismissal of any sworn member.  Suspension of a sworn member's peace officer certification by AZPOST shall subject the member to disciplinary action up to and including termination. Refer to *General Orders* regarding Training Policies and the suspension of AZPOST Peace Officer Certification.

## 1330.23 **Strikes or Labor Stoppages Prohibited**

Members shall neither engage in nor conduct a work stoppage or strike.  The term "strike" means the concerted failure to report for duty, the willful absence from one's position, the stoppage of work, or the abstention in whole or in part from the full, faithful, and proper performance of the duties of employment for the purpose of inducing,



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 1 GENERAL DEPARTMENT ORDERS |
| --- | --- | --- |
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

influencing, or coercing a change in conditions, compensation, rights, privileges, or obligations of employment.

### 1330.24 Prohibited Uses of Property

Members shall not damage, abuse or lose any Department property entrusted to them. Some items are so sensitive that their loss or theft poses serious risk to the community. Items such as firearms, identification cards, key cards, badges, and radios require a greater degree of care. Officers shall evaluate what arrangement best ensures the safety of the community under the given circumstances.

City owned property, evidence, abandoned and found property, property maintained for safekeeping, and any other property received by a member of this Department shall not be used, utilized, converted, copied, distributed, etc., for personal use by any member or by any other person.   Any property coming into the possession of a member shall be handled in accordance with established procedures.

### 1330.25 On Duty Conduct Standards

A. **General Conduct Required:** Members shall be punctual in reporting for duty at the time and place designated by their supervisors.  Members may not be absent from any duty assignment without permission or authorized leave.  All members are to remain at their assignment and on duty until properly relieved by another member or dismissed by proper authority.

B. **Chain of Command:** Members shall utilize the chain of command in all official actions as appropriate.

C. **Prohibited On Duty Conduct:** Members are prohibited from engaging in any activity, action, or conduct that detracts from their obligations and responsibilities while on duty.

D. **Completion of Assignments:** Members are expected to thoroughly and professionally complete any and all assignments, duties, or tasks for which they are responsible.

E. **Alcohol, Intoxicants, or Drugs:** Except as otherwise provided, no member shall be on duty under the influence of intoxicants or drugs, be impaired by the use of medications, whether prescribed to the member or not, or be otherwise unfit for duty because of their use, nor shall any member drink or purchase any alcoholic beverages, or use any controlled substance not prescribed to them while on duty or in uniform.  No member in plainclothes shall drink or purchase alcoholic beverages while on duty except when necessary in the performance of their duty and then only with the approval of their supervisor.

Members who are prescribed controlled substances or medications which may affect their ability to perform their duties shall adhere to the policies and requirements set forth in *General Orders* regarding Hiring and Workplace Policies and the use of medications while on duty.


Members shall not possess any intoxicants or controlled substances on Department premises except when necessary in the performance of a police task.  Such materials brought into Department premises in the furtherance of a police task shall be properly identified and stored.

Employees found to be in violation of any of the provisions of the Department's Drug and Alcohol policy set forth in *General Orders* regarding Hiring and Workplace Policies and the drug and alcohol policy shall be subject to disciplinary action up to and including termination of employment.

An employee who refuses to be examined for controlled substances or alcohol will be treated as having tested positive and may be discharged.  In no event shall the disciplinary action be less than a five (5)-day suspension.  A second refusal to be examined or tested shall result in the employee's termination of employment.

F.   **Tobacco Products:** Smoking, or the use of other tobacco products, is prohibited while performing any police function or in violation of other Department, City or State laws and policies. Those members who choose to smoke or use other tobacco products while on-duty and not performing a police function, are responsible for the safe and sanitary disposal of these items (i.e. chewing tobacco should be placed into a separate sealed receptacle prior to being disposed of in a trash can). Smoking is not permitted in any City vehicle.  Smoking in Department facilities is prohibited except as set forth in City of Tucson policy.

G.   **Investigations:** Members shall not withhold any information about criminal activity. Members shall not undertake self-assigned investigations, whether on or off duty, without prior notification to, and approval by, a supervisor.

H.   **Gambling:** No form of gambling shall be permitted on Department property or while on duty, except in the performance of police duties and then only with the approval of the member's supervisor.

I.   **Offensive Conduct, Materials, and Statements:** Members on duty or on City property shall not possess, reproduce, circulate, or post any material that may be considered offensive based upon a protected group or protected status, as defined in the Department's or City's procedures on equal employment opportunity and affirmative action, except as required for a police purpose.  Members shall not tell jokes, make verbal statements, or engage in any other conduct that may be considered offensive based upon a protected group or protected status as defined in the Department's or City's procedures on Equal Employment Opportunity and affirmative action.

### 1330.26 **Off Duty Conduct Standards**

A.   **Call Out:** During off duty time, members of the Department shall be subject to call out duty as needed.  Members shall not be contacted off duty except when, in the considered judgment of the person initiating the call, the mission of the Department requires it.

| TUCSON POLICE DEPARTMENT GENERAL ORDERS |  | VOLUME 1 GENERAL DEPARTMENT ORDERS |
|---|---|---|
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

B. **Emergency Stand-by:** Members shall be subject to emergency stand-by as deemed necessary by the Chief of Police.

C. **Standards for Police Action While Off Duty:** Off duty officers shall act in an official capacity if they observe an incident requiring police action when time is of the essence, or if such action will safeguard life, property, or prevent the escape of a felon or violent criminal.  If off duty officers observe, or have their attention called to, an incident requiring police action not meeting this standard, they shall report the incident to the appropriate law enforcement agency as soon as practical.

D. **Involvement in Neighborhood Disputes Prohibited:** Officers shall not intentionally become involved in quarrels or disputes involving their neighbors, friends, associates, or relatives.  Officers shall not make an arrest or take other official actions in personal matters or those of their family or neighbors unless such action is warranted by the immediate threat of serious bodily harm or significant property damage.  A supervisor shall be notified as soon as possible.

## 1340   SOCIAL MEDIA; CONDUCT AND RESPONSIBILITIES OF MEMBERS

### 1340.1   General

Department personnel are free to express themselves as private citizens on social media sites or via other means to the extent that their speech does not impair working relationships of this department, impede the performance of duties, impair discipline and *esprit de corps* among coworkers, or negatively affect the public perception of the department.

As public employees, members are cautioned that speech on or off duty, which relates to their official duties and responsibilities, is not protected by the First Amendment and may form the basis for discipline if deemed detrimental to the department.  Department personnel should assume that their speech and related activity on social media or other communication media sites will reflect upon the department and them as peace officers.

Members engaging in social networking or other means of information exchange must conduct themselves in a manner consistent with the Department Code of Conduct.  Members are subject to discipline for posting, sharing, or otherwise disseminating department related information in any manner that is inconsistent with this *General Order*, up to and including termination.

### 1340.2   Postings Prohibited

Adherence to the department's Code of Conduct is required in the personal use of social media and other information sharing sites.  Because such speech becomes part of the public domain and may be used to discredit members, undermine their ability to testify in court, or damage the reputation of the agency, members are prohibited from posting the following:



**TUCSON POLICE DEPARTMENT GENERAL ORDERS**

**VOLUME 1 GENERAL DEPARTMENT ORDERS**

**Revised:** November 9, 2011

**1300 CODE OF CONDUCT**
Issued May 2001

A.  Speech containing obscene or sexually explicit language, images, or acts.

B.  Any act or statement, or any other form of speech that ridicules, maligns, disparages, or otherwise indicates bias against any race, religion, color, ancestry, national origin, ethnicity, disability, gender, sexual orientation, gender identity, familial status, marital status or other protected status.

C.  Speech or acts involving themselves or other members that reflects violent, reckless, or irresponsible behavior.

D.  False information that harms the reputation of another person, group or organization.

E.  Private facts about someone without their permission that have not been previously revealed to the public, are not of legitimate public concern, and would be offensive to a reasonable person.

F.  The name, likeness or other personal identifier or attribute of another person without that person's permission in a manner that usurps or falsely uses the person's identity.

G.  The creative work of another, copyrighted or trademarked material, or other confidential business information without the permission of the owner.

1340.3    **On-Duty Usage Prohibited**

A.  Updating any social media or other information sharing sites while on duty, unless it is in the course or furtherance of employment.

B.  Text messaging while operating a city vehicle.

1340.4    **Information Sharing Requiring Prior Permission of the Chief of Police**

Members are prohibited from posting or otherwise publishing any of the following on the internet, any social networking platform, or any other media or information exchange forum:

A.  Any text, photograph, audio or video recording, or any other type of information file, related to any investigation or matter of this department.

B.  Any confidential, law enforcement sensitive or proprietary information of the department.

C.  Logo, badge, uniform, vehicle, equipment, weapon, or any identifying item or symbol affiliated with the department (except as authorized by 1340.5) without authorization of the Chief of Police.


**1340.5**   **Information Sharing Regarding Department-Sanctioned Public Activity Permitted**

Members may share and post photographs of themselves in uniform, as well as images depicting Department sanctioned public functions such as Academy graduations, promotions, Peace Officer Memorial events, and official fundraising or community projects, as well as union sponsored community activities.  Any posting of a member in uniform shall be subject to the *General Orders* governing the Code of Conduct and Department appearance standards.

**1340.6**   **Safety of Members**

For safety reasons, members are cautioned to not disclose their employment with this department on web postings, or post information pertaining to any other member without that member's permission.  This includes posting or sharing personal photos that may cause them to be recognized as members of the department.  Members working in an undercover capacity shall not post any form of visual or personal identification unless  operationally necessary.

**1340.7**   **Duty to Identify Posting**

Any member who maintains a blog, or who posts a reply to a blog that identifies the agency, must identify themselves in the blog posting, and must include a disclaimer that their viewpoints are personal and do not reflect the position of the department.

**1340.8**   **Use of Email Addresses on Information Sharing Sites**

Members shall not use City email addresses to register for or respond to any social media or internet information sharing site unless it is for a department sanctioned purpose.

**1340.9**   **Access by the Department to Member Postings**

Members should expect that any information created, downloaded, exchanged or discussed in a public online forum may be accessed by anyone, to include the department, at any time without prior notice.

**1340.10**   **Duty to Report Violations**

Any employee who becomes aware or has knowledge of a posting, website, or any other manner of posting of information in violation of this *General Order* shall notify his or her Chain of Command immediately for follow-up action.

| TUCSON POLICE DEPARTMENT GENERAL ORDERS |  | VOLUME 1 GENERAL DEPARTMENT ORDERS |
| --- | --- | --- |
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

## 1350 PROHIBITED POSSESSOR LEGISLATION; RESPONSIBILITIES OF MEMBERS

### 1350.1 General

All commissioned members, and those civilian members whose positions require handling firearms, must at all times maintain the legal ability to possess a firearm. The ability to legally possess a firearm can be affected by a variety of state and federal laws. Below is an overview regarding these laws and how they may affect an employee; check the current version of the appropriate statute for the complete verbiage.

- **Arizona Statute**

    A. Arizona statutes provide that a person is prohibited from possessing a firearm if the person:
      1. is under commitment for mental health treatment, or
      2. has been convicted or adjudicated delinquent of a felony and whose civil rights have not been restored, or
      3. is incarcerated, or
      4. is serving a term of probation for a domestic violence offense or a felony offense.

    B. Under Arizona law, a person may also be prohibited from possessing a firearm when specifically ordered not to do so by an Order of Protection or Injunction Prohibiting Harassment.

- **United States Code**

    A. Federal statutes provide that a person is a prohibited possessor when, <u>among other things</u>, the person:
      1. Has a felony conviction
      2. Has been committed by court order for mental health treatment
      3. Has been convicted of a "misdemeanor crime of domestic violence" (see below for definition)
      4. Is subject to certain protective orders.

    B. A misdemeanor crime of domestic violence is defined as a misdemeanor offense which has as an element the use or attempted use of physical force or the threatened use of a deadly weapon, by a spouse, former spouse, parent or guardian of the victim, against a person with whom the victim shares a child in common, a person who is or has cohabited with the victim as a spouse, parent or guardian, or by a person similarly situated to a spouse, parent or guardian of the victim.

    Under this definition, certain crimes that would be considered domestic violence under state law are not considered domestic violence under federal law. Similarly, certain crimes that would not be considered domestic violence under state law are considered domestic violence under federal law.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 1 GENERAL DEPARTMENT ORDERS |
|---|---|---|
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

C. Under federal law, the issuance of certain court orders protecting a person from domestic violence makes the defendant (the person to whom the order is directed) a prohibited possessor.  This prohibition applies to <u>only</u> those court orders issued:

1. After a hearing of which the person received actual notice and had an opportunity to be heard, and
2. The order restrains a person from harassing, stalking or threatening an intimate partner or the child of an intimate partner, or engaging in conduct that would place either the partner or child in reasonable fear of bodily injury, and
3. The court order includes a finding that the person represents a credible threat to the physical safety of the partner or child or by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against the partner or child.


- **Operation of State and Federal Law**

Under State law, a member may be prohibited by an Order of Protection or an Injunction Prohibiting Harassment from possessing a firearm.  When such an order is in place, sworn members and any non-sworn members whose jobs require the handling of a firearm, shall be placed on leave as provided in *General Order 1340.3*.

The Department of Justice Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) is tasked with interpreting federal firearms laws and their interplay with state laws. In Arizona, most Orders of Protection or Injunctions Against Harassment are issued without the benefit of a hearing and therefore do not have the effect of triggering federal laws regarding gun possession.  However, ATF has advised the Arizona Supreme Court that any person who receives an Arizona order and then requests a hearing on the order may in fact become a prohibited possessor under federal law, if following any such hearing the injunction or order remains in effect and meets the criteria set forth in Section C above.

Members should seek private legal advice on these issues prior to taking any action with regard to an Order of Protection or Injunction Against Harassment that is issued to the member.

**1350.2 Reporting Required**

Any member served with an Order of Protection or similar court order shall complete a *Personnel Report* with a copy of the order attached and present it to the member's chain of command prior to returning to duty. Any person wishing to serve such an order on a member shall be directed to a supervisor who shall review the order to determine whether it contains a firearms prohibition and shall immediately serve the order on the affected member. The supervisor shall immediately take any action required by the order or *General Orders*.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 1 GENERAL DEPARTMENT ORDERS |
|---|---|---|
| **Revised:** November 9, 2011 | | **1300 CODE OF CONDUCT** Issued May 2001 |

Any member arrested for a criminal offense, which may be considered domestic violence under state or federal law shall report such arrest via *Personnel Report* through the chain of command. Any conviction, including convictions which have not been previously reported, shall be similarly reported through the chain of command.

### 1350.3   Administrative Action and Discipline

Orders of Protection and similar orders issued under State law may prohibit the possession of a firearm by a member.  When such an order is in effect, the member may not possess a firearm and must be placed on leave as indicated below.

As noted above, in certain circumstances federal law may also prohibit possession of a firearm by a person who is the subject of an order of protection or similar order. However, federal law provides that a law enforcement officer whose right to possess a firearm is lost due to the existence of a qualifying protective order may nevertheless possess and use a firearm during duty hours.

The Legal Advisor shall be contacted to review all orders of protection or similar court orders to determine whether the member may continue to possess a firearm while on duty.  If possession is permitted, it shall be for on duty purposes only and the service weapon shall be provided to the officer and surrendered to a supervisor on a daily basis.

All sworn, and any non-sworn members whose position requires the handling of firearms, who are no longer permitted by operation of state or federal law to possess a firearm shall be placed on leave immediately.

Members may request to use compensatory time or vacation leave and, when such leave is exhausted, may request to be placed on leave without pay.  In no event shall the total leave time exceed 12 months. A member who does not request or is not deemed eligible for authorized leave shall be indefinitely suspended without pay for failure to maintain the ability to perform the member's job duties. Administrative procedures related to suspensions without pay shall be followed.

A member who is unable to regain the ability to legally possess a firearm within 12 months of the first day of authorized leave or suspension shall be terminated from city employment.

The Department may, separate from and in addition to any discipline resulting from the loss of the right to posses a firearm, take any necessary disciplinary action related to the member's misconduct, including any events underlying or associated with the issuance of any Order of Protection or similar court order, or any arrest.

# Exhibit I-3

| **TUCSON POLICE DEPARTMENT GENERAL ORDERS** |  | **VOLUME 2 GENERAL OPERATING PROCEDURES** |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

# 2100 ARREST POLICIES

## 2110  ARRESTS

2111    **Definitions**

As used in this Chapter, the following definitions are applicable:

- **Arrest:** The term "arrest" does not have one precise definition; rather the definition may depend upon the circumstances.  Pursuant to Arizona Revised Statutes, an arrest "is made by an actual restraint of the person to be arrested, or by his submission to the custody of the person making the arrest."   Courts have defined the term arrest to mean a seizure of a person when, under the totality of the circumstances, a reasonable person would not feel free to leave.  A "full custodial arrest" constitutes a situation where an individual under arrest is taken into custody and transported either to jail or a police facility.

- **Probable Cause:** The required level of knowledge to make a lawful arrest.  This has been defined by courts as "reasonably trustworthy knowledge, based on articulable facts and circumstances, that would lead a reasonable person to believe that a crime has been, is being, or is about to be committed, and that the person to be arrested has committed, is committing, or is about to commit that crime."   Probable cause is determined by the totality of the circumstances and may be established by the collective knowledge of all law enforcement personnel involved.

2112    **General** [CALEA 1.2.7]

When making the determination to take enforcement action, officers shall consider what is required by law, what in the best interests of the community and of the Department.  When exercising such discretion, officers shall not consider prejudice based upon race, sex, ethnic origin, religion, sexual preference or any other social, cultural or economic factor, or position in the community.  Officers shall remain objective and professional and shall not let emotions influence their action.

Following the procedures delineated in *General Orders* an officer may at any time, with or without a warrant, arrest a person if the officer has probable cause to believe:

- A felony has been committed and probable cause exists to believe the person to be arrested has committed the offense

- A misdemeanor or a petty offense has been committed and probable cause exists to believe the person to be arrested has committed the offense

2112.1   **Use of Force While Making an Arrest/Treatment of Prisoners** [CALEA 1.3.1, 70.2.1, 70.3.1]

All suspects and prisoners shall be treated courteously, humanely and with regard for their legal rights.



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

Officers shall use only the minimum force necessary to affect an arrest or restraint, and to ensure the safety of the arrestee, the officers and others.  Intentional, unjustified assaults committed by Department members shall constitute gross misconduct, and may result in criminal prosecution and administrative action, up to and including termination.

Only restraining devices and techniques authorized by the Training Center will be utilized in the restraint, transportation and detention of arrestees.  Officers shall consider using an ambulance with restraints to control and transport disabled, mentally ill, injured or extremely violent prisoners.  An officer may be assigned to travel in the ambulance or follow immediately behind, depending on the circumstances, to provide security.

**2112.2  Injury to Prisoners or Damage to Property** [CALEA 71.3.1; 70.3.2; 70.2.1]

The arresting officer shall be responsible for the safety and protection of the arrestee while in Department custody.  In case of an injury, apparent illness, or other medical condition, the arresting/transporting officer shall ensure that the arrestee receives appropriate medical attention.  The circumstances surrounding the need for and provision of medical care shall be fully documented in a written report and field photographs taken if applicable.  A supervisor shall be notified of an ill or injured prisoner as soon as is practicable.  An *Injured Person Report* shall be completed as necessary (see *General Order 2164.2*).  Prisoners, who are injured or disabled but are still in condition to be booked, shall be transported as necessary given their condition.  Officers may consider alternatives to booking, and alternate transportation techniques.

Arrestees who must be transported to a hospital shall be guarded en route and at any hospital venue, until they are cited and released or booked into jail.  In instances where a hospitalized prisoner must be guarded for an extended time, a Headquarters Security Officer can assist field supervisors with setting up a guard duty rotation.  See *General Order 2170* reference Prisoner Guard Duty.

Hospitalized prisoners shall remain handcuffed or otherwise restrained based upon their physical condition for the safety of everyone involved and to prevent escape.

Whenever injury to an arrestee or damage to property occurs as the result of any police action, the incident shall be fully documented in a *Multi-Purpose Report*, and a copy of the report shall be forwarded to the Legal Advisor.

**2112.3  Transporting Prisoners** [CALEA 1.2.5 a; 70.1.1; 70.1.2; 70.1.3; 70.1.4; 70.1.5; 70.1.6 a-e; 70.1.7 a-c; 70.1.8; 70.2.1; 70.5.1 a-c]

The Prisoner Transport Unit will be utilized to transport arrestees whenever possible.  Unless the circumstances dictate otherwise, the prisoner will be transported in a screened unit, handcuffed, and restrained by use of the seat belt or other restraining device in a manner that will prevent injury to the prisoner and the officer.  Transporting officers shall search prisoners prior to placing them in the vehicle.  Hand-carried prisoner property, such as purses, briefcases, knapsacks, etc., shall likewise be searched for weapons if it is to be transported in the police vehicle.  These items shall not be transported in the prisoner compartment of the police vehicle. Transporting officers shall



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

search the area of the vehicle occupied by the prisoner both before and after transportation.

Officers are reminded of the safety issues involved in the transportation of prisoners and shall keep all weapons guarded.  Officers transporting prisoners will seat the prisoner or situate themselves in order to monitor the activities of the prisoner.  Until investigators have debriefed them, prisoners being transported shall not be allowed conversation with other arrestees or other persons until they are in a fully secure environment.   Members must follow security protocols and may be required to secure their firearms and auxiliary weapons before entering a mental health facility, even if they are escorting a prisoner into such a facility.

Officers encountering on-site criminal or traffic situations shall notify communications of the situation.  Of primary concern is the security and safety of the prisoner.  Officers will monitor the on-site situation as necessary and shall only stop and render assistance when the risk to third parties is clear and grave and the risk to the prisoner is minimal.

Upon arrival at the booking location, officers shall follow security protocols established by the facility to include:

- Securing of firearms and other weapons;
- Keeping the prisoner restrained until prisoner is in a completely secure location;
- Sally port and booking area procedures;
- Completion of the *Arrest Information Sheet* (Including arrestee fingerprints for identification and documentation of any special circumstances.  This documentation shall remain with the prisoner if transported between facilities.)
- Notification of detention personnel of special circumstances (medical conditions, suicidal, security hazards, escape risk etc.).

If a prisoner escapes during transport or while otherwise in custody, incident command protocols and appropriate tactics shall be implemented to re-capture the individual and a supervisor shall be notified.  The incident shall be documented in a *Multi-Purpose Report* and the prisoner shall be appropriately charged.   Prisoners allowed special privileges (e.g. allowed to attend a funeral) shall be the responsibility of the entity holding the prisoner (e.g. County Jail, State Department of Corrections, etc.) and the Department will be notified by that entity as necessary and may be asked to assist with security at the venue.

## 2112.4  Recommending Attorneys and Bail Bondsman Prohibited

During the course of police business, members shall not suggest or provide advice regarding retention of a particular attorney or bail bondsman.

## 2112.5  *De Facto* Arrest

Officers are prohibited from detaining persons for unreasonable periods of time or transporting persons, without probable cause or consent, to a police facility or other site for purposes of interrogation. Arizona courts have held that detentions and transportation

**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**



**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

without probable cause are unlawful under the Fourth Amendment.  The length or detention or any transportation of a detainee must be reasonable in light of the circumstances.  A brief transport for an in-person identification, when the detention is in close proximity to the time and location of the crime, is acceptable if supported by reasonable suspicion.

### 2112.6 Necessity for Warrant [CALEA 1.2.5 a]

An officer may make an arrest with or without a warrant under the following circumstances:

- Anytime, in a public place;

- At the subject's private residence
  - If the officer has been invited inside, or
  - If the subject has come outside of the residence; or

- If the officer is invited into a third party's residence or is inside pursuant to a legitimate purpose.

In all other circumstances, an officer is required to have an arrest warrant in order to enter an individual's home to make an arrest.  If an officer is making an arrest pursuant to an arrest warrant in the home of a third party, the officer must also have a search warrant or the consent of the third party to enter that home.

Forced entry into a residence to make an arrest with a warrant shall be limited to felony offenses or misdemeanors involving violence or a continuing threat to persons if an arrest is not made.

### 2112.7 Domestic Violence Arrests

If, during the course of an investigation, an officer finds that there is probable cause to arrest a suspect for domestic violence as defined in ARS 13-3601, the suspect shall be physically arrested, regardless of the victim's desire to prosecute.  Acts committed in self-defense shall not be considered domestic violence.  Although mutual arrests in a domestic violence situation may sometimes be appropriate, officers shall consult with a supervisor before making such arrests.

If an officer believes there should be an exception to an immediate arrest of an individual for domestic violence, the officer shall review the incident with a supervisor and obtain the supervisor's authorization before deviating from the immediate arrest provision of this procedure.  Additionally, this information shall be fully documented in the appropriate police report(s).

4

| | | |
|---|---|---|
| **TUCSON POLICE DEPARTMENT GENERAL ORDERS** |  | **VOLUME 2 GENERAL OPERATING PROCEDURES** |
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

2113     **Arrest Procedures**

2113.1   **General Arrest Procedures**

Officers shall identify themselves as peace officers before taking police action.  Officers affecting an arrest shall inform the person being arrested of the cause of the arrest.  If the arrest is pursuant to an arrest warrant, officers shall inform the arrestee of the existence of the warrant.

Officers do not have to provide the above listed information to an arrestee if any of the following circumstances are present:

- Providing this information would imperil the arrest;
- The arrestee is presently engaged in commission of the offense;
- The officer is in pursuit of the arrestee immediately after commission of the offense, or after an escape from the officer's custody; or
- The arrestee flees or forcibly resists the officer before the officer has a chance to provide the information.

2113.2   **Arraignment Procedures** [CALEA 1.2.5 a]

Arraignments are held twice daily (0900 hours and 2000 hours) at the Pima County Sheriff's Minimum Security facility located at 1801 S. Mission Rd.

In order for an arrestee to be seen for morning arraignments, they must be booked into Pima County Jail by 0600 hours. In order for arrestees to be seen for evening arraignments, they must be booked into Pima County Jail by 1800 hours.

TPD court liaison officers will process the morning arraignments and PCSO court liaison officers will process the evening arraignments.

- **Felony Paperwork**
  The *Felony Interim* and *Arrest Information Sheet* shall be placed in the plastic box located in the officer's area of the jail intake.  The probable cause statement on the *Felony Interim* shall justify each felony offense charged.

- **Misdemeanor Paperwork**
  The citation and *Release Questionnaire (Form 4)* shall be placed in the lock box located outside the jail intake doors (same area where prisoner property is stored).

  - **E-Citation Program**
    The booking officer shall print one copy of the e-citation for the arrestee.  A separate copy, which includes the probable cause statement, shall be printed and placed in the above mentioned lock box with the required *Release Questionnaire (Form 4)*.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

- **Case Reports/Supplements**
  Case Reports/Supplements related to the above arrests are to be turned in by the end of the officer's shift.

**2114     Misdemeanors** [CALEA 1.2.6]

**2114.1  Field Release**

A misdemeanant will be cited and field released, except:

- When a physical arrest is mandated by statute or Department procedures;

- When the misdemeanant is under the age of 18 and comes under the jurisdiction of the Pima County Juvenile Court (excluding routine traffic violations or alcohol offenses);

- When the release could jeopardize the safety and welfare of the suspect or any other person or when the suspect has already been cited and refuses to leave, or continues to commit the violation; or

- When an identification or physical arrest would be more appropriate.

**2114.2  Identification Arrest and Release**

Officers shall conduct procedures to accurately identify an arrestee prior to citing and releasing the arrestee when the officer is unsure of the identity of the arrestee. Officers may conduct identification procedures if such information would assist in a criminal investigation. These procedures may include fingerprinting and photographing the arrestee.

**2114.3  Physical Arrest**

Officers will consider making a physical arrest of a misdemeanant in the following situations:

- The suspect cannot be satisfactorily identified;

- The suspect refuses to sign a promise to appear or by overt action or statement gives the officer probable cause to believe that the person will not appear in court;

- The suspect committed the misdemeanor in the officer's presence and a field release would be inappropriate;

- There is information indicating that similar offenses are pending on the subject; or

- A supervisor directs the physical arrest of the suspect.



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

Officers making a full custodial arrest of an individual shall search that individual incident to arrest.  Officers shall not transport an arrestee for the sole purpose of creating a situation where search incident to arrest is appropriate.

2115  **Long Form In Lieu of Arrest** [CALEA 1.2.6; 1.2.7]

An incident is considered "Long Formed" when an immediate arrest is not made, though the suspect is known. This typically involves incidents that are non-violent in nature and there is no reason to believe the suspect will flee or otherwise leave the jurisdiction, or if clear and convincing probable cause cannot be established during the preliminary investigation. As follow-up is not feasible on all misdemeanor cases, officers should strongly consider making the arrest (either physical arrest or citation only as appropriate) and avoid the long form process when presented with sufficient probable cause, absent a recommendation from the appropriate Detective Supervisor or City/County Prosecutor to the contrary.

2116  **Combined Felony and Misdemeanor Charges**

When officers arrest a subject for both felony and misdemeanor offenses, the arrestee shall be booked into jail on both the felony and misdemeanor offenses, unless the misdemeanor charge is a "lesser included" offense.  In instances when the misdemeanor is "lesser included," (e.g. felony fleeing and misdemeanor reckless driving), the misdemeanor offense(s) shall be fully documented in a *Multi-Purpose Report* and not charged.  A *Felony Interim* is required for all initial arrests for a felony offense and for confirmed out of state agency felony warrants.

Officers, upon discovering that a subject in the County Jail charged for a misdemeanor violation is wanted for a felony violation, shall immediately prepare a *Multi-Purpose Report* or *Supplementary Report* covering the facts and elements of the felony, and re-book the subject under the case number assigned to the felony offense.

2117  **Arrest Warrants** [CALEA 74.3.1; 74.3.2]

An arrest warrant is a written order issued and signed by a neutral Magistrate directed to all peace officers, commanding them to arrest the person named in the warrant and to bring that person before the court to answer criminal charges.  Only sworn members shall execute arrest warrants.

A warrant is only issued upon a sworn complaint by either a peace officer or an offended party (the victim or a prosecutor representing the victim) before a Magistrate establishing that there is probable cause for arrest.  The probable cause must establish that a crime has occurred, that the crime occurred within the jurisdiction of the court issuing the warrant, and that the named defendant committed the crime.

Warrants must contain specific information sufficient to identify the arrestee in order for officers to rely in good faith upon the warrant.  A warrant that is not sufficiently specific is facially invalid and officers may not rely on the warrant to make an arrest.

Warrants must have a complete physical description, including ethnic origin, sex, height, weight, hair color, eye color and date of birth (age alone is insufficient) before the warrant may be entered


into the computer.  Additional descriptors (Social Security Number, etc.) are acceptable, but the above listed information is required.

### 2117.1  When an Arrest Warrant is Required

Unless an exception exists, a warrant is required to make entry into a residence or other private building to effect an arrest.  Officers may enter the residence of the person who is the subject of a felony arrest warrant to effect an arrest at any time of day or night, on any day of the week, when there is probably cause to believe the subject is currently at that location.  Officers seeking to enter the residence of a third party to arrest a person who is the subject of a warrant must have either the consent of the third party to enter, or a separate search warrant authorizing entry into the third party's residence.

### 2117.2  Warrant Confirmation

All warrants and stolen vehicle information shall be confirmed with the originating agency prior to arrest.  Occasionally, warrants are quashed or have been previously served but remain in the computer as active warrants.  Officers who make arrests on such warrants without confirming the present validity of the warrant risk making an unlawful arrest.  This can result in liability for the officer and the Department.

Confirmation may be made by contact with the Records Section by telephone, computer, or through Communications.  Officers who reasonably believe that a warrant exists may lawfully detain a subject for a reasonable amount of time pending confirmation. Under normal circumstances, officers attempting to serve warrants will make contact with the subject prior to initiating confirmation proceedings.

Confirmation of the warrant's validity shall be made prior to effecting the physical arrest of the subject named on the warrant.  This does not preclude an officer from taking appropriate officer safety measures and detaining a suspect while awaiting confirmation of the warrant.

Officers shall refrain from serving a warrant if there is conflicting information or uncertainty as to the warrant's validity. In such circumstances, the TWX operator in the Records Section should be notified and will attempt to contact the court or the appropriate jurisdiction to confirm the warrant information.

When any warrant that has been confirmed is not going to be served, the officer making the decision not to serve the warrant is responsible for advising the Records Section that the warrant will not be served.  This shall be done prior to the end of the officer's tour of duty.  The Records clerk who receives this notification shall re-file the warrant for future service.

### 2117.3  Warrant Service

Officers need not possess the actual warrant when making an arrest pursuant to a warrant.  Officers shall inform the arrestee of the existence of the warrant, and if the



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

arrestee so requests, officers shall inform them of the contents of the warrant, either by reading it to them or showing the arrestee a copy as soon as is practicable.

Persons arrested pursuant to a warrant shall be taken before a Magistrate in the county where the arrest was made within 24 hours as outlined in the procedure for arraignments.

**2117.4  Other Agencies Serving TPD Warrants**

Other agencies seeking to serve outstanding TPD warrants shall be advised that the agency will only extradite for criminal and serious traffic offenses.  A Commander may make exceptions to this policy.

**2117.5  Application for an Arrest Warrant**

Officers must swear out a complaint to the Court alleging the criminal offense and naming the suspect as the offender.  This may be accomplished by presenting all available information and facts to an appropriate prosecuting attorney who will prepare the complaint.

The warrant is prepared in the appropriate Prosecutor's office, sworn to by the officer, and then signed by a Court Magistrate, a Justice of the Peace or a Superior Court Judge.

**2117.6  Apprehension of Individuals Wanted by Outside Agencies for Felony Offenses**

Persons shall not be apprehended for outside agency warrants except under the following conditions:

- The Department shall have written or telephonic authority which specifically states:

  - Name of fugitive;
  - Date of birth or age, and physical description;
  - Information on the offense alleged (charge);
  - Confirmation that the charge is a felony;
  - Warrant number;
  - Confirmation that the issuing authority will extradite; and
  - Name of the person who signed the warrant.

- Prior to arresting the subject of the warrant, the arresting officer shall obtain confirmation that the warrant is outstanding through the Records TWX operator.  A computer hit from ACIC or NCIC is not sufficient for an arrest.

- If the arrestee has committed a felony prosecutable in Pima County, the arrestee shall be arrested for that offense in addition to the warrant charge(s).

- If a request to assist an outside agency in apprehending a fugitive is received by the agency, the supervisor or detective of the appropriate unit shall be notified, and shall assume the investigation if practical.



**TUCSON POLICE DEPARTMENT GENERAL ORDERS**

**VOLUME 2 GENERAL OPERATING PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

A *Felony Interim* and *Multi-Purpose Report* are required for all confirmed out of state agency felony warrants that are served.

### 2117.7 Federal Charges

If a subject is taken into custody solely for outstanding federal charges, he or she will be transported directly to the Federal Correctional Institute (FCI) at 8901 South Wilmot Road between 0600-2400 hours. After-hours detention will require arrangements be made for temporary detention until 0600 hours. FCI requires no paperwork other than a copy of the TWX notification and confirmation. They do request that, when possible, officers telephone in advance so that they are able to make preparations.

The officer is required to complete a *Multi-Purpose Report*, classified "Assist Other Agency/Federal Criminal Justice (60.04)" with the subject indicated as the "suspect" only. No arrest information or interim sheet is required.

If the subject is in custody for other charges in addition to the federal charges, book the subject at the Pima County Jail for the additional charges. Do not include the federal charge on the *Arrest Information Sheet*. Jail personnel will place a hold on the subject and release the subject to the U.S. Marshal's custody once the local charges have been satisfied. Responsibility for notifying the U.S. Marshal's Office rests with the jail personnel.

When local charges accompany federal charges, the "Other Agency Assist" *Multi-Purpose Report* shall still be completed, along with necessary paperwork for the local charges.

### 2117.8 Traffic and Misdemeanor Arrest Warrants/Alternative to Jail Program [CALEA 61.1.2 a]

Officers will make a physical arrest of a misdemeanor warrant subject once the warrant has been confirmed. When possible, the Prisoner Transport Unit will be utilized to aid in the transportation of arrestees. Subjects arrested solely for Tucson City Court warrants (except DUI, DV, and Leaving the Scene warrants), should be transported to City Court under the Alternative to Booking program. The program is in operation business days between 0800/1115 and 1330/1600 hours and entails the arrestee being taken immediately before a magistrate in Court Room 103.

Officers may elect not to make an arrest when operational need or situational circumstances weigh against making a physical arrest (e.g., the call load dictates that the officer should not leave the field, or the arrest of the offender for a minor offense requires placement of accompanying children).

Officers who stop a suspect, but elect not to serve a warrant, shall release the suspect and advise they contact the appropriate judicial jurisdiction to resolve the issue.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

2117.9 **Service Location of Misdemeanor Warrants**

Generally, misdemeanor warrants are to be served, once confirmed, only when the person is located in a public place or when a person with authority to do so has consented to the officer's entry into the person's home. Officers shall not, except in exceptional circumstances approved by a supervisor, force entry into a person's home to serve a misdemeanor warrant. Supervisors may authorize forcible entry to serve a misdemeanor warrant only in serious cases in which there is reason to believe that harm may result to persons if the warrant is not served (e.g., domestic violence offenders).

Deviations from these procedures may be appropriate when necessary under exigent circumstances or to address unique problems (e.g., a backlog of a particular type of warrant). Any deviation from this procedure must be authorized by a Commander.

2117.10 **Civil Arrest Warrants**

The Arizona Rules of Civil Procedure (Rule 64.1) allow the courts to issue a civil arrest warrant. Such warrants shall only be served by a commissioned officer. There is no statutory violation required by the rule, nor is there a charge associated with the warrant or subsequent arrest. The warrant is not for a felony, misdemeanor or petty offense. If the subject is arrested for both criminal and civil violations, the criminal procedures shall take precedence. The following procedures shall apply when processing a civil arrest warrant.

All Civil Arrest Warrants shall be confirmed with the originating agency prior to service. Special attention will be given to any time restrictions affecting when the warrant may be served. Unless there has been a showing of good cause to the issuing Magistrate, a civil arrest warrant shall not be executed between the hours of 2200-0630.

If contact with the subject occurs at a time of day or on a day of the week that the court has ordered that the warrant not be served, the officer shall advise the subject of the existence of the warrant but shall not serve the warrant. In these incidents, no documentation is required. If the contact with the subject occurs during a time authorized by the court for service of the warrant and the warrant is confirmed, the arresting officer shall place the subject under arrest.

The location the prisoner will be transported to will be determined by the arrival time at the receiving facility:

Arrival between 0730 and 1600 hours, weekends and holidays excluded, the prisoner will be transported to the holding area, Judicial Security Unit of the Pima County Sheriffs Department (PCSD), located on the 7th floor of the Superior Court Building at 110 West Congress. While en route to the Judicial Security Unit, the transporting officer will request that TPD Communications advise the Unit that they are en route with a "10-15 civil" and provide the estimated time of arrival. Upon arrival of the officer, Judicial Security will take custody of the prisoner.



**TUCSON POLICE DEPARTMENT GENERAL ORDERS**

**VOLUME 2 GENERAL OPERATING PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

All other times, the prisoner will be transported to the Pima County Adult Detention Facility where they will be booked.

The officer is required to complete a *Multi-Purpose Report*, classified "Assist Other Agency/County Criminal Justice (60.02)" with the subject indicated as the "suspect" only. No arrest information or interim sheet is required.  All reports relative to the arrest will refer to the charge as "Civil Rule 64.1".

## 2118   Arrest of Military Personnel

### 2118.1   General [CALEA 61.1.3e]

If an active-duty member of any of the armed forces of the United States is arrested for a crime other than minor civil infractions or minor traffic offenses, officers will telephone Davis-Monthan Air Force Base law enforcement personnel, and advise them that an active-duty military member has been arrested.

For criminal arrests of military personnel officers must provide the following information:

- Name, rank, date of birth, and serial number of the arrested person;
- The offense(s) with which the person is charged; and
- The TPD case number.

Officers will also advise the military law enforcement personnel that a copy of the report will be available from the Records Section.  Officers will not disclose the criminal history of the arrested military member.

National Guard members have immunity from arrest for any offense except those involving treason or felonies while on drill and when traveling to and from drill service. Civil traffic offenses shall be handled as with any other person.  Officers are reminded of Title 28 provisions regarding driver license requirements for military personnel.  This allows them to forgo the renewal of their driver license from their home state if they are on active duty and have current military ID.

### 2118.2   Apprehension of Deserters

Title 10, *United States Code* provides, "Any civil officer having authority to apprehend offenders under the laws of the United States or of a State, Territory, Commonwealth, or Possession, or the District of Columbia, may summarily apprehend a deserter from the armed forces and deliver him into custody of those forces."

When an officer comes into contact with an individual who is listed in NCIC as a deserter, the officer shall request Communications to confirm the warrant with Davis-Monthan Security Police.  If the warrant is confirmed, Davis-Monthan personnel will respond to pick up the subject.  If Davis-Monthan personnel are unable to respond, the officer will take the subject to the Davis-Monthan law enforcement desk.


If the individual is also under arrest for a violation of a state law or city ordinance, the jail shall be advised to put a military hold on the arrestee.

If the warrant cannot be confirmed, the officer shall release the subject after obtaining identification information. A *Multi-Purpose Report* shall be completed by the officer and routed to the Davis-Monthan authorities by the Records Section.

## 2119   Undocumented Persons or Foreign Nationals

### 2119.1 Undocumented Persons

Police officers have no inherent authority to stop or detain a person solely on suspicion that the person is present in the United States unlawfully. Under federal law, mere unlawful presence is a civil violation and enforcement authority is reserved for agents of the Federal Government. During contact with suspected undocumented persons, officers shall follow the same procedures when contacting or stopping any person. If, after a person is stopped, the officer reasonably suspects that person is undocumented, the officer may:

- Request a Customs and Border Protection (CBP) agent to respond while the officer completes the original stop. The subject shall not be detained longer than necessary to conduct any investigation necessary to complete the original stop.

- If CBP cannot respond within the time necessary for the officer to complete the stop, the officer shall complete a Field Interview (FI) form after releasing the person. The form will contain the name and address of the person's employer, the subject's residence, any vehicles or additional people associated with them, at the time of the stop.

CBP representatives may not respond and/or accept control of suspected undocumented persons who are intoxicated, or may need hospitalization for treatment of injury or ill health. Officers who come in contact with suspected undocumented persons who exhibit these characteristics will deal with these persons as any other injured and intoxicated person would be handled.

**Arrests of Suspected Undocumented Persons**

- **Booking Situations- Felonies and Misdemeanors:** If the subject is arrested for a felony, or a misdemeanor for which the subject will be physically arrested, **and** the officer reasonably suspects that person is undocumented, the subject shall be booked with an Immigration and Customs Enforcement (ICE) hold. Arizona law requires officers to ask all custodial (physical) arrestees their country of origin and to ensure this information is included on all relevant court paperwork. This information is used by the court to grant or deny bail based on undocumented alien status. ICE shall be notified by phone of the arrest by the arresting officer. Consular Notification procedures under *General Order 2119.3* shall be followed.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
| --- | --- | --- |
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

- ▪ **Cite and Field Release Situations:** If the arrestee is to be cited and field released **and** the officer reasonably suspects that person is undocumented, CBP may be requested to respond or the arrestee may be transported by the officer to CBP. If awaiting CBP response, the arrestee shall only be detained for a reasonable period of time, based on call load and staffing. If CBP is unable to respond within a reasonable time, the person shall be cited and field released.

- ▪ **Juveniles:** If the arrested subject is a juvenile, the officer shall follow all existing policies concerning the arrest of juveniles, with the addition of notifying CBP of all pertinent information concerning the juvenile and their family. CBP will then be responsible for any follow-up investigation concerning the legal status of the juvenile and the family.

2119.2 **U-Visa**

The United States Congress created the U-Visa as part of the Victims of Trafficking and Violence Protection Act of 2000.  Congress recognized that there were individuals with temporary or no legal status in this country who feared that assisting law enforcement could lead to their deportation.  By providing non-citizen victims a means of stabilizing their legal status, the U-Visa encourages them to report crimes and cooperate with prosecutors.  It is designed to help curtail criminal activity, protect the innocent, and encourage non-resident immigrant victims to fully participate in proceedings that will aid in bringing criminals to justice.

- ▪ **U-Visa Avenue to Legal Status for Non-Citizens**

    The U-Visa provides an avenue to legal status for immigrant crime victims who:

    - Have suffered substantial physical or mental abuse as a result of victimization,
    - Possess information regarding the activity,
    - Offers a source of help in the investigation or prosecution, **and**
    - The incident should be an active case, although exceptions can be made.

- ▪ **U-Visa Process**

    If an officer believes the victim or witness is an appropriate candidate, the information may be provided to the CAPD Captain.  The victim or witness may also be referred to the appropriate prosecuting agency for assistance.

- ▪ **Department U-Visa Certifying Official**

    The Investigative Services Bureau Chief has been designated as the Department's Certifying Official.  It is the responsibility of the Certifying Official, or designee, to conduct follow-up on all requests received for certification of the *U-Nonimmigrant Status Certification Federal Form (I-918, Supplement B).*



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|
| **Revised:** November 9, 2011 | **2100 ARREST POLICIES** Issued May 2001 |

If it is determined that Qualifying Criteria have been met, the Certifying Official may issue a certification. The final authority for the Department on any application rests with the Chief of Police.

Department certification is only one step in the U. S Citizenship and Immigration Services process in granting a U-Visa.  See Share Drive/CAPD & PCD (CID)//U-Visa Procedures Manual for further details.

**2119.3  Consular Notification Upon Arrest of Foreign Nationals** [CALEA 1.1.4]

The United States is obligated under international treaties to notify foreign Consular Officials when foreign nationals of their country are arrested or otherwise detained for an extended period in the United States.  These obligations include:

▪ Immediately informing the foreign national of the right to have their government notified concerning the arrest/detention.

▪ Informing the appropriate Consulate without delay if the foreign national asks that such notification be made.

▪ In the case of certain countries, making such notification without delay, regardless of whether the arrestee/detainee wishes to have the notification made.

Arizona law also mandates this process in accordance with these obligations (ARS 13-3906).

Due to variations in treaties, consular notification is voluntary in some situations (the arrestee's choice), and mandatory in others (notification must be made whether the arrestee requests it or not).  Each time a foreign national from a country is arrested or detained for an extended period of time, the officer with custody of the subject shall contact Communications to determine whether notification is voluntary or mandatory. Communications maintains a list of countries that require mandatory notification as well as fax numbers for Embassies and Consulates across the United States.

▪ A *Consular Notification Form and Fax Sheet* (TPD#3208) shall be completed each time a foreign national is arrested or detained for an extended period of time.

▪ The officer with custody of the subject must ensure that the appropriate box is checked regarding the voluntary or mandatory notification status of the country and if Voluntary notification is declined.

**Voluntary Notification**

Mexico is a voluntary notification country.  If a Mexican national is taken into custody, or any other national from a country where consular notification is voluntary, the officer with custody of the subject must read statement number one (1) on the back of the *Consular Notification Form and Fax Sheet* to the arrestee.  The officer will then document that the



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

statement was read as well as the arrestee's indication of understanding and whether the arrestee wished for Consular Officials to be notified in the *Multi-Purpose Report*.

▪ If the arrestee indicates that they wish for their Consulate to be notified, the officer shall fax the completed *Consular Notification Form and Fax Sheet* and fax it to the local Mexican Consulate, or the appropriate consular or embassy office, should the arrestee be from another voluntary notification country.

▪ Submit the original copy of the *Consular Notification Form and Fax Sheet* and the fax receipt to Records.

**Mandatory Notification**

If the arrestee is from a country that requires mandatory notification of Consular Officials, then the officer with custody of the subject must read statement number two (2) on the back of *Consular Notification Form and Fax Sheet* to the arrestee.  The officer will then document that the statement was read as well as the arrestee's indication of understanding in the *Multi-Purpose Report*.

▪ The officer shall fax the completed *Consular Notification Form and Fax Notification Sheet* to the appropriate Consulate or Embassy office.

▪ Submit the original copy of the *Consular Notification Form and Fax Sheet* and the fax receipt to Records.

**Notification Response**

Once notification of the appropriate Consulate or Embassy has been made it is not necessary to wait for a reply before continuing with the investigation.  If the Consulate does contact the officer and asks to speak with the suspect, the Consulate is entitled to reasonable, private access.  That access does not take priority over the investigation. The Consulate may not act as an attorney and may not invoke any of the suspect's rights on the suspect's behalf.

2119.4 **Immunity from Arrest**

While the legislature is in session, both the U.S. and Arizona Constitutions provide federal and state legislators with immunity from arrest for any offense except those involving treason, felonies, or misdemeanors involving a breach of the peace. (A breach of the peace includes Disorderly Conduct, Assault, Domestic Violence, etc., but not DUI.). This immunity from arrest exists during the term of the legislative session and extends for 15 days before and after the session.

Foreign diplomats, their families and staff enjoy complete immunity from arrest, and their property or residences may not be searched, even with a warrant.  These persons may also not be compelled to testify or provide evidence in court proceedings.



TUCSON POLICE
DEPARTMENT
GENERAL ORDERS

VOLUME 2
GENERAL OPERATING
PROCEDURES

**Revised:** November 9, 2011

2100 ARREST POLICIES
Issued May 2001

Persons protected by diplomatic immunity will have an identification card provided by the U.S. Department of State that contains a photograph of the person, the person's name, title, mission, city and state, date of birth, identification number, expiration date and State Department Seal.  Officers shall seek verification of the identification if there is reason to doubt the validity of the card.  Officers may contact the FBI to confirm status; the FBI will work directly with the U.S. Department of State.

Persons protected by diplomatic immunity may be detained if they have committed a seriously violent crime and there is reason to believe they present a continuing danger. The FBI will immediately be contacted to take custody of the person.

## 2120   JUVENILE ARRESTS

2121   **General** [CALEA 44.1.1]

The Tucson Police Department is committed to juvenile programs designed to prevent and control delinquency, and all members and units will direct their conduct toward these ends when in contact with juvenile offenders.  When a juvenile is involved in a police-related incident, either as a victim or as a suspect/offender, procedures must be followed which differ from those followed for adults.  Federal and state laws dictate courses of action.  In certain cases, Pima County Juvenile Court Center (PCJCC) procedures require a certain action by a Department member.  This chapter addresses the general procedures for the handling of juveniles.

2122   **Juvenile Justice and Delinquency Prevention Act (JJDP Act)**

The Juvenile Justice and Delinquency Prevention Act (JJDP Act) is a federal law that pertains to the detention of juveniles dependant upon whether the juvenile is charged with a criminal offense or a status offense.  The main tenets of the law require:

▪ Sight and sound separation of juvenile arrestees from adult arrestees.

▪ A juvenile detained solely for a status offense may not be securely detained. For the purposes of the JJDP Act, a status offense includes Minor in Possession/Consumption of Alcohol charges.  The juvenile may still be charged with the criminal offense, as the JJDP Act only relates to how they are detained for such an offense. (If necessary for safety, such juveniles may be handcuffed, but not to a stationary object.)

▪ A juvenile who has committed a delinquent offense and is therefore subject to secure detention, cannot be held in secure detention longer than six (6) hours.  If further time is needed, a juvenile may be moved from secure to non-secure detention if appropriate.  (All detentions longer than two (2) hours require supervisor approval.)

2123   **Definitions**

As used in this section, the following definitions apply:



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|
| **Revised:** November 9, 2011 | **2100 ARREST POLICIES** Issued May 2001 |

- **Delinquent:** A child eight (8) years of age or older and under 18, is delinquent if adjudicated to have committed a delinquent act that would be a criminal offense if it were committed by an adult, including the violation of any law of this state or of another state.

- **Dependent Child:** A child under eight (8) years of age is a dependent child if found to have committed an act that would result in adjudication as a delinquent or incorrigible child if committed by an older child.

- **Incorrigible:** A child eight (8) years of age or older and under 18, is incorrigible if adjudicated as one who refuses to obey the reasonable orders of parents, guardians, or custodian; and who is beyond the control of such person, or who is habitually truant from school, or is a runaway from the child's home or parent, guardian, or custodian; habitually behaves in a manner likely to injure or endanger the morals or health of the child or others; commits an act that is not a delinquent act, but can be if committed by a minor; or fails to obey a lawful court order given in a non-criminal action.

- **Juvenile:** Any person under the age of eighteen (18) years of age.

- **Neglected or Abused Children** [CALEA 44.2.2 b]:

  - A child who is abandoned by parents, guardian, or custodian.

  - A child who lacks proper parental control as a result of the fault or habits of the parent, guardian, or custodian.

  - A child whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, medical or surgical care, or other necessities for the child's health, morals, or well-being.

  - A child whose parent, guardian, or custodian neglects or refuses to provide special care necessitated by the child's mental condition.

  - A child who is found in a disreputable place or who associates with vicious or immoral persons.

  - A child who is subjected to cruel and inhuman treatment and shows the effect of being physically mistreated.  The definition of abuse includes not only inflicting injury, but also allowing injury.

- **Non-offender:** A juvenile who is subject to the jurisdiction of the Juvenile Court, usually under abuse, dependency, or neglect statutes for reasons other than legally prohibited conduct of the juvenile.

- **Physical Injury:** Means the impairment of physical condition and includes but is not limited to any skin bruising, bleeding, failure to thrive, malnutrition, burns, fracture of any bone, subdural hematoma, soft tissue swelling, injury to any internal organ, or any physical condition which imperils a child's health or welfare.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

- **Responsible Party** [CALEA 44.2.2 b]**:**  A juvenile may be turned over to the care and custody of their parents, step-parents, responsible maternal or paternal relatives (e.g. grandparent, aunt, uncle), a reputable citizen of good moral character (e.g., neighbor or family friend), or private agency or institution charged with assuming such responsibility (e.g. Center for Juvenile Alternatives (CJA) for status offenses or DV Alternative Center (DVAC) for non-violent DV offenses).   If further options are necessary, CPS may be willing to refer a juvenile to Our Family Services Reunion House Shelter or another similar location.  When using other than the juvenile's actual parents or stepparents, officers shall seek authorization from a supervisor and document the action in their reports.

  Prior to releasing a juvenile to anyone, the officer shall coordinate the release with CPS to ensure the continued safety of the child and allow CPS to continue with their investigation.

- **Secure vs. Non-Secure Detention:** Secure detention is that which restricts freedom of movement, i.e., handcuffed to a handcuff ring/bench or held in a secure detention cell. Utilizing a room for non-secure detention that has a key lock, or any lock that cannot be readily unlocked from the interior by any occupant, constitutes secure detention, even if the door is kept open. Handcuffs alone do not constitute secure detention unless attached to a handcuff ring/bench.

- **Sexual Abuse:** (notwithstanding the definitions in Arizona Revised Statues Title 13, Chapter 14) means vaginal, anal or oral intercourse; vaginal or anal penetrations; or other serious forms of inappropriate sexual contact.  Also includes sexual exploitation - use of a child in prostitution, pornography, or other sexually exploitative activities.

- **Status Offense** [CALEA 44.2.2 a]**:** An act committed by a juvenile which is an offense only because it is committed by a juvenile, an adult committing the same act would not be charged with an offense (e.g., curfew violation, runaway, etc.). Pursuant to federal law, a juvenile detained solely for a status offense, may not be securely detained. The JJDP Act includes Minor in Possession/Consumption of Alcohol as status offenses. The juvenile may still be charged with the criminal offense, as the JJDP Act only relates to how the juvenile is detained and not to charging.

2124    **Arrests of Juveniles** [CALEA 44.2.1 a]

A peace officer shall take a child into temporary custody pursuant to the laws of arrest, with or without a warrant, when there is probable cause to believe that the child has committed a delinquent act which if committed by an adult could be a felony, misdemeanor, status offense, or petty offense, and the child has been apprehended in commission of the act or in fresh pursuit, or when probable cause is developed during follow-up investigation.

The decision whether to arrest a juvenile will, in most cases, follow the policy for the arrest of adults.  However, officers must also consider the gravity of the offense, the age of the offender, etc., in the disposition chosen for apprehended juveniles.

Alternatives that should be considered prior to releasing a juvenile on a Paper Referral to a parent or guardian or taking a juvenile to PCJCC is the Center for Juvenile Alternatives (CJA) for



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|
| **Revised:** November 9, 2011 | **2100 ARREST POLICIES** Issued May 2001 |

status offenses and the Domestic Violence Alternative Center (DVAC) for Domestic Violence offenses.  See *General Order 2125.3 and 2125.4* for further information.

A juvenile who has committed a delinquent offense and is therefore subject to secure detention, cannot be held in secure detention longer than six (6) hours.  If further time is needed, a juvenile may be moved from secure to non-secure detention if appropriate.  (All detentions longer than two (2) hours require supervisor approval.)

**2124.1   Rights of Juvenile Offenders** [CALEA 44.2.2 c]

A juvenile has the same Constitutional rights as an adult.  When juveniles are taken into custody based on probable cause for believing that such juveniles have committed an offense, the officer shall advise the juveniles of their Constitutional Rights (*Miranda* Warning).  Officers will indicate in their reports that the juveniles were able to understand the *Miranda* Warning.

**2124.2   Juvenile Interviews and Interrogations** [CALEA 44.2.3 a, b]

The duration of an interview with a juvenile will be reasonable in length.  Only the number of officers actually necessary to conduct the interview shall be present.  Officers will take into consideration the age and psychological state of the juvenile when conducting the interview.
If a juvenile is only a victim or witness, officers may not involuntarily detain or take the juvenile into custody without parental permission or appropriate court order.

A member may confer with a juvenile's parents, legal guardians or custodian during an interview.  If a parent is present and insistent on being present during the interview, they shall be permitted, unless the parent is also a suspect or it would interfere with the investigation.   An officer will explain to the juvenile and parents/guardians any Department policies or juvenile criminal justice system procedures that apply to the case at hand.

See *General Order 2140* regarding Interview and Interrogation policies.

**2124.3   Juvenile Prisoner Processing**

See *General Order 2150* regarding Prisoner Processing policies.

**2124.4   Juvenile Temporary Detention**

See *General Order 2180* regarding Temporary Detention policies.

**2124.5   Evidence and Testimony**

All items of an evidentiary nature pertaining to a juvenile arrest shall be gathered and maintained in the same manner as they would for any other criminal investigation.  Arresting officers shall maintain records and shall be prepared to give competent courtroom testimony in all juvenile cases.

| TUCSON POLICE DEPARTMENT GENERAL ORDERS |  | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

### 2124.6 Ill or Injured Juveniles [CALEA 44.2.2 d]

If an arrested juvenile is injured and is seen by Tucson Fire Department (TFD) paramedics and cleared (i.e. not in need of further medical treatment) prior to being transported, the juvenile can be taken directly to PCJCC and booked.  Upon arrival at PCJCC, the arresting officer will advise the booking staff that the juvenile was treated and cleared by TFD.  The officer will document in the narrative of the *Multi-Purpose Report* the name and PR# of the paramedic who treated the juvenile.  An *Injured Person Report* shall be completed in accordance with *General Orders* and field photos taken if applicable.  Should they need documentation of treatment, PCJCC will contact TFD records directly.

If a juvenile is to be taken to PCJCC, and is or claims to be ill or injured, they shall be taken to the nearest available hospital.  The method of transportation shall be discretionary, based on the situation.  The standard Department *Injured Person Report* shall be completed and field photos taken if applicable.  Immediately after reaching the hospital, the arresting or transporting officer shall telephone the Pima County Juvenile Court Center and inform them of the circumstances.  Telephone notifications to PCJCC shall be documented in the officer's report and the name of the PCJCC member notified shall be included.  Children treated and released shall then be transported to the detention facility.

PCJCC is only responsible for guarding hospitalized juvenile arrestees when the hospitalization occurs after the juvenile has already been accepted by PCJCC and cleared by the Intake Nurse.

## 2125    Offenses Committed by Juveniles [CALEA 44.2.1 a-c; 44.2.2 d, e]

An officer apprehending a juvenile offender may consider the following options for disposition.  Transportation to the appropriate facility shall be made without unnecessary delay and the parents or guardians notified as necessary.

### 2125.1 Parental Referral

In some cases, the officer may turn a juvenile over to the juvenile's parents for discipline.  This alternative may be utilized when the offense and conditions involved are such that, in the opinion of the officer, parental action can correct the child's behavior and Juvenile Court adjudication is not required.  Officers will document the incident and the fact that the juvenile was released to the parent or guardian with no referral to the Juvenile Court.  Officers shall not use the parental referral option with any juvenile taken into custody for a sex-related offense (peeping tom, exposure, sexual assault, etc.).  A found/returned runaway shall not be referred to the parent.

A Parental Referral is an arrest and the juvenile is listed as an "Arrestee" on all case paperwork.

### 2125.2 *Paper Referral*

A *Paper Referral* is a form signed by the parent or guardian promising to appear with the juvenile.  If the officer elects to paper refer the juvenile, a responsible party (see definition



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

under *General Order 2121.1*) must be located to sign a *Parent's Promise to Appear (Paper Referral)* form for the juvenile.  This alternative will be utilized when parental custody will, in the opinion of the officer, be sufficient to ensure the proper control of the juvenile pending Juvenile Court action.  Officers shall provide the parent or responsible party with a copy of the paper referral form.  The Juvenile Court Center filing system is by the juvenile's mother's last name.  It is essential that officers document this information on the paper referral.

When the parent, guardian, or responsible party is not available to sign or refuses to accept custody of the juvenile, a supervisor shall be contacted.

### 2125.3   Center for Juvenile Alternatives (CJA)

The Center for Juvenile Alternatives (CJA) is an alternative that should be considered prior to releasing a juvenile on a Paper Referral to a parent or guardian for a status offense. The CJA provides critical crisis intervention, assessment, referral and outreach services to status offenders, including a specialized program focusing on truancy issues.

### 2125.4   Domestic Violence Alternative Center (DVAC)

The Domestic Violence Alternative Center (DVAC) is an alternative to booking a juvenile into PCJCC. It provides an alternative to the traditional intake for juveniles who are charged with a non-violence related DV offense. Officers may also wish to contact DVAC regarding juveniles arrested for violence related DV offenses, as under certain circumstances, they may accept them into the program.  DVAC is housed next to the CJA facility and provides services to meet the needs of the entire family.  Short term (23-hour) respite is available on-site if it is not safe or possible for the youth to return home immediately.

### 2125.5   Pima County Juvenile Court Center (PCJCC) Detention [CALEA 44.2.1c; 44.2.2 b]

Another option is to transport the delinquent offender to the Pima County Juvenile Court Center (PCJCC).   The *Juvenile Complaint/Referral* form shall be completed prior to any juvenile being incarcerated at the detention facility.  (See also *General Orders* 2126.1.)

Officers will use the following guidelines in deciding to detain juveniles:

▪   The juvenile is an escapee from PCJCC (or a similar facility) or has an outstanding warrant.

▪   The juvenile (under age 15) is charged with murder, manslaughter, kidnapping, sexual assault, arson of an occupied structure, armed robbery, or aggravated assault.  Juveniles 15 or older arrested under these charges shall be booked at the Pima County Jail.

▪   The juvenile is charged with a delinquent offense and there is no less restrictive alternative that will reduce the risk of serious harm to the juvenile or others (e.g., DUI with severe intoxication).   This will require a medical release from the nearest available hospital prior to detention at PCJCC


- ▪ The juvenile is charged with a serious property crime or a crime of violence other than listed above, which, if committed by an adult, would be a felony, and one or more of the following circumstances exists:

  - - The juvenile is already detained or on conditional release in connection with another delinquency proceeding.

  - - The juvenile has a demonstrable record of willful failures to appear in Juvenile Court proceedings.

  - - The juvenile has a demonstrable record of violent conduct resulting in physical injury to others.

  - - The juvenile has a demonstrable record of adjudication for serious property offenses.

## 2126    Juveniles Charged as Adults

Arizona law provides that juveniles charged with certain offenses be booked into the Pima County Jail if the juvenile is 15, 16 or 17 years of age.  Those "mandatory transfer offenses" are:

- ▪ First Degree Murder
- ▪ Second Degree Murder
- ▪ Forcible Sexual Assault
- ▪ Armed Robbery
- ▪ Drive-by Shooting
- ▪ Discharging a Firearm at a Structure
- ▪ Aggravated Assault (Serious Physical Injury)
- ▪ Aggravated Assault (Deadly Weapon—guns and knives only)

The Pima County Attorney is responsible for establishing policy on reviewing juvenile cases for adult prosecution.  If the Juvenile Unit of the County Attorney's Office determines a juvenile held at PCJCC is to be transferred to the adult system, the Juvenile Unit will file a delinquency petition and a judge will sign a complaint and enter an order authorizing the arresting agency to transport the juvenile from detention to jail.

## 2127    Juvenile Traffic and Liquor Offenses [CALEA 44.2.1 b]

Civil traffic violations and criminal traffic offenses, excluding DUI offenses, must be cited into City Court.  DUI is the only juvenile criminal traffic offense that will be cited into Juvenile Court.  City Court has no jurisdiction over any other type of juvenile offense.  Juveniles who appear in City Court on criminal traffic violations are required to bring a parent or guardian to Court with them; a juvenile may appear alone on a civil traffic offense.

All Title 4 offenses involving juveniles are to be referred to PCJCC, using either a paper referral or physical arrest.  The Arizona Traffic Ticket and Complaint form may not be used to cite a juvenile into Juvenile Court on any charge.



| **TUCSON POLICE DEPARTMENT GENERAL ORDERS** | | **VOLUME 2 GENERAL OPERATING PROCEDURES** |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

2128    **Juvenile Firesetters Program**

The Tucson Fire Department (TFD) has a program for juveniles from the ages of 8 to 17 who set or play with fire. Juveniles who have been arrested for fire setting behavior may be recommended to the class through their probation officer.  A parent, guardian, police officer, or school may also refer juveniles.  Arrest for a fire related offense is not a prerequisite for referral.   Literature regarding the program is available from the Fire Department.

Juveniles younger than 8 who are referred to TFD are not enrolled in the program, but are counseled by a TFD civilian employee with an educational background related to this problem.

2129    **Pima County Juvenile Court Center (PCJCC) Procedures** [CALEA 44.2.1 c; 44.2.2 e]
When a juvenile is transported to the Pima County Juvenile Court Center, the officer shall attempt to contact the juvenile's parents to advise them of the location of their child.  The *Juvenile Complaint/Referral* form shall be completed prior to any juvenile being incarcerated at the detention facility.  See *General Order 2137.3* regarding guidelines for detention at PCJCC.

2129.1    **Booking**

If there is a warrant or other non-status offense for which the juvenile is arrested, then the juvenile may be detained at PCJCC.  Officers are to document their actions on the appropriate paperwork. Arresting officers shall complete an *Affidavit in Support of Probable Cause* when juveniles are arrested and detained.  If a copy of the *Multi-Purpose Report* is left with the arrest paperwork, the officer may write "See attached report" on the *Affidavit* in place of a narrative.   This form must be submitted with a *Juvenile Complaint/Referral Form*.

There may be times when the PCJCC is full.  In those instances, the intake personnel will request that the officer transport the juvenile to another facility.  These requests will be honored whenever possible.  In situations where accommodation is an issue, a police supervisor shall be contacted for further direction.

2129.2    **Fingerprints and Photographs** [CALEA 1.2.5 b, c]

The PCJCC fingerprints and photographs all juveniles that are detained on felonies. They will do this for other offenses on a request basis.  All of the fingerprint cards and photographs are the property of the PCJCC.  All requests for photographs and/or fingerprints must be routed through the Tucson Police Department's Identification Section.  The photograph and fingerprint information will be sent from the PCJCC to the ID Section where copies may be made.  It is the responsibility of the I.D. Section to make sure that the photographs and fingerprints are returned to the PCJCC.

2129.3    **Interviewing Juveniles at PCJCC**

The PCJCC personnel will allow interviews of detained juvenile offenders.  The intake staff will make the appropriate notifications regarding the interview.  They will not interfere with the interview in any way.  It is necessary for the interviewing officer to advise the



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

juvenile at the beginning of the interview of their Constitutional rights.  The juvenile has the right to refuse or terminate the interview.

The juvenile's probation officer may be present during the interview as well, but shall not take an active part in the interview.  The probation officer may answer questions as to the juvenile's rights, but may not give legal advice.

**2129.4  Incorrigible Juveniles**

The PCJCC does not incarcerate juveniles solely on incorrigibility charges.  The Police Department will not respond to most calls reference incorrigibility.  If a call for assistance involves an incorrigible juvenile, and there are mitigating circumstances (violence or other emergency situations), officers may be dispatched to respond.

Anytime that an officer is questioned about the possibility of having a juvenile declared incorrigible, the questioning party will be referred to the PCJCC for further information.  If a juvenile commits a crime, the appropriate arrest action shall be taken, regardless of whether the juvenile is incorrigible or not.

**2129.5  Status Offenses** [CALEA 44.2.2.a]

Officers shall be aware of what crimes constitute status offenses.  The PCJCC will not accept a juvenile being detained for status offenses (i.e. offenses that are only applicable because the suspect is a juvenile).   The Center for Juvenile Alternatives (CJA) will accept juveniles for status offenses, but not criminal offenses.

## 2130  SUSPECT IDENTIFICATION [CALEA 42.2.11 a-g; 42.2.12 a-g]

**2131  General**

Officers shall follow these guidelines when conducting an identification procedure with a victim or witness to a crime.  Any statements made by witnesses identifying possible suspects shall be completely and accurately documented by the officer.  A suspect or likeness of the suspect shall not be displayed to more than one witness at a time.  If there are several witnesses to a crime, and a show-up of a suspect is feasible and proper, arrangements shall be made for each witness to view the suspect separately.   Officers shall not use the MTC or any other means to display a photograph of a potential suspect to a witness or victim. Display of suspect photos to victims and witnesses shall be conducted in accordance with accepted Department photo lineup procedures.

An eyewitness identification procedure is unnecessary when the witness states that he or she is unable to recognize the perpetrator of the offense being investigated, knew the identity of the suspect before the offense occurred, or learned the identity without police assistance after the offense, e.g., an eyewitness recognizes the suspect's picture in a newspaper.

**2131.1  Identification Protocol**

A witness who has taken part in an identification procedure shall not be permitted to state a conclusion within the hearing of another person who is about to view a lineup, or has



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
| --- | --- | --- |
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

already viewed a lineup in the same case.  A police officer shall not, by word or gesture, suggest that the suspect committed the crime.  Witnesses making inquiries about an officer's opinion shall be informed of this restriction.  When presenting a suspect to a witness for identification, an officer shall make every effort not to say or do anything to suggest to the witness that the suspect has been arrested or detained, has confessed, possessed incriminating items, or is believed to be the perpetrator.

### 2131.2  Documentation of Identification Process

A complete record of each identification procedure shall be made.  The time, location, and other relevant circumstances (e.g. lighting conditions) and the identity of all persons present, including persons being viewed in the lineup who are not suspect, shall be noted.  Statements made by a witness viewing the lineup shall be documented, along with any significant remarks made by an officer, lawyer, or suspect.  Photographic, sound, and video recording devices will be used to document the identification procedure when possible.  The type of lineup procedure used (e.g., photo, physical) shall be noted.  The method of positive identification made by the witness shall be noted, to include the exact words used by the witness (e.g., "That's him, the third from the end with the mustache in the brown shirt.").

## 2132   Show-Up Identifications

If witnesses agree to participate and state that they might recognize the perpetrator, an officer may arrange a viewing of a potential suspect or arrestee by a witness or victim if the suspect/arrestee is detained/arrested within a short time of the offense (generally within two (2) hours).  The show-up shall then occur as soon as practical.

It should be noted that the two (2) hour timeline is only a guideline and that the length of time that passes between the offense, the detention, and the show-up must be reasonable for the situation.  Based on the severity of the crime and the circumstances, a Detective Sergeant should be contacted regarding the timeliness of conducting a show-up past the initial two (2) hours.

Nothing in these procedures precludes the transporting of witnesses in police cars to cruise the general area in which an offense has occurred in an effort to locate the suspect.  The results of a show-up should not be broadcast on a police radio due to the proximity of officers to other potential witnesses.

### 2132.1  Show-Up Location of

The witness will be brought to the suspect's location as soon as possible for a show-up identification.  Unless the suspect voluntarily consents to the transport, the suspect will not be taken to the witness' location for an identification procedure.  If the suspect has been arrested, it is permissible to transport him/her to the witness' location.

### 2132.2  Show-Up Suspect Detention

A suspect shall not be detained for an unreasonable period of time (generally no longer than the time it takes to conduct a brief investigation to confirm or dispel suspicion that



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
| --- | --- | --- |
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

they have committed a criminal offense), unless probable cause to believe the suspect committed the offense develops during the detention, or, after being clearly informed that cooperation is not mandatory, the suspect consents to take part in the show-up.

### 2132.3 Emergency Show-Up

In emergency circumstances, such as when a witness is in danger of death, blindness or other seriously incapacitating medical condition, an immediate show-up may be arranged if medically permissible.  In these situations, the limitations contained in the preceding procedures may be disregarded.  Any situation that prompts officers to deviate from these procedures shall be thoroughly documented, and a supervisor shall be notified.

### 2132.4 Hospitalized Suspects

When prompt identification is possible or necessary, and a suspect charged with the offense under investigation is hospitalized for extended treatment under non-emergency circumstances, witnesses may be taken to the hospital for viewing within the time constraints outlined above. The identification procedure shall be completely documented in accordance with these procedures.

### 2132.5 Show-Up Right to a Lawyer

Individuals do not have a right to the presence of a lawyer at any show-up procedure.

### 2132.6 Show-Up Documentation

Officers conducting a show-up shall note the date and time of the show-up, as well as any reactions of the victim or witness to the suspect.  Exact verbiage is necessary when noting either the identification of the suspect by the victim or witness or conversely the failure to identify the suspect.

## 2133 Photo Lineup Display

### 2133.1 General

Individuals do not have a right to have a lawyer present at any photographic identification procedure.  Whenever a photograph depicting an identified suspect is displayed to a victim or eyewitness, it shall be arranged at random with five or more photographs of different persons. The persons depicted in the photo display, as well as the quality and characteristics of the photos themselves (e.g. all color photographs) must be of substantially similar general appearance.  Only the face of the subject will be shown, with the shirt, name, and other information on the photograph covered.  The background in the photograph will also be the same on each picture, or as similar as possible.  "Mug" or "ID" folders, identified by printing on the folders as such, shall not be used.  If multiple suspects are involved, only one suspect shall appear on each lineup display.

If the photographs are being shown as individual pictures in a series instead of a display, the victim or witness must completely view the series even if the suspect has already


been identified from the series.  If a single photograph of a lineup that includes the suspect is available, it may be displayed alone without any other photographs.

### 2133.2 Documentation

Officers conducting the photographic lineup shall note their initials and payroll numbers on the back of the photographs, as well as the date and time the photographs were shown to the victim or witness.  The officer shall observe the witness or victim closely and document any reactions of the victim or witness to the photographs.  If the suspect is identified from the photographic display, the officer shall note the date and time on the back of the suspect's photograph.

### 2133.3 Preservation

An adequate record of each photograph shown in a display shall be made. Photographs used shall be preserved so that the display can be reconstructed at trial.  Photo books and group pictures shall be accurately described and then preserved in the event they are needed for a trial.  This procedure shall be adhered to in all pictorial identifications including those where a suspect was not identified.

## 2134   Physical Lineup

### 2134.1 General

All physical lineups shall consist of at least six persons, including the suspect.  If multiple suspects are involved, only one suspect shall appear in each lineup.  Persons placed in the lineup shall have similar physical characteristics.  Factors such as age, height, weight, hair length and color, and physical build will be considered.  Sex and ethnicity, if obvious, shall be the same for all participants.  The suspect shall be informed that they can choose initial position in the lineup and that this position may be changed after each viewing.

### 2134.2 Exceptions to Conducting a Lineup

When identification by a witness may be obtained, a lineup will be held following the arrest of the suspect, unless one of the following circumstances makes a lineup infeasible or impractical because:

- There is a lack of persons to include in the lineup group who have similar physical characteristics as the suspect.

- The suspect was released on bond or recognizance before viewing could take place.

### 2134.3 Right to Attorney

Suspects have the right to have a lawyer present at a physical lineup.  This shall include lineups that occur prior to indictment.  The suspect shall be advised of the right to have a lawyer present at the lineup.  A lineup shall be delayed for a reasonable time while

**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**



**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

waiting for a lawyer to arrive following notification.  If the suspect already has a lawyer and indicates a desire to have the lawyer attend the lineup, the suspect shall be allowed to notify the lawyer about the planned lineup, and the offense involved.  If the suspect has not already retained a lawyer, but wants one to attend the lineup, and can afford one, a reasonable time shall be allowed to retain a lawyer.  If the suspect has no lawyer but wants one to attend the lineup, and cannot afford to retain a lawyer, the officer conducting the lineup shall contact the Pima County Public Defender to arrange for a lawyer to assist the suspect.  If the Pima County Public Defender refuses to provide an attorney for the suspect prior to indictment, contact the County Attorney or the Department Legal Advisor for the proper procedure to follow.

### 2134.4  Waiver of Attorney

A suspect who is entitled to a lawyer at a lineup may waive this right.  If the suspect waives the right to have a lawyer present at the lineup, officers shall fully document that the suspect had full knowledge of the effect of waiving the right, and freely and voluntarily consented to the waiver.  The suspect's precise words providing such a waiver must be documented as part of the investigative file.  Any such waiver shall be tape-recorded or officers shall provide a statement acknowledging the waiver signed by the suspect.

### 2134.5  Role of the Attorney at a Physical Lineup

Lawyers shall be allowed to consult with their clients prior to the lineup and to observe the lineup procedure.  Such consultation shall take place outside the presence of any witnesses and/or officers.  The lawyer may make suggestions, but may not control or obstruct the procedure.

Any suggestions made by the lawyer about the process shall be considered and recorded.  Those suggestions that would enhance the process and encourage consistency with these procedures shall be implemented.

A lawyer shall be permitted to be present when a witness expresses a conclusion about the lineup.  The lawyer shall be instructed to remain silent during both the lineup and the giving of the witness' conclusion.  The lawyer may speak with any witness after the procedure, if the witness agrees to do so.  Witnesses taking part in a lineup procedure shall be told that they are under no obligation to speak with the lawyer, but that they are free to do so if they wish.  The witness' name and address will not be revealed to the lawyer without the witness' consent.

### 2134.6  Suggestions

Officers shall neither say nor do anything to set a suspect apart from the other lineup participants or in any way indicate the identity of the suspect.

### 2134.7  Conduct of Lineup Participants

Photographs or video recordings shall be made of all lineup procedures.  Non-suspects in the lineup shall be instructed to conduct themselves so as not to identify the actual



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

suspect. The suspect can be instructed to utter specific words, make gestures, or assume a particular pose, if the viewer so desires.  All participants shall do whatever reasonable act is required of the suspect.  If a witness describes the suspect as wearing a distinctive item of clothing, and the item (or something similar) is in police custody, the suspect can be compelled to wear the item.  Each participant shall wear the item of clothing in the order of appearance in the lineup.

Suspects who refuse to participate in a lineup, or to perform during a lineup as required, shall be informed that there is no right to refuse, and that evidence of refusal may be used against them at trial.  Documentation of the precise words of the refusal (tape recorded if possible) shall be made for subsequent use.

If the suspect continues to refuse, in most cases, participation in the lineup or performance of a certain act shall not be forced.  However, when necessary and with approval of a Commander, compliance may be forced.  When this occurs, the other lineup participants shall be instructed to act in a manner similar to that of the suspect.

## 2135   Court Orders for Obtaining Evidence of Physical Characteristics

### 2135.1   General

Statute provides a procedure whereby a peace officer, while investigating a felony, may seek a court order authorizing the officer to pick up and detain a suspect in order to obtain evidence of identifying physical characteristics.  Pursuant to the order, officers may obtain fingerprints, palm prints, body measurements, handwriting samples, voice exemplars, blood samples, urine samples, saliva samples, hair samples, semen and other material containing DNA material (e.g., buccal cell samples), evidence of comparative personal appearance (standing up for a lineup), and photographs of an individual.  The order permits officers to take a felony suspect into custody for this limited purpose for up to three (3) hours.

More intrusive collections of physical characteristics, (e.g., buccal cells, blood, urine and semen) require a search warrant if it is prior to a Grand Jury indictment and a Court Order if it is after a Grand Jury indictment.

In order for a Magistrate to issue an order, the officer must demonstrate reasonable cause to believe a felony has been committed and that procurement of evidence of identifying physical characteristics from the individual described in the order may contribute to the identification of the perpetrator of that felony.

### 2135.2   Procedures to Follow to Obtain a Court Order

To obtain a court order for physical characteristic evidence, the investigating officer shall prepare both a court order and an affidavit in support of the court order.  An order may be obtained telephonically in the same manner as a search warrant. The investigating officers shall include all required information in the proper court order form.


The *Arizona Court Order for Physical Characteristics* and *Affidavit in Support of Court Order* shall be used for this purpose, and if properly filled out, will provide all of the statutory requirements to obtain an order.  The investigating officers may seek the assistance of the Legal Advisor or County Attorney in drafting these documents if assistance is necessary.  The following information must be contained in the court order and affidavit in support of the court order:

- The felony under investigation

- The type of physical characteristic evidence being sought

- A statement that this evidence cannot otherwise be obtained from the Department or from the Department of Public Safety.   This provision of the statute requires the investigating officers to make a records check with their agency and D.P.S.

- The relevance of the evidence to the case being investigated

- The identity of the individual to be detained for the taking of the evidence.  The suspect will be identified in detail, including name, physical description, and residence and business addresses.

- The identity of the investigating officers who will conduct the taking of the evidence

- The place where the evidence will be taken. In most cases, the place for seizure of the evidence will be the actual location of the suspect.  Only when the type of evidence sought is of such a nature that it requires a special location, such as for collection of blood, taking of photographs or conducting a lineup, will the suspect be required to accompany the investigating officers to another location.

- The hours during which such evidence can be seized.  The time period from seizing physical evidence is limited to not more than three hours and will be done during daylight hours.   This limitation will require the investigating officers to make necessary preparations prior to obtaining the evidence.

- The time during which the court order remains in effect, not to exceed fifteen days

- An indication that the individual has been asked to voluntarily give the evidence to the officer and has refused to cooperate

The affidavit in support of the court order must also contain a detailed discussion of the facts constituting the officers' belief that the suspect may be the person who committed the crime under investigation.  This must show the existence of a reasonable cause that the suspect may be the one who committed the offense under investigation.  Reasonable cause is less than the standard of proof required for probable cause to arrest and obtain a search warrant.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|
| **Revised:** November 9, 2011 | **2100 ARREST POLICIES** Issued May 2001 |

2135.3  **Execution of the Court Order**

The court order to seize physical characteristic evidence must be executed at the time and place specified in the order, or as soon afterwards as possible if the suspect cannot be found on the date specified in the order.  The officer executing the order may use a reasonable amount of force to take the evidence specified in the order.  If the nature of the physical characteristic evidence requires the cooperation of the suspect (i.e. giving a voice or handwriting sample), and there is no cooperation, the suspect will be in violation of the court order and can be held in contempt of court for failure to comply with the order.  If the suspect refuses to cooperate in this situation, the officer shall not make an arrest, but rather shall report the incident to the court issuing the order.  The court will require the suspect to come to court and show cause why the suspect should not be held in contempt.

The order must be returned within fifteen (15) days from issuance (unless extended by the court for an additional time period not to exceed 15 days). The order must be returned within thirty (30) days after its issuance.  The return shall contain a sworn statement from the officer taking the evidence, consisting of a description of the evidence taken.

## 2140  INTERVIEWS AND INTEROGATIONS [CALEA 42.2.10 a-f; 71.1.1; 71.3.1 a]

2141  **General**

A designated interview and interrogation room is any room in which a person may be securely detained for the purpose of questioning.  This differs from temporary detention in that the interview and interrogation process typically involves repetitive contact with detainees/arrestees.

Interview and interrogation rooms are typically equipped with only a table and chairs/stools.  As they do not provide access to restrooms, water, or privacy for breaks, prolonged use of an interview and interrogation room will require that detainees be provided access to these amenities.

Only the number of officers actually necessary to conduct an interview or interrogation shall be present.  Members are not required to secure their firearms prior to entering the interview and interrogation room, unless this area is housed within the secure temporary detention area (pod).  As the removal of firearms or other weapons is not required, officers shall be mindful of weapon control when conducting interviews and interrogations.

Officers are required to log all juveniles and adults that are detained at departmental facilities for interview and interrogation, prisoner processing, and temporary detention. These facilities are required to maintain a monthly *Juvenile Detention Log* and a separate *Adult Detention Log* listing the following information regarding the detention:

- the date;
- time in and out;



**TUCSON POLICE DEPARTMENT GENERAL ORDERS**

**VOLUME 2 GENERAL OPERATING PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

- payroll number of the officer who secured the detainee and of the officer who removed the detainee;
- detainee name, date of birth, and sex;
- case number;
- charges;
- whether a meal was provided to the detainee (i.e., during prolonged questioning); and
- whether the detainee was held securely or non-securely (that which restricts freedom of movement, i.e., handcuffed to a handcuff ring/bench or held in a detention cell).

Juvenile arrestees cannot be securely detained for longer than six (6) hours. If further time is needed, a juvenile may be moved from secure to non-secure detention, though this will require a new log entry.

Damage found after an interview and interrogation room is utilized will be appropriately documented in a report and the arrestee shall be charged with Criminal Damage as appropriate.  As interview and interrogation rooms are not to be used as temporary detention, such incidents should be minimal.

The cleanliness of the interview and interrogation room used is the responsibility of the member in charge of the detainee.  All Departmental personnel shall promptly report, or handle the problem themselves if appropriate, all issues that come to their attention concerning cleanliness, damage, or unsafe conditions in these facilities.

**2142    Security**

Detainees secured for interview and interrogation, may only be secured to stationary items expressly designed for secure detention purposes, e.g., a handcuff ring.  While a subject is kept in an interview/interrogation room, the interior light of that room shall be on.  The member assigned the responsibility of security for the detainee shall check welfare at a minimum of fifteen (15) minute intervals.  This check is a face-to face visual observation.  Available audio and/or video devices may be used in addition, but they are not a substitute for this mandated check.

Detainees held in an interview and interrogation room are the responsibility of the member who places them in the room until release to another sworn department member.  As such, it is imperative that the officer responsible for the initial placement of a detainee into an interview and interrogation room thoroughly search both the detainee and the room prior to placement, and the room again after removal.  The mere fact that another officer has already searched a detainee does not preclude further officers from conducting similar searches.

As most interview and interrogation rooms are not equipped with panic alarms, members are reminded to utilize their handheld radios to call for emergency assistance as necessary.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

## 2150   PRISONER PROCESSING [CALEA 71.1.1; 71.3.2; 71.5.1 a-d]

### 2151   General

A designated area is set aside in each Department substation for prisoner processing. This involves pre-booking activities on in custody detainees, to include DUI and DRE investigations.  Prisoner processing areas differ from temporary detention cells, in that they involve continuous contact with detainees, whereas temporary detention cells allow an arrestee to be left secured and unattended.

Members are not required to secure their firearms prior to entering prisoner processing, unless the processing area is housed within the secure temporary detention area (pod). As the removal of firearms or other weapons is not required, officers shall be mindful of weapon control when conducting prisoner processing.

Officers are required to log all juveniles and adults that are detained at departmental facilities for interview and interrogation, prisoner processing, and temporary detention. These facilities are required to maintain a monthly *Juvenile Detention Log* and a separate *Adult Detention Log* listing the following information regarding the detention:

- the date;
- time in and out;
- payroll number of the officer who secured the detainee and of the officer who removed the detainee;
- detainee name, date of birth, and sex;
- case number;
- charges;
- whether a meal was provided to the detainee (i.e., during prolonged detention or custody); and
- whether the detainee was held securely or non-securely (that which restricts freedom of movement, i.e., handcuffed to a handcuff ring/bench or held in a detention cell).

Juvenile arrestees cannot be detained securely longer than six (6) hours. If further time is needed, a juvenile may be moved from secure to non-secure detention, though this will require a new log entry.

Upon conclusion of processing, if further time is needed to complete pre-booking or field release paperwork, the detainee should be transferred to a temporary detention cell. Arrestees shall not be temporarily detained (left secured and unattended) in prisoner processing areas.

The cleanliness of the detention cell used is the responsibility of the officer in charge of the arrestee. All Departmental personnel shall promptly report, or handle the problem themselves if appropriate, all issues that come to their attention concerning cleanliness, damage, or unsafe conditions in these facilities.



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

2152    **Security**

Detainees secured for prisoner processing may only be secured to stationary items expressly designed for secure detention purposes, e.g., a handcuff ring.  As escape prevention is paramount, members are required to maintain constant supervision of detainees in prisoner processing.

As most prisoner processing areas are not equipped with panic alarms, members are reminded to utilize their handheld radios to call for emergency assistance as necessary.

## 2160   PRISONER HANDLING PROCEDURES

2161    **General**

It shall be the policy of the Tucson Police Department to treat all suspects and prisoners humanely and with regard for their well being, safety and legal rights.

2162    **Field Arrest Procedures**

2162.1   **Searches**

All persons taken into lawful custody and transported shall be searched in accordance with those Department procedures that address searches incident to an arrest.  It shall be the responsibility of each officer assuming control and custody of the prisoner to conduct a thorough search of that prisoner.  For the purposes of this General Order, control and custody means accepting transfer of a prisoner and does not include brief periods when an officer observes a prisoner at the request of another officer, who remains responsible for the prisoner.

2162.2   **Transportation** [CALEA 70.1.1]

Prisoners will be transported in screened vehicles.  Unless circumstances dictate otherwise, the prisoner will be handcuffed in the manner prescribed by training and restrained by use of the seat belt or other restraining device in a manner that will prevent injury to the prisoner or to the police officer.

Transporting officers shall search prisoners prior to placing them in the vehicle.

Hand carried items, such as purses, briefcases, knapsacks, etc., which are the prisoner's property shall likewise be searched for weapons if they are to be transported in the police vehicle.  These items shall not be transported in the prisoner compartment of the police vehicle.

Transporting officers shall search the area of the vehicle occupied by the prisoner prior to and after the transport.

Officers shall complete a Transport Log on the MTC for all transports (e.g., public assists, witnesses, arrestees, suspects, etc.). The log will include the destination and odometer



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

reading (last four digits only, i.e., 354.5).  Upon arrival, an ending Transport Log shall be completed.  A dispatcher shall be notified verbally if an MTC is not available.

- TR,♦beginning mileage (defaults to jail)
- TR♦<alternative destination>,♦beginning mileage
- TRC,♦ending mileage
  (♦ = space)

## 2163   Pima County Jail (PCJ) Procedures

Members of the Department shall secure all firearms, dangerous instruments, and incendiary devices (e.g., matches, cigarette lighters, etc.) before entering a detention facility.  All weapons, to include firearms, ammunition, Tasers, batons, pepper spray, and knives shall be secured out of view in a police vehicle trunk or in a locker provided by the detention facility, unless a specific request to the contrary is made by the Commander of the detention facility.  Officers shall ensure, to the best of their ability, that non-police personnel do not become aware of the presence of auxiliary firearms when weapons are secured.

The Pima County Sheriff's Office (PCSO) jail procedures concerning security of prisoners and weapons shall be strictly adhered to.  If an officer opts to utilize the weapon lockers provided by the detention facility, the officer shall ensure that they are separated from the prisoner by the security door prior to securing their weapons.

### 2163.1   Booking Procedures

All initial misdemeanor arrests (not warrants) require as part of the booking process the completion of a *Release Questionnaire (Form 4)*.  The information contained in the form must be sufficient for the arraignment judge to determine appropriate release requirements.  The *Release Questionnaire (Form 4)* shall be shall be placed with the citation in the lock box located outside the jail intake doors (same area where prisoner property is stored).

All initial Felony arrests and confirmed out of state felony warrants, require as part of the booking process the completion of a *Felony Interim*.  When charging a suspect with a felony, do not cite for any lesser included civil or misdemeanor charges.  Document these lesser included, (e.g., felony fleeing and misdemeanor reckless driving), offenses in the *Multi-Purpose Report*.  Misdemeanor charges that are separate offenses from the felony may be cited. In cases involving a felony arrest, with a separate misdemeanor charge, the *Release Questionnaire (Form 4-)* shall also be completed.  The *Felony Interim* is left in a marked tray in booking.

If an officer is booking a subject that has questionable identification, the officer shall make note of this using one of the following methods:

- Document the lack of proper identification in the body of the case report or
- Book the subject as a JOHN/JANE DOE and list all given names under "Alias."



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

Arizona law requires that all custodial arrestees be asked their country of origin. If officers have information bearing on an arrestee's alien status, that must be provided to the court for purposes of determining bail.

Officers must provide appropriate notification to foreign Consular Officials when foreign nationals of their country are arrested or otherwise detained for an extended period. A *Consular Notification Form and Fax Sheet (TPD#3208)* shall be completed each time. The primary case officer is responsible for ensuring that the appropriate box is checked regarding the Voluntary or Mandatory notification status of the country and if Voluntary notification is declined. See *General Order 2119.2* regarding Consular Notifications.

In many instances when a suspect is arrested, circumstances develop that could substantiate additional charges. In such instances, only one violation shall be indicated unless each is a separate and clear-cut offense. No complaint shall be placed against a subject for the purpose of harassment. In the event of multiple misdemeanor charges or any combination of warrants and misdemeanor charges, suspects (if booked) shall be booked on all of the charges. They shall not be booked on one and field released on the others.

Prisoner's property that will not be accepted by the jail (e.g., bedroll, knapsack, carrying bag, etc.) shall be placed in the appropriate outside storage bins located in the booking parking lot. A *Prisoner Property Receipt* shall be completed and one copy will be placed outside of the appropriate storage bin and the other copy given to booking personnel at the time of booking

If a person is in possession of an animal at the time of arrest, the officer shall make every effort to release the animal to a friend, a relative, or a neighbor of the arrestee. If this cannot be accomplished, the Pima County Animal Care Center shall be contacted to take possession of the animal. Fees incurred for the care of the animal shall be the responsibility of the arrestee.

2163.2 **Strip Searches** [CALEA 1.2.8 a-c]

No officer shall request a strip search of a suspect without the express permission of a Commander. Strip/body cavity searches (incident to felony arrest or to a search warrant) shall only be conducted by medical or jail personnel utilizing medical or jail facilities to ensure safety and privacy for the individual. Pima County Jail requires probable cause and the completion of a memorandum at the time of the request, documenting the basis for the search.

Officers, of the same gender as the arrestee, may observe only if it is considered necessary for the preservation of evidence. In every case, the search shall be documented in a *Multi-Purpose Report* or *Supplementary Report*.

2164 **Ill or Injured Prisoners**

2164.1 **Care and Handling** [CALEA 70.3.1]



**TUCSON POLICE DEPARTMENT GENERAL ORDERS**

**VOLUME 2 GENERAL OPERATING PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

Members shall be responsible for the proper care and handling of injured or ill prisoners. If a prisoner is ill or injured or sustains an injury while or after being taken into custody, the arresting officer shall immediately notify their supervisor and obtain appropriate medical treatment for the prisoner.

Whenever possible, prisoners who have been physically arrested (i.e., full custody arrests) and require hospital treatment, will be transported to the nearest hospital.

Should the hospital refuse to treat an ill or injured prisoner, or the jail refuses to accept an ill or injured prisoner who has been treated, the officer shall immediately request that an on-duty supervisor respond to the hospital or jail and attempt to resolve the situation. If the supervisor cannot resolve the situation, the supervisor shall immediately contact the Department's Legal Advisor and the Division or Force Commander.  Complete documentation of the incident shall be addressed in a *Supplementary Report* by the transporting officer.  In addition, the transporting officer shall forward a memorandum to the Legal Advisor citing the case number and the fact that the hospital refused to treat the prisoner or that the jail refused to accept the prisoner.

**2164.2   *Injured Person Report* (IPR)**

The *Injured Person Report* (TPD 732) shall be completed when an arrestee, whether to be booked or field released, complains of illness or injury, or has any injury including minor cuts, bruises and abrasions that are present at the time of arrest or are sustained during or after the arrest.  The (IPR) shall also be completed in all instances when direct contact between a member of the Department and any citizen results in physical injury, or compliant of physical injury.  The officer who observes the injury, who is involved in the circumstances of the injury, or who is the recipient of any report of the injury or illness will be responsible for completing the form.  Officers will document how the injuries occurred if this information is known.

The *Injured Person Report* will accompany the arrestee until he or she is no longer under the care of TPD.  A copy of the report will be given to the Pima County Jail or, if the arrestee is a juvenile, to the Pima County Juvenile Court Center, and the original to Records.

When an ill or injured prisoner is booked, officers will convey to the Booking Officer any instructions or medications provided by a treatment facility.

If another injury occurs subsequent to completion of the original *Injured Person Report* and all copies of this report are available, the injury shall be documented in the original *Injured Person Report*. If all copies are not available, a second *Injured Person Report* shall be completed. When an original *Injured Person Report* is amended by a second officer, the amending officer shall initial the added narrative and include his or her name and payroll number at the bottom of the report.

Field photos should be taken if appropriate.  See also *General Orders* under Force regarding the requirements for the reporting of use of force.


2165    **Special Circumstances**

2165.1  **Pregnant Prisoners**

Extreme care shall be taken if a female indicates that she is pregnant. In all cases where a physical arrest will be made, authorization shall be obtained from a supervisor. In most misdemeanor cases, the arrest of a pregnant female will take the form of a field release. If a field release is made, complete details of the situation shall be included in the police report. In all felony cases, and in those misdemeanor cases where physical arrest is mandated, release of a pregnant female shall only be made upon authorization of a supervisor.

If, prior to booking, a pregnant female indicates that she might have a miscarriage or go into labor, she shall be taken immediately to the nearest hospital for examination. An *Injured Person Report* shall be completed.

2165.2  **Diabetic Prisoners**

Persons suffering from diabetes and certain other diseases may have an appearance commonly associated with intoxication from alcoholic beverages. When an officer is informed that a person is diabetic, and there is reason to believe that the diabetes is not under control, e.g., high blood sugar or insulin shock, TFD Paramedics shall be requested to examine the person.

2165.3  **Mentally Ill Prisoners**

If a prisoner is suffering from mental illness, the procedures governing the handling of mentally ill person shall be followed. Prior to entering a mental ward, officers may be required to secure all weapons, and officers shall follow security protocols associated with any mental health facility.

## 2170   PRISONER GUARD DUTY [CALEA 70.3.2]

A Headquarters Security Officer is responsible for scheduling all guard duty requests by accessing the personnel computer under the Share Drive/Guard-Duty-Folder, Monday-Friday 0730-1730 hours. In the event guard duty is needed after hours or on the weekend, the Incident Supervisor will ensure the following procedures are followed.

A blank *24-Hour Guard Duty Log* (TPD 730) will be completed and printed from the Guard folder. After completing the form, go to "Save As," label the form with the Case Number, and save it to the "Current Guard Duty Folder." The form should have the current date and indicate the proper 24-hour rotation for each division. Print a copy of the form to fax (as outlined below). The original form shall then be placed in the Headquarters Sergeant's in box on the door adjacent to the Headquarters Desk. A copy is also placed in the logbook that goes to the hospital.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

The arresting division has the responsibility of guarding the prisoner until 2400 hours on the day of the arrest and the following day if the arrest is made after 1200 hours. Other divisions are rotated and scheduled according to division number, beginning with the division that initiated the guard duty. If the arrest is made by ODM (team 3), they will guard the prisoner until 2400 hours that day. At 0001 hours, ODE (team 4) will take over, then ODD (team 5), and so on.

Once the log information is complete, fax a copy to each substation and communications. If this occurs after 1700 hours when substation offices are closed, then a supervisor in each division shall be personally contacted to advise of the fax and pending guard duty. If faxing from Headquarters, use the "Guard Duty" button and the fax will be sent to all divisions.

An officer from the arresting team will pick up a Guard Duty Logbook from Headquarters. There are three books numbered 1-3 that are stored in Cabinet # 20 on the north wall behind the Headquarters desk. The book will contain a set of leg irons, which <u>shall</u> be returned with the book upon the completion of guard duty. The Officer will deliver the Guard Duty Logbook to the appropriate hospital for the commencement of guard duty.

Officers are to log in and update information as required in the logbook and follow any other instructions listed per the assigned detective. (As a reminder, all comments written in the Logbook are subject to disclosure.) It is the responsibility of the guarding officer to advise headquarters of any changes, such as room numbers. If Headquarters is closed, the change shall be personally communicated to a supervisor in each division and a fax sent to the divisions. All changes in room/hospital status shall be indicated in the "Current Guard Duty Folder" on the form saved under the case number and again faxed to the Divisions.

When guard duty has ended, it is the responsibility of the Headquarter officer during normal business hours to notate the reason the guard duty has been terminated with a black marker across the guard duty face sheet, with the date and time. Typically the notation will be "Booked." The face sheet is then faxed to all the divisions and communications.

If Headquarters is closed, the officer returning the Logbook shall notate the reason for guard duty termination on the guard duty face sheet and place the entire Logbook in the Headquarters Sergeant's "in box" when returning the Logbook and leg irons to Headquarters. This officer will then fax a copy to all the divisions and communications and a supervisor in the division next assigned guard duty will be personally contacted and advised of the fax. All divisions are to place the guard duty termination fax in briefing books.

A Headquarters Security Officer shall verify that the leg irons have been returned with the Logbook and sanitize them. Headquarters will also submit all logs contained within the Logbook to records. The case number shall be written on each page of the log if it this has not already been done. Log paperwork that was used will be replaced so the book is ready for the next guard duty.

2171   **Hospitalized Prisoners**

While prisoners are occasionally hospitalized, guard duty is not always undertaken for each prisoner. During those instances when guard duty is undertaken, the Prisoner Guard Duty protocol outlined under *General Order 2170* shall be followed.



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

Prisoners may be secured via handcuffs, leg irons, or any other method necessary to prevent escape without hindering medical personnel.

No visitors shall be permitted without the express permission of the assigned detective supervisor. Generally, only members of the prisoner's immediate family are allowed visitation rights. A lawyer may be allowed to visit a client after it has been verified that the person is the prisoner's lawyer. Officers assigned to guard hospitalized felons shall maintain a log listing the names and addresses of all visitors during their tour of duty. These logs will be submitted with the Logbook upon its return to Headquarters.

Visitors will be frisked for weapons or contraband prior to having contact with the prisoner. Packages, purses, or other items carried shall be subject to search and removed from the proximity of the visitor and the prisoner during the visit. Visitors are not entitled to privacy for their visit.

A lawyer visiting a client will be searched for weapons prior to having contact with the prisoner. Lawyers will be permitted private communication with the prisoner. The guarding officer is required to maintain a visual presence.

All other visitors shall remain under police observation while with a prisoner.

### 2171.1 Misdemeanants

If possible, hospitalized misdemeanants will be field released. The guarding of a misdemeanant offender will be performed only in exceptional cases. If the suspect is physically incapable of signing a citation, complete the paperwork and forward it to the appropriate follow-up investigative unit. If the officer has reason to believe that the suspect will not appear on the charge, a determination shall be made concerning guard duty on the subject. The decision will be made by either the on-scene supervisor or a detective supervisor

### 2171.2 Felons

Any individual suspected of having committed a felony who is admitted to a hospital shall, at the discretion of either the on-scene supervisor or a detective supervisor, be guarded on a twenty-four (24) hour basis until booking at the Pima County Jail can be completed. If the decision is made not to guard the suspect, then no arrest shall be made at that time.

## 2180   TEMPORARY DETENTION

2181   **General** [CALEA 71.1.1; 71.3.1 a, e; 71.3.3 a; 71.4.1]

Temporary detention cells are designated areas within the Department utilized for securing arrestees who are left unattended. Sight and sound separation is required for juveniles from adult arrestees. In addition, males and females must be separated.



| TUCSON POLICE DEPARTMENT GENERAL ORDERS | | VOLUME 2 GENERAL OPERATING PROCEDURES |
|---|---|---|
| **Revised:** November 9, 2011 | | **2100 ARREST POLICIES** Issued May 2001 |

Members shall secure their firearms prior to entering a temporary detention cell or entering an area (pod) in which temporary detention cells are contained. See *General Order 2187* for further information regarding detention cell security.

All detentions longer than two (2) hours shall require supervisor approval. Juvenile arrestees cannot be detained in a detention cell longer than six (6) hours. If further time is needed, a juvenile may be moved from secure to non-secure detention, though this will require a new log entry as outlined in this section.

Officers are required to log all juveniles and adults that are detained at departmental facilities for interview and interrogation, prisoner processing, and temporary detention. These facilities are required to maintain a monthly *Juvenile Detention Log* and a separate *Adult Detention Log* listing the following information regarding the detention:

- the date;
- time in and out;
- payroll number of the officer who secured the detainee and of the officer who removed the detainee;
- detainee name, date of birth, and sex;
- case number;
- charges;
- whether a meal was provided to the detainee (i.e., during prolonged detention); and
- whether the detainee was held securely or non-securely (that which restricts freedom of movement, e.g., handcuffed to a handcuff ring/bench or held in a detention cell).

Damage found after a temporary detention cell is utilized will be appropriately documented in a report and the arrestee shall be charged with Criminal Damage as appropriate.

At a minimum, water, restroom, and a clean detention cell should be provided to those in temporary detention. The cleanliness of the temporary detention cell is the responsibility of the member in charge of the detainee. All Departmental personnel shall promptly report, or handle the problem themselves if appropriate, all issues that come to their attention concerning cleanliness, damage, or unsafe conditions in these facilities.

2182    **Mobility Impaired Detainees**

Detainees who are mobility impaired shall be detained in accessible detention cells pursuant to the Americans with Disabilities Act of 1990.

2183    **Teletypewriter/ Telecommunications Device for the Deaf  (TTY/TDD)**

A TTY/TDD will be provided for detainees who identify themselves as deaf or hearing impaired, as they are entitled to a level of service equivalent to that provided hearing persons. Persons who are hearing impaired shall be permitted to use the TTY/TDD communication device for a longer period of time to make their outgoing call(s) due to the slower nature of TTY/TDD communications compared with voice communications.



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

2184     **Occupancy**

No more than one prisoner will be placed in a detention cell at one time.  If more than one arrestee is brought into the facility at one time, the detention cell shall be used for those charged with the most serious crimes or who present the greatest escape risk.  All others will be held in the interview rooms.

2185     **Searching the Arrestee**

An arrestee, whether detained for a felony or misdemeanor, shall be thoroughly searched in accordance with those Department procedures that address searches incident to an arrest. This search shall be conducted immediately prior to securing the arrestee in the detention cell.  The contents of the arrestee's pockets, along with any jewelry, belt, necktie, etc., shall be kept in a property envelope and secured.  An arrestee will not be allowed to take any article into the cell that can be used to harm themselves or others, or to cause damage to the detention cell.

An arrestee will not be allowed to possess any smoking materials or incendiary devices (e.g., matches, cigarette lighters, etc.).

2185.1     **Strip Searches** [CALEA 1.2.8 a-c]

If an officer has reason to believe that an arrestee has contraband on his or her person and it is not revealed by a standard search, a strip search may be requested.  No officer shall request a strip search of a suspect without the express permission of a Commander.  Strip/body cavity searches (incident to felony arrest or to a search warrant) shall only be conducted by medical or jail personnel utilizing medical or jail facilities to ensure safety and privacy for the individual. Pima County Jail requires probable cause and the completion of a memorandum at the time of the request, documenting the basis for the search.

Officers, of the same gender as the arrestee, may observe only if it is considered necessary for the preservation of evidence.   In every case, the search shall be documented in a *Multi-Purpose Report* or *Supplementary Report*.

2186     **Detention Cell Searches and Cleanliness** [CALEA 71.4.3]

Prior to placing an arrestee in a detention cell and upon removal from it, the officer responsible for the arrestee shall examine the cell for property, contraband, and damage.  Damage found after the cell is used will be appropriately documented in the report of the arrest and the arrestee shall be charged with Criminal Damage as appropriate.

The cleanliness of the detention cell used is the responsibility of the officer in charge of the arrestee. All Departmental personnel shall promptly report, or handle the problem themselves if appropriate, all issues that come to their attention concerning cleanliness, damage, or unsafe conditions in these facilities.



**TUCSON POLICE
DEPARTMENT
GENERAL ORDERS**

**VOLUME 2
GENERAL OPERATING
PROCEDURES**

**Revised:** November 9, 2011

**2100 ARREST POLICIES**
Issued May 2001

Weekly checks shall be made by the First Sergeants to ensure cleanliness and to locate any damage to the facility. Checks will be recorded on the division's detention logs. If issues involving cleanliness, damage or unsafe conditions are evident, the division First Sergeant shall ensure that steps are taken to immediately eliminate these concerns.

At least once every three (3) years, a section within each division's Self-Audit will include an administrative review of relevant policies governing these facilities and a determination concerning the facilities ability to adequately meet department needs.

2187    **Detention Cell Security** [CALEA 71.3.1 b, c, d; 71.3.2; 71.3.3 a-f; 71.4.1]

Detainees secured in temporary detention may only be secured to stationary items expressly designed for secure detention purposes, e.g. a handcuff ring. While a subject is kept in a detention cell, the interior light of that room shall be on.  The member assigned the responsibility of security for the arrestee shall check welfare at a minimum of fifteen (15) minute intervals.  This check is a face-to-face visual observation.  Available audio and/or video devices may be used in addition, but they are not a substitute for this mandated check.

Members shall secure their firearms prior to entering a temporary detention cell or entering an area (pod) in which temporary detention cells are contained.

Detainees held in temporary detention are the responsibility of the member who places them in the detention cell, monitors them while in detention, or handles their release or transfer.  As such, it is imperative that the officer responsible for the initial placement of a detainee into temporary detention thoroughly search both the detainee and the detention cell prior to placement within the cell, and the detention cell again after removal.  The mere fact that another officer has already searched a detainee does not preclude further officers from conducting similar searches. Escape prevention is the responsibility of all members who have contact with detainees, thus only those personnel necessary to facilitate processing, searching and temporary detention of detainees will be authorized access to the detention cells.

As temporary detention cells are not equipped with panic alarms, members are reminded to utilize their handheld radios to call for emergency assistance as necessary.

Any arrestee, whose conduct is so violent that the removal of the restraints would present a serious threat of harm to officers, or damage to the detention cell, will be transported immediately to the Pima County Jail or PCJCC as appropriate.  Any arrestee who becomes violent while in a detention cell shall be restrained to prevent injury or damage, and promptly removed to the Pima County jail or PCJCC as appropriate.

Due to the presence of a variety of potentially unsecured weapons, prisoners shall not be permitted in any Department facility locker room.  Prisoners who need to use a restroom will be escorted to a public restroom within the facility if one is not readily available to them.

Exhibit I-4

# Official Web Site of the City of Phoenix

**97F Partly Cloudy** | 9:26 AM | Aug. 09, 2012

# Phoenix Police Department's Statement on SB1070 - English

Home > Police > Phoenix Police Department's Statement on SB1070 - English

**Emergency** - 911 | **Non-Emergency** - 602-262-6151 | Online Reporting
**Information** (602) 262-7626 | Job Info | E-mail
**Silent Witness** 480-WITNESS | 1-800-343-TIPS | 480-TESTIGO (Spanish) | Online Tips



Daniel V. Garcia, Chief of Police
June 25, 2012

Senate Bill 1070 resulted in new state laws for Arizona. Most of the law has been in effect since July 29, 2010. It is the duty of the sworn officers of the City of Phoenix Police Department to enforce all laws.

The Phoenix Police Department embraces a philosophy of "policing with a purpose," focused on nurturing and protecting democracy, ensuring justice, embracing the spirit of service, fundamental fairness, and protecting our communities from harm.  Treating people with dignity and respect is the ethical foundation of law enforcement.

The law went into effect on July 29, 2010, with the Federal District Court in Phoenix issuing an injunction blocking four provisions of the law (Preliminarily Enjoined and SB1070 Sections in Effect).  There are some basic facts everyone should know when discussing Senate Bill 1070:

- The Phoenix Police Department has been enforcing the non-enjoined portions of SB1070 since July 2010, and will continue to enforce the law in compliance with the Supreme Court's decision.
- Many individuals are concerned about the effect the United States Supreme Court ruling may have on the methods of the Phoenix Police Department to enforce the law. Everyone who lives in or visits our city should be assured that the officers of the Phoenix Police Department will enforce all laws, including SB1070, in a manner to ensure equal justice under the law is provided to every person irrespective of race, color or national origin.
- The Phoenix Police Department will not tolerate a violation of any persons' civil rights.
- The Phoenix Police Department will continue to concentrate our resources on crime suppression efforts specifically aimed at violent criminals and property crimes that have negative influences on our communities.
- In anticipation of the Supreme Court ruling the Governor issued an executive order directing the Arizona Police Officers Standards and Training Board to provide training for all law enforcement in Arizona. We will continue to train the men and women of the Phoenix Police Department on proper procedures to ensure compliance with the highest professional standard of providing equal justice under the law.
- The Phoenix Police Department is fully prepared to protect all individuals who exercise their First Amendment rights to demonstrate in a law-abiding manner, and will treat all people with dignity and respect while protecting the community from harm. Demonstrations held within the scope of the laws are constitutionally protected and will be protected by the Phoenix Police Department. Activities in violation of state law or city ordinances will not be tolerated.

- The Police Department and the City Attorney are thoroughly studying the Supreme Court ruling that was issued this morning to ensure that our officers are complying fully with their decision.

The Phoenix Police Department, "Policing with a Purpose".

© Copyright 2012 City of Phoenix, all rights reserved

# Exhibit I-5

# SFPD Command Staff





**Chief of Police**
Greg Suhr



**Deputy Chief**
Chief of Staff
Lyn Tomioka



**Deputy Chief**
Administration
James Dudley



**Deputy Chief**
Operations
Kevin Cashman



**Deputy Chief**
Special Operations
Denise Schmitt



**Deputy Chief**
Airport
David Shinn

**Operations Commanders**



| **Airport** | **Metro** | **Golden Gate** | **Investigations** | **MTA** |
|---|---|---|---|---|
| Commander Richard Corriea | Commander Michael Biel | Commander Charlie Orkes | Commander John Loftus | Commander Mikail Ali |

Contact SFGov          Accessibility          Policies

City and County of San Francisco ©2000-2012

# Exhibit I-6

From the Yakima Herald-Republic Online News.

Posted on Monday, May 07, 2012

Yakima's new top cop, Dominic Rizzi Jr., is sworn in
By Mark Morey
Yakima Herald-Republic

Change will likely come to the Yakima Police Department under Chief Dominic Rizzi Jr., who was sworn into office Monday morning in front of his command staff and line officers.

But true to form, the Chicago police veteran did not make grand pronouncements about what he plans to do. Instead, he said he would listen and learn from department members and residents before settling on a course of action.

His remarks to the audience of about 50 people at the city's Law and Justice Center showed he remains sensitive to the idea that he must rebuild confidence in the ranks about the role of the chief over the department.

Rizzi replaces Sam Granato, the department's first outside chief, who retired in 2011. Granato's seven-year tenure became increasingly rocky as he faced criticism that he retaliated against some officers while favoring others. Granato denied the accusations.

Police union leaders have said they believe the department is ready to move on. Rizzi said he's ready to forge a new relationship with the force.

"You'll find that I will be very accessible, honest, and most importantly, fair," Rizzi said.

"I think we will have a real good partnership over the next several years," Rizzi said, adding that he wants to create a department that both officers and the public can be proud of.

Rizzi is taking his first chief's job after more than two decades at the Chicago department, where he was promoted to lieutenant and most recently commanded a shift of officers.

The Yakima Police Department has a $24 million budget with about 130 officers.

Rizzi said he will focus on learning about the history and culture of the department and the city as he makes major decisions. He said he wants to ensure the changes he proposes will fit Yakima.

"I'm not here to turn this into another city's department," he said.

He added he would work to improve the public's perception of the department through various outreach efforts so that residents trust the agency.

Rizzi will be paid about $115,000 per year. A six-month severance package will kick in if he leaves without cause.

Mayor Micah Cawley said he sees Rizzi as a calm and precise leader who will make a priority of listening.

"With the attitude he's got, it's exciting," Cawley said at the ceremony.

Interim city manager Michael Morales, who hired Rizzi, said the new chief has earned solid reviews from superiors and subordinates alike.

"He's a fair man with the highest level of integrity -- willing and wanting to work with everyone in this department to move us to the next phase of our community's development."

Morales thanked Greg Copeland, who returns to his previous role as one of the department's three captains, for his service as acting chief.

*\* Mark Morey can be reached at 509-577-7671 or mmorey@yakimaherald.com.*



**GORDON KING/Yakima Herald-Republic**
Dominic Rizzi is sworn in as Yakima's newest police chief May 7, 2012 by Yakima city clerk Sonya Tee. Rizzi replaces former police chief Sam Granato who retired in January, 2011.



**GORDON KING/Yakima Herald-Republic**
Dominic Rizzi laughs with assistant city manager Michael Morales as he waits to be sworn in as Yakima's newest police chief May 7, 2012.



**GORDON KING/Yakima Herald-Republic**
Dominic Rizzi and assistant city manager Michael Morales stand in the Yakima Police Department muster room as Rizzi waits to be sworn in as Yakima's newest police chief May 7, 2012. Morales supervised the search for a new police chief.



**GORDON KING/Yakima Herald-Republic**
Dominic Rizzi is congratulated by Yakima city clerk Sonya Tee after swearing him in as Yakima's newest police chief May 7, 2012. Rizzi replaces former chief Sam Granato, who retired in January, 2011.



**GORDON KING/Yakima Herald-Republic**
Yakima city clerk Sonya Tee watches as Dominic Rizzi signs official papers after he is sworn in as Yakima's newest police chief May 7, 2012. Rizzi replaces former chief Sam Granato who retired in Jaunary, 2011.



**GORDON KING/Yakima Herald-Republic**
Dominic Rizzi helps his wife Valerie pin his police chief's badge on his jacket lapel after he is sworn in as Yakima's newest police chief May 7, 2012. Rizzi, who comes to Chicago, replaces former chief Sam Granato, who retired in January, 2011.



**GORDON KING / Yakima Herald-Republic**
Dominic Rizzi Jr. was officially sworn into office this morning as the city of Yakima's newest police chief.

# Exhibit I-7

Mesa clarifies policy on arrests of suspected illegal immigrants East Valley Tribune (Mesa, Arizona) July 2, 2008 Wednesday

Copyright 2008 East Valley Tribune
East Valley Tribune (Mesa, Arizona)

Distributed by McClatchy-Tribune Business News

July 2, 2008 Wednesday

**SECTION:** STATE AND REGIONAL NEWS

**ACC-NO:** 20080702-MZ-Mesa-clarifies-policy-on-arrests-of-suspected-illegal-immigrants-0702

**LENGTH:** 661 words

**HEADLINE:** Mesa clarifies policy on arrests of suspected illegal immigrants

**BYLINE:** Sonu Munshi, The Tribune, Mesa, Ariz.

**BODY:**

Jul. 2--A revised city policy will require Mesa police to contact federal immigration authorities if they have reason to believe a person arrested is in the country illegally, Mayor Scott Smith confirmed Tuesday.

Currently, Mesa police ask prisoners about their immigration status and may contact the federal Immigration and Customs Enforcement agency if a prisoner admits to being in the country illegally.

"It's a better way to utilize ICE resources and for Mesa police to clarify a criminal's immigration status," Smith told the Tribune.

Officers will not be required to ask juveniles their immigration status.

Smith, along with police Chief George Gascon, are set to announce the policy details today. Smith did not say when the policy would be put in place, saying it depended on by when officers receive required training. He said the training would be in-house.

Smith noted the revised policy specifies there can be no racial profiling during stops or detentions. He said Mesa will continue its practice of not asking a crime victim, witness or anyone stopped or cited in connection with a routine civil traffic violation their immigration status.

"We're committed to prevent any biased profiling," Smith said. "This policy will simply be a guidebook for our officers who are in the front lines every day, giving them specific guidelines and tools."

Mesa's current policy does not allow police authorities to participate in enforcement of federal immigration laws. Police also are not allowed "to arrest or detain a person when the only violation is an infraction of a federal immigration law."

The mayor said the policy is "somewhat similar" to an immigration policy Phoenix outlined in May. Phoenix police Chief Jack Harris unveiled a policy whereby officers can contact federal authorities if they suspect a person is in the country illegally. Also, Phoenix officers can now ask the immigration status of everyone arrested.

Smith said an ideal situation would be to have more uniformity between departments.

"It would be great if there were regional standards that were comparable," Smith added, noting the policy will be monitored and adjusted in the coming months based on feedback.

"My primary concern is public safety," Smith said.

Police officials are welcoming the policy. "It's a workable, intelligent and practical plan that deals with the reality that Mesa faces currently," said Fabian Cota, president of the Mesa Police Association.

Cota said officers are being formally required to contact Immigration and Customs Enforcement, the federal authority, if they find a person to be in the country illegally. "It's something that's being done now, but there's no specific clause that it's required," Cota explained.

Mesa clarifies policy on arrests of suspected illegal immigrants East Valley Tribune (Mesa, Arizona) July 2, 2008 Wednesday

Cota said Mesa police do not routinely inquire the immigration status of those pulled over for civil traffic violations and of crime victims, which the new policy would prevent.

Cota said the association's concern has been that the city is without proper training and resources to deal with illegal immigration. He said the policy will be a useful tool.

"This policy will help Mesa police by at least making the expectations clear so our officers know exactly how to deal with these day-to-day situations," Cota said.

Mesa was told by federal officials recently it would be a while before they could provide special training for 10 detention officers to identify the immigration status of inmates. But under a temporary arrangement, Mesa will be able to draw on ICE resources to deal with criminal suspects who are in the country illegally.

To see more of The Tribune, or to subscribe to the newspaper, go to http://www.eastvalleytribune.com. Copyright (c) 2008, The Tribune, Mesa, Ariz. Distributed by McClatchy-Tribune Information Services. For reprints, email tmsreprints@permissionsgroup.com, call 800-374-7985 or 847-635-6550, send a fax to 847-635-6968, or write to The Permissions Group Inc., 1247 Milwaukee Ave., Suite 303, Glenview, IL 60025, USA.

**LOAD-DATE:** July 2, 2008

# Exhibit I-8

Council OKs police's immigration policy The Arizona Republic (Phoenix) July 5, 2008 Saturday

Copyright 2008 The Arizona Republic
All Rights Reserved
The Arizona Republic (Phoenix)

July 5, 2008 Saturday
Final Chaser Edition

**SECTION:** VALLEY & STATE; Pg. 2

**LENGTH:** 365 words

**HEADLINE:** Council OKs police's immigration policy

**BYLINE:** Gary Nelson, The Arizona Republic

**BODY:**

Mesa got a civics lesson to go along with its new immigration policy.

The City Council endorsed that policy in broad terms Thursday, seeking a couple of clarifications and stressing that the new procedures will always be a work in progress.

But the recurrent theme during a nearly two-hour discussion was that whatever Mesa police do, it must accord with the spirit of the Constitution.

Police Chief George Gascon laid out publicly, for the first time, details of a policy about which council members were briefed privately in recent days. The document will kick in after a four-month training period.

It says police must ask the immigration status of anyone being arrested and contact federal authorities if there's reason to believe the suspect is here illegally.

It also allows police, in some circumstances, to ask about the residency of people stopped but not taken into custody for more minor offenses. Federal agents may be contacted in those cases, too.

Beyond that, Mesa police will not be assuming a broader role in immigration enforcement.

Gascon said such enforcement is still, essentially, a federal job. And beyond that, Gascon said, there is the Constitution.

"We do play by certain rules," he said. "There are constitutional requirements that we have to follow. And contrary to what many believe, people that are in this country, even those that are here illegally, still have certain constitutional protections.

"Those are the rules we have to play by," he added. "And if we don't, we are subject not only to criminal liability but also civil liability ... not only for the officers but for the entire city."

One southeast Valley city got a taste of that liability in 1997. Chandler police were told that year to stop people who appeared to be Hispanic and ask about their residency status, leading to civil-rights complaints, a lawsuit and, eventually, more than $700,000 in legal costs for the city.

Mayor Scott Smith picked up on Gascon's theme Thursday.

Smith asked rhetorically, "Why don't we just sort of arrest everybody and let things fall out where they may?"

Gascon replied, "One of the things we want to ensure is that we, in doing our work, are protecting everybody's rights."

**LOAD-DATE:** July 6, 2008

# Exhibit I-9

AZPOST.GOV



### Welcome to the Arizona Peace Officer Standards and Training Board

**News:**

**For news and media inquiries:  -Click Here-**

The Arizona Peace Officer Standards and Training Board was created by an act of the 28th Arizona legislature on July 1, 1968 as the Arizona Law Enforcement Officer Advisory Council. The name was officially changed to its present form on July 17, 1994.

The Board was originally created to address the need for minimum peace officer selection, recruitment, retention and training standards, and to provide curriculum and standards for all certified law enforcement training facilities. The Board was also vested with the responsibility of administering the Peace Officer Training Fund.

In 1984, the legislature charged the Board with the added responsibilities of approving a state correctional officer training curriculum and establishing minimum standards for state correctional officers. Currently the Board provides services to approximately 170 law enforcement agencies encompassing over 15,000 sworn peace officers, 9,000 correctional service officers, and 16 academies.

The mission of the Arizona Peace Officer Standards and Training Board is to foster public trust and confidence by establishing and maintaining standards of integrity, competence, and professionalism for Arizona peace officers and correctional officers.

Our vision is to produce and maintain the most professional peace officers in America.

**E-Mail Arizona POST**
[Click Here]
We are interested in your comments. Please contact our Webmaster.
updated 0740 hrs (MST), August 8, 2012

Privacy Policy Accessibility      Policy Contact      Arizona POST   | © Copyright 2012 AZPOST.gov

Exhibit I-10

# National Council 118 - Immigration and Customs Enforcement
## American Federation of Government Employees (AFL-CIO)



# <u>VOTE OF NO CONFIDENCE</u>

### IN
### ICE DIRECTOR JOHN MORTON
### AND
### ICE ODPP ASSISTANT DIRECTOR PHYLLIS COVEN

### June 25, 2010



*For Immediate Release,*

On June 11, 2010, the National Immigration and Customs Enforcement Council and its constituent local representatives from around the nation, acting on behalf of approximately 7,000 ICE officers and employees from the ICE Office of Enforcement and Removal Operations (ERO), cast a unanimous **"Vote of No Confidence"** in the Director of Immigration and Customs Enforcement (ICE), John Morton, and the Assistant Director of the ICE Office of Detention Policy and Planning (ODPP), Phyllis Coven.

This action reflects the growing dissatisfaction and concern among ICE employees and Union leaders that Director John Morton and Assistant Director Phyllis Coven have abandoned the Agency's core mission of enforcing United States Immigration Laws and providing for public safety, and have instead directed their attention to campaigning for programs and policies related to amnesty and the creation of a special detention system for foreign nationals that exceeds the care and services provided to most United States citizens similarly incarcerated.

It is the desire of our union within ICE and our employees to publicly separate ourselves from the actions of Director Morton and Assistant Director Coven and publicly state that ICE officers and employees do not support Morton or Coven, or their misguided and reckless initiatives, which could ultimately put many in America at risk.

This **"Vote of No Confidence"** is in response to the policies and actions of Director Morton and Assistant Director Coven, some of which are listed and briefly discussed below.

- Senior ICE leadership dedicates more time to campaigning for immigration reforms aimed at large scale amnesty legislation, than advising the American public and Federal lawmakers on the severity of the illegal immigration problem, and the need for more manpower and resources within ICE ERO to address it.  ICE ERO is currently overwhelmed by the massive criminal alien problem in the United States resulting in the large-scale release of criminals back into local communities.

- Criminal aliens incarcerated in local jails seek out ICE officers and volunteer for deportation to avoid prosecution, conviction and serving prison sentences.  Criminal aliens openly brag to ICE officers that they are taking advantage of the broken immigration system and will be back in the United States within days to commit crimes, while United States citizens arrested for the same offenses serve prison sentences.  State and local law enforcement, prosecutors and jails are equally overwhelmed by the criminal alien problem and lack the resources to prosecute and house these prisoners, resulting in the release of criminal aliens back into local communities before making contact with ICE.  Thousands of other criminal aliens are released to ICE without being tried for their criminal charges.  ICE senior leadership is aware that the system is broken, yet refuses to alert Congress to the severity of the situation and request additional resources to provide better enforcement and support of local agencies.

- ICE is misleading the American public with regard to the effectiveness of criminal enforcement programs like the ICE "Secure Communities Program" using it as a selling point to move forward

with amnesty related legislation. As officers in the field, we know this program will not improve enforcement or provide for public safety because ICE refuses, for political reasons, to request the additional manpower and resources needed to adequately operate the program.

- While ICE reports internally that more than 90 percent of ICE detainees are first encountered by ICE in jails after they are arrested by local police for criminal charges, ICE senior leadership misrepresents this information publicly in order to portray ICE detainees as being non-criminal in nature to support the Administration's position on amnesty and relaxed security at ICE detention facilities.

- The majority of ICE ERO Officers are prohibited from making street arrests or enforcing United States immigration laws outside of the institutional (jail) setting. This has effectively created "amnesty through policy" for anyone illegally in the United States who has not been arrested by another agency for a criminal violation.

- With only a handful of officers nationwide authorized to enforce U.S. immigration laws, and demand for these officers higher than ever before, hundreds of ICE officers nationwide perform no law enforcement duties whatsoever because of resource mismanagement within the Agency. The remaining ICE officers who do perform enforcement functions spend a majority of their time performing non-law enforcement duties because ICE ERO lacks the support staff to perform related support functions.

- ICE Detention Reforms have transformed into a detention system aimed at providing resort like living conditions to criminal aliens. Senior ICE leadership excluded ICE officers and field managers (the technical experts on ICE detention) from the development of these reforms, and instead solicited recommendations from special interest groups. The lack of technical expertise and field experience has resulted in a priority of providing bingo nights, dance lessons and hanging plants to criminals, instead of addressing safe and responsible detention reforms for non-criminal individuals and families. Unlike any other agency in the nation, ICE officers will be prevented from searching detainees housed in ICE facilities allowing weapons, drugs and other contraband into detention centers putting detainees, ICE officers and contract guards at risk.

- ICE has virtually no consistent national policies. As a result, the Agency lacks adequate direction and managerial infrastructure. Operations suffer, accountability is nonexistent, and ICE is unable to perform at its potential.

- Senior leadership ignores reports that ICE internal investigations conducted under the auspices of the ICE Office of Professional Responsibility conceal Agency and supervisor misconduct and are used to retaliate against employees who make whistleblower type disclosures or question inappropriate policies and procedures.

It is our sincere belief that the integrity of the Agency as well as public safety will be better provided for in the absence of Director Morton and Assistant Director Coven.

Chris Crane
President
AFGE Council 118 ICE

# Exhibit I-11

Report Date/Time: 12/04/2006 01:16 PM

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Eligible Registration | 38,581 | 58,138 | 65,977 | 26,194 | 14,840 | 4,208 | 7,211 | 1,484,434 | 89,939 | 57,348 | 435,391 | 102,799 | 21,673 | 103,042 | 58,626 | 2,568,401 |
| Total Ballots Cast | 19,114 | 36,878 | 38,708 | 16,953 | 7,919 | 2,177 | 3,919 | 899,484 | 46,870 | 27,090 | 284,935 | 57,870 | 8,409 | 73,472 | 29,234 | 1,553,032 |
| Total Voter Turnout Percent | 49.54 | 63.43 | 58.67 | 64.72 | 53.36 | 51.73 | 54.35 | 60.59 | 52.11 | 47.24 | 65.44 | 56.29 | 38.80 | 71.30 | 49.87 | 60.47 |
| **PRECINCTS** | 45 | 64 | 85 | 39 | 18 | 8 | 12 | 1,142 | 73 | 70 | 409 | 74 | 24 | 104 | 42 | 2,209 |

**U.S. SENATOR**

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (DEM) Jim Pederson | 11,402 | 14,849 | 20,610 | 6,643 | 2,194 | 942 | 1,457 | 364,661 | 16,998 | 11,785 | 144,275 | 24,790 | 4,892 | 26,340 | 12,303 | 664,141 |
| (LBT) Richard Mack | 831 | 1,302 | 1,448 | 533 | 516 | 119 | 173 | 26,733 | 1,981 | 951 | 7,936 | 1,836 | 197 | 2,849 | 826 | 48,231 |
| (REP) Jon Kyl * | 6,530 | 20,194 | 16,003 | 9,512 | 5,127 | 1,068 | 2,203 | 491,721 | 26,964 | 13,927 | 128,987 | 30,379 | 3,067 | 43,219 | 15,497 | 814,398 |
| (Write-In) Stephen Baker (Write-In) | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | 7 |
| (Write-In) Ray Caplette (Write-In) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 5 |

**U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 1**

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (DEM) Ellen Simon | 9,276 | --- | 20,737 | 6,432 | 2,182 | 935 | --- | --- | --- | 10,098 | --- | 11,113 | --- | 27,918 | --- | 88,691 |
| (LBT) David Schlosser | 563 | --- | 1,899 | 709 | 266 | 73 | --- | --- | --- | 1,096 | --- | 991 | --- | 4,205 | --- | 9,802 |
| (REP) Rick Renzi * | 8,967 | --- | 15,124 | 9,396 | 5,359 | 1,097 | --- | --- | --- | 14,741 | --- | 11,312 | --- | 39,650 | --- | 105,646 |

**U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 2**

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (DEM) John Thrasher | --- | --- | 124 | --- | --- | --- | 8 | 72,780 | 16,323 | 436 | --- | --- | --- | 0 | --- | 89,671 |
| (LBT) Powell Gammill | --- | --- | 8 | --- | --- | --- | 1 | 4,114 | 1,574 | 37 | --- | --- | --- | 0 | --- | 5,734 |
| (REP) Trent Franks * | --- | --- | 40 | --- | --- | --- | 4 | 108,017 | 26,954 | 135 | --- | --- | --- | 0 | --- | 135,150 |
| (Write-In) William Crum (Write-In) | --- | --- | 0 | --- | --- | --- | 0 | 4 | 1 | 0 | --- | --- | --- | 0 | --- | 5 |

**U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 3**

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (DEM) Herb Paine | --- | --- | --- | --- | --- | --- | --- | 72,586 | --- | --- | --- | --- | --- | --- | --- | 72,586 |
| (LBT) Mark Yannone | --- | --- | --- | --- | --- | --- | --- | 4,744 | --- | --- | --- | --- | --- | --- | --- | 4,744 |
| (REP) John Shadegg * | --- | --- | --- | --- | --- | --- | --- | 112,519 | --- | --- | --- | --- | --- | --- | --- | 112,519 |

**U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 4**

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (DEM) Ed Pastor * | --- | --- | --- | --- | --- | --- | --- | 56,464 | --- | --- | --- | --- | --- | --- | --- | 56,464 |
| (LBT) Ronald Harders | --- | --- | --- | --- | --- | --- | --- | 2,770 | --- | --- | --- | --- | --- | --- | --- | 2,770 |
| (REP) Don Karg | --- | --- | --- | --- | --- | --- | --- | 18,627 | --- | --- | --- | --- | --- | --- | --- | 18,627 |

* Elected

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 5** | | | | | | | | | | | | | | | | |
| (DEM) Harry Mitchell * | --- | --- | --- | --- | --- | --- | --- | 101,838 | --- | --- | --- | --- | --- | --- | --- | 101,838 |
| (LBT) Warren Severin | --- | --- | --- | --- | --- | --- | --- | 6,357 | --- | --- | --- | --- | --- | --- | --- | 6,357 |
| (REP) J.D. Hayworth | --- | --- | --- | --- | --- | --- | --- | 93,815 | --- | --- | --- | --- | --- | --- | --- | 93,815 |
| **U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 6** | | | | | | | | | | | | | | | | |
| (LBT) Jason M. Blair | --- | --- | --- | --- | --- | --- | --- | 45,802 | --- | --- | --- | 5,483 | --- | --- | --- | 51,285 |
| (REP) Jeff Flake * | --- | --- | --- | --- | --- | --- | --- | 137,777 | --- | --- | --- | 14,424 | --- | --- | --- | 152,201 |
| **U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 7** | | | | | | | | | | | | | | | | |
| (DEM) Raul M. Grijalva * | --- | --- | --- | --- | --- | --- | 1,552 | 8,626 | --- | --- | 49,850 | 2,687 | 4,442 | --- | 13,197 | 80,354 |
| (LBT) Joe Cobb | --- | --- | --- | --- | --- | --- | 199 | 664 | --- | --- | 2,386 | 208 | 107 | --- | 1,109 | 4,673 |
| (REP) Ron Drake | --- | --- | --- | --- | --- | --- | 1,921 | 8,637 | --- | --- | 17,921 | 2,773 | 1,436 | --- | 13,810 | 46,498 |
| **U.S. REPRESENTATIVE IN CONGRESS - DISTRICT NO. 8** | | | | | | | | | | | | | | | | |
| (DEM) Gabrielle Giffords * | --- | 17,889 | --- | --- | --- | --- | --- | --- | --- | --- | 116,043 | 2,449 | 1,274 | --- | --- | 137,655 |
| (IND) Jay Quick | --- | 783 | --- | --- | --- | --- | --- | --- | --- | --- | 3,523 | 62 | 40 | --- | --- | 4,408 |
| (LBT) David F. Nolan | --- | 722 | --- | --- | --- | --- | --- | --- | --- | --- | 4,037 | 62 | 28 | --- | --- | 4,849 |
| (REP) Randy Graf | --- | 16,807 | --- | --- | --- | --- | --- | --- | --- | --- | 86,386 | 2,725 | 872 | --- | --- | 106,790 |
| (Write-In) Russ Dove (Write-In) | --- | 0 | --- | --- | --- | --- | --- | --- | --- | --- | 7 | 0 | 0 | --- | --- | 7 |
| (Write-In) Leo F. Kimminau, Sr. (Write-In) | --- | 0 | --- | --- | --- | --- | --- | --- | --- | --- | 4 | 0 | 0 | --- | --- | 4 |
| (Write-In) Paul Price (Write-In) | --- | 5 | --- | --- | --- | --- | --- | --- | --- | --- | 2 | 0 | 0 | --- | --- | 7 |
| **GOVERNOR** | | | | | | | | | | | | | | | | |
| (DEM) Janet Napolitano * | 14,475 | 21,416 | 28,551 | 10,586 | 4,348 | 1,486 | 2,353 | 538,383 | 25,400 | 17,368 | 195,305 | 35,428 | 6,482 | 40,848 | 17,401 | 959,830 |
| (LBT) Barry J. Hess, II | 692 | 922 | 872 | 358 | 161 | 58 | 138 | 16,888 | 1,129 | 658 | 4,794 | 1,116 | 160 | 1,587 | 735 | 30,268 |
| (REP) Len Munsil | 3,627 | 14,038 | 8,879 | 5,803 | 3,306 | 588 | 1,342 | 332,570 | 19,588 | 8,708 | 82,052 | 20,716 | 1,634 | 30,203 | 10,474 | 543,528 |
| (Write-In) Arthur Ray Arvizu (Write-In) | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10 |
| (Write-In) Robert B. Winn (Write-In) | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 3 |
| (Write-In) Brian Wright (Write-In) | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 6 |
| **STATE SENATOR - DISTRICT NO. 1** | | | | | | | | | | | | | | | | |
| (DEM) Jo Kelleher | --- | --- | 4,882 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 20,613 | --- | 25,495 |
| (LBT) Terry Dunn | --- | --- | 564 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 2,323 | --- | 2,887 |

* Elected

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (REP) Tom O'Halleran * | --- | --- | 6,012 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 38,701 | --- | 44,713 |
| **STATE SENATOR - DISTRICT NO. 2** | | | | | | | | | | | | | | | | |
| (DEM) Albert Hale  * | 10,675 | --- | 14,119 | --- | --- | --- | --- | --- | 72 | 5,865 | --- | --- | --- | 0 | --- | 30,731 |
| (MARK HAUGHWOUT) Mark Haughwout | 696 | --- | 1,720 | --- | --- | --- | --- | --- | 6 | 341 | --- | --- | --- | 0 | --- | 2,763 |
| (REP) Royce Jenkins | 2,115 | --- | 6,629 | --- | --- | --- | --- | --- | 31 | 1,319 | --- | --- | --- | 0 | --- | 10,094 |
| **STATE SENATOR - DISTRICT NO. 3** | | | | | | | | | | | | | | | | |
| (DEM) Noah Harris | --- | --- | 948 | --- | --- | --- | 693 | --- | 16,830 | --- | --- | --- | --- | --- | --- | 18,471 |
| (REP) Ron Gould * | --- | --- | 1,314 | --- | --- | --- | 1,130 | --- | 27,513 | --- | --- | --- | --- | --- | --- | 29,957 |
| **STATE SENATOR - DISTRICT NO. 4** | | | | | | | | | | | | | | | | |
| (DEM) Ed Gogek | --- | --- | --- | --- | --- | --- | --- | 30,634 | --- | --- | --- | --- | --- | 3,267 | --- | 33,901 |
| (REP) Jack Harper * | --- | --- | --- | --- | --- | --- | --- | 43,471 | --- | --- | --- | --- | --- | 5,478 | --- | 48,949 |
| **STATE SENATOR - DISTRICT NO. 5** | | | | | | | | | | | | | | | | |
| (DEM) Phil Cobb | 1,689 | --- | 0 | 6,567 | 2,615 | 1,051 | --- | --- | --- | 7,500 | --- | 0 | --- | --- | --- | 19,422 |
| (REP) Jake Flake * | 3,422 | --- | 0 | 9,464 | 5,093 | 1,024 | --- | --- | --- | 11,319 | --- | 0 | --- | --- | --- | 30,322 |
| **STATE SENATOR - DISTRICT NO. 6** | | | | | | | | | | | | | | | | |
| (DEM) Jim Larson | --- | --- | --- | --- | --- | --- | --- | 21,477 | --- | --- | --- | --- | --- | --- | --- | 21,477 |
| (REP) Pamela Gorman * | --- | --- | --- | --- | --- | --- | --- | 29,255 | --- | --- | --- | --- | --- | --- | --- | 29,255 |
| **STATE SENATOR - DISTRICT NO. 7** | | | | | | | | | | | | | | | | |
| (DEM) Lisa Black | --- | --- | --- | --- | --- | --- | --- | 23,860 | --- | --- | --- | --- | --- | --- | --- | 23,860 |
| (REP) Jim Waring * | --- | --- | --- | --- | --- | --- | --- | 31,735 | --- | --- | --- | --- | --- | --- | --- | 31,735 |
| **STATE SENATOR - DISTRICT NO. 8** | | | | | | | | | | | | | | | | |
| (DEM) Dan Oseran | --- | --- | --- | --- | --- | --- | --- | 24,029 | --- | --- | --- | --- | --- | --- | --- | 24,029 |
| (REP) Carolyn S. Allen * | --- | --- | --- | --- | --- | --- | --- | 44,011 | --- | --- | --- | --- | --- | --- | --- | 44,011 |
| **STATE SENATOR - DISTRICT NO. 9** | | | | | | | | | | | | | | | | |
| (DEM) Steve Poe | --- | --- | --- | --- | --- | --- | --- | 24,623 | --- | --- | --- | --- | --- | --- | --- | 24,623 |
| (REP) Robert "Bob" Burns * | --- | --- | --- | --- | --- | --- | --- | 29,430 | --- | --- | --- | --- | --- | --- | --- | 29,430 |

* Elected

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE SENATOR - DISTRICT NO. 10** | | | | | | | | | | | | | | | | |
| (DEM) Martin James Monroe | --- | --- | --- | --- | --- | --- | --- | 15,416 | --- | --- | --- | --- | --- | --- | --- | 15,416 |
| (REP) Linda Gray * | --- | --- | --- | --- | --- | --- | --- | 20,040 | --- | --- | --- | --- | --- | --- | --- | 20,040 |
| **STATE SENATOR - DISTRICT NO. 11** | | | | | | | | | | | | | | | | |
| (DEM) Ann Wallack | --- | --- | --- | --- | --- | --- | --- | 28,183 | --- | --- | --- | --- | --- | --- | --- | 28,183 |
| (REP) Barbara Leff * | --- | --- | --- | --- | --- | --- | --- | 34,533 | --- | --- | --- | --- | --- | --- | --- | 34,533 |
| **STATE SENATOR - DISTRICT NO. 12** | | | | | | | | | | | | | | | | |
| (REP) Robert Blendu * | --- | --- | --- | --- | --- | --- | --- | 39,627 | --- | --- | --- | --- | --- | --- | --- | 39,627 |
| **STATE SENATOR - DISTRICT NO. 13** | | | | | | | | | | | | | | | | |
| (DEM) Richard Miranda * | --- | --- | --- | --- | --- | --- | --- | 13,979 | --- | --- | --- | --- | --- | --- | --- | 13,979 |
| **STATE SENATOR - DISTRICT NO. 14** | | | | | | | | | | | | | | | | |
| (DEM) Debbie McCune-Davis * | --- | --- | --- | --- | --- | --- | --- | 11,003 | --- | --- | --- | --- | --- | --- | --- | 11,003 |
| **STATE SENATOR - DISTRICT NO. 15** | | | | | | | | | | | | | | | | |
| (DEM) Ken Cheuvront * | --- | --- | --- | --- | --- | --- | --- | 18,797 | --- | --- | --- | --- | --- | --- | --- | 18,797 |
| (REP) Andrew Smigielski | --- | --- | --- | --- | --- | --- | --- | 8,164 | --- | --- | --- | --- | --- | --- | --- | 8,164 |
| **STATE SENATOR - DISTRICT NO. 16** | | | | | | | | | | | | | | | | |
| (DEM) Leah Landrum * | --- | --- | --- | --- | --- | --- | --- | 17,800 | --- | --- | --- | --- | --- | --- | --- | 17,800 |
| (REP) Daniel Veres | --- | --- | --- | --- | --- | --- | --- | 6,636 | --- | --- | --- | --- | --- | --- | --- | 6,636 |
| **STATE SENATOR - DISTRICT NO. 17** | | | | | | | | | | | | | | | | |
| (DEM) Meg Burton-Cahill * | --- | --- | --- | --- | --- | --- | --- | 26,285 | --- | --- | --- | --- | --- | --- | --- | 26,285 |
| (REP) Rose Crutcher | --- | --- | --- | --- | --- | --- | --- | 15,530 | --- | --- | --- | --- | --- | --- | --- | 15,530 |
| **STATE SENATOR - DISTRICT NO. 18** | | | | | | | | | | | | | | | | |
| (LBT) Rachel Kielsky | --- | --- | --- | --- | --- | --- | --- | 8,429 | --- | --- | --- | --- | --- | --- | --- | 8,429 |
| (REP) Karen S. Johnson * | --- | --- | --- | --- | --- | --- | --- | 20,122 | --- | --- | --- | --- | --- | --- | --- | 20,122 |

* Elected

Report Date/Time: 12/04/2006 01:16 PM

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE SENATOR - DISTRICT NO. 19** | | | | | | | | | | | | | | | | |
| (DEM) Steven Zachary | --- | --- | --- | --- | --- | --- | --- | 21,450 | --- | --- | --- | --- | --- | --- | --- | 21,450 |
| (REP) Chuck Gray * | --- | --- | --- | --- | --- | --- | --- | 34,262 | --- | --- | --- | --- | --- | --- | --- | 34,262 |
| **STATE SENATOR - DISTRICT NO. 20** | | | | | | | | | | | | | | | | |
| (DEM) Donna Gratehouse | --- | --- | --- | --- | --- | --- | --- | 25,603 | --- | --- | --- | --- | --- | --- | --- | 25,603 |
| (REP) John Huppenthal * | --- | --- | --- | --- | --- | --- | --- | 28,868 | --- | --- | --- | --- | --- | --- | --- | 28,868 |
| **STATE SENATOR - DISTRICT NO. 21** | | | | | | | | | | | | | | | | |
| (REP) Jay Tibshraeny * | --- | --- | --- | --- | --- | --- | --- | 48,318 | --- | --- | --- | --- | --- | --- | --- | 48,318 |
| **STATE SENATOR - DISTRICT NO. 22** | | | | | | | | | | | | | | | | |
| (DEM) Glenn A. Ray | --- | --- | --- | --- | --- | --- | --- | 23,756 | --- | --- | --- | 3,582 | --- | --- | --- | 27,338 |
| (REP) Thayer Verschoor * | --- | --- | --- | --- | --- | --- | --- | 35,321 | --- | --- | --- | 3,993 | --- | --- | --- | 39,314 |
| **STATE SENATOR - DISTRICT NO. 23** | | | | | | | | | | | | | | | | |
| (DEM) Rebecca Rios * | --- | --- | --- | 300 | --- | --- | --- | 2,016 | --- | --- | --- | 21,821 | --- | --- | --- | 24,137 |
| (REP) Cheryl Chase | --- | --- | --- | 31 | --- | --- | --- | 968 | --- | --- | --- | 19,876 | --- | --- | --- | 20,875 |
| **STATE SENATOR - DISTRICT NO. 24** | | | | | | | | | | | | | | | | |
| (DEM) Amanda Aguirre * | --- | --- | --- | --- | --- | --- | 979 | --- | --- | --- | --- | --- | --- | --- | 13,842 | 14,821 |
| (REFORM PARTY) Stanley Lenihan | --- | --- | --- | --- | --- | --- | 66 | --- | --- | --- | --- | --- | --- | --- | 861 | 927 |
| (REP) Russ Jones | --- | --- | --- | --- | --- | --- | 807 | --- | --- | --- | --- | --- | --- | --- | 13,741 | 14,548 |
| **STATE SENATOR - DISTRICT NO. 25** | | | | | | | | | | | | | | | | |
| (DEM) Marsha Arzberger * | --- | 13,492 | --- | --- | --- | --- | --- | 581 | --- | --- | 7,646 | 562 | 4,177 | --- | --- | 26,458 |
| (REP) Mary Ann Black | --- | 10,338 | --- | --- | --- | --- | --- | 746 | --- | --- | 6,242 | 634 | 1,523 | --- | --- | 19,483 |
| **STATE SENATOR - DISTRICT NO. 26** | | | | | | | | | | | | | | | | |
| (DEM) Charlene Pesquiera * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 33,946 | 2,123 | --- | --- | --- | 36,069 |
| (REP) Al Melvin | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 32,530 | 3,084 | --- | --- | --- | 35,614 |
| **STATE SENATOR - DISTRICT NO. 27** | | | | | | | | | | | | | | | | |
| (DEM) Jorge Luis Garcia * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 31,484 | --- | --- | --- | --- | 31,484 |

* Elected

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE SENATOR - DISTRICT NO. 28** | | | | | | | | | | | | | | | | |
| (DEM) Paula Aboud * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 40,878 | --- | --- | --- | --- | 40,878 |
| (Write-In) J. Michael Steimer (Write-In) | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 30 | --- | --- | --- | --- | 30 |
| **STATE SENATOR - DISTRICT NO. 29** | | | | | | | | | | | | | | | | |
| (DEM) Victor Soltero * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 24,579 | --- | --- | --- | --- | 24,579 |
| **STATE SENATOR - DISTRICT NO. 30** | | | | | | | | | | | | | | | | |
| (DEM) Jeffrey "Jeff" Chimene | --- | 3,937 | --- | --- | --- | --- | --- | --- | --- | --- | 25,800 | --- | 1,015 | --- | --- | 30,752 |
| (REP) Tim Bee * | --- | 7,615 | --- | --- | --- | --- | --- | --- | --- | --- | 40,563 | --- | 1,090 | --- | --- | 49,268 |
| **STATE REPRESENTATIVE - DISTRICT NO. 1** | | | | | | | | | | | | | | | | |
| (DEM) Wesley Edmonds | --- | --- | 5,350 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 22,022 | --- | 27,372 |
| (GEORGE SEAMAN) George Seaman | --- | --- | 1,995 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 10,442 | --- | 12,437 |
| (REP) Lucy Mason * | --- | --- | 5,034 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 34,368 | --- | 39,402 |
| (REP) Andy Tobin * | --- | --- | 4,503 | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 30,083 | --- | 34,586 |
| **STATE REPRESENTATIVE - DISTRICT NO. 2** | | | | | | | | | | | | | | | | |
| (DEM) Ann Kirkpatrick * | 7,339 | --- | 15,155 | --- | --- | --- | --- | --- | 70 | 4,223 | --- | --- | --- | 0 | --- | 26,787 |
| (DEM) Albert Tom * | 9,276 | --- | 9,028 | --- | --- | --- | --- | --- | 47 | 4,512 | --- | --- | --- | 0 | --- | 22,863 |
| (REP) Preston J. Korn | 1,714 | --- | 6,603 | --- | --- | --- | --- | --- | 11 | 919 | --- | --- | --- | 0 | --- | 9,247 |
| **STATE REPRESENTATIVE - DISTRICT NO. 3** | | | | | | | | | | | | | | | | |
| (DEM) Luis Lopez | --- | --- | 959 | --- | --- | --- | 681 | --- | 16,019 | --- | --- | --- | --- | --- | --- | 17,659 |
| (REP) Trish Groe * | --- | --- | 925 | --- | --- | --- | 925 | --- | 22,597 | --- | --- | --- | --- | --- | --- | 24,447 |
| (REP) Nancy McLain * | --- | --- | 1,260 | --- | --- | --- | 770 | --- | 22,271 | --- | --- | --- | --- | --- | --- | 24,301 |
| **STATE REPRESENTATIVE - DISTRICT NO. 4** | | | | | | | | | | | | | | | | |
| (DEM) Debra Boehlke | --- | --- | --- | --- | --- | --- | --- | 28,050 | --- | --- | --- | --- | --- | 2,652 | --- | 30,702 |
| (DEM) Sue Dolphin | --- | --- | --- | --- | --- | --- | --- | 24,999 | --- | --- | --- | --- | --- | 2,688 | --- | 27,687 |
| (REP) Tom Boone * | --- | --- | --- | --- | --- | --- | --- | 40,275 | --- | --- | --- | --- | --- | 5,034 | --- | 45,309 |
| (REP) Judy M. Burges * | --- | --- | --- | --- | --- | --- | --- | 38,895 | --- | --- | --- | --- | --- | 5,024 | --- | 43,919 |

* Elected

Report Date/Time: 12/04/2006 01:16 PM

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE REPRESENTATIVE - DISTRICT NO. 5** | | | | | | | | | | | | | | | | |
| (DEM) Jack A. Brown * | 2,670 | --- | 0 | 8,247 | 3,595 | 1,336 | --- | --- | --- | 9,349 | --- | 0 | --- | --- | --- | 25,197 |
| (REP) Bill Konopnicki * | 3,152 | --- | 0 | 8,881 | 5,232 | 1,014 | --- | --- | --- | 11,114 | --- | 0 | --- | --- | --- | 29,393 |
| **STATE REPRESENTATIVE - DISTRICT NO. 6** | | | | | | | | | | | | | | | | |
| (REP) Doug Clark * | --- | --- | --- | --- | --- | --- | --- | 29,526 | --- | --- | --- | --- | --- | --- | --- | 29,526 |
| (REP) Sam Crump * | --- | --- | --- | --- | --- | --- | --- | 27,861 | --- | --- | --- | --- | --- | --- | --- | 27,861 |
| **STATE REPRESENTATIVE - DISTRICT NO. 7** | | | | | | | | | | | | | | | | |
| (DEM) Marilyn Fox | --- | --- | --- | --- | --- | --- | --- | 21,143 | --- | --- | --- | --- | --- | --- | --- | 21,143 |
| (DEM) Jeanne Lunn | --- | --- | --- | --- | --- | --- | --- | 19,601 | --- | --- | --- | --- | --- | --- | --- | 19,601 |
| (LBT) Jim Iannuzo | --- | --- | --- | --- | --- | --- | --- | 2,128 | --- | --- | --- | --- | --- | --- | --- | 2,128 |
| (REP) Ray Barnes * | --- | --- | --- | --- | --- | --- | --- | 27,897 | --- | --- | --- | --- | --- | --- | --- | 27,897 |
| (REP) Nancy Barto * | --- | --- | --- | --- | --- | --- | --- | 29,952 | --- | --- | --- | --- | --- | --- | --- | 29,952 |
| **STATE REPRESENTATIVE - DISTRICT NO. 8** | | | | | | | | | | | | | | | | |
| (DEM) Stephanie Rimmer | --- | --- | --- | --- | --- | --- | --- | 26,684 | --- | --- | --- | --- | --- | --- | --- | 26,684 |
| (DEM) H. William Sandberg | --- | --- | --- | --- | --- | --- | --- | 19,931 | --- | --- | --- | --- | --- | --- | --- | 19,931 |
| (REP) John Kavanagh * | --- | --- | --- | --- | --- | --- | --- | 35,260 | --- | --- | --- | --- | --- | --- | --- | 35,260 |
| (REP) Michele Reagan * | --- | --- | --- | --- | --- | --- | --- | 40,118 | --- | --- | --- | --- | --- | --- | --- | 40,118 |
| **STATE REPRESENTATIVE - DISTRICT NO. 9** | | | | | | | | | | | | | | | | |
| (DEM) Sheri Van Horsen | --- | --- | --- | --- | --- | --- | --- | 23,457 | --- | --- | --- | --- | --- | --- | --- | 23,457 |
| (REP) Rick Murphy * | --- | --- | --- | --- | --- | --- | --- | 24,208 | --- | --- | --- | --- | --- | --- | --- | 24,208 |
| (REP) Bob Stump * | --- | --- | --- | --- | --- | --- | --- | 28,475 | --- | --- | --- | --- | --- | --- | --- | 28,475 |
| **STATE REPRESENTATIVE - DISTRICT NO. 10** | | | | | | | | | | | | | | | | |
| (DEM) Lamont Lovejoy | --- | --- | --- | --- | --- | --- | --- | 12,100 | --- | --- | --- | --- | --- | --- | --- | 12,100 |
| (DEM) Jackie Thrasher * | --- | --- | --- | --- | --- | --- | --- | 16,735 | --- | --- | --- | --- | --- | --- | --- | 16,735 |
| (REP) Doug Quelland | --- | --- | --- | --- | --- | --- | --- | 16,504 | --- | --- | --- | --- | --- | --- | --- | 16,504 |
| (REP) James Weiers * | --- | --- | --- | --- | --- | --- | --- | 17,093 | --- | --- | --- | --- | --- | --- | --- | 17,093 |

* Elected

Report Date/Time: 12/04/2006 01:16 PM

## STATE OF ARIZONA OFFICIAL CANVASS

Page Number 8

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE REPRESENTATIVE - DISTRICT NO. 11** | | | | | | | | | | | | | | | | |
| (DEM) Mark Anthony Desimone * | --- | --- | --- | --- | --- | --- | --- | 28,470 | --- | --- | --- | --- | --- | --- | --- | 28,470 |
| (REP) Adam Driggs * | --- | --- | --- | --- | --- | --- | --- | 29,505 | --- | --- | --- | --- | --- | --- | --- | 29,505 |
| (REP) Don Hesselbrock | --- | --- | --- | --- | --- | --- | --- | 27,353 | --- | --- | --- | --- | --- | --- | --- | 27,353 |
| **STATE REPRESENTATIVE - DISTRICT NO. 12** | | | | | | | | | | | | | | | | |
| (REP) John Nelson * | --- | --- | --- | --- | --- | --- | --- | 32,493 | --- | --- | --- | --- | --- | --- | --- | 32,493 |
| (REP) Jerry Weiers * | --- | --- | --- | --- | --- | --- | --- | 29,560 | --- | --- | --- | --- | --- | --- | --- | 29,560 |
| **STATE REPRESENTATIVE - DISTRICT NO. 13** | | | | | | | | | | | | | | | | |
| (DEM) Steve Gallardo * | --- | --- | --- | --- | --- | --- | --- | 9,814 | --- | --- | --- | --- | --- | --- | --- | 9,814 |
| (DEM) Martha Garcia * | --- | --- | --- | --- | --- | --- | --- | 10,642 | --- | --- | --- | --- | --- | --- | --- | 10,642 |
| **STATE REPRESENTATIVE - DISTRICT NO. 14** | | | | | | | | | | | | | | | | |
| (DEM) Chad Campbell * | --- | --- | --- | --- | --- | --- | --- | 7,560 | --- | --- | --- | --- | --- | --- | --- | 7,560 |
| (DEM) Robert Meza * | --- | --- | --- | --- | --- | --- | --- | 8,172 | --- | --- | --- | --- | --- | --- | --- | 8,172 |
| (LBT) Mike Renzulli | --- | --- | --- | --- | --- | --- | --- | 1,169 | --- | --- | --- | --- | --- | --- | --- | 1,169 |
| (REP) John Stevens | --- | --- | --- | --- | --- | --- | --- | 4,469 | --- | --- | --- | --- | --- | --- | --- | 4,469 |
| **STATE REPRESENTATIVE - DISTRICT NO. 15** | | | | | | | | | | | | | | | | |
| (DEM) David Lujan * | --- | --- | --- | --- | --- | --- | --- | 15,951 | --- | --- | --- | --- | --- | --- | --- | 15,951 |
| (DEM) Kyrsten Sinema * | --- | --- | --- | --- | --- | --- | --- | 15,723 | --- | --- | --- | --- | --- | --- | --- | 15,723 |
| (LBT) Richard Buck | --- | --- | --- | --- | --- | --- | --- | 1,499 | --- | --- | --- | --- | --- | --- | --- | 1,499 |
| (REP) Robert Gear | --- | --- | --- | --- | --- | --- | --- | 7,689 | --- | --- | --- | --- | --- | --- | --- | 7,689 |
| (REP) William Wheat | --- | --- | --- | --- | --- | --- | --- | 7,305 | --- | --- | --- | --- | --- | --- | --- | 7,305 |
| **STATE REPRESENTATIVE - DISTRICT NO. 16** | | | | | | | | | | | | | | | | |
| (DEM) Cloves C. Campbell, Jr. * | --- | --- | --- | --- | --- | --- | --- | 12,356 | --- | --- | --- | --- | --- | --- | --- | 12,356 |
| (DEM) Ben R. Miranda * | --- | --- | --- | --- | --- | --- | --- | 13,182 | --- | --- | --- | --- | --- | --- | --- | 13,182 |
| (REP) Daniel Coleman | --- | --- | --- | --- | --- | --- | --- | 6,469 | --- | --- | --- | --- | --- | --- | --- | 6,469 |

* Elected

Report Date/Time: 12/04/2006 01:16 PM

## STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE REPRESENTATIVE - DISTRICT NO. 17** | | | | | | | | | | | | | | | | |
| (DEM) Ed Ableser * | --- | --- | --- | --- | --- | --- | --- | 21,170 | --- | --- | --- | --- | --- | --- | --- | 21,170 |
| (DEM) David Schapira * | --- | --- | --- | --- | --- | --- | --- | 21,035 | --- | --- | --- | --- | --- | --- | --- | 21,035 |
| (REP) Dale Despain | --- | --- | --- | --- | --- | --- | --- | 14,883 | --- | --- | --- | --- | --- | --- | --- | 14,883 |
| (REP) Laura Knaperek | --- | --- | --- | --- | --- | --- | --- | 18,407 | --- | --- | --- | --- | --- | --- | --- | 18,407 |
| **STATE REPRESENTATIVE - DISTRICT NO. 18** | | | | | | | | | | | | | | | | |
| (DEM) Tammie Pursley | --- | --- | --- | --- | --- | --- | --- | 13,083 | --- | --- | --- | --- | --- | --- | --- | 13,083 |
| (REP) Mark Anderson * | --- | --- | --- | --- | --- | --- | --- | 16,196 | --- | --- | --- | --- | --- | --- | --- | 16,196 |
| (REP) Russell Pearce * | --- | --- | --- | --- | --- | --- | --- | 15,139 | --- | --- | --- | --- | --- | --- | --- | 15,139 |
| **STATE REPRESENTATIVE - DISTRICT NO. 19** | | | | | | | | | | | | | | | | |
| (DEM) Lara Wibeto | --- | --- | --- | --- | --- | --- | --- | 22,319 | --- | --- | --- | --- | --- | --- | --- | 22,319 |
| (REP) Kirk Adams * | --- | --- | --- | --- | --- | --- | --- | 28,288 | --- | --- | --- | --- | --- | --- | --- | 28,288 |
| (REP) Rich Crandall * | --- | --- | --- | --- | --- | --- | --- | 29,273 | --- | --- | --- | --- | --- | --- | --- | 29,273 |
| **STATE REPRESENTATIVE - DISTRICT NO. 20** | | | | | | | | | | | | | | | | |
| (LBT) Jack Heald | --- | --- | --- | --- | --- | --- | --- | 12,857 | --- | --- | --- | --- | --- | --- | --- | 12,857 |
| (REP) John McComish * | --- | --- | --- | --- | --- | --- | --- | 29,531 | --- | --- | --- | --- | --- | --- | --- | 29,531 |
| (REP) Bob Robson * | --- | --- | --- | --- | --- | --- | --- | 26,963 | --- | --- | --- | --- | --- | --- | --- | 26,963 |
| **STATE REPRESENTATIVE - DISTRICT NO. 21** | | | | | | | | | | | | | | | | |
| (DEM) Phil Hettmansperger | --- | --- | --- | --- | --- | --- | --- | 27,490 | --- | --- | --- | --- | --- | --- | --- | 27,490 |
| (REP) Warde V. Nichols * | --- | --- | --- | --- | --- | --- | --- | 28,353 | --- | --- | --- | --- | --- | --- | --- | 28,353 |
| (REP) Steve Yarbrough * | --- | --- | --- | --- | --- | --- | --- | 34,703 | --- | --- | --- | --- | --- | --- | --- | 34,703 |
| **STATE REPRESENTATIVE - DISTRICT NO. 22** | | | | | | | | | | | | | | | | |
| (LBT) Edward Schwebel | --- | --- | --- | --- | --- | --- | --- | 15,135 | --- | --- | --- | 2,038 | --- | --- | --- | 17,173 |
| (REP) Andy Biggs * | --- | --- | --- | --- | --- | --- | --- | 34,208 | --- | --- | --- | 3,877 | --- | --- | --- | 38,085 |
| (REP) Eddie Farnsworth * | --- | --- | --- | --- | --- | --- | --- | 34,557 | --- | --- | --- | 4,260 | --- | --- | --- | 38,817 |

* Elected

Report Date/Time: 12/04/2006 01:16 PM

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE REPRESENTATIVE - DISTRICT NO. 23** | | | | | | | | | | | | | | | | |
| (DEM) Barbara McGuire * | --- | --- | --- | 264 | --- | --- | --- | 1,293 | --- | --- | --- | 16,493 | --- | --- | --- | 18,050 |
| (DEM) Pete Rios * | --- | --- | --- | 293 | --- | --- | --- | 1,729 | --- | --- | --- | 19,462 | --- | --- | --- | 21,484 |
| (REP) John Fillmore | --- | --- | --- | 15 | --- | --- | --- | 829 | --- | --- | --- | 15,886 | --- | --- | --- | 16,730 |
| (REP) Frank Pratt | --- | --- | --- | 10 | --- | --- | --- | 803 | --- | --- | --- | 16,943 | --- | --- | --- | 17,756 |
| **STATE REPRESENTATIVE - DISTRICT NO. 24** | | | | | | | | | | | | | | | | |
| (DEM) Lynne Pancrazi * | --- | --- | --- | --- | --- | --- | 731 | --- | --- | --- | --- | --- | --- | --- | 14,152 | 14,883 |
| (DEM) Theresa Ulmer * | --- | --- | --- | --- | --- | --- | 755 | --- | --- | --- | --- | --- | --- | --- | 11,225 | 11,980 |
| (REFORM PARTY) Rodney Martin | --- | --- | --- | --- | --- | --- | 85 | --- | --- | --- | --- | --- | --- | --- | 1,431 | 1,516 |
| (REP) Joseph "Mel" Melchionne | --- | --- | --- | --- | --- | --- | 749 | --- | --- | --- | --- | --- | --- | --- | 10,668 | 11,417 |
| (REP) Ken Rosevear | --- | --- | --- | --- | --- | --- | 679 | --- | --- | --- | --- | --- | --- | --- | 11,143 | 11,822 |
| **STATE REPRESENTATIVE - DISTRICT NO. 25** | | | | | | | | | | | | | | | | |
| (BILL DORE) Bill Dore | --- | 714 | --- | --- | --- | --- | --- | 76 | --- | --- | 427 | 46 | 84 | --- | --- | 1,347 |
| (DEM) Manuel V. "Manny" Alvarez * | --- | 10,351 | --- | --- | --- | --- | --- | 500 | --- | --- | 6,245 | 449 | 3,931 | --- | --- | 21,476 |
| (DEM) Patricia Fleming | --- | 8,685 | --- | --- | --- | --- | --- | 434 | --- | --- | 5,952 | 484 | 2,963 | --- | --- | 18,518 |
| (REP) Jennifer J. Burns * | --- | 9,960 | --- | --- | --- | --- | --- | 721 | --- | --- | 6,559 | 565 | 1,497 | --- | --- | 19,302 |
| (REP) Gail Griffin | --- | 10,683 | --- | --- | --- | --- | --- | 575 | --- | --- | 5,444 | 531 | 1,265 | --- | --- | 18,498 |
| **STATE REPRESENTATIVE - DISTRICT NO. 26** | | | | | | | | | | | | | | | | |
| (DEM) Lena S. Saradnik * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 32,422 | 2,098 | --- | --- | --- | 34,520 |
| (REP) Pete Hershberger * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 37,160 | 2,573 | --- | --- | --- | 39,733 |
| (REP) David A. Jorgenson | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 26,594 | 2,673 | --- | --- | --- | 29,267 |
| **STATE REPRESENTATIVE - DISTRICT NO. 27** | | | | | | | | | | | | | | | | |
| (DEM) Olivia Cajero Bedford * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 24,756 | --- | --- | --- | --- | 24,756 |
| (DEM) Phil Lopes * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 21,697 | --- | --- | --- | --- | 21,697 |
| (REP) Gene Chewning | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 11,327 | --- | --- | --- | --- | 11,327 |
| **STATE REPRESENTATIVE - DISTRICT NO. 28** | | | | | | | | | | | | | | | | |
| (DEM) David Bradley * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 30,575 | --- | --- | --- | --- | 30,575 |
| (DEM) Steve Farley * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 30,941 | --- | --- | --- | --- | 30,941 |
| (REP) Bill Phillips | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 17,805 | --- | --- | --- | --- | 17,805 |

* Elected

# STATE OF ARIZONA OFFICIAL CANVASS

### 2006 General Election - November 7, 2006
### Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE REPRESENTATIVE - DISTRICT NO. 29** | | | | | | | | | | | | | | | | |
| (DEM) Linda Lopez * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 19,225 | --- | --- | --- | --- | 19,225 |
| (DEM) Tom Prezelski * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 14,756 | --- | --- | --- | --- | 14,756 |
| (REP) Bruce P. Murchison | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 10,763 | --- | --- | --- | --- | 10,763 |
| **STATE REPRESENTATIVE - DISTRICT NO. 30** | | | | | | | | | | | | | | | | |
| (DEM) Clarence Boykins | --- | 4,347 | --- | --- | --- | --- | --- | --- | --- | --- | 28,429 | --- | 1,088 | --- | --- | 33,864 |
| (REP) Marian Ann McClure * | --- | 6,473 | --- | --- | --- | --- | --- | --- | --- | --- | 34,127 | --- | 902 | --- | --- | 41,502 |
| (REP) Jonathan Paton * | --- | 5,770 | --- | --- | --- | --- | --- | --- | --- | --- | 32,603 | --- | 828 | --- | --- | 39,201 |
| **SECRETARY OF STATE** | | | | | | | | | | | | | | | | |
| (DEM) Israel Torres | 11,406 | 13,908 | 18,897 | 6,007 | 2,405 | 1,065 | 1,307 | 306,504 | 14,145 | 11,469 | 134,290 | 22,347 | 5,031 | 22,801 | 12,064 | 583,646 |
| (LBT) Ernest Hancock | 1,343 | 1,316 | 1,748 | 660 | 314 | 79 | 204 | 27,631 | 2,213 | 1,371 | 8,140 | 2,078 | 174 | 2,813 | 1,009 | 51,093 |
| (REP) Jan Brewer * | 5,715 | 20,137 | 16,075 | 9,608 | 4,916 | 911 | 2,179 | 524,053 | 28,000 | 13,326 | 130,238 | 30,816 | 2,734 | 44,881 | 14,805 | 848,394 |
| (Write-In) Selena A. Naumoff (Write-In) | 3 | 0 | 1 | 0 | 0 | 0 | 0 | 23 | 0 | 3 | 4 | 0 | 0 | 1 | 0 | 35 |
| **ATTORNEY GENERAL** | | | | | | | | | | | | | | | | |
| (DEM) Terry Goddard * | 13,586 | 19,547 | 26,301 | 10,070 | 4,154 | 1,429 | 2,036 | 513,462 | 21,563 | 16,294 | 179,590 | 32,991 | 5,851 | 36,350 | 15,783 | 899,007 |
| (REP) Bill Montgomery | 4,931 | 16,157 | 10,773 | 6,316 | 3,531 | 660 | 1,695 | 351,771 | 22,872 | 9,998 | 95,094 | 22,886 | 2,135 | 34,435 | 12,063 | 595,317 |
| **STATE TREASURER** | | | | | | | | | | | | | | | | |
| (DEM) Rano Singh | 11,644 | 14,343 | 20,672 | 6,710 | 2,537 | 1,053 | 1,432 | 340,139 | 15,297 | 12,307 | 136,035 | 23,769 | 4,774 | 24,650 | 11,828 | 627,190 |
| (REP) Dean Martin * | 6,496 | 20,432 | 15,196 | 9,021 | 4,822 | 941 | 2,178 | 495,568 | 28,271 | 13,308 | 131,965 | 30,523 | 2,951 | 44,042 | 15,424 | 821,138 |
| **SUPERINTENDENT OF PUBLIC INSTRUCTION** | | | | | | | | | | | | | | | | |
| (DEM) Jason Williams | 12,494 | 15,411 | 20,920 | 7,484 | 3,073 | 1,173 | 1,592 | 367,916 | 17,560 | 13,658 | 141,235 | 25,647 | 4,958 | 26,505 | 13,283 | 672,909 |
| (REP) Tom Horne * | 5,770 | 19,555 | 15,106 | 8,435 | 4,370 | 851 | 1,999 | 472,609 | 25,834 | 12,181 | 126,801 | 28,828 | 2,842 | 42,392 | 14,105 | 781,678 |
| **STATE MINE INSPECTOR** | | | | | | | | | | | | | | | | |
| (REP) Joe Hart * | 13,617 | 26,134 | 24,889 | 12,026 | 5,869 | 1,398 | 2,770 | 609,731 | 33,089 | 19,453 | 191,438 | 40,479 | 4,916 | 51,275 | 20,013 | 1,057,097 |

* Elected

Report Date/Time: 12/04/2006 01:16 PM

# STATE OF ARIZONA OFFICIAL CANVASS

Page Number 12

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

**CORPORATION COMMISSIONER**

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (DEM) Richard Boyer | 11,152 | 14,790 | 18,032 | 6,584 | 2,708 | 1,000 | 1,437 | 308,182 | 15,503 | 11,670 | 128,857 | 22,827 | 4,402 | 22,869 | 11,872 | 581,885 |
| (DEM) Mark Manoil | 8,851 | 12,404 | 16,455 | 5,851 | 2,296 | 852 | 1,145 | 295,745 | 12,903 | 9,470 | 120,341 | 20,087 | 3,910 | 20,968 | 10,284 | 541,562 |
| (LBT) Rick Fowlkes | 1,171 | 2,203 | 3,004 | 1,154 | 390 | 125 | 260 | 51,697 | 3,172 | 1,687 | 16,617 | 3,580 | 342 | 4,925 | 1,357 | 91,684 |
| (REP) Kris Mayes * | 4,140 | 15,102 | 12,023 | 6,871 | 3,542 | 633 | 1,595 | 397,875 | 20,624 | 9,371 | 106,830 | 23,320 | 2,238 | 38,013 | 11,167 | 653,344 |
| (REP) Gary Pierce * | 4,335 | 15,510 | 11,271 | 6,713 | 3,774 | 632 | 1,632 | 390,445 | 20,973 | 10,104 | 100,087 | 23,776 | 2,079 | 34,157 | 12,978 | 638,466 |

* Elected

Report Date/Time: 12/04/2006 01:16 PM

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Justice of the Arizona Supreme Court** | | | | | | | | | | | | | | | | |
| **ANDREW HURWITZ** | | | | | | | | | | | | | | | | |
| Be retained YES * | 11,795 | 23,734 | 22,546 | 9,466 | 4,596 | 1,283 | 2,266 | 407,868 | 26,949 | 16,205 | 167,332 | 33,438 | 5,006 | 42,461 | 18,611 | 793,556 |
| Be retained NO | 4,290 | 5,807 | 5,681 | 2,918 | 1,270 | 309 | 714 | 137,193 | 7,320 | 4,957 | 41,366 | 8,700 | 1,297 | 9,619 | 3,955 | 235,396 |
| **RUTH V. MCGREGOR** | | | | | | | | | | | | | | | | |
| Be retained YES * | 12,059 | 24,057 | 22,796 | 9,647 | 4,977 | 1,297 | 2,311 | 418,806 | 27,287 | 16,233 | 168,872 | 34,049 | 5,033 | 41,364 | 18,529 | 807,317 |
| Be retained NO | 4,047 | 5,328 | 5,090 | 2,667 | 1,143 | 284 | 638 | 126,632 | 6,708 | 4,598 | 38,785 | 7,969 | 1,187 | 8,219 | 3,624 | 216,919 |
| **Judge of the Court of Appeals Division I** | | | | | | | | | | | | | | | | |
| **DONN KESSLER** | | | | | | | | | | | | | | | | |
| Be retained YES * | --- | --- | --- | --- | --- | --- | --- | 379,143 | --- | --- | --- | --- | --- | --- | --- | 379,143 |
| Be retained NO | --- | --- | --- | --- | --- | --- | --- | 133,169 | --- | --- | --- | --- | --- | --- | --- | 133,169 |
| **PATRICIA K. NORRIS** | | | | | | | | | | | | | | | | |
| Be retained YES * | --- | --- | --- | --- | --- | --- | --- | 383,417 | --- | --- | --- | --- | --- | --- | --- | 383,417 |
| Be retained NO | --- | --- | --- | --- | --- | --- | --- | 137,085 | --- | --- | --- | --- | --- | --- | --- | 137,085 |
| **MAURICE PORTLEY** | | | | | | | | | | | | | | | | |
| Be retained YES * | --- | --- | --- | --- | --- | --- | --- | 363,130 | --- | --- | --- | --- | --- | --- | --- | 363,130 |
| Be retained NO | --- | --- | --- | --- | --- | --- | --- | 141,694 | --- | --- | --- | --- | --- | --- | --- | 141,694 |
| **Judge of the Court of Appeals Division II** | | | | | | | | | | | | | | | | |
| **J. WILLIAM BRAMMER, JR.** | | | | | | | | | | | | | | | | |
| Be retained YES * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 163,724 | --- | --- | --- | --- | 163,724 |
| Be retained NO | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 42,868 | --- | --- | --- | --- | 42,868 |
| **PETER J. ECKERSTROM** | | | | | | | | | | | | | | | | |
| Be retained YES * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 161,359 | --- | --- | --- | --- | 161,359 |
| Be retained NO | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 42,883 | --- | --- | --- | --- | 42,883 |
| **PHILIP G. ESPINOSA** | | | | | | | | | | | | | | | | |
| Be retained YES * | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 156,517 | --- | --- | --- | --- | 156,517 |
| Be retained NO | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | 47,962 | --- | --- | --- | --- | 47,962 |
| **Judge of the Court of Appeals Division II** | | | | | | | | | | | | | | | | |
| **JOSEPH HOWARD** | | | | | | | | | | | | | | | | |
| Be retained YES * | --- | 23,610 | --- | 9,214 | 4,731 | 1,300 | --- | --- | --- | --- | --- | 32,648 | 4,863 | --- | --- | 76,366 |
| Be retained NO | --- | 5,509 | --- | 2,732 | 1,177 | 270 | --- | --- | --- | --- | --- | 8,079 | 1,175 | --- | --- | 18,942 |

* Retained

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PROPOSITION 100** | PROPOSED AMENDMENT TO THE CONSTITUTION BY THE LEGISLATURE<br>HOUSE CONCURRENT RESOLUTION 2028<br>PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; AMENDING ARTICLE II, SECTION 22, CONSTITUTION OF ARIZONA; RELATING TO BAILABLE OFFENSES. | | | | | | | | | | | | | | | |
| YES * | 11,953 | 28,605 | 25,860 | 12,932 | 6,233 | 1,541 | 3,015 | 698,106 | 38,932 | 19,147 | 194,331 | 44,588 | 4,975 | 59,393 | 21,350 | 1,170,961 |
| NO | 6,120 | 6,900 | 11,516 | 3,108 | 1,313 | 459 | 642 | 175,706 | 5,436 | 6,076 | 83,156 | 10,792 | 2,747 | 12,160 | 6,330 | 332,461 |
| **PROPOSITION 101** | PROPOSED AMENDMENT TO THE CONSTITUTION BY THE LEGISLATURE<br>HOUSE CONCURRENT RESOLUTION 2056<br>PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; AMENDING ARTICLE IX, SECTION 19, CONSTITUTION OF ARIZONA; RELATING TO LOCAL PROPERTY TAX LEVIES. | | | | | | | | | | | | | | | |
| YES * | 6,586 | 15,622 | 15,452 | 8,158 | 3,653 | 833 | 1,717 | 441,666 | 25,664 | 10,755 | 127,780 | 26,238 | 3,162 | 37,835 | 11,048 | 736,169 |
| NO | 11,285 | 18,997 | 20,713 | 7,737 | 3,725 | 1,172 | 1,885 | 398,110 | 17,760 | 13,939 | 140,481 | 27,716 | 4,382 | 31,444 | 15,808 | 715,154 |
| **PROPOSITION 102** | PROPOSED AMENDMENT TO THE CONSTITUTION BY THE LEGISLATURE<br>SENATE CONCURRENT RESOLUTION 1001<br>PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; AMENDING ARTICLE II, CONSTITUTION OF ARIZONA, BY ADDING SECTION 35; RELATING TO STANDING IN CIVIL ACTIONS. | | | | | | | | | | | | | | | |
| YES * | 11,244 | 27,031 | 24,034 | 12,573 | 5,785 | 1,365 | 2,850 | 656,151 | 38,034 | 17,980 | 182,717 | 42,116 | 4,404 | 55,982 | 19,971 | 1,102,237 |
| NO | 6,682 | 7,804 | 13,099 | 3,576 | 1,547 | 632 | 790 | 206,523 | 6,060 | 7,021 | 91,124 | 12,722 | 3,211 | 14,582 | 7,341 | 382,714 |
| **PROPOSITION 103** | PROPOSED AMENDMENT TO THE CONSTITUTION BY THE LEGISLATURE<br>HOUSE CONCURRENT RESOLUTION 2036<br>PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; REPEALING ARTICLE XXVIII, CONSTITUTION OF ARIZONA; AMENDING THE CONSTITUTION OF ARIZONA BY ADDING A NEW ARTICLE XXVIII; RELATING TO ENGLISH AS THE OFFICIAL LANGUAGE. | | | | | | | | | | | | | | | |
| YES * | 7,779 | 27,421 | 22,493 | 12,851 | 5,567 | 1,293 | 3,024 | 670,395 | 40,770 | 16,653 | 180,268 | 42,641 | 3,910 | 58,978 | 20,230 | 1,114,273 |
| NO | 10,131 | 7,915 | 15,102 | 3,486 | 1,779 | 739 | 669 | 204,667 | 4,252 | 8,581 | 97,113 | 12,919 | 3,908 | 12,529 | 7,707 | 391,497 |
| **PROPOSITION 104** | PROPOSED AMENDMENT TO THE CONSTITUTION BY THE LEGISLATURE<br>HOUSE CONCURRENT RESOLUTION 2001<br>PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; AMENDING ARTICLE IX, SECTION 8, CONSTITUTION OF ARIZONA; RELATING TO MUNICIPAL DEBT. | | | | | | | | | | | | | | | |
| YES * | 7,910 | 18,246 | 20,293 | 8,927 | 3,751 | 1,012 | 1,839 | 502,993 | 23,727 | 13,499 | 158,346 | 30,994 | 4,094 | 40,405 | 13,061 | 849,097 |
| NO | 9,366 | 16,173 | 15,315 | 6,630 | 3,516 | 932 | 1,685 | 321,986 | 19,211 | 10,957 | 107,535 | 22,963 | 3,345 | 27,443 | 13,582 | 580,639 |
| **PROPOSITION 105** | PROPOSED AMENDMENT TO THE CONSTITUTION BY THE LEGISLATURE<br>HOUSE CONCURRENT RESOLUTION 2045<br>PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; AMENDING ARTICLE X, SECTIONS 3 AND 4, CONSTITUTION OF ARIZONA; AMENDING ARTICLE X, CONSTITUTION OF ARIZONA, BY ADDING SECTIONS 4.1, 4.2 AND 4.3; RELATING TO STATE TRUST LANDS; PROVIDING FOR CONDITIONAL REPEAL AND CONDITIONAL ENACTMENT. | | | | | | | | | | | | | | | |
| YES | 5,030 | 9,807 | 9,778 | 4,198 | 2,069 | 505 | 1,024 | 245,085 | 12,355 | 7,228 | 68,348 | 16,154 | 2,262 | 19,365 | 6,898 | 410,106 |
| NO * | 12,146 | 24,307 | 26,136 | 11,505 | 5,158 | 1,471 | 2,543 | 580,119 | 30,487 | 17,650 | 197,729 | 37,971 | 5,154 | 48,954 | 19,477 | 1,020,807 |

* Received a majority of the votes

# STATE OF ARIZONA OFFICIAL CANVASS

2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PROPOSITION 106** | **PROPOSED AMENDMENT TO THE CONSTITUTION BY INITIATIVE PETITION** <br> PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; AMENDING ARTICLE X, SECTIONS 1, 3, AND 4, CONSTITUTION OF ARIZONA; AMENDING ARTICLE X, CONSTITUTION OF ARIZONA, BY ADDING SECTIONS 1.1, 1.2, 7.1 AND 12; RELATING TO STATE LANDS. | | | | | | | | | | | | | | | |
| YES | 7,685 | 12,528 | 19,702 | 5,916 | 1,991 | 539 | 1,179 | 420,831 | 14,755 | 10,016 | 136,488 | 26,051 | 3,763 | 31,183 | 9,019 | 701,646 |
| NO * | 9,394 | 21,676 | 16,438 | 10,039 | 5,304 | 1,443 | 2,412 | 411,941 | 28,435 | 14,896 | 130,492 | 28,277 | 3,692 | 37,736 | 17,365 | 739,540 |
| **PROPOSITION 107** | **PROPOSED AMENDMENT TO THE CONSTITUTION BY INITIATIVE PETITION** <br> PROPOSING AN AMENDMENT TO THE CONSTITUTION OF ARIZONA; AMENDING THE CONSTITUTION OF ARIZONA; BY ADDING ARTICLE XXX; RELATING TO THE PROTECTION OF MARRIAGE. | | | | | | | | | | | | | | | |
| YES | 8,661 | 19,422 | 15,139 | 8,526 | 5,221 | 1,151 | 1,921 | 421,568 | 25,429 | 14,194 | 115,915 | 28,873 | 3,473 | 36,992 | 15,004 | 721,489 |
| NO * | 8,740 | 15,490 | 22,279 | 7,775 | 2,369 | 885 | 1,772 | 449,065 | 19,254 | 11,246 | 158,721 | 26,882 | 4,204 | 34,346 | 12,470 | 775,498 |
| **PROPOSITION 200** | **PROPOSED BY INITIATIVE PETITION** <br> CREATING THE ARIZONA VOTER REWARD ACT AND AMENDING ARIZONA REVISED STATUTES SECTIONS 5-518 AND 5-522 RELATING TO THE ARIZONA LOTTERY COMMISSION. | | | | | | | | | | | | | | | |
| YES | 9,437 | 12,830 | 15,927 | 5,209 | 2,219 | 781 | 1,463 | 277,315 | 16,947 | 10,827 | 88,728 | 20,585 | 3,367 | 20,815 | 10,191 | 496,641 |
| NO * | 7,884 | 22,354 | 21,216 | 10,858 | 5,247 | 1,217 | 2,159 | 588,223 | 27,447 | 14,307 | 184,399 | 34,961 | 4,206 | 49,506 | 17,300 | 991,284 |
| **PROPOSITION 201** | **PROPOSED BY INITIATIVE PETITION** <br> REPEALING SECTIONS 36-601.01 AND 36-601.02, AMENDING BY ADDING NEW SECTION 36-601.01 AND AMENDING SECTION 42-3251.02 ARIZONA REVISED STATUTES; RELATING TO THE SMOKE-FREE ARIZONA ACT. | | | | | | | | | | | | | | | |
| YES * | 10,381 | 18,399 | 23,208 | 7,585 | 3,783 | 879 | 1,526 | 481,907 | 22,129 | 13,181 | 160,459 | 28,961 | 4,689 | 36,405 | 15,193 | 828,685 |
| NO | 7,100 | 17,026 | 14,420 | 8,776 | 3,816 | 1,155 | 2,192 | 398,360 | 23,142 | 12,330 | 117,960 | 27,327 | 3,110 | 35,268 | 12,729 | 684,711 |
| **PROPOSITION 202** | **PROPOSED BY INITIATIVE PETITION** <br> REPEALING SECTION 23-362, AMENDING BY ADDING NEW SECTION 23-362 RELATING TO THE ARIZONA MINIMUM WAGE ACT. | | | | | | | | | | | | | | | |
| YES * | 14,317 | 23,975 | 28,907 | 10,905 | 4,380 | 1,401 | 2,407 | 549,269 | 31,090 | 17,943 | 196,040 | 37,196 | 5,862 | 45,190 | 18,465 | 987,347 |
| NO | 3,349 | 12,219 | 8,687 | 5,359 | 3,372 | 650 | 1,336 | 327,941 | 13,804 | 7,803 | 82,201 | 18,911 | 1,927 | 26,138 | 9,373 | 523,070 |
| **PROPOSITION 203** | **PROPOSED BY INITIATIVE PETITION** <br> PROPOSING AMENDMENTS TO TITLE 8, ARIZONA REVISED STATUTES, BY ADDING CHAPTER 13; AMENDING TITLE 42, CHAPTER 3, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 9; AND PROVIDING FOR INITIAL FUNDING AND INITIAL TERMS OF BOARD AND REGIONAL COUNCIL MEMBERS; RELATING TO FUNDING FOR EARLY CHILDHOOD DEVELOPMENT AND HEALTH PROGRAMS. | | | | | | | | | | | | | | | |
| YES * | 11,882 | 16,892 | 23,406 | 7,577 | 3,380 | 902 | 1,454 | 466,481 | 17,963 | 13,859 | 148,827 | 27,904 | 4,768 | 34,293 | 13,724 | 793,312 |
| NO | 5,520 | 18,887 | 13,736 | 8,534 | 4,252 | 1,105 | 2,188 | 399,942 | 26,309 | 11,527 | 125,771 | 27,551 | 2,922 | 36,387 | 13,655 | 698,286 |
| **PROPOSITION 204** | **PROPOSED BY INITIATIVE PETITION** <br> PROPOSING AMENDMENT TO TITLE 13, CHAPTER 29, ARIZONA REVISED STATUTES BY ADDING SECTION 13-2910.07; RELATING TO CRUEL AND INHUMANE CONFINEMENT OF ANIMALS. | | | | | | | | | | | | | | | |
| YES * | 9,363 | 18,417 | 25,187 | 8,675 | 2,922 | 862 | 1,935 | 557,440 | 26,735 | 12,162 | 169,668 | 31,526 | 4,705 | 43,700 | 13,616 | 926,913 |
| NO | 7,863 | 16,962 | 12,005 | 7,615 | 4,745 | 1,156 | 1,754 | 313,763 | 17,653 | 13,179 | 104,256 | 24,074 | 2,878 | 27,687 | 13,600 | 569,190 |

* Received a majority of the votes

# STATE OF ARIZONA OFFICIAL CANVASS

## 2006 General Election - November 7, 2006
### Compiled and Issued by the Arizona Secretary of State

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**PROPOSITION 205**
PROPOSED BY INITIATIVE PETITION
PROPOSING AMENDMENTS TO TITLE 16, CHAPTER 2, ARTICLE 4, ARIZONA REVISED STATUTES, BY REPEALING SECTION 16-248, ARIZONA REVISED STATUTES; PROPOSING AMENDMENTS TO TITLE 16, CHAPTER 4, ARTICLE 1, ARIZONA REVISED STATUTES, BY REPEALING SECTION 16-404, ARIZONA REVISED STATUTES AND ADDING A NEW SECTION 16-404, ARIZONA REVISED STATUTES; PROPOSING AMENDMENTS TO TITLE 16, CHAPTER 4, ARTICLE 2, ARIZONA REVISED STATUTES BY AMENDING SECTION 16-411, ARIZONA REVISED STATUTES; PROPOSING AMENDMENTS TO TITLE 16, CHAPTER 4, ARTICLE 5, ARIZONA REVISED STATUTES, BY AMENDING SECTION 16-461, ARIZONA REVISED STATUTES; PROPOSING AMENDMENTS TO TITLE 16, CHAPTER 4, ARTICLE 6, ARIZONA REVISED STATUTES, BY REPEALING SECTION 16-510, ARIZONA REVISED STATUTES AND ADDING A NEW SECTION 16-510, ARIZONA REVISED STATUTES; RELATING TO VOTE BY MAIL.

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YES | 7,526 | 8,279 | 12,147 | 4,494 | 1,360 | 436 | 868 | 245,592 | 11,281 | 7,931 | 85,412 | 16,237 | 2,231 | 22,226 | 5,859 | 431,879 |
| NO * | 9,823 | 27,091 | 24,840 | 11,638 | 6,293 | 1,573 | 2,778 | 622,886 | 32,997 | 17,329 | 188,357 | 39,215 | 5,432 | 48,658 | 21,557 | 1,060,467 |

**PROPOSITION 206**
PROPOSED BY INITIATIVE PETITION
AMENDING TITLE 36, CHAPTER 6, ARIZONA REVISED STATUTES BY REPEALING SECTIONS 36-601.01 AND 36-601.02; ADDING NEW SECTION 36-601.01; RELATING TO SMOKING.

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YES | 8,377 | 15,266 | 14,632 | 7,240 | 3,463 | 912 | 1,661 | 372,889 | 20,393 | 11,788 | 110,301 | 24,881 | 3,939 | 31,841 | 13,268 | 640,851 |
| NO * | 9,037 | 20,625 | 22,878 | 8,976 | 4,116 | 1,125 | 2,053 | 500,383 | 24,187 | 13,526 | 166,643 | 30,496 | 3,708 | 39,510 | 14,177 | 861,440 |

**PROPOSITION 207**
PROPOSED BY INITIATIVE PETITION
AMENDING TITLE 12, CHAPTER 8, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 2.1; RELATING TO THE PRIVATE PROPERTY RIGHTS PROTECTION ACT.

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YES * | 8,759 | 24,203 | 22,032 | 11,033 | 5,045 | 1,416 | 2,620 | 562,153 | 34,372 | 15,541 | 157,472 | 37,871 | 4,398 | 50,165 | 18,453 | 955,533 |
| NO | 8,452 | 11,207 | 14,627 | 5,100 | 2,538 | 593 | 1,045 | 291,740 | 9,952 | 9,275 | 114,924 | 17,473 | 3,153 | 20,152 | 8,930 | 519,161 |

**PROPOSITION 300**
REFERRED TO THE PEOPLE BY THE LEGISLATURE
SENATE CONCURRENT RESOLUTION 1031
ENACTING AND ORDERING THE SUBMISSION TO THE PEOPLE OF A MEASURE RELATING TO PUBLIC PROGRAM ELIGIBILITY.

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YES * | 10,699 | 27,445 | 22,879 | 12,075 | 5,715 | 1,321 | 2,755 | 626,047 | 37,655 | 18,040 | 175,217 | 41,711 | 4,750 | 53,836 | 20,299 | 1,060,444 |
| NO | 6,600 | 8,185 | 13,944 | 4,098 | 1,912 | 699 | 896 | 233,400 | 6,960 | 7,400 | 98,779 | 13,973 | 2,956 | 16,794 | 7,398 | 423,994 |

**PROPOSITION 301**
REFERRED TO THE PEOPLE BY THE LEGISLATURE
SENATE CONCURRENT RESOLUTION 1033
ENACTING AND ORDERING THE SUBMISSION TO THE PEOPLE OF A MEASURE RELATING TO PROBATION FOR METHAMPHETAMINE OFFENSES.

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YES * | 9,451 | 21,127 | 18,414 | 9,968 | 4,816 | 1,135 | 2,268 | 517,349 | 28,627 | 15,485 | 131,251 | 33,198 | 3,722 | 44,834 | 14,946 | 856,591 |
| NO | 7,839 | 14,447 | 18,486 | 5,890 | 2,728 | 844 | 1,375 | 339,674 | 15,472 | 9,788 | 140,620 | 21,909 | 3,792 | 25,463 | 12,222 | 620,549 |

**PROPOSITION 302**
RECOMMENDATION OF THE COMMISSION ON SALARIES FOR ELECTIVE STATE OFFICERS AS TO LEGISLATIVE SALARIES HAS BEEN CERTIFIED TO THE SECRETARY OF STATE AND IS HEREBY SUBMITTED TO THE QUALIFIED ELECTORS FOR THEIR APPROVAL OR REJECTION.
"SHALL THE RECOMMENDATION OF THE COMMISSION ON SALARIES FOR ELECTIVE STATE OFFICERS CONCERNING LEGISLATIVE SALARIES BE ACCEPTED?"
_____YES _____NO
RECOMMENDATIONS, IF APPROVED BY THE ELECTORS, SHALL BECOME EFFECTIVE AT THE BEGINNING OF THE NEXT REGULAR LEGISLATIVE SESSION WITHOUT ANY OTHER AUTHORIZING LEGISLATION.
CURRENT SALARY..............$24,000
PROPOSED SALARY...........$36,000

| | Apache | Cochise | Coconino | Gila | Graham | Greenlee | La Paz | Maricopa | Mohave | Navajo | Pima | Pinal | Santa Cruz | Yavapai | Yuma | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YES | 6,610 | 13,782 | 16,881 | 6,527 | 2,888 | 730 | 1,269 | 437,053 | 16,024 | 10,309 | 129,095 | 23,561 | 3,169 | 29,934 | 10,029 | 707,861 |
| NO * | 10,822 | 21,713 | 20,107 | 9,355 | 4,737 | 1,284 | 2,413 | 422,584 | 28,393 | 14,858 | 143,724 | 32,085 | 4,429 | 40,877 | 17,547 | 774,928 |

* Received a majority of the votes

## STATE OF ARIZONA OFFICIAL CANVASS
2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

## 2006 GENERAL ELECTION OFFICIAL CANVASS CERTIFICATION

I, Janice K. Brewer, Secretary of State of Arizona, do hereby certify that the foregoing table is a true, correct and complete tabulation of the votes cast at the 2006 General Election held in the State of Arizona on the 7th day of November 2006, showing the name of each person voted for, for a Federal or State office in said election, and the number of votes received by each person in said election, as shown by the tabulations received from the Boards of Supervisors of each county in the State of Arizona.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of the State of Arizona, this 4th day of December 2006, at the Capitol in Phoenix.

JANICE K. BREWER
Secretary of State

A.R.S. § 16-648 requires that this canvass be conducted in the presence of the Governor and Attorney General whose affirming signatures follow.

JANET NAPOLITANO
Governor

TERRY GODDARD
Attorney General

# STATE OF ARIZONA OFFICIAL CANVASS
2006 General Election - November 7, 2006
Compiled and Issued by the Arizona Secretary of State

## 2006 GENERAL ELECTION OFFICIAL CANVASS CERTIFICATION

I, Janice K. Brewer, Secretary of State of Arizona, do hereby certify that the foregoing enumeration of election returns is a true, correct and complete tabulation of the votes cast for and against the nineteen propositions which appeared on the ballot of the 2006 General Election held in the State of Arizona on the 7th day of November 2006.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of the State of Arizona, this 4th day of December 2006, at the Capitol in Phoenix.



JANICE K. BREWER
Secretary of State

A.R.S. § 16-648 requires that this canvass be conducted in the presence of the Governor and Chief Justice of the Supreme Court whose affirming signatures follow.

JANET NAPOLITANO
Governor

RUTH V. MCGREGOR
Chief Justice
Arizona Supreme Court

# Exhibit I-12

**U.S.ENGLISH,INC.**

2000 L ST., NW • SUITE 702 • WASHINGTON, DC 20036
TELEPHONE: 202-833-0100 • FAX: 202-833-0108

# Full Texts of State Official English Laws

## ALABAMA (1990)
### ALA. CONST. AMEND. 509
**English as Official Language of State.**

English is the official language of the state of Alabama. The legislature shall enforce this amendment by appropriate legislation. The legislature and officials of the state of Alabama shall take all steps necessary to insure that the role of English as the common language of the state of Alabama is preserved and enhanced. The legislature shall make no law which diminishes or ignores the role of English as the common language of the state of Alabama.

Any person who is a resident of or doing business in the state of Alabama shall have standing to sue the state of Alabama to enforce this amendment, and the courts of record of the state of Alabama shall have jurisdiction to hear cases brought to enforce this provision. The legislature may provide reasonable and appropriate limitations on the time and manner of suits brought under this amendment.

## ALASKA (1998)
### Ballot Measure 6 (November 1998 Election)
**Section 1. Findings and Purpose**

The people of the state of Alaska find that English is the common unifying language of the state of Alaska and the United States of America, and declare a compelling interest in promoting, preserving and strengthening its use.

**Section 2. Official Language**

The English language is the official language of the State of Alaska.

**Section 3. Scope**

The English language is the language to be used by all public agencies in all government functions and actions. The English language shall be used in the preparation of all official public documents and records, including all documents officially compiled, published or recorded by the government.

**Section 4. Applicability**

This Act applies to the legislative and executive branches of the State of Alaska and all political subdivisions, including all departments, agencies, divisions and instrumentalities of the State, the University of Alaska, all public authorities and corporations, all local governments and departments, agencies, divisions, and instrumentalities of local governments, and all government officers and employees.

**Section 5. Exceptions**

The government, as defined in Section 4 of this Act, may use a language other than English when necessary for the following purposes:

to communicate health and safety information or when an emergency requires the use of a language other than English,

to teach another language to students proficient in English,

to teach English to students of limited English proficiency,

to promote international relations, trade, tourism or sporting events,

to protect the constitutional and legal rights of criminal defendants,

to serve the needs of the judicial system in civil and criminal cases in compliance with court rules and orders,

to investigate criminal activity and protect the rights of crime victims,

to the extent necessary to comply with federal law, including the Native American Languages Act,

to attend or observe religious ceremonies,

to use non-English terms of art, names, phrases, or expressions included as part of communications otherwise in English, and

to communicate orally with constituents by elected public officials and their staffs, if the public official or staff member is already proficient in a language other than English.

An individual may provided testimony or make a statement to the government in a language other than English, if the individual is not an officer or employee of the government, and if the testimony or statement is translated into English and included in the records of the government.

**Section 6. Public Accountability**

All costs related to the preparation, translation, printing, or recording of documents, records, brochures, pamphlets, flyers, or other material in languages other than English shall be defined as a separate line item in the budget of every governmental agency, department, or office.

**Section 7. Non-Denial of Employment or Services**

No governmental entity shall require knowledge of a language other than English as a condition of employment unless the requirements of the position fall within one of the exceptions provided in Section 5 of this Act, and facility in another language is a bona fide job qualification required to fulfill a function included within one of the exceptions.

No person may be denied services, assistance, benefits, or facilities, directly or indirectly provided by the government, because that person communicates only in English.

**Section 8. Private Sector Excluded**

This Act shall not be construed in any way that infringes upon the rights of persons to use languages other than English in activities or functions conducted solely in the private sector, and the government may not restrict the use of language other than English in such private activities or functions.

**Section 9. Private Cause of Action Authorized**

Any person may bring suit against any governmental entity to enforce the provisions of this Act.

**Section 10. Severability**

he provisions of this Act are independent and severable, and if any provisions of this Act, or the applicability of any provision to any person or circumstance, shall be held to be invalid by a court of competent jurisdiction, the remainder of this Act shall not be affected and shall be given effect to the fullest extent practicable.

## ARIZONA (2006)
### Ariz. Const. Art. XXVIII
**English as the Official Language: Definitions**

Section 1. In this article, unless the context otherwise requires:

1. "Government" includes all laws, public proceedings, rules, publications, orders, actions, programs, policies, departments, boards, agencies, organizations and instrumentalities of this state or political subdivisions of this state, as appropriate under the circumstances to a particular official action.

2. "Official action" includes the performance of any function or action on behalf of this state or a political subdivision of this state or required by state law that appears to present the views, position or imprimatur

of the state or political subdivision or that binds or commits the state or political subdivision, but does not include:

(a) The teaching of or the encouragement of learning languages other than English.

(b) Actions required under the federal individuals with disabilities education act or other federal laws.

(c) Actions, documents or policies necessary for tourism, commerce or international trade.

(d) Actions or documents that protect the public health and safety, including law enforcement and emergency services.

(e) Actions that protect the rights of victims of crimes or criminal defendants.

(f) Using terms of art or phrases from languages other than English.

(g) Using or preserving Native American languages.

(h) Providing assistance to hearing impaired or illiterate persons.

(i) Informal and nonbinding translations or communications among or between representatives of government and other persons if this activity does not affect or impair supervision, management, conduct or execution of official actions and if the representatives of government make clear that these translations or communications are unofficial and are not binding on this state or a political subdivision of this state.

(j) Actions necessary to preserve the right to petition for the redress of grievances.

3. "Preserve, protect and enhance the role of English" includes:

(a) Avoiding any official actions that ignore, harm or diminish the role of English as the language of government.

(b) Protecting the rights of persons in this state who use English.

(c) Encouraging greater opportunities for individuals to learn the English language.

(d) To the greatest extent possible under federal statute, providing services, programs, publications, documents and materials in English.

4. "Representatives of government" includes all individuals or entities during the performance of the individual's or entity's official actions.

**Official language of Arizona**

Section 2. The official language of the state of Arizona is English.

**Preserving and enhancing the role of the official language; right to use English**

Section 3. A. Representatives of government in this state shall preserve, protect and enhance the role of English as the official language of the government of Arizona.

B. A person shall not be discriminated against or penalized in any way because the person uses or attempts to use English in public or private communication.

**Official actions to be conducted in English**

Section 4. Official actions shall be conducted in English.

**Rules of construction**

Section 5. This article shall not be construed to prohibit any representative of government, including a member of the legislature, while performing official duties, from communicating unofficially through any medium with another person in a language other than English if official action is conducted in English.

**Standing; notification of attorney general; recovery of costs**

Section 6. A. A person who resides or does business in this state may file a civil action for relief from any official action that violates this article in a manner that causes injury to the person.

B. A person who resides or does business in this state and who contends that this article is not being implemented or enforced may file a civil action to determine if the failure or inaction complained of is a violation of this article and for injunctive or mandatory relief.

C. A person shall not file an action under this section unless the person has notified the attorney general of the alleged violation and the attorney general or other appropriate representative of government has not provided appropriate relief within a reasonable time under the circumstances. An action filed under this section may be in addition to or in lieu of any action by officers of this state, including the attorney general.

D. A person who files and is successful in an action under this section may be awarded all costs expended or incurred in the action, including reasonable attorney fees.

# ARKANSAS (1987)
## Ark. Code Ann. § 1-4-117

(a) The English language shall be the official language of the state of Arkansas.

(b) This section shall not prohibit the public schools from performing their duty to provide equal educational opportunities to all children.

# CALIFORNIA (1986)
## Const. Art. III § 6

Section 1. (a) Purpose: English is the common language of the people of the United States of America and the state of California. This section is intended to preserve, protect and strengthen the English language, and not to supersede any of the rights guaranteed to the people by this Constitution.

(b) English as the official language of California.

(c) Enforcement.

The Legislature shall enforce this section by appropriate legislation. The Legislature and officials of the state of California shall take all steps necessary to insure that the role of English as the common language of the state of California is preserved and enhanced. The Legislature shall make no law which diminishes or ignores the role of English as the common language of the state of California.

(d) Personal Right of Action and Jurisdiction of Courts.

Any person who is a resident of or doing business in the state of California shall have standing to sue the state of California to enforce this section, and the Courts of record of the state of California shall have jurisdiction to hear cases brought to enforce this section. The Legislature may provide reasonable and appropriate limitations on the time and manner of suits brought under this section.

Section 2. Severability: If any provision of this section, or the application of any such provision to any person or circumstance, shall be held invalid, the remainder of this section to the extent it can be given effect shall not be affected thereby, and to this end the provisions of this section are severable.

# COLORADO (1988)
## Const. Art. II § 30a

The English language is the official language of the state of Colorado.

This section is self-executing; however, the General Assembly may enact laws to implement this section.

# FLORIDA (1988)
## Const. Art. II § 9

(a) English is the official language of the state of Florida.

(b) The Legislature shall have the power to enforce this section by appropriate legislation

# GEORGIA (1996)
## Code Ann. § 50-3-100

a.   The English language is designated as the official language of the state of Georgia. The official language shall be the language used for each public record, as defined in Code Section 50-18-70, and each public meeting, as defined in Code Section 50-14-1, and for official Acts of the state of Georgia, including those governmental documents, records, meetings, actions, or policies which are enforceable with the full weight and authority of the state of Georgia.

b.   This Code section shall not be construed in any way to deny a person's rights under the Constitution of Georgia or the Constitution of the United States or any laws, statutes, or regulations of the United States or of the state of Georgia as a result of that person's inability to communicate in the official language.

c.   State agencies, counties, municipal corporations, and political subdivisions of this state are authorized to use or to print official documents and forms in languages other than the official language, at the discretion of their governing authorities. Documents filed or recorded with a state agency or with the clerk of a county, municipal corporation, or

political subdivision must be in the official language or, if the original document is in a language other than the official language, an English translation of the document must be simultaneously filed.

d. The provisions of subsection (a) of this Code section shall not apply:

   1. When in conflict with federal law;
   2. When the public safety, health, or justice require the use of other languages;
   3. To instruction designed to teach the speaking, reading, or writing of foreign languages;
   4. To instruction designed to aid students with limited English proficiency in their transition and integration into the education system of the state; and
   5. To the promotion of international commerce, tourism, sporting events, or cultural events.

## HAWAII (1978)
### Const Art. XV § 4

English and Hawaiian shall be the official languages of Hawaii, except that Hawaiian shall be required for public acts and transactions only as provided by law.

## IDAHO (2007)
### Code Ch. 73-121

SECTION 1. That Section 73-121, Idaho Code, be, and the same is hereby amended to read as follows:

73-121. CERTAIN DOCUMENTS TO BE IN ENGLISH THE OFFICIAL STATE LANGUAGE.

(1) English is hereby declared to be the official language of the state of Idaho.

(2) Except as provided in this section, the English language is the sole language of the government.

(3) Except as provided in subsection (4) of this section, any document, certificate or instrument required to be filed, recorded or endorsed by any officer of this state, or of any county, city or district in this state, shall be in the English language or shall be accompanied by a certified translation in English and all transactions, proceedings, meetings or publications issued, conducted or regulated by, or on behalf of, or representing the state of Idaho, or any county, city or other political subdivision in this state shall be in the English language.

(4) Language other than English may be used when required:
(a) By the United States Constitution, the Idaho Constitution, federal law or federal regulation;
(b) By law enforcement or public health and safety needs;
(c) By public schools according to the rules promulgated by the state board of education pursuant to subsection (6) of this section;
(d) By the public postsecondary educational institutions to pursue educational purposes;
(e) To promote and encourage tourism and economic development, including the hosting of international events;
(f) To change the use of non-English terms of art, phrases, proper names or expressions included as part of communication otherwise in English; and
(g) By libraries to:
   (i) Collect and promote foreign language materials; and
   (ii) Provide foreign language services and activities.

(5) Unless exempted by subsection (4) of this section, all state funds appropriated or designated for the printing or translation of materials or the provision of services or information in a language other than English shall be returned to the state general fund.
(a) Each state agency that has state funds appropriated or designated for the printing or translation of materials or the provision of services or information in a language other than English shall:
   (i) Notify the state controller that those moneys exist and the amount of those moneys; and
   (ii) Return those moneys to the state controller for deposit into the state general fund.
(b) The state controller shall account for those moneys and inform the legislature of the existence and amount of those moneys at the beginning of the legislature's annual general session.

(6) The state board of education shall make rules governing the use of foreign languages in the public schools that promote the following principles:
(a) Non-English speaking children and adults should become able to read, write and understand English as quickly as possible;
(b) Foreign language instruction should be encouraged;
(c) Formal and informal programs in English as a second language should be initiated, continued and expanded; and
(d) Public schools should establish communication with non-English speaking parents within their systems, using a means designed to maximize understanding when necessary, while encouraging those parents who do not speak English to become more proficient in English.

(7) Nothing in this section shall restrict the rights of governmental employees, private businesses, not-for-profit organizations or private individuals to exercise their right under the first amendment of the United States constitution or section 9, article I, of the Idaho constitution.

SECTION 2. SEVERABILITY. The provisions of this act are hereby declared to be severable and if any provision of this act or the application of such provision to any person or circumstance is declared invalid for any reason, such declaration shall not affect the validity of the remaining portions of this act.

## ILLINOIS (1969)
### 5 ILCS 460/20

The official language of the state of Illinois is English.

## INDIANA (1984)
### Code Ch. 10 § 1

The English language is adopted as the official language of the state of Indiana.

## IOWA (2002)
### Code Ch. 1.18, Ch. 4.14

1. The general assembly of the state of Iowa finds and declares the following:
   a. The state of Iowa is comprised of individuals from different ethnic, cultural, and linguistic backgrounds. The state of Iowa encourages the assimilation of Iowans into Iowa's rich culture.
   b. Throughout the history of Iowa and of the United States, the common thread binding individuals of differing backgrounds together has been the English language.
   c. Among the powers reserved to each state is the power to establish the English language as the official language of the state, and otherwise to promote the English language within the state, subject to the prohibitions enumerated in the Constitution of the United States and in laws of the state.
2. In order to encourage every citizen of this state to become more proficient in the English language, thereby facilitating participation in the economic, political, and cultural activities of this state and of the United States, the English language is hereby declared to be the official language of the state of Iowa.
3. Except as otherwise provided for in subsections 4 and 5, the English language shall be the language of government in Iowa. All official documents, regulations, orders, transactions, proceedings, programs, meetings, publications, or actions taken or issued, which are conducted or regulated by, or on behalf of, or representing the state and all of its political subdivisions shall be in the English language. For the purposes of this section, "official action" means any action taken by the government in Iowa or by an authorized officer or agent of the government in Iowa that does any of the following:
   a. Binds the government.
   b. Is required by law.

    c.  Is otherwise subject to scrutiny by either the press or the public.

4.  This section shall not apply to:

    a.  The teaching of languages.

    b.  Requirements under the federal Individuals with Disabilities Education Act.

    c.  Actions, documents, or policies necessary for trade, tourism, or commerce.

    d.  Actions or documents that protect the public health and safety.

    e.  Actions or documents that facilitate activities pertaining to compiling any census of populations.

    f.  Actions or documents that protect the rights of victims of crimes or criminal defendants.

    g.  Use of proper names, terms of art, or phrases from languages other than English.

    h.  Any language usage required by or necessary to secure the rights guaranteed by the Constitution and laws of the United States of America or the Constitution of the State of Iowa.

    i.  Any oral or written communications, examinations, or publications produced or utilized by a driver's license station, provided public safety is not jeopardized.

5.  Nothing in this section shall be construed to do any of the following:

    a.  Prohibit an individual member of the general assembly or officer of state government, while performing official business, from communicating through any medium with another person in a language other than English, if that member or officer deems it necessary or desirable to do so.

    b.  Limit the preservation or use of Native American languages, as defined in the federal Native American Languages Act of 1992.

    c.  Disparage any language other than English or discourage any person from learning or using a language other than English.

# KANSAS (2007)
## Stat. Ann. §73-28 (2801-2807)

**73-2801.  English designated official language of state.** (a) English shall be designated as the official language of the state of Kansas.

(b)  The official language is designated as the language of any official public document or record and any official public meeting:

(1)  An official public document or record is any document officially compiled, published or recorded by the state including deeds, publicly probated wills and any other document or record required to be kept open for public inspection pursuant to the open records act.

(2)  An official public meeting is any meeting required to be open pursuant to K.S.A. 75-4317 et seq., and amendments thereto.

(c)  Except as otherwise provided by law, no state agency or political or taxing subdivision of the state shall be required to provide any documents, information, literature or other written materials in any language other than English. Nothing shall prohibit state agencies or political or taxing subdivisions from: (1) Publishing any official public document or record in languages other than English at their discretion, so long as the document or record is also published in English; or (2) permitting a person who does not speak English to speak or communicate at an official public meeting with the assistance of an interpreter.

**73-2802.  Use of language other than English.** A state agency or political or taxing subdivision, or its officers or employees, may use a language other than the English language to:

(a)  Provide information orally to individuals in the course of delivering services to the general public;

(b)  comply with federal law;

(c)  protect the public health or safety;

(d)  protect the rights of parties and witnesses in a civil or criminal action in a court or in an administrative proceeding;

(e)  provide instruction in foreign and native American language courses;

(f)  provide instruction designed to aid students with limited English proficiency so they can make a timely transition to use of the English language in the public schools;

(g)  promote international commerce, trade or tourism;

(h)  use terms of art or phrases from languages other than the English language in documents;

(i)  provide signage and documents in braille; and

(j)  communicate in American Sign Language.

**73-2803.  Construction of act; limitations on governmental restrictions applicable to private sector.** This act shall not be construed in any way to infringe upon the rights of citizens under the constitution of the state of Kansas or the constitution of the United States in the use of language in any private activity. No agency or officer of the state or any political or taxing subdivision of the state may place any restrictions or requirements regarding language usage in any business operating in the private sector other than official documents, forms, submissions or other communications directed to government agencies and officers, which communications shall be in the common language as recognized in this act.

  **73-2804.  Same; native Americans.** This act may not be construed in any way to limit the use of any other language by a tribal government of native Americans located in the state of Kansas. A school district and a tribe, by mutual agreement, may provide for the instruction of students that recognizes the cultural identity of native American children and promotes the use of a common language for communication.

**73-2805.  Rights not diminished or expanded.** Nothing in this act shall diminish or expand any existing rights under the laws of Kansas or the United States relative to services or materials provided by the government of Kansas in any language other than English.

**73-2806.  Promotion of English language; assistance for non-native speakers.** The state of Kansas recognizes the importance of establishing and actively promoting English language classes, English language training or citizenship classes for non-native speakers. The local entity designated by the state board of regents to offer such services shall seek the assistance of local political subdivisions, community-based agencies and organizations, migrant worker groups, refugee resettlement programs, schools, churches and others in making non-native speakers aware of the availability of such classes and training and ensuring their continuation and expansion.

**73-2807.  Severability clause.** The provisions of this act are severable and any provision held invalid shall not affect or impair any of the remaining provisions of this act.

# KENTUCKY (1984)
## Rev. Stat. § 2.013

English is designated as the official state language of Kentucky.

# LOUISIANA (1811)
## Enabling Act, 2 U.S.Stat. 641 § 3

And be it further enacted, ...that after the admission of the said territory of Orleans as a state into the Union, the laws which such state may pass shall be promulgated and its records of every description shall be preserved, and its judicial and legislative written proceedings conducted in the language in which the laws and the judicial and legislative written proceedings of the United States are now published and conducted...

"It is the opinion of this office that English is the sole official language of Louisiana."

  --Richard P. Ieyoub

  Attorney General of Louisiana, February 13, 1992

# MASSACHUSETTS (1975)
## Supreme Court Ruling

Recognized by the Supreme Court of Massachusetts in Commonwealth v. Olivo (1975)

# MISSISSIPPI (1987)
## Code Ann. § 3-3-31

The English language is the official language of the state of Mississippi.

## MISSOURI (2008)
### Rev. Stat. § 1.028

The general assembly recognizes that English is the most common language used in Missouri and recognizes that fluency in English is necessary for full integration into our common American culture.

## MONTANA (1995)
### Code Ann. § 1-1-510
**English as official and primary language of state and local governments.**

1. English is the official and primary language of:
   a. the state and local governments;
   b. government officers and employees acting in the course and scope of their employment; and
   c. government documents and records.
2. A state statute, local government ordinance, or state or local government policy may not require a language other than English to be used by government officers and employees acting in the course and scope of their employment or for government documents or records or require a language other than English to be taught in a school.
3. This section is not intended to violate the federal or state constitutional right to freedom of speech of government officers and employees acting in the course and scope of their employment. This section does not prohibit a government officer or employee acting in the course and scope of employment from using a language other than English, including use in a government document or record, if the employee chooses, or prohibit the teaching of Native American languages, sign languages, or other languages in a school for general educational purposes.

## NEBRASKA (1920)
### Const. Art. I § 27

The English language is hereby declared to be the official language of this state, and all official proceedings, records and publications shall be in such language, and the common school branches shall be taught in said language in public, private, denominational and parochial schools.

## NEW HAMPSHIRE (1995)
### RSA 3-C:1-6

3-C:1 Official State Language.
I. The official language of the state of New Hampshire shall be English. English is designated as the language of all official public documents and records, and of all public proceedings and nonpublic sessions.
II. For the purposes of this chapter, "official public documents and records" are all documents officially compiled, published, or recorded by the state.
III. For the purposes of this chapter, "public proceedings and nonpublic sessions" mean those proceedings and sessions as defined in RSA 91-A, and includes the information recorded at such proceedings and sessions.

3-C:2 Exceptions. The provisions of this chapter shall not apply:
I. To all public proceedings between the state of New Hampshire and the province of Quebec when, in the opinion of the state administrator involved in such proceedings, it may be necessary to conduct such proceedings between Quebec and New Hampshire wholly or partially in French, and to use official public documents and records during the public proceedings, which are written wholly or partially in French.
II. To instruction in foreign languages courses.
III. To instruction designed to aid students with limited English in a timely transition and integration into the general educational system.
IV. To the promotion of international commerce, tourism, and sporting events.
V. When deemed to interfere with needs of the justice system.
VI. When the public safety, health, or emergency services require the use of other languages.

VII. When expert testimony or witnesses may require a language other than English; provided, however, that for purposes of deliberation, decision making, or recordkeeping, the official version of such testimony or commentary shall be the officially translated English-language version.

3-C:3 Employment. No person shall be denied employment with the state or with any political subdivision of the state based solely upon that person's lack of facility in a foreign language, except when related to bona fide job needs reflected in the exceptions listed in RSA 3-C:2.

3-C:4 Construction. This chapter shall not be construed in any way to infringe on the rights of citizens under the state constitution or the constitution of the United States in the use of language in activities or functions conducted solely in the private sector. No agency or officer of the state or of any political subdivision of the state shall place any restrictions or requirements regarding language usage for businesses operating in the private sector other than in official documents, forms, submissions, or other communications directed to government agencies and officers, which communications shall be in English as recognized in this chapter.

## NORTH CAROLINA (1987)
### Gen. Stat. Ch. 145 § 12

a. Purpose. English is the common language of the people of the United States of America and the state of North Carolina. This section is intended to preserve, protect and strengthen the English language, and not to supersede any of the rights guaranteed to the people by the Constitution of the United States or the Constitution of North Carolina.
b. English as the official Language of North Carolina. English is the official language of the state of North Carolina.

## NORTH DAKOTA (1987)
### Cent. Code § 54-02-13

**English as official language.** The English language is the official language of the state of North Dakota.

## OKLAHOMA (2010)
### State Question 751 (2010 Election)

Section 1. As English is the common and unifying language of the State of Oklahoma, all official actions of the state shall be conducted in the English language, except as required by federal law. No person shall have a cause of action against an agency or political subdivision of this state of failure to provide any official government actions in any language other than English. Nothing in this Article shall be construed to diminish or impair the use, study, development, or encouragement of any Native American language in any context or for any purpose. The Legislature shall have the power to implement, enforce and determine the proper application of this Article by appropriate legislation.

## SOUTH CAROLINA (1987)
### Code Ann. § 1-1-(696-698)

§ 1-1-696. **Official State language.**
The English language is the official language of the state of South Carolina.

§ 1-1-697. **Use of language other than English prohibited.**
Neither this state nor any political subdivision thereof shall require, by law, ordinance, regulation, order, decree, program, or policy, the use of any language other than English; provided, however, that nothing in this act shall prohibit a state agency or a political subdivision of the state from requiring an applicant to have certain degrees of knowledge of a foreign language as a condition of employment where appropriate.

§ 1-1-698. **Exceptions to prohibition against use of language other than English.**
his act does not prohibit any law, ordinance, regulation, order, decree program, or policy requiring educational instruction in a language other than English for the purpose of making students who use a language other than English proficient in English or making students proficient in a language in addition to English.

# Exhibit I-13



INTERNATIONAL
OLYMPIC
COMMITTEE

# FACTSHEET
## THE OLYMPIC MOVEMENT
### UPDATE - JUNE 2012

## ORIGIN

The brainchild of Frenchman Pierre de Coubertin, the Olympic Movement and the International Olympic Committee (IOC) were officially established on 23 June 1894 at the Paris International Congress that was organised by Coubertin at the Sorbonne.

Coubertin's vision for the Olympic Games may be summarised as follows: *"Why did I restore the Olympic Games? To ennoble and strengthen sports, to ensure their independence and duration, and thus to enable them better to fulfil the educational role incumbent upon them in the modern world."* Coubertin is also the author of the famous phrase which characterises the Olympic Games: "*The important thing in life is not the triumph, but the fight; the essential thing is not to have won, but to have fought well.*"

The host cities for both the first and second editions of the modern Olympic Games were quickly agreed upon during this Congress: Athens for 1896 and Paris for 1900.

## THE IOC

From a legal standpoint, the IOC is an international non-governmental non-profit organisation, of unlimited duration, in the form of an association with the status of a legal person, recognised by the Swiss Federal Council (ruling of 17 September 1981). Its official languages are French and English. The administrative headquarters of the IOC were originally based in Paris, but, since 10 April 1915, they have been based in Lausanne, Switzerland.

## THE OLYMPIC MOVEMENT

*"Under the supreme authority of the International Olympic Committee, the Olympic Movement encompasses organisations, athletes and other persons who agree to be guided by*

*the Olympic Charter."* (Olympic Charter, 2011, Rule 1)

*"The Olympic Movement is the concerted, organised, universal and permanent action, carried out under the supreme authority of the IOC, all individuals and entities who are inspired by the values of Olympism. […] Belonging to the Olympic Movement requires compliance with the Olympic Charter and recognition by the IOC".* (Olympic Charter, 2011, Fundamental Principles)

In addition to the IOC, the Olympic Movement therefore includes the International Sports Federations (IFs), the National Olympic Committees (NOCs), the Organising Committees for the Olympic Games (OCOGs), all other recognised federations, institutions and organisations, as well athletes, judges/referees, coaches and other sports technicians.

The goal of the Olympic Movement is clearly defined in the Olympic Charter: "*The goal of the Olympic Movement is to contribute to building a peaceful and better world by educating youth people through sport practised in accordance with Olympism and its values.* " (Olympic Charter, 2011, Rule 1)

## THE MEMBERS

The first membership list of the IOC in 1894 included a total of 15 individuals, but the number today is currently 106, including the President and the Executive Board. At present, the IOC also has 32 honorary members and one honour member. The composition of the IOC's general membership today is reflective of the important part that is also played by the other segments of the Olympic family. This is demonstrated via the current Olympic Charter stipulation that 15 representatives of the different Olympic family constituents (individuals holding leadership positions within an IF, NOC or athlete members of the Athletes' Commission) can become IOC



members. Forty of the IOC's current members have taken part in the Olympic Games as athletes, of whom 20 are medallists. In more recent years, the IOC membership has also evolved in terms of gender. In 1981, Pirjo Häggman and Flor Isava Fonseca were the first women to be elected as IOC members, and today there are 19 in the IOC, while the others are members or honorary members.

## THE PRESIDENTS

It is a common misconception that, as the founder of the modern Olympic Games, Pierre de Coubertin was also the first IOC President. Instead, following the original stipulation that the President should be from the country hosting the upcoming Games, it was the Greek Demetrius Vikelas who was the first IOC President. The original rule was quickly replaced, however, and modifications to it can be found in the various editions of the Olympic Charter. As a result, the number of individuals who have held the position of IOC President has been few, and the period of their presidency has varied considerably.

Today, in accordance with Rule 20 of the Olympic Charter, the President is elected by secret ballot for a period of eight years, with the possibility of a single extension of four years. **See table A.**

## THE EXECUTIVE BOARD

The Executive Board has the general responsibility for the administration and management of the IOC's affairs.

Along with the President, it is the Executive Board members who are responsible for overseeing the IOC's administrative affairs. Created in 1921, the Executive Board is currently composed of the IOC President, four Vice-Presidents and 10 other members, all elected by the Session by secret ballot, by a majority of votes cast, for a four-year term.

Board members may serve no more than two consecutive terms, and must then wait two years before being re-eligible for election to the Board.

## THE SESSION

The general assembly of the members of the IOC is called a Session. The Session meets at least once a year. The Session is the supreme organ of the IOC. It adopts, modifies and interprets the Olympic Charter. Upon the proposal of the Executive Board, it elects the members of the IOC. The Session also elects the host cities of the Olympic Games. The quorum required for a Session is half the total membership of the IOC plus one. Decisions of the Session are taken by a majority of the votes cast; however, a majority of two-thirds of the votes cast is required for any modification of the Fundamental Principles of Olympism, of the Rules of the Olympic Charter or if elsewhere provided in the Olympic Charter.

## THE COMMISSIONS

The President nominates special commissions or working groups to study certain specific subjects and make recommendations to the Executive Board. The composition of some of the commissions is mixed, and includes IOC members, representatives of the IFs and NOCs, athletes, technical experts, advisers and sports specialists. In 2012, there are 25 commissions preparing recommendations for the Executive Board.

### THE CURRENT COMMISSIONS

- Athletes
- Audit Committee
- Coordination Commissions for the Olympic Games
- Culture and Olympic Education
- Entourage Commission
- Ethics



- Evaluation
- Executive Board
- Finance
- International relations
- IOC Representatives In WADA
- Juridical
- Marketing
- Medical
- Nominations
- Olympic Philately, Numismatic and Memorabilia
- Olympic Programme
- Olympic Solidarity
- Press
- Radio and Television
- Sport and Environment
- Sport and Law
- Sport for All
- TV Rights and New Media
- Women and Sport

One of the most recent commissions, established in 1999 by President Juan Antonio Samaranch, is the Ethics Commission. Integrity within the Olympic Movement extends beyond the Fundamental Principles and the athletes' oath taken at the Games. Through the existence of commissions such as the Ethics or Medical Commissions, as well as via efforts to address problems such as the commercial abuse of the athlete, the IOC is working to uphold its ethical and fundamental principles in a changing world. For information on the other commissions, please consult specific factsheets and publications.

## THE ADMINISTRATION

The IOC administration is placed under the responsibility of the Director General, Mr Christophe De Kepper. He runs the administration under the authority and guidance of the President. He is assisted in this task by the directors.

The main assignments of the administration include: preparation, implementation and follow-up of the decisions taken by the Session, the Executive Board and the President; preparation and follow-up of the work of all the commissions; and permanent liaison with the IFs, NOCs and OCOGs, including coordination of the preparations for all Olympic Games.

## THE INTERNATIONAL SPORTS FEDERATIONS (IFs)

The International Sports Federations are international non-governmental organisations recognised by the IOC as administrating one or more sports at world level. When the IOC was established in 1894, only a very small number of IFs existed. Today, however, there are 28 Summer IFs, 7 Winter IFs, and 32 Recognised Sports Federations that are currently affiliated to the Olympic Movement. The IFs are responsible for overseeing the technical aspects and management of their sport at the Olympic Games. They also establish the eligibility criteria for the competitions of the Games, in accordance with the Olympic Charter. They likewise play an active role in the applicant and candidate city evaluation process. They join the IOC in the fight against doping in sport. In order to discuss common problems and decide on their events calendars, the Olympic Summer Sports IFs, the Olympic Winter Sports IFs and the Recognised IFs have formed associations: the Association of Summer Olympic International Federations (ASOIF), the Association of International Olympic Winter Federations (AIOWF), the Association of Recognised International Sports Federations (ARISF) and Sport Accord, which also includes other sports federations.

## THE NATIONAL OLYMPIC COMMITTEES (NOCs)

More than 200 NOCs belonging to the Olympic family are essential "ambassadors" of the Olympic Movement in their respective countries,



and the tasks assigned to them are clearly stipulated under Rule 27 of the Olympic Charter. The NOCs are responsible for sending participants to the Games and endorsing potential future Olympic host cities within their countries. Furthermore, they are assigned the task of promoting the Olympic Movement, its work, and its fundamental principles in their day-to-day activities. The NOCs form five continental associations, which are represented within the Association of National Olympic Committees (ANOC).

# THE ORGANISING COMMITTEES FOR THE OLYMPIC GAMES (OCOGs)

The organisation of the Olympic Games is entrusted by the IOC to the NOC of the country of the host city as well as to the host city itself. The NOC forms, for that purpose, an Organising Committee for the Olympic Games, which, from the time it is constituted, communicates directly with the IOC, from which it receives instructions. The OCOG executive body includes: the IOC member or members in the country; the President and Secretary General of the NOC; and at least one member representing, and designated by the host city.

The OCOG must undertake its work in accordance with the Olympic Charter and the Host City Contract concluded between the IOC, the NOC and the city. Some of the aspects of an OCOG's work include:

- to give equal treatment to every sport on the programme and ensure that competitions are held according to the rules of the IFs;
- to choose and, if necessary, create the required facilities, competition sites, stadiums and training halls, and to arrange for the equipment required;
- to accommodate the athletes, their entourage and the officials;

- to organise the cultural events that are an essential element of the celebration of the Olympic Games.

# Figure A: The presidents

| Demetrius Vikelas (GRE) | 1894 – 1896 |
| Pierre de Coubertin (FRA) | 1896 – 1925 |
| Henri de Baillet-Latour (BEL) | 1925 – 1942 |
| J. Sigfrid Edström (SWE) | 1946 – 1952 |
| Avery Brundage (USA) | 1952 – 1972 |
| Lord Killanin (IRL) | 1972 – 1980 |
| Juan Antonio Samaranch (ESP) | 1980 – 2001 |
| Jacques Rogge (BEL) | 2001 – |

# Figure B: Games of the Olympiad and Olympic Winter Games

| *Games of the Olympiad* |
| Athens 1896 |
| Paris 1900 |
| St Louis 1904 |
| London 1908 |
| Stockholm 1912 |
| Antwerp 1920 |
| Paris 1924 |
| Amsterdam 1928 |
| Los Angeles 1932 |
| Berlin 1936 |
| London 1948 |
| Helsinki 1952 |
| Melbourne/Stockholm 1956 |
| Rome 1960 |
| Tokyo 1964 |
| Mexico City 1968 |
| Munich 1972 |
| Montreal 1976 |
| Moscow 1980 |
| Los Angeles 1984 |
| Seoul 1988 |
| Barcelona 1992 |
| Atlanta 1996 |
| Sydney 2000 |
| Athens 2004 |
| Beijing 2008 |
| **London 2012** |
| **Rio 2016** |



| Winter Games |
| --- |
| 1924 Chamonix |
| 1928 St Moritz |
| 1932 Lake Placid |
| 1936 Garmisch-Partenkirchen |
| 1948 St Moritz |
| 1952 Oslo |
| 1956 Cortina d'Ampezzo |
| 1960 Squaw Valley |
| 1964 Innsbruck |
| 1968 Grenoble |
| 1972 Sapporo |
| 1976 Innsbruck |
| 1980 Lake Placid |
| 1984 Sarajevo |
| 1988 Calgary |
| 1992 Albertville |
| 1994 Lillehammer |
| 1998 Nagano |
| 2002 Salt Lake City |
| 2006 Turin |
| 2010 Vancouver |
| **2014 Sochi** |
| **2018 PyeongChang** |

## IMPRINT

**THE OLYMPIC MOVEMENT**                      21 June 2012

A publication of the

INTERNATIONAL
OLYMPIC
COMMITTEE

Château de Vidy,
1007 Lausanne,
Switzerland

For further information, please contact

Olympic Studies Centre
Tel. + 41 21 621 63 18
Fax + 41 21 621 67 18
studies_centre@olympic.org

# Exhibit I-14

Exhibit 1

IN THE OFFICE OF ADMINISTRATIVE HEARINGS

|  |  |
|---|---|
| In the matter of the Hearing of an Appeal By: | ) ) ) ) No. Docket No. ) 11F-002-ADE ) |
| Tucson Unified School District No. 1 | ) ) ) ) |

DEPOSITION OF JOHN HUPPENTHAL

Phoenix, Arizona

August 16, 2011

1:17 p.m.

BY:  LILIA MONARREZ, CSR, RPR
      Certified Reporter
      Certificate No. 50699

**Coash & Coash, Inc.,  602-258-1440**

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

Page 2

```
 1                    I N D E X
 2   JOHN HUPPENTHAL
 3               EXAMINATION
 4                                            Page
 5   BY MS. SMITH                               4
 6
 7
 8               E X H I B I T S
 9                                            Page
10   Exhibit 21  Official Statement of Superintendent  54
11               of Public Instruction John Huppenthal
12               on His Determination Regarding the
13               Tucson Unified School District's
14               Violation of A.R.S. Section 15, 112
15   Exhibit 22  Letter, march 9, 2011          85
```

01:17:59-01:18:24                           Page 4

```
 1              Phoenix, Arizona
 2           Tuesday, August 16, 2011
 3                  1:17 p.m.
 4
 5              JOHN HUPPENTHAL,
 6   a witness herein, having been first duly sworn by the
 7   Certified Reporter to speak the truth and nothing but
 8   the truth, was examined and testified as follows:
 9
10              EXAMINATION
11   BY MS. SMITH:
12   Q.  Can you please state your full name for the
13   record?
14   A.  John F. Huppenthal.
15   Q.  Have you ever had your deposition taken before?
16   A.  Probably about -- I guess it would be 20 years
17   ago now or 18 years ago.
18   Q.  So just one time?
19   A.  Yeah.
20   Q.  Okay.  What was the general context in which
21   your deposition was taken before?
22   A.  Geez.  I don't even hardly recall.  It was some
23   municipal bond thing when I was on city council.
24   Q.  Okay.  You were a witness, essentially?
25   A.  Yeah.  Okay.  Something like that.  I don't
```

Page 3

```
 1            DEPOSITION OF JOHN HUPPENTHAL,
 2   was taken on August 16, 2011, commencing at 1:17 p.m. at
 3   BURCH & CRACCHIOLO, P.A., 702 East Osborn, Suite 200,
 4   Phoenix, Arizona, before Lilia Monarrez, a Certified
 5   Reporter of the State of Arizona.
 6
 7                    *   *   *
 8   APPEARANCES:
 9      For the Appellant:
          DeCONCINI McDONALD YETWIN & LACY, P.C.
10        By:  Lisa Anne Smith, Esq.
               Sesaly O. Stamps, Esq.
11        2525 East Broadway Boulevard
          Suite 200
12        Tucson, Arizona 85716
          (520) 322-5000
13
14      For John Huppenthal, Superintendent of Public
        Instruction and Executive Director of the Arizona
15      State Board of Education:
          BURCH & CRACCHIOLO, P.A.
16        By:  Bryan Murphy, Esq.
               Melissa G. Iyer, Esq.
17        702 East Osborn
          Suite 200
18        Phoenix, Arizona 85014
          (602) 274-7611
19
20      Also Present:
          Merle Bianchi, Chief of Staff
21        Department of Eduction
22
23
24
25
```

01:18:32-01:19:14                           Page 5

```
 1   know.
 2   Q.  Fair enough.
 3   A.  I know it was a long time ago.
 4   Q.  Given that you don't remember the content of the
 5   deposition, even though I'm sure you spoke with your
 6   lawyer a little I'm going to kind of go over what's
 7   going to happen here today.
 8   A.  Okay.
 9   Q.  Obviously, the court reporter is taking down
10   what we say, so one of the most important things is
11   that we not speak over one another because if we do it
12   makes it hard for her to get the words down.  So please
13   try to wait until I finish asking a question before you
14   answer and I will also try to do the same for you.
15   A.  Okay.
16   Q.  It seems obvious, but we constantly talk over
17   each other in regular conversation.
18       Secondly, if you are saying yes or no, please be
19   sure to say yes or no as opposed to nodding or shaking
20   your head or giving other -- something else that
21   doesn't come out clearly on the record.
22   A.  Okay.
23   Q.  If you need to take a break at any time, that's
24   fine.  Just let us know.  We can take a break.  I
25   usually tend to take a break about after about an hour,
```

**01:19:28-01:20:17**        Page 6

1  hour and a half anyway, and I don't know that your
2  deposition will go that much longer than that. The
3  only caveat to that is that if there's a question
4  pending then we just ask that you answer that question
5  before we take a break.
6  A. Okay.
7  Q. And if I ask a question, which is altogether
8  possible, that you lose somewhere in the middle and it
9  doesn't make any sense, please ask me to just rephrase
10  it and I will do so.
11      Okay?
12  A. Okay.
13  Q. All right. Can you give me an overview about
14  your -- of your educational background?
15      I'm going to ask you about sort of your
16  educational background and your work experience, but
17  just to begin with educational background starting with
18  college.
19  A. I got a degree in engineering from Northern
20  Arizona University, mechanical engineering, and a
21  master's degree in business administration from Arizona
22  State University.
23  Q. Okay. And when did you get those degrees?
24  A. 1977 and, I think, 1983.
25  Q. Okay.

**01:20:25-01:21:38**        Page 7

1  A. So I believe that was --
2  Q. Okay.
3  A. Either '83 or '82.
4  Q. Fair enough.
5      And then can you give me a summary of your work
6  experience? What have you done since -- let's just say
7  since you got your master's degree?
8  A. I was a senior planning analyst for the Salt
9  River Project. I worked for the Salt River Project for
10  32 years before I retired last January.
11  Q. Okay. January 2010 or 2011?
12  A. 2011.
13  Q. Okay. In order to assume the position that
14  you're in now?
15  A. Yes. Uh-huh.
16  Q. And you've also been involved in -- you've had a
17  political career as well?
18  A. Yeah. I was on the Chandler City Council from
19  1984 to 1992. I was state senator from 1992 to 2000,
20  and I was in the House of Representatives from -- it
21  gets blurry. Anyway, I ended up back in the state
22  Senate after a stint in the House of Representatives
23  and left the state Senate. You know, I served in the
24  state Senate through 2010.
25  Q. Right. Okay.

**01:21:48-01:22:34**        Page 8

1      Were you -- was there a break between being in
2  the Senate and the House of Representatives and then
3  back in the Senate?
4  A. No. It was all --
5  Q. It was just which position you were in?
6  A. Yeah. It was all continuous.
7  Q. Okay. So you were in the Arizona state
8  legislature from 1992 through to 2010?
9  A. Yeah.
10  Q. Okay.
11  A. Yes.
12  Q. And you were in the Senate when House Bill 2281
13  was considered and ultimately passed.
14      Correct?
15  A. Now, when you reference bill numbers, every year
16  they use the same bill numbers all over again. So when
17  you've been there 18 years --
18  Q. You've been through plenty of those?
19  A. There have been 18 2281s.
20  Q. Okay. So I'm talking about --
21  A. So I'm going to assume --
22  Q. Yes. Your assumption is going to be right. I'm
23  talking about the particular HB 2281 that turned into
24  A.R.S. 15-112.
25  A. Okay. Yes. Uh-huh. I was there.

**01:22:45-01:23:41**        Page 9

1  Q. Okay. And it's my understanding that you
2  actually introduced a couple of amendments to that
3  bill.
4      Do you recall that?
5  A. I don't recall --
6  Q. Okay.
7  A. -- doing that, but quite easily could have been.
8  The way I ran the legislative process, we had a large
9  group that would grind away and we'd have analysts, and
10  I had -- my analysts were the very best. And so when
11  they said run amendments, I ran amendments.
12  Q. Okay. Also, my analyst sitting here next to me,
13  she's found out for me what those amendments were. So
14  if you recall, you know, why you introduced them, it's
15  only a couple of things. One was a change -- I think
16  it's my understanding the bill changed from having the
17  superintendent to have the authority to enforce it to
18  having the State Board of Education have the authority
19  to enforce it, and you introduced an amendment to bring
20  it back so that both the superintendent and the state
21  board had the authority.
22      Do you recall that?
23  A. I do recall that.
24  Q. And can you tell me why you suggested that
25  amendment which ultimately was accepted?

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

---

01:23:56-01:25:03                                      Page 10

1   A. You know, I don't recall exactly why I put that
2   on the table. I don't have a distinct recollection
3   over it.
4   Q. Okay. And the second amendment -- and I guess
5   it was actually two, but they did the same thing which
6   was to delay the effective date of the legislation
7   until the very end of 2010, slash, the very beginning
8   of 2011.
9       Do you recall that?
10  A. I do.
11  Q. And can you tell me why you proposed that
12  change?
13  A. I wanted it to -- I wanted it to start with the
14  beginning of the term of the new superintendent.
15  Q. Okay. Is there a particular reason?
16  A. Well, I felt like we were going into a political
17  season and I felt like the -- that the matter at hand
18  was serious enough that it should be taken out of a
19  political context and be able to be dealt with in a
20  deliberative fashion. I felt the issues were very
21  serious that were involved in the whole endeavor and
22  that it shouldn't be treated as a political football.
23  Q. Were you surprised when then Superintendent
24  Horne issued signing on his last day in office?
25  A. No. He had asked me about it.

---

01:25:23-01:26:26                                      Page 11

1   Q. Okay. I asked you what about it, if you had an
2   opinion about him issuing them just as he left and you
3   came in or --
4   A. He basically came to me and just checked with me
5   on the whole issue, and I just let him know that he
6   needed to make his own decisions.
7   Q. Okay.
8   A. As best I can recall. I don't -- you know, I
9   didn't take notes of the conversation.
10  Q. Fair enough.
11      During the time that the bill that ultimately
12  became a law was debated and discussed, Tucson Unified
13  School District Mexican-American Studies Program was,
14  is it fair to say, always in the limelight as part of
15  that discussion?
16  A. The -- yes. Uh-huh.
17  Q. Were there other programs or departments that
18  you recall people talking about or looking at with
19  relation to this issue?
20  A. No.
21  Q. And can you explain to me a little bit about --
22  and I don't want to misquote you, so correct what I'm
23  saying that's wrong, but I think you said that part of
24  the reason why you -- or that the reason why you wanted
25  to delay the effective date was to kind of move it from

---

01:26:33-01:27:33                                      Page 12

1   a political arena to a more of a deliberative arena.
2   A. Uh-huh.
3   Q. Is that fair?
4   A. Yes.
5   Q. Tell me what you mean by that.
6   A. Well, you had an election taking place August
7   and November. I just felt that when that decision
8   needed to be made was out of that -- out of that span.
9   Q. Okay. So that it didn't -- the politics of it
10  didn't enter into or -- let me strike that question.
11      So that it wouldn't be made in the context of an
12  election?
13  A. Yeah.
14  Q. Okay. So as we just discussed, former
15  Superintendent Horne did issue his own findings finding
16  this program in violation of the statute on his last
17  day before you took over.
18  A. Uh-huh.
19  Q. The same day you took over, actually, I think.
20  Right?
21  A. Yeah. Uh-huh.
22  Q. So given that he had done that in, you know, a
23  pretty lengthy document with all sorts of specific
24  things mentioned in it, why did you decide to not,
25  essentially, enforce that finding but to do something,

---

01:27:53-01:28:47                                      Page 13

1   to do your own review and your own findings?
2   A. Well, I felt that there needed to be a clear
3   distinction between the legislative political arena and
4   then in taking this role as superintendent, you need to
5   do this in a very deliberative fashion because this is
6   a serious issue and it needed to be dealt with
7   seriously.
8   Q. Okay. And so you felt it was important for you
9   to take your own look at the data?
10  A. Yes. Uh-huh.
11  Q. And have you as superintendent or has ADE since
12  you've been there investigated any other school
13  districts' ethnic studies programs for compliance with
14  15-112?
15  A. Not to my knowledge.
16  Q. Are you aware of even considering investigating
17  any other districts for compliance with 15-112?
18  A. I haven't, and not to my knowledge has the
19  department.
20  Q. Okay. Is there someone else who would -- I
21  mean, could that be going on without you knowing about
22  it?
23  A. I doubt it but, you know, I've learned to be
24  careful about how I -- there's 480 people in that
25  building.

---

| 01:28:52-01:29:46                          Page 14 |
|---|

1  Q. Okay.
2  A. And I've found that they're doing a lot of
3  things.
4  Q. And actually that reminds me that I meant to ask
5  you, what is your --
6  A. 480, plus or minus, you know.
7  Q. -- role as superintendent? I mean, what is it
8  that -- how would you describe what you're in charge
9  of, what you oversee? And all those 480 people, is
10 that part of it?
11 A. Yeah.
12 Q. Okay.
13 A. 480, plus or minus.
14 Q. Okay.
15 A. To define my role?
16 Q. Yes.
17 A. You know, there's a series of things laid out
18 statutorily that -- you know, and I reference those as
19 to what my duties are.
20 Q. And I understand from other depositions I've
21 taken last week that you have two, essentially, sort of
22 chief officers who report directly to you, Mr. Hibbs
23 and Mr. Stollar.
24      Is that correct?
25 A. Yes. Uh-huh. Yeah.

| 01:29:55-01:30:50                          Page 15 |
|---|

1  Q. And then each of them supervise the next level
2  down of -- I can't remember their titles, but deputy
3  superintendents.
4  A. Uh-huh.
5  Q. Is that correct?
6  A. Yes. Uh-huh.
7  Q. All right. So you're at the top of the chain
8  and then everyone else, I assume, falls down below the
9  rest of them?
10 A. Yeah. There are some other -- there are some
11 other employees that report to me, but they don't
12 have -- they don't have large spans of control below
13 them.
14 Q. Okay. All right. And as to the two, Mr. Hibbs
15 and Mr. Stollar, what are their roles and what are they
16 responsible for, what areas?
17 A. Mr. Stollar is the educational officer and
18 Mr. Hibbs is the operational officer.
19 Q. Okay. And I talked to Mr. Stollar so I do
20 understand what he's sort of in charge of.
21      What does it mean to be the operational officer?
22 A. Well, you have a whole series of logistical
23 things. You have a large computer system.
24 Q. Okay.
25 A. Through which billions of dollars and a

| 01:31:07-01:32:10                          Page 16 |
|---|

1  million-plus students, their information flows, so
2  those logistical things which aren't directly
3  educational mission.
4  Q. Okay. Like the management of all that
5  information and that type of thing falls on the
6  operation side?
7  A. Yeah, and other -- not just I.T. but other
8  logistical things that wouldn't properly be classified
9  as educational in nature, although in reality those
10 spans of control blur a little bit at the edges.
11 Q. Okay. I know from speaking with Mr. Stollar and
12 from Ms. Hrabluk they have careers in education.
13 A. Yes.
14 Q. And I know from speaking to you just now you do
15 not have a career in education.
16 A. No.
17 Q. What about Mr. Hibbs?
18 A. He was the former director of First Things First
19 so -- and he -- prior to that he had a lengthy career
20 as a super star administrator in state agencies going
21 across the whole series of state agencies.
22 Q. I don't know what First Things First is.
23 A. It's an organization that the voters created
24 that delivers services for preschool.
25 Q. Okay.

| 01:32:24-01:33:29                          Page 17 |
|---|

1  A. Preschool services to students statewide.
2  Q. And he was the -- I'm sorry.
3      What did you say his role was with regard to
4  that generally?
5  A. He was the top -- he was their top officer. I
6  don't know what his specific -- how they specifically
7  title him.
8  Q. Okay.
9  A. He ran First Things First, which is a pretty
10 sizable organization.
11 Q. Okay. And with regard -- but other than that
12 experience, it sounds like what you're saying as far as
13 you know, he doesn't have a background or a career as
14 an educator or in education specifically?
15 A. No. Huh-uh. No.
16 Q. Okay. So when you decided that you would take
17 your own look at the Mexican-American Studies
18 Department Program, what did you -- did you make a
19 decision about how to proceed in conjunction with other
20 folks or were you the person who kind of drove what
21 should we do in order to take a look at this?
22 A. I did it in conjunction with my people, so we
23 had discussions about how to proceed.
24 Q. Okay. And your people would they be
25 Ms. Hrabluk, Mr. Stollar?

| 01:33:51-01:34:50 Page 18 | 01:36:50-01:37:59 Page 20 |
|---|---|

**Page 18**

1  A. Mr. Stollar hadn't come on --
2  Q. Oh, that's right.
3  A. -- at that point. So I made it in conjunction
4  with Elliott, Elliott Hibbs, and Stacy Morely and my
5  chief of staff.
6  Q. Okay. And so was it that group of folks,
7  including yourself, then that made the decision to seek
8  an outside entity to conduct some kind of audit or
9  investigation?
10 A. Yes. Uh-huh.
11 Q. Okay. And why did you make a decision to --
12 A. Not -- you know, I don't want to construe it
13 exactly in that fashion because those conversations
14 happened in, you know, a complex weave of interactions
15 so I don't want to say that they happened in any
16 specific way.
17 Q. And it wasn't like you all sat down and said,
18 how should we do this and then decided let's go hire an
19 auditor.
20    Is that what you're saying?
21 A. That might have happened at some specific point,
22 but also Elliott Hibbs and myself had discussions which
23 might have more directly led to the audit.
24 Q. Okay. When you first took office, did you have
25 an opinion about whether Horne's findings were likely

**Page 20**

1  A. Well, there's two contexts. One is I have a
2  statutory obligation to analyze the law. So the law
3  took place at a specific point in time and so I had to
4  focus on the evidentiary record from that point
5  forward.
6  Q. Okay.
7  A. I mean, that just -- the other thing that I was
8  very much interested in was more broadly how -- and
9  this is separate and apart from that determination --
10 more broadly the issues that involved education in
11 general and how I would deal with this phenomena
12 because I felt like thinking about this as a phenomena
13 that was limited to Tucson Unified or even limited to
14 Arizona would be too narrow of thinking.
15 Q. And you said a couple of times "this phenomena."
16    Tell me what you are talking about when you say
17 that.
18 A. Just generally sort of philosophy in general and
19 how it affects society, how it affects people's
20 likelihood to succeed, the philosophy that they pick up
21 an education but -- let me be clear. Those issues are
22 separate and apart from the determination under state
23 law. So I wanted to be able to think about this deeply
24 and broadly but, also, more directly deal with the
25 specific statutory duty I had under the law that was

| 01:35:09-01:36:31 Page 19 | 01:38:18-01:39:31 Page 21 |
|---|---|

**Page 19**

1  reflective of what was going on at TUSD?
2  A. I did.
3  Q. And what was your opinion?
4  A. I think that they -- I felt that they needed
5  more investigation.
6  Q. Why?
7  A. I just felt that I had an obligation to set
8  aside the legislative background where we had testimony
9  that came in front of us legislatively by both sides of
10 the equation and then we had debates that took place in
11 the political context. I felt like I needed to set
12 that aside and to do a more rigorous analysis of what
13 was going on. I felt that the issues that were
14 involved were huge for education far more than this --
15 what was going on in Tucson Unified as a small
16 microcosm of a much bigger phenomena that needed to be
17 addressed, and so I think I just felt like I needed to
18 deal with it very seriously.
19 Q. Okay. And so when you -- were you looking --
20 I'm sorry.
21    When you decided to look at it more seriously,
22 did you want to look at what was going on prior to the
23 effective date of the law or were you looking primarily
24 at what was going on after the effective date of the
25 law?

**Page 21**

1  developed.
2  Q. Okay. So we were talking about then when you
3  decided how you're going to go about taking this
4  careful look at the program, and one of the things that
5  you decided to do was to hire an outside entity to do
6  its own -- do an audit.
7  A. Yes.
8  Q. Okay. And why did you choose to hire an outside
9  entity as opposed to having people within ADE do an
10 investigation?
11 A. I felt that having something done independently
12 was the proper way to go to make sure that we -- we
13 could separate the political context from anything,
14 that we would have that degree of independence.
15 Q. Okay. And do you think that you achieved that,
16 a view from an independent entity outside the politics
17 by getting the investigation and the report from
18 Cambium?
19 A. No. I didn't feel like I got that product from
20 them.
21 Q. Why is that? Based on what?
22 A. I have been a member of the Joint Legislative
23 Audit Committee. I've been subject to audits myself
24 personally on a number of times and so the audits to me
25 are a really rigorous discipline. And statistics, when

| 01:39:53-01:41:09 | Page 22 |
| --- | --- |

1   you pull a sample, there is a -- specific things have
2   to happen for that sample to represent the whole
3   universe. And so when you are in an audit situation
4   and they're looking at examples or samples, those
5   samples should represent the whole body. And as I went
6   through the report, I felt that that didn't happen with
7   the Cambium audit.
8    Q. Were there other concerns you had about the
9   audit?
10   A. Only in looking back at it. There were attacks
11   made on the people originally selected for the audit,
12   and so I had concerns about the fact that the
13   independence of the audit may have been affected. And
14   I have no evidence that it was, but I just had concerns
15   that the independence of the audit may have been
16   affected by what appeared to be quite a number of
17   fairly vicious attacks on the people who were
18   originally slated to do the audit.
19    But those aspects, I don't know. All I can say
20   is that when I looked at the final product of the
21   audit, I found it to be of limited usefulness because
22   as we looked at a broader range of evidence the audit,
23   it seemed to me, did not live up to the rigor that an
24   audit should live up to.
25    Q. Okay. You indicated -- the first -- one of the

| 01:41:23-01:42:27 | Page 23 |
| --- | --- |

1   first things you said was that, for example, with an
2   audit samples of people -- I assume you are talking --
3   well, I should have mentioned this.
4    You said samples have to be representative of
5   the whole body.
6   A. Uh-huh.
7    Q. Is there a particular aspect or aspects of the
8   audit you are talking about when you say that you
9   didn't think that that happened?
10   A. I think just generally the samples of the
11   classroom, the samples of the students, and the samples
12   of the teachers, it appeared to me to be lacking in
13   that regard. But the thing I need to emphasize is we
14   went through the audit, but then we had another broad
15   array of information that we got directly about what
16   was going on in the classrooms. And so it was the
17   entirety of the context upon which we made our
18   decision.
19    Q. Right. And I understand that. I mean -- and
20   I'm going to ask you some questions about that too,
21   but -- let me ask you that now then.
22    What other -- what is the broad array of other
23   information about what was going on in the classrooms
24   that ADE reviewed in addition to the audit?
25   A. Well, I have to go to staff specifically, but

| 01:42:48-01:43:22 | Page 24 |
| --- | --- |

1   they were able to pull a lot of information that wasn't
2   available to the audit that was coursework. And so we
3   were able to -- it was in the entirety of the context
4   that we were able to -- that we had as the foundation
5   for our decision.
6    Q. And the staff, it's my understanding that
7   Ms. Hrabluk was kind of one of the main people who was
8   doing that work.
9    Is that correct?
10   A. Yes.
11    Q. And Mr. Stollar was involved?
12   A. Uh-huh, and Mr. Hibbs.
13    Q. Okay. And it's my understanding from talking to
14   them that primarily what they looked at or actually all
15   that they -- everything that they did was to review
16   materials, written materials, whether they be texts,
17   curricular materials, you know, other documents from
18   the Mexican-American Studies Department.
19    Is that correct?
20   A. Books, yes.
21    Q. Is that your understanding too?
22   A. Yes. Uh-huh.
23    Q. They didn't go visit classrooms?
24   A. No, they did not.
25    Q. And they didn't conduct focus groups?

| 01:43:31-01:44:31 | Page 25 |
| --- | --- |

1   A. Now, when I say, no, they did not, I don't have
2   any personal information that they did not. I don't
3   have any knowledge that they did.
4    Q. Okay.
5   A. So I don't think that they did.
6    Q. Okay. And as far as you know, they didn't do,
7   for example, focus group interviews?
8   A. No.
9    Q. Okay.
10   A. Not to my knowledge.
11    Q. They did get -- are you aware that they received
12   like emails, for example, and correspondence from
13   essentially concerned citizens, unsolicited input from
14   concerned citizens?
15   A. I don't have any knowledge of that.
16    Q. Okay.
17   A. However, to the extent that those materials may
18   be in the process somewhere, I may have come across
19   that information that way, but I don't have any
20   knowledge that they received emails.
21    Q. So how did information then come to you? Were
22   you looking at textbooks or written materials from
23   classes personally?
24   A. To some extent, yes.
25    Q. Okay. Things that they selected out -- the rest

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

---

**01:44:54-01:45:52**      Page 26

1   of your staff selected out for you to take a look at,
2   or were you kind of doing your own review of things?
3   A. They had a -- they had evidence. And so I was
4   able, to a certain extent, to look at that evidence
5   directly but, more importantly, they're very good. And
6   I was able to go over what -- go over with them their
7   determinations.
8   Q. When you say they had certain evidence that you were
9   able to look at to a certain extent directly, what are
10  you talking about?
11  A. Well, I'm talking about their summaries to what
12  they found, that type of thing.
13  Q. Okay. That's what I thought you might be
14  talking about, and I have a few of those. I'll show
15  you to see if that's what you were referring to. Let
16  me go back, though.
17      You said that you had some concerns about the
18  independence and you were clear that you don't know
19  that it was effective, but you were concerned about it
20  because there were some vicious attacks on some of the
21  people that were supposed to be involved.
22      Can you tell me what you are talking about?
23  A. At some point, I became aware that there was --
24  that Cambium was being attacked.
25  Q. Because of participating in this audit?

---

**01:46:13-01:47:15**      Page 27

1   A. That was my perception. I don't -- you know, I
2   didn't spend a lot of time going down that route, but I
3   just had some -- you know, I became aware that there
4   appeared to be some -- that Cambium was taking fire for
5   biding on the audit.
6   Q. Do you have a sense of from whom they were
7   taking that fire?
8   A. It was from the -- just the sense of it I got
9   was it was from the Mexican-American studies community.
10  Q. In Tucson?
11  A. I didn't know that. I don't have any knowledge
12  of that directly.
13  Q. Okay. And it was Cambium in general or specific
14  individual people?
15  A. I just had a general sense that it was both
16  Cambium in general and also specific people.
17  Q. Is there someone on your staff who would know
18  more specifically what -- anything about what your
19  concerns were here?
20  A. No. I didn't get that information to staff.
21  Q. Okay. Is it something you discussed with your
22  staff, concerns about Cambium's independence?
23  A. No, not to my recollection. I mean, there's a
24  possibility that I did, but I don't -- you know, I
25  don't recall it. I just took it as another day in the

---

**01:47:33-01:48:55**      Page 28

1   life of, you know.
2   Q. Okay. Did you have a role in developing the
3   scope of the audit?
4   A. Perhaps a little bit, you know. I wouldn't -- I
5   can't recall any specifics about that. I was engaged
6   in discussions about those kinds of things. That
7   was -- I don't have any direct recollection of that.
8   Q. Okay. Were you aware that the scope of work
9   that Cambium was asked to do was -- I mean, the
10  questions that they were asked to look at and to answer
11  weren't just about 15-112 and the MAS compliance with
12  that? Are you aware of that?
13  A. We -- we had -- there were discussions about the
14  audit, and even though I don't recall the particulars I
15  just know my nature is that I would have engaged that,
16  you know, in a discussion of the organization of that,
17  but I don't recall the specifics of those
18  conversations.
19  Q. So you don't recall the specific scope of the
20  audit or what questions Cambium was asked to look at
21  and answer?
22  A. Not directly offhand. I mean, it's been a while
23  since I read the audit.
24  Q. Okay. So you hired Cambium?
25  A. Uh-huh.

---

**01:49:04-01:49:41**      Page 29

1   Q. And you understand they subcontracted with NAEP?
2   Are you aware of that?
3   A. I'm not.
4   Q. Okay. And Cambium did an investigation.
5   A. Uh-huh.
6   Q. Correct?
7   A. Yeah.
8   Q. And they produced a report?
9   A. Yes.
10  Q. And they did that to assist you in coming to
11  some determination about what was going on in the MAS
12  program at TUSD?
13  A. Yes.
14  Q. And the state paid them $110,000 for that work.
15  Correct?
16  A. That's what I've been told.
17  Q. Okay. You don't pay the bills, huh?
18  A. I didn't write the check.
19  Q. Okay. Do you have any knowledge of how many
20  person hours Cambium put into the investigation that
21  they did?
22  A. I don't.
23  Q. Do you have any idea how many person hours ADE
24  staff put into the investigation that they did?
25  A. No, I don't.

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

1   Q. Do you have any reason to know -- to have an
2 opinion about whether Cambium put more hours into it or
3 whether ADE put more hours into it?
4   A. I don't.
5   Q. Okay. And let's just kind of close the loop.
6 I've got a book of exhibits here in front of you, and
7 if you can just flip to Tab Number 3 in that book of
8 exhibits.
9   A. Okay.
10   Q. Do you recognize that as the report that was
11 produced and delivered to ADE from Cambium?
12   A. I do.
13   Q. And did you -- despite some of the limitations
14 that you've identified that you are concerned about,
15 did you consider this report and their findings in
16 reaching your own findings about the MAS program?
17   A. I did.
18   Q. Okay. Did you rely on the information contained
19 in this report?
20   A. As I mentioned before, I found it of limited
21 usefulness.
22   Q. Okay. Did you identify for your staff a date by
23 which this needed to be completed, the report or the
24 audit?
25   A. I felt that because of its effect -- excuse me.

1   Q. Do you need some water?
2   A. Just generally I wanted -- I was concerned about
3 Tucson Unified School District. I was concerned about
4 John Pedicone in particular. I had a lot of respect
5 for him. I had previously identified him as clearly in
6 the top ten of, you know, sort of the hall of fame of
7 superintendents based on what he had been able to
8 achieve at Flowing Wells. So I thought that if there
9 was anybody who could be successful at Tucson Unified,
10 you know, he was sort of Tucson Unified's last chance.
11     And so I was thinking strategically how I
12 could -- how we could time our stuff to cause the least
13 chaos for him. So I was thinking of that, in part, and
14 so I was thinking that just strategically generally,
15 not specifically relating to this report, but I was
16 hoping to have things timed such that would happen at
17 the end of the semester so the finding -- we would
18 analyze the evidence and come to our conclusions.
19     At the end of the semester you would then --
20 that would then, you know, strategically work out best
21 for him, I thought, but that's just general thinking.
22 I don't get things on specific dates and I always know
23 that the best laid plans of mice and men, you know, but
24 to the extent that I could guide it I was hoping to
25 cause the least amount of chaos for him.

1   Q. Okay. When I talked to Ms. Hrabluk last week,
2 she -- I asked her about, essentially, well, why didn't
3 you give Cambium more time based on some concerns that
4 maybe they hadn't seen enough classrooms, things like
5 that. She was under the impression that there was a
6 specific deadline related to 60 days by which the audit
7 had to be completed.
8   A. Well, I made a -- I may have created that
9 environment by my desire to sequence this in a certain
10 way.
11   Q. Okay. But it wasn't, in your mind, based on any
12 statutory deadline or some other deadline.
13     It was just based on the considerations you've
14 just described for us?
15   A. I don't know. I'd have to sit down and work out
16 a timeline to be able to answer that. I just had a
17 general sense that I wanted to strategically move
18 things in a certain direction, and so I don't know how
19 that could have been interpreted by staff.
20   Q. Okay. Did you have any discussions with your
21 staff about -- as the audit was ongoing about any
22 concerns related to limitations on how much Cambium was
23 seeing or not seeing?
24   A. No.
25   Q. Okay. Did you ever have any discussions about

1 potentially asking them to go back and see more or
2 extending a deadline so that they could, for example,
3 visit more classes?
4   A. No.
5   Q. Do you think it would have been helpful to have
6 more classroom visits or to have wider varieties of
7 people interviewed and in focus groups and those
8 settings?
9   A. You know, I can't -- I didn't speculate on
10 those, you know. I had the product that was in front
11 of me. It was -- you know, we needed to come to a
12 decision and move forward and we had a broad base of
13 information with which to make that decision, and so I
14 felt comfortable that we -- in my mind this decision
15 wasn't a close call as we reviewed all the evidence.
16   Q. And specifically from what you've said, I mean,
17 the evidence that you reviewed included this report.
18     Correct?
19   A. Yes. Uh-huh.
20   Q. And it included summaries of information from
21 your staff.
22   A. Uh-huh.
23   Q. Yes?
24   A. Yes.
25   Q. And was there other evidence that you reviewed?

| 01:56:32-01:57:25 | Page 34 |
| --- | --- |

1   A. Well, directly evidence, the evidence itself
2   over time I was able to -- the direct evidence itself,
3   a fair amount of that I was able to review that.
4   Q. And I'm sorry. You did say that earlier.
5       And the direct evidence that you would have
6   reviewed would it have been evidence that was also
7   described in the summaries you reviewed?
8   A. Yes. Uh-huh.
9   Q. Okay.
10  A. To a certain extent. Not all of it was
11  described in the summaries, but that's just the nature
12  of summaries.
13  Q. Right. And I guess what I'm -- and I maybe
14  didn't ask a very clear question.
15      For example, if a summary listed a book and a
16  passage, I assume you may have read more than that,
17  simply than one passage from the book?
18  A. Yeah.
19  Q. But if a summary listed ten books might you have
20  also looked at an 11th or a 12th book that weren't on
21  that or any other summary?
22  A. I don't think so.
23  Q. Okay. You indicated when I was asking you about
24  the timing that essentially when you entered into the
25  position of superintendent you were concerned about

| 01:59:04-01:59:50 | Page 36 |
| --- | --- |

1   100 people to pick from, you know, he'd be pretty close
2   to Number 1.
3   Q. Okay. Now, you visited TUSD during the hearings
4   on the bill that became 15-112? Is that what you were
5   saying?
6   A. At a delayed date.
7   Q. As in after it was -- what do you mean by that?
8   A. The hearings took place during the legislative
9   session, and I visited the classroom afterwards.
10  Q. Okay. Do you recall approximately when, what
11  time of year?
12  A. I should remember that.
13  Q. Does she know? Because I don't mind if she
14  tells you. Okay. She says she doesn't know.
15      MS. BIANCHI: I don't remember. I don't
16  remember.
17      THE WITNESS: You know, all I know is that
18  it was after the legislative session, and so I don't
19  believe that it was in the spring. I believe it would
20  have been in the fall.
21  BY MS. SMITH:
22  Q. The fall of 2010? Not this school year, in
23  other words, but just last school year?
24  A. No, I don't --
25  Q. Maybe before then even?

| 01:57:34-01:58:47 | Page 35 |
| --- | --- |

1   TUSD and you were concerned about John Pedicone.
2   A. Uh-huh.
3   Q. What do you mean by that? What was your concern
4   about TUSD first?
5   A. Well, when I had visited the -- when the hearing
6   took place, had I visited the school and I had pulled
7   their data, and they were a below average academic
8   gains district. And I felt like the controversy for
9   Mexican-American study was just part of a general
10  disease of poor leadership in the district and that he
11  potentially could pull that off. Tucson Unified is the
12  second largest school district in the state, and so if
13  the state's education system is going to perform well
14  TUSD has to do better.
15  Q. Okay. And when you say he could potentially
16  pull that off, you mean Pedicone?
17  A. Yeah, Pedicone.
18  Q. So when you say you had concerns about Pedicone,
19  you weren't concerned that he was the wrong person for
20  the job? I mean, it's not that kind of concern.
21      Right?
22  A. No. I think he was the perfect person for the
23  job.
24  Q. Okay.
25  A. That if you had to pick -- you know, if you had

| 02:00:08-02:00:59 | Page 37 |
| --- | --- |

1   A. It could not have been fall of 2010. So it had
2   to be -- yeah, it couldn't have been in the fall of
3   2010.
4   Q. Okay. So it would have been sometime in the --
5   probably in the '09-'10 school year, 2009 -- as opposed
6   to last school year which was the '10-'11 school year?
7   A. This is bad that I can't remember when that was,
8   but I -- I mean, I do a lot of stuff.
9   Q. Okay.
10  A. So it was -- yeah, it would have had to have
11  been in that school year, '09-'10, because it wasn't in
12  in '10-'11, I don't believe. I don't believe it was.
13  Q. Okay. And what did you visit?
14  A. I visited Curtis Acosta's class at Tucson High
15  School.
16  Q. Okay. On just one occasion?
17  A. Yes.
18  Q. And did you stay for the whole class period?
19  A. Yes. Uh-huh.
20  Q. Okay. And this was before the effective date of
21  the statute. I think we've established that.
22      Correct?
23  A. Oh, yeah.
24  Q. Because it wasn't when you were superintendent.
25  A. Yes.

02:01:16-02:02:28                                    Page 38

1   Q. Okay. And did you observe things that concerned
2   you?
3   A. The -- yes. There were a couple of things that
4   concerned me when I was there.
5   Q. Can you describe them to me?
6   A. Well, I was concerned they had a poster of Che
7   Guevara up on the wall.
8   Q. Okay.
9   A. I mean, he helped direct a communist death camp
10  in Cuba. I think the historical record is pretty clear
11  on that. They portrayed Benjamin Franklin as a racist
12  to the kids.
13  Q. And was that just in conversation or is that
14  also in materials that you observed?
15  A. I didn't -- I didn't observe it in the
16  materials. They just verbally portrayed him as a
17  racist.
18  Q. Okay. Was it -- do you recall, was that
19  portrayal based on any particular evidence or, you
20  know, an example of an occasion that gave rise to that
21  portrayal?
22  A. I don't recall the exact context of it now.
23  Q. Okay. Was there anything else in the class that
24  concerned you that you observed?
25  A. There was a conversation of the students in

02:02:50-02:03:48                                    Page 39

1   which they were just talking about their -- this
2   concept of oppression, being oppressed and who the
3   oppressor was. There were conversations among the
4   students that were of concern to me.
5   Q. As part of class discussion or -- I mean, as
6   part of the work that they were supposed to be doing in
7   the class they were having these conversations, or this
8   was like talking while the teacher is talking
9   independent of what they were talking about?
10  A. It was in the context of there were discussions
11  going on. It was in the context of what was going on
12  in the class.
13  Q. And I've seen that, you know, in your findings
14  and in other things that we've taken a look at in the
15  last couple of weeks, the idea of oppression and
16  oppressors.
17      Do you think that a conversation among students
18  about oppression that they may have suffered and by
19  whom they may have been oppressed is automatically a
20  violation of 15-112?
21  A. Oh, no.
22  Q. Okay. So what is it about the conversation that
23  you overheard that concerned you?
24  A. I don't think it had anything that concerned me
25  in regards to the statute. It just concerned me in

02:04:09-02:05:00                                    Page 40

1   general that if a student believes that they're part of
2   an oppressed class that they may take on the role of a
3   victim, and so I was just concerned about that mental
4   model being one that would -- that might lead to a mode
5   of failure.
6   Q. Okay.
7   A. If I believe I'm being oppressed by some power
8   structure and that that could factor against me and I
9   can't win, you know, I just had concerns about that as
10  a mental model for moving through life.
11  Q. Okay.
12  A. But, I mean, those things were prior to me being
13  superintendent. So, you know, there's a mental
14  discipline of setting aside that prior stuff and
15  saying, okay, we've got to take a look at what's going
16  on here and now in a broader context of this whole --
17  of everything that was going on.
18  Q. Right.
19  A. But there wasn't anything in my visit in that
20  class that reassured me that said, geez, everything in
21  here is okay.
22  Q. Okay.
23  A. You know, there were a number of things that I
24  just walked away with some question marks.
25  Q. Okay. And I appreciate that and I appreciate

02:05:22-02:06:45                                    Page 41

1   also that you sort of tried to set aside what happened
2   before and kind of look at this going forward and once
3   you became superintendent, but one of the questions I
4   have because it's, for example, referenced in your
5   findings, there's materials that refer to Chicanos as
6   oppressed and others as oppressors is what your concern
7   is with that characterization. And so you've obviously
8   identified one thing, a concern that it may put on --
9   that the students may take on the role of a victim and
10  may be kind of a model of failure.
11      Is there something else about that kind of
12  oppressor/oppressed discussion or characterization that
13  concerns you now in your role as superintendent in
14  looking at the statute?
15  A. Absolutely. As we look through the materials we
16  see over and over again this model of an historical
17  event that takes place in the context of some social
18  injustice and it's characterized in racial terms, and
19  instead of being viewed in a historical balance kind of
20  way it's being viewed in racial terms as -- and used as
21  a call for racial solidarity and to -- we see that
22  model in the literature of oppression and always being
23  in the context of a white Caucasian power structure and
24  an Hispanic -- an oppression of Hispanics. And we see
25  that over and over again as we go through the classroom

02:07:04-02:08:23                                    Page 42

1  materials.
2  Q. And so how does that fit into 15-112?
3  A. Well, we think it's a direct violation of the
4  statute and we also think it's very inappropriate in an
5  educational setting for that kind of continual context.
6  Q. And when you -- you are talking about seeing
7  these kinds of references in materials?
8  A. Yes. Uh-huh.
9  Q. And do you have a sense of how those materials
10 have been used in the context of classroom discussions
11 since January of 2011?
12 A. We -- this is where we had some challenges and
13 this was where the issues come out about the audit. We
14 had direct representations that what was happening
15 January forward in 2011 was the same thing that had
16 happened prior. So we had a number of representations
17 to that effect by people in authority at Tucson Unified
18 School District, and so our analysis of what was
19 happening in 2011 had to be based on an analysis of
20 materials drawn out from 2010. And so that's where we
21 were particularly concerned about the failure of the
22 Cambium audit to live up to strict and rigorous audit
23 procedures.
24 Q. And do you know who indicated that what was
25 happening after January 2011 was the same as what was

02:08:43-02:10:08                                    Page 43

1  happening before January of 2011?
2  A. You know, I can't recall specifically, but I
3  believe that occurred -- those representations were
4  coming at us from a number -- from a number of view
5  points throughout the -- you know, at a number of
6  administrative levels from TUSD.
7  Q. Do you remember that being mentioned in the
8  audit at all?
9  A. I don't recall.
10 Q. Aside from that one class of Mr. Costa that you
11 visited in a prior school year -- we're not exactly
12 sure when -- did you ever visit any other classes at
13 TUSD?
14 A. No, I did not.
15 Q. And I think you already said you're not aware
16 that anyone on your staff did either.
17    Correct?
18 A. That's true.
19 Q. Okay.
20 A. To my knowledge. I just -- you know.
21 Q. That's fine. I've talked to them too, so they
22 agree with you. They didn't visit classrooms or do
23 focus groups.
24    And based on those conversations with your staff
25 and what you just said, it is my understanding that

02:10:27-02:11:14                                    Page 44

1  the -- aside from looking at the audit, the other thing
2  ADE did primarily or I think exclusively is to review a
3  variety of different materials, texts, some curricular
4  materials, some website pages, et cetera?
5  A. Uh-huh.
6  Q. Is that basically your understanding?
7  A. Yes.
8  Q. Okay.
9  A. But I want to emphasize that that was a
10 substantive body of materials.
11 Q. Okay.
12 A. Very substantive.
13 Q. And it's my further understanding that the
14 people reviewing those materials did not always know
15 whether they were or were not being used in classes or
16 what classes they were or were not being used in.
17    Do you have any reason to think that that's not
18 correct?
19    MR. MURPHY: Could you repeat that, please?
20 I'm sorry.
21    MS. SMITH: I can actually ask it sightly
22 differently.
23 BY MS. SMITH:
24 Q. For example, I talked to Kathy Hrabluk and she
25 said she reviewed materials and she did not know for

02:11:33-02:12:49                                    Page 45

1  certain whether those materials were used in classes
2  from January 2011 forward. If they came from TUSD
3  generated lists of materials, she assumed that they
4  were used.
5     Do you have any information that the materials
6  that you relied upon were definitely used after
7  January 1 of 2011?
8  A. On any one specific piece the answer is no, but
9  we had direct representations, though, that what had
10 happened in 2010 was continuing.
11 Q. Okay.
12 A. And so the materials that we were looking at
13 were direct materials that had been used in classes in
14 2010 and if you are directly told by people in
15 authority that they have not changed anything, I think
16 the assumption would be that those materials or
17 materials very similar to them would be used in 2011.
18 Q. Okay. Would you agree with me that if you look
19 at a particular, say, book not in the context of the
20 classroom or what's being taught, that you can't tell
21 how that book is being used in the classroom?
22    And I'll give you -- let me give you a specific
23 example.
24    If you've learned that a teacher was having
25 students read some writings by Hitler, would you

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

02:13:05-02:14:19                                Page 46

 1  conclude or draw the conclusion that the teacher was
 2  teaching anti-Semitism to the students?
 3      A.  Absolutely not.
 4      Q.  Okay.  And why wouldn't you?
 5      A.  Because it's entirely possible to view the words
 6  of Hitler and Stalin and Malsatang (phonetic) and you
 7  name it in a scholarly fashion to understand what
 8  happened, how they developed their thoughts, whatever.
 9  So if it's done carefully and appropriately, it can be
10  entirely appropriate.
11      Q.  Okay.  And so how do you know -- do you and your
12  staff know that the materials that they reviewed were
13  not being used in a manner that was careful and
14  appropriate?
15      A.  Well, let's take, for example, Hitler.  Let's
16  suppose the teacher came in and talked about an
17  incident in which somebody from Jewish ancestry had
18  taken advantage of somebody who was not of Jewish
19  ancestry and then characterized that in a fashion that
20  race against race, that would be horribly
21  inappropriate, and that horrible inappropriateness is
22  exactly what we see suffused through the
23  Mexican-American studies literature.  It's a different
24  context.  It's Caucasian versus Hispanic, but we see
25  that over and over again in the literature.

02:14:36-02:15:46                                Page 47

 1          So would it be -- you could use these materials
 2  in an entirely appropriate fashion, but it's the --
 3  suffused right within the writing of the literature is
 4  using a historical event to create a racial context,
 5  racial solidarity, and it's the propagation of racism
 6  through our educational system.  It's just completely
 7  inappropriate.
 8      Q.  And do you have evidence that these materials
 9  are being used by the Mexican-American studies teachers
10  in a way that propagates racism?
11      A.  Oh, that's at the heart of our conclusion.  It's
12  through all of the historical context.  It's to take an
13  historical event that took place that had the potential
14  to be construed in racial tones to use that as a call
15  for racial solidarity and a sense of victimhood and
16  to -- so direct violations of the law, but even past
17  the law it's just completely inappropriate in education
18  to do that.  And it's -- this isn't a close call.  It's
19  through -- this stuff is weaved.  It's way through all
20  this stuff.
21      Q.  But you are saying that materials could be used
22  potentially in a way that's appropriate, but then what
23  I hear you saying is the materials themselves actually
24  aren't appropriate?
25      A.  The materials themselves aren't appropriate.  In

02:16:04-02:17:12                                Page 48

 1  other words, they don't talk about historical events as
 2  being an injustice, you know, and being -- they're
 3  going -- they're going past that.  They're using a
 4  historical event as a call for racial consciousness,
 5  racial solidarity, not to identify this as something
 6  that we can do better at in society to improve
 7  ourselves but rather as a solidarity; we're a victim.
 8  I mean, this is -- this is through all this.  This is
 9  in the journal writings of the directors of the
10  program.  This is not appropriate.
11      Q.  But the auditors -- correct me if I'm wrong,
12  what the auditor said what they saw in the classroom
13  was not the promotement of -- promotion of racism or
14  ethnic solidarity or that point of view, didn't they?
15      A.  Well, and this is where we have problems with
16  the rigor of the audit, and the nature of an audit is
17  supposed to be that you pull a sample and that sample
18  reflects the underlying body of knowledge.  And as we
19  looked at the samples that they pulled and the way in
20  which the classroom visits were done, there's no
21  chance.  I think there's an awareness by -- there
22  absolutely would be an awareness by the
23  Mexican-American Studies Department that this stuff
24  does not fare well in the light of day, and so
25  naturally the auditors are never going to observe it.

02:17:29-02:19:10                                Page 49

 1      Q.  And as Ms. Hrabluk said, I mean, one of the
 2  problems is when you have them only there for two
 3  weeks, it kind of gives -- potentially gives teachers
 4  an opportunity to make certain lesson plans that they
 5  think won't be found objectionable.
 6          Is that right?
 7      A.  Yeah.
 8      Q.  Okay.  So why not give them more time so that
 9  they could view courses over an extended period of time
10  or, conversely, have ADE folks go down unannounced
11  at -- you know, throughout the semester to see what the
12  classroom context is like when it's --
13      A.  I think you get to a point where you have to
14  make decisions, and so in looking at the audit we could
15  see its limited usefulness.  We can go through the
16  materials and we could see directly what was repeated
17  over and over in here.  We can go to the journal
18  writings of the director of the program, you know.  The
19  journal writings were consistent with the materials.
20  We also had testimony from people who had actually been
21  in the class of students, who had been in the classes.
22  So we had -- this was not -- this wasn't a close call.
23  We had a broad base of information to make a decision.
24      Q.  Okay.  Can you look at Exhibit Number 14 -- 13?
25  Do you recognize that document?

| 02:19:53-02:21:27 Page 50 | 02:23:37-02:24:27 Page 52 |
|---|---|

**Page 50**

1   A. Yes. Uh-huh.
2   Q. Can you tell me what it is? I mean, I can see
3   what it's entitled, but I guess do you know who created
4   it?
5   A. Oh, who created this document right here?
6   Q. Yeah.
7   A. I don't know specifically who. It would have
8   been somebody on my staff, I'm assuming.
9   Q. Okay. Is it one of the summaries that you
10   looked at?
11   A. I believe so.
12   Q. Okay. But you don't know who created this one?
13   A. No, I don't.
14   Q. Okay. Can you look at Exhibit Number 14? Do
15   you recognize this document?
16   A. Okay. Can you repeat the question?
17   Q. Do you recognize this document?
18   A. I generally recall having read it as part of our
19   deliberations.
20   Q. Okay. And this -- I can tell you that Kathy
21   Hrabluk told me that this is the summary that she made
22   of the materials that she reviewed and found to be
23   problematic.
24   A. Okay.
25   Q. Is this one of the summaries that you looked at

**Page 52**

1   besides what's in these three documents that was relied
2   upon. Mr. Stollar told me that Exhibit 20 was a list
3   of everything that he relied upon in -- besides the
4   audit, everything that he relied upon in concluding
5   that there are violations, and Ms Hrabluk told me the
6   same thing with regard to Exhibit 14. And then there's
7   Exhibit 13 which no one that I talked to knows who
8   made.
9   So what I'm just trying to find out is aside
10   from the texts and things that are listed in these
11   three documents, if you think you relied upon any other
12   documentary evidence besides these three summaries and
13   other information that's in these same texts that are
14   listed on these summaries?
15   A. The information that they talk about in here, I
16   had a lot of that information. So at times I would
17   spend time reading through --
18   Q. Right.
19   A. -- some of the base information.
20   Q. And I understand that. And you said that, and I
21   understand that just because they put one sentence
22   doesn't mean you didn't read more than one sentence in
23   that material or book.
24   A. Yeah.
25   Q. But what I'm just trying to establish is if --

| 02:21:36-02:23:21 Page 51 | 02:24:42-02:25:29 Page 53 |
|---|---|

**Page 51**

1   and relied upon?
2   A. I believe so.
3   Q. Okay. It has a letter written, A(4), A(2),
4   A(2), et cetera.
5   Do you know who -- do you recognize the
6   handwriting or did you make those marks?
7   A. No. Huh-uh.
8   Q. Okay. And then can you turn to Exhibit 20? And
9   do you recognize this document?
10   A. No. I can't say that I recognize this
11   particular document.
12   Q. Okay. And I'll represent to you that
13   Mr. Stollar told me this is his summary of information
14   that he reviewed.
15   A. Okay.
16   Q. So you -- so you don't know whether or not this
17   is one of the summaries that you relied upon?
18   A. It might have been. I don't recall
19   specifically.
20   Q. Do you know if there were other summaries
21   besides the three I've just showed you that you relied
22   upon in reaching your findings?
23   A. I don't recall specifically.
24   Q. Do you have somewhere a list of the -- I was
25   trying to find out, you know, if there was anything

**Page 53**

1   you know, if I stacked up all the documents or books
2   that are listed in these three things, that that would
3   be a comprehensive list of materials that were relied
4   upon by you in reaching your conclusions?
5   A. I think -- yes. I think that would likely be
6   the case.
7   Q. Okay.
8   A. You know, to a certain extent there was a
9   narrowing process where information came in and I would
10   read bulks of it and, you know, spend time looking
11   through it and then it narrowed down as we got closer
12   to the summaries.
13   Q. Okay.
14   A. Now, this particular one here as I read through
15   it I recognize individual items, so it may well have
16   been part of the process that I went through as we were
17   making our recommendations.
18   Q. Okay. You are saying -- and I think you are
19   talking about Exhibit 20.
20   You are saying even though you don't recognize
21   that document, when you look at it --
22   A. Yeah.
23   Q. -- there's things in it that do look familiar?
24   A. Yes.
25   Q. Okay.

**In the Matter of the Hearing of an Appeal by:**
**Tucson Unified School District No. 1**

John Huppenthal
September 16, 2011

---

02:34:33-02:35:38                                              Page 54

1    MS. SMITH: Let's take a short break.
2        (Whereupon, a recess was taken in the
3    proceedings and Exhibit Number 21 was marked for
4    identification.)
5    BY MS. SMITH:
6    Q. I'm showing you what's been marked as Exhibit
7    21. I assume you recognize that document.
8    A. Uh-huh.
9    Q. Is that a yes?
10   A. Yes.
11   Q. And that's the text, I guess, of your official
12   statement relating to your determination about the
13   violation of A.R.S. 15-112.
14       Correct?
15   A. Yes, yes.
16   Q. Okay. And that was prepared for -- essentially,
17   for kind of a news or a media briefing on your finding.
18       Is that correct?
19   A. Yes.
20   Q. Okay. And you provided this statement after
21   Ms. Hrabluk spoke about -- specifically about issues
22   related to the unified school district's program and
23   the fact they did have an adopted curriculum and
24   approved textbooks and had involved statutory required
25   steps to establish a district-wide program.

---

02:35:52-02:36:42                                              Page 55

1        Is that correct?
2    A. Yes, yes.
3    Q. Okay. And have you discovered in your time as
4    superintendent that TUSD is not the only district in
5    the state that has at least some programs or
6    departments that don't have properly adopted
7    curricular -- the type of curriculum that Ms. Hrabluk
8    was talking about?
9    A. Yes.
10   Q. Okay. And you would agree that ADE doesn't have
11   the authority to withhold funds from districts just
12   because they haven't gone through that process?
13   A. Yes.
14   Q. Even though you think they should go through
15   that process and the law requires that?
16   A. Yes.
17   Q. Okay. So I'm looking towards -- the last couple
18   of paragraphs of it, actually, just the very end -- on
19   the first page. I'm sorry. The very end of the third
20   to the last paragraph, it says that you had several
21   concerns with the audit.
22       Correct?
23   A. Yes.
24   Q. Do you see that? And obviously we've discussed
25   that.

---

02:36:50-02:38:17                                              Page 56

1        The first thing it says is "two-thirds of the
2    final audit report was beyond the scope of the legal
3    determination I am making today."
4        Do you see that?
5    A. Yes. Uh-huh.
6    Q. But would you agree with me that the scope of
7    what Cambium did was within the scope of what they were
8    requested to do by ADE?
9    A. You know, I'd have to analyze that. I think
10   that's likely true.
11   Q. Okay. Given the importance of this issue as you
12   framed it today, why didn't you have them just focus on
13   the one thing which is is the program violating 15-112?
14   A. I don't know the reason for that. I think --
15   you know, I'd have to go back and revisit those
16   discussions that took place as we were deliberating the
17   development of the audit.
18   Q. Okay. And then in the second -- it says the
19   second -- TUSD knew when visits and interviews would be
20   taking place and only 37 percent of the classrooms were
21   observed and most were observed only once and for only
22   30 minutes.
23       Right?
24   A. Uh-huh.
25   Q. Is that a yes?

---

02:38:25-02:39:32                                              Page 57

1    A. Yes.
2    Q. Would you agree with me that the limited number
3    of classrooms visited and the limited amount of time
4    was in part based on the short time frame that Cambium
5    had to conduct the audit?
6    A. Perhaps, but the more important issue was as we
7    took a look at the audit we came to the conclusion that
8    it would have been -- in the polarized electrified
9    environment, it really would have been impossible to do
10   an audit that revealed the underlying truth because in
11   that polarized environment there was no way that you
12   could -- you could, in a sense, do an audit which would
13   be a random unobserved sampling of what was going on in
14   those classrooms.
15   Q. Okay. Why did you think it was important for
16   them to see what was going on in the classrooms at all?
17   A. Well, you get a variance between the written
18   materials and what actually was going on in the
19   classroom. So you could have violations of the law
20   that were going on in the classrooms that could be
21   supported by written materials so you needed to -- you
22   needed written materials and you needed classroom
23   observations.
24   Q. And isn't it also -- isn't the converse also
25   true that you could have materials that observed in a

---

| 02:39:48-02:40:58 | Page 58 |
|---|---|

1  vacuum might appear to be problematic in terms of the
2  law but they could be used in a classroom in a way that
3  made you feel that they were in the appropriate context
4  not being used to promote resentment or ethnic
5  solidarity?
6  A. Just -- our conclusion is that was highly
7  unlikely and that's, you know, as you -- this is where
8  we think the journal writings of the directors are
9  important. We think it's the absolute intent of the
10  program to carry out the classroom and to train the
11  teachers in a way that is consistent with what we
12  observed in the materials which was a clear violation
13  of the law.
14  Q. So it was your conclusion based on all the
15  things that you talked about that the intent of the
16  director -- you are saying directors, but are you
17  talking about Mr. Arce?
18  A. Yeah, Mr. Arce and before him, Agustin Romero.
19  Q. Okay.
20  A. We had journal -- there were journal writings by
21  him too.
22  Q. And do you know when Mr. Romero stopped being
23  the director of the department?
24  A. I don't.
25  Q. Okay. So you are saying -- so just to back up

| 02:41:14-02:42:22 | Page 59 |
|---|---|

1  then, that based on their journal writings, Mr. Arce's
2  and Mr. Romero's -- and when you say journal writings,
3  you mean writings in like, for example, academic
4  journal?
5  A. Yes. Uh-huh.
6  Q. Not like a diary?
7  A. Yes, yes.
8  Q. Okay. Was that their intent was to carry -- I'm
9  sorry -- to use the materials in a way that was
10  consistent with what you saw in the materials that was
11  in violation of the statute?
12  A. Yes. And the consistent model over and over
13  again in their journal writings as well was to take a
14  historical incident and characterize it in racial
15  terms, have a call to racial solidarity and then to
16  engage in political activism. Those -- all of that is
17  illegal and really entirely inappropriate for the
18  classroom.
19  Q. Do you think it was -- from what you reviewed
20  and read, do you believe it was, for example,
21  Mr. Arce's intent to promote resentment amongst the
22  students of individuals of other races?
23  A. I can only conclude -- you know, his intent is
24  something that he owns himself, but I can only conclude
25  that that is the outcome of the model that's created.

| 02:42:46-02:44:10 | Page 60 |
|---|---|

1  So you repeat that over and over again in your
2  materials and you use these historical incidents to
3  repeatedly have this call to racial solidarity and then
4  I think -- and I think it is appropriate to say
5  resentment of a white Caucasian power structure and
6  then of call to political activism. And that's -- you
7  know, it's not a close call. It's a violation of the
8  law and it's -- even more so, it's inappropriate for
9  the classroom.
10  Q. And you've made the point several times and I
11  understand, you know, what opinion you are expressing
12  about it being inappropriate for the classroom, but I
13  do want to just focus on the ways in which you think
14  these things violate the statute as opposed to other
15  ways in which you think they may also be inappropriate.
16  A. Okay. And I think I'm careful to say each time
17  that it is in fact there.
18  Q. How do you determine that materials or a
19  particular approach promote a particular outcome? How
20  did you make that determination?
21  A. Well, you would have to -- a lot of the
22  materials were very explicit in the connection. It
23  wasn't ambiguous. It was very direct. The call to
24  racial solidarity, it wasn't shaded or implied. It was
25  direct.

| 02:44:26-02:46:06 | Page 61 |
|---|---|

1  Q. Okay. So let's talk --
2  A. The call to resentment, you know. These were
3  direct calls in the classroom materials that we took a
4  look at. The writings of the director in the journals,
5  it's very direct stuff.
6  Q. Do you think that the concept of trying to
7  determine what a course promotes requires some look at
8  the actual outcome; in other words, how students react
9  to what takes place in the classroom?
10  A. You know, that would be speculation on my part.
11  I have a statute. I have course materials. I have --
12  you know, I have to make a conclusion based on the
13  evidence that I have. I could speculate on that, and
14  it would be on limited evidence, but --
15  Q. I think you misunderstand what I'm trying to ask
16  and it may be because I didn't ask it very well. I'm
17  not asking you if you know what outcome did come from
18  these classes. That's not what I'm asking you. I'm
19  asking you if you think that in order to figure out
20  what a class is promoting one of the things you need to
21  look at is what students walk away from the class with.
22  A. Yeah, yes.
23  Q. Okay. I mean, if every -- for example,
24  hypothetically, if every students walks away from a
25  particular class loving their neighbor, you wouldn't

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

02:46:29-02:47:37                                      Page 62

1    say it was promoting hatred of your neighbor.
2         It would be hard to say that, wouldn't it?
3    A.  If you -- if you call students together in
4    solidarity and you call them to identify themselves as
5    the oppressed, they may very well have very positive
6    relationships towards each other, but when you have --
7    when you call them to an identity of being oppressed,
8    by definition there's an oppressor and that's where
9    other emotions come into play.
10   Q.  And you read more, I think, into what I asked
11   you than I intended.  I wasn't actually trying to draw
12   any connection between this program and my comment.
13   A.  Okay.
14   Q.  My comment was simply -- I mean, we can do it --
15   we can do it this way.
16        If in fact you could determine that the students
17   who took a class did not feel any resentment, would you
18   still conclude that the class was promoting resentment?
19   A.  Well, I don't have -- I don't have that evidence
20   in front of me.  I think what we did in looking at the
21   body of evidence, it was -- again, it wasn't a close
22   call.  There was just a lot of evidence in there that
23   the class was promoting resentment.
24   Q.  Okay.  But I'm trying to ask you a question
25   theoretically.

02:47:52-02:48:47                                      Page 63

1         Would you -- can you conclude that a class is
2    promoting something that no student walks away from it
3    feeling?  You know, promoting love of France and every
4    student walks away hating France, would you say that
5    the class is -- see, I'm trying to, like, actually step
6    away from the specifics of this and find out what it
7    means to promote something in a class.  That's what I'm
8    trying to do, maybe not very well.
9    A.  Well, I'd have to conclude that the class was
10   unsuccessful.
11   Q.  Okay.
12   A.  And generally speaking, my analysis leads me to
13   believe that all classes are successful to some degree,
14   and so if a class is promoting resentment I would
15   gather that -- to some degree that it was successful.
16   Q.  Okay.
17   A.  Maybe not absolutely successful.  Maybe not
18   every student would feel resentment and maybe not every
19   teacher would execute that plan, you know, but --
20   Q.  Okay.
21   A.  You know, but if that was the game plan, I'd
22   gather that students would get the gist of it and, to
23   some degree, feel resentment.
24   Q.  So the student -- the outcome, the actual
25   outcome of the class is at least some evidence in what

02:49:07-02:50:00                                      Page 64

1    the class itself is promoting.
2         Do you agree with that?
3    A.  Yes.  Uh-huh, yes.
4    Q.  Okay.  Okay.  Let's look at the findings
5    themselves into Exhibit 1 in your notebook.  So I'm
6    looking under Roman Numeral II, and this is actually --
7    the first thing there is just it sets forth that part
8    of 15-112.
9         Correct?
10   A.  Uh-huh.
11   Q.  Sorry.  I'm going to keep asking you to say yes
12   instead of uh-huh.
13   A.  Yes.  Okay.
14   Q.  Under A it prohibits a school district or
15   charter school in the state shall not include in its
16   program of instruction any courses or classes that
17   include the following.
18        Correct?
19   A.  Uh-huh.
20   Q.  Okay.
21        MR. MURPHY:  Yes?
22        THE WITNESS:  Yes.
23   BY MS. SMITH:
24   Q.  So -- I mean, I knew it did say that so I wasn't
25   as worried as far as getting that answer.  It says what

02:50:16-02:51:13                                      Page 65

1    it says.
2         In your role in enforcing the statute, do you
3    understand that to be prohibiting this content in
4    specific courses or classes?  I mean, that's what the
5    statute says.
6         Right?
7    A.  I guess I'm missing -- you're just asking me to
8    conclude that the statute says what it says or -- I
9    don't understand.
10   Q.  Okay.  So let me ask you a different question.
11   A.  Okay.
12   Q.  Your findings and the materials upon which you
13   relied, they don't, for example, say anything about the
14   Chicano art class that's offered in TUSD.
15        Did you conclude that the Chicano art class
16   violates the statute?  I mean, it's a course or class.
17        Is it a course or class that violates the
18   statute?
19   A.  I didn't -- I didn't examine that class.
20   Q.  Okay.  So is it fair to say you did not make a
21   finding about that particular class?
22   A.  There's a universe of things that I haven't done
23   in my life.
24   Q.  Well, no, and that's fair.  I'm sure you didn't
25   make a finding about the majority of the classes

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

---

**02:51:25-02:52:39**      Page 66

1   offered by TUSD, but I'm looking at a small number of
2   those classes and I'm not going to ask you about every
3   class TUSD offers.
4      Okay?
5   A. Okay.
6   Q. But when I read the findings, it seems to me it
7   says the department violates the statute, but I see the
8   statute as saying it's courses or classes that violate
9   the statute. And so I'm looking at specific courses or
10   classes and wanting to know for my client, does this
11   course violate the statute? I can't tell from your
12   findings.
13      So, for example, the Chicano art class, did you
14   or anyone at ADE make any specific findings that that
15   class violates this statute?
16   A. Not to my knowledge.
17   Q. Okay. Did you or anyone at ADE make a specific
18   finding that the elementary school MAS program violates
19   this statute?
20   A. My belief is that we did.
21   Q. Okay. And is there anything that you can point
22   to that says what is problematic about the elementary
23   school program specifically?
24   A. I believe there are. I recall specifically
25   going over exhibits relating to that.

---

**02:52:50-02:53:57**      Page 67

1   Q. Okay.
2   A. I can't recall those specifically now, but I
3   recall that there was specific concern about the
4   elementary.
5   Q. Okay. So if I went through those summaries of
6   materials, for example, if there's materials on there
7   that have been identified as being used in elementary
8   school, would that be the kind of thing you relied upon
9   with regard to that program?
10   A. Yes, yes.
11   Q. Okay. What about do you know whether there was
12   a specific -- you reached a specific conclusion related
13   to the middle school program?
14   A. I believe so, yes.
15   Q. And would your answer -- if I said what the
16   findings were, would it be the same?
17   A. Yes.
18   Q. Okay. What about there's -- there are two high
19   school literature classes offered through the
20   Mexican-American Studies Department, essentially junior
21   literature and senior literature.
22      Are you aware of that?
23   A. Yes.
24   Q. Okay. And did you make findings that those two
25   specific classes violated the statute?

---

**02:54:21-02:55:45**      Page 68

1   A. You know, I'd have to go back and look at some
2   of the specifics in that regard.
3   Q. Okay. So let me ask you this, if on those
4   summaries of documentary evidence there was, let's just
5   say -- and I don't know if this is true, but let's just
6   say there's not a single book listed on those summaries
7   that's actually used in any way in the junior
8   literature class.
9   A. Uh-huh.
10   Q. Would that mean that you did not make a finding
11   that the junior literature class was in violation of
12   the statute?
13   A. The -- you know, I don't -- I don't know the
14   answer to that question.
15   Q. Okay. Do you believe that a school district in
16   Arizona can teach a Mexican-American literature class
17   without being in violation of 15-112?
18   A. Absolutely.
19   Q. Okay. Even if all of the literature read in
20   that class is written by Mexican-American authors?
21   A. Yes.
22   Q. Okay. So what is it about TUSD's literature
23   program that differentiates it from a program that
24   would be okay that would offer at least similar
25   content?

---

**02:55:59-02:57:14**      Page 69

1   A. Well, as we went over in the -- prior in the
2   questioning, there would be two things.
3   Q. Okay.
4   A. One, it's targeted specifically at one racial
5   group in terms of the targeting of the class and,
6   Number 2, that the nature of the classroom materials is
7   such that it treats students as part of a racial group
8   and that it uses that solidarity to promote resentment
9   of another racial group, so really going specifically
10   to the statute.
11   Q. But it's not -- I mean, but I think from what
12   you said before that a list of texts that were all
13   novels by Mexican-American authors, you would not
14   consider those materials such that they treat students
15   as part of a particular group and, therefore, promote
16   resentment?
17   A. The fact that they are Mexican-American authors
18   is not the qualifying point.
19   Q. Okay.
20   A. And, again, there would also be a context. If
21   that literature was then used in a class in a way that
22   called students together to solidarity as a racial
23   group and promoted resentment for another racial group,
24   then there would be a violation of the law.
25   Q. So at that point if you saw, say, the list of

---

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

---

02:57:29-02:58:47          Page 70

1  literature and let's just, to make it easy, say it's
2  just ten books, novels written by Mexican-American
3  authors, you can't make any conclusion from that list
4  of books that there is any violation of the statute
5  going on I think is what you just said.
6      Right?
7  A. Yes.
8  Q. So then you'd have to go to the classroom and
9  see the context in which they are being used?
10  A. Or the classroom materials.
11  Q. Or other materials besides the books. I was
12  just kind of theorizing this. I understand you are
13  saying if there's other materials out there, they may
14  set the context.
15  A. And in this context, too, what's going on in the
16  classroom is the key part -- is a part of the whole
17  thing.
18  Q. Okay. But apart from the visits that Cambium
19  did, ADE didn't do any classroom visits since January 1
20  of 2011 that you're aware of?
21  A. No.
22  Q. Okay.
23  A. I think as we take a look at those textbooks the
24  context of the textbooks is critical in this regard,
25  particularly as we get down into the elementary school

---

02:59:07-03:00:13          Page 71

1  level, that the context of the textbook -- if the
2  textbook itself is essentially a call to racial
3  solidarity, a call to resentment, that the textbooks
4  could be a part of it.
5  Q. Okay. Is it your understanding that in the
6  elementary school program there's a textbook that the
7  students are using?
8  A. I think that as we went over it, there were
9  concerns about the classroom materials going down into
10  the elementary school level. So there was specific
11  intense concerns about what was happening at the
12  elementary school level in regards to the classrooms.
13  Q. When you just used the phrase textbook, you are
14  talking about any text -- any materials that are used
15  in the class.
16      Is that true?
17  A. Yes. Uh-huh.
18  Q. Okay. In your finding related to A(2), which
19  starts on the first page and carries over to the second
20  page of Exhibit Number 1, you say -- I'm looking at the
21  second bullet point -- well, actually, before I ask you
22  that question let me ask you this.
23      Is it your view that the materials that have
24  been listed on those summaries that you and your staff
25  found to be in violation of this statute cannot be used

---

03:00:27-03:01:09          Page 72

1  in any context in which they would be appropriate? I
2  mean, that those are just things that are always going
3  to be inappropriate, or do you believe that at least
4  some of them could be used in an appropriate context in
5  which they would not violate the statute?
6  A. I think fatigue is catching up to me here.
7  Q. And I'm actually really close to being done so
8  try to hang in there for a little bit longer.
9      Do you want to take a short break or --
10  A. No. I'm okay.
11  Q. Okay.
12  A. You know, I would have to go over each one by
13  itself and think about it in the context, so I don't
14  know that I'd be able to say a blanket.
15  Q. So you think that -- you think that if you
16  looked over them you might say, well, this will never
17  be appropriate but this might be able to be used in the
18  appropriate context. You just can't say without
19  looking at each one.
20      Is that true?
21  A. Yeah. I think I have to look at them each one
22  in particular.
23  Q. Okay. The second bullet point of this finding
24  says that reviewed materials present only one
25  perspective of historical events.

---

03:01:22-03:02:02          Page 73

1      You see that? Well, you don't have to actually
2  look. If you remember saying that you don't have to
3  look at it, but I'll tell you where I am. Oh, no, I'm
4  not. I'm sorry. Wrong exhibit. I'm on this exhibit.
5  A. Okay.
6      MR. MURPHY: Second page.
7  BY MS. SMITH:
8  Q. Next page, just here at the top, the second
9  bullet point right there. It's your finding that the
10  reviewed materials present only one perspective of
11  historical events.
12      Do you see that?
13  A. Uh-huh.
14  Q. Is that yes?
15  A. Yes.
16  Q. Okay. Did you review the American history
17  textbook that's used in the Mexican-American -- I mean,
18  the American history from the Mexican-American's
19  perspective class?
20  A. You know, I believe I did. I'm trying to recall
21  the specifics. It's been a while.
22  Q. Both the Mexican -- both the history -- American
23  history from the Mexican-American perspectives and
24  American government class have on their book lists the
25  standard district text for those subjects.

---

1      Is that your understanding?
2    A. You know, I'd have to go back and take a review
3    of that.
4    Q. Okay. Would you agree with me that if the
5    history class, for example, uses the standard district
6    textbook for American history as well as supplemental
7    materials that it's highly likely that the textbook
8    itself presents a different perspective from the
9    supplemental materials that you reviewed?
10      MR. MURPHY: I'll object to form.
11      MS. SMITH: That's fine.
12   BY MS. SMITH:
13   Q. I mean, do you think that the district's
14   American history adopted textbook presents only one
15   perspective and that is of Latino people being
16   prosecuted, oppressed and subjugated by the hegemony?
17   A. Well, I think that -- I think that as we went
18   over the material, that this here was overwhelming in
19   the materials of the classroom, the writings of the
20   directors; that it just suffused the whole literature.
21   And, you know, my recollection is very specific on the
22   repetition of these events because there are many
23   events in which you could look at a specific historical
24   event and it was Caucasians oppressing Hispanics, but
25   in other events it would be an Hispanic oppressing an

1    Hispanic.
2      And those historical events were completely
3    lacking from the literature to give them some kind of
4    sense that these kind of injustices occur in all
5    dimensions, and it's all -- an obligation on all of us
6    to live better lives and to create a better society.
7    When you only view those historical incidents in which
8    it's Caucasians oppressing Hispanics, you by definition
9    are doing what we're talking about here. You are
10   giving them a lop-sided view. You are calling them to
11   come together in group solidarity around racial -- in
12   racial terms and to resent people that are the
13   oppressors.
14      So there's no -- there's no multiplicity of
15   context that oppression happens in all dimensions and
16   injustice happens in all manners, you know, whites
17   oppressing whites, Hispanics oppressing Hispanics.
18   It's on all of our obligation to do better. It's
19   the -- and I think that's where we have the problem is
20   just it was -- it just became overwhelming.
21      MR. MURPHY: Could I take a time out? I
22   need to get Melissa.
23      MS. SMITH: Sure.
24      (Whereupon, a recess was taken in the
25   proceedings. Mr. Murphy left the proceedings and Ms.

1    Iyer joined the proceedings.)
2    BY MS. SMITH:
3    Q. Okay. So my question -- the question that I
4    ended with that you were just answering as we took a
5    break is whether you recall reviewing the district
6    adopted textbook for American history that is a part of
7    the American history and the Mexican-American
8    perspective book list?
9      MS. IYER: Object to the form.
10      You can answer.
11      THE WITNESS: Yeah, I don't recall
12   specifically, but my general recollection is that I
13   did.
14   BY MS. SMITH:
15   Q. Okay. Is it your recollection that that history
16   textbook came from the same perspective that you were
17   just describing before we took a break?
18   A. I don't -- I don't recall.
19   Q. Okay. Do you recall reviewing the American
20   government textbook that's used by the district in all
21   of its American government classes, including the
22   social justice education project classes?
23   A. I don't recall that specifically.
24   Q. Okay.
25   A. We went through a lot of materials, a lot of

1    books.
2    Q. Your conclusion is that the reviewed materials
3    present only one perspective of historical events. So
4    I understand that to say that you did not review any
5    materials that presented a different perspective of
6    historical events.
7      MS. IYER: Object to the form.
8      You can answer.
9    BY MS. SMITH:
10   Q. Is that what you intend to say there when you
11   say that the reviewed materials present only one
12   perspective?
13   A. What we saw was overwhelming. So was it
14   absolutely 100 percent? I don't know, but it was
15   overwhelmingly through the materials that we looked at
16   over and over again that repeated form abusing an
17   historical incident in which there was an injustice to
18   cast it in racial terms where you call the Hispanics to
19   solidarity to identify in racial terms and to call the
20   students to identify with the group that suffered the
21   injustice and to call them to political action. We --
22   and that's what we're referring to.
23      It's an overwhelming nature in the literature
24   that we looked at. Was it absolutely one hundred
25   percent? You know, I couldn't speak to that, but it

| 03:10:08-03:11:24 | Page 78 | 03:12:34-03:13:48 | Page 80 |
|---|---|---|---|

**Page 78**

1  was suffused through the literature.
2  Q. So it's your concern that the overwhelming
3  weight of the textual material that you understand the
4  students to have been introduced to in these classes
5  was from this particular perspective that you've
6  described?
7  A. Yes. And I think for that to be any significant
8  part of the class is illegal and inappropriate.
9  Q. Okay. The second -- the next paragraph down
10  discusses your findings with regard to 15-112 A(3), and
11  is that a summary of all of the evidence that you
12  relied upon to determine that the district's classes --
13  that some of the district's classes or courses were
14  designed primarily for students of a particular ethnic
15  group?
16  A. I think very closely, yes.
17  Q. Okay. Did you make a conclusion that the
18  elementary school program was designed particularly for
19  students of a particular ethnic group?
20  A. I don't recall that specifically.
21  Q. And if the program is essentially an itinerant
22  teacher who visits a regularly established classroom
23  one day a week, does that sound like something that's
24  designed particularly for students of a particular
25  race? I mean -- I'm sorry -- primarily for students of

**Page 80**

1  Again, that same general form that I referred to
2  before, historical incidents, you know, being cast in
3  racial terms, creating a sense of victimhood,
4  oppression among the students.
5  Q. You reference under the second bullet point that
6  the MAS department's website states that the department
7  was formed to specifically enhance the academic success
8  of the Latino students.
9      Correct?
10  A. Yes.
11  Q. And it goes on to say that although it can
12  benefit all students.
13      Correct?
14  A. Yes.
15  Q. And did you look at that entire website and --
16  actually, did you look at the whole website?
17  A. I believe I did review the whole thing. I don't
18  know that I can recall at all specifically.
19  Q. Fair enough.
20      Do you recall references on the website to how
21  the department could be useful to students generally?
22  A. Obliquely, but the primary focus we saw in this
23  literature and other literature was a targeting at
24  Hispanic students. And we also saw as a fundamental
25  sort of building block that we -- this concept of

| 03:11:38-03:12:17 | Page 79 | 03:14:14-03:15:05 | Page 81 |
|---|---|---|---|

**Page 79**

1  a particular race to you?
2      MS. IYER: Object to the form.
3      THE WITNESS: You know, I'd have to take a
4  look at the details on how all that is being organized.
5  BY MS. SMITH:
6  Q. I guess part of my concern is, where does the
7  district look to find out exactly which classes
8  violated exactly which sections and exactly how they
9  did it? Is there anywhere they can look to find that
10  out?
11  A. Well, I think you start with the findings right
12  here. I mean, these findings are very specific.
13  Q. But, for example, I've asked you, does the
14  elementary school program violate this part of the
15  statute and, I mean, you are saying, I don't know.
16      Is there somewhere where I can turn to find out
17  whether or not it does?
18      MS. IYER: Object to the form and
19  foundation.
20  BY MS. SMITH:
21  Q. Or whether you found that it does, which I guess
22  is more to the point?
23  A. Yeah. And I think specifically as to the
24  finding as to the elementary school was the nature of
25  the materials that were going into those classrooms.

**Page 81**

1  the students themselves, if they couldn't achieve this
2  consciousness of being members of an oppressed class,
3  that -- the statement that unless you were a Hispanic
4  you couldn't benefit from this; you couldn't achieve
5  this consciousness.
6  Q. You saw those references on the TUSD MAS
7  website?
8  A. Not on the -- not on the website, but as part of
9  the journal writings of the directors, those kind of
10  things. So, you know, in that context of the specific
11  targeting of the website, you know, it's a totality of
12  the situation.
13  Q. You understand that the department was formed
14  prior to the enactment of 15-112.
15      Right?
16  A. Yes.
17  Q. Okay. And that the statement that the
18  department was formed -- would you agree with me that
19  the statement that the department was formed to
20  enhance -- sorry -- the department was formed to
21  specifically enhance the academic success of Latino
22  students is a historical statement about how the
23  department or why the department was formed? Would you
24  agree with me?
25      MS. IYER: Form and foundation.

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

1 BY MS. SMITH:
2    Q. The statement that the department was formed for
3 such and such a purpose is historical statement about
4 why the department was formed when it was formed.
5      Would you agree with that?
6        MS. IYER: Object to the form.
7        THE WITNESS: Now, when you --
8 BY MS. SMITH:
9    Q. Just because she says that, you can still
10 answer.
11        MS. IYER: Yeah. It's for preservation
12 purposes. You can still answer the question if you
13 have an answer.
14        THE WITNESS: You know, that would cause me
15 to speculate, and I don't know.
16 BY MS. SMITH:
17    Q. Well, how do you understand it, the statement
18 that says the department was formed for this purpose?
19 Do you understand that to be something that's happening
20 today as we sit here or something that happened when
21 the department was originally formed?
22    A. Well, it would have been done -- yeah. I think
23 your statement that they came into being before 15-112,
24 yes.
25    Q. Okay. Let's talk for a minute about 15-112

1 A(4). It prohibits advocating for ethnic solidarity
2 instead of treating pupils as individuals.
3      In your role as the person -- as a person who is
4 enforcing the statute, what does it mean instead of
5 treating pupils as individuals?
6        MS. IYER: I'm going to object to the form.
7 BY MS. SMITH:
8    Q. How do you interpret that in attempting to
9 determine whether TUSD was in compliance with this?
10      And let me just say, you have explained
11 thoroughly and I understand your position on how the
12 materials that you reviewed, et cetera, advocate for
13 ethnic solidarity. I understand that part of it. What
14 I'm curious about is how you reach a conclusion that
15 the classes and courses that you looked at did not
16 treat pupils as individuals.
17    A. Well, A(3) and A(4) are almost -- in a sense,
18 they are almost identical provisions that when you --
19 when you do what the course materials do, that you
20 create this model that essentially you're not treating
21 them as individuals, that some whites oppress whites,
22 you know. You have all kinds of injustices that happen
23 in society. You have whites that oppress whites. You
24 have whites that oppress Hispanics. You have Hispanics
25 that oppress whites. There are a wide variety of

1 injustices that are out there.
2      When you try to create a context in which -- of
3 Caucasians oppressing Hispanics, you're not -- that to
4 me by definition is not treating students as
5 individuals.
6    Q. What does it mean to treat students as
7 individuals?
8    A. It means to -- it means to in a historical
9 context like that to be very careful about your
10 communications with students. We all have an
11 obligation to make a better society and injustices can
12 occur in all stripes and manners. So when you
13 create -- when you actively work to create a class
14 consciousness around a racial identity, that to me is a
15 direct violation of treating students as individuals.
16    Q. So are they mutually exclusive advocating ethnic
17 solidarity and treating pupils as individuals, in your
18 view?
19    A. Yeah.
20    Q. In other words, you can't do -- you can't
21 advocate ethnic solidarity and still treat pupils as
22 individuals?
23    A. In my view, they are.
24        MS. SMITH: Is this 22?
25        (Whereupon, Exhibit Number 22 was marked

1 for identification.)
2 BY MS. SMITH:
3    Q. I'm showing you what's been marked as Exhibit
4 22.
5      Do you recognize this document?
6    A. Yes.
7    Q. Okay. It's a letter to Dr. Pedicone from
8 Elliott Hibbs related to the investigation of the
9 department's complaints with 15-112.
10      Right?
11    A. Yes. Uh-huh.
12    Q. Okay. And, obviously, this letter is not from
13 you. It's from Mr. Hibbs.
14    A. Uh-huh.
15    Q. But was this letter written under your
16 direction?
17    A. Not under my direct direction, just under the
18 general scope of my authority.
19    Q. Okay. Do you believe that this letter sets
20 forth ADE's position on the issues that are addressed
21 in it as of March 9, 2011?
22    A. You know, I'd need to study it a little bit.
23    Q. Okay. Well, let me ask a couple of specific
24 questions and then you can tell me if you say, well,
25 this was never my position or whatever the case might

---

03:20:44-03:21:31                                  Page 86

1   be.
2       Okay?
3   A.  Okay.
4   Q.  I'm looking at the second paragraph and you're
5   describing, I believe, the investigation that you're
6   going to take -- that's going to take place. Well,
7   actually, at the end of the first paragraph you say,
8   "We recently engaged a national company specializing in
9   research-based education solutions to conduct the
10  investigation." And then in the second paragraph it
11  says, we anticipate the investigation will take four to
12  six weeks, culminating in a comprehensive, written
13  report to the Department of Education.
14      Do you see that?
15  A.  Yes.
16  Q.  And the report to which you are referring is the
17  Cambium report that we looked at as Exhibit 3.
18      Right?
19  A.  Uh-huh. Yeah.
20  Q.  Okay. Later in that same paragraph it says that
21  after you -- ADE reviews that report, you'll draw your
22  own conclusion about the district's compliance, and
23  that obviously occurred.
24      Correct?
25  A.  Uh-huh. Yes.

---

03:21:40-03:22:39                                  Page 87

1   Q.  Okay. And then it says that if you conclude or
2   if ADE concludes that the district remains out of
3   compliance, you'll issue an amended notice of
4   violation.
5       Right?
6   A.  Yes.
7   Q.  Okay. This is -- the next sentence is the one
8   I'm interested in: That notice of violation will be as
9   detailed as possible in order to afford you and your
10  administration a clear idea of what classes or courses
11  violate A.R.S. 15-112 and in what manner they do so.
12      Do you see that?
13  A.  Yes.
14  Q.  And was that your intention to provide the
15  district with a notification that was as detailed as
16  possible providing that information?
17  A.  You know, I think it says what it says, yes.
18  Q.  Okay. I mean, but this isn't -- I mean, this is
19  why I said does this represent the position of ADE as
20  of March 9, 2011 or of your office, the
21  superintendent's office? And you said you weren't sure
22  without looking at it.
23  A.  Yes.
24  Q.  But that was your intent?
25  A.  Yes.

---

03:22:57-03:24:25                                  Page 88

1   Q.  And do you believe that the findings that we've
2   just been looking at informed TUSD what classes or
3   courses violate the statute? It doesn't actually list
4   a single class on it, does it -- your findings?
5   A.  I think the -- by definition the classes that
6   are in violation are the Mexican-American studies
7   classes which are specifically identified as
8   Mexican-American studies classes.
9   Q.  All of those classes?
10  A.  Yes.
11  Q.  And do you believe that your statements -- that
12  your statement identifies the manner in which each
13  individual class violates that statute?
14  A.  Not each individual class, no.
15  Q.  Why do you think it would be important to give
16  TUSD a notice that was as detailed as possible?
17  A.  Well, the purpose of the detail is to allow TUSD
18  to come into compliance.
19  Q.  Okay. And so what does TUSD need to do to come
20  into compliance, in your opinion?
21  A.  Well, what TUSD needs to do to come into
22  compliance is to -- they need to develop a curriculum
23  that gives details about what students are learning,
24  sort of in detail what materials are going to be going
25  into the class, what textbooks are going to be used,

---

03:24:46-03:26:02                                  Page 89

1   and they have to go out and hold hearings in the
2   community and they have to present to the community the
3   specific materials that are going to be used in the
4   class and how those materials are going to be used.
5   Q.  Does A.R.S. 15-112 require that?
6   A.  The -- A.R.S. 15-112 does not require that, but
7   at this point for them to come into compliance with
8   state law and to come -- you are asking for my opinion
9   at this point.
10  Q.  Well, but not just because you're anyone but
11  because you are the person who gets to decide whether
12  or not they're in compliance with it.
13  A.  Yeah, but the challenge that you have is if you
14  haven't gone to your board for approval of materials
15  then there is -- you have a rogue operation that you
16  then don't know what it's doing. It could be in
17  compliance one day and in violation the next. There's
18  no system. So the only way that we can ever know if
19  it's in compliance is to go and sample it on a nonstop
20  basis. We have to be in it's classrooms every day.
21  Q.  Right.
22  A.  So I'm telling you just mechanically 15-112
23  doesn't require that, but to come into compliance
24  requires that because to come into compliance with
25  15-112 requires that because on a practical, logistical

---

03:26:23-03:27:31                                           Page 90

1    basis you have this inflamed community. You have a
2    state law that requires curriculum approval. You have
3    materials right now that are illegal and inappropriate.
4           You know, to clean up this mess it seems to me
5    that logistically the only way to get around this is to
6    have all materials approved by the board, to have the
7    curriculum completely approved and to -- and on top of
8    that to allow observation of the classroom by the
9    community to know that those -- that those curriculum
10   and those materials are the real materials and
11   curriculum being used and that the -- you know.
12          I've been in this business 25 years, you know.
13   Whether it's a zoning violation out at the corner or
14   what, when you have an inflamed community, you hold
15   hearings. You consider what they have to say. You've
16   got to go back and get the support of your community.
17   This is -- this isn't brain surgery. It's -- you know,
18   on how to do this, but at this point to extract
19   themselves -- and this is even independent of this.
20   This is on a practical basis.
21          Even if we weren't here pushing this they still
22   would need to come to peace with their community, and
23   this is what they should be doing just to do good
24   educational work, you know. That requirement that the
25   board approve the curriculum, it's a state law, but

03:27:46-03:28:44                                           Page 91

1    it's just simple common sense in a situation where you
2    have an inflamed community over a curriculum.
3           Bring it forward. Hold extensive hearings.
4    Make sure that all of your books are approved, all of
5    your coursework is approved, and then allow the
6    community to come in and view the product, you know,
7    allow them to come in and observe what's going on in
8    the classroom.
9    Q. ADE -- I mean, the statute --
10   A. I mean -- and you are talking statutes. I'm
11   just talking common sense as somebody that's been
12   involved in these processes for 25 years. So that's --
13   and I'm off the discipline here, you know. We have a
14   lot of evidence. This wasn't a close call on a
15   violation of the -- of 15-112. It's not a close call.
16   They're way overdue for getting a grip on this in their
17   board and, you know, repairing this.
18   Q. The statute gives the district 60 days after a
19   finding of a violation to come into compliance.
20      Correct?
21   A. Uh-huh. Yeah.
22   Q. Are you telling me -- because I understand what
23   you are just saying. This is just, essentially, good
24   advice about running a political subdivision of the
25   state or any kind of government, but are you telling me

03:29:00-03:35:00                                           Page 92

1    that the only way that the district can come into
2    compliance is to go through this process?
3    A. I'm just telling you from somebody who's got a
4    lot of battle scars on how you deal with these
5    situations. That's just -- you know, this doesn't have
6    to do with -- I'm not making a legal determination.
7    You know, from a legal standpoint they can go through
8    that process and there could still be a violation of
9    the state law, but I don't -- I mean, it's possible
10   that they would be.
11          Practically, I don't think that they would
12   because if in order to get -- if you've got curriculum
13   and textbooks and materials that are approved by your
14   community, very likely -- for me it would be very
15   likely that they would be -- they would comply with the
16   state law.
17   Q. Would you agree that it's a process that can't
18   possibly be completed in 60 days?
19   A. I have to work out the logistics on that.
20   Q. Okay. Well, if -- let me just take a quick
21   break because I'm just about done.
22   A. Okay.
23          (Whereupon, a recess was taken in the
24   proceedings.)
25          MS. SMITH: I don't have any more

                                                            Page 93

1    questions.
2           THE WITNESS:  Thank you.
3           (Whereupon, the proceedings concluded at
4    3:35 p.m.)
5
6                                        _____
7                                        JOHN HUPPENTHAL
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 94

```
 1   STATE OF ARIZONA       )
 2   COUNTY OF MARICOPA     )
 3              BE IT KNOWN the foregoing deposition was
 4   taken by me pursuant to stipulation of counsel; that I
 5   was then and there a Certified Reporter of the State of
 6   Arizona, and by virtue thereof authorized to administer
 7   an oath; that the witness before testifying was duly
 8   sworn by me to testify to the whole truth, pursuant to
 9   A.R.S. Section 41-324(B); pursuant to request,
10   notification was provided that the deposition is
11   available for review and signature; that the questions
12   propounded by counsel and the answers of the witness
13   thereto were taken down by me in shorthand and
14   thereafter transcribed into typewriting under my
15   direction; that the foregoing pages are a full, true,
16   and accurate transcript of all proceedings and
17   testimony had and adduced upon the taking of said
18   deposition, all done to the best of my skill and
19   ability.
20              I FURTHER CERTIFY that I am in no way
21   related to nor employed by any of the parties thereto
22   nor am I in any way interested in the outcome hereof.
23              DATED at Phoenix, Arizona, this 22nd day of
24   August, 2011.
25              _____
                 LILIA MONARREZ, RPR, CR #50699
```

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

**$**

**$110,000 (1)** 29:14

**0**

**09-'10 (2)** 37:5,11

**1**

**1 (5)** 36:2;45:7;64:5;70:19;
71:20
**1:17 (1)** 4:3
**100 (2)** 36:1;77:14
**10-'11 (2)** 37:6,12
**11th (1)** 34:20
**12th (1)** 34:20
**13 (2)** 49:24;52:7
**14 (3)** 49:24;50:14;52:6
**15-112 (22)** 8:24;13:14,17;
28:11;36:4;39:20;42:2;
54:13;56:13;64:8;68:17;
78:10;81:14;82:23,25;
85:9;87:11;89:5,6,22,25;
91:15
**16 (1)** 4:2
**18 (3)** 4:17;8:17,19
**1977 (1)** 6:24
**1983 (1)** 6:24
**1984 (1)** 7:19
**1992 (3)** 7:19,19;8:8

**2**

**2 (1)** 69:6
**20 (4)** 4:16;51:8;52:2;53:19
**2000 (1)** 7:19
**2009 (1)** 37:5
**2010 (10)** 7:11,24;8:8;10:7;
36:22;37:1,3;42:20;
45:10,14
**2011 (15)** 4:2;7:11,12;10:8;
42:11,15,19,25;43:1;
45:2,7,17;70:20;85:21;
87:20
**21 (2)** 54:3,7
**22 (3)** 84:24,25;85:4
**2281 (2)** 8:12,23
**2281s (1)** 8:19
**25 (2)** 90:12;91:12

**3**

**3 (2)** 30:7;86:17
**30 (1)** 56:22
**32 (1)** 7:10
**37 (1)** 56:20

**4**

**480 (4)** 13:24;14:6,9,13

**6**

**60 (3)** 32:6;91:18;92:18

**8**

**82 (1)** 7:3
**83 (1)** 7:3

**9**

**9 (2)** 85:21;87:20

**A**

**A2 (3)** 51:3,4;71:18
**A3 (2)** 78:10;83:17
**A4 (3)** 51:3;83:1,17
**able (14)** 10:19;20:23;24:1,3;
4;26:4,6,9;31:7;32:16;
34:2,3;72:14,17
**absolute (1)** 58:9
**Absolutely (7)** 41:15;46:3;
48:22;63:17;68:18;
77:14,24
**abusing (1)** 77:16
**academic (4)** 35:7;59:3;
80:7;81:21
**accepted (1)** 9:25
**achieve (3)** 31:8;81:1,4
**achieved (1)** 21:15
**Acosta's (1)** 37:14
**across (3)** 16:21;25:18
**action (1)** 77:21
**actively (1)** 84:13
**activism (1)** 59:16;60:6
**actual (2)** 61:8;63:24
**actually (20)** 9:2;10:5;12:19;
14:4;24:14;44:21;47:23;
49:20;55:18;57:18;
62:11;63:5;64:6;68:7;
71:21;72:7;73:1;80:16;
86:7;88:3
**addition (1)** 23:24
**addressed (2)** 19:17;85:20
**ADE (17)** 13:11;21:9;23:24;
29:23;30:3,11;44:2;
49:10;55:10;56:8;66:14,
17;70:19;86:21;87:2,19;
91:9
**ADE's (1)** 85:20
**administration (2)** 6:21;
87:10
**administrative (1)** 43:6
**administrator (1)** 16:20
**adopted (4)** 54:23;55:6;
74:14;76:6
**advantage (1)** 46:18
**advice (1)** 91:24
**advocate (2)** 83:12;84:21
**advocating (2)** 83:1;84:16
**affected (2)** 22:13,16

**affects (2)** 20:19,19
**afford (1)** 87:9
**afterwards (1)** 36:9
**again (10)** 8:16;41:16,25;
46:25;59:13;60:1;62:21;
69:20;77:16;80:1
**against (2)** 40:8;46:20
**agencies (2)** 16:20,21
**ago (3)** 4:17,17;5:3
**agree (11)** 43:22;45:18;
55:10;56:6;57:2;64:2;
74:4;81:18,24;82:5;
92:17
**Agustin (1)** 58:18
**allow (8)** 88:17;90:8;91:5,7
**almost (2)** 83:17,18
**although (2)** 16:9;80:11
**altogether (1)** 6:7
**always (5)** 11:14;31:22;
41:22;44:14;72:2
**ambiguous (1)** 60:23
**amended (1)** 87:3
**amendment (7)** 9:19,25;
10:4
**amendments (4)** 9:2,11,11,
13
**American (10)** 73:16,18,22,
24;74:6,14;76:6,7,19,21
**among (3)** 39:3,17;80:4
**amongst (1)** 59:21
**amount (3)** 31:25;34:3;57:3
**analysis (4)** 19:12;42:18,19;
63:12
**analyst (2)** 7:8;9:12
**analysts (2)** 9:9,10
**analyze (3)** 20:2;31:18;56:9
**ancestry (2)** 46:17,19
**anticipate (1)** 86:11
**anti-Semitism (1)** 46:2
**apart (3)** 20:9,22;70:18
**appear (1)** 58:1
**appeared (3)** 22:16;23:12;
27:4
**appreciate (2)** 40:25,25
**approach (1)** 60:19
**appropriate (13)** 46:10,14;
47:2,22,24,25;48:10;
58:3;60:4;72:1,4,17,18
**appropriately (1)** 46:9
**approval (2)** 89:14;90:2
**approve (1)** 90:25
**approved (6)** 54:24;90:6,7;
91:4,5;92:13
**approximately (1)** 36:10
**Arce (2)** 58:17,18
**Arce's (2)** 59:1,21
**areas (1)** 15:16
**arena (1)** 12:1,1;13:3
**Arizona (6)** 4:1;6:20,21;8:7;
20:14;68:16
**around (3)** 75:11;84:14;
90:5
**array (2)** 23:15,22

**ARS (5)** 8:24;54:13;87:11;
89:5,6
**art (5)** 65:14,15;66:13
**aside (7)** 19:8,12;40:14;
41:1;43:10;44:1;52:9
**aspect (1)** 23:7
**aspects (2)** 22:19;23:7
**assist (1)** 29:10
**assume (6)** 7:13;8:21;15:8;
23:2;34:16;54:7
**assumed (1)** 45:3
**assuming (1)** 50:8
**assumption (2)** 8:22;45:16
**attacked (1)** 26:24
**attacks (3)** 22:10,17;26:20
**attempting (1)** 83:8
**audit (44)** 18:8,23;21:6,23;
22:3,7,9,11,13,15,18,21,
22,24;23:2,8,14,24;24:2;
26:25;27:5;28:3,14,20,
23;30:24;32:6,21;42:13,
22,22;43:8;44:1;48:16,
16;49:14;52:4;55:21;
56:2,17;57:5,7,10,12
**auditor (2)** 18:19;48:12
**auditors (2)** 48:11,25
**audits (2)** 21:23,24
**August (2)** 4:2;12:6
**authority (9)** 9:17,18,21;
42:17;45:15;55:11;
85:18
**authors (4)** 68:20;69:13,17;
70:3
**automatically (1)** 39:19
**available (1)** 24:2
**average (1)** 35:7
**aware (10)** 13:16;25:11;
26:23;27:3;28:8,12;
29:2;43:15;67:22;70:20
**awareness (2)** 48:21,22
**away (7)** 9:9;40:24;61:21,
24;63:2,4,6

**B**

**back (11)** 7:21;8:3;9:20;
22:10;26:16;33:1;56:15;
58:25;68:1;74:2;90:16
**background (5)** 6:14,16,17;
17:13;19:8
**bad (1)** 37:7
**balance (1)** 41:19
**base (3)** 33:12;49:23;52:19
**Based (12)** 21:21;31:7;32:3,
11,13;38:19;42:19;
43:24;57:4;58:14;59:1;
61:12
**basically (2)** 11:4;44:6
**basis (3)** 89:20;90:1,20
**battle (1)** 92:4
**became (6)** 11:12;26:23;
27:3;36:4;41:3;75:20
**begin (1)** 6:17

**beginning (2)** 10:7,14
**belief (1)** 66:20
**believes (1)** 40:1
**below (3)** 15:8,12;35:7
**benefit (2)** 80:12;81:4
**Benjamin (1)** 38:11
**besides (5)** 51:21;52:1,3,12;
70:11
**best (4)** 9:10;11:8;31:20,23
**better (5)** 35:14;48:6;75:6,6,
18;84:11
**beyond (1)** 55:2
**BIANCHI (1)** 36:15
**biding (1)** 27:5
**bigger (1)** 19:16
**Bill (7)** 8:12,15,16;9:3,16;
11:11;36:4
**billions (1)** 15:25
**bills (1)** 29:17
**bit (5)** 11:21;16:10;28:4;
72:8;85:22
**blanket (1)** 72:14
**block (1)** 80:25
**blur (1)** 16:10
**blurry (1)** 7:21
**Board (6)** 9:18,21;89:14;
90:6,25;91:17
**body (5)** 22:5;23:5;44:10;
48:18;62:21
**bond (1)** 4:23
**book (11)** 30:6,7;34:15,17,
20;45:19,21;52:23;68:6;
73:24;76:8
**Books (8)** 24:20;34:19;53:1;
70:2,4,11;77:1;91:4
**both (5)** 9:20;19:9;27:15;
73:22,22
**brain (1)** 90:17
**break (10)** 5:23,24,25;6:5;
8:1;54:1;72:9;76:5,17;
92:21
**briefing (1)** 54:17
**bring (3)** 9:19;91:3
**broad (3)** 23:14,22;33:12;
49:23
**broader (2)** 22:22;40:16
**broadly (3)** 20:8,10,24
**building (1)** 13:25;80:25
**bulks (1)** 53:10
**bullet (4)** 71:21;72:23;73:9;
80:5
**business (2)** 6:21;90:12

**C**

**call (23)** 33:15;41:21;47:14,
18;48:4;49:22;59:15;
60:3,6,7,23,25;61:2;62:3,4,
7,22;71:2,3;77:18,19,21;
91:14,15
**called (1)** 69:22
**calling (1)** 75:10
**calls (1)** 61:3

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

John Huppenthal
September 16, 2011

**Cambium (20)** 21:18;22:7;
26:24;27:4,13,16;28:9,
20,24;29:4,20;30:2,11;
32:3,22;42:22;56:7;
57:4;70:18;86:17
**Cambium's (1)** 27:22
**came (9)** 11:3,4;19:9;45:2;
46:16;53:9;57:7;76:16;
82:23
**camp (1)** 38:9
**Can (44)** 4:12;5:24;6:13;7:5;
9:24;10:11;11:8,21;
22:19;26:22;30:7;38:5;
44:21;46:9;48:6;49:15,
17,24;50:2,2,14,16,20;
51:8;59:23,24;62:14,15;
63:1;66:21;68:16;76:10;
77:8;79:9,16;80:11,18;
82:9,12;84:11;85:24;
89:18;92:1,7
**career (4)** 7:17;16:15,19;
17:13
**careers (1)** 16:12
**careful (5)** 13:24;21:4;
46:13;60:16;84:9
**carefully (1)** 46:9
**carries (1)** 71:19
**carry (2)** 58:10;59:8
**case (2)** 53:6;85:25
**cast (2)** 77:18;80:2
**catching (1)** 72:6
**Caucasian (3)** 41:23;46:24;
60:5
**Caucasians (3)** 74:24;75:8;
84:3
**cause (3)** 31:12,25;82:14
**caveat (1)** 6:3
**certain (8)** 26:4,9;32:9,18;
34:10;45:1;49:4;53:8
**Certified (1)** 4:7
**cetera (3)** 44:4;51:4;83:12
**chain (1)** 15:7
**challenge (1)** 89:13
**challenges (1)** 42:12
**chance (2)** 31:10;48:21
**Chandler (1)** 7:18
**change (2)** 9:15;10:12
**changed (2)** 9:16;45:15
**chaos (2)** 31:13,25
**characterization (2)** 41:7;12
**characterize (1)** 59:14
**characterized (2)** 41:18;
46:19
**charge (2)** 14:8;15:20
**charter (1)** 64:15
**Che (1)** 38:6
**check (1)** 29:18
**checked (1)** 11:4
**Chicano (3)** 65:14,15;66:13
**Chicanos (1)** 41:5
**chief (2)** 14:22;18:5
**choose (1)** 21:8
**citizens (2)** 25:13,14

**city (2)** 4:23;7:18
**class (50)** 37:14,18;38:23;
39:5,7,12;40:2,20;43:10;
49:21;61:20,21,25;
62:17,18,23;63:1,5,7,9,
14,25;64:1;65:14,15,16,
17,19,21;66:3,13,15;
68:8,11,16,20;69:5,21;
71:15;73:19,24;74:5;
78:8;81:2;84:13;88:4,
13,14,25;89:4
**classes (31)** 25:23;33:3;
43:12;44:15,16;45:1,13;
49:21;61:18;63:13;
64:16;65:4,25;66:2,8,10;
67:19,25;76:21,22;78:4,
12,13;79:7;83:15;87:10;
88:2,5,7,8,9
**classified (1)** 16:8
**classroom (29)** 23:11;33:6;
36:9;41:25;42:10;45:20,
21;48:12,20;49:12;
57:19,22;58:2,10;59:18;
60:9,12;61:3,9;69:6;
70:8,10,16,19;71:9;
74:19;78:22;90:8;91:8
**classrooms (13)** 23:16,23;
24:23;32:4;43:22;56:20;
57:3,14,16,20;71:12;
79:25;89:20
**clean (1)** 90:4
**clear (7)** 13:2;20:21;26:18;
34:14;38:10;58:12;
87:10
**clearly (2)** 5:21;31:5
**client (1)** 66:10
**close (10)** 30:5;33:15;36:1;
47:18;49:22;60:7;62:21;
72:7;91:14,15
**closely (1)** 78:16
**closer (1)** 53:11
**college (1)** 6:18
**comfortable (1)** 33:14
**coming (2)** 29:10;43:4
**comment (2)** 62:12,14
**Committee (1)** 21:23
**common (2)** 91:1,11
**communications (1)** 84:10
**communist (1)** 38:9
**community (11)** 27:9;89:2,2;
90:1,9,14,16,22;91:2,6;
92:14
**company (1)** 86:8
**complaints (1)** 85:9
**completed (3)** 30:23;32:7;
92:18
**completely (4)** 47:6,17;75:2;
90:7
**complex (1)** 18:14
**compliance (17)** 13:13,17;
28:11;83:9;86:22;87:3;
88:18,20,22;89:7,12,17,
19,23,24;91:19;92:2

**comply (1)** 92:15
**comprehensive (2)** 53:3;
86:12
**computer (1)** 15:23
**concept (3)** 39:2;61:6;80:25
**concern (8)** 35:3,20;39:4;
41:6,8;67:3;78:2;79:6
**concerned (18)** 25:13,14;
26:19;30:14;31:2,3;
34:25;35:1,19;38:1,4,6,
24;39:23,24,25;40:3;
42:21
**concerns (14)** 22:8,12,14;
26:17;27:19,22;32:3,22;
35:18;40:9;41:13;55:21;
71:9,11
**conclude (9)** 46:1;59:23,24;
62:18;63:1,9;65:8,15;
87:1
**concludes (1)** 87:2
**concluding (1)** 52:4
**conclusion (12)** 46:1;47:11;
57:7;58:6,14;61:12;
67:12;70:3;77:2;78:17;
83:14;86:22
**conclusions (2)** 31:18;53:4
**conduct (4)** 18:8;24:25;
57:5;86:9
**conjunction (3)** 17:19,22;
18:3
**connection (2)** 60:22;62:12
**consciousness (4)** 48:4;
81:2,5;84:14
**consider (3)** 30:15;69:14;
90:15
**considerations (1)** 32:13
**considered (1)** 8:13
**considering (1)** 13:16
**consistent (4)** 49:19;58:11;
59:10,12
**constantly (1)** 5:16
**construe (1)** 18:12
**construed (1)** 47:14
**contained (1)** 30:18
**content (3)** 5:4;65:3;68:25
**context (35)** 4:20;10:19;
12:11;19:11;21:13;
23:17;24:3;38:22;39:10,
11;40:16;41:17,23;42:5,
10;45:19;46:24;47:4,12;
49:12;58:3;69:20;70:9,
14,15,24;71:1;72:1,4,13,
18;75:15;81:10;84:2,9
**contexts (1)** 20:1
**continual (1)** 42:5
**continuing (1)** 45:10
**continuous (1)** 8:6
**control (2)** 15:12;16:10
**controversy (1)** 35:8
**conversation (6)** 5:17;11:9;
38:13,25;39:17,22
**conversations (5)** 18:13;
28:18;39:3,7;43:24

**converse (1)** 57:24
**conversely (1)** 49:10
**corner (1)** 90:13
**correspondence (1)** 25:12
**Costa (1)** 43:10
**council (2)** 4:23;7:18
**couple (7)** 9:2,15;20:15;
38:3;39:15;55:17;85:23
**course (6)** 61:7,11;65:16,
17;66:11;83:19
**courses (9)** 49:9;64:16;
65:4;66:8,9;78:13;
83:15;87:10;88:3
**coursework (2)** 24:2;91:5
**court (1)** 5:9
**create (6)** 47:4;75:6;83:20;
84:2,13,13
**created (6)** 16:23;32:8;50:3,
5,12;59:25
**creating (1)** 80:3
**critical (1)** 70:24
**Cuba (1)** 38:10
**culminating (1)** 86:12
**curious (1)** 83:14
**curricular (3)** 24:17;44:3;
55:7
**curriculum (10)** 54:23;55:7;
88:22;90:2,7,9,11,25;
91:2;92:12
**Curtis (1)** 37:14

**D**

**data (2)** 13:9;35:7
**date (7)** 10:6;11:25;19:23,
24;30:22;36:6;37:20
**dates (1)** 31:22
**day (8)** 10:24;12:17,19;
27:25;48:24;78:23;
89:17,20
**days (3)** 32:6;91:18;92:18
**deadline (4)** 32:6,12,12;
33:2
**deal (4)** 19:18;20:11,24;
92:4
**dealt (2)** 10:19;13:6
**death (1)** 38:9
**debated (1)** 11:12
**debates (1)** 19:10
**decide (2)** 12:24;89:11
**decided (5)** 17:16;18:18;
19:21;21:3,5
**decision (10)** 12:7;17:19;
18:7,11;23:18;24:5;
33:12,13,14;49:23
**decisions (2)** 11:6;49:14
**deeply (1)** 20:23
**define (1)** 14:15
**definitely (1)** 45:6
**definition (4)** 62:8;75:8;
84:4;88:15
**degree (7)** 6:19,21;7:7;
21:14;63:13,15,23

**degrees (1)** 6:23
**delay (2)** 10:6;11:25
**delayed (1)** 36:6
**deliberating (1)** 56:16
**deliberations (1)** 50:19
**deliberative (3)** 10:20;12:1;
13:5
**delivered (1)** 30:11
**delivers (1)** 16:24
**department (20)** 13:19;17:18;
24:18;48:23;58:23;66:7;
67:20;80:6,21;81:13,18,
19,20,23,23;82:2,4,18,
21;86:13
**departments (2)** 11:17;55:6
**department's (2)** 80:6;85:9
**deposition (4)** 4:15,21;5:5;
6:2
**depositions (1)** 14:20
**deputy (1)** 15:2
**describe (3)** 14:8;38:5
**described (4)** 32:14;34:7,
11;78:6
**describing (2)** 76:17;86:5
**designed (3)** 78:14,18,24
**desire (1)** 32:9
**despite (1)** 30:13
**detail (2)** 88:17,24
**detailed (3)** 87:9,15;88:16
**details (2)** 79:4;88:23
**determination (7)** 20:9,22;
29:11;54:12;56:3;60:20;
92:6
**determinations (1)** 26:7
**determine (6)** 60:18;61:7;
62:16;78:12;83:9
**develop (1)** 88:22
**developed (2)** 21:1;46:8
**developing (1)** 28:2
**development (1)** 56:17
**diary (1)** 59:6
**different (5)** 44:3;46:23;
65:10;74:8;77:5
**differentiates (1)** 68:23
**differently (1)** 44:22
**dimensions (2)** 75:5,15
**direct (15)** 28:7;34:2,5;38:9;
42:3,14;45:9,13;47:16;
60:23,25;61:3,5;84:15;
85:17
**direction (3)** 32:18;85:16,17
**directly (12)** 14:22;16:2;
18:23;20:24;23:15;26:5,
9;27:12;28:22;34:1;
45:14;49:16
**director (5)** 16:18;49:18;
58:16,23;61:4
**directors (5)** 48:9;58:8,16;
74:20;81:9
**discipline (3)** 21:25;40:14;
91:13
**discovered (1)** 55:3
**discussed (4)** 11:12;12:14;

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. I

John Huppenthal
September 16, 2011

27:21;55:24
**discusses (1)** 78:10
**discussion (4)** 11:15;28:16; 39:5;41:12
**discussions (9)** 17:23; 18:22;28:6,13;32:20,25; 39:10;42:10;56:16
**disease (1)** 35:10
**distinct (1)** 10:2
**distinction (1)** 13:3
**District (18)** 11:13;31:3;35:8, 10,12;42:18;55:4;64:14; 68:15;73:25;74:5;76:5, 20;79:7;87:2,15;91:18; 92:1
**districts (2)** 13:17;55:11
**district's (5)** 54:22;74:13; 78:12,13;86:22
**districts' (1)** 13:13
**district-wide (1)** 54:25
**document (10)** 12:23;49:25; 50:5,15,17;51:9,11; 53:21;54:7;85:5
**documentary (2)** 52:12;68:4
**documents (4)** 24:17;52:1, 11;53:1
**dollars (1)** 15:25
**done (9)** 7:6;12:22;21:11; 46:9;48:20;65:22;72:7; 82:22;92:21
**doubt (1)** 13:23
**down (12)** 5:9,12;15:2,8; 18:17;27:2;32:15;49:10; 53:11;70:25;71:9;78:9
**Dr (1)** 85:7
**draw (3)** 46:1;62:11;86:21
**drawn (1)** 42:20
**drove (1)** 17:20
**duly (1)** 4:6
**During (3)** 11:11;36:3,8
**duties (1)** 14:19
**duty (1)** 20:25

**E**

**earlier (1)** 34:4
**easily (1)** 9:7
**easy (1)** 70:1
**edges (1)** 16:10
**Education (12)** 9:18;16:12, 15;17:14;19:14;20:10, 21;35:13;47:17;76:22; 86:9,13
**educational (9)** 6:14,16,17; 15:17;16:3,9;42:5;47:6; 90:24
**educator (1)** 17:14
**effect (2)** 30:25;42:17
**effective (6)** 10:6;11:25; 19:23,24;26:19;37:20
**Either (2)** 7:3;43:16
**election (2)** 12:6,12
**electrified (1)** 57:8

elementary (11) 66:18,22; 67:4,7;70:25;71:6,10,12; 78:18;79:14,24
**Elliott (4)** 18:4,4,22;85:8
**else (5)** 5:20;13:20;15:8; 38:23;41:11
**emails (2)** 25:12,20
**emotions (1)** 62:9
**emphasize (2)** 23:13;44:9
**employees (1)** 15:11
**enactment (1)** 81:14
**end (6)** 10:7;31:17,19; 55:18,19;86:7
**endeavor (1)** 10:21
**ended (2)** 7:21;76:4
**enforce (3)** 9:17,19;12:25
**enforcing (2)** 65:2;83:4
**engage (1)** 59:16
**engaged (3)** 28:5,15;86:8
**engineering (2)** 6:19,20
**enhance (3)** 80:7;81:20,21
**enough (6)** 5:2;7:4;10:18; 11:10;32:4;80:19
**enter (1)** 12:10
**entered (1)** 34:24
**entire (1)** 80:15
**entirely (4)** 46:5,10;47:2; 59:17
**entirety (2)** 23:17;24:3
**entitled (1)** 50:3
**entity (4)** 18:8;21:5,9,16
**environment (3)** 32:9;57:9, 11
**equation (1)** 19:10
**essentially (12)** 4:24;12:25; 14:21;25:13;32:2;34:24; 54:16;67:20;71:2;78:21; 83:20;91:23
**establish (2)** 52:25;54:25
**established (2)** 37:21;78:22
**et (3)** 44:4;51:4;83:12
**ethnic (9)** 13:13;48:14;58:4; 78:14,19;83:1,13;84:16, 21
**even (13)** 4:22;5:5;13:16; 20:13;28:14;36:25; 47:16;53:20;55:14;60:8; 68:19;90:19,21
**event (5)** 41:17;47:4,13; 48:4;74:24
**events (9)** 48:1;72:25; 73:11;74:22,23,25;75:2; 77:3,6
**everyone (1)** 15:8
**evidence (26)** 22:14,22;26:3, 4,8;31:18;33:15,17,25; 34:1,1,2,5,6;38:19;47:8; 52:12;61:13,14;62:19, 21,22;63:25;68:4;78:11; 91:14
**evidentiary (1)** 20:4
**exact (1)** 38:22
**exactly (7)** 10:1;18:13;

43:11;46:22;79:7,8,8
**EXAMINATION (1)** 4:10
**examine (1)** 65:19
**examined (1)** 4:8
**example (8)** 23:1;25:7,12; 33:2;34:15;38:20;41:4; 44:24;45:23;46:15;59:3, 20;61:23;65:13;66:13; 67:6;74:5;79:13
**examples (1)** 22:4
**exclusive (1)** 84:16
**exclusively (1)** 44:2
**excuse (1)** 30:25
**execute (1)** 63:19
**Exhibit (16)** 49:24;50:14; 51:8;52:2,6,7;53:19; 54:3,6;64:17;71:20;73:4, 4;84:25;85:3;86:17
**exhibits (3)** 30:6,8;66:25
**experience (3)** 6:16;7:6; 17:12
**explain (1)** 11:21
**explained (1)** 83:10
**explicit (1)** 60:22
**expressing (1)** 60:11
**extended (1)** 49:9
**extending (1)** 33:2
**extensive (1)** 91:3
**extent (7)** 25:17;24;26:4,9; 31:24;34:10;53:8
**extract (1)** 90:18

**F**

**fact (5)** 22:12;54:23;60:17; 62:16;69:17
**factor (1)** 40:8
**failure (3)** 40:5;41:10;42:21
**Fair (9)** 5:2;7:4;11:10,14; 12:3;34:3;65:20,24; 80:19
**fairly (1)** 22:17
**fall (4)** 36:20,22;37:1,2
**falls (2)** 15:8;16:5
**fame (1)** 31:6
**familiar (1)** 53:23
**far (4)** 17:12;19:14;25:6; 64:25
**fare (1)** 48:24
**fashion (6)** 10:20;13:5; 18:13;46:7,19;47:2
**fatigue (1)** 72:6
**feel (5)** 21:19;58:3;62:17; 63:18,23
**feeling (1)** 63:3
**felt (17)** 10:16,17,20;12:7; 13:2,8;19:4,7,11,13,17; 20:12;21:11;22:6;30:25; 33:14;35:8
**few (1)** 26:14
**figure (1)** 61:19
**final (2)** 22:20;56:2
**find (6)** 51:25;52:9;63:6;

79:7,9,16
**finding (13)** 12:15,25;31:17; 54:17;65:21,25;66:18; 68:10;71:18;72:23;73:9; 79:24;91:19
**findings (20)** 12:15;13:1; 18:25;30:15,16;39:13; 41:5;51:22;64:4;65:12; 66:6,12,14;67:16,24; 78:10;79:11,12;88:1,4
**fine (5)** 5:24;43:21;74:11
**finish (1)** 5:13
**fire (2)** 27:4,7
**first (16)** 4:6;16:18,18,22,22; 17:9,9;18:24;22:25; 23:1;35:4;55:19;56:1; 64:7;71:19;86:7
**fit (1)** 42:2
**flip (1)** 30:7
**Flowing (1)** 31:8
**flows (1)** 16:1
**focus (3)** 20:4;24:25;25:7; 33:7;43:23;56:12;60:13; 80:22
**folks (3)** 17:20;18:6;49:10
**following (1)** 64:17
**follows (1)** 4:8
**football (1)** 10:22
**form (10)** 74:10;76:9;77:7,16; 79:2,18;80:1;81:25; 82:6;83:6
**formed (11)** 80:7;81:13,18, 19,20,23;82:2,4,4,18,21
**former (2)** 12:14;16:18
**forth (2)** 64:7;85:20
**forward (6)** 20:5;33:12;41:2; 42:15;45:2;91:3
**found (9)** 9:13;14:2;22:21; 26:12;30:20;49:5;50:22; 71:25;79:21
**foundation (3)** 24:4;79:19; 81:25
**four (1)** 86:11
**frame (1)** 57:4
**framed (1)** 56:12
**France (2)** 63:3,4
**Franklin (1)** 38:11
**front (4)** 19:9;30:6;33:10; 62:20
**full (1)** 4:12
**fundamental (1)** 80:24
**funds (1)** 55:11
**further (1)** 44:13

**G**

**gains (1)** 35:8
**game (1)** 63:21
**gather (2)** 63:15,22
**gave (1)** 38:20
**Geez (2)** 4:22;40:20
**general (13)** 4:20;20:11,18; 27:13,15,16;31:21;

32:17;35:9;40:1;76:12; 80:1;85:18
**generally (8)** 17:4;20:18; 23:10;31:2,14;50:18; 63:12;80:21
**generated (1)** 45:3
**gets (2)** 7:21;89:11
**gist (1)** 63:22
**Given (3)** 5:4;12:22;56:11
**gives (4)** 49:3,3;88:23; 91:18
**giving (2)** 5:20;75:10
**goes (1)** 80:11
**good (3)** 26:5;90:23;91:23
**government (4)** 73:24; 76:20,21;91:25
**grind (1)** 9:9
**grip (1)** 91:16
**group (13)** 9:9;18:6;25:7; 69:5,7,9,15,23,23;75:11; 77:20;78:15,19
**groups (3)** 24:25;33:7;43:23
**guess (8)** 4:16;10:4;34:13; 50:3;54:11;65:7;79:6,21
**Guevara (1)** 38:7
**guide (1)** 31:24

**H**

**half (1)** 6:1
**hall (1)** 31:6
**hand (1)** 10:17
**handwriting (1)** 51:6
**hang (1)** 72:8
**happen (5)** 5:7;22:2,6; 31:16;83:22
**happened (9)** 18:14,15,21; 23:9;41:1;42:16;45:10; 46:8;82:20
**happening (6)** 42:14,19,25; 43:1;71:11;82:19
**happens (2)** 75:15,16
**hard (2)** 5:12;62:2
**hardly (1)** 4:22
**hating (1)** 63:4
**hatred (1)** 62:1
**HB (1)** 8:23
**head (1)** 5:20
**hear (1)** 47:23
**hearing (1)** 35:5
**hearings (5)** 36:3,8;89:1; 90:15;91:3
**heart (1)** 47:11
**hegemony (1)** 74:16
**helped (1)** 38:9
**helpful (1)** 33:5
**herein (1)** 4:6
**Hibbs (9)** 14:22;15:14,18; 16:17;18:4;22;24:12; 85:8,13
**High (2)** 37:14;67:18
**highly (2)** 58:6;74:7
**himself (1)** 59:24

hire (3) 18:18;21:5,8
hired (1) 28:24
Hispanic (6) 41:24;46:24;
  74:25;75:1;80:24;81:3
Hispanics (9) 41:24;74:24;
  75:8,17,17;77:18;83:24,
  24;84:3
historical (22) 38:10;41:16,
  19;47:4,12,13;48:1,4;
  59:14;60:2;72:25;73:11;
  74:23;75:2,7;77:3,6,17;
  80:2;81:22;82:3;84:8
history (10) 73:16,18,22,23;
  74:5,6,14;76:6,7,15
Hitler (3) 45:25;46:6,15
hold (3) 89:1;90:14;91:3
hoping (2) 31:16,24
Horne (2) 10:24;12:15
Horne's (1) 18:25
horrible (1) 46:21
horribly (1) 46:20
hour (2) 5:25;6:1
hours (4) 29:20,23;30:2,3
House (4) 7:20,22;8:2,12
Hrabluk (10) 16:12;17:25;
  24:7;32:1;44:24;49:1;
  50:21;52:5;54:21;55:7
huge (1) 19:14
huh (1) 29:17
Huh-uh (2) 17:15;51:7
hundred (1) 77:24
HUPPENTHAL (2) 4:5,14
hypothetically (1) 61:24

I

idea (3) 29:23;39:15;87:10
identical (1) 83:18
identification (2) 54:4;85:1
identified (5) 30:14;31:5;
  41:8;67:7;88:7
identifies (1) 88:12
identify (5) 30:22;48:5;62:4;
  77:19,20
identity (2) 62:7;84:14
II (1) 64:6
illegal (3) 59:17;78:8;90:3
implied (1) 60:24
importance (1) 56:11
important (6) 5:10;13:8;
  57:6,15;58:9;88:15
importantly (1) 26:5
impossible (1) 57:9
impression (1) 32:5
improve (1) 48:6
inappropriate (11) 42:4;
  46:21;47:7,17;59:17;
  60:8,12,15;72:3;78:8;
  90:3
inappropriateness (1) 46:21
incident (3) 46:17;59:14;
  77:17
incidents (3) 60:2;75:7;80:2

include (2) 64:15,17
included (2) 33:17,20
including (2) 18:7;76:21
independence (5) 21:14;
  22:13,15;26:18;27:2
independent (3) 21:16;39:9;
  90:19
independently (1) 21:11
indicated (3) 22:25;34:23;
  42:24
individual (1) 27:14;53:15;
  88:13,14
individuals (10) 59:22;83:2,5,
  16,21;84:5,7,15,17,22
inflamed (3) 90:1,14;91:2
information (21) 16:1,5;23:15,
  23;24:1;25:2,19,21;
  27:20;30:18;33:13,20;
  45:5;49:23;51:13;52:13,
  15,16,19;53:9;87:16
informed (1) 88:22
injustice (5) 41:18;48:2;
  75:16;77:17,21
injustices (4) 75:4;83:22;
  84:1,11
input (1) 25:13
instead (4) 41:19;64:12;
  83:2,4
instruction (1) 64:16
intend (1) 77:10
intended (1) 62:11
intense (1) 71:11
intent (6) 58:9,15;59:8,21,
  23;87:24
intention (1) 87:14
interactions (1) 18:14
interested (2) 20:8;87:8
interpret (1) 83:8
interpreted (1) 32:19
interviewed (1) 33:7
interviews (2) 25:7;56:19
into (24) 8:23;10:16;12:10;
  29:20,24;30:2,3;34:24;
  42:2;62:9,10;70:25;
  71:9;79:25;82:23;88:18,
  20,21,25;89:7,23,24;
  91:19;92:1
introduced (4) 9:2,14,19;
  78:4
investigated (1) 13:12
investigating (1) 13:14
investigation (11) 18:9,19,5,
  21:10,17;29:4,20,24;
  85:8;86:5,10,11
involved (8) 7:16;10:21;
  19:14;20:10;24:11;
  26:21;54:24;91:12
issue (7) 11:5,19;12:15;
  13:6;56:11;57:6;87:3
issued (1) 10:24
issues (7) 10:20;19:13;
  20:10,21;43:12;54:21;
  85:20

issuing (1) 11:2
items (1) 53:15
itinerant (1) 78:21
Iyer (6) 76:1,9;77:7;79:2,18;
  81:25;82:6,11;83:6

J

January (9) 7:10,11;42:11,
  15,25;43:1;45:2,7;70:19
Jewish (2) 46:17,18
job (2) 35:20,23
JOHN (4) 4:5,14;31:4;35:1
joined (1) 76:1
Joint (1) 21:22
journal (11) 48:9;49:17,19;
  58:8,20,20;59:1,2,4,13;
  81:9
journals (1) 61:4
junior (3) 67:20;68:7,11
justice (1) 76:22

K

Kathy (2) 44:24;50:20
keep (1) 64:13
key (1) 70:16
kids (1) 38:12
kind (21) 5:6;11:25;17:20;
  18:8;24:7;26:2;30:5;
  35:20;41:2,10,11,19;
  42:5;49:3;54:17;67:8;
  70:12;75:3,4;81:9;91:25
kinds (3) 28:6;42:7;83:22
knew (2) 56:19;64:24
knowing (1) 13:21
knowledge (11) 13:15,18;
  25:3,10,15,20;27:11;
  29:19;43:20;48:18;
  66:16
knows (1) 52:7

L

lacking (2) 23:12;75:3
laid (2) 14:17;31:23
large (3) 9:8;15:12,23
largest (1) 35:12
last (11) 7:10;10:24;12:16;
  14:21;31:10;32:1;36:23;
  37:6;39:15;55:17,20
Later (1) 86:20
Latino (3) 74:15;80:8;81:21
law (20) 11:12;19:23,25;
  20:2,2,23,25;47:16,17;
  55:15;57:19;58:2,13;
  60:8;69:24;89:8;90:2,
  25;92:9,16
lawyer (1) 5:6
lead (1) 40:4
leadership (1) 35:10
leads (1) 63:12
learned (2) 13:23;45:24

learning (1) 88:23
least (6) 31:12,25;55:5;
  63:25;68:24;72:3
led (1) 18:23
left (3) 7:23;11:2;75:25
legal (3) 56:2;92:6,7
legislation (1) 10:6
legislative (6) 9:8;13:3;19:8;
  21:22;36:8,18
legislatively (1) 19:9
legislature (1) 8:8
lengthy (2) 12:23;16:19
lesson (1) 49:4
letter (5) 51:3;85:7,12,15,19
level (4) 15:1;71:1,10,12
levels (1) 43:6
life (3) 28:1;40:10;65:23
light (1) 48:24
likelihood (1) 20:20
likely (6) 18:25;53:5;56:10;
  74:7;92:14,15
limelight (1) 11:14
limitations (2) 30:13;33:22
limited (8) 20:13,13;22:21;
  30:20;49:15;57:2,3;
  61:14
list (8) 51:24;52:2;53:3;
  69:12,25;70:3;76:8;88:3
listed (7) 34:15,19;52:10,14;
  53:2;68:6;71:24
lists (2) 45:3;73:24
literature (20) 41:22;46:23,
  25;47:3;67:19,21,21;
  68:8,11,16,19,22;69:21;
  70:1;74:20;75:3;77:23;
  78:1;80:23,23
little (6) 5:6;11:21;16:10;
  28:4;72:8;85:22
live (4) 22:23,24;42:22;75:6
lives (1) 75:6
logical (4) 15:22;16:2,8;
  89:25
logistically (1) 90:5
logistics (1) 92:19
long (1) 5:3
longer (2) 6:2;72:8
look (36) 13:9;17:17,21;
  19:21,22;21:4;26:1,4,9;
  28:10,20;39:14;40:15;
  41:2,15;45:18;49:24;
  50:14;53:21,23;57:7;
  61:4,7,21;64:4;68:1;
  70:23;72:21;73:2,3;
  74:23;79:4,7,9;80:15,16
looked (12) 22:20,22;24:14;
  34:20;48:19;50:10,25;
  72:16;77:15,24;83:15;
  86:17
looking (21) 11:18;19:19,23;
  22:4,10;25:22;41:14;
  44:1;45:12;49:14;53:10;
  55:17;62:20;64:6;66:1,
  9;71:20;72:19;86:4;

87:22;88:2
loop (1) 30:5
lop-sided (1) 75:10
lose (1) 6:8
lot (12) 14:2;24:1;27:2;31:4;
  37:8;52:16;60:21;62:22;
  76:25,25;91:14;92:4
love (1) 63:3
loving (1) 61:25

M

main (1) 24:7
majority (1) 65:25
makes (1) 5:12
making (3) 53:17;56:3;92:6
Malsatang (1) 46:6
management (1) 16:4
manner (3) 46:13;87:11;
  88:12
manners (2) 75:16;84:12
many (3) 29:19,23;74:22
March (2) 85:21;87:20
marked (4) 54:3,6;84:25;
  85:3
marks (2) 40:24;51:6
MAS (6) 28:11;29:11;30:16;
  66:18;80:6;81:6
master's (2) 6:21;7:7
material (3) 52:23;74:18;
  78:3
materials (80) 24:16,16,17;
  25:17,22;38:14,16;41:5,
  15;42:1,7,9,20;44:3,4,
  10,14,25;45:1,3,5,12,13,
  16,17;46:12;47:1,8,21,
  23,25;49:16,19;50:22;
  53:3;57:18,21,22,25;
  58:12;59:9,10;60:2,18,
  22;61:3,11;65:12;67:6,
  6;69:6,14;70:10,11,13;
  71:9,14,23;72:24;73:10;
  74:7,9,19;76:25;77:2,5,
  11,15;79:25;83:12,19;
  88:24;89:3,4,14;90:3,6,
  10,10;92:13
matter (1) 10:17
may (17) 22:13,15;25:17,18;
  32:8;34:16;39:18,19;
  40:2;41:8,9,10;53:15;
  60:15;61:16;62:5;70:13
maybe (7) 32:4;34:13;
  36:25;63:8,17,17,18
mean (43) 12:5;13:21;14:7;
  15:21;20:7;23:19;27:23;
  28:9,22;33:16;35:3,16,
  20;36:7;37:8;38:9;39:5;
  40:12;48:8;49:1;50:2;
  52:22;59:3;61:23;62:14;
  64:24;65:4,16;68:10;
  69:11;72:2;73:17;74:13;
  78:25;79:12,15;83:4;
  84:6;87:18,18;91:9,10;

92:9
**means (3)** 63:7;84:8,8
**meant (1)** 14:4
**mechanical (1)** 6:20
**mechanically (1)** 89:22
**media (1)** 54:17
**Melissa (1)** 75:22
**member (1)** 21:22
**members (1)** 81:2
**men (1)** 31:23
**mental (3)** 40:3,10,13
**mentioned (4)** 12:24;23:3;
30:20;43:7
**mess (1)** 90:4
**Mexican (1)** 73:22
**Mexican-American (19)**
11:13;17:17;24:18;
27:9;35:9;46:23;47:9;
48:23;67:20;68:16,20;
69:13,17;70:2;73:17,23;
76:7;88:6,8
**Mexican-American's (1)**
73:18
**mice (1)** 31:23
**microcosm (1)** 19:16
**middle (2)** 6:8;67:13
**might (10)** 18:21,23;26:13;
34:19;40:4;51:18;58:1;
72:16,17;85:25
**million-plus (1)** 16:1
**mind (3)** 32:11;33:14;36:13
**minus (2)** 14:6,13
**minute (1)** 82:25
**minutes (1)** 56:22
**misquote (1)** 11:22
**missing (1)** 65:7
**mission (1)** 16:3
**misunderstand (1)** 61:15
**mode (1)** 40:4
**model (8)** 40:4,10;41:10,16,
22;59:12,25;83:20
**more (25)** 12:1;18:23;19:5,
12,14,21;20:8,10,24;
26:5;27:18;30:2,3;32:3;
33:1,3,6;34:16;49:8;
52:22;57:6;60:8;62:10;
79:22;92:25
**Morely (1)** 18:4
**most (2)** 5:10;56:21
**move (3)** 11:25;32:17;33:12
**moving (1)** 40:10
**much (4)** 6:2;19:16;20:8;
32:22
**multiplicity (1)** 75:14
**municipal (1)** 4:23
**MURPHY (6)** 44:19;64:21;
73:6;74:10;75:21,25
**mutually (1)** 84:16
**myself (2)** 18:22;21:23

**N**

**NAEP (1)** 29:1

---

**name (2)** 4:12;46:7
**narrow (1)** 20:14
**narrowed (1)** 53:11
**narrowing (1)** 53:9
**national (1)** 86:8
**naturally (1)** 48:25
**nature (7)** 16:9;28:15;
34:11;48:16;69:6;77:23;
79:24
**need (5)** 5:23;13:4;23:13;
31:1;61:20;75:22;85:22;
88:19,22;90:22
**needed (13)** 11:6;12:8;13:2,
6;19:4,11,16,17;30:23;
33:11;57:21,22,22
**needs (1)** 88:21
**neighbor (2)** 61:25;62:1
**new (1)** 10:14
**news (1)** 54:17
**next (6)** 9:12;15:1;73:8;
78:9;87:7;89:17
**nodding (1)** 5:19
**nonstop (1)** 89:19
**Northern (1)** 6:19
**notebook (1)** 64:5
**notes (1)** 11:9
**notice (3)** 87:3,8;88:16
**notification (1)** 87:15
**novels (2)** 69:13;70:2
**November (1)** 12:7
**number (17)** 21:24;22:16;
30:7;36:2;40:23;42:16;
43:4,4,5;49:24;50:14;
54:3;57:2;66:1;69:6;
71:20;84:25
**numbers (2)** 8:15,16
**Numeral (1)** 64:6

**O**

**object (7)** 74:10;76:9;77:7;
79:2,18;82:6;83:6
**objectionable (1)** 49:5
**obligation (5)** 19:7;20:2;
75:5,18;84:11
**Obliquely (1)** 80:22
**observation (1)** 90:8
**observations (1)** 57:23
**observe (4)** 38:1,15;48:25;
91:7
**observed (6)** 38:14,24;
56:21,21;57:25;58:12
**obvious (1)** 5:16
**Obviously (5)** 5:9;41:7;
55:24;85:12;86:23
**occasion (2)** 37:16;38:20
**occur (2)** 75:4;84:12
**occurred (2)** 43:3;86:23
**off (3)** 35:11,16;91:13
**offer (1)** 68:24
**offered (3)** 65:14;66:1;67:19
**offers (1)** 66:3
**offhand (1)** 28:22

---

**office (4)** 10:24;18:24;
87:20,21
**officer (4)** 15:17,18,21;17:5
**officers (1)** 14:22
**official (1)** 54:11
**once (2)** 41:2;56:21
**one (40)** 4:18;5:10,11;9:15;
20:1;21:4;22:25;24:7;
34:17;37:16;40:4;41:3,
8;43:10;45:8;49:1;50:9,
12,25;51:17;52:7,21,22;
53:14;56:13;61:20;69:4,
4;72:12,19,21,24;73:10;
74:14;77:3,11,24;78:23;
87:7;89:17
**ongoing (1)** 32:21
**only (19)** 6:3;9:15;22:10;
49:2;55:4;56:20,21,21;
59:23,24;72:24;73:10;
74:14;75:7;77:3,11;
89:18;90:5;92:1
**operation (2)** 16:6;89:15
**operational (2)** 15:18,21
**opinion (7)** 11:2;18:25;19:3;
30:2;60:11;88:20;89:8
**opportunity (1)** 49:4
**opposed (4)** 5:19;21:9;37:5;
60:14
**oppress (4)** 83:21,23,24,25
**oppressed (9)** 39:2,19;40:2,
7;41:6;62:5,7;74:16;
81:2
**oppressing (6)** 74:24,25;
75:8,17,17;84:3
**oppression (7)** 39:2,15,18;
41:22,24;75:15;80:4
**oppressor (2)** 39:3;62:8
**oppressor/oppressed (1)**
41:12
**oppressors (3)** 39:16;41:6;
75:13
**order (5)** 7:13;17:21;61:19;
87:9;92:12
**organization (3)** 16:23;
17:10;28:16
**organized (1)** 79:4
**originally (3)** 22:11,18;82:21
**others (1)** 41:6
**ourselves (1)** 48:7
**out (27)** 5:21;9:13;10:18;
12:8,8;14:17;25:25;
26:1;31:20;32:15;42:13,
20;51:25;52:9;58:10;
61:19;63:6;70:13;75:21;
79:7,10,16;84:1;87:2;
89:1;90:13;92:19
**outcome (6)** 59:25;60:19;
61:8,17;63:24,25
**outside (4)** 18:8;21:5,8,16
**over (33)** 5:6,11,16;8:16;
10:3;12:17,19;26:6,6;
34:2;41:16,16,25,25;
46:25,25;49:9,17,17;

---

59:12,12;60:1,1;66:25;
69:1;71:8,19;72:12,16;
74:18;77:16,16;91:2
**overdue (1)** 91:16
**overheard (1)** 39:23
**oversee (1)** 14:9
**overview (1)** 6:13
**overwhelming (5)** 74:18;
75:20;77:13,23;78:2
**overwhelmingly (1)** 77:15
**own (10)** 11:6;12:15;13:1,1,
9;17:17;21:6;26:2;
30:16;86:22
**owns (1)** 59:24

**P**

**page (5)** 55:19;71:19,20;
73:6,8
**pages (1)** 44:4
**paid (1)** 29:14
**paragraph (6)** 55:20;78:9;
86:4,7,10,20
**paragraphs (1)** 55:18
**part (24)** 11:14,23;14:10;
31:13;35:9;39:5,6;40:1;
50:18;53:16;57:4;61:10;
64:7;69:7,15;70:16,16;
71:4;76:6;78:8;79:6,14;
81:8;83:13
**participating (1)** 26:25
**particular (19)** 8:23;10:15;
23:7;31:4;38:19;45:19;
51:11;53:14;60:19,19;
61:25;65:21;69:15;
72:22;78:5,14,19,24;
79:1
**particularly (4)** 42:21;70:25;
78:18,24
**particulars (1)** 28:14
**passage (2)** 34:16,17
**passed (1)** 8:13
**past (2)** 47:16;48:3
**pay (1)** 29:17
**peace (1)** 90:22
**Pedicone (6)** 31:4;35:1,16,
17,18;85:7
**pending (1)** 6:4
**people (21)** 11:18;13:24;
14:9;17:22,24;21:9;
22:11,17;23:2;24:7;
26:21;27:14,16;33:7;
36:1;42:17;44:14;45:14;
49:20;74:15;75:12
**people's (1)** 20:19
**percent (3)** 56:20;77:14,25
**perception (1)** 27:1
**perfect (1)** 35:22
**perform (1)** 35:13
**Perhaps (2)** 34:4;57:6
**period (2)** 37:18;49:9
**person (8)** 17:20;29:20,23;
35:19,22;83:3,3;89:11

---

**personal (1)** 25:2
**personally (2)** 21:24;25:23
**perspective (11)** 72:25;73:10,
19;74:8,15;76:8,16;77:3,
5,12;78:5
**perspectives (1)** 73:23
**phenomena (4)** 19:16;
20:11,12,15
**philosophy (2)** 20:18,20
**Phoenix (1)** 4:1
**phonetic (1)** 46:6
**phrase (1)** 71:13
**pick (3)** 20:20;35:25;36:1
**piece (1)** 45:8
**place (11)** 12:6;19:10;20:3;
35:6;36:8;41:17;47:13;
56:16,20;61:9;86:6
**plan (2)** 63:19,21
**planning (1)** 7:8
**plans (3)** 31:23;49:4
**play (1)** 62:9
**please (5)** 4:12;5:12,18;6:9;
44:19
**plenty (1)** 8:18
**plus (2)** 14:6,13
**pm (1)** 4:3
**point (19)** 18:3,21;20:3,4;
26:23;48:14;49:13;
60:10;66:21;69:18,25;
71:21;72:23;73:9;79:22;
80:5;89:7,9;90:18
**points (1)** 43:5
**polarized (2)** 57:8,11
**political (12)** 7:17;10:16,19,
22;12:1;13:3;19:11;
21:13;59:16;60:6;77:21;
91:24
**politics (2)** 12:9;21:16
**poor (1)** 35:10
**portrayal (2)** 38:19,21
**portrayed (2)** 38:11,16
**position (7)** 7:13;8:5;34:25;
83:11;85:20,25;87:19
**positive (1)** 62:5
**possibility (1)** 27:24
**possible (6)** 6:8;46:5;87:9,
16;88:16;92:9
**possibly (1)** 92:18
**poster (1)** 38:6
**potential (1)** 47:13
**potentially (5)** 33:1;35:11,
15;47:22;49:3
**power (3)** 40:7;41:23;60:5
**practical (2)** 89:25;90:20
**Practically (1)** 92:11
**prepared (1)** 54:16
**preschool (2)** 16:24;17:1
**present (5)** 72:24;73:10;
77:3,11;89:2
**presented (1)** 77:5
**presents (2)** 74:8,14
**preservation (1)** 82:11
**pretty (4)** 12:23;17:9;36:1;

38:10
**previously (5)** 31:5
**primarily (5)** 19:23;24:14;
44:2;78:14,25
**primary (1)** 80:22
**prior (8)** 16:19;19:22;40:12,
14;42:16;43:11;69:1;
81:14
**Probably (2)** 4:16;37:5
**problem (1)** 75:19
**problematic (5)** 50:23;58:1;
66:22
**problems (2)** 48:15;49:2
**procedures (1)** 42:23
**proceed (2)** 17:19,23
**proceedings (5)** 54:3;75:25,
25;76:1;92:24
**process (9)** 9:8;25:18;53:9,
16;55:12,15;92:2,8,17
**processes (1)** 91:12
**produced (2)** 29:8;30:11
**product (4)** 21:19;22:20;
33:10;91:6
**Program (24)** 11:13;12:16;
17:18;21:4;29:12;30:16;
48:10;49:18;54:22,25;
56:13;58:10;62:12;
64:16;66:18,23;67:9,13;
68:23,23;71:6;78:18,21;
79:14
**programs (3)** 11:17;13:13;
55:5
**prohibiting (1)** 65:3
**prohibits (2)** 64:14;83:1
**Project (3)** 7:9,9;76:22
**promote (6)** 58:4;59:21;
60:19;63:7;69:8,15
**promoted (1)** 69:23
**promotement (1)** 48:13
**promotes (1)** 61:7
**promoting (5)** 61:20;62:1,
18,23;63:2,3,14;64:1
**promotion (1)** 48:13
**propagates (1)** 47:10
**propagation (1)** 47:5
**proper (1)** 21:12
**properly (2)** 16:8;55:6
**proposed (1)** 10:11
**prosecuted (1)** 74:16
**provide (1)** 87:14
**provided (1)** 54:20
**providing (1)** 87:16
**provisions (1)** 83:18
**pull (5)** 22:1;24:1;35:11,16;
48:17
**pulled (2)** 35:6;48:19
**pupils (5)** 83:2,5,16;84:17,
21
**purpose (3)** 82:3,18;88:17
**purposes (1)** 82:12
**pushing (1)** 90:21
**put (7)** 10:1;29:20,24;30:2,
3;41:8;52:21

**Q**

**qualifying (1)** 69:18
**quick (1)** 92:20
**quite (2)** 9:7;22:16

**R**

**race (4)** 46:20,20;78:25;
79:1
**races (1)** 59:22
**racial (25)** 41:18,20,21;47:4,
5,14,15;48:4,5;59:14,15;
60:3,24;69:4,7,9,22,23;
71:2;75:11,12;77:18,19;
80:3;84:14
**racism (3)** 47:5,10;48:13
**racist (2)** 38:11,17
**ran (3)** 9:8,11;17:9
**random (1)** 57:13
**range (1)** 22:22
**rather (1)** 48:7
**reach (1)** 83:14
**reached (1)** 67:12
**reaching (3)** 30:16;51:22;
53:4
**react (1)** 61:8
**read (11)** 28:23;34:16;45:25;
50:18;52:22;53:10,14;
59:20;62:10;66:6;68:19
**reading (1)** 52:17
**real (1)** 90:10
**reality (1)** 16:9
**really (5)** 21:25;57:9;59:17;
69:9;72:7
**reason (6)** 10:15;11:24,24;
30:1;44:17;56:14
**reassured (1)** 40:20
**recall (5)** 4:22;9:4,5,14,22,
23;10:1,9;11:8,18;
27:25;28:5,14,17,19;
36:10;38:18,22;43:2,9;
50:18;51:18,23;66:24;
67:2,3;73:20;76:5,11,18,
19,23;78:20;80:18,20
**received (2)** 25:11,20
**recently (1)** 86:8
**recess (3)** 54:2;75:24;92:23
**recognize (11)** 30:10;49:25;
50:15,17;51:5,9,10;
53:15,20;54:7;85:5
**recollection (6)** 10:2;27:23;
28:7;74:21;76:12,15
**recommendations (1)** 53:17
**record (4)** 4:13;5:21;20:4;
38:10
**refer (1)** 41:5
**reference (8)** 8:15;14:18;
80:5
**referenced (1)** 41:4
**references (3)** 42:7;80:20;
81:6
**referred (1)** 80:1
**referring (3)** 26:15;77:22;
86:16
**reflective (1)** 19:1
**reflects (1)** 48:18
**regard (8)** 17:3;11;23:13;
52:6;67:9;68:2;70:24;
78:10
**regards (2)** 39:25;71:12
**regular (1)** 5:17
**regularly (1)** 78:22
**related (6)** 32:6,22;54:22;
67:12;71:18;85:8
**relating (3)** 31:15;54:12;
66:25
**relation (1)** 11:19
**relationships (1)** 62:6
**relied (12)** 45:6;51:1,17,21;
52:1,3,4,11;53:3;65:13;
67:8;78:12
**rely (1)** 30:18
**remains (1)** 87:2
**remember (8)** 5:4;15:2;
36:12,15,16;37:7;43:7;
73:2
**reminds (1)** 14:4
**repairing (1)** 91:17
**repeat (3)** 44:19;50:16;60:1
**repeated (2)** 49:16;77:16
**repeatedly (1)** 60:3
**repetition (1)** 74:22
**rephrase (1)** 6:9
**report (16)** 14:22;15:11;
21:17;22:6;29:8;30:10,
15,19,23;31:15;33:17;
56:2;86:13,16,17,21
**Reporter (2)** 4:7;5:9
**represent (4)** 22:2,5;51:12;
87:19
**representations (4)** 42:14,
16;43:3;45:9
**representative (1)** 23:4
**Representatives (3)** 7:20,22;
8:2
**requested (1)** 56:8
**require (5)** 89:5,6,23
**required (1)** 54:24
**requirement (1)** 90:24
**requires (5)** 55:15;61:7;
89:24,25;90:2
**research-based (1)** 86:9
**resent (1)** 75:12
**resentment (14)** 58:4;59:21;
60:5;61:2;62:17,18,23;
63:14,18,23;69:8,16,23;
71:3
**respect (1)** 31:4
**responsible (1)** 15:16
**rest (2)** 15:9;25:25
**retired (1)** 7:10
**revealed (1)** 57:10
**review (9)** 13:1;24:15;26:2;
34:3;44:2;73:16;74:2;
77:4;80:17
**reviewed (17)** 23:24;33:15,
17,25;34:6,7;44:25;
46:12;50:22;51:14;
59:19;72:24;73:10;74:9;
77:2,11;83:12
**reviewing (3)** 44:14;76:5,19
**reviews (1)** 86:21
**revisit (1)** 56:15
**right (26)** 6:13;7:25;8:22;
12:20;15:7,14;18:2;
23:19;34:13;35:21;
40:18;47:3;49:6;50:5;
52:18;56:23;65:6;70:6;
73:9;79:11;81:15;85:10;
86:18;87:5;89:21;90:3
**rigor (2)** 22:23;48:16
**rigorous (3)** 19:12;21:25;
42:22
**rise (1)** 38:20
**River (2)** 7:9,9
**rogue (1)** 89:15
**role (10)** 13:4;14:7,15;17:3;
28:2;40:2;41:9,13;65:2;
83:3
**roles (1)** 15:9
**Roman (1)** 64:6
**Romero (2)** 58:18,22
**Romero's (1)** 59:2
**route (1)** 27:2
**run (1)** 91:24
**running (1)** 91:24

**S**

**Salt (2)** 7:8,9
**same (12)** 5:14;8:16;10:5;
12:19;42:15,25;52:6,13;
67:16;76:16;80:1;86:20
**sample (5)** 22:1,2;48:17,17;
89:19
**samples (8)** 22:4,5;23:2,4,
10,11,11;48:19
**sampling (1)** 57:13
**sat (1)** 18:17
**saw (7)** 48:12;59:10;69:25;
77:13;80:22,24;81:6
**saying (5)** 5:18;11:23;
17:12;18:20;36:5;40:15;
47:21,23;53:18,20;
58:16,25;66:8;70:13;
73:2;79:15;91:23
**scars (1)** 92:4
**scholarly (1)** 46:7
**School (30)** 11:13;13:12;
31:3;35:6,12;36:22,23;
37:5,6,6,11,15;42:18;
43:11;54:2;64:14,15;
66:18,23;67:8,13,19;
68:15;70:25;71:6,10,12;
78:18;79:14,24
**scope (7)** 28:3,8,19;56:2,6,
7;85:18
**season (1)** 10:17
**second (13)** 10:4;35:12;
56:18,19;71:19,21;
72:23;73:6,8;78:9;80:5;
86:4,10
**Secondly (1)** 5:18
**sections (1)** 79:8
**seeing (3)** 32:23,23;42:6
**seek (1)** 18:7
**seemed (2)** 22:23
**seems (5)** 5:16;66:6;90:4
**selected (3)** 22:11;25:25;
26:1
**semester (3)** 31:17,19;49:11
**Senate (6)** 7:22,23,24;8:2,3,
12
**senator (1)** 7:19
**senior (2)** 7:8;67:21
**sense (5)** 6:9;27:6,8,15;
32:17;42:9;47:15;57:12;
75:4;80:3;83:17;91:1,11
**sentence (3)** 32:22;87:7
**separate (3)** 20:9;22;21:13
**sequence (1)** 32:9
**series (3)** 14:17;15:22;
16:21
**serious (3)** 10:18,21;13:6
**seriously (3)** 13:7;19:18,21
**served (1)** 7:23
**services (2)** 16:24;17:1
**session (2)** 36:9,18
**set (4)** 19:7,11;41:1;70:14
**sets (2)** 64:7;85:19
**setting (2)** 40:14;42:5
**settings (1)** 33:8
**several (3)** 55:20;60:10
**shaded (1)** 60:24
**shaking (1)** 5:19
**shall (1)** 64:15
**short (3)** 54:1;57:4;72:9
**show (1)** 26:14
**showed (1)** 51:21
**showing (2)** 54:6;85:3
**side (1)** 16:6
**sides (1)** 19:9
**sightly (1)** 44:21
**significant (1)** 78:7
**signing (1)** 10:24
**similar (2)** 45:17;68:24
**simple (1)** 91:1
**simply (2)** 34:17;62:14
**single (2)** 68:6;88:4
**sit (2)** 32:15;82:20
**sitting (1)** 9:12
**situation (2)** 22:3;81:12;
91:1
**situations (1)** 92:5
**six (1)** 86:12
**sizable (1)** 17:10
**slash (1)** 10:7
**slated (1)** 22:18
**small (2)** 19:15;66:1
**SMITH (23)** 4:11;36:21;

44:21,23;54:1,5;64:23;
73:7;74:11,12;75:23;
76:2,14;77:9;79:5,20;
82:1,8,16;83:7;84:24;
85:2;92:25
**social (2)** 41:17;76:22
**society (5)** 20:19;48:6;75:6;
83:23;84:11
**solidarity (20)** 41:21;47:5,15;
48:5,7,14;58:5;59:15;
60:3,24;62:4;69:8,22;
71:3;75:11;77:19;83:1,
13;84:17,21
**solutions (1)** 86:9
**somebody (5)** 46:17,18;
50:8;91:11;92:3
**someone (2)** 13:20;27:17
**sometime (1)** 37:4
**somewhere (4)** 6:8;25:18;
51:24;79:16
**sorry (10)** 17:2;19:20;34:4;
44:20;55:19;59:9;64:11;
73:4;78:25;81:20
**sort (9)** 6:15;14:21;15:20;
20:18;31:6,10;41:1;
80:25;88:24
**sorts (1)** 12:23
**sound (1)** 78:23
**sounds (1)** 17:12
**span (1)** 12:8
**spans (2)** 15:12;16:10
**speak (3)** 4:7;5:11;77:25
**speaking (3)** 16:11,14;63:12
**specializing (1)** 86:8
**specific (29)** 12:23;17:6;
18:16,21;20:3,25;22:1;
27:13,16;28:19;31:22;
32:6;45:8,22;65:4;66:9,
14,17;67:3,12,12,25;
71:10;74:21,23;79:12;
81:10;85:23;89:3
**specifically (24)** 17:6,14;
23:25;27:18;31:15;
33:16;43:2;50:7;51:19,
23;54:21;66:23,24;67:2;
69:4,9;76:12,23;78:20;
79:23;80:7,18;81:21;
88:7
**specifics (5)** 28:5,17;63:6;
68:2;73:21
**speculate (3)** 33:9;61:13;
82:15
**speculation (1)** 61:10
**spend (3)** 27:2;52:17;53:10
**spoke (3)** 5:5;54:21
**spring (1)** 36:19
**stacked (1)** 53:1
**Stacy (1)** 18:4
**staff (17)** 18:5;23:25;24:6;
26:1;27:17,20,22;29:24;
30:22;32:19,21;33:21;
43:16,24;46:12;50:8;
71:24

**Stalin (1)** 46:6
**standard (2)** 73:25;74:5
**standpoint (1)** 92:7
**star (1)** 16:20
**start (2)** 10:13;79:11
**starting (1)** 6:17
**starts (1)** 71:19
**state (22)** 4:12;6:22;7:19,21,
23,24;8:7;9:18,20;16:20,
21;20:22;29:14;35:12;
55:5;64:15;89:8;90:2,
25;91:25;92:9,16
**statement (11)** 54:12,20;81:3,
17,19,22;82:2,3,17,23;
88:12
**statements (1)** 88:11
**states (1)** 80:6
**state's (1)** 35:13
**statewide (1)** 17:1
**statistics (1)** 21:25
**statute (31)** 12:16;37:21;
39:25;41:14;42:4;59:11;
60:14;61:11;65:2,5,8,16,
18;66:7,8,9,11,15,19;
67:25;68:12;69:10;70:4;
71:25;72:5;79:15;83:4;
88:3,13;91:9,18
**statutes (1)** 91:10
**statutorily (1)** 14:18
**statutory (4)** 20:2,25;32:12;
54:24
**stay (1)** 37:18
**step (1)** 63:5
**steps (1)** 54:25
**still (6)** 62:18;82:9,12;
84:21;90:21;92:8
**stint (1)** 7:22
**Stollar (10)** 14:23;15:15,17,
19;16:11;17:25;18:1;
24:11;51:13;52:2
**stopped (1)** 58:22
**strategically (4)** 31:11,14,20;
32:17
**strict (1)** 42:22
**strike (1)** 12:10
**stripes (1)** 84:12
**structure (3)** 40:8;41:23;
60:5
**student (5)** 40:1;63:2,4,18,
24
**students (39)** 16:1;17:1;
23:11;38:25;39:4,17;
41:9;45:25;46:2;49:21;
59:22;61:8,21,24;62:3,
16;63:22;69:7,14,22;
71:7;77:20;78:4,14,19,
24,25;80:4,8,12,21,24;
81:1,22;84:4,6,10,15;
88:23
**Studies (11)** 11:13;13:13;
17:17;24:18;27:9;46:23;
47:9;48:23;67:20;88:6,8
**study (2)** 35:9;85:22

**stuff (7)** 31:12;37:8;40:14;
47:19,20;48:23;61:5
**subcontracted (1)** 29:1
**subdivision (1)** 91:24
**subject (1)** 21:23
**subjects (1)** 73:25
**subjugated (1)** 74:16
**substantive (2)** 44:10,12
**succeed (1)** 20:20
**success (2)** 80:7;81:21
**successful (4)** 31:9;63:13,
15,17
**suffered (3)** 39:18;77:20
**suffused (4)** 46:22;47:3;
74:20;78:1
**suggested (1)** 9:24
**summaries (16)** 26:11;33:20;
34:7,11,12;50:9,25;
51:17,20;52:12,14;
53:12;67:5;68:4,6;71:24
**summary (7)** 7:5;34:15,19,
21;50:21;51:13;78:11
**super (1)** 16:20
**superintendent (14)** 9:17,20,
10:14,23;12:15;13:4,11;
14:7;34:25;37:24;40:13;
41:3,13;55:4
**superintendents (2)** 15:3;
31:7
**superintendent's (1)** 87:21
**supervise (1)** 15:1
**supplemental (2)** 74:6,9
**support (1)** 90:16
**supported (1)** 57:21
**suppose (1)** 46:16
**supposed (3)** 26:21;39:6;
48:17
**sure (8)** 5:5,19;21:12;43:12;
65:24;75:23;87:21;91:4
**surgery (1)** 90:17
**surprised (1)** 10:23
**sworn (1)** 4:6
**system (4)** 15:23;35:13;
47:6;89:18

**T**

**Tab (1)** 30:7
**table (1)** 10:2
**talk (5)** 5:16;48:1;52:15;
61:1;82:25
**talked (7)** 15:19;32:1;43:21;
44:24;46:16;52:7;58:15
**talking (24)** 8:20,23;11:18;
20:16;21:2;23:2,8;
24:13;26:10,11,14,22;
39:1,8,8,9;42:6;53:19;
55:8;58:17;71:14;75:9;
91:10,11
**targeted (1)** 69:4
**targeting (3)** 69:5;80:23;
81:11
**taught (1)** 45:20

**teach (1)** 68:16
**teacher (6)** 39:8;45:24;46:1,
16;63:19;78:22
**teachers (3)** 23:12;47:9;
49:3;58:11
**teaching (1)** 46:2
**telling (4)** 89:22;91:22,25;
92:3
**tells (1)** 36:14
**ten (3)** 31:6;34:19;70:2
**tend (1)** 5:25
**term (1)** 10:14
**terms (9)** 41:18,20;58:1;
59:15;69:5;75:12;77:18,
19;80:3
**testified (1)** 4:8
**testimony (3)** 19:8;49:20
**textbook (11)** 71:1,2,6,13;
73:17;74:6,7,14;76:6,16,
20
**textbooks (7)** 25:22;54:24;
70:23,24;71:3;88:25;
92:13
**texts (5)** 24:16;44:3;52:10,
13;69:12
**textual (1)** 78:3
**theoretically (1)** 62:25
**theorizing (1)** 70:12
**therefore (1)** 69:15
**thinking (6)** 20:12,14;31:11,
13,14,21
**third (1)** 55:19
**thoroughly (1)** 83:11
**though (6)** 5:5;26:16;28:14;
45:9;53:20;55:14
**thought (3)** 26:13;31:8,21
**thoughts (1)** 46:8
**three (5)** 51:21;52:1,11,12;
53:2
**throughout (2)** 43:5;49:11
**timed (1)** 31:16
**timeline (1)** 32:16
**times (4)** 20:15;21:24;
52:16;60:10
**timing (1)** 34:24
**title (1)** 17:7
**titles (1)** 15:2
**today (4)** 5:7;56:3,12;82:20
**together (3)** 62:3;69:22;
75:11
**told (6)** 29:16;45:14;50:21;
51:13;52:2,5
**tones (1)** 47:14
**took (15)** 12:17,19;18:24;
19:10;20:3;27:25;35:6;
36:8;47:13;56:16;57:7;
61:3;62:17;76:4,17
**top (6)** 15:7;17:5,5;31:6;
73:8;90:7
**totality (1)** 81:11
**towards (2)** 55:17;62:6
**train (1)** 58:10
**treat (4)** 69:14;83:16;84:6,

21
**treated (1)** 10:22
**treating (6)** 83:2,5,20;84:4,
15,17
**treats (1)** 69:7
**tried (1)** 41:1
**true (6)** 43:18;56:10;57:25;
68:5;71:16;72:20
**truth (3)** 4:7,8;57:10
**try (4)** 5:13,14;72:8;84:2
**trying (5)** 51:25;52:9,25;
61:6,15;62:11,24;63:5,8;
73:20
**Tucson (10)** 11:12;19:15;
20:13;27:10;31:3,9,10;
35:11;37:14;42:17
**Tuesday (1)** 4:2
**turn (2)** 51:8;79:16
**turned (1)** 8:23
**TUSD (21)** 19:1;29:12;35:1,
4,14;36:3;43:6,13;45:2;
55:4;56:19;65:14;66:1,
3;81:6;83:9;88:2,16,17,
19,21
**TUSD's (1)** 68:22
**two (8)** 10:5;14:21;15:14;
20:1;49:2;67:18,24;69:2
**two-thirds (1)** 56:1
**type (3)** 16:5;26:12;55:7

**U**

**ultimately (3)** 8:13;9:25;
11:11
**unannounced (1)** 49:10
**under (9)** 20:22,25;32:5;
64:6,14;80:5;85:15,17,
17
**underlying (2)** 48:18;57:10
**Unified (8)** 11:12;19:15;
20:13;31:3,9;35:11;
42:17;54:22
**Unified's (1)** 31:10
**universe (2)** 22:3;65:22
**University (2)** 6:20,22
**unless (1)** 81:3
**unlikely (1)** 58:7
**unobserved (1)** 57:13
**unsolicited (1)** 25:13
**unsuccessful (1)** 63:10
**up (10)** 7:21;20:20;22:23,24;
38:7;42:22;53:1;58:25;
72:6;90:4
**upon (13)** 23:17;45:6;51:1,
17,22;52:2,3,4,11;53:4;
65:12;67:8;78:12
**use (5)** 8:16;47:1,14;59:9;
60:2
**used (30)** 41:20;42:10;44:15,
16;45:1,4,6,13,17,21;
46:13;47:9,21;58:2,4;
67:7;68:7;69:21;70:9;
71:13,14,25;72:4,17;

In the Matter of the Hearing of an Appeal by:
Tucson Unified School District No. 1

73:17;76:20;88:25;89:3,
  4;90:11
**useful (1)** 80:21
**usefulness (3)** 22:21;30:21;
  49:15
**uses (2)** 69:8;74:5
**using (3)** 47:4;48:3;71:7
**usually (1)** 5:25

---

**V**

**vacuum (1)** 58:1
**variance (1)** 57:17
**varieties (1)** 33:6
**variety (2)** 44:3;83:25
**verbally (1)** 38:16
**versus (1)** 46:24
**vicious (2)** 22:17;26:20
**victim (3)** 40:3;41:9;48:7
**victimhood (2)** 47:15;80:3
**view (11)** 21:16;43:4;46:5;
  48:14;49:9;71:23;75:7,
  10;84:18,23;91:6
**viewed (2)** 41:19,20
**violate (7)** 60:14;66:8,11;
  72:5;79:14;87:11;88:3
**violated (2)** 67:25;79:8
**violates (6)** 65:16,17;66:7,
  15,18;88:13
**violating (1)** 56:13
**violation (21)** 12:16;39:20;
  42:3;54:13;58:12;59:11;
  60:7;68:11,17;69:24;
  70:4;71:25;84:15;87:4,
  8;88:6;89:17;90:13;
  91:15,19;92:8
**violations (3)** 47:16;52:5;
  57:19
**visit (6)** 24:23;33:3;37:13;
  40:19;43:12,22
**visited (7)** 35:5,6;36:3,9;
  37:14;43:11;57:3
**visits (6)** 33:6;48:20;56:19;
  70:18,19;78:22
**voters (1)** 16:23

---

**W**

**wait (1)** 5:13
**walk (1)** 61:21
**walked (1)** 40:24
**walks (3)** 61:24;63:2,4
**wall (1)** 38:7
**water (1)** 31:1
**way (21)** 9:8;18:16;21:12;
  25:19;32:10;41:20;
  47:10,19,22;48:19;
  57:11;58:2,11;59:9;
  62:15;68:7;69:21;89:18;
  90:5;91:16;92:1
**ways (2)** 60:13,15
**weave (1)** 18:14
**weaved (1)** 47:19

**website (8)** 44:4;80:6,15,16,
  20;81:7,8,11
**week (3)** 14:21;32:1;78:23
**weeks (3)** 39:15;49:3;86:12
**weight (1)** 78:3
**Wells (1)** 31:8
**weren't (5)** 28:11;34:20;
  35:19;87:21;90:21
**what's (8)** 5:6;40:15;45:20;
  52:1;54:6;70:15;85:3;
  91:7
**Whereupon (4)** 54:2;75:24;
  84:25;92:23
**white (2)** 41:23;60:5
**whites (8)** 75:16,17;83:21,
  21,23,23,24,25
**whole (13)** 10:21;11:5;15:22;
  16:21;22:2,5;23:5;
  37:18;40:16;70:16;
  74:20;80:16,17
**who's (1)** 92:3
**wide (1)** 83:25
**wider (1)** 33:6
**win (1)** 40:9
**withhold (1)** 55:11
**within (3)** 21:9;47:3;56:7
**without (4)** 13:21;68:17;
  72:18;87:22
**witness (8)** 4:6,24;36:17;
  64:22;76:11;79:3;82:7,
  14
**words (6)** 5:12;36:23;46:5;
  48:1;61:8;84:20
**work (11)** 6:16;7:5;24:8;28:8;
  29:14;31:20;32:15;39:6;
  84:13;90:24;92:19
**worked (1)** 7:9
**worried (1)** 64:25
**write (1)** 29:18
**writing (1)** 47:3
**writings (13)** 45:25;48:9;
  49:18,19;58:8,20;59:1,2,
  3,13;61:4;74:19;81:9
**written (10)** 24:16;25:22;
  51:3;57:17,21,22;68:20;
  70:2;85:15;86:12
**wrong (4)** 11:23;35:19;
  48:11;73:4

---

**Y**

**year (9)** 8:15;36:11,22,23;
  37:5,6,6,11;43:11
**years (6)** 4:16,17;7:10;8:17;
  90:12;91:12

---

**Z**

**zoning (1)** 90:13

Coash & Coash, Inc., 602-258-1440

# Exhibit I-15

REFERENCE TITLE: immigration; law enforcement; safe neighborhoods

State of Arizona
Senate
Forty-ninth Legislature
Second Regular Session
2010

# SB 1070

Introduced by
Senators Pearce R, Gray C, Gray L; Representatives Antenori, Barnes,
Gowan, Hendrix, Kavanagh, Seel; Senators Allen S, Burns, Gorman, Harper,
Huppenthal, Leff, Melvin, Nelson, Pierce S, Tibshraeny, Verschoor, Waring;
Representatives Ash, Biggs, Burges, Court, Crump, Lesko, Mason, McLain,
Montenegro, Murphy, Nichols, Reagan, Stevens, Weiers J, Weiers JP,
Yarbrough

AN ACT

AMENDING TITLE 11, CHAPTER 7, ARIZONA REVISED STATUTES, BY ADDING ARTICLE 8;
AMENDING TITLE 13, CHAPTER 15, ARIZONA REVISED STATUTES, BY ADDING SECTION
13-1509; AMENDING TITLE 13, CHAPTER 29, ARIZONA REVISED STATUTES, BY ADDING
SECTIONS 13-2928 AND 13-2929; AMENDING SECTIONS 23-212, 23-212.01, 23-214 AND
28-3511, ARIZONA REVISED STATUTES; RELATING TO UNLAWFULLY PRESENT ALIENS.


(TEXT OF BILL BEGINS ON NEXT PAGE)

SB 1070

```
1   Be it enacted by the Legislature of the State of Arizona:
2       Section 1.  Intent
3       The legislature finds that there is a compelling interest in the
4   cooperative enforcement of federal immigration laws throughout all of
5   Arizona.  The legislature declares that the intent of this act is make
6   attrition through enforcement the public policy of all state and local
7   government agencies in Arizona.  The provisions of this act are intended to
8   work together to discourage and deter the unlawful entry and presence of
9   aliens and economic activity by persons unlawfully present in the United
10  States.
11      Sec. 2.  Title 11, chapter 7, Arizona Revised Statutes, is amended by
12  adding article 8, to read:
13              ARTICLE 8.  ENFORCEMENT OF IMMIGRATION LAWS
14      11-1051.  Cooperation  and  assistance  in  enforcement  of
15              immigration laws; indemnification
16      A.  NO OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR
17  OTHER POLITICAL SUBDIVISION OF THIS STATE MAY ADOPT A POLICY THAT LIMITS OR
18  RESTRICTS THE ENFORCEMENT OF FEDERAL IMMIGRATION LAWS TO LESS THAN THE FULL
19  EXTENT PERMITTED BY FEDERAL LAW.
20      B.  FOR ANY LEGITIMATE CONTACT MADE BY AN OFFICIAL OR AGENCY OF THIS
21  STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE
22  WHERE REASONABLE SUSPICION EXISTS THAT THE PERSON IS AN ALIEN WHO IS
23  UNLAWFULLY PRESENT IN THE UNITED STATES, A REASONABLE ATTEMPT SHALL BE MADE
24  TO DETERMINE THE IMMIGRATION STATUS OF THE PERSON.  THE PERSON'S IMMIGRATION
25  STATUS SHALL BE VERIFIED WITH THE FEDERAL GOVERNMENT PURSUANT TO 8 UNITED
26  STATES CODE SECTION 1373(c).
27      C.  IF AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES IS
28  CONVICTED OF A VIOLATION OF STATE OR LOCAL LAW, ON DISCHARGE FROM
29  IMPRISONMENT OR ASSESSMENT OF ANY FINE THAT IS IMPOSED, THE ALIEN SHALL BE
30  TRANSFERRED IMMEDIATELY TO THE CUSTODY OF THE UNITED STATES IMMIGRATION AND
31  CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION.
32      D.  NOTWITHSTANDING ANY OTHER LAW, A LAW ENFORCEMENT AGENCY MAY
33  SECURELY TRANSPORT AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES
34  AND WHO IS IN THE AGENCY'S CUSTODY TO A FEDERAL FACILITY IN THIS STATE OR TO
35  ANY OTHER POINT OF TRANSFER INTO FEDERAL CUSTODY THAT IS OUTSIDE THE
36  JURISDICTION OF THE LAW ENFORCEMENT AGENCY.
37      E.  A LAW ENFORCEMENT OFFICER, WITHOUT A WARRANT, MAY ARREST A PERSON
38  IF THE OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT THE PERSON HAS COMMITTED
39  ANY PUBLIC OFFENSE THAT MAKES THE PERSON REMOVABLE FROM THE UNITED STATES.
40      F.  EXCEPT AS PROVIDED IN FEDERAL LAW, OFFICIALS OR AGENCIES OF THIS
41  STATE AND COUNTIES, CITIES, TOWNS AND OTHER POLITICAL SUBDIVISIONS OF THIS
42  STATE MAY NOT BE PROHIBITED OR IN ANY WAY BE RESTRICTED FROM SENDING,
43  RECEIVING OR MAINTAINING INFORMATION RELATING TO THE IMMIGRATION STATUS OF
44  ANY INDIVIDUAL OR EXCHANGING THAT INFORMATION WITH ANY OTHER FEDERAL, STATE
45  OR LOCAL GOVERNMENTAL ENTITY FOR THE FOLLOWING OFFICIAL PURPOSES:
```

SB 1070

1       1.  DETERMINING ELIGIBILITY FOR ANY PUBLIC BENEFIT, SERVICE OR LICENSE
2   PROVIDED BY ANY FEDERAL, STATE, LOCAL OR OTHER POLITICAL SUBDIVISION OF THIS
3   STATE.
4       2.  VERIFYING ANY CLAIM OF RESIDENCE OR DOMICILE IF DETERMINATION OF
5   RESIDENCE OR DOMICILE IS REQUIRED UNDER THE LAWS OF THIS STATE OR A JUDICIAL
6   ORDER ISSUED PURSUANT TO A CIVIL OR CRIMINAL PROCEEDING IN THIS STATE.
7       3.  CONFIRMING THE IDENTITY OF ANY PERSON WHO IS DETAINED.
8       4.  IF THE PERSON IS AN ALIEN, DETERMINING WHETHER THE PERSON IS IN
9   COMPLIANCE WITH THE FEDERAL REGISTRATION LAWS PRESCRIBED BY TITLE II, CHAPTER
10  7 OF THE FEDERAL IMMIGRATION AND NATIONALITY ACT.
11      G.  A PERSON MAY BRING AN ACTION IN SUPERIOR COURT TO CHALLENGE ANY
12  OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL
13  SUBDIVISION OF THIS STATE THAT ADOPTS OR IMPLEMENTS A POLICY THAT LIMITS OR
14  RESTRICTS THE ENFORCEMENT OF FEDERAL IMMIGRATION LAWS TO LESS THAN THE FULL
15  EXTENT PERMITTED BY FEDERAL LAW.  IF THERE IS A JUDICIAL FINDING THAT AN
16  ENTITY HAS VIOLATED THIS SECTION, THE COURT SHALL ORDER ANY OF THE FOLLOWING:
17      1.  THAT THE PERSON WHO BROUGHT THE ACTION RECOVER COURT COSTS AND
18  ATTORNEY FEES.
19      2.  THAT THE ENTITY PAY A CIVIL PENALTY OF NOT LESS THAN ONE THOUSAND
20  DOLLARS AND NOT MORE THAN FIVE THOUSAND DOLLARS FOR EACH DAY THAT THE POLICY
21  HAS REMAINED IN EFFECT AFTER THE FILING OF AN ACTION PURSUANT TO THIS
22  SUBSECTION.
23      H.  A COURT SHALL COLLECT THE CIVIL PENALTY PRESCRIBED IN SUBSECTION G
24  AND REMIT THE CIVIL PENALTY TO THE DEPARTMENT OF PUBLIC SAFETY, WHICH SHALL
25  ESTABLISH A SPECIAL SUBACCOUNT FOR THE MONIES IN THE ACCOUNT ESTABLISHED FOR
26  THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION APPROPRIATION.
27  MONIES IN THE SPECIAL SUBACCOUNT ARE SUBJECT TO LEGISLATIVE APPROPRIATION FOR
28  DISTRIBUTION FOR GANG AND IMMIGRATION ENFORCEMENT AND FOR COUNTY JAIL
29  REIMBURSEMENT COSTS RELATING TO ILLEGAL IMMIGRATION.
30      I.  A LAW ENFORCEMENT OFFICER IS INDEMNIFIED BY THE LAW ENFORCEMENT
31  OFFICER'S AGENCY AGAINST REASONABLE COSTS AND EXPENSES, INCLUDING ATTORNEY
32  FEES, INCURRED BY THE OFFICER IN CONNECTION WITH ANY ACTION, SUIT OR
33  PROCEEDING BROUGHT PURSUANT TO THIS SECTION TO WHICH THE OFFICER MAY BE A
34  PARTY BY REASON OF THE OFFICER BEING OR HAVING BEEN A MEMBER OF THE LAW
35  ENFORCEMENT AGENCY, EXCEPT IN RELATION TO MATTERS IN WHICH THE OFFICER IS
36  ADJUDGED TO HAVE ACTED IN BAD FAITH.
37      Sec. 3.  Title 13, chapter 15, Arizona Revised Statutes, is amended by
38  adding section 13-1509, to read:
39      13-1509.  Trespassing by illegal aliens; assessment; exception;
40                classification
41      A.  IN ADDITION TO ANY VIOLATION OF FEDERAL LAW, A PERSON IS GUILTY OF
42  TRESPASSING IF THE PERSON IS BOTH:

- 2 -

SB 1070

```
1          1.   PRESENT ON ANY PUBLIC OR PRIVATE LAND IN THIS STATE.
2          2.   IN VIOLATION OF 8 UNITED STATES CODE SECTION 1304(e) OR 1306(a).
3          B.   IN THE ENFORCEMENT OF THIS SECTION, THE FINAL DETERMINATION OF AN
4    ALIEN'S IMMIGRATION STATUS SHALL BE DETERMINED BY EITHER:
5          1.   A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED TO VERIFY OR ASCERTAIN
6    AN ALIEN'S IMMIGRATION STATUS.
7          2.   A LAW ENFORCEMENT OFFICER OR AGENCY COMMUNICATING WITH THE UNITED
8    STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED STATES BORDER
9    PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c).
10         C.   A PERSON WHO IS SENTENCED PURSUANT TO THIS SECTION IS NOT ELIGIBLE
11   FOR SUSPENSION OR COMMUTATION OF SENTENCE OR RELEASE ON ANY BASIS UNTIL THE
12   SENTENCE IMPOSED IS SERVED.
13         D.   IN ADDITION TO ANY OTHER PENALTY PRESCRIBED BY LAW, THE COURT SHALL
14   ORDER THE PERSON TO PAY JAIL COSTS AND AN ADDITIONAL ASSESSMENT IN THE
15   FOLLOWING AMOUNTS:
16         1.   AT LEAST FIVE HUNDRED DOLLARS FOR A FIRST VIOLATION.
17         2.   TWICE THE AMOUNT SPECIFIED IN PARAGRAPH 1 OF THIS SUBSECTION IF THE
18   PERSON WAS PREVIOUSLY SUBJECT TO AN ASSESSMENT PURSUANT TO THIS SUBSECTION.
19         E.   A COURT SHALL COLLECT THE ASSESSMENTS PRESCRIBED IN SUBSECTION D OF
20   THIS SECTION AND REMIT THE ASSESSMENTS TO THE DEPARTMENT OF PUBLIC SAFETY,
21   WHICH SHALL ESTABLISH A SPECIAL SUBACCOUNT FOR THE MONIES IN THE ACCOUNT
22   ESTABLISHED FOR THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT
23   MISSION APPROPRIATION.  MONIES IN THE SPECIAL SUBACCOUNT ARE SUBJECT TO
24   LEGISLATIVE  APPROPRIATION  FOR  DISTRIBUTION  FOR  GANG  AND  IMMIGRATION
25   ENFORCEMENT AND FOR COUNTY JAIL REIMBURSEMENT COSTS RELATING TO ILLEGAL
26   IMMIGRATION.
27         F.   THIS SECTION DOES NOT APPLY TO A PERSON WHO MAINTAINS AUTHORIZATION
28   FROM THE FEDERAL GOVERNMENT TO REMAIN IN THE UNITED STATES.
29         G.   A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR, EXCEPT THAT A
30   VIOLATION OF THIS SECTION IS:
31         1.   A CLASS 2 FELONY IF THE PERSON VIOLATES THIS SECTION WHILE IN
32   POSSESSION OF ANY OF THE FOLLOWING:
33         (a)  A DANGEROUS DRUG AS DEFINED IN SECTION 13-3401.
34         (b)  PRECURSOR CHEMICALS THAT ARE USED IN THE MANUFACTURING OF
35   METHAMPHETAMINE IN VIOLATION OF SECTION 13-3404.01.
36         (c)  A DEADLY WEAPON OR A DANGEROUS INSTRUMENT, AS DEFINED IN SECTION
37   13-105.
38         (d)  PROPERTY THAT IS USED FOR THE PURPOSE OF COMMITTING AN ACT OF
39   TERRORISM AS PRESCRIBED IN SECTION 13-2308.01.
40         2.   A CLASS 4 FELONY IF THE PERSON EITHER:
41         (a)  IS CONVICTED OF A SECOND OR SUBSEQUENT VIOLATION OF THIS SECTION.
42         (b)  WITHIN SIXTY MONTHS BEFORE THE VIOLATION, HAS BEEN REMOVED FROM
43   THE UNITED STATES PURSUANT TO 8 UNITED STATES CODE SECTION 1229a OR HAS
44   ACCEPTED A VOLUNTARY REMOVAL FROM THE UNITED STATES PURSUANT TO 8 UNITED
45   STATES CODE SECTION 1229c.
```

- 3 -

SB 1070

```
 1        Sec. 4.  Title 13, chapter 29, Arizona Revised Statutes, is amended by
 2   adding sections 13-2928 and 13-2929, to read:
 3        13-2928.  Unlawful stopping to hire and pick up passengers for
 4                  work;  unlawful  application,  solicitation  or
 5                  employment; classification; definitions
 6        A.  IT IS UNLAWFUL FOR AN OCCUPANT OF A MOTOR VEHICLE THAT IS STOPPED
 7   ON A STREET, ROADWAY OR HIGHWAY TO ATTEMPT TO HIRE OR HIRE AND PICK UP
 8   PASSENGERS FOR WORK AT A DIFFERENT LOCATION IF THE MOTOR VEHICLE BLOCKS OR
 9   IMPEDES THE NORMAL MOVEMENT OF TRAFFIC.
10        B.  IT IS UNLAWFUL FOR A PERSON TO ENTER A MOTOR VEHICLE THAT IS
11   STOPPED ON A STREET, ROADWAY OR HIGHWAY IN ORDER TO BE HIRED BY AN OCCUPANT
12   OF THE MOTOR VEHICLE AND TO BE TRANSPORTED TO WORK AT A DIFFERENT LOCATION IF
13   THE MOTOR VEHICLE BLOCKS OR IMPEDES THE NORMAL MOVEMENT OF TRAFFIC.
14        C.  IT IS UNLAWFUL FOR A PERSON WHO IS UNLAWFULLY PRESENT IN THE UNITED
15   STATES AND WHO IS AN UNAUTHORIZED ALIEN TO KNOWINGLY APPLY FOR WORK, SOLICIT
16   WORK IN A PUBLIC PLACE OR PERFORM WORK AS AN EMPLOYEE OR INDEPENDENT
17   CONTRACTOR IN THIS STATE.
18        D.  A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR.
19        E.  FOR THE PURPOSES OF THIS SECTION:
20        1.  "SOLICIT" MEANS VERBAL OR NONVERBAL COMMUNICATION BY A GESTURE OR A
21   NOD THAT WOULD INDICATE TO A REASONABLE PERSON THAT A PERSON IS WILLING TO BE
22   EMPLOYED.
23        2.  "UNAUTHORIZED ALIEN" MEANS AN ALIEN WHO DOES NOT HAVE THE LEGAL
24   RIGHT OR AUTHORIZATION UNDER FEDERAL LAW TO WORK IN THE UNITED STATES AS
25   DESCRIBED IN 8 UNITED STATES CODE SECTION 1324a(h)(3).
26        13-2929.  Unlawful transporting, moving, concealing, harboring
27                  or  shielding  of  unlawful  aliens;  vehicle
28                  impoundment; classification
29        A.  IT IS UNLAWFUL FOR A PERSON TO:
30        1.  TRANSPORT OR MOVE OR ATTEMPT TO TRANSPORT OR MOVE AN ALIEN IN THIS
31   STATE IN A MEANS OF TRANSPORTATION IF THE PERSON KNOWS OR RECKLESSLY
32   DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE
33   UNITED STATES IN VIOLATION OF LAW.
34        2.  CONCEAL, HARBOR OR SHIELD OR ATTEMPT TO CONCEAL, HARBOR OR SHIELD
35   AN ALIEN FROM DETECTION IN ANY PLACE IN THIS STATE, INCLUDING ANY BUILDING OR
36   ANY MEANS OF TRANSPORTATION, IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE
37   FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE UNITED STATES
38   IN VIOLATION OF LAW.
39        3.  ENCOURAGE OR INDUCE AN ALIEN TO COME TO OR RESIDE IN THIS STATE IF
40   THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT SUCH COMING TO,
41   ENTERING OR RESIDING IN THIS STATE IS OR WILL BE IN VIOLATION OF LAW.
42        B.  A MEANS OF TRANSPORTATION THAT IS USED IN THE COMMISSION OF A
43   VIOLATION OF THIS SECTION IS SUBJECT TO MANDATORY VEHICLE IMMOBILIZATION OR
44   IMPOUNDMENT PURSUANT TO SECTION 28-3511.
```

SB 1070

1      C.  A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A CLASS 1
2 MISDEMEANOR AND IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND DOLLARS, EXCEPT
3 THAT A VIOLATION OF THIS SECTION THAT INVOLVES TEN OR MORE ILLEGAL ALIENS IS
4 A CLASS 6 FELONY AND THE PERSON IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND
5 DOLLARS FOR EACH ALIEN WHO IS INVOLVED.
6      Sec. 5.  Section 23-212, Arizona Revised Statutes, is amended to read:
7     23-212.  Knowingly employing unauthorized aliens; prohibition;
8             false   and   frivolous   complaints;   violation;
9             classification; license suspension and revocation;
10            affirmative defense
11     A.  An employer shall not knowingly employ an unauthorized alien.  If,
12 in the case when an employer uses a contract, subcontract or other
13 independent contractor agreement to obtain the labor of an alien in this
14 state, the employer knowingly contracts with an unauthorized alien or with a
15 person who employs or contracts with an unauthorized alien to perform the
16 labor, the employer violates this subsection.
17     B.  The attorney general shall prescribe a complaint form for a person
18 to allege a violation of subsection A of this section.  The complainant shall
19 not be required to list the complainant's social security number on the
20 complaint form or to have the complaint form notarized.  On receipt of a
21 complaint on a prescribed complaint form that an employer allegedly knowingly
22 employs an unauthorized alien, the attorney general or county attorney shall
23 investigate whether the employer has violated subsection A of this section.
24 If a complaint is received but is not submitted on a prescribed complaint
25 form, the attorney general or county attorney may investigate whether the
26 employer has violated subsection A of this section.  This subsection shall
27 not be construed to prohibit the filing of anonymous complaints that are not
28 submitted on a prescribed complaint form.  The attorney general or county
29 attorney shall not investigate complaints that are based solely on race,
30 color or national origin.  A complaint that is submitted to a county attorney
31 shall be submitted to the county attorney in the county in which the alleged
32 unauthorized alien is or was employed by the employer.  The county sheriff or
33 any other local law enforcement agency may assist in investigating a
34 complaint.  THE COUNTY ATTORNEY MAY TAKE EVIDENCE, ADMINISTER OATHS OR
35 AFFIRMATIONS, ISSUE SUBPOENAS REQUIRING ATTENDANCE AND TESTIMONY OF WITNESSES
36 AND CAUSE DEPOSITIONS TO BE TAKEN.  When investigating a complaint, the
37 attorney general or county attorney shall verify the work authorization of
38 the alleged unauthorized alien with the federal government pursuant to 8
39 United States Code section 1373(c).  A state, county or local official shall
40 not attempt to independently make a final determination on whether an alien
41 is authorized to work in the United States.  An alien's immigration status or
42 work authorization status shall be verified with the federal government
43 pursuant to 8 United States Code section 1373(c).  A person who knowingly
44 files a false and frivolous complaint under this subsection is guilty of a
45 class 3 misdemeanor.

- 5 -

SB 1070

1      C.  PROCEEDINGS HELD DURING THE COURSE OF A CONFIDENTIAL INVESTIGATION
2   ARE EXEMPT FROM TITLE 38, CHAPTER 3, ARTICLE 3.1.
3      C.  D.  If, after an investigation, the attorney general or county
4   attorney determines that the complaint is not false and frivolous:
5      1.  The attorney general or county attorney shall notify the United
6   States immigration and customs enforcement of the unauthorized alien.
7      2.  The attorney general or county attorney shall notify the local law
8   enforcement agency of the unauthorized alien.
9      3.  The attorney general shall notify the appropriate county attorney
10  to bring an action pursuant to subsection D  E of this section if the
11  complaint was originally filed with the attorney general.
12     D.  E.  An action for a violation of subsection A of this section shall
13  be brought against the employer by the county attorney in the county where
14  the unauthorized alien employee is or was employed by the employer.  The
15  county attorney shall not bring an action against any employer for any
16  violation of subsection A of this section that occurs before January 1, 2008.
17  A second violation of this section shall be based only on an unauthorized
18  alien who is or was employed by the employer after an action has been brought
19  for a violation of subsection A of this section or section 23-212.01,
20  subsection A.
21     E.  F.  For any action in superior court under this section, the court
22  shall expedite the action, including assigning the hearing at the earliest
23  practicable date.
24     F.  G.  On a finding of a violation of subsection A of this section:
25     1.  For a first violation, as described in paragraph 3 of this
26  subsection, the court:
27     (a)  Shall order the employer to terminate the employment of all
28  unauthorized aliens.
29     (b)  Shall order the employer to be subject to a three year
30  probationary period for the business location where the unauthorized alien
31  performed work.  During the probationary period the employer shall file
32  quarterly reports in the form provided in section 23-722.01 with the county
33  attorney of each new employee who is hired by the employer at the business
34  location where the unauthorized alien performed work.
35     (c)  Shall order the employer to file a signed sworn affidavit with the
36  county attorney within three business days after the order is issued.  The
37  affidavit shall state that the employer has terminated the employment of all
38  unauthorized aliens in this state and that the employer will not
39  intentionally or knowingly employ an unauthorized alien in this state.  The
40  court shall order the appropriate agencies to suspend all licenses subject to
41  this subdivision that are held by the employer if the employer fails to file
42  a signed sworn affidavit with the county attorney within three business days
43  after the order is issued.  All licenses that are suspended under this
44  subdivision shall remain suspended until the employer files a signed sworn
45  affidavit with the county attorney.  Notwithstanding any other law, on filing

- 6 -

SB 1070

1    of the affidavit the suspended licenses shall be reinstated immediately by
2    the appropriate agencies.  For the purposes of this subdivision, the licenses
3    that are subject to suspension under this subdivision are all licenses that
4    are held by the employer specific to the business location where the
5    unauthorized alien performed work.  If the employer does not hold a license
6    specific to the business location where the unauthorized alien performed
7    work, but a license is necessary to operate the employer's business in
8    general, the licenses that are subject to suspension under this subdivision
9    are all licenses that are held by the employer at the employer's primary
10   place of business.  On receipt of the court's order and notwithstanding any
11   other law, the appropriate agencies shall suspend the licenses according to
12   the court's order.  The court shall send a copy of the court's order to the
13   attorney general and the attorney general shall maintain the copy pursuant to
14   subsection G̶ H of this section.
15         (d)  May order the appropriate agencies to suspend all licenses
16   described in subdivision (c) of this paragraph that are held by the employer
17   for not to exceed ten business days.  The court shall base its decision to
18   suspend under this subdivision on any evidence or information submitted to it
19   during the action for a violation of this subsection and shall consider the
20   following factors, if relevant:
21         (i)  The number of unauthorized aliens employed by the employer.
22         (ii)  Any prior misconduct by the employer.
23         (iii)  The degree of harm resulting from the violation.
24         (iv)  Whether the employer made good faith efforts to comply with any
25   applicable requirements.
26         (v)  The duration of the violation.
27         (vi)  The role of the directors, officers or principals of the employer
28   in the violation.
29         (vii)  Any other factors the court deems appropriate.
30         2.  For a second violation, as described in paragraph 3 of this
31   subsection, the court shall order the appropriate agencies to permanently
32   revoke all licenses that are held by the employer specific to the business
33   location where the unauthorized alien performed work.  If the employer does
34   not hold a license specific to the business location where the unauthorized
35   alien performed work, but a license is necessary to operate the employer's
36   business in general, the court shall order the appropriate agencies to
37   permanently revoke all licenses that are held by the employer at the
38   employer's primary place of business.  On receipt of the order and
39   notwithstanding any other law, the appropriate agencies shall immediately
40   revoke the licenses.
41         3.  The violation shall be considered:
42         (a)  A first violation by an employer at a business location if the
43   violation did not occur during a probationary period ordered by the court
44   under this subsection or section 23-212.01, subsection F̶ G for that
45   employer's business location.

SB 1070

1    (b)  A second violation by an employer at a business location if the
2    violation occurred during a probationary period ordered by the court under
3    this subsection or section 23-212.01, subsection F  G for that employer's
4    business location.
5    G.  H.  The attorney general shall maintain copies of court orders that
6    are received pursuant to subsection F  G of this section and shall maintain a
7    database of the employers and business locations that have a first violation
8    of subsection A of this section and make the court orders available on the
9    attorney general's website.
10   H.  I.  On determining whether an employee is an unauthorized alien,
11   the court shall consider only the federal government's determination pursuant
12   to 8 United States Code section 1373(c).  The federal government's
13   determination creates a rebuttable presumption of the employee's lawful
14   status.  The court may take judicial notice of the federal government's
15   determination and may request the federal government to provide automated or
16   testimonial verification pursuant to 8 United States Code section 1373(c).
17   I.  J.  For the purposes of this section, proof of verifying the
18   employment authorization of an employee through the e-verify program creates
19   a rebuttable presumption that an employer did not knowingly employ an
20   unauthorized alien.
21   J.  K.  For the purposes of this section, an employer that establishes
22   that it has complied in good faith with the requirements of 8 United States
23   Code section 1324a(b) establishes an affirmative defense that the employer
24   did not knowingly employ an unauthorized alien.  An employer is considered to
25   have complied with the requirements of 8 United States Code section 1324a(b),
26   notwithstanding an isolated, sporadic or accidental technical or procedural
27   failure to meet the requirements, if there is a good faith attempt to comply
28   with the requirements.
29   L.  AN EMPLOYER IS NOT ENTRAPPED UNDER THIS SECTION IF THE EMPLOYER WAS
30   PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND LAW ENFORCEMENT
31   OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO
32   VIOLATE SUBSECTION A OF THIS SECTION.  IT IS NOT ENTRAPMENT FOR LAW
33   ENFORCEMENT OFFICERS OR THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR
34   IDENTITIES.
35   Sec. 6.  Section 23-212.01, Arizona Revised Statutes, is amended to
36   read:
37   23-212.01.  Intentionally   employing   unauthorized   aliens;
38               prohibition;  false  and  frivolous  complaints;
39               violation; classification; license suspension and
40               revocation; affirmative defense
41   A.  An employer shall not intentionally employ an unauthorized alien.
42   If, in the case when an employer uses a contract, subcontract or other
43   independent contractor agreement to obtain the labor of an alien in this
44   state, the employer intentionally contracts with an unauthorized alien or

- 8 -

SB 1070

1   with a person who employs or contracts with an unauthorized alien to perform
2   the labor, the employer violates this subsection.
3        B.  The attorney general shall prescribe a complaint form for a person
4   to allege a violation of subsection A of this section.  The complainant shall
5   not be required to list the complainant's social security number on the
6   complaint form or to have the complaint form notarized.  On receipt of a
7   complaint on a prescribed complaint form that an employer allegedly
8   intentionally employs an unauthorized alien, the attorney general or county
9   attorney shall investigate whether the employer has violated subsection A of
10  this section.  If a complaint is received but is not submitted on a
11  prescribed complaint form, the attorney general or county attorney may
12  investigate whether the employer has violated subsection A of this section.
13  This subsection shall not be construed to prohibit the filing of anonymous
14  complaints that are not submitted on a prescribed complaint form.  The
15  attorney general or county attorney shall not investigate complaints that are
16  based solely on race, color or national origin.  A complaint that is
17  submitted to a county attorney shall be submitted to the county attorney in
18  the county in which the alleged unauthorized alien is or was employed by the
19  employer.  The county sheriff or any other local law enforcement agency may
20  assist in investigating a complaint.  THE COUNTY ATTORNEY MAY TAKE EVIDENCE,
21  ADMINISTER OATHS OR AFFIRMATIONS, ISSUE SUBPOENAS REQUIRING ATTENDANCE AND
22  TESTIMONY OF WITNESSES AND CAUSE DEPOSITIONS TO BE TAKEN.  When investigating
23  a complaint, the attorney general or county attorney shall verify the work
24  authorization of the alleged unauthorized alien with the federal government
25  pursuant to 8 United States Code section 1373(c).  A state, county or local
26  official shall not attempt to independently make a final determination on
27  whether an alien is authorized to work in the United States.  An alien's
28  immigration status or work authorization status shall be verified with the
29  federal government pursuant to 8 United States Code section 1373(c).  A
30  person who knowingly files a false and frivolous complaint under this
31  subsection is guilty of a class 3 misdemeanor.
32        C.  PROCEEDINGS HELD DURING THE COURSE OF A CONFIDENTIAL INVESTIGATION
33  ARE EXEMPT FROM TITLE 38, CHAPTER 3, ARTICLE 3.1.
34        C̶.̶  D.  If, after an investigation, the attorney general or county
35  attorney determines that the complaint is not false and frivolous:
36        1.  The attorney general or county attorney shall notify the United
37  States immigration and customs enforcement of the unauthorized alien.
38        2.  The attorney general or county attorney shall notify the local law
39  enforcement agency of the unauthorized alien.
40        3.  The attorney general shall notify the appropriate county attorney
41  to bring an action pursuant to subsection D̶  E of this section if the
42  complaint was originally filed with the attorney general.
43        D̶.̶  E.  An action for a violation of subsection A of this section shall
44  be brought against the employer by the county attorney in the county where
45  the unauthorized alien employee is or was employed by the employer.  The

- 9 -

SB 1070

1   county attorney shall not bring an action against any employer for any
2   violation of subsection A of this section that occurs before January 1, 2008.
3   A second violation of this section shall be based only on an unauthorized
4   alien who is or was employed by the employer after an action has been brought
5   for a violation of subsection A of this section or section 23-212,
6   subsection A.
7      E. F. For any action in superior court under this section, the court
8   shall expedite the action, including assigning the hearing at the earliest
9   practicable date.
10      F. G. On a finding of a violation of subsection A of this section:
11      1. For a first violation, as described in paragraph 3 of this
12   subsection, the court shall:
13      (a) Order the employer to terminate the employment of all unauthorized
14   aliens.
15      (b) Order the employer to be subject to a five year probationary
16   period for the business location where the unauthorized alien performed work.
17   During the probationary period the employer shall file quarterly reports in
18   the form provided in section 23-722.01 with the county attorney of each new
19   employee who is hired by the employer at the business location where the
20   unauthorized alien performed work.
21      (c) Order the appropriate agencies to suspend all licenses described
22   in subdivision (d) of this paragraph that are held by the employer for a
23   minimum of ten days. The court shall base its decision on the length of the
24   suspension under this subdivision on any evidence or information submitted to
25   it during the action for a violation of this subsection and shall consider
26   the following factors, if relevant:
27      (i) The number of unauthorized aliens employed by the employer.
28      (ii) Any prior misconduct by the employer.
29      (iii) The degree of harm resulting from the violation.
30      (iv) Whether the employer made good faith efforts to comply with any
31   applicable requirements.
32      (v) The duration of the violation.
33      (vi) The role of the directors, officers or principals of the employer
34   in the violation.
35      (vii) Any other factors the court deems appropriate.
36      (d) Order the employer to file a signed sworn affidavit with the
37   county attorney. The affidavit shall state that the employer has terminated
38   the employment of all unauthorized aliens in this state and that the employer
39   will not intentionally or knowingly employ an unauthorized alien in this
40   state. The court shall order the appropriate agencies to suspend all
41   licenses subject to this subdivision that are held by the employer if the
42   employer fails to file a signed sworn affidavit with the county attorney
43   within three business days after the order is issued. All licenses that are
44   suspended under this subdivision for failing to file a signed sworn affidavit
45   shall remain suspended until the employer files a signed sworn affidavit with

SB 1070

1   the county attorney.  For the purposes of this subdivision, the licenses that
2   are subject to suspension under this subdivision are all licenses that are
3   held by the employer specific to the business location where the unauthorized
4   alien performed work.  If the employer does not hold a license specific to
5   the business location where the unauthorized alien performed work, but a
6   license is necessary to operate the employer's business in general, the
7   licenses that are subject to suspension under this subdivision are all
8   licenses that are held by the employer at the employer's primary place of
9   business.  On receipt of the court's order and notwithstanding any other law,
10  the appropriate agencies shall suspend the licenses according to the court's
11  order.  The court shall send a copy of the court's order to the attorney
12  general and the attorney general shall maintain the copy pursuant to
13  subsection G̶ H of this section.
14      2.  For a second violation, as described in paragraph 3 of this
15  subsection, the court shall order the appropriate agencies to permanently
16  revoke all licenses that are held by the employer specific to the business
17  location where the unauthorized alien performed work.  If the employer does
18  not hold a license specific to the business location where the unauthorized
19  alien performed work, but a license is necessary to operate the employer's
20  business in general, the court shall order the appropriate agencies to
21  permanently revoke all licenses that are held by the employer at the
22  employer's primary place of business.  On receipt of the order and
23  notwithstanding any other law, the appropriate agencies shall immediately
24  revoke the licenses.
25      3.  The violation shall be considered:
26      (a)  A first violation by an employer at a business location if the
27  violation did not occur during a probationary period ordered by the court
28  under this subsection or section 23-212, subsection F̶ G for that employer's
29  business location.
30      (b)  A second violation by an employer at a business location if the
31  violation occurred during a probationary period ordered by the court under
32  this subsection or section 23-212, subsection F̶ G for that employer's
33  business location.
34      G̶. H.  The attorney general shall maintain copies of court orders that
35  are received pursuant to subsection F̶ G of this section and shall maintain a
36  database of the employers and business locations that have a first violation
37  of subsection A of this section and make the court orders available on the
38  attorney general's website.
39      H̶. I.  On determining whether an employee is an unauthorized alien,
40  the court shall consider only the federal government's determination pursuant
41  to 8 United States Code section 1373(c).  The federal government's
42  determination creates a rebuttable presumption of the employee's lawful
43  status.  The court may take judicial notice of the federal government's
44  determination and may request the federal government to provide automated or
45  testimonial verification pursuant to 8 United States Code section 1373(c).

- 11 -

SB 1070

1        ~~I.~~ J.  For the purposes of this section, proof of verifying the
2    employment authorization of an employee through the e-verify program creates
3    a rebuttable presumption that an employer did not intentionally employ an
4    unauthorized alien.
5        ~~J.~~ K.  For the purposes of this section, an employer that establishes
6    that it has complied in good faith with the requirements of 8 United States
7    Code section 1324a(b) establishes an affirmative defense that the employer
8    did not intentionally employ an unauthorized alien.   An employer is
9    considered to have complied with the requirements of 8 United States Code
10   section 1324a(b), notwithstanding an isolated, sporadic or accidental
11   technical or procedural failure to meet the requirements, if there is a good
12   faith attempt to comply with the requirements.
13       L.   AN EMPLOYER IS NOT ENTRAPPED UNDER THIS SECTION IF THE EMPLOYER WAS
14   PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND LAW ENFORCEMENT
15   OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO
16   VIOLATE SUBSECTION A OF THIS SECTION. IT IS NOT ENTRAPMENT FOR LAW
17   ENFORCEMENT OFFICERS OR THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR
18   IDENTITIES.
19       Sec. 7.  Section 23-214, Arizona Revised Statutes, is amended to read:
20       23-214.  Verification of employment eligibility; e-verify
21                program; economic development incentives; list of
22                registered employers; violation; classification
23       A.  After December 31, 2007, every employer, after hiring an employee,
24   shall verify the employment eligibility of the employee through the e-verify
25   program AND SHALL KEEP A RECORD OF THE VERIFICATION.
26       B.  In addition to any other requirement for an employer to receive an
27   economic development incentive from a government entity, the employer shall
28   register with and participate in the e-verify program.  Before receiving the
29   economic development incentive, the employer shall provide proof to the
30   government entity that the employer is registered with and is participating
31   in the e-verify program.  If the government entity determines that the
32   employer is not complying with this subsection, the government entity shall
33   notify the employer by certified mail of the government entity's
34   determination of noncompliance and the employer's right to appeal the
35   determination. On a final determination of noncompliance, the employer shall
36   repay all monies received as an economic development incentive to the
37   government entity within thirty days of the final determination.  For the
38   purposes of this subsection:
39       1.  "Economic development incentive" means any grant, loan or
40   performance-based incentive from any government entity that is awarded after
41   September 30, 2008.  Economic development incentive does not include any tax
42   provision under title 42 or 43.
43       2.  "Government entity" means this state and any political subdivision
44   of this state that receives and uses tax revenues.

SB 1070

 1      C.  Every  three  months  the  attorney  general  shall  request  from  the
 2  United  States  department  of  homeland  security  a  list  of  employers  from  this
 3  state  that  are  registered  with  the  e-verify  program.   On  receipt  of  the  list
 4  of  employers,  the  attorney  general  shall  make  the  list  available  on  the
 5  attorney  general's  website.
 6      D.  A  VIOLATION  OF  SUBSECTION  A  IS  A  CLASS  3  MISDEMEANOR.
 7      Sec.  8.   Section  28-3511,  Arizona  Revised  Statutes,  is  amended  to  read:
 8      28-3511.   Removal  and  immobilization  or  impoundment  of  vehicle
 9      A.  A  peace  officer  shall  cause  the  removal  and  either  immobilization
10  or  impoundment  of  a  vehicle  if  the  peace  officer  determines  that  a  person  is
11  driving  the  vehicle  while  any  of  the  following  applies:
12      1.  The  person's  driving  privilege  is  suspended  or  revoked  for  any
13  reason.
14      2.  The  person  has  not  ever  been  issued  a  valid  driver  license  or
15  permit  by  this  state  and  the  person  does  not  produce  evidence  of  ever  having
16  a  valid  driver  license  or  permit  issued  by  another  jurisdiction.   This
17  paragraph  does  not  apply  to  the  operation  of  an  implement  of  husbandry.
18      3.  The  person  is  subject  to  an  ignition  interlock  device  requirement
19  pursuant  to  chapter  4  of  this  title  and  the  person  is  operating  a  vehicle
20  without  a  functioning  certified  ignition  interlock  device.   This  paragraph
21  does  not  apply  to  a  person  operating  an  employer's  vehicle  or  the  operation
22  of  a  vehicle  due  to  a  substantial  emergency  as  defined  in  section  28-1464.
23      4.  THE  PERSON  IS  TRANSPORTING,  MOVING,  CONCEALING,  HARBORING  OR
24  SHIELDING  OR  ATTEMPTING  TO  TRANSPORT,  MOVE,  CONCEAL,  HARBOR  OR  SHIELD  AN
25  ALIEN  IN  THIS  STATE  IN  A  VEHICLE  IF  THE  PERSON  KNOWS  OR  RECKLESSLY  DISREGARDS
26  THE  FACT  THAT  THE  ALIEN  HAS  COME  TO,  HAS  ENTERED  OR  REMAINS  IN  THE  UNITED
27  STATES  IN  VIOLATION  OF  LAW.
28      B.  A  peace  officer  shall  cause  the  removal  and  impoundment  of  a
29  vehicle  if  the  peace  officer  determines  that  a  person  is  driving  the  vehicle
30  and  if  all  of  the  following  apply:
31      1.  The  person's  driving  privilege  is  canceled,  suspended  or  revoked
32  for  any  reason  or  the  person  has  not  ever  been  issued  a  driver  license  or
33  permit  by  this  state  and  the  person  does  not  produce  evidence  of  ever  having
34  a  driver  license  or  permit  issued  by  another  jurisdiction.
35      2.  The  person  is  not  in  compliance  with  the  financial  responsibility
36  requirements  of  chapter  9,  article  4  of  this  title.
37      3.  The  person  is  driving  a  vehicle  that  is  involved  in  an  accident
38  that  results  in  either  property  damage  or  injury  to  or  death  of  another
39  person.
40      C.  Except  as  provided  in  subsection  D  of  this  section,  while  a  peace
41  officer  has  control  of  the  vehicle  the  peace  officer  shall  cause  the  removal
42  and  either  immobilization  or  impoundment  of  the  vehicle  if  the  peace  officer
43  has  probable  cause  to  arrest  the  driver  of  the  vehicle  for  a  violation  of
44  section  4-244,  paragraph  34  or  section  28-1382  or  28-1383.

SB 1070

1      D.  A peace officer shall not cause the removal and either the
2  immobilization or impoundment of a vehicle pursuant to subsection C of this
3  section if all of the following apply:
4      1.  The peace officer determines that the vehicle is currently
5  registered and that the driver or the vehicle is in compliance with the
6  financial responsibility requirements of chapter 9, article 4 of this title.
7      2.  The spouse of the driver is with the driver at the time of the
8  arrest.
9      3.  The peace officer has reasonable grounds to believe that the spouse
10  of the driver:
11      (a)  Has a valid driver license.
12      (b)  Is not impaired by intoxicating liquor, any drug, a vapor
13  releasing substance containing a toxic substance or any combination of
14  liquor, drugs or vapor releasing substances.
15      (c)  Does not have any spirituous liquor in the spouse's body if the
16  spouse is under twenty-one years of age.
17      4.  The spouse notifies the peace officer that the spouse will drive
18  the vehicle from the place of arrest to the driver's home or other place of
19  safety.
20      5.  The spouse drives the vehicle as prescribed by paragraph 4 of this
21  subsection.
22      E.  Except as otherwise provided in this article, a vehicle that is
23  removed and either immobilized or impounded pursuant to subsection A, B or C
24  of this section shall be immobilized or impounded for thirty days.   An
25  insurance company does not have a duty to pay any benefits for charges or
26  fees for immobilization or impoundment.
27      F.  The owner of a vehicle that is removed and either immobilized or
28  impounded pursuant to subsection A, B or C of this section, the spouse of the
29  owner and each person identified on the department's record with an interest
30  in the vehicle shall be provided with an opportunity for an immobilization or
31  poststorage hearing pursuant to section 28-3514.
32      Sec. 9.  <u>Severability, implementation  and construction</u>
33      A.  If a provision of this act or its application to any person or
34  circumstance is held invalid, the invalidity does not affect other provisions
35  or applications of the act that can be given effect without the invalid
36  provision or application, and to this end the provisions of this act are
37  severable.
38      B.  The terms of this act regarding immigration shall be construed to
39  have the meanings given to them under federal immigration law.
40      C.  This act shall be implemented in a manner consistent with federal
41  laws regulating immigration, protecting the civil rights of all persons and
42  respecting the privileges and immunities of United States citizens.
43      Sec. 10.  <u>Short title</u>
44      This act may be cited as the "Support Our Law Enforcement and Safe
45  Neighborhoods Act".

- 14 -

Exhibit I-16



## Arizona State Legislature

Bill Number Search: [        ] 🔍

Forty-ninth Legislature - Second Regular Session    **Email a Member** | Email Webmaster    **change session** | printer friendly version

Senate     House     Legislative Council     JLBC     More Agencies     Bills     Committees     Calendars/News

### BILL STATUS OVERVIEW

**SB1070**

| **SPONSORS:** | PEARCE R | P | GRAY C | P | GRAY L | P |
|---|---|---|---|---|---|---|
| | ANTENORI | P | BARNES | P | GOWAN | P |
| | HENDRIX | P | KAVANAGH | P | SEEL | P |
| | ALLEN S | C | BURNS | C | GORMAN | C |
| | HARPER | C | HUPPENTHAL | C | LEFF | C |
| | MELVIN | C | NELSON | C | PIERCE S | C |
| | TIBSHRAENY | C | VERSCHOOR | C | WARING | C |
| | ASH | C | BIGGS | C | BURGES | C |
| | COURT | C | CRUMP | C | LESKO | C |
| | MASON | C | MCLAIN | C | MONTENEGRO | C |
| | MURPHY | C | NICHOLS | C | REAGAN | C |
| | STEVENS | C | WEIERS J | C | WEIERS JP | C |
| | YARBROUGH | C | | | | |

**TITLE:** immigration; law enforcement; safe neighborhoods
       (NOW: safe neighborhoods; immigration; law enforcement)

**SENATE FIRST READ:** 01/13/10
**SENATE SECOND READ:** 01/14/10
**COMMITTEES: ASSIGNED COMMITTEES ACTION**

| Vote Detail | 01/13/10 | PSHS | 01/20/10 (4-3-0-0) DPA |
|---|---|---|---|
| | 01/13/10 | RULES | 02/01/10 PFCA |

**MAJORITY CAUCUS:** 02/09/10 Y
**MINORITY CAUCUS:** 02/09/10 Y

**COW ACTION 1: DATE    ACTION AYES NAYS NV EXC VAC**

| | 02/11/10 DPA | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|

 **AMENDMENTS**
 PSHS (ref Bill) adopted
  RULES (ref PSHS) adopted
  Pearce R (ref Bill) adopted

**THIRD READ: DATE    AYES NAYS NV EXC VAC EMER AMEND RFE 2/3 VOTE RESULT**

| Vote Detail | 02/15/10 | 17 | 13 | 0 | 0 | | Y | | | PASSED |
|---|---|---|---|---|---|---|---|---|---|---|

**TRANSMIT TO HOUSE:** 02/15/10
**HOUSE FIRST READ:** 03/23/10
**COMMITTEES: ASSIGNED COMMITTEES ACTION**

| Vote Detail | 03/23/10 | MAPS | 03/31/10 (5-2-0-1-0) DPA/SE |
|---|---|---|---|
| Vote Detail | 03/23/10 | RULES | 04/05/10 (4-1-0-3-0) C&P |

**HOUSE SECOND READ:** 03/24/10
**MAJORITY CAUCUS** 04/06/10 Y
**MINORITY CAUCUS** 04/06/10 Y

**COW ACTION 1: DATE    ACTION AYES NAYS NV EXC VAC**

| | 04/13/10 DPA | 0 | 0 | 0 | 0 |
|---|---|---|---|---|---|

**AMENDMENTS**
 MAPS - passed as amended
 Floor Amend to MAPS - Biggs - passed

| THIRD READ: DATE | AYES | NAYS | NV | EXC | VAC | EMER | AMEND | RFE | 2/3 | VOTE RESULT |
|---|---|---|---|---|---|---|---|---|---|---|
| Vote Detail   04/13/10 | 35 | 21 | 4 | 0 | | | Y | | | PASSED |

**TRANSMIT TO SENATE:** 04/13/10
**MAJORITY CAUCUS:** 04/15/10 Y
**MINORITY CAUCUS:** 04/15/10 Y

| SENATE CONCURRENCE: DATE | AYES | NAYS | NV | EXC |
|---|---|---|---|---|
| 04/19/10 | 0 | 0 | 0 | 0 |

| SENATE FINAL READ: DATE | AYES | NAYS | NV | EXC | VAC | EMER | RFE | 2/3 | VOTE RESULT |
|---|---|---|---|---|---|---|---|---|---|
| Vote Detail   04/19/10 | 17 | 11 | 2 | 0 | | | | | PASSED |

**TRANSMITTED TO:**   GOVERNOR        04/19/10
**ACTION:**   SIGNED        04/23/10
**CHAPTER:**   113
**CHAPTERED VERSION:** House Engrossed Version

©2007 Arizona State Legislature.                    privacy statment

Exhibit I-17

# ARIZONA STATE SENATE

## 49TH LEGISLATURE
## SECOND REGULAR SESSION

**MINUTES OF COMMITTEE ON**
**PUBLIC SAFETY AND HUMAN SERVICES**

**DATE:**     January 20, 2010          **TIME:**  9:00 A.M.          **ROOM:**  SHR3

**CHAIRMAN:**  Senator Linda Gray          **VICE-CHAIRMAN:**  Senator S. Allen

**ANALYST:**    Amber O'Dell          **INTERN:**          Kendra Kovarik

**COMMITTEE**
**SECRETARY:**          Shelley Ponce

---

**ATTENDANCE**                               **BILLS**

---

| Committee Members | Pr | Ab | Ex | Bill Number | Disposition |
|---|---|---|---|---|---|
| Senator Alvarez | X | | | SB 1018 | DPA |
| Senator Landrum Taylor | X | | | SB 1070 | DPA |
| Senator Melvin | X | | | SB 1071 | DP |
| Senator Rios | X | | | SB 1084 | DP |
| Senator Waring | X | | | SB 1091 | DP |
| Senator S. Allen, Vice-Chairman | X | | | | |
| Senator L. Gray, Chairman | X | | | | |

Chairman Gray called the meeting to order at 9:05 a.m. and attendance was taken.

## CONSIDERATION OF BILLS

### SB 1070 – immigration; law enforcement; safe neighborhoods – DO PASS AMENDED

**Amber O'Dell, Public Safety and Human Services Committee Analyst,** explained SB 1070 and the 25-line Gray amendment dated 01/19/10 at 3:08 p.m. (Attachment A).

**Senator Russell Pearce, bill sponsor,** further explained SB 1070.

Senator Gray noted the individuals who registered their position on the bill (Attachment B).

**Allison Bell, Arizona Chamber of Commerce & Industry,** testified as neutral and explained that the amendment alleviates possible problems.

**Jennifer Allen, Executive Director, Border Action Network,** testified in opposition to SB 1070.

**Fernando Gonzales, representing himself,** testified in opposition to SB 1070.

**John Thomas, Arizona Association of Chiefs of Police,** testified in opposition to SB 1070.

**Mark Spencer, President, Phoenix Law Enforcement Association (PLEA),** testified in support of SB 1070.

**Joe Sigg, Arizona Farm Bureau,** testified in opposition to SB 1070.

**Rob Haney, representing himself,** testified in support of SB 1070.

**Alessandra Meetze, Executive Director, American Civil Liberties Union (ACLU) of Arizona,** testified in opposition to SB 1070.

**Tom Husband, representing himself,** testified in support of SB 1070.

> **Senator Sylvia Allen moved SB 1070 be returned with a DO PASS recommendation.**

> **Senator Sylvia Allen moved the 25-line Gray amendment dated 01/19/10 at 3:08 p.m. (Attachment A) be ADOPTED.  The motion CARRIED by voice vote.**

> **Senator Sylvia Allen moved SB 1070 be returned with an AS AMENDED, DO PASS recommendation.  The motion CARRIED by roll call vote of 4-3-0 (Attachment 1).**

Senators Alvarez, Landrum Taylor and Sylvia Allen explained their votes.

### RECESS

Senator Linda Gray stated that the committee would RECESS at 10:30 a.m. for five minutes.

**RECONVENE**

Senator Linda Gray RECONVENED the meeting at 10:35 a.m.

**SB 1018 – photo enforcement procedures; justice courts – DO PASS AMENDED**

**Amber O'Dell, Public Safety and Human Services Committee Analyst,** explained SB 1018 and the 11-line Gray amendment dated 01/19/10 at 1:12 p.m. (Attachment C).

**Gerald Williams, President, Maricopa County JP Association,** testified in support of SB 1018.

**Senator Russell Pearce, bill sponsor,** further explained SB 1018.

**Lester Pearce, Judge, Mesa Justice Court,** testified in support of SB 1018.

**Jerry Landau, Legislative Liaison, Arizona Supreme Court, Administrative Office of the Courts,** testified as neutral and discussed the Gray amendment.

**Mike Williams, Redflex,** testified as neutral on SB 1018.

Senator Sylvia Allen noted the individuals who registered their position on the bill (Attachment B).

> **Senator Sylvia Allen moved SB 1018 be returned with a DO PASS recommendation.**

> **Senator Sylvia Allen moved the 11-line Gray amendment dated 01/19/10 at 1:12 p.m. (Attachment C).  The motion CARRIED with a voice vote.**

> **Senator Sylvia Allen moved SB 1018 be returned with an AS AMENDED, DO PASS recommendation. The motion CARRIED by a roll call vote of 6-0-1 (Attachment 2).**

Senator Gray explained her vote.

**SB 1071 – involuntary civil commitment; privileged communications - DO PASS**

**Kendra Kovarik, Public Safety and Human Services Committee Intern,** explained SB 1071.

**Rebecca Baker, Deputy County Attorney, Maricopa County Attorney's Office,** testified in support of SB 1071.

Senator Gray noted the individuals who registered their position on the bill (Attachment B).

> **Senator Sylvia Allen moved SB 1071 be returned with a DO PASS recommendation. The motion CARRIED by a roll call vote of 6-0-1 (Attachment 3).**

**SB 1084 – injunction against harassment; fees – DO PASS**

**Kendra Kovarik, Public Safety and Human Services Committee Intern,** explained SB 1084.

Senator Gray noted the individuals who registered their position on the bill (Attachment B).

**Don Hughes, Lobbyist, American Family Insurance Company,** answered questions posed by the committee.

> **Senator Sylvia Allen moved SB 1084 be returned with a DO PASS recommendation. The motion CARRIED by roll call vote of 6-0-1 (Attachment 4).**

## SB 1091– CPS workers; investigations; group homes – DO PASS

**Kendra Kovarik, Public Safety and Human Services Committee Intern,** explained SB 1091.

Emily Jenkins, President/CEO, Arizona Council of Human Service Providers**,** testified in opposition to SB 1091.

**Herschella Horton, Chief, Legislative Services, Department of Economic Security (DES),** answered questions posed by the committee.

**Beth Rosenberg, Children's Action Alliance,** testified in support of SB 1091.

> **Senator Sylvia Allen moved SB 1091 be returned with a DO PASS recommendation. The motion CARRIED by roll call vote of 6-0-1 (Attachment 5).**

There being no further business, the meeting was adjourned at 11:04 a.m.

Respectfully submitted,


Shelley Ponce
Committee Secretary

(Audio recordings and attachments on file in the Secretary of the Senate's Office/Resource Center, Room 115. Audio archives are available at http://www.azleg.gov)

Committee on Public Safety and
Human Services
January 20, 2010

# Exhibit I-18

**BILL #**  SB 1070

**SPONSOR:**  Pearce

**PREPARED BY:**  Kimberly Cordes-Sween

**TITLE:**  immigration; law enforcement; safe neighborhoods

**STATUS:**  As Amended by Senate PSHS and Senate RULES

# FISCAL ANALYSIS

## Description

Among the major changes, the bill:

1)  Requires officials and agencies of the state and political divisions to fully comply with and assist in the enforcement of federal immigration laws.  This includes prohibiting the adoption of any policies that limit immigration enforcement; utilizing various means to verify immigration status; transferring illegal aliens to federal custody; and arresting individuals without a warrant for a public offense that could cause deportation.
2)  Requires employers to maintain records of verification of employment eligibility for each employee for the length of employment or 3 years, whichever is longer.
3)  Establishes crimes involving trespassing by illegal aliens; stopping to hire or solicit work under specified circumstances; and transporting, harboring or concealing unlawful aliens while also committing a criminal offense.  For these crimes, there would be fines from $500 to $5,000, or more, depending on the circumstance.
4)  Requires that all civil penalties that result from an entity adopting policies that limit enforcement of federal immigration laws or an individual being convicted of trespassing, be deposited into a new Department of Public Safety (DPS) subaccount for the Gang and Immigration Intelligence Team Enforcement Mission (GIITEM).

## Estimated Impact

The fiscal impact of this bill cannot be determined with certainty.  We do not have a means to quantify the number of individuals arrested under the bill's provisions or the impact on the level of illegal immigration.

Direct Impacts
*Incarceration Costs*
The bill could result in additional costs by detaining illegal aliens in state prisons.  The total cost to the state will depend on how long these individuals are incarcerated before being transferred to federal custody.  The marginal cost per day is $9.67 ($3,531 annually).  The number of new offenders or persons detained, pursuant to SB 1070, cannot be predicted in advance.

Local governments would also have increased jail costs as a result of SB 1070.

*Law Enforcement Training Costs*
There may be additional costs associated with providing DPS officers, as well as other law enforcement, with further immigration enforcement related training.  Given that it is unclear how much, if any, additional training would be required, the potential total cost is unknown.  DPS, however, does not anticipate it to have a significant cost impact on the state.

*County Prosecution Costs*
SB 1070 is anticipated to result in additional expenses for county attorneys related to prosecution of new crimes, as identified in this bill.  These expenses would be in addition to the costs of enforcing current employer sanctions laws.  Additional county prosecution costs cannot be predicted in advance.

*New Revenue from Fines Assessed on New Crimes*
The bill would also generate additional fine revenue.  Fine revenue cannot be estimated in advance since it will depend on the number of violators, the number of prior offenses, the severity of the offense, and how long a policy has been in place.

The Arizona Association of Counties and the League of Cities and Towns have not conducted fiscal impact analyses on this bill.

(Continued)

Broader Impacts

The bill could have broader consequences on both state revenues and expenditures. To the extent that the bill increases enforcement of immigration laws, the level of illegal immigration could decline. Lower levels of immigration would reduce participation in state-funded programs, which would then affect spending.

Reduced immigration levels would also impact state revenues. The growth in general tax collections would decline with a reduced immigrant population. This reduction may be offset somewhat if wages increase to remaining residents in an attempt to offset the overall decline in the labor supply.

The magnitude of these broader revenue and spending impacts of this bill will depend on the effects on the level of immigration, which cannot be determined in advance.

**Analysis**

*Enforcing Federal Law*

According to current federal law, an alien is considered guilty of improper entry into the United States if that individual 1) falsely represents their status in order to achieve entry, 2) enters or attempts to enter without authorization by an immigration official (such as through U.S. Customs entry points or without a visa), or 3) evades inspection by immigration officers.

Since SB 1070 would require law enforcement to make additional efforts to adhere to federal immigration law and creates new crimes, the bill may generate new incarceration costs. The bill includes provisions requiring law enforcement to determine the immigration status of any individual who raises "reasonable suspicion" that they are an illegal alien, making an arrest without a warrant for any public offense that could cause deportation, transferring an illegal alien to Immigration and Customs Enforcement (ICE) upon completion of incarceration or assessment of a fine, and prohibiting officials or agencies from imposing laws or policies that hinder federal immigration laws.

In order to ensure that law enforcement is upholding federal immigration laws, DPS, as well as other law enforcement agencies, may provide additional training to officers. The cost would depend on the number of hours of training required. DPS does not anticipate that there would be significant training costs to the state; however, additional training related to immigration enforcement may be required by the federal government. The necessity of federal training is currently unknown.

*Establishing New Crimes*

This bill establishes new crimes of 1) trespassing by illegal aliens, 2) stopping to hire or soliciting work under specified circumstances, and 3) transporting, harboring, or concealing unlawful aliens while also committing a criminal offense. Given that these are new crimes, a prison or jail sentence would be imposed depending on the severity of the crime and the class of felony or misdemeanor that is identified in this bill. This would also result in additional cost to state prisons to incarcerate the violators of these provisions.

All offenders sentenced after January 1, 1994 are required to serve a minimum of 85% of their court-imposed sentence, pursuant to A.R.S § 41-1604.07. For the purposes of these estimates, the minimum cost would include the minimum sentence, as adjusted for the 85% rule, and would be at the marginal cost of $9.67 per day. The maximum cost would be 100% of the sentence served with the full operational cost of $60 per day.

Trespassing by illegal aliens, stopping to hire or soliciting work under specified circumstances, and transporting, harboring, or concealing unlawful aliens in commission of a criminal offense would be considered class 1 misdemeanors under SB 1070, which has a maximum sentence limit of 6 months. The sentence would be determined by the judge. There is no minimum sentence.

In the case of trespassing, if the occurrence was a second or subsequent offense, it would be considered a class 4 felony, which has a minimum sentence of 1.5 years and a maximum of 3 years. In addition, trespassing is considered a class 2 felony if there are illicit drugs or a dangerous weapon found at the time of detainment. Class 2 felonies are 4 to 10 years. Lastly, if an individual is found guilty of transporting 10 or more illegal aliens while also committing a criminal offense, it constitutes a class 6 felony. *Table 1* below provides details of the sentencing for the new crimes established in SB 1070.

(Continued)

| Table 1 | Prison Cost per New Offender | | |
|---|---|---|---|
| **Charge** | **85% of Minimum Sentence** | **Minimum Sentence** | **Maximum Sentence** |
| Class 1 Misdemeanor | none | none | 6 months |
| Class 6 Felony | 5 months | 6 months | 1.5 years |
| Class 4 Felony | 1.3 years | 1.5 years | 3 years |
| Class 2 Felony | 3.4 years | 4 years | 10 years |

*Employee Verification*
As of January 1, 2008, employers operating under an Arizona business license must be in compliance with the Legal Arizona Workers Act.  All employers in Arizona are required to use the federal government's E-Verify system to check the legal status of employees.  SB 1070 requires that all employers maintain records of verification of employment eligibility for each employee for the length of employment or 3 years, whichever is longer.  This is not estimated to have a state fiscal impact.

*New Fine Revenue*
The bill would also generate additional fine revenue.  Fine revenue cannot be estimated in advance since it will depend on the number of violators, the number of prior offenses, the severity of the offense, and how long a policy has been in place.

The bill establishes the following fines for new crimes in SB 1070:  a minimum of $500 in the case of a first offense of trespassing ($1,000 for subsequent offenses), a minimum of $1,000 for unlawful transportation of an illegal alien while also committing a criminal offense (at least $1,000 per alien if the violation involves 10 or more aliens), and $1,000 to $5,000 per day for an entity that adopts a policy that impedes the enforcement of federal immigration laws.  The amount of fine revenue cannot be determined in advance and will depend on the number of new offenders detained.

All civil penalties that result from an entity adopting policies that limit enforcement of federal immigration laws or an individual being convicted of trespassing, would be deposited into a new DPS subaccount for GIITEM.  GIITEM, which is overseen and largely funded by DPS, is a multi-agency law enforcement task force that targets gang activity and illegal immigration statewide.  As a result, these revenues would be deposited into a state fund and subject to legislative appropriation.

Other new offenses that do not have a GIITEM revenue stream identified in the bill would typically benefit the jurisdiction in which the fine is assessed.  However, there are surcharges on those fines that would be deposited into state funds, such as the Criminal Justice Enhancement Fund, which benefits various state criminal justice agencies.  For example, unlawfully stopping to hire or solicit work is classified as a class 1 misdemeanor and could carry a fine of up to $2,500.  Each fine would have surcharges of 84% plus a $20 probation surcharge fee to pay for state and county probation costs.  A $2,500 fine would result in $2,100 in state surcharge revenues.  Total estimated new revenues that would be generated by new crimes cannot be predicted and would depend on the amount of the court-imposed fine and how many offenders would be found guilty.

**Local Government Impact**

Because the bill would impact local law enforcement agencies, any potential costs and savings identified above also apply to local governments.  Similarly, any of the economic costs and benefits described above would have effects both at the state and local levels.   This includes incarceration costs, law enforcement training, and new revenue generated by new crimes established by SB 1070, as well as any indirect costs or savings that may occur with benefits and tax collections.

Beyond the costs and savings mentioned above, the bill could increase costs for City Attorneys' Offices and County Attorneys' Offices to investigate and enforce crimes under this legislation.  These prosecution costs will vary depending on the severity of the crime, duration of a potential court case and other mitigating factors.  The magnitude of this impact cannot be determined in advance.

2/5/10

# Exhibit I-19

Forty-ninth Legislature                          Public Safety and Human Services
Second Regular Session                                              S.B. 1070

PUBLIC SAFETY AND HUMAN SERVICES COMMITTEE

SENATE AMENDMENTS TO S.B. 1070

(Reference to printed bill)

1  Page 1, line 5, after "is" insert "to"

2    Line 20, strike "AN" insert "A LAW ENFORCEMENT"

3  Page 3, line 31, strike "2" insert "3"

4  Page 4, line 29, after "PERSON" insert "WHO IS IN VIOLATION OF A CRIMINAL OFFENSE"

5  Page 5, line 34, after the period strike remainder of line

6    Strike line 35

7    Line 36, strike "AND CAUSE DEPOSITIONS TO BE TAKEN."

8  Page 6, strike lines 1 and 2

9    Reletter to conform

10    Line 10, strike "D E" insert "D"

11  Page 7, line 14, strike "G H" insert "G"

12    Line 44, strike "F G" insert "F"

13  Page 8, lines 3 and 6, strike "F G" insert "F"

14  Page 9, line 20, after the period strike remainder of line

15    Strike line 21

16    Line 22, strike "TESTIMONY OF WITNESSES AND CAUSE DEPOSITIONS TO BE TAKEN."

17    Strike lines 32 and 33

18    Reletter to conform

19    Line 41, strike "D E" insert "D"

20  Page 11, line 13, strike "G H" insert "G"

21    Lines 28, 32 and 35, strike "F G" insert "F"

22  Page 12, line 25, after "VERIFICATION" insert "FOR THE DURATION OF THE EMPLOYEE'S

23      EMPLOYMENT OR AT LEAST THREE YEARS, WHICHEVER IS LONGER"

24  Page 13, strike line 6

25  Amend title to conform


1/19/10
3:08 PM
S: AO/tam

Forty-ninth Legislature                                                           Pearce R
Second Regular Session                                                            S.B. 1070

PEARCE FLOOR AMENDMENT

SENATE AMENDMENTS TO S.B. 1070

(Reference to printed bill)

1    Page 1, line 20, strike "LEGITIMATE" insert "LAWFUL"

2    Line 23, after "MADE" insert ", WHEN PRACTICABLE,"

3    Page 2, line 24, strike ", WHICH SHALL"

4    Strike lines 25 through 29, insert:

5        "FOR DEPOSIT IN THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT

6    MISSION FUND ESTABLISHED BY SECTION 41-1724."

7    Between lines 36 and 37, insert:

8        "J.  THIS SECTION SHALL BE IMPLEMENTED IN A MANNER CONSISTENT WITH

9    FEDERAL LAWS REGULATING IMMIGRATION, PROTECTING THE CIVIL RIGHTS OF ALL

10   PERSONS AND RESPECTING THE PRIVILEGES AND IMMUNITIES OF UNITED STATES

11   CITIZENS."

12   Page 3, line 5, after "AUTHORIZED" insert "BY THE FEDERAL GOVERNMENT"

13   After line 45, insert:

14       Sec. 4.  Section 13-2319, Arizona Revised Statutes, is amended to read:

15       13-2319.  Smuggling; classification; definitions

16       A.  It is unlawful for a person to intentionally engage in the

17   smuggling of human beings for profit or commercial purpose.

18       B.  A violation of this section is a class 4 felony.

19       C.  Notwithstanding subsection B of this section, a violation of this

20   section:

21       1.  Is a class 2 felony if the human being who is smuggled is under

22   eighteen years of age and is not accompanied by a family member over eighteen

23   years of age or the offense involved the use of a deadly weapon or dangerous

24   instrument.

25       2.  Is a class 3 felony if the offense involves the use or threatened

26   use of deadly physical force and the person is not eligible for suspension of

27   sentence, probation, pardon or release from confinement on any other basis

Senate Amendments to S.B. 1070

1    except  pursuant  to  section  31-233,  subsection  A  or  B  until  the  sentence
2    imposed  by  the  court  is  served,  the  person  is  eligible  for  release  pursuant
3    to section 41-1604.07 or the sentence is commuted.

4        D.  Chapter  10  of  this  title  does  not  apply  to  a  violation  of
5    subsection C, paragraph 1 of this section.

6        E.  NOTWITHSTANDING ANY OTHER LAW, A PEACE OFFICER MAY LAWFULLY STOP
7    ANY PERSON WHO IS OPERATING A MOTOR VEHICLE IF THE OFFICER HAS REASONABLE
8    SUSPICION TO BELIEVE THE PERSON IS IN VIOLATION OF ANY CIVIL TRAFFIC LAW AND
9    THIS SECTION.

10       E.  F.  For the purposes of this section:

11       1.  "Family member" means the person's parent, grandparent, sibling or
12   any other person who is related to the person by consanguinity or affinity to
13   the second degree.

14       2.  "Procurement  of  transportation"  means  any  participation  in  or
15   facilitation of transportation and includes:

16       (a)  Providing services that facilitate transportation including travel
17   arrangement services or money transmission services.

18       (b)  Providing property that facilitates transportation, including a
19   weapon, a vehicle or other means of transportation or false identification,
20   or selling, leasing, renting or otherwise making available a drop house as
21   defined in section 13-2322.

22       3.  "Smuggling of human beings" means the transportation, procurement
23   of transportation or use of property or real property by a person or an
24   entity  that  knows  or  has  reason  to  know  that  the  person  or  persons
25   transported or to be transported are not United States citizens, permanent
26   resident aliens or persons otherwise lawfully in this state or have attempted
27   to enter, entered or remained in the United States in violation of law."

28   Renumber to conform
29   Page 8, strike lines 29 through 34, insert:

30       "L.  IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF
31   THIS SECTION THAT THE EMPLOYER WAS ENTRAPPED. TO CLAIM ENTRAPMENT, THE
32   EMPLOYER MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE

Senate Amendments to S.B. 1070

1 SUBSTANTIAL ELEMENTS OF THE VIOLATION.  AN EMPLOYER WHO ASSERTS AN ENTRAPMENT
2 DEFENSE HAS THE BURDEN OF PROVING THE FOLLOWING BY CLEAR AND CONVINCING
3 EVIDENCE:
4   1.  THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT
5 OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.
6   2.  THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE
7 EMPLOYER TO COMMIT THE VIOLATION.
8   3.  THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE
9 LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO
10 COMMIT THE VIOLATION.
11   M.  AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS
12 PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT
13 OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO
14 COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR
15 THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY.  THE CONDUCT
16 OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING
17 IF AN EMPLOYER HAS PROVEN ENTRAPMENT."
18 Page 12, strike lines 13 through 18, insert:
19   "L.  IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF
20 THIS SECTION THAT THE EMPLOYER WAS ENTRAPPED.  TO CLAIM ENTRAPMENT, THE
21 EMPLOYER MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE
22 SUBSTANTIAL ELEMENTS OF THE VIOLATION.  AN EMPLOYER WHO ASSERTS AN ENTRAPMENT
23 DEFENSE HAS THE BURDEN OF PROVING THE FOLLOWING BY CLEAR AND CONVINCING
24 EVIDENCE:
25   1.  THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT
26 OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.
27   2.  THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE
28 EMPLOYER TO COMMIT THE VIOLATION.
29   3.  THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE
30 LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO
31 COMMIT THE VIOLATION.

Senate Amendments to S.B. 1070

1        M.  AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS

2    PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT

3    OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO

4    COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR

5    THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY.  THE CONDUCT

6    OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING

7    IF AN EMPLOYER HAS PROVEN ENTRAPMENT."

8  Page 13, line 23, after "PERSON" insert "IS IN VIOLATION OF A CRIMINAL OFFENSE AND"

9  Page 14, between lines 31 and 32, insert:

10      "Sec. 9.  Title 41, chapter 12, article 2, Arizona Revised Statutes, is

11    amended by adding section 41-1724, to read:

12      41-1724.  Gang and immigration intelligence team enforcement

13            mission fund

14      THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION FUND IS

15    ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTION 11-1051 AND

16    MONIES APPROPRIATED BY THE LEGISLATURE.  THE DEPARTMENT SHALL ADMINISTER THE

17    FUND.  MONIES IN THE FUND ARE SUBJECT TO LEGISLATIVE APPROPRIATION AND SHALL

18    BE USED FOR GANG AND IMMIGRATION ENFORCEMENT AND FOR COUNTY JAIL

19    REIMBURSEMENT COSTS RELATING TO ILLEGAL IMMIGRATION."

20  Renumber to conform

21  Amend title to conform

1070rp
2/10/2010
4:41 PM
C: sp

Forty-ninth Legislature
Second Regular Session

COMMITTEE ON MILITARY AFFAIRS AND PUBLIC SAFETY

HOUSE OF REPRESENTATIVES AMENDMENTS TO S.B. 1070

(Reference to Senate engrossed bill)

1   Strike everything after the enacting clause and insert:

2           "Section 1.   Intent

3           The  legislature  finds  that  there  is  a  compelling  interest  in  the

4   cooperative  enforcement  of  federal  immigration  laws  throughout  all  of

5   Arizona.   The  legislature  declares  that  the  intent  of  this  act  is  to  make

6   attrition  through  enforcement  the  public  policy  of  all  state  and  local

7   government agencies in Arizona.  The provisions of this act are intended to

8   work together to discourage and deter the unlawful entry and presence of

9   aliens and economic activity by persons unlawfully present in the United

10  States.

11          Sec. 2.   Title 11, chapter 7, Arizona Revised Statutes, is amended by

12  adding article 8, to read:

13                  ARTICLE 8.   ENFORCEMENT OF IMMIGRATION LAWS

14          11-1051.   Cooperation   and   assistance   in   enforcement   of

15                      immigration laws; indemnification

16          A.   NO OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR

17  OTHER  POLITICAL  SUBDIVISION  OF  THIS  STATE  MAY  LIMIT  OR  RESTRICT  THE

18  ENFORCEMENT  OF  FEDERAL  IMMIGRATION  LAWS  TO  LESS  THAN  THE  FULL  EXTENT

19  PERMITTED BY FEDERAL LAW.

20          B.   FOR ANY LAWFUL CONTACT MADE BY A LAW ENFORCEMENT OFFICIAL OR AGENCY

21  OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS

22  STATE WHERE REASONABLE SUSPICION EXISTS THAT THE PERSON IS AN ALIEN WHO IS

23  UNLAWFULLY PRESENT IN THE UNITED STATES, A REASONABLE ATTEMPT SHALL BE MADE,

24  WHEN  PRACTICABLE,  TO  DETERMINE  THE  IMMIGRATION  STATUS  OF  THE  PERSON.   ANY

25  PERSON WHO IS ARRESTED SHALL HAVE THE PERSON'S IMMIGRATION STATUS DETERMINED

26  BEFORE  THE  PERSON  IS  RELEASED.    THE  PERSON'S  IMMIGRATION  STATUS  SHALL  BE

27  VERIFIED WITH THE FEDERAL GOVERNMENT PURSUANT TO 8 UNITED STATES CODE SECTION

28  1373(c).   A LAW ENFORCEMENT OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY,

House Amendments to S.B. 1070

1   CITY, TOWN OR OTHER POLITICAL SUBDIVISION OF THIS STATE MAY NOT SOLELY
2   CONSIDER RACE, COLOR OR NATIONAL ORIGIN IN IMPLEMENTING THE REQUIREMENTS OF
3   THIS SUBSECTION EXCEPT TO THE EXTENT PERMITTED BY THE UNITED STATES OR
4   ARIZONA CONSTITUTION.   A PERSON IS PRESUMED TO NOT BE AN ALIEN WHO IS
5   UNLAWFULLY PRESENT IN THE UNITED STATES IF THE PERSON PROVIDES TO THE LAW
6   ENFORCEMENT OFFICER OR AGENCY ANY OF THE FOLLOWING:
7        1.  A VALID ARIZONA DRIVER LICENSE.
8        2.  A VALID ARIZONA NONOPERATING IDENTIFICATION LICENSE.
9        3.  A TRIBAL ENROLLMENT CARD OR OTHER FORM OF TRIBAL IDENTIFICATION.
10       4.  A VALID UNITED STATES FEDERAL, STATE OR LOCAL GOVERNMENT ISSUED
11   IDENTIFICATION.
12       C.  IF AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES IS
13   CONVICTED OF A VIOLATION OF STATE OR LOCAL LAW, ON DISCHARGE FROM
14   IMPRISONMENT OR ASSESSMENT OF ANY FINE THAT IS IMPOSED, THE ALIEN SHALL BE
15   TRANSFERRED IMMEDIATELY TO THE CUSTODY OF THE UNITED STATES IMMIGRATION AND
16   CUSTOMS ENFORCEMENT OR THE UNITED STATES CUSTOMS AND BORDER PROTECTION.
17       D.  NOTWITHSTANDING ANY OTHER LAW, A LAW ENFORCEMENT AGENCY MAY
18   SECURELY TRANSPORT AN ALIEN WHO IS UNLAWFULLY PRESENT IN THE UNITED STATES
19   AND WHO IS IN THE AGENCY'S CUSTODY TO A FEDERAL FACILITY IN THIS STATE OR TO
20   ANY OTHER POINT OF TRANSFER INTO FEDERAL CUSTODY THAT IS OUTSIDE THE
21   JURISDICTION OF THE LAW ENFORCEMENT AGENCY.
22       E.  EXCEPT AS PROVIDED IN FEDERAL LAW, OFFICIALS OR AGENCIES OF THIS
23   STATE AND COUNTIES, CITIES, TOWNS AND OTHER POLITICAL SUBDIVISIONS OF THIS
24   STATE MAY NOT BE PROHIBITED OR IN ANY WAY BE RESTRICTED FROM SENDING,
25   RECEIVING OR MAINTAINING INFORMATION RELATING TO THE IMMIGRATION STATUS,
26   LAWFUL OR UNLAWFUL, OF ANY INDIVIDUAL OR EXCHANGING THAT INFORMATION WITH ANY
27   OTHER FEDERAL, STATE OR LOCAL GOVERNMENTAL ENTITY FOR THE FOLLOWING OFFICIAL
28   PURPOSES:
29       1.  DETERMINING ELIGIBILITY FOR ANY PUBLIC BENEFIT, SERVICE OR LICENSE
30   PROVIDED BY ANY FEDERAL, STATE, LOCAL OR OTHER POLITICAL SUBDIVISION OF THIS
31   STATE.

1      2.  VERIFYING ANY CLAIM OF RESIDENCE OR DOMICILE IF DETERMINATION OF
2    RESIDENCE OR DOMICILE IS REQUIRED UNDER THE LAWS OF THIS STATE OR A JUDICIAL
3    ORDER ISSUED PURSUANT TO A CIVIL OR CRIMINAL PROCEEDING IN THIS STATE.
4      3.  IF THE PERSON IS AN ALIEN, DETERMINING WHETHER THE PERSON IS IN
5    COMPLIANCE WITH THE FEDERAL REGISTRATION LAWS PRESCRIBED BY TITLE II, CHAPTER
6    7 OF THE FEDERAL IMMIGRATION AND NATIONALITY ACT.
7      4.  PURSUANT TO 8 UNITED STATES CODE SECTION 1373 AND 8 UNITED STATES
8    CODE SECTION 1644.
9      F.  A PERSON MAY BRING AN ACTION IN SUPERIOR COURT TO CHALLENGE ANY
10   OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR OTHER POLITICAL
11   SUBDIVISION OF THIS STATE THAT ADOPTS OR IMPLEMENTS A POLICY OR PRACTICE THAT
12   LIMITS OR RESTRICTS THE ENFORCEMENT OF FEDERAL IMMIGRATION LAWS TO LESS THAN
13   THE FULL EXTENT PERMITTED BY FEDERAL LAW.  IF THERE IS A JUDICIAL FINDING
14   THAT AN ENTITY HAS VIOLATED THIS SECTION, THE COURT SHALL ORDER ANY OF THE
15   FOLLOWING:
16     1.  THAT THE PERSON WHO BROUGHT THE ACTION RECOVER COURT COSTS AND
17   ATTORNEY FEES.
18     2.  THAT THE ENTITY PAY A CIVIL PENALTY OF NOT LESS THAN ONE THOUSAND
19   DOLLARS AND NOT MORE THAN FIVE THOUSAND DOLLARS FOR EACH DAY THAT THE POLICY
20   HAS REMAINED IN EFFECT AFTER THE FILING OF AN ACTION PURSUANT TO THIS
21   SUBSECTION.
22     G.  A COURT SHALL COLLECT THE CIVIL PENALTY PRESCRIBED IN SUBSECTION F
23   AND REMIT THE CIVIL PENALTY TO THE DEPARTMENT OF PUBLIC SAFETY FOR DEPOSIT IN
24   THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION FUND
25   ESTABLISHED BY SECTION 41-1724.
26     H.  EXCEPT IN RELATION TO MATTERS IN WHICH THE OFFICER IS ADJUDGED TO
27   HAVE ACTED IN BAD FAITH, A LAW ENFORCEMENT OFFICER IS INDEMNIFIED BY THE LAW
28   ENFORCEMENT OFFICER'S AGENCY AGAINST REASONABLE COSTS AND EXPENSES, INCLUDING
29   ATTORNEY FEES, INCURRED BY THE OFFICER IN CONNECTION WITH ANY ACTION, SUIT OR
30   PROCEEDING BROUGHT PURSUANT TO THIS SECTION TO WHICH THE OFFICER MAY BE A
31   PARTY BY REASON OF THE OFFICER BEING OR HAVING BEEN A MEMBER OF THE LAW
32   ENFORCEMENT AGENCY.

House Amendments to S.B. 1070

1    I. THIS SECTION SHALL BE IMPLEMENTED IN A MANNER CONSISTENT WITH
2    FEDERAL LAWS REGULATING IMMIGRATION, PROTECTING THE CIVIL RIGHTS OF ALL
3    PERSONS AND RESPECTING THE PRIVILEGES AND IMMUNITIES OF UNITED STATES
4    CITIZENS.
5    Sec. 3.  Title 13, chapter 15, Arizona Revised Statutes, is amended by
6    adding section 13-1509, to read:
7    13-1509.  Willful failure to complete or carry an alien
8    registration document; assessment; exception;
9    classification
10   A.  IN ADDITION TO ANY VIOLATION OF FEDERAL LAW, A PERSON IS GUILTY OF
11   WILLFUL FAILURE TO COMPLETE OR CARRY AN ALIEN REGISTRATION DOCUMENT IF THE
12   PERSON IS IN VIOLATION OF 8 UNITED STATES CODE SECTION 1304(e) OR 1306(a).
13   B.  IN THE ENFORCEMENT OF THIS SECTION, THE FINAL DETERMINATION OF AN
14   ALIEN'S IMMIGRATION STATUS SHALL BE DETERMINED BY EITHER:
15   1.  A LAW ENFORCEMENT OFFICER WHO IS AUTHORIZED BY THE FEDERAL
16   GOVERNMENT TO VERIFY OR ASCERTAIN AN ALIEN'S IMMIGRATION STATUS.
17   2.  THE UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT OR THE UNITED
18   STATES BORDER PROTECTION PURSUANT TO 8 UNITED STATES CODE SECTION 1373(c).
19   C.  A PERSON WHO IS SENTENCED PURSUANT TO THIS SECTION IS NOT ELIGIBLE
20   FOR SUSPENSION OR COMMUTATION OF SENTENCE OR RELEASE ON ANY BASIS UNTIL THE
21   SENTENCE IMPOSED IS SERVED.
22   D.  IN ADDITION TO ANY OTHER PENALTY PRESCRIBED BY LAW, THE COURT SHALL
23   ORDER THE PERSON TO PAY JAIL COSTS AND AN ADDITIONAL ASSESSMENT IN THE
24   FOLLOWING AMOUNTS:
25   1.  AT LEAST FIVE HUNDRED DOLLARS FOR A FIRST VIOLATION.
26   2.  TWICE THE AMOUNT SPECIFIED IN PARAGRAPH 1 OF THIS SUBSECTION IF THE
27   PERSON WAS PREVIOUSLY SUBJECT TO AN ASSESSMENT PURSUANT TO THIS SUBSECTION.
28   E.  A COURT SHALL COLLECT THE ASSESSMENTS PRESCRIBED IN SUBSECTION D OF
29   THIS SECTION AND REMIT THE ASSESSMENTS TO THE DEPARTMENT OF PUBLIC SAFETY,
30   WHICH SHALL ESTABLISH A SPECIAL SUBACCOUNT FOR THE MONIES IN THE ACCOUNT
31   ESTABLISHED FOR THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT
32   MISSION APPROPRIATION.  MONIES IN THE SPECIAL SUBACCOUNT ARE SUBJECT TO

House Amendments to S.B. 1070

1    LEGISLATIVE APPROPRIATION FOR DISTRIBUTION FOR GANG AND IMMIGRATION

2    ENFORCEMENT AND FOR COUNTY JAIL REIMBURSEMENT COSTS RELATING TO ILLEGAL

3    IMMIGRATION.

4    F.  THIS SECTION DOES NOT APPLY TO A PERSON WHO MAINTAINS AUTHORIZATION

5    FROM THE FEDERAL GOVERNMENT TO REMAIN IN THE UNITED STATES.

6    G.  A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR, EXCEPT THAT A

7    VIOLATION OF THIS SECTION IS:

8    1.  A CLASS 3 FELONY IF THE PERSON VIOLATES THIS SECTION WHILE IN

9    POSSESSION OF ANY OF THE FOLLOWING:

10    (a)  A DANGEROUS DRUG AS DEFINED IN SECTION 13-3401.

11    (b)  PRECURSOR CHEMICALS THAT ARE USED IN THE MANUFACTURING OF

12    METHAMPHETAMINE IN VIOLATION OF SECTION 13-3404.01.

13    (c)  A DEADLY WEAPON OR A DANGEROUS INSTRUMENT, AS DEFINED IN SECTION

14    13-105.

15    (d)  PROPERTY THAT IS USED FOR THE PURPOSE OF COMMITTING AN ACT OF

16    TERRORISM AS PRESCRIBED IN SECTION 13-2308.01.

17    2.  A CLASS 4 FELONY IF THE PERSON EITHER:

18    (a)  IS CONVICTED OF A SECOND OR SUBSEQUENT VIOLATION OF THIS SECTION.

19    (b)  WITHIN SIXTY MONTHS BEFORE THE VIOLATION, HAS BEEN REMOVED FROM

20    THE UNITED STATES PURSUANT TO 8 UNITED STATES CODE SECTION 1229a OR HAS

21    ACCEPTED A VOLUNTARY REMOVAL FROM THE UNITED STATES PURSUANT TO 8 UNITED

22    STATES CODE SECTION 1229c.

23    Sec. 4.  Section 13-2319, Arizona Revised Statutes, is amended to read:

24    13-2319.  Smuggling; classification; definitions

25    A.  It is unlawful for a person to intentionally engage in the

26    smuggling of human beings for profit or commercial purpose.

27    B.  A violation of this section is a class 4 felony.

28    C.  Notwithstanding subsection B of this section, a violation of this

29    section:

30    1.  Is a class 2 felony if the human being who is smuggled is under

31    eighteen years of age and is not accompanied by a family member over eighteen

House Amendments to S.B. 1070

1    years of age or the offense involved the use of a deadly weapon or dangerous
2    instrument.
3        2.  Is a class 3 felony if the offense involves the use or threatened
4    use of deadly physical force and the person is not eligible for suspension of
5    sentence, probation, pardon or release from confinement on any other basis
6    except pursuant to section 31-233, subsection A or B until the sentence
7    imposed by the court is served, the person is eligible for release pursuant
8    to section 41-1604.07 or the sentence is commuted.
9        D.  Chapter 10 of this title does not apply to a violation of
10   subsection C, paragraph 1 of this section.
11       E.  NOTWITHSTANDING ANY OTHER LAW, A PEACE OFFICER MAY LAWFULLY STOP
12   ANY PERSON WHO IS OPERATING A MOTOR VEHICLE IF THE OFFICER HAS REASONABLE
13   SUSPICION TO BELIEVE THE PERSON IS IN VIOLATION OF ANY CIVIL TRAFFIC LAW AND
14   THIS SECTION.
15       E.  F.  For the purposes of this section:
16       1.  "Family member" means the person's parent, grandparent, sibling or
17   any other person who is related to the person by consanguinity or affinity to
18   the second degree.
19       2.  "Procurement of transportation" means any participation in or
20   facilitation of transportation and includes:
21       (a)  Providing services that facilitate transportation including travel
22   arrangement services or money transmission services.
23       (b)  Providing property that facilitates transportation, including a
24   weapon, a vehicle or other means of transportation or false identification,
25   or selling, leasing, renting or otherwise making available a drop house as
26   defined in section 13-2322.
27       3.  "Smuggling of human beings" means the transportation, procurement
28   of transportation or use of property or real property by a person or an
29   entity that knows or has reason to know that the person or persons
30   transported or to be transported are not United States citizens, permanent
31   resident aliens or persons otherwise lawfully in this state or have attempted
32   to enter, entered or remained in the United States in violation of law.

| | |
|---|---|
| 1 | Sec. 5.  Title 13, chapter 29, Arizona Revised Statutes, is amended by |
| 2 | adding sections 13-2928 and 13-2929, to read: |
| 3 | 13-2928.  Unlawful stopping to hire and pick up passengers for |
| 4 | work; unlawful application, solicitation or |
| 5 | employment; classification; definitions |
| 6 | A.  IT IS UNLAWFUL FOR AN OCCUPANT OF A MOTOR VEHICLE THAT IS STOPPED |
| 7 | ON A STREET, ROADWAY OR HIGHWAY TO ATTEMPT TO HIRE OR HIRE AND PICK UP |
| 8 | PASSENGERS FOR WORK AT A DIFFERENT LOCATION IF THE MOTOR VEHICLE BLOCKS OR |
| 9 | IMPEDES THE NORMAL MOVEMENT OF TRAFFIC. |
| 10 | B.  IT IS UNLAWFUL FOR A PERSON TO ENTER A MOTOR VEHICLE THAT IS |
| 11 | STOPPED ON A STREET, ROADWAY OR HIGHWAY IN ORDER TO BE HIRED BY AN OCCUPANT |
| 12 | OF THE MOTOR VEHICLE AND TO BE TRANSPORTED TO WORK AT A DIFFERENT LOCATION IF |
| 13 | THE MOTOR VEHICLE BLOCKS OR IMPEDES THE NORMAL MOVEMENT OF TRAFFIC. |
| 14 | C.  IT IS UNLAWFUL FOR A PERSON WHO IS UNLAWFULLY PRESENT IN THE UNITED |
| 15 | STATES AND WHO IS AN UNAUTHORIZED ALIEN TO KNOWINGLY APPLY FOR WORK, SOLICIT |
| 16 | WORK IN A PUBLIC PLACE OR PERFORM WORK AS AN EMPLOYEE OR INDEPENDENT |
| 17 | CONTRACTOR IN THIS STATE. |
| 18 | D.  A VIOLATION OF THIS SECTION IS A CLASS 1 MISDEMEANOR. |
| 19 | E.  FOR THE PURPOSES OF THIS SECTION: |
| 20 | 1.  "SOLICIT" MEANS VERBAL OR NONVERBAL COMMUNICATION BY A GESTURE OR A |
| 21 | NOD THAT WOULD INDICATE TO A REASONABLE PERSON THAT A PERSON IS WILLING TO BE |
| 22 | EMPLOYED. |
| 23 | 2.  "UNAUTHORIZED ALIEN" MEANS AN ALIEN WHO DOES NOT HAVE THE LEGAL |
| 24 | RIGHT OR AUTHORIZATION UNDER FEDERAL LAW TO WORK IN THE UNITED STATES AS |
| 25 | DESCRIBED IN 8 UNITED STATES CODE SECTION 1324a(h)(3). |
| 26 | 13-2929.  Unlawful transporting, moving, concealing, harboring |
| 27 | or shielding of unlawful aliens; vehicle |
| 28 | impoundment; defense; classification |
| 29 | A.  IT IS UNLAWFUL FOR A PERSON TO: |
| 30 | 1.  TRANSPORT OR MOVE OR ATTEMPT TO TRANSPORT OR MOVE AN ALIEN IN THIS |
| 31 | STATE, IN FURTHERANCE OF THE ILLEGAL PRESENCE OF THE ALIEN IN THE UNITED |
| 32 | STATES, IN A MEANS OF TRANSPORTATION IF THE PERSON KNOWS OR RECKLESSLY |

1    DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE
2    UNITED STATES IN VIOLATION OF LAW.

3        2.   CONCEAL, HARBOR OR SHIELD OR ATTEMPT TO CONCEAL, HARBOR OR SHIELD
4    AN ALIEN FROM DETECTION IN ANY PLACE IN THIS STATE, INCLUDING ANY BUILDING OR
5    ANY MEANS OF TRANSPORTATION, IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE
6    FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE UNITED STATES
7    IN VIOLATION OF LAW.

8        3.   ENCOURAGE OR INDUCE AN ALIEN TO COME TO OR RESIDE IN THIS STATE IF
9    THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT SUCH COMING TO,
10   ENTERING OR RESIDING IN THIS STATE IS OR WILL BE IN VIOLATION OF LAW.

11       B.   A MEANS OF TRANSPORTATION THAT IS USED IN THE COMMISSION OF A
12   VIOLATION OF THIS SECTION IS SUBJECT TO MANDATORY VEHICLE IMMOBILIZATION OR
13   IMPOUNDMENT PURSUANT TO SECTION 28-3511.

14       C.   IT IS A DEFENSE TO A PROSECUTION FOR A VIOLATION OF THIS SECTION
15   THAT THE PERSON WAS PROVIDING OR ASSISTED IN PROVIDING EMERGENCY, PUBLIC
16   SAFETY OR PUBLIC HEALTH SERVICES OTHERWISE AVAILABLE TO THE GENERAL PUBLIC
17   WITHOUT REGARD TO INCOME.

18       D.   A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A CLASS 1
19   MISDEMEANOR AND IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND DOLLARS, EXCEPT
20   THAT A VIOLATION OF THIS SECTION THAT INVOLVES TEN OR MORE ILLEGAL ALIENS IS
21   A CLASS 6 FELONY AND THE PERSON IS SUBJECT TO A FINE OF AT LEAST ONE THOUSAND
22   DOLLARS FOR EACH ALIEN WHO IS INVOLVED.

23       Sec. 6.   Section 13-3883, Arizona Revised Statutes, is amended to read:

24       13-3883.   Arrest by officer without warrant

25       A.   A peace officer may, without a warrant, MAY arrest a person if he
26   THE OFFICER has probable cause to believe:

27       1.   A felony has been committed and probable cause to believe the
28   person to be arrested has committed the felony.

29       2.   A misdemeanor has been committed in his THE OFFICER'S presence and
30   probable cause to believe the person to be arrested has committed the
31   offense.

House Amendments to S.B. 1070

1    3.  The person to be arrested has been involved in a traffic accident
2    and violated any criminal section of title 28, and that such violation
3    occurred prior to or immediately following such traffic accident.

4    4.  A misdemeanor or a petty offense has been committed and probable
5    cause to believe the person to be arrested has committed the offense.  A
6    person arrested under this paragraph is eligible for release under section
7    13-3903.

8    5.  THE PERSON TO BE ARRESTED HAS COMMITTED ANY PUBLIC OFFENSE THAT
9    MAKES THE PERSON REMOVABLE FROM THE UNITED STATES.

10   B.  A peace officer may stop and detain a person as is reasonably
11   necessary to investigate an actual or suspected violation of any traffic law
12   committed in the officer's presence and may serve a copy of the traffic
13   complaint for any alleged civil or criminal traffic violation.  A peace
14   officer who serves a copy of the traffic complaint shall do so within a
15   reasonable time of the alleged criminal or civil traffic violation.

16   Sec. 7.  Section 23-212, Arizona Revised Statutes, is amended to read:

17   23-212.   Knowingly employing unauthorized aliens; prohibition;
18              false and frivolous complaints; violation;
19              classification; license suspension and revocation;
20              affirmative defense

21   A.  An employer shall not knowingly employ an unauthorized alien.  If,
22   in the case when an employer uses a contract, subcontract or other
23   independent contractor agreement to obtain the labor of an alien in this
24   state, the employer knowingly contracts with an unauthorized alien or with a
25   person who employs or contracts with an unauthorized alien to perform the
26   labor, the employer violates this subsection.

27   B.  The attorney general shall prescribe a complaint form for a person
28   to allege a violation of subsection A of this section.  The complainant shall
29   not be required to list the complainant's social security number on the
30   complaint form or to have the complaint form notarized.  On receipt of a
31   complaint on a prescribed complaint form that an employer allegedly knowingly
32   employs an unauthorized alien, the attorney general or county attorney shall

House Amendments to S.B. 1070

1     investigate whether the employer has violated subsection A of this section.
2     If a complaint is received but is not submitted on a prescribed complaint
3     form, the attorney general or county attorney may investigate whether the
4     employer has violated subsection A of this section.  This subsection shall
5     not be construed to prohibit the filing of anonymous complaints that are not
6     submitted on a prescribed complaint form.  The attorney general or county
7     attorney shall not investigate complaints that are based solely on race,
8     color or national origin.  A complaint that is submitted to a county attorney
9     shall be submitted to the county attorney in the county in which the alleged
10    unauthorized alien is or was employed by the employer.  The county sheriff or
11    any other local law enforcement agency may assist in investigating a
12    complaint.  When investigating a complaint, the attorney general or county
13    attorney shall verify the work authorization of the alleged unauthorized
14    alien with the federal government pursuant to 8 United States Code section
15    1373(c).  A state, county or local official shall not attempt to
16    independently make a final determination on whether an alien is authorized to
17    work in the United States.  An alien's immigration status or work
18    authorization status shall be verified with the federal government pursuant
19    to 8 United States Code section 1373(c).  A person who knowingly files a
20    false and frivolous complaint under this subsection is guilty of a class 3
21    misdemeanor.
22        C.  If, after an investigation, the attorney general or county attorney
23    determines that the complaint is not false and frivolous:
24        1.  The attorney general or county attorney shall notify the United
25    States immigration and customs enforcement of the unauthorized alien.
26        2.  The attorney general or county attorney shall notify the local law
27    enforcement agency of the unauthorized alien.
28        3.  The attorney general shall notify the appropriate county attorney
29    to bring an action pursuant to subsection D of this section if the complaint
30    was originally filed with the attorney general.

House Amendments to S.B. 1070

1    D.  An action for a violation of subsection A of this section shall be
2    brought against the employer by the county attorney in the county where the
3    unauthorized alien employee is or was employed by the employer.  The county
4    attorney shall not bring an action against any employer for any violation of
5    subsection A of this section that occurs before January 1, 2008.  A second
6    violation of this section shall be based only on an unauthorized alien who is
7    or was employed by the employer after an action has been brought for a
8    violation of subsection A of this section or section 23-212.01, subsection A.
9    E.  For any action in superior court under this section, the court
10   shall expedite the action, including assigning the hearing at the earliest
11   practicable date.
12   F.  On a finding of a violation of subsection A of this section:
13   1.  For a first violation, as described in paragraph 3 of this
14   subsection, the court:
15   (a)  Shall order the employer to terminate the employment of all
16   unauthorized aliens.
17   (b)  Shall order the employer to be subject to a three year
18   probationary period for the business location where the unauthorized alien
19   performed work.  During the probationary period the employer shall file
20   quarterly reports in the form provided in section 23-722.01 with the county
21   attorney of each new employee who is hired by the employer at the business
22   location where the unauthorized alien performed work.
23   (c)  Shall order the employer to file a signed sworn affidavit with the
24   county attorney within three business days after the order is issued.  The
25   affidavit shall state that the employer has terminated the employment of all
26   unauthorized aliens in this state and that the employer will not
27   intentionally or knowingly employ an unauthorized alien in this state.  The
28   court shall order the appropriate agencies to suspend all licenses subject to
29   this subdivision that are held by the employer if the employer fails to file
30   a signed sworn affidavit with the county attorney within three business days
31   after the order is issued.  All licenses that are suspended under this
32   subdivision shall remain suspended until the employer files a signed sworn

-11-

House Amendments to S.B. 1070

1    affidavit with the county attorney.  Notwithstanding any other law, on filing
2    of the affidavit the suspended licenses shall be reinstated immediately by
3    the appropriate agencies.  For the purposes of this subdivision, the licenses
4    that are subject to suspension under this subdivision are all licenses that
5    are held by the employer specific to the business location where the
6    unauthorized alien performed work.  If the employer does not hold a license
7    specific to the business location where the unauthorized alien performed
8    work, but a license is necessary to operate the employer's business in
9    general, the licenses that are subject to suspension under this subdivision
10   are all licenses that are held by the employer at the employer's primary
11   place of business.  On receipt of the court's order and notwithstanding any
12   other law, the appropriate agencies shall suspend the licenses according to
13   the court's order.  The court shall send a copy of the court's order to the
14   attorney general and the attorney general shall maintain the copy pursuant to
15   subsection G of this section.

16       (d)  May order the appropriate agencies to suspend all licenses
17   described in subdivision (c) of this paragraph that are held by the employer
18   for not to exceed ten business days.  The court shall base its decision to
19   suspend under this subdivision on any evidence or information submitted to it
20   during the action for a violation of this subsection and shall consider the
21   following factors, if relevant:

22       (i)  The number of unauthorized aliens employed by the employer.

23       (ii)  Any prior misconduct by the employer.

24       (iii)  The degree of harm resulting from the violation.

25       (iv)  Whether the employer made good faith efforts to comply with any
26   applicable requirements.

27       (v)  The duration of the violation.

28       (vi)  The role of the directors, officers or principals of the employer
29   in the violation.

30       (vii)  Any other factors the court deems appropriate.

31       2.  For a second violation, as described in paragraph 3 of this
32   subsection, the court shall order the appropriate agencies to permanently

-12-

House Amendments to S.B. 1070

1     revoke all licenses that are held by the employer specific to the business
2     location where the unauthorized alien performed work.  If the employer does
3     not hold a license specific to the business location where the unauthorized
4     alien performed work, but a license is necessary to operate the employer's
5     business in general, the court shall order the appropriate agencies to
6     permanently revoke all licenses that are held by the employer at the
7     employer's primary place of business. On receipt of the order and
8     notwithstanding any other law, the appropriate agencies shall immediately
9     revoke the licenses.

10     3.  The violation shall be considered:

11     (a)  A first violation by an employer at a business location if the
12     violation did not occur during a probationary period ordered by the court
13     under this subsection or section 23-212.01, subsection F for that employer's
14     business location.

15     (b)  A second violation by an employer at a business location if the
16     violation occurred during a probationary period ordered by the court under
17     this subsection or section 23-212.01, subsection F for that employer's
18     business location.

19     G.  The attorney general shall maintain copies of court orders that are
20     received pursuant to subsection F of this section and shall maintain a
21     database of the employers and business locations that have a first violation
22     of subsection A of this section and make the court orders available on the
23     attorney general's website.

24     H.  On determining whether an employee is an unauthorized alien, the
25     court shall consider only the federal government's determination pursuant to
26     8 United States Code section 1373(c). The federal government's determination
27     creates a rebuttable presumption of the employee's lawful status.  The court
28     may take judicial notice of the federal government's determination and may
29     request the federal government to provide automated or testimonial
30     verification pursuant to 8 United States Code section 1373(c).

House Amendments to S.B. 1070

1         I.  For the purposes of this section, proof of verifying the employment

2    authorization of an employee through the e-verify program creates a

3    rebuttable presumption that an employer did not knowingly employ an

4    unauthorized alien.

5         J.  For the purposes of this section, an employer that establishes that

6    it has complied in good faith with the requirements of 8 United States Code

7    section 1324a(b) establishes an affirmative defense that the employer did not

8    knowingly employ an unauthorized alien.  An employer is considered to have

9    complied with the requirements of 8 United States Code section 1324a(b),

10    notwithstanding an isolated, sporadic or accidental technical or procedural

11    failure to meet the requirements, if there is a good faith attempt to comply

12    with the requirements.

13         K.  IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF THIS

14    SECTION THAT THE EMPLOYER WAS ENTRAPPED.  TO CLAIM ENTRAPMENT, THE EMPLOYER

15    MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE SUBSTANTIAL

16    ELEMENTS OF THE VIOLATION.  AN EMPLOYER WHO ASSERTS AN ENTRAPMENT DEFENSE HAS

17    THE BURDEN OF PROVING THE FOLLOWING BY CLEAR AND CONVINCING EVIDENCE:

18         1.  THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT

19    OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.

20         2.  THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE

21    EMPLOYER TO COMMIT THE VIOLATION.

22         3.  THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE

23    LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO

24    COMMIT THE VIOLATION.

25         L.  AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS

26    PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT

27    OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO

28    COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR

29    THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY.  THE CONDUCT

30    OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING

31    IF AN EMPLOYER HAS PROVEN ENTRAPMENT.

House Amendments to S.B. 1070

1    Sec. 8.  Section 23-212.01, Arizona Revised Statutes, is amended to
2    read:
3         23-212.01.  Intentionally  employing  unauthorized  aliens;
4                     prohibition;  false  and  frivolous  complaints;
5                     violation; classification; license suspension and
6                     revocation; affirmative defense
7         A.  An employer shall not intentionally employ an unauthorized alien.
8    If, in the case when an employer uses a contract, subcontract or other
9    independent contractor agreement to obtain the labor of an alien in this
10   state, the employer intentionally contracts with an unauthorized alien or
11   with a person who employs or contracts with an unauthorized alien to perform
12   the labor, the employer violates this subsection.
13        B.  The attorney general shall prescribe a complaint form for a person
14   to allege a violation of subsection A of this section.  The complainant shall
15   not be required to list the complainant's social security number on the
16   complaint form or to have the complaint form notarized.  On receipt of a
17   complaint  on  a  prescribed  complaint  form  that  an  employer  allegedly
18   intentionally employs an unauthorized alien, the attorney general or county
19   attorney shall investigate whether the employer has violated subsection A of
20   this  section.  If  a  complaint  is  received  but  is  not  submitted  on  a
21   prescribed  complaint  form,  the  attorney  general  or  county  attorney  may
22   investigate whether the employer has violated subsection A of this section.
23   This subsection shall not be construed to prohibit the filing of anonymous
24   complaints  that  are  not  submitted  on  a  prescribed  complaint  form.  The
25   attorney general or county attorney shall not investigate complaints that are
26   based  solely  on  race,  color  or  national  origin.  A  complaint  that  is
27   submitted to a county attorney shall be submitted to the county attorney in
28   the county in which the alleged unauthorized alien is or was employed by the
29   employer.  The county sheriff or any other local law enforcement agency may
30   assist in investigating a complaint.  When investigating a complaint, the
31   attorney general or county attorney shall verify the work authorization of
32   the  alleged  unauthorized  alien  with  the  federal  government  pursuant  to

House Amendments to S.B. 1070

1   8 United States Code section 1373(c).  A state, county or local official
2   shall not attempt to independently make a final determination on whether an
3   alien is authorized to work in the United States.  An alien's immigration
4   status or work authorization status shall be verified with the federal
5   government pursuant to 8 United States Code section 1373(c).  A person who
6   knowingly files a false and frivolous complaint under this subsection is
7   guilty of a class 3 misdemeanor.

8       C.  If, after an investigation, the attorney general or county attorney
9   determines that the complaint is not false and frivolous:

10      1.  The attorney general or county attorney shall notify the United
11  States immigration and customs enforcement of the unauthorized alien.

12      2.  The attorney general or county attorney shall notify the local law
13  enforcement agency of the unauthorized alien.

14      3.  The attorney general shall notify the appropriate county attorney
15  to bring an action pursuant to subsection D of this section if the complaint
16  was originally filed with the attorney general.

17      D.  An action for a violation of subsection A of this section shall be
18  brought against the employer by the county attorney in the county where the
19  unauthorized alien employee is or was employed by the employer.  The county
20  attorney shall not bring an action against any employer for any violation of
21  subsection A of this section that occurs before January 1, 2008. A second
22  violation of this section shall be based only on an unauthorized alien who is
23  or was employed by the employer after an action has been brought for a
24  violation of subsection A of this section or section 23-212, subsection A.

25      E.  For any action in superior court under this section, the court
26  shall expedite the action, including assigning the hearing at the earliest
27  practicable date.

28      F.  On a finding of a violation of subsection A of this section:

29      1.  For a first violation, as described in paragraph 3 of this
30  subsection, the court shall:

31      (a)  Order the employer to terminate the employment of all unauthorized
32  aliens.

House Amendments to S.B. 1070

1     (b)  Order the employer to be subject to a five year probationary
2     period for the business location where the unauthorized alien performed work.
3     During the probationary period the employer shall file quarterly reports in
4     the form provided in section 23-722.01 with the county attorney of each new
5     employee who is hired by the employer at the business location where the
6     unauthorized alien performed work.
7     (c)  Order the appropriate agencies to suspend all licenses described
8     in subdivision (d) of this paragraph that are held by the employer for a
9     minimum of ten days.  The court shall base its decision on the length of the
10    suspension under this subdivision on any evidence or information submitted to
11    it during the action for a violation of this subsection and shall consider
12    the following factors, if relevant:
13    (i)  The number of unauthorized aliens employed by the employer.
14    (ii)  Any prior misconduct by the employer.
15    (iii)  The degree of harm resulting from the violation.
16    (iv)  Whether the employer made good faith efforts to comply with any
17    applicable requirements.
18    (v)  The duration of the violation.
19    (vi)  The role of the directors, officers or principals of the employer
20    in the violation.
21    (vii)  Any other factors the court deems appropriate.
22    (d)  Order the employer to file a signed sworn affidavit with the
23    county attorney.  The affidavit shall state that the employer has terminated
24    the employment of all unauthorized aliens in this state and that the employer
25    will not intentionally or knowingly employ an unauthorized alien in this
26    state.  The court shall order the appropriate agencies to suspend all
27    licenses subject to this subdivision that are held by the employer if the
28    employer fails to file a signed sworn affidavit with the county attorney
29    within three business days after the order is issued.  All licenses that are
30    suspended under this subdivision for failing to file a signed sworn affidavit
31    shall remain suspended until the employer files a signed sworn affidavit with
32    the county attorney.  For the purposes of this subdivision, the licenses that

House Amendments to S.B. 1070

1    are subject to suspension under this subdivision are all licenses that are
2    held by the employer specific to the business location where the unauthorized
3    alien performed work.  If the employer does not hold a license specific to
4    the business location where the unauthorized alien performed work, but a
5    license is necessary to operate the employer's business in general, the
6    licenses that are subject to suspension under this subdivision are all
7    licenses that are held by the employer at the employer's primary place of
8    business. On receipt of the court's order and notwithstanding any other law,
9    the appropriate agencies shall suspend the licenses according to the court's
10   order.  The court shall send a copy of the court's order to the attorney
11   general and the attorney general shall maintain the copy pursuant to
12   subsection G of this section.

13       2.  For a second violation, as described in paragraph 3 of this
14   subsection, the court shall order the appropriate agencies to permanently
15   revoke all licenses that are held by the employer specific to the business
16   location where the unauthorized alien performed work.  If the employer does
17   not hold a license specific to the business location where the unauthorized
18   alien performed work, but a license is necessary to operate the employer's
19   business in general, the court shall order the appropriate agencies to
20   permanently revoke all licenses that are held by the employer at the
21   employer's primary place of business. On receipt of the order and
22   notwithstanding any other law, the appropriate agencies shall immediately
23   revoke the licenses.

24       3.  The violation shall be considered:

25       (a)  A first violation by an employer at a business location if the
26   violation did not occur during a probationary period ordered by the court
27   under this subsection or section 23-212, subsection F for that employer's
28   business location.

29       (b)  A second violation by an employer at a business location if the
30   violation occurred during a probationary period ordered by the court under
31   this subsection or section 23-212, subsection F for that employer's business
32   location.

House Amendments to S.B. 1070

1       G.   The attorney general shall maintain copies of court orders that are
2   received pursuant to subsection F of this section and shall maintain a
3   database of the employers and business locations that have a first violation
4   of subsection A of this section and make the court orders available on the
5   attorney general's website.

6       H.   On determining whether an employee is an unauthorized alien, the
7   court shall consider only the federal government's determination pursuant to
8   8 United States Code section 1373(c).  The federal government's determination
9   creates a rebuttable presumption of the employee's lawful status.  The court
10  may take judicial notice of the federal government's determination and may
11  request the federal government to provide automated or testimonial
12  verification pursuant to 8 United States Code section 1373(c).

13      I.   For the purposes of this section, proof of verifying the employment
14  authorization of an employee through the e-verify program creates a
15  rebuttable presumption that an employer did not intentionally employ an
16  unauthorized alien.

17      J.   For the purposes of this section, an employer that establishes that
18  it has complied in good faith with the requirements of 8 United States Code
19  section 1324a(b) establishes an affirmative defense that the employer did not
20  intentionally employ an unauthorized alien.  An employer is considered to
21  have complied with the requirements of 8 United States Code section 1324a(b),
22  notwithstanding an isolated, sporadic or accidental technical or procedural
23  failure to meet the requirements, if there is a good faith attempt to comply
24  with the requirements.

25      K.   IT IS AN AFFIRMATIVE DEFENSE TO A VIOLATION OF SUBSECTION A OF THIS
26  SECTION THAT THE EMPLOYER WAS ENTRAPPED.  TO CLAIM ENTRAPMENT, THE EMPLOYER
27  MUST ADMIT BY THE EMPLOYER'S TESTIMONY OR OTHER EVIDENCE THE SUBSTANTIAL
28  ELEMENTS OF THE VIOLATION.  AN EMPLOYER WHO ASSERTS AN ENTRAPMENT DEFENSE HAS
29  THE BURDEN OF PROVING THE FOLLOWING BY CLEAR AND CONVINCING EVIDENCE:

30      1.   THE IDEA OF COMMITTING THE VIOLATION STARTED WITH LAW ENFORCEMENT
31  OFFICERS OR THEIR AGENTS RATHER THAN WITH THE EMPLOYER.

House Amendments to S.B. 1070

1        2.  THE LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE

2    EMPLOYER TO COMMIT THE VIOLATION.

3        3.  THE EMPLOYER WAS NOT PREDISPOSED TO COMMIT THE VIOLATION BEFORE THE

4    LAW ENFORCEMENT OFFICERS OR THEIR AGENTS URGED AND INDUCED THE EMPLOYER TO

5    COMMIT THE VIOLATION.

6        L.  AN EMPLOYER DOES NOT ESTABLISH ENTRAPMENT IF THE EMPLOYER WAS

7    PREDISPOSED TO VIOLATE SUBSECTION A OF THIS SECTION AND THE LAW ENFORCEMENT

8    OFFICERS OR THEIR AGENTS MERELY PROVIDED THE EMPLOYER WITH AN OPPORTUNITY TO

9    COMMIT THE VIOLATION. IT IS NOT ENTRAPMENT FOR LAW ENFORCEMENT OFFICERS OR

10    THEIR AGENTS MERELY TO USE A RUSE OR TO CONCEAL THEIR IDENTITY.  THE CONDUCT

11    OF LAW ENFORCEMENT OFFICERS AND THEIR AGENTS MAY BE CONSIDERED IN DETERMINING

12    IF AN EMPLOYER HAS PROVEN ENTRAPMENT.

13        Sec. 9.  Section 23-214, Arizona Revised Statutes, is amended to read:

14        23-214.  Verification of employment eligibility; e-verify

15                program; economic development incentives; list of

16                registered employers

17        A.  After December 31, 2007, every employer, after hiring an employee,

18    shall verify the employment eligibility of the employee through the e-verify

19    program AND SHALL KEEP A RECORD OF THE VERIFICATION FOR THE DURATION OF THE

20    EMPLOYEE'S EMPLOYMENT OR AT LEAST THREE YEARS, WHICHEVER IS LONGER.

21        B.  In addition to any other requirement for an employer to receive an

22    economic development incentive from a government entity, the employer shall

23    register with and participate in the e-verify program.  Before receiving the

24    economic development incentive, the employer shall provide proof to the

25    government entity that the employer is registered with and is participating

26    in the e-verify program.  If the government entity determines that the

27    employer is not complying with this subsection, the government entity shall

28    notify the employer by certified mail of the government entity's

29    determination of noncompliance and the employer's right to appeal the

30    determination. On a final determination of noncompliance, the employer shall

31    repay all monies received as an economic development incentive to the

House Amendments to S.B. 1070

1    government entity within thirty days of the final determination.  For the
2    purposes of this subsection:
3        1.  "Economic development incentive" means any grant, loan or
4    performance-based incentive from any government entity that is awarded after
5    September 30, 2008.  Economic development incentive does not include any tax
6    provision under title 42 or 43.
7        2.  "Government entity" means this state and any political subdivision
8    of this state that receives and uses tax revenues.
9        C.  Every three months the attorney general shall request from the
10   United States department of homeland security a list of employers from this
11   state that are registered with the e-verify program.  On receipt of the list
12   of employers, the attorney general shall make the list available on the
13   attorney general's website.
14       Sec. 10.  Section 28-3511, Arizona Revised Statutes, is amended to
15   read:
16       28-3511.  Removal and immobilization or impoundment of vehicle
17       A.  A peace officer shall cause the removal and either immobilization
18   or impoundment of a vehicle if the peace officer determines that a person is
19   driving the vehicle while any of the following applies:
20       1.  The person's driving privilege is suspended or revoked for any
21   reason.
22       2.  The person has not ever been issued a valid driver license or
23   permit by this state and the person does not produce evidence of ever having
24   a valid driver license or permit issued by another jurisdiction.  This
25   paragraph does not apply to the operation of an implement of husbandry.
26       3.  The person is subject to an ignition interlock device requirement
27   pursuant to chapter 4 of this title and the person is operating a vehicle
28   without a functioning certified ignition interlock device.  This paragraph
29   does not apply to a person operating an employer's vehicle or the operation
30   of a vehicle due to a substantial emergency as defined in section 28-1464.
31       4.  IN FURTHERANCE OF THE ILLEGAL PRESENCE OF AN ALIEN IN THE UNITED
32   STATES, THE PERSON IS TRANSPORTING OR MOVING OR ATTEMPTING TO TRANSPORT OR

House Amendments to S.B. 1070

1    MOVE AN ALIEN IN THIS STATE IN A VEHICLE IF THE PERSON KNOWS OR RECKLESSLY
2    DISREGARDS THE FACT THAT THE ALIEN HAS COME TO, HAS ENTERED OR REMAINS IN THE
3    UNITED STATES IN VIOLATION OF LAW.
4        5.  THE PERSON IS CONCEALING, HARBORING OR SHIELDING OR ATTEMPTING TO
5    CONCEAL, HARBOR OR SHIELD FROM DETECTION AN ALIEN IN THIS STATE IN A VEHICLE
6    IF THE PERSON KNOWS OR RECKLESSLY DISREGARDS THE FACT THAT THE ALIEN HAS COME
7    TO, ENTERED OR REMAINS IN THE UNITED STATES IN VIOLATION OF LAW.
8        B.  A peace officer shall cause the removal and impoundment of a
9    vehicle if the peace officer determines that a person is driving the vehicle
10   and if all of the following apply:
11       1.  The person's driving privilege is canceled, suspended or revoked
12   for any reason or the person has not ever been issued a driver license or
13   permit by this state and the person does not produce evidence of ever having
14   a driver license or permit issued by another jurisdiction.
15       2.  The person is not in compliance with the financial responsibility
16   requirements of chapter 9, article 4 of this title.
17       3.  The person is driving a vehicle that is involved in an accident
18   that results in either property damage or injury to or death of another
19   person.
20       C.  Except as provided in subsection D of this section, while a peace
21   officer has control of the vehicle the peace officer shall cause the removal
22   and either immobilization or impoundment of the vehicle if the peace officer
23   has probable cause to arrest the driver of the vehicle for a violation of
24   section 4-244, paragraph 34 or section 28-1382 or 28-1383.
25       D.  A peace officer shall not cause the removal and either the
26   immobilization or impoundment of a vehicle pursuant to subsection C of this
27   section if all of the following apply:
28       1.  The peace officer determines that the vehicle is currently
29   registered and that the driver or the vehicle is in compliance with the
30   financial responsibility requirements of chapter 9, article 4 of this title.
31       2.  The spouse of the driver is with the driver at the time of the
32   arrest.

House Amendments to S.B. 1070

1    3.  The peace officer has reasonable grounds to believe that the spouse
2    of the driver:
3    (a)  Has a valid driver license.
4    (b)  Is not impaired by intoxicating liquor, any drug, a vapor
5    releasing substance containing a toxic substance or any combination of
6    liquor, drugs or vapor releasing substances.
7    (c)  Does not have any spirituous liquor in the spouse's body if the
8    spouse is under twenty-one years of age.
9    4.  The spouse notifies the peace officer that the spouse will drive
10   the vehicle from the place of arrest to the driver's home or other place of
11   safety.
12   5.  The spouse drives the vehicle as prescribed by paragraph 4 of this
13   subsection.
14   E.  Except as otherwise provided in this article, a vehicle that is
15   removed and either immobilized or impounded pursuant to subsection A, B or C
16   of this section shall be immobilized or impounded for thirty days.  An
17   insurance company does not have a duty to pay any benefits for charges or
18   fees for immobilization or impoundment.
19   F.  The owner of a vehicle that is removed and either immobilized or
20   impounded pursuant to subsection A, B or C of this section, the spouse of the
21   owner and each person identified on the department's record with an interest
22   in the vehicle shall be provided with an opportunity for an immobilization or
23   poststorage hearing pursuant to section 28-3514.
24   Sec. 11.  Title 41, chapter 12, article 2, Arizona Revised Statutes, is
25   amended by adding section 41-1724, to read:
26   41-1724.  Gang and immigration intelligence team enforcement
27              mission fund
28   THE GANG AND IMMIGRATION INTELLIGENCE TEAM ENFORCEMENT MISSION FUND IS
29   ESTABLISHED CONSISTING OF MONIES DEPOSITED PURSUANT TO SECTION 11-1051 AND
30   MONIES APPROPRIATED BY THE LEGISLATURE.  THE DEPARTMENT SHALL ADMINISTER THE
31   FUND.  MONIES IN THE FUND ARE SUBJECT TO LEGISLATIVE APPROPRIATION AND SHALL

House Amendments to S.B. 1070

1    BE USED FOR GANG AND IMMIGRATION ENFORCEMENT AND FOR COUNTY JAIL
2    REIMBURSEMENT COSTS RELATING TO ILLEGAL IMMIGRATION.
3         Sec. 12.   Severability, implementation and construction
4         A.  If a provision of this act or its application to any person or
5    circumstance is held invalid, the invalidity does not affect other provisions
6    or applications of the act that can be given effect without the invalid
7    provision or application, and to this end the provisions of this act are
8    severable.
9         B.  The terms of this act regarding immigration shall be construed to
10   have the meanings given to them under federal immigration law.
11        C.  This act shall be implemented in a manner consistent with federal
12   laws regulating immigration, protecting the civil rights of all persons and
13   respecting the privileges and immunities of United States citizens.
14        D.  Nothing in this act shall implement or shall be construed or
15   interpreted to implement or establish the REAL ID act of 2005 (P.L. 109-13,
16   division B; 119 Stat. 302) including the use of a radio frequency
17   identification chip.
18        Sec. 13.   Short title
19        This act may be cited as the "Support Our Law Enforcement and Safe
20   Neighborhoods Act"."
21   Amend title to conform

     and, as so amended, it do pass


                                   DAVID M. GOWAN, SR.
                                   Vice-Chairman


     1070-se-maps
     3/31/10
     H:jmb

     1070dg
     03/29/2010
     3:35 PM
     C: sp

Forty-ninth Legislature                                    Biggs
Second Regular Session                                  S.B. 1070

BIGGS FLOOR AMENDMENT

HOUSE OF REPRESENTATIVES AMENDMENTS TO S.B. 1070

(Reference to the MILITARY AFFAIRS AND PUBLIC SAFETY Committee amendment)

1   Page 1, line 20, after "OR" insert "A LAW ENFORCEMENT"

2   Line 21, after "A" insert "LAW ENFORCEMENT OFFICIAL OR A LAW ENFORCEMENT AGENCY

3       OF A"

4   Line 24, after "PERSON" insert ", EXCEPT IF THE DETERMINATION MAY HINDER OR

5       OBSTRUCT AN INVESTIGATION"

6   Page 2, line 9, after "A" insert "VALID"

7   Line 10, strike "A" insert "IF THE ENTITY REQUIRES PROOF OF LEGAL PRESENCE IN

8       THE UNITED STATES BEFORE ISSUANCE, ANY"

9   Line 14, after "OR" insert "ON THE"; strike "FINE" insert "MONETARY OBLIGATION";

10      after the comma strike remainder of line

11  Line 15, strike "TRANSFERRED IMMEDIATELY TO THE CUSTODY OF"

12  Line 16, after "PROTECTION" insert "SHALL BE IMMEDIATELY NOTIFIED"

13  Line 18, after "WHO" insert "THE AGENCY HAS RECEIVED VERIFICATION"

14  Line 21, after the period insert "A LAW ENFORCEMENT AGENCY SHALL OBTAIN JUDICIAL

15      AUTHORIZATION BEFORE SECURELY TRANSPORTING AN ALIEN WHO IS UNLAWFULLY PRESENT

16      IN THE UNITED STATES TO A POINT OF TRANSFER THAT IS OUTSIDE OF THIS STATE."

17  Page 3, between lines 8 and 9, insert:

18          "F.  THIS SECTION DOES NOT IMPLEMENT, AUTHORIZE OR ESTABLISH AND SHALL

19      NOT BE CONSTRUED TO IMPLEMENT, AUTHORIZE OR ESTABLISH THE REAL ID ACT OF 2005

20      (P.L. 109-13, DIVISION B; 119 STAT. 302), INCLUDING THE USE OF A RADIO

21      FREQUENCY IDENTIFICATION CHIP."

22  Reletter to conform

23  Line 9, after "PERSON" insert "WHO IS A LEGAL RESIDENT OF THIS STATE"

24  Lines 14 and 15, strike "ANY OF THE FOLLOWING:"

25  Strike lines 16 and 17

26  Line 18, strike "2."

27  Line 22, strike "F" insert "G OF THIS SECTION"

House Amendments to S.B. 1070

1   Page 3, line 23, strike "DEPARTMENT OF PUBLIC SAFETY" insert "STATE TREASURER"

2   Between lines 25 and 26, insert:

3          "I.  THE COURT MAY AWARD COURT COSTS AND REASONABLE ATTORNEY FEES TO

4   ANY PERSON OR ANY OFFICIAL OR AGENCY OF THIS STATE OR A COUNTY, CITY, TOWN OR

5   OTHER POLITICAL SUBDIVISION OF THIS STATE THAT PREVAILS BY AN ADJUDICATION ON

6   THE MERITS IN A PROCEEDING BROUGHT PURSUANT TO THIS SECTION."

7   Reletter to conform

8   Line 30, strike the second "TO" insert "IN"

9   Line 31, strike "PARTY" insert "DEFENDANT"

10  Page 4, line 8, after "exception;" insert "authenticated records;"

11  Line 13, strike "THE FINAL DETERMINATION OF"

12  Line 14, strike "SHALL" insert "MAY"; strike "EITHER"

13  Line 18, after the first "STATES" insert "CUSTOMS AND"

14  Line 20, after "SUSPENSION" strike remainder of line

15  Strike line 21, insert "OF SENTENCE, PROBATION, PARDON, COMMUTATION OF SENTENCE,

16  OR RELEASE FROM CONFINEMENT ON ANY BASIS EXCEPT AS AUTHORIZED BY SECTION

17  31-233, SUBSECTION A OR B UNTIL THE SENTENCE IMPOSED BY THE COURT HAS BEEN

18  SERVED OR THE PERSON IS ELIGIBLE FOR RELEASE PURSUANT TO SECTION 41-1604.07."

19  Page 5, between lines 5 and 6, insert:

20          "G.  ANY RECORD THAT RELATES TO THE IMMIGRATION STATUS OF A PERSON IS

21  ADMISSIBLE IN ANY COURT WITHOUT FURTHER FOUNDATION OR TESTIMONY FROM A

22  CUSTODIAN OF RECORDS IF THE RECORD IS CERTIFIED AS AUTHENTIC BY THE

23  GOVERNMENT AGENCY THAT IS RESPONSIBLE FOR MAINTAINING THE RECORD."

24  Reletter to conform

25  Page 6, line 11, after the comma insert "IN THE ENFORCEMENT OF THIS SECTION"

26  Lines 13 and 14, strike "AND THIS SECTION"

27  Page 7, line 28, strike "defense" insert "exception"

28  Line 29, after "PERSON" insert "WHO IS IN VIOLATION OF A CRIMINAL OFFENSE"

29  Page 8, strike lines 14 through 17, insert:

30          "C.  THIS SECTION DOES NOT APPLY TO A CHILD PROTECTIVE SERVICES WORKER

31  ACTING IN THE WORKER'S OFFICIAL CAPACITY OR A PERSON WHO IS ACTING IN THE

32  CAPACITY OF A FIRST RESPONDER, AN AMBULANCE ATTENDANT OR AN EMERGENCY MEDICAL

House Amendments to S.B. 1070

1         TECHNICIAN AND WHO IS TRANSPORTING OR MOVING AN ALIEN IN THIS STATE PURSUANT

2         TO TITLE 36, CHAPTER 21.1."

3  Page 14, line 17, strike "CLEAR AND CONVINCING" insert "A PREPONDERANCE OF THE"

4  Page 19, line 29, strike "CLEAR AND CONVINCING" insert "A PREPONDERANCE OF THE"

5  Page 21, line 32, after "STATES" insert "AND IN VIOLATION OF A CRIMINAL OFFENSE"

6  Amend title to conform

_____

ANDY BIGGS

1070ab
04/13/2010
11:38 AM
C: sp

Exhibit I-20

ARIZONA HOUSE OF REPRESENTATIVES
Forty-ninth Legislature – Second Regular Session

**COMMITTEE ON MILITARY AFFAIRS AND PUBLIC SAFETY**

Minutes of Meeting
Wednesday, March 31, 2010
House Hearing Room 3  --  9:00 a.m.

Vice-Chairman Gowan called the meeting to order at 9:01 a.m. and attendance was noted by the secretary.

**Members Present**

| | | |
|---|---|---|
| Ms. Fleming | Ms. Sinema | Mr. Gowan, Vice-Chairman |
| Ms. Reeve | Mr. Stevens | Mr. Weiers JP, Chairman |
| Mr. Seel | | |

**Members Absent**

Mrs. McGuire

**Committee Action**

| | |
|---|---|
| SB1070 – DPA S/E (5-2-0-1) | SCR1056 – DPA (7-0-0-1) |
| SB1109 - HELD | |

Note: On Tuesday, March 30, Representative Sinema was appointed as a Member of the Committee on Military Affairs and Public Safety replacing Representative Patterson.

**CONSIDERATION OF BILLS:**

**SB1070 – immigration; law enforcement; safe neighborhoods – DO PASS AMENDED S/E**
      **S/E: same subject**

Without objection, Vice-Chairman Gowan announced that he will allow his three-line amendment dated 3/30/10 for consideration (Attachment 1).   Ms. Sinema objected on the basis that the amendment was distributed after the deadline.  She said it can be offered in Committee of the Whole.  Vice-Chairman Gowan concurred.

   **Mr. Seel moved that SB1070 do pass.**

   **Mr. Seel moved that the Gowan 24-page strike-everything amendment dated 3/29/10 to SB1070 be adopted (Attachment 2).**

<u>Rene Guillen, Majority Research Analyst, Banking and Insurance Committee and the Water and Energy Committee,</u> advised that the strike-everything amendment (Attachment 2) is similar to the underlying bill and to HB2632, immigration; law enforcement; safe neighborhoods, which was heard in this Committee and passed out of Committee of the Whole last week.  He reviewed the major differences between the underlying bill and the changes made by the strike-everything amendment (Attachment 3):

- Stipulates that any person who is arrested must have his status determined before the person is released.
- Stipulates that implementation of the provisions relating to determination of status for lawful contact cannot solely consider race, color or national origin.
- Specifies that a person is presumed to not be unlawfully present if they provide any of the following to an officer:  a valid driver license, a valid nonoperating identification license, a tribal enrollment card or other form of tribal identification or a valid federal, state or local government-issued identification.
- Changes the trespassing provisions from trespassing to willful failure to comply or carry an alien registration document.
- Provides a defense from prosecution under unlawfully transporting, moving, concealing, harboring or shielding unlawful aliens if the person is providing or assisting in providing emergency public safety or public health services otherwise available to the general public without regard to income.
- Changes the wording requiring peace officers to impound or remove vehicles using transporting, moving, concealing, harboring or shielding unlawfully present aliens.
- Explains the severability, implementation and construction of the bill clause.

In reply to Ms. Sinema's questions relating to the trespass section, Mr. Guillen explained that the original bill required that a person had to be on private or public land or in violation of registration documents.   The strike-everything amendment removes language relating to trespassing and being on public or private land and retains just the violation of registration documents language.

<u>Senator Russell Pearce, sponsor,</u> advised that this bill addresses the federal government's failure to act with regard to securing our borders and enforcing our laws.  He stated that this is a nation of laws and that the rule of law is important.  He contended that citizens have a constitutional right to expect the immigration laws to be enforced.  This bill eliminates the sanctuary policies which are already illegal.  In addition, it is illegal to have a policy that restricts the exchange of information between local law enforcement and Immigration and Customs Enforcement (ICE).  He maintained that this is not only a federal issue and that states have an inherent authority to enforce these laws and ask for information about immigration status the same as for any other legal traffic stop.  He reiterated that he wants these laws to be enforced and the integrity of this nation protected.

Ms. Sinema queried whether the state has the ability to arrest, try in a court of law and deport undocumented persons.  Senator Pearce answered that the federal entity deports illegal aliens; no state has the authority to remove a person from this country.

Senator Pearce continued with his testimony.  He related that this legislation allows law enforcement to do its job.  If a person is in Arizona in violation of federal law, that person can be arrested by state law enforcement.  He pointed out that 75 percent of the citizens endorse this proposal and he read the names of law enforcement associations and other groups in support of SB1070.  He asked Members for their support.

Ms. Sinema expressed concern about the language on page 4, lines 10 through 12, relating to failure to carry an alien registration document and asked whether a photocopy is sufficient to meet the requirement of this policy.  Senator Pearce advised that federal law does not allow photocopies.  He stated that this language mirrors federal law and only Congress can change federal law.  Ms. Sinema argued that a person can be held in custody while that person's status is being verified, causing the person to be subject to a loss of liberty even though the person has not committed a crime.  Senator Pearce disagreed.  He said that if the legal status is validated by a call to ICE, the person will not be held.  Ms. Sinema again stated that the person is subject to being held until verification is made by ICE.

Ms. Fleming brought up the issue of foreign national spouses of military personnel. Senator Pearce stated that this bill does not address that issue because it is already in federal statute.

In reply to Ms. Sinema, Senator Pearce said there is a very strong civil rights provision in the bill.  He pointed out that in order to have lawful contact, law enforcement personnel must have reasonable suspicion to believe there is probable cause before a person can be arrested.

<u>Dale Wiebusch, Legislative Associate, League of Arizona Cities and Towns,</u> in opposition to SB1070, testified that local law enforcement works with the ICE unit of the Department of Homeland Security.  Statistics show that 6,500 to 7,000 illegal aliens have been turned over to ICE by municipal law enforcement agencies so the League does not believe this bill is necessary because it is already being done.

To that point, Chairman Weiers asked why a large number of law enforcement officers have told him they want this bill because their hands are tied on this issue.  Mr. Wiebusch said that since these people are being turned over to ICE, it appears that the system is working.

Mr. Seel asked Mr. Wiebusch whether the League represents the City of Phoenix.  Mr. Wiebusch stated that all incorporated municipalities in the state are members of the League.  Mr. Seel brought up the City of Phoenix's policy which specifically instructed its officers, when they came across illegal aliens, that they were not to identify them but were supposed to turn them over to community organizations.  To that point, Ms. Sinema said she understands that the City of Phoenix policy requires officers to identify people who have engaged in criminal activity but not to do so for lesser offenses, such as traffic stops.

Ms. Sinema asked whether all cities that oppose this legislation share concerns about unfunded mandates included in the bill.  Mr. Wiebusch said they also have other concerns with the bill.

<u>John Thomas, Arizona Association of Chiefs of Police,</u> testified in opposition to SB1070 because of drafting concerns and said those concerns can be resolved by redrafting the language.   He reviewed specific areas that need to be addressed:

Page 1, lines 16 through 19 and lines 20 through 24
Page 2, lines 17 through 21
Page 3, lines 9 through 14 and lines 26 through 31
Page 4, lines 7 through 21 and lines 10 through 12
Page 6, lines 11 through 14
Pages 7, line 29
Page 8, lines 1 through 2, lines 3 through 7, lines 8 through 10, and lines 14 through 17
Page 9, lines 8 through 9
Page 20, lines 17 through 20

Ms. Sinema brought up areas of concern to her and discussion ensued on the following:
- Page 1, line 24 – "when practicable" is not defined.
- Page 2, section D – "transporting an individual outside the jurisdiction of the law enforcement agency" may be interpreted as out of state.
- Page 3, section F – "less than full extent permitted by federal law" could make an official or agency of this state, county, city, town or other political subdivision subject to a civil suit.
- Page 6, section E – "an officer may lawfully stop any person if he believes the person is in violation of any civil traffic law" changes a secondary offense to a primary offense.
- Page 7, section 13-2928 – "transporting" may apply to a school bus driver, public bus driver or cab driver.

<u>Ron Johnson, Executive Director, Arizona Catholic Conference,</u> spoke in opposition to SB1070. He contended that humanitarian concerns need to be protected.  He reminded Members about testimony he gave on HB2632 about victims and witnesses of crimes and spoke of the need for further clarity so they will not be afraid to come forward.  He raised additional concerns about language on pages 7 and 8 relating to conceal, harbor, and transport and said that language is so broad it can be interpreted to include nonprofit organizations, serving meals to the homeless, homeless shelters or just serving the community at large.  He pointed out that on page 8, line 2, there is a defense included; however, he said he believes "defense" should be changed to "exemption."

Mr. Stevens questioned whether it is possible to look at a person and determine whether that person is a criminal.  Mr. Johnson replied in the negative.  Mr. Stevens asked Mr. Johnson if he has a problem with a church harboring or hiding illegal immigrants.  Mr. Johnson said the Arizona Catholic Conference does not endorse anything that is against the law and added that is not one of the concerns being addressed.

<u>Jennifer Allen, Executive Director, Border Action Network,</u> testified as being opposed to the entire bill.  Members of the Border Action Network are absolutely opposed to all components of this legislation because they believe SB1070 is one of the most poorly thought out, scantily-researched and most far-reaching pieces of legislation they have ever reviewed.  She agreed that the current immigration policy is broken and needs to be fixed; however, this proposal is not the

solution and does nothing to address the fundamental problems of the issue.  She said this proposal will result in exorbitant costs to the state and cause undue hardship to residents.  She said this is politics, not policy making.  It takes away law enforcement flexibility; it takes away officer discretion and adds new complex responsibilities without providing for training or resources.  It has civil liberties implications by requiring all people to carry identification documents to establish their legal status in this country.  As written, it will be costly to implement the provisions of the bill.  She maintained that SB1070 is irresponsible legislation and urged Members to vote against this bill.

Father Glenn Jenks, Valley Interfaith Project, in opposition to SB1070, spoke about unfunded costs to municipalities and the loss of revenue to the state.  He said that undocumented residents spend about $4.4 billion dollars in this state per year and pay $2.4 billion in taxes every year.  He said it is irresponsible in this economic climate to pass such a bill.  In addition, families are terrified; they will not report crimes, nor will they be witnesses to crimes as long as these kinds of bills become law.

Mr. Stevens asked Father Jenks about the financial data he cited and asked whether it can be provided to the Committee.  Father Jenks answered that the numbers are from a study done by a professor at the University of Arizona  He said he will be happy to provide that data.

In response to Ms. Sinema's query, Father Jenks advised that Valley Interfaith Project represents about 75,000 people in 45 congregations.

Allison Bell, Vice President for Government Relations, Arizona Chamber of Commerce & Industry, neutral on SB1070, spoke about retention of E-Verify records, the inappropriateness of transferring criminal code into civil statutes, and the definition of "harboring."

Todd Landfried, Director, Government Relations & Marketing, Arizona Employers for Immigration Reform, neutral on SB1070, revealed some concerns with the bill.  He said he shares concerns expressed by others about the lack of resources to communities to cover the costs of implementing the provisions of the bill, and opined that taxes will have to be raised and businesses will have to pay.  He expressed unease about unintended consequences; the bill can be interpreted only as a negative incentive for businesses to locate in Arizona.  Lastly, there is concern about the harboring issue and gave an example where a construction business will be in violation of this law if a driver has someone in the truck who is an undocumented person.  He encouraged Legislators to fix language to address these issues.

Levi Bolton, Vice President, Phoenix Law Enforcement Association (PLEA), testified in support of SB1070.  He provided an example of verification of a suspected illegal alien by law enforcement and pointed out the simplicity of verifying whether the person is undocumented.  In addition, he referred to testimony relating to additional training which will be costly and onerous, and claimed that current training enables officers to determine reasonable suspicion.  He urged support of the legislation.

Mark Spencer, President, Phoenix Law Enforcement Association (PLEA), in support of SB1070, spoke about the cost of illegal immigration by citing the names of police officers who have lost their lives or been injured at the hands of illegal aliens.  He related that in March, 2004 the

Phoenix Police Department abandoned its proactive policy on immigration enforcement, restricted its partnership with ICE and mandated that an illegal alien commit another crime or serious felony for an officer to contact ICE.  Eight out of ten members of PLEA believed this policy was detrimental to the quality of life in the City of Phoenix and saw a clear connection between illegal immigration and crime.  He stated that the federal government has failed miserably in protecting the borders.  He related that PLEA does not believe that ethnicity is an indication of criminality.  He urged the Committee to support this bill.

Ms. Sinema asked whether the verbiage on page 3, section F, causes concern.  Officer Spencer replied that the section addresses an officer's discretion.  Ms. Sinema said she is not referring to intent, but to the language which allows anyone to sue.  Discussion ensued.

Ms. Sinema referred to the language relating to "when practicable" on page 1, line 24, and asked whether there should be an exemption for a victim or a witness.  Officer Spencer said that is addressed by federal statute.

Mr. Seel brought up the City of Phoenix policy on immigration.  Officer Spencer opined that even with the changed policy, there still is resistance by Phoenix police management.  Mr. Seel asked how this proposal will affect that policy.  Officer Spencer stated that it allows an officer to exercise reasonable discretion to engage with federal officers in immigration matters.  He said it brings accountability to departments and encourages officers to use common sense.

Senator Pearce asserted that this is a common sense bill; it puts common sense and discretion back into the law.  He addressed arguments and objections raised by opponents of the bill.  The bill complies with but does not exceed federal law.  It is about protecting law-abiding citizens and he again stated that the state has the inherent responsibility to enforce laws and protect the citizens of this state.

Ms. Reeve asked for an explanation of "harbor."  Senator Pearce said that language was taken from federal law.

Ms. Sinema again brought up the language on page 6, section E, which allows an officer to stop someone for a secondary offense and she asked whether further work can be done on terminology to resolve the issue.

Ms. Sinema stated concern for the people who are authorized aliens but do not have a legal right to work, such as students, and asked whether language can be adjusted to address this.  Senator Pearce advised that issue is addressed in the bill.  He noted that this legislation is about illegal aliens in the United States, not about immigrants.

Ms. Sinema raised concern about privacy rights and referenced page 2, lines 22 through 28.  Senator Pearce related that language mirrors federal law.  The language does not expand the duties of law enforcement officers, nor does it limit the ability for someone to sue.  It gives officers the discretion to determine whether actions are reasonable and practical.

Ms. Sinema brought up the issue of illegal aliens who volunteer to serve in the armed forces.  She asked whether they will be subject to this legislation when they return after serving the

country.  Senator Pearce stated that matter is covered by federal law and states cannot change federal policy.  Ms. Sinema commented that states can choose to make exclusions.

Ms. Sinema asked who will provide training since more officers will be engaged in enforcing immigration policies.  Senator Pearce advised that the Arizona Peace Officers Standards and Training Board (AZPOST) provides officer training; no additional training will be required.

Mr. Seel announced the names of those who signed up in support of the strike-everything amendment to SB1070 but did not speak:
Paul Yoder, American Citizens United
Diana Culver, Director/President Kids Klub, Inc.
Ray Churay, Deputy Director, Maricopa County Sheriff's Office
Beth Straley, Campaign Administrator, 40 Days For Life, representing self
Rebecca Baker, Deputy County Attorney, Maricopa County Attorney's Office
Kevin Myers, United for A Sovereign America (USA), representing self
Pamela Pearson, representing self
James Hallgren, Assistant Prayer Coordinator, 40 Days for Life, representing self
Royce Flora, Chairman, District 8 Republican Committee, representing self
Brian Livingston, Executive Director, Arizona Police Association
Ann Flora, representing self
Kathryn Kobon, representing self
Martha Payan, American Conservation Union

Mr. Seel announced the names of those who signed up in opposition to the strike-everything amendment to SB1070 but did not speak:
Lucy Howell, St. Vincent de Paul Society, Phoenix Diocesan Board
Jeff Greenspan, Arizona Campaign for Liberty
Rosemary Anton, representing self
Chris Griffin, representing self
Salvador Reza, coordinator, representing self
Alessandra Meetze, Executive Director, American Civil Liberties Union of Arizona
Thomas Donovan, Valley Interfaith Project
Craig McDermott, representing self
Rob Dalager, City of Phoenix Police Department
Bonnie Danowski, Valley Interfaith Project
Ellen Katz, Litigation Director, William E. Morris Institute for Justice
Jozef De Groot, representing self
Susan Charlton, attorney, City of Phoenix,  Phoenix Police Department
Scott Butler, City of Mesa
Ryan Harper, representing City of Sierra Vista
Lisa Estrada, Intergovernmental Affairs Coordinator, City of Peoria
Lydia Guzman, representing self
Katie Decker, Legislative Liaison, Town of Fountain Hills
Ken Rineer, Self and Gun Owners of Arizona
Connie Scoggins, Assistant City Attorney, City of Yuma
Janet Valder, Valley Interfaith Project
Paul Ahler, Executive Director, Arizona Prosecuting Attorneys' Council

Michelle Gramley, Town of Gilbert
Linda Brown, Arizona Advocacy Network
Molly McGovern, Service Employees International Union (SEIU) Arizona
Shirley Gunther, Intergovernmental Affairs Manager, City of Avondale
Tom Schoaf, City of Litchfield Park
Kendra Leiby, Arizona Coalition Against Domestic Violence
Jamaar Williams, Vice Chair, Chicano Latino Law Students' Association
Ramon Garcia, representing self

Mr. Seel announced the names of those who signed up as neutral on the strike-everything amendment to SB1070 but did not speak:
Farrell Quinlan, State Director, National Federation of Independent Business

Ms. Sinema advised that Alessandra Soler Meetze, Executive Director of the American Civil Liberties Union of Arizona, sent an e-mail to Members of the Committee asking that her written statement be made part of the record (Attachment 4).

> **Question was called on the motion that the Gowan 24-page strike-everything dated 3/29/10 to SB1070 be adopted (Attachment 2).  The motion carried.**

> **Mr. Seel moved that SB1070 as amended do pass.  The motion carried by a roll call vote of 5-2-0-1 (Attachment 5).**

**SB1109 – technical correction; vehicle refueling apparatus(now: disciplinary warnings; personnel; definition ) - HELD**

> **Vice-Chairman Gowan announced that SB1109 will be held.**

**SCR1056 - Vietnam veterans' memorial day – DO PASS AMENDED**

> **Mr. Seel moved that SCR1056 do pass.**

Nicholas Calderon, Majority Intern, stated that SCR1056 designates March 29 of each year as Vietnam Veterans' Memorial Day in Arizona (Attachment 6).

> **Mr. Seel moved that the Weiers two-line amendment dated 3/29/10 to SCR1056 be adopted (Attachment 7).**

Mr. Calderon explained that the amendment changes the title of the holiday from Vietnam Veterans' Memorial Day to Vietnam Veterans' Day (Attachment 7).

Senator Ron Gould, sponsor, said he brought this legislation forward because it was brought to his attention that Arizona has never declared a Vietnam Veterans Day.

In reply to Chairman Weiers, Senator Gould said he agrees with the amendment, explaining that it will eliminate any confusion between Memorial Day and Vietnam Veterans Memorial Day.

Colonel Joey Strickland, Director, Arizona Department of Veterans' Services, testified in support of SCR1056.  He related that 40 years ago, three million soldiers were asked to serve in America's longest war.  He stated that 60,000 never returned home and thousands continue to die from Agent Orange exposure every day.  He said those who survived came home to a country that took its anger and political views out on them, the American warrior.  The past cannot be changed but by supporting this Resolution and creating a Vietnam Veterans Day in Arizona, a wrong can be corrected.

David Lucier, President, Arizona Veterans Foundation, in support of SCR1056, related that he received the Congressional Gold Medal for his late mother, a civilian who was a Woman's Air Service pilot, just two weeks ago when that organization received official recognition, veterans' benefits and an official memorial for the women who died in the line of duty.

Michael Marks, representing self, apologized to the Committee for his emotional testimony.  He revealed that he and his two brothers fought in Vietnam.  He lost one brother two years ago from Agent Orange and the other brother is fighting cancer from exposure to Agent Orange.  He stated that he has been a volunteer with a Vietnam veterans' organization for 20 years and has been fighting for this recognition for a long time.  He thanked Members for this bill and stated his total support for SCR1056.

David Carasco, representing self, testified in favor of SCR1056.  He advised that he is the commander of an honor guard known as the Prisoner of War (POW), Missing in Action (MIA) and Killed in Action (KIA) Honor Guard.  He disclosed that he has been working at the Vietnam Memorial over the last two weeks in preparation for the ceremony that will take place and said that passage of this legislation will be a great gift at that time.

Mr. Seel announced the names of those who signed up in support of SCR1056 but did not speak:
David Hampton, Public Information Officer, Arizona Department of Veterans' Services
Robin Quinn, representing self
Beth Straley, Campaign Administrator, 40 Days For Life, representing self
James Hallgren, Assistant Prayer Coordinator, 40 Days for Life, representing self
Ramon Garcia, representing self

> **Question was called on the motion that the Weiers two-line amendment dated 3/29/10 to SCR1056 be adopted (Attachment 7).  The motion carried.**
>
> **Mr. Seel moved that SCR1056 as amended do pass.  The motion carried by a roll call vote of 7-0-0-1 (Attachment 8).**

Without objection, the meeting adjourned at 12:28 p.m.

_____
Joanne Bell, Committee Secretary
April 6, 2010

(Original minutes, attachments and audio on file in the Chief Clerk's Office; video archives available at http://www.azleg.gov)