# Exhibit I-21



**Arizona State Legislature**

Bill Number Search:

Forty-ninth Legislature - Second Regular Session

Email a Member | Email Webmaster                    change session | printer friendly version

Senate      House      Legislative Council      JLBC      More Agencies      Bills      Committees      Calendars/News

**BILL STATUS OVERVIEW**

**HB2162**

**SPONSORS:** NICHOLS P
**TITLE:** technical correction; revenue bond authority
      (NOW: immigration; border security)
      (PREV NOW: research development; production; incentive program)
**HOUSE FIRST READ:** 02/09/10
**COMMITTEES: ASSIGNED COMMITTEES ACTION**
Vote Detail    02/09/10   GOV     02/23/10 (5-2-0-2-0) **DPA/SE**
Vote Detail    02/09/10   RULES   03/01/10 (7-0-0-1-0) **C&P**
**HOUSE SECOND READ:** 02/10/10
**MAJORITY CAUCUS** 03/01/10 Y
**MINORITY CAUCUS:** 03/01/10 Y
**COW ACTION 1: DATE   ACTION   AYES NAYS NV EXC VAC**
            03/04/10 **RET ON CAL** 0    0     0  0 0
**COW ACTION 2: DATE   ACTION AYES NAYS NV EXC VAC**
          03/08/10 **DPA**    0    0    0  0
 **AMENDMENTS**
 GOV - passed as amended
 Floor Amend to GOV - Nichols - passed
**THIRD READ: DATE    AYES NAYS NV EXC VAC EMER AMEND RFE 2/3 VOTE RESULT**
Vote Detail    03/17/10 38   17    5  0         Y             PASSED
**TRANSMIT TO SENATE:** 03/17/10
**SENATE FIRST READ:** 03/18/10
**SENATE SECOND READ:** 03/22/10
**COMMITTEES: ASSIGNED COMMITTEES ACTION**
          03/22/10   FIN      04/01/10 **W/D**
Vote Detail    04/01/10   APPROP   04/06/10 (8-1-0-0) **DPA/SE**
          03/22/10   RULES   04/14/10 **PFC**
**MAJORITY CAUCUS:** 04/15/10 Y
**MINORITY CAUCUS:** 04/15/10 Y
**COW ACTION 1: DATE   ACTION AYES NAYS NV EXC VAC**
          04/22/10 **DPA**    0    0    0  0
 **AMENDMENTS**
 APPROP (ref Bill) adopted
 Pearce flr amend (ref APPROP) adopted
 Nelson flr amend (ref APPROP) adopted
**THIRD READ: DATE    AYES NAYS NV EXC VAC EMER AMEND RFE 2/3 VOTE RESULT**
Vote Detail    04/26/10 18   11    1  0         Y             PASSED
**TRANSMIT TO HOUSE:** 04/26/10
**MAJORITY CAUCUS:** 04/27/10 Y

**MINORITY CAUCUS:** 04/27/10 Y

**CONFERENCE COMMITTEE:**

**HOUSE:**    APPOINTED 04/28/10         FREE

**MEMBERS:**    BIGGS, JONES, SINEMA

**CONFERENCE COMMITTEE:**

**SENATE:**    APPOINTED 04/29/10         FREE

**MEMBERS:**    PEARCE R, ALVAREZ, MELVIN

**RECOMMENDATION:**    That the House accept the Senate amendments with exceptions and the bill be further amended.

**MINORITY REPORT:**    Y

**HOUSE ADOPT:**    04/29/10

**SENATE ADOPT:**    04/29/10

| **HOUSE FINAL READ: DATE** | AYES | NAYS | NV | EXC | VAC | EMER | RFE | 2/3 | VOTE RESULT |
|---|---|---|---|---|---|---|---|---|---|
| Vote Detail  04/29/10 | 33 | 22 | 5 | 0 | | | | | PASSED |

**TRANSMIT TO SENATE:** 04/29/10

| **SENATE FINAL READ: DATE** | AYES | NAYS | NV | EXC | VAC | EMER | RFE | 2/3 | VOTE RESULT |
|---|---|---|---|---|---|---|---|---|---|
| Vote Detail  04/29/10 | 16 | 11 | 3 | 0 | | | | | PASSED |

**TRANSMITTED TO:**    GOVERNOR        04/30/10

**ACTION:**    SIGNED        04/30/10

**CHAPTER:**    211

**CHAPTERED VERSION:** Conference Engrossed Version

©2007 Arizona State Legislature.        privacy statment

# Exhibit I-22



Reprints



This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.

April 4, 2010

# Ranchers Alarmed by Killing Near Border

By **RANDAL C. ARCHIBOLD**

DOUGLAS, Ariz. — Sooner or later, they all feared, one of them would be killed.

The ranchers, retirees and others who prefer to live off the grid in the vast desert near the Mexican border regularly confront the desperate and dehydrated illegal border crossers, who knock on their doors for directions and water, and lately more of the less innocent, who scurry across their land or lie low in the brush, stooped with marijuana and other drugs bundled on their backs.

Now, according to the leading police theory, the inevitable has occurred, whipping up a political storm and sending a shiver through a community not easily shaken.

Robert N. Krentz Jr., 58, the scion of one of the best-known and oldest ranching families here in southeast Arizona, was found shot to death March 27 on his vast, remote ranch north of here after radioing to his brother that he was aiding someone he believed to be an illegal immigrant.

Mr. Krentz went missing shortly after that call, and the police found his body several hours later in his all-terrain vehicle, his guns untouched in the back, his dog shot and critically wounded. Fresh footprints led from the scene to the Mexican border 20 miles away.

Given Mr. Krentz's radio transmission, the footprints and heavy drug and illegal immigrant trafficking in that area, investigators are working on the assumption that he encountered a smuggler, possibly heading back to Mexico.

"You never know who you're dealing with out here because you get all kinds of traffic through here," said William McDonald, a fellow rancher on the vast mesquite scrubland pocked with canyons and scattered mountain ranges floating on the horizon like islands.

Mr. McDonald and other residents said that in the last year or two the traffic had taken a more sinister turn, with larger numbers of drug smugglers, many clad in black and led by armed scouts.

"It was only a matter of time," he said. "Everything was in place for something like this to happen."

Sheriff Larry A. Dever of Cochise County said if it was related to smuggling, it would be the first such killing of a rancher in more than three decades. But as local, state and federal investigators pore over the case, no motive has been ruled out, Sheriff Dever said.

Mr. Krentz's family, in a statement last week, said they had little doubt that the killing was related to smuggling. They went on to vent frustration at what they said was a lack of concern by federal leaders.

"We hold no malice towards the Mexican people for this senseless act but do hold the political forces in this country and Mexico accountable for what has happened," the family said. "Their disregard of our repeated pleas and warnings of impending violence towards our community fell on deaf ears shrouded in political correctness. As a result, we have paid the ultimate price for their negligence in credibly securing our borderlands."

Arizona, where the border authorities arrest more people and seize more drugs than in any other state, has long been a flashpoint for the immigration debate, and ranchers as a whole have been in the thick of it. Some have allowed armed civilian patrol groups to use their property to help catch border crossers.

The mere possibility that a rancher died at the hands of a smuggler led a host of politicians facing election challenges this year — including Senator John McCain and Gov. Jan Brewer, both Republicans, as well as Representative Gabrielle Giffords, a Democrat who represents the area — to quickly condemn the killing and to call for tighter border enforcement.

They demanded, among other things, that the federal government post National Guard troops on the border, a move that Gov. Bill Richardson of New Mexico made on his own last week, ordering his state Guard commander to send an untold number of troops there to help keep watch.

Although as Arizona governor she supported a limited Guard deployment on the border and pleaded with the Bush administration to keep them there when the temporary deployment was up in 2008, Homeland Security Secretary Janet Napolitano has not backed the idea now.

Instead, the department said it had increased its own resources at the border in the last year and had offered a $25,000 reward for information leading to the capture of Mr. Krentz's killer.

"We are carefully monitoring the situation, and will continue to ensure that we are doing everything necessary to keep communities along the Southwest border safe," a spokesman, Matthew Chandler, said in a statement.

Such assurances get a skeptical greetings here, where everybody has a story about an encounter with immigrants or smugglers.

The parched man who still waited for the rancher to come home before using his water tap. The group of smugglers using a catapult to fling marijuana bundles over the fence. The community clean-up that yielded two pickup truck loads of burlap from smugglers who had unbundled marijuana packages. And more recently, the series of break-ins and thefts.

Residents said they believed that the completion of a segment of the border wall near Douglas shifted smuggling traffic farther east in the last couple of years to more remote, rugged areas along the New Mexico border.

The area is guarded by two divisions of the Border Patrol who use different types of radios and have had trouble communicating with each other, officials at the agency have acknowledged. In addition, ranchers said, many of the agents are newly hired and unfamiliar with the area, slowing response times.

While some believe that the border wall completed in the last few years has slowed down large groups, many others have little faith in it.

Bill Odle, who lives about 400 feet from the border, drove along the fence last week, pointing out spots where smugglers have cut it and scaled it, sometimes bringing ladders to speed their way.

"It doesn't work in stopping people, but it does stop wildlife," Mr. Odle said.

But another rancher, Richard Hodges, who said he had received threats from smugglers for reporting them to the Border Patrol, believes that the fence does at least slow down traffic, particularly the large groups.

Mr. Hodges once let a civilian patrol group erect a fence near the border on his property, but the group, the Minuteman Civil Defense Corps recently disbanded and the fence is being taken down.

By all accounts, Mr. Krentz never got caught up in border politics. A bear of a man with a reserved nature, he could seem imposing at first glance but almost always rendered help to those who needed it, friends and family said. He inherited the 35,000-acre ranch from his father — it has been in the family since 1907 — and in 2008 it was inducted into the Arizona Farming and Ranching Hall of Fame.

"He was a typical ranch kid," said Wendy Glenn, a neighbor and longtime friend who said she heard Mr. Krentz's last transmission on her radio.

Now, like others, Ms. Glenn said she planned to be more cautious. "Usually if somebody needs help, you walk up to them and help them," she said. "We won't just walk up and offer help anymore."

*Jonathon Shacat contributed reporting.*

Exhibit I-23



TO THE
ENCHANTING CITY
OF SHANGHAI

▌ **Back to Article**      🖶 **Click to Print**



**Sunday, Jun. 20, 1999**

# Death On The Beat

**By Steve Lopez/Phoenix**

His shift about to begin, Phoenix police officer Marc Atkinson asks his wife if she knows something he doesn't, the way she keeps telling him to be careful. Yes, maybe she does. Maybe they both know something, but it has no shape. It is the same thing officer Scott Masino's wife feels when she tells him at about the same time that she doesn't want him to go to work. Something unknowable haunts the day.

It is March 26, 1999, the day Atkinson's seven-month-old son Jeremy will learn to drink from a cup, and Marc's wife Karen will page him with the news. It is the day Atkinson, 28, will call old friends out of the blue, uncharacteristically skip lunch and return a long-ago borrowed book to a Maryvale Precinct squad mate--a book on street survival, with a section on ambushes. And then he will ask his sergeant if he can be freed from radio calls to keep an eye on a west Phoenix dive that is a magnet for drug dealers.

At about 5 p.m., Atkinson pulls into the parking lot of the bar along with two other squad cars, and three young men run from the vicinity of a white 1988 Lincoln Town Car. The cops tail them into the bar and ask questions, but the answers lead nowhere. The other two officers peel off, and Atkinson waits, alone, watching the dive from a distance, in a neighborhood gone to hell. This is exactly where he wanted to be.

Atkinson is a former marine, and the well-groomed north side of Phoenix was too quiet for him. Three years ago, he asked for a transfer to Maryvale, where the action is. No white-haired Sansabelts in golf carts here. Drugs rule; gang bangers shoot each other out of boredom; and third-generation Mexican Americans join Anglos in grumbling about the illegals who pour across the border four hours to the south and come here to live, 10 and 20 to a house.

Atkinson, widely regarded as the best cop in his squad, believes he is needed in this precinct. He hands out police-badge stickers to children and tells Karen chilling stories abut the conditions he finds them living in. His sense of frustration grows with each shift, but he is still young enough to think he can make a difference for thousands of residents who sweat the mortgage payments and fear for their kids' safety.

Now he runs the license plate on the Lincoln, and it comes up suspended, and when three young men, possibly the same three from earlier, emerge from the bar and drive away, he follows. He radios in that

he is heading east on Thomas Road, planning to pull the car over. The Lincoln speeds up, and Atkinson goes to his lights and siren. His next radio transmission is one word--bailout; it quickens the pulse of every cop who hears it. Across the west side, squad cars bearing the raised-wing symbol of the mythic Phoenix change direction like birds in flight.

At 30th and Catalina, a colorless flatland marked by the concrete cake boxes of light industry, the driver of the Lincoln has jammed on the brakes and is bolting on foot as Atkinson turns the corner in pursuit. The backseat passenger hotfoots it in the other direction, and the front passenger slides cleanly across the seat, perhaps unseen by Atkinson. That passenger stands at the door, levels a .357 magnum at the squad car and fires several rounds. He is wearing a SAY NO TO DRUGS SHIRT. There is $7,000 worth of cocaine in the glove box and a shotgun in the backseat.

A security guard driving to work comes upon the scene and opens fire on the shooter as Atkinson's car rolls ahead aimlessly and plows into a utility pole. The guard, a red-haired, 300-lb. Irishman named Rory Vertigan, wings the shooter, who drops the Lincoln into reverse, slams into Vertigan's car and comes out flashing metal. Vertigan, his gun empty, rushes the driver, rips his gun away, throws him to the pavement and hands the weapon to another civilian just on the scene, ordering him to stand watch while Vertigan rushes to Atkinson and sees he has been shot.

The first officer on the scene is Masino, whose wife had not wanted him on the street today. He kicks a hole in the passenger window, unlocks the door and tries to revive Atkinson with help from another officer. She is Patricia Johnson, Atkinson's best friend on the force--the one who had lent him the book on street survival. Atkinson has taken two bullets in the right side of his head. Says Masino, 28: "It's almost like Marc's spirit was standing there next to him."

With the help of civilians, including two Hispanics who followed one of the fleeing suspects and used cell phones to report his location to police, all three suspects are in custody within minutes. All three are illegal aliens.

And now the commander of the Maryvale Precinct, a man who was born in Mexico and became a naturalized citizen at 24, is on his way to the murder scene. Manny Davila lives in two worlds, one the color of his uniform and the other the color of his skin, and he knows those worlds have collided on this horrible day. A day in which a brilliant, falling sun glints across the sprawling desert city, catching the top of the utility pole that Atkinson plowed into and casting the shadow of a perfect cross onto the side of a building across the street.

Police brutality in New York City. Racial profiling in New Jersey. Quick trigger fingers in Chicago, where two unarmed black motorists were killed by police in separate incidents on a single day earlier this month. Judging by the national headlines, it is a season of cops gone mad. The story in Phoenix is different, but it is part of the same drama--the constantly stressed marriage between mostly white police forces and the minorities they work with, who are at once disproportionately the victims of crime and its

perpetrators. The great majority of hardworking, law-abiding minority residents need the police for protection, just as the police need their help to catch the bad guys. But it is a relationship that can easily spiral into mutual recrimination, triggered by a cop killing or by police brutality.

Phoenix has had its share of both. Last year the city paid $5.3 million to the family of a black 25-year-old who died as the result of a neck hold during a 1994 altercation with police; he was a double amputee whose prosthetic legs came off during the struggle. And a civil trial awaits in the 1996 police killing of a 16-year-old Hispanic, shot 25 times while armed with a butcher knife.

Arizona state representative John Loredo, 29, a Mexican American, says that since 1990, he has been pulled over by police "six or seven times for no reason other than racial profiling." Once, while pulling up to his grandmother's house on Christmas Eve, his car lit up. Five police cruisers were behind him, a helicopter overhead. He was ordered onto his knees and handcuffed. "They said there'd been a drive-by shooting," Loredo says, and he presumably matched a suspect description. "Situations like that happen all the time," Loredo claims, judging by calls he receives from constituents and by the way that police have come at him with sass and swagger until they find out he is a public official.

Loredo says most of his west-side neighbors want the police responding quickly to their calls, locking up gangsters and shutting down drug dens. But they don't want their kids harassed--good kids who go to school and to work--as part of the deal. "That type of aggression has an extremely negative impact on people."

Davila, who works the very neighborhood where Loredo lives, answers, "We've got nearly 3,000 officers in this city. Do we have some bad apples? Yes. But we're trying, and this is a department I'm proud of."

Davila got laughed out of elementary school when his family moved 40 years ago from Mexico to Douglas, Ariz. He couldn't speak English, and kids made fun of him, so he ran home, only to have his mother drag him back. One day the teacher had the class write a letter. Put the principal's name at the top, she said, followed by a comma. Davila dutifully wrote down the principal's name and then drew a picture of a bed. The Spanish word for bed is cama. The teacher slapped him, the class roared, and his mother told him to find a way to endure. Without an education, he would have no chance in America.

Davila is now 49, and on July 20 he'll complete the course work for a master's degree from Northern Arizona University. His grade-point average is 4.0, and his wife Sue hangs his report cards on the refrigerator along with their son's and daughter's, both community-college students. And still he must endure. He is called "coconut"--brown on the outside, white on the inside--by some Mexican Americans. And when he made sergeant in 1982, he overheard a white colleague say, "We got another spic promoted. Let's see how long this beaner lasts." Yet Davila believes as passionately in the goodness of his officers as he does in the goodness of struggling immigrants.

As he retraces Atkinson's route, wheeling through the last moments of his life, Davila comes upon the shrine where the officer died. Davila had tried, in his quiet way, to live beyond the stereotypes that divide police and community, white and Hispanic. And now there were people out there stirring it up, the vultures and hacks, politicizing Atkinson's death before he was in the ground. At the spot where the afternoon sun still draws a cross on the wall, Davila's spirit breaks again. "You had people calling the radio talk shows to take their shots. It started with illegal aliens, and then it was, 'Let's send all the Mexicans back.'" Some of his officers were jumpy too--ready to crack down on immigrants. "I told people that it's not whites or Hispanics who killed Marc," Davila says. "It's drug-dealing cop killers. The issue isn't ethnicity--it's crime and drugs." Losing Atkinson was bad enough. Davila was determined to lose nothing more.

Tom Martinez, 59, has been on block watch for 18 years in the neighborhood where Atkinson worked and died. "You see this older woman out front? She's undercover. Reports everything to us." Martinez works for the recreation department. The friends who ride civilian posse with him work construction jobs and return to their well-kept homes each day with aching backs and cracked hands, and then they take turns pulling night duty, trying to pass pride of ownership and safe streets on to the grandchildren. "We've been burglarized 10 times, and nobody ever sees a vehicle or a person," says Tom Sapien, 51, who peers into the twilight from Martinez's backseat and misses nothing. "People are afraid to get involved."

Phoenix businessman Alfredo Gutierrez, a former state senator, makes poetry of the west side's Los Angelized sprawl. "It's a place with no edges. It bleeds in and out of industrial and residential developments, and there's a creeping invisibility--an anonymity." The weak sense of community makes the area all the harder to police. And there is ethnic fragmentation as long-established Hispanics see new Mexican immigrants moving in next door, calling south of the border for the relatives and parking the truck on the sidewalk.

Davila knew he had a cultural clash on his hands when he took a call from a resident complaining that the next-door neighbor was growing corn in the front yard. New immigrants, Davila says, are "suspicious of cops. In Mexico most of a policeman's salary is from bribes. They think we're going to beat them up or take their money." It doesn't help that while Hispanics make up more than 28% of the 1.2 million residents of Phoenix, they account for only 12% of the city's police.

To all of this, add the drug problem. On May 5, police stumbled onto the biggest drug bust in city history--a ton of cocaine valued at half a billion dollars--and arrested two Mexican nationals. A federal drug official told the Arizona Republic, "Phoenix has arrived...as a drug transshipment point."

And then there's the gang problem. An estimated 300 gangs and 7,000 gang members work the streets of Phoenix, selling drugs, stealing cars and occasionally aerating one another. One day officer Robert Vasquez brings an East Side gang member into the station for a chat--a kid he is trying to rescue after meeting him at an alternative school. The 17-year-old has a tattoo of an X under his right eye and an 8

under his left. It's his gang ID. He runs with Wetback Power's 18th Street crew. "It's crazy out there now," he says. "You could be walking down the street, and some little 12-year-old will shoot you." Last year he was shot in both legs by a member of the Mafia Crip Gangsters, and he pulls up one pant leg to show through-and-through wounds where a bullet skewered his leg.

You begin to understand the frustration police feel when the gang member says that shooting a cop wins you honor these days; that all his contemporaries do is fight and shoot and get high and steal; that he will never identify the kid who shot him because ratting is the lowest; that he burns names under an R.I.P. tattoo on his left arm when close friends die; that he doesn't expect to live to 25; that sometimes he dreams about going legit and getting a really good job. Like what? "I don't know," he says. "Like maybe a telemarketer."

The last line of defense against the barbarians is filing into the briefing room at the Maryvale Precinct, home to 229 sworn officers. Marc Atkinson's old squad is just beginning its 3:30 p.m. to 1:30 a.m. shift. Sergeant Pete Fenton tells them about a fresh homicide and about a tree that will be planted in Marc's honor out front. A chalkboard advisory warns against dining at a certain fast-food joint because a cook with a grudge, just out of jail, is bound to add special ingredients to any cop's dinner.

Several weeks have passed since Atkinson's murder, but you wouldn't know it to look around the room. Officers wear stickers on their belts or radios: IN MEMORY OF 5930. Atkinson's badge number. And now it hits you that these are kids. The age range is 24 to 34. At 28, Atkinson was the senior officer among 10. The one they looked up to. The one who couldn't die. When he did, they began wondering how they could be crazy enough to do this job. And then three weeks later, officer James Snedigar was shot dead as his SWAT team moved on an apartment in the nearby town of Chandler. Two of his three assailants, one of whom was killed, were identified as members of the New Mexican Mafia.

Out on patrol, Masino sees a car inching along suspiciously, and then suddenly the car speeds up and darts out of sight into a parking lot. Masino finds it, approaches cautiously and sees the driver and a passenger drinking beer. Neither speaks English, and Masino knows only a little Spanish. With TIME translating, we find out the driver has no license, no registration and no keys. He started the car with a screwdriver. When he finds out he's under arrest, he makes a brief move on Masino, then thinks better of it. The passenger's hands, meanwhile, drop down under the seat in the car, maybe to hide something, maybe to get something, and in that moment everything is crystal clear: the potential for the cop to shoot. The potential for the suspect to shoot. The potential for either to die, and for the press, the public and the lawyers to wrestle over the facts for months and never approach the truth.

As this one turns out, there was no weapon or drug stash under the seat. Masino releases the passenger, telling him to stay home next time he wants to drink. The kid makes a rude gesture. "Nice doing business with you," Masino says.

Detective: "So, then you were the one that killed the officer, kid?"

Suspect: "Well, yeah, there's no other. How can I tell you?"

Detective: "Are you afraid?"

Suspect: "Well, yes ... I didn't want to do that. I didn't even think that he had died, but I know that I deserve my punishment."

The interview with Felipe Petrona-Cabanas, 17, took place the night of Atkinson's murder. On April 5, a Maricopa County grand jury indictment charged Petrona-Cabanas, his 18-year-old cousin and a third man, age 21, with first-degree murder. The 17-year-old will be tried as an adult in what will be a potential death-penalty case for all three. They have pleaded not guilty.

The first week was hard on little Jeremy Atkinson, and he cried a lot. Whenever the garage door opened, he got excited, thinking it was his father. Now nine months old, Jeremy has just awakened from a nap, and Karen Atkinson, who has only recently returned to her job as a nurse, goes and gets him in their two-story house north of Phoenix. Marc's squad was right. Jeremy looks just like him. Sky-blue eyes, hair the color of straw.

When Marc talked about his work, it was mostly about the kids he would see. "He'd go into a house to arrest the parents for drugs, and he'd see a two-year-old, naked, needing a diaper, and the kid reaches up: 'Please hold me.'" At home, Atkinson was on a mission to have Jeremy's first word be Dah-dah. He'd hold him close, look into his eyes and repeat it over and over. But Jeremy never responded. And then shortly after Marc's death, Karen was awakened one night by Jeremy's voice on the intercom: "Dah-dah, dah-dah, dah-dah..."

Take all the problems of the day--drugs, gangs, the politics of immigration--and Manny Davila has an answer for them. Not a police roundup or a new law. A trip to a school. Here is Davila eating a cafeteria burger with the boy he has visited once a week for the past year in the Pathfinder program he volunteered for. He chose Andoni, 11, because he sees some of himself in the boy. Andoni was born in Mexico too. After lunch, in 98-degree heat, Davila organizes a basketball game on the playground. "He works with the whole class," says Nicole Liggett, Andoni's fifth-grade teacher. "He reads to the class with me; he plays with the kids at recess; he brings stickers, candy, ice cream."

In his three years as commander of the Maryvale Precinct, Davila and his officers have given up nights and weekends to help people paint, mend fences, organize anti-crime marches. On the streets of Maryvale, residents frequently refer to "my police officer," and the officer refers to "one of my people" getting robbed.

At the Woodmar apartment complex, Masino is seen as some kind of alien force by a woman whose name is being withheld to protect her from gangs. "I thought he was crazy, the way he just walked through here by himself at night," says the grandmother, whose phone lines were cut when she began snitching on dealers who had turned the complex into a drug emporium and shooting gallery.

In February work by Masino and other officers resulted in 18 arrests. To keep the gangsters from returning, Masino and officer Brian Kornegay opened a substation in one of the units. They gave a cell phone to the woman whose phone lines had been cut. When Masino pulls up now in his patrol car, that woman's seven grandchildren, no longer confined to the house, climb into his car to play with the lights and loudspeaker.

This kind of work provides a vital, unseen ballast as Phoenix is rocked by Atkinson's murder and by the ugly reaction from some quarters that there should be a crackdown on "the Mexicans" who should be sent packing. What could be a breakdown in race relations is defused by a quiet, powerful counter-demonstration--a defining moment in city history.

In response to the racist outbursts on talk radio, Hispanic leaders called for a peace march and a prayer vigil for Tuesday evening, four days after Atkinson's murder, with such short notice that no one knew how many people might show up. At 6 p.m., they started to gather in a field not far from the bar where Atkinson's chase had begun: adults and children, first in a trickle and then in a swelling stream. Michael Hernandez Nowakowski, a radio-station general manager, had bought hundreds of candles, and people began lighting them.

By 7 p.m., 800 people had gathered, and now police officers were joining in, clearing a path for a twilight procession along the course of Atkinson's pursuit. Children carried photographs of Atkinson. A mariachi band played De Colores, a song about the rainbow after the storm.

As the marchers approached the site where Atkinson died, some left flowers or novena candles; others left poems or notes of thanks, many in Spanish. And then Davila spoke, in Spanish, then in English, thanking the throng for turning the place of Atkinson's death into sacred ground. State senator Joe Eddie Lopez followed him, asking Davila to tell his officers "that we love the work that you do, that we are slow to express it as much as we should, but that the safety of our children and our families rests in your hands."

After the vigil broke up, about 100 people stayed behind and said a rosary. Karen Atkinson was there, along with Marc's mother, brother and sister, and strangers went up to them to say--some in Spanish, some in English--that they were sorry. It would be the first night since her husband's death that Karen Atkinson slept.

Click to Print

**Find this article at:**
http://www.time.com/time/magazine/article/0,9171,27142,00.html

Copyright © 2012 Time Inc. All rights reserved. Reproduction in whole or in part without permission is prohibited.

Privacy Policy  |  Add TIME Headlines to your Site  |  Contact Us  |  Customer Service

# Exhibit I-24



# CRIMINAL ALIEN STATISTICS

**Summary**: On average each day 25 Americans die at the hands of criminal aliens in the United States. Twelve Americans are murdered by criminal aliens. Another ten Americans are killed by drunk-driving criminal aliens. Finally, an additional three Americans will die because of negligent homicides by criminal aliens, such as running a red light, speeding, or the negligent handling of a dangerous weapon.

*Murder* - The willful (non-negligent) killing of one human being by another. This includes first and second-degree murder, as well as non-negligent manslaughter. Murder does not include deaths caused by negligence, suicide, or accident; justifiable homicides; attempts to murder or assaults to murder, which are considered "aggravated assaults."

*Negligent Homicide* - Negligent homicide is the killing of another person through gross negligence or without malice. It can also be considered a death that is the result of the negligent operation of a motor vehicle, which includes the operation of a car, boat or snowmobile.

**Source:**  Iowa Representative Steve King (IA-5) first brought these alarming statistics to our attention earlier this year.  Recently, Congressman King was the guest of Bill O'Reilly who had asked the Iowan come on his show to discuss his findings in greater detail.

## Statistics:

### *Criminal Alien Prison Population –*
According to an April 7th, 2005 General Accounting Office (GAO) study entitled, "*Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails*" [Report # GAO-05-337R] prepared for the Congressional Subcommittee on Immigration, Border Security, and Claims:

> "27% of the total population in all U.S. prison systems (including city, county, state and federal) is composed of criminal aliens."

### *Total Murders in the U.S. in 2005 –*
According to the FBI, there were 16,692 persons murdered in the U.S. in 2005. The Uniform Crime Reporting Program defines murder and non-negligent manslaughter as the willful killing of one human being by another.

*Total Drunk-Driving Fatalities in the U.S. in 2005 –*
According to the National Highway Traffic Safety Administration, 12,945 Americans were killed in car crashes where the driver had a blood alcohol concentration of .08g/dL or higher in 2005.

## Calculations:

Total number of people murdered in the U.S. at the hands of criminal aliens in 2005: ***4,507***

> This number is calculated by taking 27% multiplied by the total number of murders in the U.S. in 2005 (.27 x 16,692 = 4,507)

> This figure equals approximately **12 murders every day** at the hands of criminal aliens (4,507 / 365 = 12)

Total number of people killed in the U.S. as a result of drunk-driving criminal aliens in 2005: ***3,495***

> This number is calculated by taking 27% multiplied by the total number of alcohol-related fatalities in 2005 (.27 x 12,945 = 3,495)

> This figure equals approximately **10 deaths every day** at the hands of criminal alien drunk drivers (3,495 / 365 = 10)

## Conclusions:

**Twenty-five Americans die at the hands of criminal aliens every day in the U.S.**

> (12 murders + 10 drunk-driving fatalities + 3 negligent homicides = 25 deaths every day)

**In the year 2005, criminal aliens killed more than three times the number of Americans murdered in the terrorist attacks of 9-11 died.**

> 9,125 Americans died at the hands of criminal aliens in 2005, as compared to approximately 3,000 Americans who perished in 9-11.

## Additional Statistics:

**Federal prison criminal alien population:**

> Total number of criminal aliens in federal prison: 48,708

> > Mexico 63%, Colombia and Dominican Republic 7% each, Jamaica 4%, Cuba 3% and El Salvador 2%, remaining countries represent less than 2% each.
> > > Source:  Bureau of Prisons (BOP)

**Top 5 State prisons system criminal alien population:**

> Total number of criminal aliens in top 5 states' prison systems:  51,600

> > Mexico 58%, Cuba and Dominican Republic 5% each, El Salvador 4%, Jamaica 3%, remaining countries represent less than 3% each.

**Top 5 local jails' criminal alien population:**

> Total number of criminal aliens in top 5 states' prison systems:  170,000

> > Mexico 65%, El Salvador 6%, Guatemala 3%, remaining countries represent less than 3% each.

Exhibit I-25

## Kidnapping Capital of the U.S.A.

*By BRIAN ROSS, RICHARD ESPOSITO and ASA ESLOCKER*
*February 11, 2009—*

abcnews.go.com

Washington Too Concerned With al Qaeda Terrorists to Care, Officials Say

In what officials caution is now a dangerous and even deadly crime wave, Phoenix, Arizona has become the kidnapping capital of America, with more incidents than any other city in the world outside of Mexico City and over 370 cases last year alone. But local authorities say Washington, DC is too obsessed with al Qaeda terrorists to care about what is happening in their own backyard right now.

"We're in the eye of the storm," Phoenix Police Chief Andy Anderson told ABC News of the violent crimes and ruthless tactics spurred by Mexico's drug cartels that have expanded business across the border. "If it doesn't stop here, if we're not able to fix it here and get it turned around, it will go across the nation," he said.

California Attorney General Jerry Brown warned that as the U.S. government focuses so intently on Islamic extremist groups, other types of terrorists – those involved with the same kidnappings, extortion and drug cartels that are sweeping Phoenix – are overlooked.

"Those [criminals], for the average Californian or the average America, may be a more immediate threat to their well being," Brown said.

In fact, kidnappings and other crimes connected to the Mexican drug cartels are quickly spreading across the border, from Texas to California. The majority of the victims are either illegal aliens or connected to the drug trade.

An ABC News' investigation uncovered horrific cases of chopped-off hands, legs and heads when a victim's family doesn't pay up fast enough.

"They're ruthless, so now they're ripping each other off, but doing it in our city," Anderson said.

Click here to listen to a call from a kidnapping victim and his captor.

Click here to see photos of a kidnapping rescue mission.

To try and combat the crime wave, the Phoenix police have created a special unit to handle the kidnappings called the Home Invasion Task Force, which has pulled more than a dozen officers off other assignments. The crimes are occurring across the valley and in all types of neighborhoods, authorities warn.

Crimes Endanger More Than Just Victims

"These are very dangerous situations here, not only dangerous situations for our community, but also extremely dangerous for our officers who have to go out and track these guys and arrest these folks," Anderson said.

Click here to watch a Phoenix police sergeant on the job.

In some cases, dozens of people at a time have been kidnapped. They are often illegal aliens whose captors then demand ransom from the victims' relatives in Mexico.

ABC News followed Sergeant Phil Roberts in Phoenix on a day when his unit was working on three on-going kidnapping cases and trying to find a victim in peril.

"Our victim's probably being brutalized, he's probably being beaten up and tortured and God knows what else is taking place," Roberts told ABC News. "And we don't know whether he's a legal or illegal. We look at it as if he's a human being. He's being tortured out there, and we've got to do everything we can to try and rescue that individual."

http://abcnews.go.com/Blotter/story?id=6848672&page=1

Watch Brian Ross' full report tonight on Nightline at 11:30 p.m. ET.

Click Here for the Investigative Homepage.

Exhibit I-26

Park Ranger Kristopher William Eggle, United States Department of the Interior - National Park Serv...

Case 2:10-cv-01061-SRB   Document 731-11   Filed 08/10/12   Page 25 of 158

Login | About Us | Contact Us | Search

Connect With ODMP   



*"When a police officer is killed, it's not an agency that loses an officer, it's an entire nation." -Chris Cosgriff, ODMP Founder*

# ODMP Remembers...

United States > U.S. Government > United States Department of the Interior - National Park Service > Park Ranger Kristopher William Eggle

 

**Park Ranger**
**Kristopher William Eggle**

United States Department of the Interior - National Park Service, U.S. Government

End of Watch: Friday, August 9, 2002

- Reagan County Sheriff's Office
  Texas ~ August 1, 2012
- Milwaukee County Sheriff's Office
  Wisconsin ~ July 31, 2012
- Waxahachie Police Department
  Texas ~ July 28, 2012
- United States Postal Inspection Service
  U.S. Government ~ July 26, 2012
- Westfield Police Department
  Massachusetts ~ July 26, 2012

### Bio & Incident Details

**Age:** 27

**Tour:** Not available

**Badge #** 1207

**Cause:** Gunfire

**Location:** Arizona

**Incident Date:** 8/9/2002

**Weapon:** Rifle: AK-47

**Suspect:** Shot and killed

- Leave a Reflection
- Add to My Heroes
- Update this memorial

Share this memorial:

Ranger Kristopher Eggle was shot and killed while he and several U.S. Border Patrol Agents attempted to apprehended two armed, illegal aliens.

The suspects had fled from Mexican authorities into Organ Pipe Cactus National Monument, Arizona at 1400 hours. The Mexican authorities called the Border Patrol and notified them of the suspects. A Border Patrol helicopter in the area located the suspects and directed Ranger Eggle and Border Patrol Agents to the area.

One of the suspects was apprehended without incident, but the second suspect opened fire with an AK-47 rifle. Ranger Eggle was struck below his vest, causing a fatal wound. The suspect then fled on foot south toward the Mexican border. He ran to approximately fifty yards from the border, where approximately 30 to 50 Mexican officers from numerous agencies opened fire from Mexico killing him. A medivac helicopter was sent to the scene, but Ranger Eggle had already succumbed to his wounds.

The suspect who was arrested during the incident was sentenced to 15.5 years in prison.

Ranger Eggle was a recent recipient of the Director's Award at FLETC. He is survived by his parents and a sister, who is a civilian employee for the National Park Service.

Leave a Reflection · Update Memorial

### Most Recent Reflection

View all 104 Reflections

Thank you for your service Sir, RIP

*James Kotke*
*Civilian / Former Officer*
*WSF Park Police (Wi.)*
*July 9, 2012*

Create an account for more options, or use this form to leave a Reflection now:

**Your Reflection:**



**All 2012 Deaths**

Line of duty deaths this year

63    -49%

LODD Notifications

Memorial Gifts

Front Line Club

Officer Safety Posters

Donate

Park Ranger Kristopher William Eggle, United States Department of the Interior - National Park Serv...

Case 2:10-cv-01061-SRB   Document 731-11   Filed 08/10/12   Page 26 of 158

**Your rank & name:** [                    ] (will show below Reflection)

Your agency or relationship: [                    ] (will show below Reflection)

**Your e-mail:** [                    ] (e-mail remains private)

☐ Remember my rank, agency and email address

☐ I have read and agree to the Reflections Terms of Use (revised 5/31/2012)

[Submit Reflection]

Terms of Use | Privacy Statement
Copyright © 1996-2012, The Officer Down Memorial Page, Inc

Exhibit I-27

You are currently viewing the printable version of this article, to return to the normal page, please click here.

NEWS | OPINION | CAMPAIGN 2012 | SPORTS | BOOKS | LIFE | MEDIA | BLOGS | COMMUNITIES

Search

STAY 'N PLAY PACKAGE INCLUDES:     AS LOW AS $46 PER PERSON, PER NIGHT
● Parking     CLICK FOR DETAILS
OFFER EXPIRES 9/2/12
Knott's HOTEL

EDITORS' PICKS:   It's not over till it's over for backers of Ron Paul

SOCIAL:

# Drug smuggler spared death in '98 killing of border agent

COMMENTS (0)   SHARE   TWEET   EMAIL   PRINT   MORE     TEXT SIZE: + -     0

By The Washington Times                                          Friday, November 24, 2000

A drug smuggler convicted in Arizona in the murder of a U.S. Border Patrol agent faces life in prison rather than the death penalty at his January sentencing as part of a deal with Mexico to spare his life in exchange for his extradition to this country to stand trial.

Bernardo Velarde Lopez, 28, was convicted Tuesday by a federal jury in Tucson in the June 1998 killing of Border Patrol Agent Alexander Kirpnick, gunned down near Nogales, Ariz., while he and his partner sought to arrest four men hauling marijuana into this country.

Agent Kirpnick, 27, who immigrated to the United States from the Soviet Union in 1988, died from a gunshot wound to the head. He and his partner, Agent Steven Heiden, had responded to investigate "hits" from sensors hidden inside Potrero Canyon, just west of Nogales, a favorite route for drug smugglers.

Velarde was found guilty in the murder of a federal agent and possession of a firearm during a drug-trafficking crime, resulting in death, conspiracy and drug charges.

The United States agreed with Mexican authorities not to seek the death penalty in exchange for Velarde's extradition to this country to stand trial. Facing a life sentence without the possibility of parole, Velarde will be sentenced Jan. 25 before U.S. District Judge John Roll in Tucson.

Federal prosecutors said Velarde, of Nogales, Mexico, and three other men were attempting to smuggle 110 pounds of marijuana over the border when they were confronted by Agents Kirpnick and Heiden. Agent Kirpnick was shot as he disappeared behind some brush while attempting to arrest Velarde, prosecutors said.

The agent was rushed to a Tucson hospital, where he died four hours later.

After the shooting, all four suspects fled into the desert, although Agent Heiden located Manuel Gamez as he sought to return on foot to Mexico. Gamez later was convicted on charges of marijuana smuggling and sentenced to 12 years in prison. He identified Velarde as the shooter.

Velarde was arrested in Nogales by Mexican police and extradited to the United States to face trial in Agent Kirpnick's death five months later.

Agent Kirpnick's June 3, 1998, death was followed five weeks later by the murder of Border Patrol Agents Susan Lynn Rodriguez, 28, and Ricardo Guillermo Salinas, 24. They were killed during a gunfight in a cornfield near San Benito, Texas, about 20 miles north of the U.S.-Mexico border.

The two agents had responded to a call for assistance to search for a murder suspect and died when the suspect stepped out of the field and fired numerous shots at them with an AK-47 semiautomatic rifle.

Agent Rodriguez, the daughter of retired El Paso Deputy Border Patrol Chief Steve Williams, was the first female Border Patrol agent killed in the line of duty. The suspected gunman, Ernest Moore, 25, was wounded during the Texas shootout and died 10 hours later at a hospital. Police said Moore was the son of a Harlingen, Texas, police detective.

The deaths of Agents Kirpnick, Rodriguez and Salinas prompted the Justice Department to review the Border Patrol's operational policies, while insisting that the agency remain aggressive in its enforcement efforts. The review was led by Deputy Attorney General Eric H. Holder Jr., and proposed ways to better protect the agents who work along the 2,000-mile U.S.-Mexico border.

"We still plan to be aggressive in our enforcement of the immigration laws," Mr. Holder said at the time. "We will not back down. We are determined to do the job that the American people expect us to do on the border with regard to illegal immigration and also the flow of drugs."

Part of the Holder plan included the recruitment of 1,000 new Border Patrol agents, most of whom have been and will be assigned to the U.S.-Mexico border. The recruitment effort continues.

You are currently viewing the printable version of this article, to return to the normal page, please click here.

# Exhibit I-28

Home a safe haven for Mexican suspects;Death penalty halts extradition for U.S. crimes The Washington Times
January 9, 2004, Friday, Final Edition

Copyright 2004 The Washington Times LLC
All Rights Reserved
The Washington Times

January 9, 2004, Friday, Final Edition

**SECTION:** PAGE ONE; Pg. A01

**LENGTH:** 822 words

**HEADLINE:** Home a safe haven for Mexican suspects; Death penalty halts extradition for U.S. crimes

**BYLINE:** By Guy Taylor, THE WASHINGTON TIMES

**BODY:**

Hundreds of Mexican citizens suspected of committing violent crimes in the United States have escaped justice by slipping across America's porous southern border into Mexico, which refuses to extradite suspects facing the death penalty or life imprisonment.

Authorities have identified more than a dozen cases in which illegal aliens were accused of injuring or killing a U.S. law-enforcement officer but are believed to have fled to Mexico.

President Bush's plan to grant legal status to millions of illegal immigrants employed in the United States raises questions about whether Mexico may agree to start extraditing suspects in all U.S. crimes.

"One of the things would be cooperation on extraditions," said Mark Krikorian, executive director of the Center for Immigration Studies, a Washington think tank supporting tighter controls on immigration.

Mr. Bush heads Monday to the Summit of the Americas in Monterrey, Mexico, and a White House spokesman yesterday did not know whether the president plans to discuss extradition with Mexican President Vicente Fox. Mr. Fox has been seeking greater access to U.S. jobs for Mexicans and praised Mr. Bush's immigration proposal Wednesday.

U.S. officials don't have information on the number of violent criminals hiding in Mexico, but they believe the number is at least in the hundreds. District attorneys in most states don't keep records of crimes committed by illegal aliens, even ones who have fled.

In California, officials estimate some 350 violent felons have fled south seeking protection of a Mexican Supreme Court ruling that the death penalty and life in prison without parole represent cruel and unusual punishment.

Sen. Diane Feinstein, California Democrat, introduced a Senate resolution last month calling on Mr. Bush to put pressure on Mexico to ensure suspects wanted for serious crimes can be extradited.

"Many of these people are living free and unpunished in Mexico," she told reporters in California. "In some cases, we even know where they are."

Perhaps the most high-profile case is the April 2002 murder of Los Angeles Deputy Sheriff David March, who was shot execution-style during a traffic stop. The prime suspect is Mexican national Armando Garcia, said to have fled south after the murder.

"He's believed to be somewhere in Mexico," said Sandi Gibbons, spokeswoman for the Los Angeles County District Attorney's Office.

Mrs. Gibbons said the office has been working so far unsuccessfully with federal officials in the State and Justice departments to get Mr. Garcia and others returned from Mexico for trial.

"We feel that if a person commits a crime here, especially if they kill someone here, that they need to be brought back here to be brought to justice," she said. "This is where the victims are."

Mrs. Gibbons noted Mexico's refusal to extradite criminals applies only to Mexican citizens. There have been cases, she said, of non-Mexican nationals who have been extradited and tried in the United States.

Home a safe haven for Mexican suspects;Death penalty halts extradition for U.S. crimes The Washington Times
January 9, 2004, Friday, Final Edition

A recent case in Burbank, Calif., involved extradition of David Garcia, the top suspect in a November murder of Burbank police Officer Matthew Pavelka.

Mexican authorities arrested Mr. Garcia on Thanksgiving in the border city of Tijuana. As a U.S. citizen, he was extradited almost immediately to the United States, where he most likely will face the death penalty.

Mrs. Feinstein said a survey last year by the National Association of District Attorneys determined that in addition to the California cases, there are at least 60 others being held up nationwide by Mexico's refusal to extradite.

Wrangling over extradition between U.S. and Mexican authorities is nothing new. Fifteen years passed before Rudolph Romero, the gunman who fled to Mexico after the 1988 killing of Phoenix police Officer Ken Collings, was caught, brought back for trial and sentenced.

Mexican authorities didn't agree to look for Romero until 11 years after the killing, and when they caught him, he wasn't returned to the United States until prosecutors in Phoenix guaranteed he wouldn't face the death penalty.

U.S. authorities say that is an accepted part of the process of arresting fugitives in Mexico. It's not exclusive to Mexico though.

"I know of no countries that have a no-death-penalty statute who will extradite on a death-penalty case without the assurance that we won't seek the death penalty," said Chris Dudley, chief inspector of international investigations for the U.S. Marshals Service.

However, Mr. Dudley, and others, including U.S. Marshal Geoff Shank, who heads investigations for the Northeast United States, said Mexico's extradition policy "has not negatively affected our relationship with Mexico at all."

Mr. Shank said the Marshals Service, which routinely hunts fugitives in foreign lands, gets along with Mexican police "better than anyone else."

**GRAPHIC:** Dave Drew, a local resident, protested near day laborers waiting for work in Farmingville, N.Y., on Wednesday. Millions of illegal immigrants could be freed from the threat of deportation under a Bush administration proposal. [Photo by AP]

**LOAD-DATE:** January 9, 2004

# Exhibit I-29

**News Release**
FOR IMMEDIATE RELEASE
January 29, 2005

## Agustin Vasquez-Mendoza Extradited To Arizona
### *For the Murder of DEA Special Agent Richard Fass in 1994*

JAN 29— DEA Administrator Karen P. Tandy announced the extradition of Agustin Vasquez-Mendoza from Mexico to the United States to stand trial for his role in the murder of DEA Special Agent Richard Fass, 10 years ago, in Glendale, Arizona. Vasquez-Mendoza was removed from Mexico City by DEA Agents and was transported to Phoenix, Arizona, where he will appear before a Maricopa County Judge to answer a July 5, 1994 Maricopa County Grand Jury indictment for First Degree Murder,



Conspiracy/Armed Robbery, Attempted Murder, Attempted Armed Robbery, Kidnapping and First Degree Burglary.

On June 30, 1994, Special Agent Richard E. Fass, while operating in an undercover capacity, was shot five times, in a cold blooded, pre-meditated plan by Vasquez-Mendoza and his associates to rob Special Agent Fass of $160,000 in cash that they believed was for the purchase of methamphetamine. Vasquez-Mendoza was the head of a criminal organization that owned and operated several clandestine methamphetamine laboratories in the Mexican State of Senora. Vasquez-Mendoza then smuggled the methamphetamine into the United States for distribution. Vasquez-Mendoza and three additional defendants, Rafael Rubio-Mendez, Juan Vasquez-Rubio and Eduardo Aceves-Vasquez, were identified as being involved in planning the robbery/murder of Special Agent Fass. Agustin Vasquez-Mendoza, managed to evade capture and fled to Mexico. The three co-defendants were arrested and charged. All three defendants were subsequently convicted and sentenced for their part in the murder of Special Agent Fass. On July 9, 2000, Agustin Vasquez-Mendoza was arrested in the State of Puebla, Mexico, and an extradition was requested for his return to the U.S. to face charges.

"More than a decade ago, DEA Special Agent Richard Fass was killed in cold-blood trying to put violent wholesale methamphetamine traffickers out of business. After a relentless six year manhunt the mastermind behind Agent Fass' murder is returned to the scene of the crime to face justice," said DEA Administrator Karen P. Tandy.



Paul K. Charlton, the United States Attorney for the District of Arizona stated " This is a good day for Law Enforcement. We are grateful to the Mexican government and look forward to presenting this case to a jury."

The manhunt for Vasquez-Mendoza had been one of the most intense in recent U.S./Mexico law enforcement history. Special Agents and personnel from the Phoenix F.D. immediately began searching for the fugitive while the Glendale and Phoenix Police Department's homicide units initiated their murder investigation against his co-defendants. DEA personnel enlisted the

assistance of the intelligence community and many Mexican law enforcement entities. Vasquez-Mendoza was placed on the Federal Bureau of Investigation's (FBI) Top Ten List on August 3, 1996. On October 1, 1998, DEA, FBI and the Department of State offered a reward up to 2.2 million dollars for his arrest. The arrest and extradition of Vasquez-Mendoza culminates a long and arduous investigation led by DEA Phoenix Field Division with assistance from the Mexico City Country Office (MCCO). Vasquez-Mendoza was profiled in three "America's Most Wanted" television productions and two "Unsolved Mystery" productions. Hot lines were established and manned around the clock handling thousands of leads that came from as far south as Panama City and as far north as Montreal, Canada.



"Today we achieved the outcome we've been working so diligently on for almost 11 years. The exhaustive work of Glendale Police Detectives, partnering with DEA, made today's extradition of Agustin VASQUEZ-Mendoza possible," said Glendale Chief of Police Andrew Kirkland.

"We are very happy that Agustin Vasquez-Mendoza is in U.S. custody, and we intend to prosecute him to the fullest extent of the law," stated Maricopa County Attorney Andrew Thomas.

"I would like to thank the Government of Mexico, in particular, Attorney General Rafel Macedo de la Concha for monitoring the progress of this investigation and moving forward with the extradition," said Administrator Tandy.

Assistant United States Attorneys (AUSA) Keith Vercauteren and Kevin Rapp, both of which are cross-designated as Maricopa County State Prosecutors, are currently assigned to the Fass murder case and will be responsible for the prosecution of VASQUEZ-Mendoza upon his arrival in the United States. Vasquez-Mendoza faces life with the possibility of parole after serving 25 years of imprisonment if convicted of the charges.

For additional information, please contact DEA's Office of Public Affairs at 202-307-7977.

# Exhibit I-30



2102 West Encanto Blvd.
Phoenix, AZ 85005 - 6638
(602) 223-2000
azdps.gov

## FALLEN OFFICERS

### Sgt. Manuel H. Tapia, 41

**Residence: Nogales**
**Badge: 1409**
**End of Watch: January 8, 1991**



Sgt. Tapia was shot at about 7 p.m. Jan. 7, 1991, in Nogales by a drug suspect. He died at about 1 a.m. Jan. 8, 1991, at Tucson Medical Center. The suspect, Noel Gonzales-Bernal of Nogales, Sonora, Mexico, was fatally shot by a Nogales police officer. The incident occurred in Nogales, about a mile north of the border, after Tapia and the Nogales police officer stopped the suspect's Thunderbird. Upon asking the suspect to open the vehicle's trunk, the suspect fled on foot with Sgt. Tapia chasing him. The suspect then turned and shot Sgt. Tapia. The suspect was then shot. It was later learned that Sgt. Tapia was unarmed, having inadvertently left his weapon in his vehicle.

<< Previous                                                                    Next >>

# Exhibit I-31



# Arizona State Legislature

Bill Number Search: [        ] 🔍

**Forty-ninth Legislature - Second Regular Session**

**Email a Member** | Email Webmaster          **change session** | printer friendly version

Senate     House     Legislative Council     JLBC     More Agencies     Bills     Committees     Calendars/News

## Paula Aboud

**Democrat**                    **District 28**



Senate
1700 W. Washington
Room 314
Phoenix, AZ 85007
Phone Number: (602) 926-5262
Fax Number: (602) 926-3429

Email Address: paboud@azleg.gov

| Member Information | District Information |
|---|---|
| Bio Information | David Bradley (House of Representatives) |
| Committee Assignments | Steve Farley (House of Representatives) |
| Sponsored Bills | United State Congress |

**Personal Information:**

**Home City:** Tucson
**Occupation:** Semi-Retired; property manager
**Member Since:** 2006

**Legislative Achievements:**
I have served in the Senate since Jan. 2006 in the seat vacated by Congresswoman Gabrielle Giffords. I proudly serve on three standing committees and most especially as the ranking Democratic member of the powerful Appropriations Committee. I also serve on the Health Committee and Education Committee. I have served on Higher Education Committee and Commerce and Economic Development committees. In addition, I have been selected to serve on the JCCR and JLBC Committees, the Joint Committee on Capitol Review and the Joint Legislative Budget Committee.

In 2009 – present: I was chosen as one of two legislators to serve on the Making Opportunity Affordable Grant Team that has worked with the regents, business community, universities & community colleges to write a Lumina Foundation Grant to bring more affordable baccalaureate degrees to Arizona to meet the demand for a more educated workforce.

**Education:**
I graduated from Tucson High School and received a Bachelor of Arts Degree from the University of Arizona with a major in English. Upon completion of master-level education courses, I received a Certificate of Teaching in Arizona and taught English and coached state championship teams at Rincon High School in Tucson. Subsequently, I became a licensed real estate agent in Tucson. Later still, I became a trained mediator through the American Arbitration Association and a trained Life Coach from the Coaches Training Institute of Berkeley, California.

**Professional Experience:**
I enjoyed working for 7 years as a high school English teacher at Rincon High School in Tucson, Arizona for 7 years while coaching the state championship volleyball teams and the girls' tennis teams. Desiring to pursue a family tradition reflecting a love of real estate, I became a licensed real estate agent in Arizona and specialized in residential properties for 5 years. When the opportunity arose to resume my coaching career at a higher level, I relocated to Maine to become a college tennis and squash coach at Colby College in Waterville, Maine, for 7 years. A family illness prompted my

# Exhibit I-32

Member Page



# Arizona State Legislature

Bill Number Search: [        ] 🔍

**Forty-ninth Legislature - Second Regular Session**

**Email a Member** | Email Webmaster          change session | printer friendly version

Senate       House       Legislative Council       JLBC       More Agencies       Bills       Committees       Calendars/News

### Rebecca Rios
### Assistant Minority Leader

**Democrat**                    **District 23**

Senate
1700 W. Washington
Room 213
Phoenix, AZ 85007
Phone Number:  (602) 926-5685
Fax Number:  (602) 417-3167

Email Address: rrios@azleg.gov

## Member Information                    ## District Information
Bio Information                          Barbara McGuire (House of Representatives)
Committee Assignments                    Frank Pratt (House of Representatives)
Sponsored Bills                          United State Congress

**Personal Information:**

**Home City:** Apache Junction
**Occupation:** Community Relations
**Member Since:** 2004

**Current Office:**
State Senator, Assistant Minority Leader
Current District: 23
First Elected: 11/02/2004
Last Elected: 11/2008
Next Election: 2010
Party: Democrat

**Committees:**
Appropriations
Public Safety & Human Services
Retirement & Rural Development
Joint Legislative Audit Committee
Joint Legislative Budget Committee
Senate Ethics Committee

**Background Information**
Birth date: 06/04/1967
Birthplace: Tucson, AZ

**Education:**
Master's Degree in Social Work, Arizona State University, 2003.
Bachelor's Degree in Social Work, Arizona State University, 1989.
Associates of Arts Degree, Central Arizona College, 1987

**Political Experience:**
1995 - 2000, elected to 3 terms in the Arizona House of Representatives

2005 - Current, Arizona State Senator, District 23

**Organizations:**
1995 - Current Head Start Board, Pinal/Gila County, including 3 years as President of the Board
2007 - Arizona Rural Health Association, Board Member
2007 - Community Alliance Against Family Abuse, Board Member

**Previous International Travel:**
1995 - Delegate to Mongolia, American Council of Young Political Leaders
2005 - Delegate to Taiwan, National Association of Women Legislators
2007 - Delegate to Israel, American Israeli Public Affairs Committee

top

### Committee Assignments

| Committee | Position | Minutes | Agendas |
|---|---|---|---|
| Appropriations | Member | Click Here | Click Here |
| Public Safety and Human Services | Member | Click Here | Click Here |
| Appropriations Subcommittee on Transportation and Criminal Justice | Member | Click Here | Click Here |

top

### Sponsored Bills

| Bill Number ▼ | Sponsor Type ▼ | Short Title ▼ | Final Vote |
|---|---|---|---|
| HB2133 | C | air quality nonattainment areas; designation | |
| HB2291 | P | preexisting condition exclusions; prohibition | |
| HB2292 | C | disabled employees; employer harassment | |
| HB2293 | C | law enforcement merit system; membership | |
| HB2294 | C | business license; ethics pledge | |
| HB2295 | C | unemployment insurance; eligibility; full-time students | |
| HB2394 | P | technical correction; expenditure limitation (NOW: expenditure limitation; town of Superior) | |
| HB2525 | C | life sentence; parole eligibility | |
| HB2576 | C | heat and power tax credit | |
| HB2595 | C | enterprise zone; jobs incentives | |
| HB2608 | C | constables; jurisdiction | |
| HCR2066 | C | review; questionable arson convictions | |
| HCR2067 | C | John Pintek; death resolution | |
| HCR2068 | P | Jack Brown western day | |
| HCR2070 | P | death resolution; Stewart Udall | |
| HCR2071 | P | Norm Moore | |
| HR2007 | C | Hector Morales; death resolution | |
| SB1090 | C | welfare assistance; assignment of rights | |
| SB1091 | P | CPS workers; investigations; group homes | |
| SB1141 | C | CAGRD revenue bonding; sustainability policies | |
| SB1152 | P | foster care children; rights | |
| SB1164 | P | traditional Native American practices; regulation | |
| SB1173 | C | debtor property exemptions; earned income | |
| SB1174 | P | African-American affairs; commission | |
| SB1229 | C | labor organizations; nonunion employees; representation | |
| SB1230 | P | public employees; collective bargaining | |
| SB1231 | C | employer communications; religious; political beliefs | |
| SB1232 | C | outsourcing; state service positions; prohibition. (NOW: civil rights; discrimination; employment | |
| SB1233 | P | right to work; unions | |
| SB1234 | C | sale of prescription records; prohibition | |
| SB1236 | C | health care business; consumer information | |
| SB1256 | C | standard deduction; nonresidents; pro-rate. | |
| SB1261 | P | families of fallen officers fund | See Vote |
| SB1293 | C | income tax credits; repeal dates | |
| SB1295 | C | business development program; disabled persons | |
| SB1386 | P* | condominiums; homeowners' associations; rental limits | |
| SB1443 | C | photo enforcement procedures | |
| SCR1024 | P | Chicago Cubs; spring training | |
| SCR1035 | P | collective bargaining | |
| SCR1053 | P* | ratification; equal rights amendment | |

top

P* = Prime Prime Sponsor, P = Prime Sponsor, C = Co-Sponsor

©2007 Arizona State Legislature.                                                                 privacy statement

# Exhibit I-33



# Arizona State Legislature

Bill Number Search: [      ] 🔍

**Forty-ninth Legislature - Second Regular Session**

**Email a Member** | Email Webmaster          **change session** | printer friendly version

Senate     House     Legislative Council     JLBC     More Agencies     Bills     Committees     Calendars/News

### Linda Lopez
### Minority Whip

**Democrat**          **District 29**

Senate
1700 W. Washington
Room 315
Phoenix, AZ 85007
Phone Number: (602) 926-4089
Fax Number: (602) 417-3029

Email Address: llopez@azleg.gov

## Member Information                    ## District Information

**Bio Information**                      **Matt Heinz (House of Representatives)**
**Committee Assignments**                **Daniel Patterson (House of Representatives)**
**Sponsored Bills**                      **United State Congress**

**Personal Information:**

**Home City:** Tucson
**Occupation:** Program Development Coordinator, La Frontier Center Member
**Member Since:** 2001

---

**Linda's Legislative Achievements:**

First elected to office in 2001 to serve District 29; House Minority Whip 2003-2004; Assistant Minority Leader 2005-2006; Current committee assignments are Appropriations( B); Health; Rules; Joint Legislative Budget Committee; CPS Oversight; and the Governor's Commission on Reforming CPS. Linda has and will continue to have a positive impact at the House of Representati-ves.

**Professional Experience:**

Linda serves as Community Relations Coordinator for La Frontera Center, Inc., Tucson. She has been employed and worked for the center since 1991 and is responsible for pursuing funding opportunities for programs, collaborating with other agencies and providers to ensure optimum services for children and adults, and for promoting La Frontera Center to the community. Ms. Lopez has also served as a Clinical Supervisor for Child/Family Center, responsible for overseeing all aspects of daily operations of the Child/Family Center to include personnel management, program development and implementation for a variety of children with special needs, provision of counseling services for children and parents/guardians, and review of financial operations. Prior to this she served as Child/Family Specialist which required direct contact with a variety of special needs children, including developmentally delayed and emotionally and behaviorally disturbed. She developed treatment plans, maintained client records, counseled children and parents/guardians, conducted home visits, and collaborated with staff of cooperating agencies. She was a foster parent for 10 years for 44 foster children who had been abused and neglected. Many of the children had special needs, including schizophrenia, learning disabilities, depression, developmental delays and behavior disorders.

**Personal & Family:**

Linda was born in September 1948. She and her brother Terry spent their formative years growing up in Indiana. In 1964 her family moved to the San Francisco Bay area where Linda attended University of California at Berkeley. In 1973, she moved to Tucson. As the children grew up Linda decided to return to college. She is the mother to two

beautiful daughters, **Toni** and **Bobbi** and a son **Aaron**. Linda has bragging rights to two grandsons, **Kyle** and **Dylan** and their wonderful mother **Charla**. She was also a foster mother to 44 abused/neglected children.

In 2001, Linda decided to run for and won a seat at the House of Representatives for District 29. She is humbled and honored to serve the district and the people of the great state of Arizona. Ms. Lopez has an extraordinary capacity for hard work and enjoys serving the public. She has a great passion for children and education. Linda has been a member of the Sunnyside School Board since 1986, 5 years as board president, and 2 years as clerk of the board. As one can well imagine Ms. Lopez is a highly pivotal figure in her community and district.

**Education:**

B.A., University of Arizona, Women's Studies, Psychology, minor, 1990, 15 units of graduate credit toward M.A. in History, 1991.
University of California, Berkeley – 1966 to 1968

**Academic Honors:**

Dean's List, Phi Beta Kappa and National Golden Key Honor Society

**Awards:**

Among the many awards Linda has received are:

1996 NOW Woman of Courage
1996 Arizona Art Advocate
1998 YWCA Woman on the Move Award
2000 Noche de la Estrella Serenata de Honor
2003 Arizona School Boards Association Legislator of the Year
2004 Sunnyside School District Hall of Fame Award
2005 Distinguished Service to Exceptional Children
2006 National Association of Social Workers Elected Official of the Year
2006 Arizona School Boards Association Legislator of the Year for 2005

**Associations:**

Ms. Lopez serves on numerous boards and is a member of many organizations, including:
National Conference of State Legislatures Women's Legislative Network, Executive Committee Board
Sunnyside School Board Member, 1986-2002, 2005 to present
Parents as Teachers, 1998 to present. Advisory Committee member
Arizona Schools Board Association, 1991 to 2002, 2005 to present. Served as President in 2001
Arizona Hispanic – Native American School Board Members Caucus. 1987 to 2002. 2005 to present. Served as president in 1994
Council of Urban Boards of Education, 1992 – 2002, 2005 to present. Served as chair (2002)
National Hispanic Caucus of School Board Members, 1988 to 2002 – present - President 1999 – 2000.
Juvenile Services Coordinating Council, 2000 – present. Member
National Organization for Women
Arizona Women's Political Caucus
NAACP
American Association of University Women
End of Life Choices -- Arizona
Planned Parenthood
Arizona Human Rights Fund
Business and Professional Women's Association
Los Descendientes of Tucson
Tucson Sister Cities
Co-Chair Governor's Task Force on Preventing Prenatal Exposure to Alcohol and Other Drugs…..2005
NALEO (National Association of Latino Elected Officials)

**Leadership Development:**

2004 Flemming Fellow 2005 Harvard University Kennedy School of Government Program for Senior Government Executives, Fannie Mae Foundation
2005 Center for Women Policy Studies Foreign Policy Institute for Women Legislators

top

### Committee Assignments

| Committee | Position | Minutes | Agendas |
|---|---|---|---|
| Education Accountability and Reform | Member | Click Here | Click Here |
| Healthcare and Medical Liability Reform | Member | Click Here | Click Here |

top

### Sponsored Bills

| Bill Number ▼ | Sponsor Type ▼ | Short Title ▼ | Final Vote |
|---|---|---|---|
| HB2525 | C | life sentence; parole eligibility | |
| HB2544 | C | unrestrained minors; motor vehicles; prohibition | |
| HB2545 | C | professions; dismissed complaints; records | See Vote |
| HB2547 | C | prescription drugs; reimportation | |
| HB2548 | C | minor parents; medical decisions | |

| | | |
|---|---|---|
| HB2549 | C | designated beneficiaries |
| HB2550 | C | state employees; insurance; dependent definition |
| HB2552 | C | liquor establishments; hours of operation |
| HB2553 | C | driver licenses; automatic organ donation |
| HB2654 | C | state; retirees health insurance pool |
| HB2736 | P | sports authority; surcharges |
| HCR2047 | P | Maurice Grossman |
| HCR2067 | P | John Pintek; death resolution |
| HCR2068 | P | Jack Brown western day |
| HCR2070 | P | death resolution; Stewart Udall |
| HCR2071 | P | Norm Moore |
| HR2007 | C | Hector Morales; death resolution |
| SB1164 | P | traditional Native American practices; regulation |
| SB1173 | C | debtor property exemptions; earned income |
| SB1174 | P | African-American affairs; commission |
| SB1181 | C | autism spectrum disorder task force |
| SB1182 | C | psychiatric mental health nurse practitioners |
| SB1215 | C | AHCCCS; integrative therapies pilot program |
| SB1230 | C | public employees; collective bargaining |
| SB1231 | P | employer communications; religious; political beliefs |
| SB1232 | C | outsourcing; state service positions; prohibition. |
| | | (NOW: civil rights; discrimination; employment |
| SB1233 | C | right to work; unions |
| SB1234 | C | sale of prescription records; prohibition |
| SB1235 | C | hazardous substances; insurance |
| SB1236 | C | health care business; consumer information |
| SB1237 | C | prescription marketing costs; full disclosure |
| SB1256 | C | standard deduction; nonresidents; pro-rate. |
| SB1260 | P | school tax credits; temporary suspension |
| SB1285 | C | optometrists; medications |
| SB1292 | C | civil actions; time limits; crimes |
| SB1293 | C | income tax credits; repeal dates |
| SB1295 | C | business development program; disabled persons |
| SB1297 | P* | ELL programs; alternative models |
| SB1298 | P* | end-of-life options; right to know |
| SB1299 | P* | school district personnel; decisions |
| SCR1024 | P | Chicago Cubs; spring training |
| SCR1031 | P | public revenue expenditures; ballot measures |
| SCR1035 | C | collective bargaining |
| SCR1038 | C | legislative salary reduction |
| SCR1041 | P | repeal 1992 Proposition 108 |
| SCR1053 | P | ratification; equal rights amendment |

**top**

P* = Prime Prime Sponsor, P = Prime Sponsor, C = Co-Sponsor

©2007 Arizona State Legislature.                                                                                                   privacy statment

Exhibit I-34



# Arizona State Legislature

Bill Number Search:

Forty-ninth Legislature - Second Regular Session     **Email a Member** | Email Webmaster     **change session** | printer friendly version

Senate     House     Legislative Council     JLBC     More Agencies     Bills     Committees     Calendars/News

**Daniel Patterson**

**Democrat**                    **District 29**

House of Representatives
1700 W. Washington
Room 123
Phoenix, AZ 85007
Phone Number: (602) 926-5342
Fax Number: (602) 417-3169

Email Address: dpatterson@azleg.gov

## Member Information
**Bio Information**
**Committee Assignments**
**Sponsored Bills**

## District Information
**Matt Heinz (House of Representatives)**
**Linda Lopez (Senate)**
**United State Congress**

## Personal Information:

**Home City:** Tucson
**Member Since:** 2009

Daniel Patterson is a progressive, independent and fiscally responsible Democratic Representative.

Daniel is a family man from south downtown Tucson, where his family generates solar power and grows food. He's worked with many Arizona legislators, Governor Janet Napolitano, US Reps. Raul Grijalva and Gabrielle Giffords, and Republicans, Independents and Greens.

As a former Tucson Planning Commissioner, Center for Progressive Leadership Arizona Political Leaders Fellow, Board Member of the Pima County Board of Adjustment, and Santa Rita Park Neighborhood President, Daniel Patterson has demonstrated government and community leadership.

Mr. Patterson is an Ecologist with strong environmental, water and energy knowledge and planning skills to help quality of life in Tucson's scenic, fragile and growing south and southeast areas of district 29, and across Arizona.

His priorities include improving the economy, education, health care, jobs, public safety, human & civil rights, water, transportation, energy and the environment.  Patterson's district 29 includes all of Davis-Monthan Air Force Base.

Daniel Patterson is the Southwest Director of Public Employees for Environmental Responsibility, a national conservation service organization. He formerly worked with the US Department of the Interior-Bureau of Land Management, and later directed a major desert wildlife and natural resources program.  He also has business experience, having helped his family run a successful automotive company, and he ran his own consulting business.

Daniel is a graduate of Michigan State University's College of Agriculture and Natural Resources.

top

### Committee Assignments

| Committee | Position | Minutes | Agendas |
|---|---|---|---|
| Water and Energy | Member | Click Here | Click Here |

top

### Sponsored Bills

| Bill Number ▼ | Sponsor Type ▼ | Short Title ▼ | Final Vote |
|---|---|---|---|
| HB2264 | C | bald eagle; endangered species act | |
| HB2274 | C | voter registration; permanent early voting | |
| HB2275 | C | election day voter registration | |

# Exhibit I-35



## Human Trafficking

Home • About Us • What We Investigate • Civil Rights • Human Trafficking



### It's sad but true: here in this country, people are being bought, sold, and smuggled like modern-day slaves.

They are trapped in lives of misery—often beaten, starved, and forced to work as prostitutes or to take grueling jobs as migrant, domestic, restaurant, or factory workers with little or no pay. We're working hard to stop human trafficking—not only because of the personal and psychological toll it takes on society, but also because it facilitates the illegal movement of immigrants across borders and provides a ready source of income for organized crime groups and even terrorists.

### In Depth

**About Our Program**
- FBI Initiatives
- Interview on Human Trafficking

**Related Information**
- Federal Civil Rights Statutes
- Bureau of Justice Statistics' Trafficking Incidents

**Stories and Features**
- Massive Case with 600 Thai Victims
- Putting a Stop to Modern-Day Slavery
- Human Trafficking: Today's Slave Trade
- Major Prostitution Ring Busted
- Human Trafficking Intelligence Report
- "Sister Ping" Sentenced to 35 Years
- FBI Exec on Trafficking of Persons
- Anatomy of Global Case: Part 1 | Part 2
- Case of the Texas Sex Slaves

**Report Human Trafficking/Get Help**
- Call 1-888-428-7581, 9 a.m. to 5 p.m. EST
- Contact Your Local FBI Office
- Submit Information Electronically
- FBI Office for Victim Assistance
- Help for Victims Brochure

**Related FBI Websites**
- Innocence Lost: Child Prostitution
- Organized Crime
- Violent Gangs

**More Human Trafficking Websites**
- U.S. Department of Justice
- U.S. Department of Homeland Security
- U.S. Department of State
- U.S. Department of Health & Human Services
- U.S. Agency for International Development

### In the News



**Help Identify Victims**
Thousands in the U.S. and millions worldwide are forced into legal and illegal activities. **Details**

**More News & Features**

*08.02.12*  **Washington:** Leader of Internet prostitution business sentenced to over four years.

*07.18.12*  **Atlanta:** Man found guilty of operating violent sex trafficking ring.

*07.16.12*  **Philadelphia:** Ukrainian national sentenced to life for running human trafficking operation.

*More press releases*

### Report Trafficking & Get Help



You can report trafficking crimes and get help by calling the Department of Justice Trafficking in Persons and Worker Exploitation Task Force Complaint Line at 1-888-428-7581 (voice and TTY). New laws provide options for trafficking victims regardless of immigration status. Operators have access to interpreters and can talk with callers in their own language. The service is offered on weekdays from 9 a.m. to 5 p.m. EST. After hours, information is available on tape in English, Spanish, Russian, and Mandarin.

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. Federal Government. **U.S. Department of Justice**

Close

Exhibit I-36

HOME    ABOUT CWA    CORE ISSUES    MULTIMEDIA    MEDIA CENTER





Sign up for our E-Alerts
[SIGN UP]

Search our Site
[SEARCH]

LEGISLATION | LEGAL STUDIES | BEVERLY LAHAYE INSTITUTE | CULTURE AND FAMILY ISSUES | STATES | PUBLICATIONS



HOME > COMMENTARY > IMMIGRATION AND SEX TRAFFICKING

# Immigration and Sex Trafficking

**Recent Articles from
Concerned Women for America**

Good News on Teens and Sex

Human Trafficking Caucus Briefing

She Votes 2012 Bus Tour Video!

CWA CEO and President Penny Nance
Comments on Sandra Fluke Joining the
Obama Campaign Appeal to Women

Demonizing Romney



The issues of illegal immigration and sex trafficking are closely linked, according to many who follow both issues.

Click here to watch:



Tom Fitton, President of Judicial Watch, www.judicialwatch.org



T.J. Bunner, President of National Border Patrol Council (AFL-CIO)



Erin Anderson, Arizona property owner



Dr. Janice Crouse, Senior Fellow of the Beverly LaHaye Institute - Click here for written statement(.pdf).



Steven Camarota, Director of the Research Center for Immigration Studies

More multimedia content.

Send this article to a friend:

| Enter Address Here |

[ Send this URL ]

**Share this article:**

Concerned Women for America
1015 Fifteenth St. N.W., Suite 1100
Washington, D.C. 20005
Phone: (202) 488-7000
Fax: (202) 488-0806
E-mail: mail@cwfa.org



# STATEMENT
## Dr. Janice Shaw Crouse

Any illegal activity spawns violence and exploitation. Illegal immigration, facilitated by wretched criminal networks, fosters sex trafficking and human smuggling.

Both are evidences of dreams for a better future gone horribly wrong.

Both are recognized by the United Nations as the fastest-growing international crimes.

Human smuggling involves a person paying for covert passage into the United States.  We've all heard the stories of crammed containers and long hikes across the desert.  Smuggling often involves fraudulent documents and a lot of money — but the deal is mutually agreed to even if the price is exorbitant.  Ultimately, the relationship with the smuggler ends with delivery to the destination.

Human trafficking, though, involves deception that quickly turns into coercion with force, threats and/or brutality.  Vulnerable girls, women and men are tricked or lured into casting their lot with con men who promise legitimate jobs and bright prospects that turn out to be nightmares of unbelievable exploitation.  The victim ends up in slavery and is used as a commercial commodity by criminal networks that make billions of dollars a year in their illegal exploitation of other human beings.

Sex trafficking is unique in that the girls can be sold and resold numerous times.  Sex trafficking is also unique in that the girls become slaves of the pimps who ultimately control them – through beatings, sleep deprivation, and horrible scare tactics and mind-control techniques.  With their passports confiscated and told that they have to work off the debt they incurred by getting passage into the U.S., the girls become modern-day slaves with horrible consequences – often required to service up to 30 men a day and  inhumane conditions of bondage. The girls get little or no income and are subjected to physical and sexual violence daily.

If the victims are under age 18, they are considered to be trafficked whether fraud, force or coercion is used or not. The traffickers prey on vulnerable Mexicans and they use Mexico as the transit nation for victims from Asia, Europe, South and Central America.

Both smuggling and trafficking are sordid enterprises that make multiple billions of dollars for criminal networks willing to exploit desperate people for fast bucks with little risk and almost no expense.  As with most international crimes, the trafficking world leads to violence and death; the bodies of young Mexican girls have begun turning up in the states on both sides of the border — unclaimed and without documentation so their identity is lost.

These bodies are mute witnesses to the horrible facelessness and inhumane brutality of this international criminal activity.

Our nation's porous southern borders and lack of enforcement against illegal immigration make it easy for the traffickers to ply their trade and profit from exploiting women and children.

# Exhibit I-37

War on Terror: Security Failure: 9/11: The 7 missed clues; HOW FBI AND CIA KEPT ON BLUNDERING; News
Sunday Mirror (London, England) June 9, 2002

Copyright 2002 Gale Group, Inc.
All Rights Reserved
ASAP
Copyright 2002 MGN LTD
Sunday Mirror (London, England)

June 9, 2002

**SECTION:** Pg. 16 ISSN: 0956-8077

**ACC-NO:** 87043750

**LENGTH:** 1732 words

**HEADLINE:** War on Terror: Security Failure: 9/11: The 7 missed clues; HOW FBI AND CIA KEPT ON BLUN-DERING;
News

**BODY:**

Byline: BARRY WIGMORE in Washington

PRESIDENT Bush was forced to carry out the biggest-ever shake-up of America's security system last week after the FBI and CIA missed SEVEN glaring clues pointing to the 9/11 disaster, an investigation hasrevealed.

The trail that finally led to 2,969 dying in the Twin Towers and Pentagon terrorist attacks goes back nearly four years.

Yet due to turf wars between the FBI and CIA and bureaucratic bungling, two al-Qaeda terrorists were allowed to plot the attacks for 20months in the United States after the security service "lost track of them".

The inquest into the security blunders has led to 23 law enforcement agencies from the Secret Service to the Coast Guards being combined into one super-security department with a pounds 27billion-a-year budget.

It has also created an unlikely star in FBI lawyer Coleen Rowley who accused senior staff at the bureau's Washington headquarters of "throwing up roadblocks" in preventing agents gathering crucial evidence.

Rowley, a veteran with 21 years FBI service, thought she would be sacked for her outburst but instead she has become a key figure in the Senate's probe into security mistakes now being carried out in a sound-proofed room in Washington.

And here step-by-step we reveal how the United States failed to act on several crucial clues...

1 THE CONFESSION

THE trail started in August, 1998 when a would-be suicide bomber should have died after a lorry filled with explosives was driven at the gates of the US embassy in Nairobi.

In all 213 people were killed, but at the last moment Muhammad Rashed Daoud al-Owhali, a 20-year-old Saudi from a wealthy family, jumped out

He was arrested in a seedy Nairobi hotel and then interrogated by the FBI. He co-operated and gave a detailed confession. He even provided the FBI with the phone number of an al-Qaeda safe house in Yemen,owned by Ahmed Al-Hada, an Osama bin Laden loyalist.

2 THE PHONE LINK

AS the FBI operates mainly in the United States as a national police force it alerted the CIA, which carries out secret operations abroad. Helped by the National Security Agency, the CIA staked out the house and waited.

The phone was tapped and eavesdropping bugs put in the house whilespy satellites photographed every visitor.

War on Terror: Security Failure: 9/11: The 7 missed clues; HOW FBI AND CIA KEPT ON BLUNDERING; News Sunday Mirror (London, England) June 9, 2002

The CIA discovered a terrorist summit of Bin Laden's top lieutenants was to be held in the Malaysian capital Kuala Lumpur in January 2000.

In an exclusive suburban apartment overlooking a golf course designed by American golfing legend Jack Nicklaus, al-Qaeda terrorists posing as tourists plotted future strikes against the United States.

Malaysian detectives followed and photographed the terrorists sightseeing and ducking into cybercafes to keep in touch with fellow terrorists on Arab websites.

3 BOMBERS SPOTTED

CIA agents followed one of the terrorists, 25-year-old Nawaf Alhazmi, when he left Kuala Lumpur and flew on to Bangkok. And they were still on his trail when he left for Los Angeles on January 15, 2000.

On the same flight, sitting a few seats away, was another al-Qaedaterrorist who had been at the Kuala Lumpur summit - 26-year-old Khalid Almihdhar.

The two were later to share another flight - American Airlines 77 when it was flown into the Pentagon.

The CIA should have tipped off the the FBI, so the two suspects with known terrorist links could be tailed, or informed the US State Department or Immigration Service so they could have been refused entry. Instead they did nothing. "The FBI wants to arrest suspects while the CIA wants to let them run and see where it leads," explained a CIA-man. "They don't co-operate. And this time the suspects just vanished."

4 LOSING THE TRAIL

FOR a year and nine months, Alhazmi and Almihdhar were left to continue their work unhindered by the security service. They lived openly, using their real names to rent an apartment in San Diego, California.

They got social security cards and drivers' licences, the "passports" to life in the United States. A Muslim who was chided by Almihdhar for watching "immoral" American television retorted: "If you're so religious, why don't you have facial hair?" Tellingly Almihdhar replied: "You will know some day, brother." Alhazmi and Almihdhar opened bank accounts, and took out credit cards. They bought season tickets to Sea World and lived on burgers and fries.

They also enrolled for lessons at Sorbi's Flying Club.

Both were pretty useless and failed to get their pilot's licence despite logging 50 hours in a single-engine Cessna. "They were only interested in flying big jets," says instructor Rick Garza. "I just thought they didn't have the aptitude. They were like Dumb and Dumber."

The two terrorists couldn't have been easier to find. Alhazmi's name appears on page 13 of the 2000-2001 San Diego phone book, with hisfull address in Mount Ada Rd, and phone number. More outgoing and fun-loving than Almihdhar, Alhazmi even put an ad on the Internet for aMexican mail-order bride. According to neighbours, Mohamed Atta, whopiloted the first plane to hit the World Trade Center and is regarded as the leader of the 9/11 terrorists, visited Almihdhar and Alhazmiat their house in San Diego.

When Almihdhar bought a dark blue 1988 Toyota Corolla car for $3,000 cash, he registered it in his name. He signed the registration over to Alhazmi, whose name was on the papers when the car was found at Dulles International Airport on September 11.

The FBI still knew nothing about them and the CIA, which could have told them, stayed silent.

When the USS Cole was bombed off the Yemen coast in October 2000, killing 17 servicemen, the FBI turned up the name of a suspect Tawfiqbin Attash, also known as Khallad, a committed al-Qaeda terrorist, even though he has only one leg.

And analysts at the CIA's Counter Terrorism Centre found a pictureof Khallad next to Almihdha at the Kuala Lumpur terrorist summit.

Early in 2001, after failing to get a pilot's licence at two California flying schools, Alhazmi moved to Phoenix, Arizona. There he joined another al-Qaeda member, Hani Hanjour, who piloted American Airlines Flight 77.

War on Terror: Security Failure: 9/11: The 7 missed clues; HOW FBI AND CIA KEPT ON BLUNDERING; News Sunday Mirror (London, England) June 9, 2002

In April 2001, five months before the attacks, Alhazmi was stoppedfor speeding in Oklahoma. The police ran his California driver's licence through the crime computers. When nothing came up, he was issuedwith two tickets, totalling pounds 96, and sent him on his way. The tickets were not discovered until after September 11.

5 TERRORIST'S VISA

IN June 2001, Almihdhar left the US for a "holiday" in Europe and the Middle East. While away the visa which would allow him back into the States expired. As the State Department knew nothing of his terrorist links the consular office in Saudi Arabia issued him with a new one. This was despite the still-silent CIA linking Almihdhar with Khallad.

6 THE 9/11 SUMMIT

JUST under a month before the September 11 attacks, Almihdhar met Atta and other terrorist plotters in Las Vegas. Checks carried out after the attacks showed at one point Atta even tried to get a pounds 450,000 loan from the US Department of Agriculture to buy crop-dustingplanes with which he planned to poison Washington. He vowed to cut the throat of the loan officer who interviewed him and threatened to destroy all the government buildings in Washington - but was not arrested.

And in Minneapolis, Minnesota, FBI agents got a call from instructors at the Pan Am flying school which operates from a local airport. They were suspicious about a man named Zacarias Moussaoui, who spoke bad English and was desperate to learn to fly a Boeing 747 jumbo jet.

At 34-year-old Moussaoui's hotel, the FBI discovered his visa had expired and he was arrested. Then they checked his background.

They discovered that in the early 1990s French police had him on their terrorist watch list and Scotland Yard also had a dossier on him. While studying at London's South Bank University, Moussaoui, a French-Moroccan, had toured Europe and the Middle East establishing ties with radical Islamic groups.

In 1997 Moussaoui was politely told he was no longer welcome at the South Bank mosque where he worshipped because of his violent views.But by then he had done his training at the same terrorist camp in eastern Afghanistan as British "shoe bomber" Richard Reid.

7 THE BUNGLED SEARCH

THE Minneapolis FBI team wanted a search warrant to allow them to sift through Moussaoui's papers and crucially his laptop computer.

On August 23, the CIA finally woke up. As US intelligence picked up repeated signals that Bin Laden was about to launch a major assault, CIA Director George Tenet ordered his staff to check their files again.

It didn't take long to discover the file on Almihdhar and Alhazmi.The CIA sent an urgent cable, labelled "IMMEDIATE" to the State Department, Customs, INS and FBI, telling them to watch the two men.

It was too late. The terror plot had been finalised. The suicide bombers had gone to ground. On September 5, 2001, Almihdhar bought hisFlight 77 ticket at the Baltimore-Washington International Airport. Alhazmi was staying nearby in Laurel, Maryland. On September 11, theyboarded the plane that hit the Pentagon.

The way FBI agents in Minneapolis were thwarted by bureaucrats at the Washington HQ, was set out in a furious 13-page memo by Rowley toDirector Robert Mueller. When Moussaoui's notebook and laptop were searched, a money trail linked him to Atta and other terrorists through an al-Qaeda paymaster, Ramzi Bin al-Shibh, in Germany.

Moussaoui received pounds 10,000 from Bin al-Shibh who also sent money to other hijackers while they were studying at Florida flight schools. In the months before the attacks, Alhazmi opened bank accountswith five other September 11 terrorists.

Moussaoui, who is due in court this week, now faces the death penalty on conspiracy and terrorism charges.

In her memo, full of indignant exclamation marks, Rowley says thatif they'd had these information sooner: "It's at least possible we could have gotten lucky and uncovered one or two more of the terrorists in flight training prior to September 11."

As more than one senator has said at the security inquiry: "They had it all there - but they failed to connect the dots."

War on Terror: Security Failure: 9/11: The 7 missed clues; HOW FBI AND CIA KEPT ON BLUNDERING; News
Sunday Mirror (London, England) June 9, 2002

news@sundaymirror.co.uk

COMMENT: Page 14

CAPTION(S):

US Embassy, Nairobi; Khalid Almihdhar and Nawaf Alhazmi; 'STAR': FBI's Coleen Rowley; Sorbi's Flying Club,
San Diego; USS Cole, Yemen; Zacarias Moussaoui; Meeting in Las Vegas; Muhammad al-Owhali; Mohammad Atta

**LOAD-DATE:** February 21, 2008

# Exhibit I-38



| | |
|---|---|
| **CHANDLER POLICE DEPARTMENT GENERAL ORDERS** *Serving with Courage, Pride, and Dedication* | Order **E-10 ARRESTS** |
| | Subject **100 Policy and Procedures** Effective **02/26/10** |

High Frequency/High Severity

**Summary:**
[1.2.1] [1.2.5] [74.3.1]

This order provides guidelines for making arrests.

**A. POLICY**

1. **OFFICERS SHALL STRICTLY OBSERVE** the laws of arrest by the Arizona Revised Statutes, applicable court decisions, federal laws, and local ordinances when making arrests

2. **IT IS THE OFFICER'S RESPONSIBILITY TO BE AWARE** of and comply with any changes in the law or requirements of new court decisions

3. **OFFICERS WILL EMPLOY ONLY** the necessary restraint to assure safe custody and safety of the officer when making an arrest

4. **THE ARRESTING OFFICER IS RESPONSIBLE** for the safety and protection of the arrested person while in the officer's custody

**B. IDENTIFYING PERSON TO BE ARRESTED**
[42.2.3]

1. **OFFICERS SHALL PROPERLY IDENTIFY** the person to be arrested as the one for whom the warrant was issued by physical description or any other identification information

2. **INCONCLUSIVE IDENTIFICATION**

   a. **Released:** Officer shall release the person and write and forward a memorandum with pertinent information, including a physical description of the person, vehicle, address, etc., to the originating police agency

   b. **Booking into jail:** If booking the suspect into jail or requesting a complaint and the suspect does not have identification or the officer feels the identification is questionable, the officer will request an identification specialist to be dispatched to conduct an AFIS comparison on the suspect **while he is in the officer's custody**

> New

3. **MANDATORY FINGERPRINTING**

   a. Per ARS 41-1750, all persons arrested for:
      1) Any felony
      2) Any sex offense
      3) Driving under the influence
      4) Ignition interlock violations
      5) Any domestic violence offense

   Shall be ten printed prior to release from custody.

    b. The arresting officer shall:
       1) Be responsible to 10 print all suspects applicable to this statute during the booking/citation process
       2) Complete the <u>mandatory fingerprint form</u>
       3) Provide the defendant with a copy of the form to present to the court at their next appearance
    c. If the suspect is physically unable to be printed at the time of arrest, the court will order the suspect to be printed within 20 days after their first appearance

## C. ESSENTIAL ELEMENTS OF ARREST
[42.2.3] [61.1.2] [71.1.2] [72.5.1] [74.3.1]

1. **THE FOLLOWING ELEMENTS** are normally required to effect a lawful arrest:

    a. **Intent** on the part of the officer making the arrest
    b. **Authority** which is lawful on the part of the officer making the arrest
    c. **Seizure** or **detention** of the arrestee
    d. **Understanding** on the part of the arrestee that he or she has been arrested

2. **ARREST PROCESS:** At the time of arrest, arresting officers shall:

    a. **Advise** the arrested person of the reason for arrest, if practical
    b. **Handcuff** the person with the handcuffs "double locked"
    c. **"Pat down"** the arrested person for weapons immediately following the handcuffing procedure
    d. **Search** the arrested person for weapons and/or contraband
       1) As soon as reasonable after arrest
       2) Always prior to being transported
       3) Again upon reaching the jail or temporary detention area
    e. **Remove personal property** and document on the Arrest/Booking form by either:
       1) The officer in the field, or
       2) At the detention facility during the intake process
    f. **Escort** the arrested person to a vehicle for transport or to another secure location as soon as possible
    g. **Search transport vehicles** for contraband prior to and after transporting prisoners
    h. **Search arrested person's vehicle:** If the suspect was in or a recent occupant of a motor vehicle, complete a search incident to arrest of the passenger compartment of the vehicle, all storage compartments in the passenger compartment and all containers in the passenger compartment whether locked or unlocked and no matter to whom they belong

## D. FORCED ENTRY FOR ARREST
[74.3.1]

1. **ABSENT EXIGENT CIRCUMSTANCES** requiring immediate action, officers **will not forcefully enter** to arrest a person without a warrant for felony offenses

a. ARS 13-3891 (as amended) allows an officer to force entry when attempting an arrest for any warrant or for a felony without a warrant

b. Restrictions pertaining to this law have arisen due to federal and state court decisions that limit access under these circumstances

2. **EXIGENT CIRCUMSTANCES,** per case law and Constitutional requirements, exist under limited circumstances. The recognized **exceptions** in Arizona are:

a. Hot Pursuit
b. Response to an emergency
c. Probability for the destruction of evidence
d. Knowledge the suspect is fleeing or about to flee
e. Risk of violence
f. Substantial risk of harm to the persons involved or the law enforcement process if the police must wait for a warrant

*(For additional description exceptions see G.O.E-09 200D Searches: Warrantless)*

3. **UNDER NO CIRCUMSTANCES** may an officer force entry to effect a **misdemeanor arrest** (exigent circumstances do not apply) without a warrant

a. An officer may enter the suspect's usual residence to effect an arrest only with an arrest warrant, search warrant, or consent

b. If the officer intends to enter a **third person's residence** to effect a warrant arrest, the officer will need the arrest warrant **and** a search warrant

**E. PROBABLE CAUSE STOP FILE**

Officers may request a "wanted" entry be placed in NCIC when an officer needs to take prompt action to apprehend a person who has committed (or the officer has probable cause to believe the person has committed) a felony, or circumstances prevent the immediate acquisition of a warrant. The wanted entry is good for 48 hours, and the officer must notify Records to cancel it once an arrest warrant is obtained.

**F. TYPES OF ARREST**

[1.2.6] [42.2.3] [61.1.2] [74.3.1]

Figure 1. **Types of Arrests**

| Arrest Type | Procedure |
|---|---|
| **1. Basic Types** | a. Arrest with a warrant<br>b. Arrest without a warrant based on probable cause |
| **2. By Felony Warrant** | a. Prior to making a felony warrant arrest, request Communications to verify the existence of an outstanding warrant and identity of the person to be arrested<br>1) Information on felony warrants is available from NCIC/ACIC through the Communications Center<br>2) When the NCIC/ACIC computers are down, the Communications Center will check the MCSO Records Section for local felony warrants |

| Arrest Type | Procedure |
|---|---|
| | b.   It is not necessary to obtain a copy of a warrant prior to serving it in an on-view situation.  If it is a local warrant, show the suspect a copy of the warrant as soon as possible. |
| **3.  By Misdemeanor Warrant** | Officer will verify outstanding City of Chandler or other city warrants through the Communications Center before execution is attempted |
| **4.  By Juvenile Warrant** | See: E-11.300 Juveniles |
| **5.  By Civil Warrant** | A civil warrant carries the same authority and responsibilities as a felony or misdemeanor warrant<br>a.   Officers shall follow the same procedure as an arrest for a felony warrant<br>b.   Officers shall only make an arrest on civil warrants that have been processed by the Sheriff's Office in the county in which the warrant was issued. This requirement is necessary to comply with Arizona Rules of Civil Procedures. |
| **6. Arrest Without a Warrant** | Officers may arrest without a warrant anytime the officer has probable cause to believe a crime has been committed and the suspect is in a place where the officer has a legal right to be. It does not matter whether or not the crime was committed in the officer's presence<br>*State v. Keener, 206 Ariz. 29, 75 P.3d 119 (2003)* |
| **7.  Immunity from Arrest**<br>[1.2.6] [61.1.3] [74.3.1] | Certain specified persons are immune from arrest under certain conditions.  Officers, however, shall report the details of all offenses on applicable offense reports.<br>a.   **Diplomatic agents,** such as ambassadors and foreign ministers, their families, servants, and staff are totally immune from arrest for any offense.<br>    1)   Direct questions regarding whether an individual is entitled to this immunity to the Office of Consular Affairs or the Federal Bureau of Investigation.<br>    2)   Complete a written report of the incident documenting the facts of the incident and the identity of the individual and promptly forwarded to the Department of State<br>b.   **Foreign consuls,** their families, servants, and employees are not immune from arrest except as follows:<br>    1)   The Mexican consul is immune from arrest while performing consular duties; however, deputy consuls are immune only if they are citizens of Mexico<br>    2)   If either the consul or a deputy consul is involved in offenses, the matter shall be referred to the shift commander<br>    3)   The courtesy of immunity is not extended to the families, servants, or employees of the consulate; however, whenever practical, they shall be released on misdemeanor offenses in lieu of booking pending the issuance of a complaint for the offense.  In such cases, the citation in lieu of detention procedures may be followed if appropriate criteria are met.<br>    4)   Do not give vehicles bearing any consular corps license plates parking citations, nor cite for traffic or driver's license violations drivers assigned to the Mexican consulate<br>    5)   Refer to a supervisor when offenses have been committed by members, families, or employees of all other foreign consulates |

| Arrest Type | Procedure |
|---|---|
| **7. *Immunity from Arrest, cont.*** | c. **Legislators** are immune from arrest while the legislature is in session for 15 days prior to the start of the session and during the session<br>  1) This immunity does not apply in cases of treason, felonies, or misdemeanors amounting to a breach of the peace<br>  2) Officers shall make arrests for misdemeanors only in cases of an offense by violence, an immediate disturbance of the public order-such as assault or in cases of driving a vehicle while under the influence of intoxicating liquor within the guidelines set forth in the operations order on DUI<br>  3) Officers shall refer the interpretation of a breach of the peace and the decision to arrest in all cases to a supervisor<br>  4) This immunity shall be inclusive of any civil process, including civil traffic citations. Per ARS 28-1591, civil traffic citations shall be treated as civil matters, and legislators are immune from such process if they wish to exercise their privilege of immunity from civil traffic citations.<br>d. **Federal employees** who are operating federally-owned vehicles are subject to the same enforcement policy as other citizens who are in violation of traffic ordinances except that they shall not be cited for driver's license violations<br>  1) Military personnel are not required to have an Arizona driver's license or Arizona vehicle registration if they possess a valid driver's license or vehicle registration from another state or the District of Columbia<br>  2) Arizona National Guard members, unless charged with a felony offense, are immune from arrest while en route to and from an armory drill, encampment, formation, or otherwise engaged in training activities. If a guard member in an immune status commits a misdemeanor offense for which the member could be arrested, an investigation shall be made so that a warrant or summons may be obtained for action after the period of immunity expires. The member's National Guard unit shall be notified of the incident. |
| **8. Illegal Aliens** | See General Order E-17.100 Undocumented Persons and Foreign Nationals |
| **9. Military AWOL / Deserter**<br>[74.3.1] | a. **Peace officers have no authority** to arrest individuals who are **"absent without leave" (AWOL)** even if listed in NCIC.  Officers should document all information regarding the individual's current address and telephone number and so it may be forwarded to the proper military authorities.<br>b. Peace officers may arrest those individuals listed in NCIC as a **deserter** once their status has been confirmed.  Upon arrest, they shall be turned over to the appropriate branch of the service or held in the detention area until a military police detail can arrive. |
| **10. Citizen's Arrest**<br>(ARS 13-3884)<br>[74.3.1] | a. **When an officer is called** to a scene of a citizen's arrest, the officer shall:<br>1) Secure the scene<br>2) Separate the parties<br>3) Then, conduct the officer's own investigation into the allegations |

| Arrest Type | Procedure |
|---|---|
| | b. **Upon completion** of the investigation, the officer shall make the appropriate disposition of the case |
| **11.  Fugitive Arrest**<br>[74.3.1] | a. **Definition:** A fugitive is any person wanted by virtue of a verified warrant with provisions to extradite by any law enforcement agency outside the State of Arizona<br>b. **Officers shall honor a warrant** for the arrest of a wanted subject if received from a law enforcement or correction agency or other public authority with powers of prosecution and extradition<br>　1) Certified copies of the complaint and warrant and verification that extradition has been authorized must be on file before the arrest is made; however, in the case of a serious offense or the probability that the fugitive will escape, an arrest may be made on a telegraphic or teletype warrant<br>　2) The warrant must contain the following information regardless of how they are received:<br>　　a) Name of defendant as shown on the warrant<br>　　b) Charge as shown on the warrant<br>　　c) Warrant number<br>　　d) Date of issue of the warrant<br>　　e) Name of the judge and court having the authority to issue the warrant<br>　　f) County and state where the warrant was issued<br>　　g) Recommended bond, if any<br>　　h) Statement that the demanding agency will extradite<br>c. **Requests to arrest by telephone** usually will **not be** honored except in unusual or emergency cases; ask the demanding agency to send a telegram or teletype with the required warrant and extradition information immediately following the telephone call. A supervisor must authorize this arrest before it can be made.<br>d. **Requirements for warrant verification** of an entry into NCIC may be met by confirmation through a telephone call to the issuing agency |
| **12. City Summons**<br>[74.3.1] | a. **Issued by the City Court**. Each summons bears an identifying number in addition to the defendant's name.<br>b. **Distribution** of pages<br>　1) **Last page:** Give to the defendant or the person accepting for the defendant<br>　2) **Original and second pages:** Return to City Court<br>c. **Procedure For Serving:**<br>　1) Officer must serve the person named on the summons or another responsible person in the same household at the residence as indicated above<br>　　a) Do not leave a copy of a summons under a door, in a mailbox, or otherwise unattended<br>　　b) Any person at least 18 years of age may be given a summons for another person in the same household at the residence<br>　2) The officer shall sign his name, badge number, the date of service, and the name of the person accepting on the original when serving a summons, and then return the original and second page to the City Court |

| Arrest Type | Procedure |
|---|---|
| | 3) If a summons cannot be served, show the reason on the summons, (e.g., "moved out-of-state," "moved and left no forwarding address").  Note on the summons if the address on the summons is nonexistent, and returned to City Court. |
| **13.  Warrant Arrests**<br>[74.3.1] | a.  Officers shall transport a subject arrested on a warrant with the money to bond out to Chandler Police Department<br>1) **Normal business hours**: Court personnel will assign the subject an appearance date for Chandler warrants only upon receipt of the bond<br>2) **Telephone the Maricopa County Sheriffs Office** (MCSO) to ensure that the correct amount of money is obtained and to get any further information<br>3) **If no bond is required**, officer may video-arraign the subject (see Section E13e for details)<br>4) **When others post bond**, Records personnel shall notify the jail via computer-generated message.  The computer-generated message will contain the receipt number and advise the prisoner is available for release<br>5) **The Records** Unit shall handle out-of-city warrants 24 hours a day and city warrants during hours City Court is not open<br>b.  **If the subject can have someone respond** to the station within a reasonable amount of time to bond out the subject, the officer shall wait with the subject at the Police Department<br>c.  **If the subject cannot bond out**, transport the subject to the county jail and book him. The officer shall return to the station to sign off on the warrant before the officer's end of tour of duty.<br>d.  **Officer may book person(s) with Department of Corrections'** (DOC) warrants at the Sheriff's substation.  However, if the DOC only has a hold on the subject (no warrant present), MCSO will not accept the prisoner on just the hold.  Check with the Alhambra Reception Section (ARS) of the DOC to determine if subject may be booked there.<br>e.  **The videophone** is in the DUI intoxilyzer area.  The instructions and logbook are located on the desk in this area.  The detention officers shall, if available, assist, any officer when they have arrested subjects with warrants out of Tempe, Glendale, Mesa, Scottsdale or Gilbert courts.  This procedure should be used from 0800 through 1400 hours, Monday through Friday.  After hours, subject should be booked at MCSO as usual.<br>f.  **On a City Court warrant, if hazard to health** and well-being to detainees exist (both criminal and traffic):<br>1) **If City Court is open,** take the subject directly to City Court where arrangements will be made for a court hearing<br>2) **If City Court is closed,** do not arrest.  Forward information to the City Court concerning the contact, including where the defendant resides and is employed. |
| **14.  Cite and Release**<br>[1.2.6] [61.1.2] [74.3.1] | a.  **All persons arrested for a misdemeanor offense** may be cited and released in conformity with ARS §§13-3883(4), 13-3903 only when the following conditions are met:<br>1) Positive identification is provided through acceptable documents such as a driver's license, military ID card, or other |

| Arrest Type | Procedure |
|---|---|
| | reliable documents or sources |
| | 2) Resident of Arizona, preferably a resident of Maricopa County if arrested for a misdemeanor other than a traffic offense |
| | 3) Must provide a "physical" address, not a P.O. Box |
| | 4) No outstanding arrest warrants and a criminal history check does not show ongoing criminal activity, FTA or FTP in any jurisdiction |
| | 5) Has the physical and mental condition of a responsible person |
| | 6) **Only exception**: Subjects arrested for domestic violence or violations of Orders of Protection shall be booked unless otherwise authorized by a supervisor |
| | b. **The officer will book** if any of the following exists.  The officer shall be able to articulate in his report any actions taken and decisions made. |
| | 1) The suspect has been involved in a violent crime |
| | 2) The suspect actively resists arrest or attempts to evade arrest by flight |
| | 3) The suspect presented forged or false information |
| | 4) The suspect's physical and mental condition is not that of a responsible person |
| | 5) The criminal history check reveals the suspect has a history of criminal activity, FTA or FTP in any jurisdiction |
| | **Only exception**: When a supervisor approves the deviation |
| | c. **Forms:** |
| | 1) **Criminal Charges:** Complete a final disposition form, complete with fingerprints, on the cite and release forms |
| | 2) **Misdemeanor Charges:** No final disposition form required for misdemeanor traffic offenses, such as failure to pay fine charges and charges of no identification |
| | 3) **All DUIs and hit-and-runs:** Complete a final disposition form |
| | d. **Requiring to appear:** The arresting officer may, with the approval of a supervisor, require the person arrested to appear before the magistrate as authorized by ARS 13-3898.  Any person held under the authority of ARS 13-3898 may secure his release by posting the required bond, except in cases of domestic violence or violations of Orders of Protection. |
| **15. Felony Arrests**<br><br>[74.3.1] | a. **Officer shall transport prisoner** to the appropriate county jail for arraignment |
| | b. **To be seen by the Chandler Justice of the Peace (JP) only:** Officer shall make prior arrangements with the judge and note in the "Details of Arrest" section of the Arrest/Booking Sheet "To Be Seen By Chandler JP Only" |
| | c. **Associated misdemeanors** shall be charged on the same information or indictment and filed by the Maricopa County Attorney's Office if a felony charge is filed |
| | d. **Multiple defendants** where any one of the defendants is charged with a felony, the County Attorney's Office will file all defendants together.  Officer shall include the accomplice's last name, first name, and DOB on each of the Arrest Records in the "Details of Arrest" section. |

| Arrest Type | Procedure |
|---|---|
| **16. Multiple Felony Charges**<br><br>[74.3.1] | In all cases where there are multiple charges of felonies and misdemeanors, submit requests for complaints to the Maricopa County Attorney's Office for review<br>a. Do **not** file misdemeanors in City Court when requesting felony review;<br>b. However, civil traffic citations may be issued when appropriate |
| **17. Probation Violations** | An officer may arrest a subject for a probation or parole violation when the officer is personally aware of the subject's terms of probation or parole<br>a. **An officer may enforce search terms** of probation when the officer has reasonable suspicion the subject is involved in criminal activity<br>b. **An officer does not need permission** from a probation officer to take this enforcement action.  *U.S. v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001).* |



This page intentionally left blank

# Exhibit I-39

I.        ARRESTS BY PEACE OFFICERS

          Arrests shall be made for violations of city and county ordinances as well as
          state and federal laws.

II.       FIELD RELEASE ARRESTS

          A.    Suspects who are arrested in Justice Precincts for any criminal
                misdemeanor or for the traffic offenses of DUI, driving with a suspended
                or revoked license, reckless driving, or leaving the scene of an accident,
                shall be cited into the appropriate Justice Precinct Court.  They are to be
                cited to appear not less than twenty-one (21) nor more than twenty-eight
                (28) business days after the arrest, in accordance with the days and times
                set by the court.

                If, however, they are cited to appear in Ajo, Arizona, they are to appear
                not less than five (5) nor more than ten (10) business days after the arrest,
                in accordance with the days and times set by the court.

          B.    Traffic violators cited for routine violations shall be cited in conformance
                with Pima County Sheriff's Department Rules and Regulations.

III.      MISDEMEANOR FIELD RELEASE ARRESTS

          A.    Deputies shall not decide whether it is appropriate to physically arrest or
                arrest and field release until the conclusion of the investigation.

          B.    All persons arrested on probable cause for a misdemeanor shall be
                physically arrested if one or more of the following circumstances are
                present:

                1.    The arrestee refuses to provide adequate identification or uses a false
                      name or home address.

                2.    The arrestee refuses to sign the citation.

                3.    The arrestee has an outstanding arrest warrant.

                4.    The arrestee's release will likely result in injury to another person,
                      e.g., threats against a victim, etc.

                5.    The arrestee has committed an act of domestic violence.

6. The arrestee is intoxicated and, after being warned, insists on driving.

7. The arrestee will be likely to continue to engage in unlawful activity based on facts that the arresting officer can document, e.g., the arrestee was field released for the same or a similar offense within the past twenty-four (24) hours.

C. If a physical arrest is not mandated, the deputy should still consider the following possible circumstances in determining whether arrest and field release is appropriate:

1. The misdemeanant is under the age of eighteen (18) and comes under the jurisdiction of the Pima County Juvenile Court (excluding routine traffic violations or alcohol offenses).

2. The arrestee does not have a valid Arizona home address, i.e., works as a cross-country truck driver, a transient, etc.

D. After arresting a person on probable cause for a misdemeanor that allows for the option of field release of that person, the deputy may consider having fingerprints and photographs of the arrested person to document the identification of the arrestee for the record.

E. Under no circumstances shall a person be arrested for a civil traffic offense as defined in Title 28. When a person has committed an arrestable offense, in addition to a civil traffic offense, the person may be arrested and booked only for the criminal violation(s). Civil traffic violations shall be listed on the same citation as the charged criminal offense(s).

F. When an intoxicated person is field released, the arresting deputy shall arrange for the person to return to his/her home or some other acceptable place, e.g., Gateway (LARC) or a friend's home.

G. Juveniles may be field released by paper referral or by citation, as appropriate.

IV.        DOMESTIC VIOLENCE ARRESTS

A.   Deputies shall give victims and potential victims of domestic violence phone numbers of the Sheriff's Department and other emergency agencies and information about Orders of Protection (A.R.S. § 13-3601). The Pima County Sheriff's Department Domestic Violence Information Card contains this information.

B.   Felony Domestic Violence Incidents

1.   If a domestic violence incident occurs and it rises to the level of a felony, or there is a significant history of domestic violence (misdemeanor or felony), the deputy shall make immediate notification to the Domestic Violence Unit Supervisor or the Night Detective Unit Supervisor during the Night Detective Unit shift.

2.   Patrol level interviews of children at felony domestic violence incidents shall be kept to a line of questioning necessary to establish the elements of the crime. In-depth interviews shall be the responsibility of the Criminal Investigations Division investigating Unit.

C.   Reports

1.   All domestic violence incident reports shall be dictated as either: priority one (1) for arrests, all felonies, and all cases involving children; or priority two (2) for all other cases.

2.   For all cases involving children, the deputy shall request that a copy of the report be forwarded to Child Protective Services.

D.   Arrest Policy

1.   Pursuant to A.R.S. § 13-3601, a physical arrest SHALL be made when responding to a report of an incident of domestic violence, whether or not the victim wants prosecution, **if any of the following circumstances exist:**

a.   There is probable cause to believe that the defendant has committed an act of domestic violence and has inflicted physical injury on the victim.

b.   There is probable cause to believe that the defendant has committed an act of domestic violence and has used a deadly weapon or dangerous instrument in the commission of the act.

c.   Probable cause exists for an arrest and charge of domestic violence where the underlying offense is any of the following (as defined in the A.R.S. citations indicated):

(1)   Assault:   13-1203

(2)   Aggravated Assault:   13-1204

(3)   Unlawful Imprisonment:   13-1303

(4)   Kidnapping:   13-1304

(5)   Endangerment:   13-1201

(6)   Any Dangerous Crime Against Children:   13-604.01

(7)   Child/Vulnerable Adult Abuse or Emotional Abuse:   13-3623

(8)   Interfering with Judicial Proceedings:   13-2810

d.   This applies to a felony or misdemeanor offense, whether or not it occurred in the presence of a deputy.  Charges must include both A.R.S. § 13-3601 and one (1) or more of the criminal acts which constitute domestic violence.  Independent probable cause must exist for each person arrested for commission of an act of domestic violence.  An act of self-defense that is justified under Title 13 Chapter Four is not deemed to be an act of domestic violence.

e.   In exceptional circumstances and only if it reasonably appears that the victim will be protected from further injury, a supervisor may authorize a non-arrest decision even though the above criteria apply.  The decision and concurrence by the supervisor not to arrest shall be documented by the deputy regarding the deputy's belief that the victim will be protected and the exceptional circumstances that exist.

2.   In all other cases, a deputy may arrest a person if there is probable cause to believe that domestic violence has been committed and the deputy has probable cause to believe that the person to be arrested committed the offense, whether the offense is a felony or misdemeanor, and whether or not the offense was committed in the presence of the deputy.  If an arrest is made it shall be a **physical** arrest.

3.   Aggravated Domestic Violence (13-3601.02) is an aggravated charge of Domestic Violence (13-3601), not a Criminal Act of 13-3601.

4.   In making a non-arrest decision, the deputy shall exercise his/her judgment based on the facts as they reasonably appear and considering the potential for violence or harm.

5.   The deputy shall document any action taken, including the decision not to arrest, information furnished to parties involved, and the potential for violence or harm.

6.   When a deputy does not find probable cause to believe any of these criminal acts have occurred and thus does not make an arrest, the information on the Domestic Violence Card must still be given to alleged or potential victims.

E.   Department Personnel Involved in Domestic Violence

1.   Any deputy responding to a report of domestic violence involving a member of the Sheriff's Department shall notify the Supervisor of the Domestic Violence Unit as soon as possible and provide the Supervisor with the facts of the incident.

2.   In all cases the Domestic Violence Unit Supervisor shall:

a.   Notify the appropriate CID Commander who will determine whether or not a criminal investigation will be initiated

b.   Notify the Office of Special Investigations Supervisor or Commander

c.   Notify the Peer Support Supervisor, if applicable.

d.   Notify the member's immediate supervisor

3.    Criminal Investigations

   a.    The on-call Domestic Violence Detective shall respond if the CID Commander has determined a criminal investigation will be initiated.

   b.    If circumstances and time permit, the appropriate CID Commander shall be notified prior to physically arresting any Department member.

4.    The Office of Special Investigations shall have primary responsibility for the administrative investigation.

5.    Any Department member involved in a report of domestic violence investigated by any law enforcement agency shall immediately notify his/her supervisor.

6.    Any supervisor being informed of a domestic violence investigation by another agency that involves a Department member shall forward the information via memo to the Office of Special Investigations Commander.

F.    Department Personnel Convicted of a Crime of Domestic Violence

1.    If a member of the Department is convicted of a crime of Domestic Violence, the member is subject to sanctions of the Federal Firearms Law, and he/she is termed a prohibited possessor of firearms and ammunition.

2.    A member of the Department, upon conviction of a crime of Domestic Violence shall immediately notify his/her immediate supervisor of the conviction.  If the member is weapon qualified, his/her firearms privilege shall be revoked.

   a.    Members affected shall not possess any weapon or ammunition whether in an on-duty or off-duty status.

   b.    The member shall immediately relinquish all Department issued firearms and ammunition to his/her immediate supervisor who will deliver the weapons and ammunition to the Department Armorer within twenty-four (24) hours.

       c.     When the member is no longer a prohibited possessor under the law, all firearms and ammunition previously relinquished may be reissued to the member by the Department Armorer.

   3.     Commissioned members affected by the law shall be placed in a limited-duty status for up to thirty (30) work days.

   4.     Resolution of Conviction

       a.     Commissioned members who have not resolved their case in thirty (30) work days will be placed on Administrative Suspension without pay.

       b.     Commissioned members shall have twelve (12) months from the date of the conviction to resolve their case in such a manner as to permit possession/use of a weapon.  If the case is not resolved in this time period, the affected member shall be terminated.

G.   Orders of Protection, Injunctions Against Harassment, and Preliminary Injunctions

   1.     An Order of Protection (A.R.S. § 13-3602), Injunction Against Harassment (A.R.S. § 12-1809), and Preliminary Injunction (A.R.S. § 25-315) all state that a violator may be arrested and prosecuted for interfering with judicial proceedings and any other crime committed in disobeying the order.

   2.     An Order of Protection and the Injunction Against Harassment are effective for one (1) year from the date of service.   When served in the field, the deputy making service shall complete the affidavit or certificate of service and forward it to the Civil Enforcement Section for processing through the originating court, thereby initiating the registration process through Terminal Operations.

         A copy of an order of the court, whether or not registered, is presumed to be a valid existing order of the court for a period of one (1) year from the date of service on the defendant.

3.  Unless otherwise stated, the Preliminary Injunction is effective against the petitioner when the petition is filed and against the respondent on service of a copy of the order or on actual notice of the order, whichever is sooner. The Preliminary Injunction remains effective until further order of the court or the entry of a decree of dissolution, legal separation, or annulment. The deputy making service shall complete the affidavit or certificate of service and forward it to the Civil Enforcement Section for processing through the originating court, thereby initiating the registration process through Terminal Operations.

    A certified copy of an injunction, whether or not registered, is presumed to be a valid existing order of the court until further order of the court or the entry of a decree of dissolution, legal separation, or annulment.

4.  A deputy who finds probable cause to believe that a person is in violation of a valid Order of Protection, Injunction Against Harassment, or Preliminary Injunction shall physically arrest that person, whether or not the deputy witnessed the violation and even if the victim does not desire prosecution.  Violators shall be charged with interfering with judicial proceedings (A.R.S. § 13-2810).  Any separate violations of A.R.S. § 13-3601 or other A.R.S. violations shall be charged separately.

5.  Orders of Protection issued in any other jurisdiction, so long as they are effective in the issuing jurisdiction, are given full faith and credit by our jurisdiction and will be enforced accordingly.  There is no need to obtain an order in this jurisdiction, nor for the order from the other jurisdiction to be registered in this jurisdiction.  The charge will be interfering with judicial procedures (A.R.S. § 13-2810).

6.  Affidavit or Certificate of Service

    Whenever a deputy serves an Order of Protection, an Affidavit or Certificate of Service shall be completed and forwarded to the Civil Enforcement Section for processing through the originating court. An Affidavit or Certificate of Service is already incorporated on Emergency Orders of Protection.

    a.  The Affidavit or Certificate of Service will be completed by the deputy serving the Order of Protection.

     (1)    The Plaintiff's/Defendant's names will be entered as listed on the Order of Protection.

     (2)    The Court Number or Case Number (a Superior Court-issued number), whichever is listed on the Order of Protection, shall be entered on the appropriate line of the Affidavit or Certificate of Service.

     (3)    The deputy shall note the date the order was received for service, the name of the person it was served on, and the date, time, and location of service. The deputy shall then date and sign the Affidavit or Certificate of Service.

     (4)    The deputy shall circle the court (see RETURN TO) that issued the Order of Protection.

   b.    The original Affidavit or Certificate of Service shall not be attached to case reports or M.I. cards.

   c.    The Affidavit or Certificate of Service shall be forwarded to the Civil Enforcement Section.

H.   Emergency Orders of Protection

   1.    During the hours that the courts are closed, a judge, justice of the peace, magistrate, or commissioner may issue by telephone an emergency order of protection if a peace officer states that he/she has reasonable grounds to believe that a person is in immediate and present danger of domestic violence based on an allegation of a recent incident of actual domestic violence.

   2.    An Emergency Order of Protection expires at the close of the next day of judicial business following the day of issue unless otherwise continued by the court.

3.    Procedures

a.    A deputy may request an Emergency Order of Protection when there are reasonable grounds to believe that a person's life or health is in imminent danger from an act of domestic violence. An Emergency Order of Protection shall not serve as a substitute for arrest but may be requested in addition to arrest in those cases where a victim's life or health would be in imminent danger after release of the defendant from jail. The decision to seek an Emergency Order of Protection requires the deputy to use sound judgment based on the circumstances at the time.

b.    The Pima County Sheriff's Department's Terminal Operations shall maintain a list of the names and phone numbers of available judges, justices of the peace, magistrates, and commissioners who may issue Emergency Orders of Protection by telephone. Deputies or other law enforcement officers wishing to obtain an Emergency Order of Protection may contact Terminal Operations to obtain the name and phone number of the on-call judicial officer.

c.    Upon contacting the on-call judicial officer, the deputy shall state the grounds on which he/she believes the emergency order should be issued. If a determination is made to issue the emergency order, the deputy who receives the verbal order shall write and sign the written order and provide a copy to the protected party. If the emergency order is denied, the deputy shall document this fact.

d.    The Emergency Order of Protection must be served on the defendant to be effective. If the defendant cannot be personally served, the deputy may notify the defendant of the existence and content of the order by phone or other means. The deputy shall then document the service or the notification of the defendant. If the defendant has been notified of the existence and substance of the order and commits an act that violates the order, the defendant may be arrested for violating the order.

e.   Deputies shall verbally notify Terminal Operations of all Emergency Orders of Protection as soon as practicable after issuance.  If an order is issued but not immediately served on the defendant:

   (1)   An additional notification to Terminal Operations shall be made upon service or notification of the order to the defendant.

   (2)   Terminal Operations will provide the deputy with the court number for the order.

f.   Efforts to obtain an Emergency Order of Protection shall be documented in a departmental incident report.  The original of an Emergency Order of Protection that has been served on the defendant shall be forwarded to Records Maintenance.

g.   Records Maintenance shall return to the Clerk of the Superior Court the original of an Emergency Order of Protection that has been issued.

h.   The Pima County Sheriff's Department's Information Services Unit shall maintain a log of all Emergency Orders of Protection issued in Pima County.  The log shall contain, but not be limited to, the following information:

   (1)   Order number

   (2)   Plaintiff name

   (3)   Defendant name, description, and date of birth

   (4)   Law enforcement officer and agency receiving order

   (5)   Judge issuing order

   (6)   Date of issuance

   (7)   Date of expiration

   (8)   Date and time of service or interpretation to defendant

        i.     A violation of an Emergency Order of Protection is subject to the same mandatory enforcement as an Order of Protection, Injunction Against Harassment, and the Preliminary Injunction under A.R.S. § 13-2810, Interfering with Judicial Proceedings, and any other statute that may have been violated in disobeying the order.

I.    Seizure of Firearms Pursuant to A.R.S. §13-3601

1.    A firearm seized by a deputy pursuant to A.R.S. § 13-3601 shall be placed into the Evidence Unit and held for no fewer than fourteen (14) days.  The deputy shall give the owner or possessor of the firearm(s) a copy of the Property and Evidence Control Form listing the seized firearm.  The deputy shall also provide the victim of the Domestic Violence incident from whom the firearm was seized information regarding how the firearm may be released.

2.    The deputy shall complete an incident report documenting the reason for the seizure.  The report shall list circumstance codes for domestic violence (DOMV) and firearm involvement (GUN).  The deputy shall ensure that a copy of each such report is forwarded to the supervisor of the Domestic Violence Unit.

3.    Upon receipt of a report documenting seizure of a firearm, the Domestic Violence Supervisor or designee shall present the report to the appropriate Deputy County Attorney for a determination of whether to file a notice of intent to retain the firearm.

4.    In the event a firearm is retained by the Department pursuant to a court order, the firearm shall be held for the duration of the order unless released sooner by the court.

5.    In the event a notice of intent to retain the firearm is not filed, the firearm shall be returned to its true owner after fourteen (14) days, providing the appropriate records indicated that the person to receive the firearm is not a prohibited possessor due to:

    a.    Felony conviction

    b.    Appropriate domestic violence conviction

    c.    A pending domestic violence charge

6. The deputy or detective authorizing release of the firearm shall notify, via mail, the victim of the domestic violence incident from which the firearm was seized before the firearm is released.

J. Firearms Transferred Pursuant to an Order of Protection

1. A firearm transferred to the Pima County Sheriff's Department pursuant to an Order of Protection shall be placed into the Evidence Unit and held for the duration of the order unless released sooner by the court.

2. Any Department member who receives a firearm pursuant to an Order of Protection shall complete an incident report documenting the transfer. The report shall list circumstance codes for Domestic Violence (DOMV) and firearm involvement (GUN). The member shall ensure that a copy of each such report is forwarded to the supervisor of the Domestic Violence Unit.

3. The member shall give the owner and/or possessor of the firearm a copy of the Property and Evidence Control Form listing the transferred firearm.

V. CRIMINAL AND FUGITIVE WARRANTS

Arrest warrants shall be confirmed as valid and extraditable by contacting the entering agency. Communications shall obtain such confirmation from agencies other than the Sheriff's Department. Terminal Operations confirms the warrant only when the Sheriff's Department holds the warrant.

A. Felony Warrants

1. Upon confirmation, the detaining deputy shall arrest the fugitive.

2. The arrested felony fugitive shall be advised of his/her Miranda Rights.

3. Arresting deputies shall question fugitives who have waived their Rights. Conversations with fugitives shall be recorded in the deputy's supplemental report.

4. Fugitives shall be transported and booked into the Pima County Jail in conformity with departmental rules, regulations, and procedures.

B.   Misdemeanor Arrests

1.   Upon confirmation, the detaining deputy shall arrest the fugitive.  In cases of out-of-custody misdemeanor warrants, the fugitive shall not be arrested if the agency holding the warrant declines extradition.

2.   The arrested misdemeanor fugitive shall be advised of his/her Miranda Rights.

3.   Arresting deputies shall question fugitives who have waived their Rights.  Conversations with fugitives shall be documented in the deputy's report.

4.   Fugitives shall be transported and booked into the Pima County Jail in conformity with departmental rules, regulations, and procedures.

5.   When an outside agency requests a misdemeanor fugitive be arrested, and a response is required, the request must be approved by a supervisor or above.

6.   With approval of a supervisor or above, the detaining deputy may use his/her discretion and NOT arrest the fugitive under exigent circumstances (operational needs far outweigh the need to have a deputy leave the patrol area).  This may occur under the following circumstances:

a.   The foundational charge for the Failure to Appear (FTA) warrant is for criminal traffic, other than DUI, and the fugitive is not in custody for any other reason and no other reason for arrest exists.

b.   The warrant is for an unusual violation, e.g., leash law, fishing without a license, etc.

c.   If the circumstances dictate that the fugitive **not** be arrested, the detaining deputy shall initiate a report which will include justification for not arresting the fugitive, the fugitive's current home and business addresses, and any other information that will assist in re-locating the fugitive.  The fugitive will also be provided information on how to have the warrant quashed on their own initiative.

VI.        EXTRADITIONS

A.     Terminal Operations shall be responsible for coordinating extraditions with the County Attorney's Office and the agency holding the prisoner(s) to be extradited.

B.     Terminal Operations shall be responsible for arranging transportation of all extraditable prisoners from the holding agency to the PCADC.

C.     If Terminal Operations is unable to secure/confirm arrangements for the prisoner's transportation, either with the Department's Air Unit or contracted vendor, they will initiate the Extradition Travel Order Form and forward it to the Extradition Coordinator in the Grants and Planning Unit for assistance.

D.     The Extradition Coordinator shall determine the method of transportation, the number of deputies required to accomplish the extradition, and the necessity for car rental and hotel accommodations.

E.     The Extradition Coordinator shall maintain a list of all commissioned personnel that have volunteered to participate in extraditions.

F.     This list shall contain the following information:

1.     Deputy's name and badge number

2.     Current assignment

3.     Desired travel locations

G.     As extraditions arise, the coordinator shall notify the next deputy on the list for that particular location.  Names shall be placed on the notification list in the following order of priority:

1.     Deputies

2.     Sergeants

3.     Commanders

H.   If the coordinator does not have anyone on the list and time permits, the coordinator shall advertise in the Daily Bulletin for any deputy, sergeant, or commander interested in the extradition to contact the Extradition Coordinator immediately.

I.   In the event no one responds to the advertisement, the Administrative Services Division Commander shall assign a particular area of the Department to conduct the extradition.

J.   Deputies who volunteer to do extraditions shall not be eligible to receive overtime compensation.

K.   Deputies wanting to be added to the extradition rotation list should submit a memorandum to the Extradition Coordinator, via chain of command, indicating their desired travel locations.

L.   Only those deputies ordered to perform an extradition shall be eligible to receive overtime compensation in accordance with Pima County Administrative Procedures, Business Travel.

VII.     CIVIL ARREST WARRANTS

A.   A Civil Arrest Warrant is an order issued by the court in a non-criminal matter, directed to any peace officer in the state, to arrest the individual named therein and bring such person before the court.

B.   All Civil Arrest Warrants have restrictions as to the time and day the warrant may be served.   Absent extraordinary circumstances, e.g., instructions from the court not to release or a high bond, civil arrest warrants shall not be served:

1.   After 1600 hours and before 0730 hours

2.   On weekends

3.   On Pima County recognized holidays

C.   When a physical arrest is made solely on the basis of a civil arrest warrant, the subject will be taken immediately before a judge.

1.   The arresting deputy shall contact the Corrections Bureau Judicial Security Unit to arrange a court appearance.   If a judge is not available the subject will not be arrested.

2. The subject shall be transported to the Judicial Security Unit where he/she shall be turned over to Judicial Security staff with a completed Arrest Information Sheet.

3. The arresting deputy shall complete a case report to document the circumstances of the arrest.

D. When a subject is arrested for both criminal and civil offenses, the criminal procedures shall take precedence.

E. When a civil arrest warrant is not served either because of the limitations of the warrant or this policy, the responsible deputy shall document the circumstances of the contact in a case report.

VIII. ORDERS FOR CUSTODIAL EVALUATION, PETITIONS TO REVOKE OUTPATIENT TREATMENT PLAN, AND ORDER TO TRANSPORT

A. Definition:

ORDER FOR CUSTODIAL EVALUATION:   A Superior Court order commanding a peace officer to take a named person into custody and deliver the person to a specified mental health evaluation agency.

1. In Pima County, Orders for Custodial Evaluation are issued by the Pima County Superior Court and shall be filed in the Pima County Sheriff's Department Terminal Operations.

2. Orders for Custodial Evaluation are valid for fourteen (14) days from the date of issue (the date of issue is considered one day) unless served sooner.

B. Judicial Security shall be primarily responsible for the execution of Orders for Custodial Evaluation, although any deputy who identifies a person named in such an order shall be required to serve the order.

1. Upon being advised by the Superior Court that such an order has been issued, the Judicial Security Unit shall obtain three (3) copies of the papers associated with the order from the Civil Desk of the Clerk of the Superior Court and immediately attempt to locate the person named within.

     2.    The Judicial Security deputy assigned to execute the order shall notify Communications of the order, the location where the order will be executed, and shall request to meet with and brief the on-duty patrol supervisor in that District.

     3.    Based upon the circumstances of the order, the on-duty patrol supervisor shall determine what law enforcement resources are required and shall assign those resources as necessary to execute the order.

     4.    If unable to locate the named person, the assigned Judicial Security Unit deputy shall deliver one (1) copy of the order papers to the evaluation agency, one (1) copy to Terminal Operations, and one (1) copy to the appropriate District for information purposes.

         a.    The appropriate District personnel shall ensure that the District copy is purged after the fourteenth day from the date of issue.

C.   Terminal Operations personnel shall file all received Orders for Custodial Evaluation and shall accomplish computer entry.

     1.    If the order has not been served within fourteen (14) days from the date of issue, the Terminal Operations copy shall be purged and sent to the Superior Court, and the computer entry shall be canceled.

     2.    When the Judicial Security Unit is able to take the named person into custody before filing a copy with Terminal Operations, the second copy shall not be filed with Terminal Operations but shall be delivered directly to the Superior Court Clerk.

D.   Deputies shall verify that the order is valid by calling Terminal Operations before taking the named person into custody unless the order is served before a copy has been filed.

E.   Upon identifying a person who is the subject of a valid Order for Custodial Evaluation, the following procedure shall be followed:

     1.    The person shall be transported by the deputy to the evaluation agency named in the order.  If the person is elderly, feeble, violent, or otherwise in a state that may result in physical harm to self or others, the deputy may utilize the services of the County contract ambulance to accomplish transport.

      a.    Persons transported to Kino Hospital shall be taken to the Emergency Room.  The evaluation agency copy of the Order for Custodial Evaluation, if previously delivered, will be located at the SBS reception desk.

      b.    Persons transported to the Arizona Health Sciences Center (University of Arizona Hospital) shall be taken to the Emergency Room where Emergency Room personnel will contact hospital security personnel who will escort the patient to the 7th Floor East.  The evaluation agency copy of the Order for Custodial Evaluation, if previously delivered, will be located at the In-Patient Unit, 7th Floor East.

      c.    Persons transported to the Veterans Hospital on Mondays through Fridays before 1700 hours shall be taken to the Mental Health Unit, 5th Floor; otherwise, they shall be taken to the Emergency Room.  The evaluation agency copy of the Order for Custodial Evaluation, if previously delivered, will be located in the Mental Health Unit, 5th Floor.

2.    After transporting the person to the evaluation agency, the deputy shall secure the evaluation agency's copy of the Order and accomplish the following:

      a.    Read to the person the patient's rights portion from the Notice of Right to Hearing

      b.    Complete the Return form of the order to indicate that the order has been served

      c.    Leave a complete copy of the order with the evaluation agency

3.    If a second copy of the order has been filed with Terminal Operations, the deputy shall contact Terminal Operations to advise that the order has been served, and the Terminal Operator shall complete the Terminal Operations copy with the same information that the deputy entered on the evaluation agency's copy.

      a.    The deputy shall obtain the identification number of the Terminal Operator contacted and enter this number in the "Computer Entry Cleared by" block of the Return form of the order.

      b.    The Terminal Operator receiving the information shall forward the completed second copy of the order papers to the Superior Court.

    4.    If the second copy of the order papers has not been filed with Terminal Operations, it shall be delivered to the Superior Court by the deputy.

    5.    An incident report shall be completed by the deputy to document the actions taken and shall be classified "Civil Matter — Court Order Enforced."

IX.      REQUEST FOR LAW ENFORCEMENT ASSISTANCE BY BONDSMEN

A.    Authority of Bondsmen

    1.    Bondsmen are authorized to arrest a fugitive when they are given written authority by the surety endorsed on a certified copy of a bond A.R.S. § 13-3885.

    2.    "SURETY" is defined as one who undertakes to pay money or to do any other act in the event that his principal fails herein. He is one who is bound with his principal for the payment of a sum of money or for the performance of some duty or promise and who is entitled to be indemnified by someone who ought to have paid or performed if payment or performance is enforced against him.

            Everyone who incurs a liability in person or estate for the benefit of another, without sharing in the consideration, stands in the position of a "surety," whatever may be the form of his obligation (Black's Law Dictionary).

B.    Responsibility of Department Personnel

    1.    Department members are permitted to receive information from bondsmen about fugitives but are not authorized to disseminate to them sources of official departmental records or information from those sources.

2.    Department members shall not offer bondsmen tactical advice nor oversee nor direct their activities.

3.    When Department personnel are present at an arrest, the following procedures shall apply:

a.    If an Arizona warrant exists, the individual shall be arrested by Department personnel on the warrant.

b.    If an out-of-state warrant exists, the person shall be arrested by Department personnel pursuant to A.R.S. § 13-3854.

c.    If no warrant exists, Department personnel have no authority to arrest; the surety may arrest pursuant to A.R.S. § 13-3885 if the surety possesses the appropriate written authority.

(1)    A bondsman without paperwork has no legal authority to arrest (see 13-3885) unless the surety himself is doing the arrest.  When he/she acts as an agent, the certified copy of the bond and written authority is needed.

(2)    If the arrestee denies that he/she is the person named in the surety bond or questions the Bondsman's authority to make the arrest, the deputy shall gather the facts and contact the on-call County Attorney for guidance.

d.    Any arrest of a fugitive by Department personnel must follow the prescribed Arizona judicial processes.

(1)    The arrest must comply with procedures set forth in PCSD Rules and Regulations, Arrest Procedures.

(2)    The surety shall not be permitted to take the prisoner anywhere once Department personnel have made an arrest.

X.    RELEASE OF ARRESTED PERSONS

A.    Arresting deputies shall make every effort to have persons released from custody when they learn probable cause does not exist and there is no reason to retain custody of the arrested person.

B.    Deputies shall utilize the following procedure in order to release persons from custody prior to booking:

    1.    The arresting officer shall verify that the person in custody should be released by ascertaining that probable cause for arrest does not exist and that there are no holds or other reason for retaining custody of the person.

    2.    The arresting officer shall make a detailed supplemental report explaining why the person was released.

    3.    In the case of a misdemeanor, the arresting officer shall void all copies of the misdemeanor criminal citation.

    4.    In the case of a felony, the arresting officer shall void the interim complaint.

C.    Law enforcement officers are unable to release persons from custody after arrestees have been booked.  Should a deputy learn that such a person should be released from custody, the deputy shall:

    1.    Contact the on-call Deputy County Attorney or the Legal Advisor and explain why the person should be released

    2.    Write an explanatory supplemental report

D.    An Intake Services member may order the release of an inmate prior to his/her initial appearance when the inmate was arrested for a warrant that was previously served or quashed, thereby invalidating the arrest.  In such cases the arresting officer shall do the following:

    1.    Cooperate with the Intake Services member who must contact the arresting officer and verify that the arrested person can be released

    2.    Prepare a detailed supplemental report explaining the circumstance under which the arrested person was released

XI.    PERSONS IMMUNE TO ARREST

A.    Legislators

    1.    Arizona and federal legislators are immune to arrest while the legislature is in session and for fifteen days prior to such session.

2.     Legislators are immune to arrest while traveling to their homes at the end of the session or from their homes to attend a session.

3.     Immunity does not apply in cases of treason, felonies, or misdemeanors amounting to a breach of the peace.

4.     Deputies shall arrest for misdemeanors only in cases of violent offenses, or immediate disturbance of the public order, e.g., assault, or driving while under the influence of alcoholic beverages or drugs. The interpretation of the breach of the peace and decision to arrest shall be referred to a supervisor or commander in all cases.

B.     Diplomats and their families are afforded varying types of immunity depending upon their residency, duty status, and assignment. Certain employees of an embassy also enjoy partial immunity. For this reason, verification of type and degree of immunity is essential. Deputies shall refer all such cases to a supervisor or commander. Verification may be made through one (1) of the following:

1.     During normal business hours:

Legal Advisor for Consular Affairs
Department of State
Washington, D.C.
(202) 647-4415

2.     After normal business hours:

Command Center of the Bureau of Diplomatic Security
Department of State
(202) 663-0812 (24 hours)

C.     Consular officers are immune from arrest while performing official duties, except for felonies that endanger the public. In these cases, a summons may be issued.

1.     As a matter of courtesy, vehicles bearing Consular Corp license plates shall not be given parking citations nor shall drivers be cited for traffic violations if they are assigned to the Mexican Consulate.

2.     Deputies shall refer any matter involving an offense by a foreign consul to a supervisor or commander.  If the Mexican Consul or Deputy Consul is involved, the matter shall be referred to the Division Commander.

3.     Immunity is not afforded to the families and servants of the Consul or Deputy Consul.  However, whenever practicable, these persons shall be released on misdemeanor offenses in lieu of booking pending issuance of a complaint for the offense.

D.     Federal employees operating federally owned vehicles are subject to the same enforcement policy as other citizens who are in violation of traffic ordinances, except they may not be cited for driver's license violations.

E.     Military personnel are immune from the requirement to have an Arizona driver's license or Arizona vehicle registration if they possess a valid driver's license or vehicle registration from another state or the District of Columbia.

F.     Members of the Arizona National Guard are exempt from arrest while en route to and from Guard drill, encampment, or formation and while engaged in training activities unless charged with a felony.

1.     The purpose of affording guardsmen this immunity is to prevent them from missing a scheduled meeting or encampment.  Therefore, they may be cited for non-bookable traffic violations.

2.     If a guardsman commits a bookable misdemeanor while in exempt status, an investigation with necessary reports shall be made for purposes of obtaining a warrant or summons for action after the immunity period expires.

G.     Guidelines for deputies stopping or coming in contact with individuals who claim diplomatic or consular immunity are as follows:

1.     No citation or warning may be issued at the time of the initial contact. (This does not preclude enforcement action following initial contact if it is later determined the subject is not immune from the action.)

2.    Deputies shall request identification.  Diplomats and consuls, their families, and staff members should have credentials issued by the U.S. State Department.  (Legislators should have credentials issued by the body of which they are members.)

3.    The individual shall not be subjected to sobriety tests.

4.    Individuals who are a hazard to themselves or the public shall be placed in protective custody until such time as the guidelines in paragraph G.5 below may be followed.  Physical restraint shall not be employed unless absolutely necessary to protect public safety.

5.    If the individual is not capable of driving safely, the officer may do one or more of the following:

a.    Transport the individual to a motel or other location

b.    Contact a friend or relative of the individual to respond

c.    Request Communications to call a taxi

d.    Transport the individual to his/her residence

e.    Inventory and tow the vehicle

f.    Request that a supervisor or commander contact the Office of Protocol in Washington, D.C., for further assistance in contacts involving diplomatic or consular immunity

H.   Verification of Immunity

1.    The officer shall request a supervisor's assistance in determining whether or not the subject's claim of immunity is proper.

2.    The supervisor shall contact the Office of Protocol in Washington, D.C. or the local office of the Federal Bureau of Investigations to verify claims of immunity.

3.    If it is determined that the subject is in fact entitled to immunity from the particular law enforcement action, no further enforcement action shall be taken.  If it is determined that the subject is not immune from the action, enforcement action may then be initiated by the officer.

I.     After contacts with individuals claiming immunity, officers shall promptly notify their supervisor or a commander.  The supervisor or commander shall, within twenty-four (24) hours, notify the appropriate Division Commander.

    1.    Officers shall prepare incident reports for all contacts where immunity is claimed and forward them, via chain of command, to their Division Commander.

    2.    The Division Commander shall ensure that reports concerning diplomatic or consular contacts are forwarded to:

        Command Center- Bureau of Diplomatic Security
        U.S. Department of State
        Washington, D.C. 20520

XII.     CONSULATE NOTIFICATIONS ON ARREST OF FOREIGN NATIONALS

Certain treaties between the United States and other countries require that local law enforcement officials make notification to consulates when a foreign citizen is taken into custody.  Failure to make the appropriate notifications may result in the suppression of statements or other evidence against the defendant. The following procedures shall be followed when a foreign citizen is taken into custody.

A.    General

    1.    Deputies are required to notify foreign citizens who are taken into custody of their right to consular notification.

    2.    This requirement does not allow deputies to ask persons whether or not they are citizens or whether they are legally or illegally in this country.  Consular notification procedures should be followed only if an arrestee self-identifies as a foreign national or if the arresting deputy has reasonable grounds to believe the person is not a citizen and has verified that with the person.  Consular notification shall be done whether or not a person is legally within the United States.

3.  This Order applies only in those situations where a foreign national has been taken into custody and will be detained for more than a brief period of time. This Order does not apply in most situations in which a person is arrested, cited, and field released. The Order applies to all foreign citizens, including permanent resident aliens. This Order does not apply to persons who are both citizens of the United States and another country (dual citizenship).

4.  Consulate notification is in addition to any other notification required by law, including <u>Miranda.</u>

B.  Notifications

Due to variations in treaties, consulate notification is voluntary (at the arrestee's option) in some situations and mandatory (the arrestee has no option) in others. The Communications Unit will maintain a list of countries that require mandatory notification. Mexico is a voluntary notification country. If you arrest a national of any country other than Mexico, you must contact Communications to determine if notification is mandatory or voluntary.

1.  Voluntary Notification Procedures

a.  If the deputy has knowledge that the individual taken into custody is a foreign national from a voluntary notification country, he/she must advise the arrestee of the right to notify the arrestee's consulate. Deputies shall make use of the advisory statements outlined on the back of form PCSD 900.

b.  If the arrestee requests notification to his/her consulate, the deputy shall complete the following:

(1)  Fill out form PCSD 900 in its entirety

(2)  Fax the document to the appropriate consulate

(3)  Forward a copy of the notification to the Pima County Sheriff's Department Fugitive Investigations Strike Force (F.I.S.T.) Supervisor

(4)  Forward the original notification document to:

**PIMA COUNTY SHERIFF'S DEPARTMENT, RECORDS UNIT**

2.     Mandatory Notification Procedures

   a.     If a foreign national from a mandatory notification country is taken into custody, the arresting deputy MUST advise the arrestee that the arrestee's consulate will be notified of the arrest.  Deputies shall make use of the advisory statements outlined on the back of form PCSD 900.

   b.     The deputy shall complete the following:

      (1)     Fill out form PCSD 900 in its entirety

      (2)     Fax the document to the appropriate consulate

      (3)     Forward a copy to the Pima County Sheriff's Department Fugitive Investigations Strike Unit (F.I.S.T.) supervisor

      (4)     Forward the original notification document to:

         **PIMA COUNTY SHERIFF'S DEPARTMENT, RECORDS UNIT**

C.     Continuance of Investigation

Once the Consulate or Embassy notification has been made, internal investigations can continue. If the consulate contacts the deputy handling the case and requests to speak with the suspect, the consulate is entitled to reasonable, private access.

The consulate may not act as an attorney and may not invoke any of the suspect's/arrestee's rights on the suspect's/arrestee's behalf.

XIII.     RESTRAINING ARRESTEES

A.     Arrested persons shall be handcuffed and the handcuffs double locked when arrestees are being held or transported outside the detention or corrections facilities.

B.     Other Department approved restraint devices may be used in situations where conventional handcuffing alone is not successful.

C.     After any restraint device has been applied, arrestees who are prone shall be placed in an upright position as soon as possible.  Any exceptions shall be for medical purposes only.

D.   Expectorant Shield

1.   The Department's authorized expectorant shield is to be used with in-custody subjects who are either spitting at law enforcement personnel, are violent, and/or bleeding from the mouth or head area.

2.   The expectorant shield is made from nylon mesh and is large enough to fit over the head and to be tied in the back.  It is imperative that the straps are placed **UNDER** the arms; the shields are **NEVER**, under any circumstances, to be tied around the neck.  The shield is designed to allow unrestrictive breathing and yet keep expectorant and/or blood from contacting the Department member.

3.   The expectorant shield is considered a form of restraint in that it effectively restrains the prisoner or inmate, in a safe and humane manner, from projecting expectorant or blood onto Department members.

4.   When the expectorant shield is applied to any inmate or prisoner, that inmate or prisoner shall be **continuously** monitored by the actual physical presence of a Department member in the **immediate** proximity of the inmate or prisoner.  At no time shall the inmate or prisoner be left alone and unmonitored.

In situations where the inmate or prisoner is complaining of being claustrophobic or is having difficulty breathing as a result of the shield, the shield shall be immediately removed and the inmate or prisoner evaluated for medical assistance.

5.   The expectorant shield shall be removed from the inmate or prisoner as soon as it is believed safe to do so, or as directed by a supervisor.  Following use, the expectorant shield is to be disposed of in a manner appropriate for contaminated materials.  A replacement shield should then be obtained from Material Management.

XIV.     DNA TESTING OF ARRESTEES

A.   Pursuant to A.R.S. §13-610, DNA testing of adults arrested for any of the following criminal violations is required:

1.   Negligent Homicide:  13-1102

2.   Manslaughter:  13-1103

3.      Murder, 2nd Degree:  13-1104

4.      Murder, 1st Degree:  13-1105

5.      Indecent Exposure:  13-1402

6.      Public Sexual Indecency; Public Sexual Indecency to a Minor:  13-1403

7.      Sexual Abuse:  13-1404

8.      Sexual Conduct with a Minor:  13-1405

9.      Sexual Assault:  13-1406

10.     Molestation of a Child:  13-1410

11.     Bestiality:  13-1411

12.     Continuous Sexual Abuse of a Child:  13-1417

13.     Burglary, 2nd Degree:  13-1507

14.     Burglary, 1st Degree:  13-1508

15.     Keeping or Residing in House of Prostitution; Employment in Prostitution:  13-3208

16.     Prostitution:  13-3214

17.     Portraying Adult as Minor:   13-3555

18.     Incest:  13-3608

19.     The following violations when the discharge, use, or threatening exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury is involved:

        a.      Aggravated Assault:  13-1204

        b.      Arson of an Occupied Structure:  13-1704

        c.      Armed Robbery:  13-1904

        d.    <u>Kidnapping:</u>  13-1304

        e.    <u>Sexual Conduct with a Minor Under Fifteen (15) Years of Age:</u>  13-1405(B)

        f.    <u>Child Prostitution:</u>  13-3212

        g.    Any dangerous crime against children under 13-604.01(N)(1)

B.  Adults arrested for any of the above offenses shall be booked into the Pima County Adult Detention Center.

C.  Juveniles booked as adults at the Pima County Adult Detention Center will be required to undergo DNA testing under this statute.  Samples will not be obtained from juveniles physically referred to the Pima County Juvenile Court Center.

## XV.    TRANSPORTING PRISONERS

A.  Prisoners shall be placed in the front seat of a patrol vehicle if no screen or shield is in the vehicle.  When the vehicle is equipped with a screen or shield, the prisoner shall be placed in the rear seat.

B.  The seat belt shall be utilized to secure the prisoner.

C.  Prisoners shall not be transported while lying on their chest, stomach, or side.

D.  Neither juveniles and adults nor males and females shall be transported together unless authorized by a supervisor.

E.  When a deputy transports a member of the opposite sex, other than an observer or member of the Department, in a Department vehicle, the officer shall advise the radio dispatcher of the situation, location, destination, and odometer mileage.  Upon arrival at the destination, the odometer mileage shall be given to the radio dispatcher

XVI.        INTERVIEW ROOM SECURITY

When a deputy has taken an arrestee into custody and the arrestee is being taken to an interview room, the following policy shall apply:

A.  Upon placing the arrestee in an interview room, the escorting deputy shall ensure that:

1.  The arrestee has been searched

2.  The arrestee is handcuffed to the rear, and the handcuffs are double locked

B.  The handcuffs shall remain on the arrestee at all times unless in the presence of a deputy who is interviewing or processing the arrestee.

C.  At no time shall an arrestee be left unattended in an interview room.

D.  If the deputy needs to leave the interview room, he/she shall verify that the arrestee is handcuffed to the rear, the door is dead bolted, and a relief deputy has arrived and has been briefed.

XVII.       INTERROGATION OF SUSPECTS

A.  A suspect in custody shall be given Miranda Warnings prior to interrogation.  If the suspect explicitly indicates he/she does not want to answer questions or desires to talk with an attorney, then all interrogation is to cease.  Interrogation may resume ONLY if the suspect initiates, without prompting, further communication, exchanges, or conversations with the deputy.

B.  The only exception to this policy may be made in order to meet the need of emergencies that create immediate danger to the public or law enforcement officers, e.g., finding a hidden weapon, locating a victim, etc.

XVIII.      TELEPHONE CALLS FOR ARRESTEES

Persons arrested and booked into the Corrections Bureau shall be allowed to complete a telephone call to arrange for release or for other emergency purposes at the time of booking.  The number of calls and telephone numbers shall be listed on the arrest information slip.

A.   If the arrested person is combative or too intoxicated to complete telephone calls, this fact shall be noted on the arrest record, and an opportunity shall be given to complete these calls at a later time.

B.   Telephone calls shall be limited to a reasonable length of time and shall be for legitimate purposes.

XIX.      INITIAL APPEARANCES

A.   All suspects arrested for a felony offense or an in-custody misdemeanor must be granted an initial appearance before a magistrate within twenty-four (24) hours of the arrest.

B.   The Interim Complaint form must be completed for all felony arrests.

XX.      TRANSPORTATION OF SICK OR INJURED PERSONS

A.   Members of the Pima County Sheriff's Department shall not transport a sick or injured person, prisoners excepted, in departmental vehicles.  An ambulance shall be dispatched unless the deputy feels that immediate transportation is vital to save the life of the sick or injured person.

B.   Deputies shall not escort other vehicles unless authorized to do so by a supervisor.  Deputies shall not use emergency equipment when escorting other vehicles.

C.   A deputy may, through Communications, notify the receiving hospital or medical facility of the approximate ETA and the nature and severity of the victim's illness.

D.   If a person who has been arrested becomes ill or sustains an injury after arrest and prior to being booked into the Pima County Corrections Bureau, the arresting deputy shall:

1.   Immediately notify a supervisor

2.      Transport the prisoner to the currently designated hospital by departmental vehicle, if possible, or ambulance, if necessary

3.      Obtain a medical release from the hospital personnel who treat the prisoner

4.      Recount in the offense report or supplement the illness or injury and how it came about

5.      Take photographs of the injury/injuries

E.   Persons who are ill or injured prior to being arrested and are field released need not be treated by medical personnel if:

1.      Department personnel are in no way involved in the injury

2.      The person can be field released rather than physically referred to the Pima County Juvenile Court Center or booked into the Pima County Corrections Bureau

   a.      The person is a juvenile who may be released to a parent or guardian rather than being physically referred to the Pima County Juvenile Court Center.

   b.      The person is an adult who is charged with a misdemeanor as provided for in A.R.S. § 13-3903.

3.      Persons who are to be incarcerated must be treated and released in accordance with paragraph D above.

XXI.      EMERGENCY ADMISSION OF A MENTALLY DISTURBED PERSON

A.   Procedures for the emergency admission of mentally disturbed persons are provided for under A.R.S. § 36-524.  Such admissions are accomplished by telephonic application for emergency admission to an evaluation agency.

1.      Health facilities designated as evaluation agencies in Pima County are as follows:

   a.      University Physicians Hospital at Kino

   b.      Arizona Health Sciences Center (University of Arizona)

      c.      Veterans Memorial Hospital

      d.      Palo Verde Hospital

2.    Applications for petitions for emergency admission may be made by applicants only when the following two conditions are met:

      a.      The applicant personally observes overt symptoms of mental illness on the part of the person to be admitted.

      b.      The applicant believes, through personal observation, that the person to be committed is a danger to self or others.

            (1)    "Danger to self" means behavior that constitutes a danger of inflicting substantial bodily harm upon oneself, including attempted suicide.

            (2)    "Danger to others" means behavior that constitutes a danger of inflicting substantial bodily harm upon another person.

3.    In situations where a deputy is the sole observer of the person's behavior, the deputy shall be the applicant for the petition to have the person admitted.

4.    In situations where only a private citizen has observed the person's behavior, the private citizen must be the applicant, and the deputy shall assist the private citizen in seeking application for emergency admission by telephone.

B.  The field procedure for obtaining a telephonic application for emergency admission is as follows:

1.    Whenever necessary, deputies may call the SAMHC Crisis Center for advice and assistance when encountering mentally disturbed persons.

2.  Upon personally observing or being informed of acts constituting grounds for emergency admission, the deputy shall attempt to convince the disturbed person to voluntarily submit to hospitalization for evaluation, care, and treatment.

    a.  Persons eighteen (18) years or older shall sign such application themselves.

    b.  Persons under eighteen (18) years of age must be accompanied by a parent, guardian, or next of kin to the evaluation agency.

    c.  Deputies shall transport such voluntary applicants if no other person or means of transportation is available or if the deputy believes police transportation should be utilized for safety reasons.

3.  If the disturbed person refuses voluntary evaluation and the deputy has probable cause to believe that the person meets the conditions for emergency admission per the preceding paragraph A.2. above, the deputy shall seek such admission.

    a.  If no other person qualifies or is willing to act as the applicant, the deputy shall act as applicant as long as the deputy meets the requirements in paragraph A.2. above.

    b.  If another person is present who can act as the applicant, the deputy shall assist in the emergency admission process.

4.  The deputy shall contact one of the evaluation agencies identified in paragraph A.1. above and apply for emergency admission by telephone to the on-call screening physician.

    a.  If the on-call physician is not at the facility, a nurse will take the deputy's phone number, and the physician will be paged and advised to contact the deputy.

    b.  Upon contacting the on-call physician, the applicant deputy or private citizen shall provide the following information:

        (1)  A statement that the applicant believes, on the basis of personal observation, that the person is, as a result of mental disorder, a danger to self or others

        (2)    The specific nature of the danger

        (3)    A summary of the observations upon which the statement of danger is based

        (4)    A statement of the facts that called the person to be admitted to the applicant's attention

    c.    The on-call physician will make a determination over the phone, based upon the facts provided, whether the mentally disturbed person will be admitted for observation.

5.    Only when the on-call physician has given statutory authority shall a mentally disturbed person be transported to an evaluation agency.

    a.    If the responsible deputy perceives no danger in transporting the mentally disturbed person, the individual may be transported in a departmental vehicle. If possible, two (2) deputies shall accompany the person to the evaluation agency or the person shall be transported in a screened unit.

    b.    Should the deputy feel an ambulance is more appropriate to transport the person to the evaluation agency, an ambulance shall be requested. The person shall be restrained as circumstances dictate and then transported to the evaluation agency.

    c.    If a private citizen is the applicant, the citizen should make arrangements for personal transportation to the evaluation agency; however, the deputy, if unable to make such arrangements, may transport the citizen.

    d.    If the private citizen is the sole observer of the disturbed person's behavior under conditions described in A.2. above, the citizen must be present at the evaluation agency to sign the petition for emergency admission.

6.   Upon arrival at the evaluation agency, the applicant deputy or private citizen will be required to complete a written report on the application petition and provide the information specified in paragraphs B.4.b. (1) through (4) above.

   a.   Deputies shall prepare an incident report of the incident that shall contain the probable cause leading the deputy to transport the disturbed person to the evaluation agency.  The name and title of the evaluating physician and whether the disturbed person was admitted shall be noted.

   b.   If the deputy is the applicant, the deputy shall remain at the evaluation agency until the evaluating physician has determined if the person will be admitted.  If the person is not admitted, the deputy shall take appropriate enforcement action or arrange to have the person transported back to the place of apprehension.

C.   When a private citizen wishes to obtain emergency admission of a mentally disturbed person but cannot meet the requirements of paragraph A.2. above, the deputy should advise the citizen to contact one of the indicated evaluation agencies to ascertain what non-emergency procedures are available.

Exhibit I-40

**Administrator**

| | |
|---|---|
| **From:** | russellpearce [russellpearce@cox.net] |
| **Sent:** | Sunday, October 19, 2008 10:16 PM |
| **To:** | Russell K. Pearce |
| **Subject:** | Fw: 1 Million sex crimes by illegals |

## Study: 1 million sex crimes by illegals
### Researcher estimates more than 100 offenders crossing border daily

Posted: May 31, 2006
1:00 a.m. Eastern

Based on a one-year in-depth study, a researcher estimates there are about 240,000 illegal immigrant sex offenders in the United States who have had an average of four victims each.



Deborah Schurman-Kauflin of the Violent Crimes Institute in Atlanta analyzed 1,500 cases from January 1999 through April 2006 that included serial rapes, serial murders, sexual homicides and child molestation committed by illegal immigrants.

Deborah Schurman-Kauflin in CNN interview

She found that while the offenders were located in 36 states, most were in states with the highest numbers of illegal immigrants. California had the most offenders, followed by Texas, Arizona, New Jersey, New York and Florida.

Schurman-Kauflin concluded that, based on a figure of 12 million illegal immigrants and the fact that more of this population is male than average, sex offenders among illegals make up a higher percentage than offenders in the general population.

She arrives at the figure of 240,000 offenders – a conservative estimate, she says – through public records showing about 2 percent of illegals apprehended are sex offenders.

"This translates to 93 sex offenders and 12 serial sexual offenders

10/13/2011

coming across U.S. borders illegally per day," she says.

She points out the 1,500 offenders in her study had a total of 5,999 victims, and each sex offender averaged four victims.

"This places the estimate for victimization numbers around 960,000 for the 88 months examined in this study," she declares.

Schurman-Kauflin breaks down the 1,500 cases reviewed this way:

- 525, or 35 percent, were child molestations
- 358, or 24 percent, were rapes
- 617, or 41 percent, were sexual homicides and serial murders

Of the child molestations, 47 percent of the victims were Hispanic, 36 percent Caucasian, 8 percent Asian, 6 percent African American and 3 percent other nationalities.

In 82 percent of the cases, she noted, the victims were known to their attackers.
"In those instances, the illegal immigrants typically gained access to the victims after having worked as a day laborer at or near the victims' homes," she says. "Victims ranged in age from 1 year old to 13 years old, with the average age being 6."

In her examination of the sex-related homicides, Schurman-Kauflin found the most common method was for an offender to break into a residence and ambush his victims.

Not only were victims raped, she said, but some – 6 percent – were mutilated.
"The crime scenes were very bloody, expressing intense, angry perpetrator personalities," she said. "Specifically, most victims were blitzed, rendered incapable of fighting back, and then raped and murdered. The most common method of killing was bludgeoning, followed by stabbing."
She found it especially disturbing that in 22 percent of all sex crimes committed by illegal immigrants, victims with physical and mental disabilities were targeted.

The highest number of sex offenders, according to the study, came from Mexico. El Salvador was the original home to the next highest number. Other countries of origin included Brazil, China, Ecuador, Guatemala, Honduras, Jamaica, Nicaragua, Puerto Rico, Russia, and Vietnam.

Nearly 63 percent of the offenders had been deported on another offense prior to the sex crime, the study showed. There was an average of three years of committing crimes such as DUI, assault or drug related offenses prior to being apprehended for a sexual offense.

10/13/2011

**Ex. I-40, p. 2**

In 81 percent of cases, offenders were drinking or using drugs prior to offending. Rapists and killers were more likely to use alcohol and drugs consistently than child molesters.

Only about 25 percent of offenders were found to have been stable within a community. In 31 percent of the crimes, the offenders entered into the communities where they offended within two months of the commission of their sex offenses.

But many, 79 percent, had been in the U.S. for more than one year before being arrested for a sex crime. They typically were known to the criminal justice system for prior, less serious offenses before they molested, raped or murdered, the study said.

Schurman-Kauflin concludes illegal immigrants gradually commit worse crimes and are continually released back into society or deported.

"Those who were deported simply returned illegally again," she says.

She points out that only 2 percent of the offenders in her study had no history of criminal behavior, beyond crossing the border illegally.

"There is a clear pattern of criminal escalation," she said.


Support Your American Freedom Rider, The Job They Save May Be Yours
www.americanfreedomriders.com

**Administrator**

| | |
|---|---|
| **From:** | russellpearce [russellpearce@cox.net] |
| **Sent:** | Tuesday, January 27, 2009 10:51 PM |
| **To:** | Karen Smith; Russell K. Pearce; Steven Moortel |
| **Subject:** | Fw: Illegal Immigrant Hits Police Car With Truck |

I want to know if he had a license and if so how he got it????

http://www.kpho.com/news/18576600/detail.html?
treets=pho&tid=2657542831813&tml=pho_4pm&tmi=pho_4pm_1_05000101272009&ts=H

# KPHO.com

# Illegal Immigrant Hits Police Car With Truck

POSTED: 1:03 pm MST January 27, 2009
UPDATED: 1:28 pm MST January 27, 2009

**PHOENIX --** A Mesa police officer's patrol car was damaged when an illegal immigrant from Mexico put his 1979 Ford pickup in reverse and hit the cruiser, police said.

Isias Medina, 25, was arrested on suspicion of aggravated DUI after an officer pulled him over for several traffic violations this morning, police said.

During the traffic stop, Medina showed police a Mexican voter's registration card, police said. Police discovered his U.S. driving privileges had been suspended, according to Sgt. Ed Wessing, spokesman for the Mesa Police Department.

Medina admitted to police he was not a U.S. citizen.

Police said the patrol car suffered minor front-end damage from the incident.

*Copyright 2009 by **KPHO.com**. All rights reserved.
This material may not be published, broadcast, rewritten or redistributed.*

**A Good Credit Score is 700 or Above. See yours in just 2 easy steps!**

9/19/2011

## Administrator

| | |
|---|---|
| **From:** | russellpearce [russellpearce@cox.net] |
| **Sent:** | Thursday, February 26, 2009 11:33 PM |
| **To:** | Russell K. Pearce; russellpearce |
| **Subject:** | Illegal aliens commit 12 murders every day in the U |

Illegal aliens commit 12 murders every day in the U.S.


According to Rep. Steve King, illegal aliens commit 12 murders every day in the U.S. and kill another 13 daily through drunken driving incidents.

That's more than 9,000 people killed every year by illegal aliens.

As World Net Daily's Joseph Farah points out, that means more people are murdered by illegal aliens in one year than have been killed in the Iraq and
Afghanistan wars since their inception.

Rep. King also notes that on average eight children are sexually abused by illegal aliens every day -- that's over 2,920 annually. And that's just a small portion of the illegal alien crime wave.

+ + 4.1 million crimes by illegal aliens

As we reported in Grassfire's booklet, "The Truth About The Illegal Invasion," some 325,000 criminal illegal aliens will be incarcerated in state and federal prisons
this fiscal year. A GAO study found that illegal aliens commit, on average, 12.6 criminal offenses. This means incarcerated illegal aliens have committed over 4.1
million crimes -- and that does not include illegal alien criminals who are not incarcerated. And we learned from Rep. Tom Tancredo that thousands of illegals are coming from terrorist and suspect nations.


Subject: Investigaions-Border-Report.pdf


Drawing a Line in the Sand: CONFRONTING THE THREAT AT THE SOUTHWEST BORDER
      With pictures and data:  A congressional report on crime, violence, drugs, gangs, terrorist, sex predators coming into America among the 4 million to 10 million entering illegally ANNUALLY!!!!  There are hundreds of thousands violent criminals in America that are illegal aliens.


The character of its people measures the greatness of our nation, we live in a Constitutional Republic based on moral law, freedom and personal responsibility

When, oh when, will our people listen to the wise advice of our founders, like Noah Webster, and cast their votes ONLY for men of independence and virtue, who will honor their oath to God and the Constitution!!


9/19/2011

Our elected officials taken an Oath and have sworn to protect and uphold "all the" laws and the Constitution. Article IV and Sec. 4 of the United States Constitution requires our President and Congress to secure our borders from invasion and the laws that are broken.  What are they waiting for?

Secure the border and enforce our laws. We do not need comprehensive reform, what we need is comprehensive enforcement! When do we stand up for
Americans and protect our citizens?

Arizona is #1 in the nation in crime.

Phoenix is the 3rd to 5th most likely city to be murdered in.

Over 4000 homicide warrants issued to suspects that have fled back south across the border. By CHARLES YOO, BILL MONTGOMERY, The Atlanta
Journal-Constitution Published on: 06/27/05

The largest and most violent gangs in America made up of illegal aliens.

"Local Law Enforcement's Inherent Authority of Immigration Law:" Sanctuary Policies significantly contribute to this gang and crime epidemic, like in Phoenix, Mesa that restrict local law enforcement from enforcing immigration law they have the inherent authority to enforce. Congress has firmly established that there is a significant public interest in the effective enforcement of immigration law. Congress could have chosen to limit local enforcement pursuant to its plenary power over immigration, but it has not done so. In the absence of a limitation on local enforcement powers, the states are bound by the Supremacy Clause of the United 'States Constitution to enforce violations of the federal immigration laws. "The statutory law of the United States is part of the law of each state just as if it were written into state statutory law."

Over 9000 people killed "annually" by illegal aliens (25 per day; 13 by DUI 12 by stabbing and shootings (Congressional Homeland Security Committee)

In Los Angeles, 95% of all outstanding warrants for homicide are illegal aliens.  (McDonald a Manhattan Institute scholar):

Two-thirds of the 17,000 outstanding fugitive felony warrants in L.A. are for illegal aliens. (McDonald a Manhattan Institute scholar)

18th Street Gang that operates across Southern California some 20,000 strong are illegal aliens.

Washington Times: 80,000 "absconders," illegal aliens convicted of felonies, murder, rape, drug dealing and child molestation.

NewsWithViews.com: In 2003, according to the Arizona Department of Motor Vehicles, 57,600 cars were stolen in Phoenix. It is now the car-jacking capital of the world. Most were SUV's and pickup trucks. At a conservative average of $15,000.00 per vehicle, owner losses exceeded $864 million.

Gang follows illegal aliens By Jon Ward THE WASHINGTON TIMES The violent MS-13 -- or Mara Salvatrucha -- street gang is following the migratory routes of illegal aliens across the country, FBI officials say, calling the Salvadoran gang the new American Mafia.

ATTRITION THROUGH ENFORCEMENT:

9/19/2011

 Government's Own Data Show Point to a Cost-Effective Strategy The report, by CIS Senior Policy Analyst Jessica Vaughan, an attrition strategy could cut the illegal population by nearly half in five years an increase of less than 1 percent of the President's 2007 budget request for the Department of Homeland Security ($42.7 billion).

WASHINGTON - Rep. Tom Tancredo's charge that Mexican drug cartels are buying up legitimate businesses in U.S. Cities to launder money and using some of
the proceeds to win local mayoral and city council seats for politicians who can shape the policies and personnel decisions of their police forces, has been backed up by a veteran gang investigator.

We are destroying this very nation we all love.  Most of them may be good people, but have still entered our country illegally and one cannot ignore the overall damage to this nation and the damage that comes with this invasion and to our law abiding citizens, in the way of crime, billions in dollars, and in the loss of lives.

Thanks to those that put America First.  I will stand firm on the Rule of Law and what is right. We are destroying the very nation we love.

"Today, we need a nation of Minutemen, citizens who are not only prepared to take arms, but citizens who regard the preservation of freedom as the basic
purpose of their daily life".  -John F. Kennedy

I say to the public the good citizens of Arizona and America, when do we stand up for Americans, America and the Rule of Law?  If not now when?
Reading this and looking at the victims is "HORRIFIC"!

These crimes should never have happened as none of these illegals should have been here in the first place.  We must stop this invasion.  We must enforce our laws. We must put America and Americans First.

 Enough is enough!!!  Enforce our laws!!  This is some of the Cost in Crime; Cost in Dollars, the Cost in Lives!!!  I hope folks understand the damage to America by this invasion of over 3 million plus illegal aliens annually, 5,000 to 10,000 every single day.  1 out of 10 entering illegally already has a felony record.

   George W. Bush, in his refusal to enforce U.S. Immigration laws and his failure to carry out his constitutional duty to defend the nation from that invasion, is guilty of impeachable offenses as stated by Patrick J. Buchanan.

       **1) Secure the border now.**
       **2) Stop Sanctuary Polices: Demand local law enforcement get involved and enforce the law now.**
       **3) Worksite Enforcement, go after employers who "knowingly" hire illegal aliens.**
       **4) Stop public services (welfare, food stamps, renting to illegals, home loans, public education, etc.) to illegal aliens now.**
       **5) Make it clear you cannot be here illegally and your child cannot become an UnConstitutional Citizen by Birth.**

       "This country has lost control of its borders. And no country can sustain that kind of position." - President Ronald Reagan

9/19/2011

Illegal aliens commit 12 murders every day in the U                    Page 4 of 4

        We are a nation of laws. We, and our elected officials, must have the courage - the fortitude -
to enforce, with compassion but without apology, those laws that protect the integrity of our borders
and our rights as lawful citizens.

        Rep. Russell Pearce, R-18, Mesa, Arizona.

9/19/2011

**Administrator**

| | |
|---|---|
| **From:** | russellpearce [russellpearce@cox.net] |
| **Sent:** | Thursday, February 26, 2009 11:40 PM |
| **To:** | Constantin Querard |
| **Subject:** | FOR REVIEW: Fw: ALIPAC - Illegal Alien Gang Initiation: Attempted Murder of US Police Officer! |

The Department of Homeland Security has released this advisory to officers.  Interrogations of the suspects indicate that the attempted murder of South Carolina deputy was a gang initiation.  Lexington County Deputy Deputy Ted Xanthakis and his K-9 police dog partner were attacked by three illegal aliens with a shotgun but survived on Feb. 8, 2009.
http://www.alipac.us/article3998.html

HOW DID IT GET THIS BAD?  WHERE HAS LAW ENFORCEMENT BEEN?  IF OUR POLICE CHIEFS AND ELECTED OFFICIALS CONTINUE TO IGNORE THE DAMAGE TO AMERICA WITH THEIR SANCTUARY POLICIES IT WILL EVEN GET WORSE.   EVEN OUR ATTORNEY GENERAL HAS STATED THIS BORDER VIOLENCE IS OUR 21ST CENTURY'S GREATEST THREAT.  YET WE HAVE POLICIES ALL OVER THIS STATE AND NATION THAT REFUSE TO ENFORCE OUR LAWS.

**Phx #2 in the "world" in kidnappings**
**Home invasions, kidnapping, car jacking, identity theft capitol of the nation**
**9,000 killing yearly by illegal aliens in the U.S. 25 everyday, 12 by stabbings and shootings and 13 by DUI and related crimes**
**1 million gang members in U.S.; largest and most violent gangs in America made up of illegal aliens**
**1 million sex crime victims of illegal aliens, over 240 thousand sex crime predators' in U.S. of illegal aliens with over 4 victims each**
**About 6000 border drug related homicides last year along the border**
**20 beheadings just last month alone along the border**
**Billions in cost of education, healthcare, and criminal justice cost**
**American's jobs taken (highest unemployment rate in U.S. in 26 years)**
**Wages suppressed due to illegal work force ($1.4 billion annually in Arizona)**

**GET MAD!!!  It is time to renew our efforts to eliminate ALL sanctuary policies in this state: Require officials to fully enforce federal immigration laws of the United States. (And require Governor Jan Brewer to implement ALL of Proposition 200 as passed by voters: NO MORE TAXPAYER BENEFITS OF ANY KIND)   "If it be asked, what is the most sacred duty and the greatest source of our security in a Republic? The answer would be an inviolable respect for the Constitution and Laws" — Alexander Hamilton.**

My personal background in law enforcement has given me a unique and in-touch perspective with the needs and hazards experienced by rank-and-file police officers. I am delighted to have the support of Phoenix Law Enforcement Association (P.L.E.A.), Border Patrol, Maricopa County Republican Party, Arizona State Republican Party (both passed Resolutions unanimously in support), Sheriff Joe, County Attorney Andrew Thomas, Hispanic groups, PAChyderm Coalition, Arizona Republican Assembly, other Patriotic groups and according to the polls over 75% of Arizona Citizens.

9/19/2011

**Ex. I-40, p. 9**

Like me, PLEA understands the danger of ignoring illegal immigration. The burden of blind-eye police department policies and open-border philosophies were paid for with the lives of not only PLEA members, but other law enforcement personnel throughout our state. The danger clearly spread beyond law enforcement into our communities with more lives being lost. The quality of life in our state is being sacrificed for political correctness.

WE stand together in support of safer neighborhoods and the rule of law.

**Theodore Roosevelt's: AMERICAN in 1907.**

**"In the first place, we should insist that if the immigrant who comes here in good faith becomes an American and assimilates himself to us, he shall be treated on an exact equality with everyone else, for it is an outrage to discriminate against any such man because of creed, or birthplace, or origin. But this is predicated upon the person's becoming in every facet an American, and nothing but an American...There can be no divided allegiance here. Any man who says he is an American, but something else also, isn't an American at all. We have room for but one flag, the American flag... We have room for but one language here, and that is the English language... and we have room for but one sole loyalty and that is a loyalty to the American people."**

We, as elected officials, must have the courage and the fortitude to enforce, with compassion but without apology, those laws that protect the integrity of our borders and our rights of our lawful citizens.

The Federal Government's failure is malfeasance.  States and local governments also have a Constitutional responsibility to protect their citizens and taxpayers. Inaction has had devastating economic and social consequences.

We have a crisis in America; and those that ignore the damage to America and the destruction of our nation and our neighborhoods are in violation of their Oath of Office.  We must demand the laws be enforced.   We don't need reform we need enforcement.   It will take all of us to force our politicians to do something about it.

Enforcement not Reform is what is needed.

I cannot stand by and be a spectator to the death, maiming or damage to another police officer, citizen or taxpayer by an illegal alien because we refuse to enforce our laws and fail to put America and Americans First.

Simply enforce our laws and you will see less crime, lower taxes, smaller class sizes, shorter lines in our emergency rooms and reduce deaths, murders, maimings, drugs, home invasions, car jackings, kidnappings, jobs taken from Americans, reduced wages, an ultimately save the taxpayer billions of dollars. We cannot afford to "NOT" enforce our laws. Attrition by Enforcement.

This is the "only" law we allow our elected officials to put conditions on before our police officers can do their job. The only criminals that get conditional protection from our elected and appointed officials.

Citizens have a constitutional right to expect the protection of federal laws which prohibit unauthorized activities by non-citizens and are denied equal protection by law enforcement, police departments or magistrates when they fail to enforce those laws.

I PLEDGE TO CONTINUE TO WORK TO ELIMINATE ALL SANCTUARY POLICIES IN THIS STATE, THE RESULT WILL BE LESS CRIME & LOWER TAXES.
Many of our Police Chiefs are in complete violation of their Oaths of Office while citizens and taxpayers pay the price.
As former Chief Deputy of Maricopa County Sheriff's Office, former Judge and now a lawmaker, I witnessed a day that I couldn't imagine: Police chiefs throughout the Valley stood together and proclaimed their opposition to enforcing the law in complete Violation of their Oath of Office.

I sat ashen as I watched the news reports.

The chiefs of police, including Phoenix's Harris, Mesa's Gascon, stood at a Press Conference and publicly refused to enforce the law. Less than a month after the brutal murder of a police officer at the hands of an illegal alien, they snub the opportunity to make necessary changes, all for the sake of political correctness.

9/19/2011

## Death and maimings of police officers & citizens by illegal aliens (just a few):

**Officer's Figueroa, Erfle, Atkinson, Sitek, Eggle, Collins, Epling, Deputy's Pearce & Argetsinger, Sgt. Tapia, Martin, Fass, Kirpnick, Schechterle, Gilbert mother killed, Jason Iraq veteran, Mother a "legal immigrant" killed, triple homicide, 3 illegals beat pregnant woman, 5 illegals kill principal, Feds arrest 2,100 violent criminal aliens, deputy in hit and run, Trooper Shot to Death, Day laborer killed girlfriend's baby, Muslim from Bosnia - Killed 5 in crowded shopping mall, Sniper, John Lee Malvo, required by law to be immediately deported. Instead, released Malvo and his cohort killed 10 people, two disabled teenage daughters raped Salvadoran street gang, Dep. March killed, Tricia Taylor lost both her legs, 10 year old Walter Valenzuela murdered, Kimberley Hope murdered, 5 year old Ana Cerna murdered, Joseph Crummy murdered, Amber Merkle only 8, killed, Vinessa, 23, brutally raped & murdered, and the list goes on.**

9,000 Americans killed each year, 25 each day, 12 by stabbings and shootings, 13 by DUI and related crimes (Congressional Report; Drawing a Line in the Sand).

Study: 1 million sex crimes by illegals; More than 100 sex offenders crossing border daily Deborah Schurman-Kauflin: Based on a one-year in-depth study, a researcher estimates there are about 240,000 illegal immigrant sex offenders in the United States who have had an average of four victims each.

Police officers have the inherent authority to uphold city, state and federal law (the law is clear and the courts have codified that authority and the Constitutional authority is clear). These officers witness the harm done to innocent Arizonans on a daily basis while their superiors instruct them to ignore their oath of office. Officers on the street have the legal authority, will and desire to enforce the law but the hierarchy stands against them, more interested in PC and harboring illegal aliens, rather than doing their job of protecting lawful citizens and that of "Public Safety".

The more than 800,000 state and local law enforcement officers in the United States constitute a vital force multiplier. Most importantly, state and local police officers represent a critical line of defense in the war against terrorism. In the six months before 9/11, there were four tragic missed opportunities to arrest the leaders and pilots of the 9/11 terrorists. Had the federal government acquired & disseminated information about basic civil immigration violations to local law enforcement through the NCIC system, several terrorists might have been arrested, and the 9/11 plot might have unraveled. The 4 ring leaders all had been stopped by law enforcement just prior to 9/11 and all in violation of immigration law. As George Santayana reminded us: "Progress, far from consisting in change, depends on retentiveness. . . . Those who cannot remember the past are condemned to repeat it."

While "We the People" debate the action or lack thereof from the federal government, our cities, neighborhoods, our streets have turned into war zones. Legions of illegal alien gangs fight for the right to smuggle drugs and people. An illegal alien pulled over by police for a traffic offense has no worries about facing anything more than a small fine, many of our Chiefs prefer to wait until they kill someone of commit a serious felony. A congressional Homeland Security Committee report estimates that illegals kill over 9,000 Americans a year; annually they kill twice the number of Americans than the brave soldiers who have lost their lives in Iraq to date.

Many of these have prior contacts or arrests and still remain in the U.S. Enough is enough.

After years of witnessing the increase in crime, it is inexcusable for our Valley's police chiefs to maintain their sanctuary policies. We can not stand by and tolerate them putting the rights of non-citizens above citizens.

Every day the cost of ignoring the border increases tax fraud, identity theft, and property crimes, a burden on Arizona residents; billions to educate, medicate and incarcerate; but the irreversible cost of violent crimes can not be endured any more.

Police chiefs in this state are more interested in putting handcuffs on their officers than illegal aliens.

Arizonans have spoken loudly and yet they refuse to listen:
In '04 Passing Prop. 200, requiring proof of citizenship & ID at the polls to vote, and denying public benefits to illegal aliens; Nov. '06 by a 75% average citizens passed Propositions 100, denying bail to illegals who commit serious felonies; 102, denying punitive damages to illegals; 103, making English Arizona's Official Language; and 300, denying public benefits to those in our country illegally.
We also passed at the legislature the toughest Worksite Enforcement bill in the nation, "The Fair and Legal Employment Act".
I am not sure what part of "illegal" they don't understand, but finally the citizens are standing up and demanding we

9/19/2011

tackle the problem of illegal immigration. Let's take the handcuffs off from our police officers, Arizona will finally be able to give away its title as a crime capital of the United States.

By allowing our cops on the beat to do their jobs, they could be responsible for the one of the largest crime reduction programs in state history.

Those that refuse to follow their constitutional duty or live up to their oath of office should be forced to step aside and make way for honest, hard-working law enforcement officers that know their job and cost of not doing it. Your Mayor and City Council would have to do their job first.

Since that isn't likely to happen, I hope the voters have the final say.

Senator Russell Pearce ( www.russellpearce.com )

9/19/2011

**Administrator**

| | |
|---|---|
| **From:** | russellpearce [russellpearce@cox.net] |
| **Sent:** | Friday, March 20, 2009 6:37 PM |
| **To:** | Russell K. Pearce; Karen Smith |
| **Subject:** | Emailing: Killing, immigration issue outrage Mo. town |

r

<u>News</u>

### Killing, immigration issue outrage Mo. town

by **Jim Salter** - Mar. 20, 2009 10:06 AM
Associated Press

HANNIBAL, Mo. - A Hannibal police officer was finishing up mundane paperwork on a quiet Saturday morning when Manuel Cazares walked into the station, blood splattered on his hands and shoes.

Cazares put his hands out, crossed them, and told the officer to arrest him.

"I killed two people," he allegedly said.

Details surrounding the allegations are far too common: an abusive relationship, a jilted lover, a sudden attack.

But some in this Mississippi River community of 17,000 best known as Mark Twain's hometown aren't just outraged by the violence. They also question why Cazares was in Hannibal at all.

Cazares admitted after his arrest that he is an illegal immigrant from Mexico. The 32-year-old had several run-ins with law enforcement before the homicides, but officials had never questioned his legal status.

Now he is charged with two counts of second-degree murder and armed criminal action in the Feb. 28 deaths of his ex-girlfriend, 27-year-old Amanda Thomas, and 25-year-old Carl Patrick Epley.

"I don't know how this happens," said Tina White-Masengill, Thomas' sister. "My stepdad told police many times, I don't even think the guy's a legal citizen.' "

During his three years in Hannibal, Cazares managed to avoid detection, despite a few traffic violations and a property damage conviction after an arrest for allegedly beating up Thomas and tearing up her home. Thomas had a restraining order against Cazares, who got probation in the property-damage case.

Police say his name wasn't in a database maintained by Immigration and Customs Enforcement. Police and Cazares' boss also say he had authentic-looking identification, including a Social Security card. And police noted that Cazares speaks fluent English.

Cazares' attorney did not return phone messages seeking comment. Cazares is being held in lieu of $1 million bond.

Hannibal police declined several interview requests from The Associated Press, but said soon after the killing that they had received several angry calls, some with racial overtones.

Days after the killings, rocks were thrown through plate-glass windows at the Mexican restaurant where Cazares worked. The FBI decided against opening a hate-crime investigation after concluding that it was vandalism, not retaliation.

Hundreds of messages related to the case were posted on the Hannibal Courier-Post Web site, with several questioning why authorities hadn't been able to determine Cazares' legal status before. One suggested police should conduct raids to seek out other illegal immigrants.

"Of course we have folks who say that's unconstitutional and racial profiling so we have to ignore the problem until this sort of terrible tragedy takes place," the posting read. The newspaper eventually took down the postings.

At a news conference, police Capt. James Hark told reporters that tracking illegal immigrants is a

Killing, immigration issue outrage Mo. town

federal responsibility. He said the department is sympathetic to the victims' families, "but, in retrospect, there's nothing in the system that would have prevented this from happening."

ICE spokesman Carl Rusnok said the agency seeks to work closely with local police to uncover illegal immigrants.

"When local law enforcement suspect that they have arrested an illegal alien on criminal charges, we encourage them to forward those suspicions to ICE, where we will make the appropriate determination whether that person is in the country legally or illegally, and whether he is deportable," Rusnok said.

The relationship between Cazares and Thomas had long been rocky, with Thomas seeking restraining orders in 2007 and again early last year. Marion County prosecutor Tom Redington said the first order was dismissed when Thomas failed to appear at a court hearing; the second was dismissed at her request.

Thomas made a third attempt around Thanksgiving and obtained a restraining order that was supposed to keep Cazares away from the small brick duplex where she lived with their 20-month-old son and a 7-year-old daughter from a previous relationship.

Yet neighbors said they often saw Cazares in the area.

"We pulled up one night and he drives up the street with his car lights off and just sits there watching her house," said neighbor Charles Thomas, who is not related to the victim.

In early February, Thomas told police she thought Cazares was stalking her. White-Masengill said her sister played cell phone messages for police, including one in which he said, "No one can love you like I do."

Redington said he didn't have Cazares arrested immediately because of the "on-again, off-again nature of their relationship." He asked Thomas to obtain records that would show that Cazares had been calling her, but she never got the records.

According to court records, Cazares offered the following account of the killings in his confession:

Despite the restraining order, he and Thomas had spent the night of Feb. 26 together after she called him. He thought they would be together again the next night.

Instead, Thomas went out. At some point she met up with Epley, a friend from her nearby hometown of Monroe City.

Cazares fumed when a friend told him he saw Thomas outside a bar. He stayed up late drinking beer, then went to Thomas' home the next morning and found her with Epley.

Cazares said he went to the kitchen, found a knife and stabbed Epley before turning the knife on Thomas.

He then drove around in Thomas' car before using her cell phone to call his mother. He told her "that I loved her and that I did something that was not right and for her to take care of herself."

He said he considered suicide, but instead quietly turned himself in.

Ex. I-40, p. 14

## Administrator

| | |
|---|---|
| **From:** | Kara Tretbar [ktretbar@AssociatedAsset.com] |
| **Sent:** | Thursday, April 16, 2009 2:48 PM |
| **To:** | Russell K. Pearce |

**Subject:** RE: Homebuilders, New Business, New Housing, NO impact fee increases

Thank you for your communication and response. It goes a long way when one knows someone is reading and listening. You are the only one who answered me.

Thank you Mr. Pearce,

**Kara Tretbar CAAM**
AAM,LLC
602-288-2655 - Direct Line
480-821-2334- Fax
602-957-9191- Main Line
480-217-0868 - Cellular
ktretbar@aamaz.com

**From:** Russell K. Pearce [mailto:rpearce@azleg.gov]
**Sent:** Thursday, April 16, 2009 1:13 PM
**To:** Kara Tretbar
**Subject:** RE: Homebuilders, New Business, New Housing, NO impact fee increases

Thank you and I agree with you. I will not be voting to raise taxes and have never voted to raise taxes. We are over taxed and over regulated now. I will do all I can to rain in the cities and this out of control taxation of the construction industry. www.russellpearce.com

**From:** Kara Tretbar [mailto:ktretbar@AssociatedAsset.com]
**Sent:** Thursday, March 19, 2009 3:39 PM
**To:** Al Melvin; Albert Hale; Amanda Aguirre; Barbara Leff; Carolyn Allen; Chuck Gray; Debbie McCune Davis ; John B. Nelson; Jay Tibshraeny; Jim Waring; John Huppenthal; Jonathan Paton; Jorge Luis Garcia; Ken Cheuvront; Leah Landrum-Taylor; Linda Gray; Manuel V. "Manny" Alvarez; Meg Burton Cahill; Pamela Gorman; Paula Aboud; Rebecca Rios; Richard Miranda; Robert Burns; Ron Gould; Russell K. Pearce; Steve Pierce; Sylvia Allen; Thayer Verschoor
**Subject:** Homebuilders, New Business, New Housing, NO impact fee increases

Dear Legislatures,

I write to you as a business person, a human being, a homeowner, a mother, an aunt...I am all of these. I have learned of the new impact fees that are going to be placed on home builders. **I object.** Here's why:

    a.)   Arizona government (and yes business leadership) did not plan our growth around jobs, **we planned it around growth**. Growth has failed because of it and is aggravated by this bizarre economic time. Now, instead of finding a way to bring new jobs, the plan is to make it harder for those that can carry on by raising fees.  This is "tax and spend", or in this case, "fee imposition and spend". **Very bad idea. If we would all start being honest** about what we need, which is more business in Arizona, then the jobs, the housing starts, new homebuilding, and everything else will rise. **Please, please, please do not raise impact fees.** It affects future homeowners and the home builders... there are some things you could impose upon home builders that would help...but that is for another email.

    b.)   All of you knew what Arizona has been heading to with home building...if you did not, that's

9/19/2011

scary… and not an acceptable answer.

c.) Here's the perception we the minions discuss out here: On one hand, you let the homebuilders run wild with very little oversight from 2000-2007 and now you want to get more money from them…it is exactly what Washington is doing and this is NOT a good balanced approach to long term economic health for us here in Arizona.

d.) We are all in this together. The government, both Federal and State, the banks, the homeowners, and big business went crazy for several years, drunk with consumption, now we have to pay the price. Which is, tighten the belt, make do with what we have, build new partnerships and improve-not punish-the old relationships. We have to DO WITH LESS…and on my goodness, be both conservative AND creative.

**The problems most discussed around the dinner table and lunch room table are:**

1. Bring new business into the state-manufacturing, technology development, research centers, private colleges, AGRICULTURE.

2. Shut the border until we can find a way to get guest workers SAFELY over the border. Just shut it down. **What does anyone not get about illegal entry?** This IS NOT about race or civil rights. How long do you think I could go over there and be illegal…not long. Stop letting the Mexican government walk on us.

3. STOP FORECLOSURES-stop arguing about who did it right or wrong, this is a huge deal, find a way…then we can sell houses again here-ONCE we have jobs here…

4. Work with homebuilders to start building smaller, "green communities", that are affordable. Why do we all need to live in 5000 square foot? We are not Texas.

5. Don't be supporters of stupid tax increases that hurt the everyday person by making it impossible for their employer to stay afloat.

   How about something like a "share" tax? The share tax is in addition to what worker's pay in income tax every year and it is split between the counties for roadwork and development improvements. Charge us $10 per head for every legal, working person in the state. Send the money to the one place in the budget. Businesses pay $100.00 share tax every year with their state taxes.

6. Could our state survive an audit? I wonder, because with all the money generated in the last decade, we sure don't have a lot to show for it…except another tax increase or fee.

If any of you read this, I appreciate it. I am one of several representatives at my company that talk to YOUR constituency every day in neighborhoods and businesses. Across the board, Republican or Democrat, the above seems to be the buzz out here.

If the people lead, leaders will follow.

Thank you,

**Kara Tretbar CAAM**
AAM,LLC
602-288-2655 - Direct Line
480-821-2334- Fax
602-957-9191- Main Line
480-217-0868 - Cellular
ktretbar@aamaz.com

9/19/2011

**Administrator**

**From:**    russellpearce [russellpearce@cox.net]
**Sent:**    Sunday, May 10, 2009 6:27 PM
**To:**    Russell K. Pearce; Karen Smith
**Subject:** Fw: Chandler serial rapist suspect Santana Batiz-Aceves - twice deported

----- Original Message -----
**From:** LINDABENT@aol.com
**To:** jtni1@cox.net ; russellpearce@cox.net
**Sent:** Sunday, May 10, 2009 12:53 PM
**Subject:** Chandler serial rapist suspect Santana Batiz-Aceves - twice deported

# Twice-deported illegal alien criminal is Arizona serial rapist suspect



All of the illegal alien suspect's victims were young girls between the ages of 12 and 15. He started his raping spree last June–targeting young girls living in single-parent homes after watching the victims and casing their homes before the attacks. He worked as a heavy equipment operator:

He packed his car, withdrew his cash and planned to slip quietly into Mexico. But the escape was cut short Friday morning as Chandler detectives closed in. Police then arrested the man on suspicion of sexually assaulting five girls and attacking another in the Chandler Rapist crime spree that spanned 18 months, police announced Saturday.

Santana Batiz-Aceves, 39, a twice-deported illegal immigrant with a history of drug charges, was arrested about 11:49 a.m. Friday at his Chandler home near Arizona Avenue and Ray Road. He was booked into Maricopa County's Fourth Avenue Jail on suspicion of 25 felonies, including kidnapping, child molestation, sexual abuse, sexual conduct with a minor, aggravated assault, burglary and trespassing.

He is being held without bond.

"From the beginning of this investigation, we have believed that help from our community and good, old-fashioned police work were the most likely avenues to solving this series of crimes," Chandler police Chief Sherry Kiyler said at a news conference Saturday. "This has turned out to be the case."

Police said DNA links Batiz-Aceves, a heavy equipment operator, to three of the sexual assaults. Items found in his car and house also link him to the attacks, police said.

Kiyler said the arrest unfolded Friday morning when detectives were working a saturation patrol in the area of the rapes. A Chandler task force detective spotted a white two-door Toyota Tercel matching a car described in a Nov. 8 home intrusion linked to the Chandler

9/19/2011

Rapist. Police followed the car and stopped it about 7 a.m. Friday near North California Street and Ray Road. During the stop, a detective noticed a jacket in the car matching descriptions provided by two victims.

Batiz-Aceves first told detectives his name was Ricardo Ramirez Lopez and that he lived in Casa Grande and was in Chandler for work and to find a friend, Kiyler said. When police asked to swab his cheek for DNA, he refused. Officers kept a close watch on the man and obtained a court order for his DNA, but when they tried to contact him at his home, they said he was attempting to leave. "When we went back to contact him, he was in the process of loading up his vehicle," said Chandler police spokesman Sgt. Rick Griner.

Griner said Batiz-Aceves also had a large sum of cash , and detectives concluded he was planning to flee to Mexico.

Valley police departments don't keep track of the numbers of crimes committed by immigrants, legal or illegal, because they consider immigration to be a federal responsibility. The federal Immigration and Customs Enforcement agency concentrates mostly on human- and drug-smuggling operations without comparing its notes with law enforcement in general.

About 20 percent of the 9,423 inmates in Maricopa County jails on Friday had immigration holds, said Maricopa County sheriff's Deputy Doug Matteson. About 10 percent of Arizona's population is made up of Mexican nationals.

Batiz Aceves' illegal status undoubtedly will be held up by most people as the consequences of failures in federal immigration policy, sociologists and national immigration experts said. The crimes he's accused of also will reinforce the stance that the same borders that allow ordinary immigrants to illegally enter the U.S. to find work also allow in immigrants who commit crimes, they said.

"(The U.S. borders) are an open invitation to people who are criminals," said Ira Mehlman, spokesman for the Federation for American Immigration Reform, a Washington organization that opposes any form of legalization for undocumented immigrants. "Just as people come here to take advantage of other benefits this country has to offer, criminals will come here also."

The crimes Batiz Aceves is accused of also will add fuel to the debate about whether state and local police should enforce immigration laws: Batiz Aceves' arrest comes four months after another undocumented immigrant killed Phoenix police Officer Nick Erfle.

Hey, how's that fence coming along?
**Never mind.**

***

Dan Riehl: If Batiz Aceves had lived, worked, and raped in Arkansas, would he have earned a **Huckabee pardon?**

---

Recession-proof vacation ideas. Find free things to do in the U.S.

**Administrator**

| | |
|---|---|
| **From:** | russellpearce [russellpearce@cox.net] |
| **Sent:** | Monday, May 11, 2009 10:13 PM |
| **To:** | Russell K. Pearce; Karen Smith; Laura Devany; Michael Hunter; Jake Agron |
| **Subject:** | Fw: States with highest rates of fatal hit-and-run crashes have highest # illegals |

# Roadkillers: unlicensed, drunk-driving illegal aliens are killing Americans and each other, by the carload

<u>New American, The</u> , <u>April 2, 2007</u>  by <u>R. Cort Kirkwood</u>

The Ceran family of Salt Lake City, Utah, was returning home on Christmas Eve after attending a performance of A Christmas Carol. They didn't know who awaited them on the road: Carlos Rodolfo Prieto, an unlicensed, drunk-driving illegal alien from Mexico. The 24-year-old Prieto, prosecutors allege, ran a red light and smashed into the six Cerans, killing Cheryl Ceran, 47, and two of her children, 15-year-old Ian and 7-year-old Julianna. Gary Ceran, 45, and two other children survived the crash.

So did Prieto. He failed a roadside sobriety test and confessed to drinking five beers before the rubber hit the road. Police had collared Prieto twice before for DUI. He was not deported.

In October, an illegal alien admitted drinking a 12-pack of beer before he killed someone in Tennessee. And in two weeks alone over late October and early November, World Net Daily has reported, drunk-driving illegals killed five people in North Carolina.

Highway homicide is a deadly and largely unknown aspect of illegal immigration, and startling data and horror stories from newspapers across the country show that the states with the highest numbers of illegals are, most likely, the most dangerous places to drive.

The Data

One such eye-opener appeared as "The hit-kill-and-run state" stories, published in 2005 in the Arizona Daily Star. "The seven states with the highest rates of fatal hit-and-run crashes," the paper reported, "are also the seven states that have the most illegal immigrants, according to two think tanks." With 500,000 illegal aliens, or 9 percent of its population, the paper reported, Arizona ranked fifth in that measure behind California, Texas, Florida, and New York. About 5.6 percent of Arizona's fatal crashes between 1994 and 2004, the newspaper reported, were hit-and-run.

In California, the state with the most illegal immigrants, more than 7 percent of the fatal wrecks were hit-and-run, the Daily Star reported, the highest in the nation. With one million unlicensed drivers., California also boasted the highest number of hit-and-runs of all the states, according to a 2003 San Francisco Chronicle article.

More recent data on California, gleaned from the federal Fatality Analysis Reporting System, show that California's figure for fatal hit-and-runs in 2005 reached 9 percent, or 347 of 3,846 fatal crashes. Arizona's number stayed the same as its average from 1994 to 2004. The figure for Texas came in at 5 percent, an increase from 4.5 percent. Florida's figure increased from 4.9 percent to 5.6 percent.

9/19/2011

By contrast, the states with the lowest percentage of fatal hit-and-run crashes also had the lowest number of illegals. In Vermont, with 4,000 illegals in 2005, the Federation for American Immigration Reform reports, one of 68 fatal crashes was a hit-and-run. Wyoming, also with 4,000 illegals, posted just one hit-and-run fatality among 147 total, or 0.6 percent. Maine too had just 4,000 illegals. Just one of its 151 fatal crashes was a hit-and-run.

"A lot of it," a traffic expert told the paper, "is the Mexican border." Indeed it is. And not just for hit-and-run killers.

More proof that illegal immigrants are lethal drivers is found in the evidence tying unlicensed drivers, who are disproportionately illegal aliens, to traffic fatalities. The American Automobile Association (AAA) published the second of two reports in 2003 documenting that unlicensed drivers are more lethal than licensed drivers. That report, entitled Unlicensed to Kill, The Sequel, used numbers gathered between 1993 to 1999. Unsurprisingly, correlating the AAA data with other figures detailing the number of illegal aliens in a state demonstrates that states with the highest numbers of fatal crashes involving unlicensed drivers correspond to the states with the highest numbers of illegal aliens. In California, with the highest population of illegals, at least 20.9 percent of the drivers in fatal crashes were unlicensed. Arizona's and New Mexico's figures were even higher: 21.1 and 23.1. Maine's figure was just 6.1 percent, Wyoming's, 11.2 and Vermont's 13.7.

Law enforcement authorities confirm that unlicensed drivers are disproportionately illegal aliens. According to World Net Daily, a district attorney in New York has reported that at one point, 66 percent of those charged with misdemeanor unlicensed driving were illegals. "Unfortunately," a highway patrolman in California told WND, "the undocumented drivers here [drive unlicensed] more than the natives." In short, illegal aliens drive without licenses and cause fatalities in numbers exceeding their proportion of the population.

Assuming these data aren't a wild fluke, the obvious question is why illegal aliens, mostly Mexicans, are so often unlicensed, and why they so often leave the scene of an accident. The answers are hardly a mystery. They are unlicensed because they are illegal, although being illegal does not mean they will be unlicensed, as THE NEW AMERICAN showed in its story about Wisconsin's generous policy on licensing ("Illegal Immigrants in a State of Disarray," Feb. 19).

http://findarticles.com/p/articles/mi_m0JZS/is_7_23/ai_n25004214/

---

Recession-proof vacation ideas. Find free things to do in the U.S.

9/19/2011

## Administrator

**From:** La Baronesa de la Noche [baroness2u@yahoo.com]
**Sent:** Wednesday, June 10, 2009 2:42 AM
**To:** Manuel V. "Manny" Alvarez; Linda Gray; Leah Landrum-Taylor; Al Melvin; Rebecca Rios; Jay Tibshraeny; Jim Waring; Robert Burns; Jorge Luis Garcia; Pamela Gorman; Chuck Gray; Debbie McCune Davis; Thayer Verschoor
**Subject:** RE: SB1175 - PLEASE SUPPORT THIS BILL!

It is the responsibility of each and every American to do whatever they can to help keep our country, our citizens and our way of life safe and secure from those who threaten them.

Writing this email to each of you is what I am able to do but in the end it is YOU who have the power to pass this bill so that our law enforcement is able to do their job and enforce our laws,
laws that were put in place to protect us from people who have no respect for our laws or our country. I hope that you see how important this is to not only our community but to our entire country. Someone has to be strong enough to do what needs to be done to stop protecting these people. Illegal immigration has been allowed to go on for far too long and has cost us dearly.

Please understand that this is not a race issue or a matter of hate for anyone. (I'm an American of Mexican descent.) It is about love for our country. I hope that you all love our great country as much as I do because if you do you will pass SB1175 for the good of our country.

Wishing you strength,
Brandy Baron

REFERENCE TITLE: illegal aliens; enforcement; trespassing.

State of Arizona

Senate

Forty-ninth Legislature

9/19/2011

First Regular Session

2009

# SB 1175

Introduced by

Senators Pearce: Harper

AN ACT

amending title 11, chapter 7, Arizona Revised Statutes, by adding article 8; amending title 13, chapter 15, Arizona Revised Statutes, by adding section 13−1509; relating to illegal aliens.

(TEXT OF BILL BEGINS ON NEXT PAGE)

Be it enacted by the Legislature of the State of Arizona:

Section 1.  Title 11, chapter 7, Arizona Revised Statutes, is amended by adding article 8, to read:

ARTICLE 8.  ENFORCEMENT OF IMMIGRATION LAWS

11-1051.  Cooperation and assistance in enforcement of immigration laws

A.  No official, agency or personnel of this state or county, city or town of this state may adopt a policy that limits the enforcement of federal immigration laws to the full extent permitted by federal law. For any legitimate contact made by such officials, agencies or personnel where reasonable suspicion exists regarding the immigration status of a person, a reasonable attempt shall be made to determine the immigration status of the person. If the person who is arrested is an alien, the person's immigration status shall be verified

9/19/2011

with the federal government pursuant to 8 United States Code section 1373(c). If the person is an alien who is unlawfully present in the United States and this state or a local governmental entity elects not to prosecute the person for a violation of state or local law, the person shall be transferred to the custody of the United States immigration and customs enforcement or the United States customs and border protection. If an alien who is unlawfully present in the United States is acquitted of any violation of state or local law, is discharged from imprisonment or pays any fine imposed, the alien shall be transferred immediately to the custody of the United States immigration and customs enforcement.

B.  Except as provided in federal law, officials, agencies or personnel of this state and counties, cities and towns of this state may not be prohibited or in any way be restricted from sending, receiving or maintaining information relating to the immigration status, lawful or unlawful, of any individual or exchanging that information with any other federal, state or local governmental entity for the following official purposes:

1.  Determination of eligibility for any federal, state or local public benefit, service or license that is restricted in whole or in part on the basis of immigration status.

2.  Verification of any claim of legal domicile if legal domicile is required by law or contract.

3.  Confirmation of the identity of any person who is detained.

C.  A person may bring an action in superior court to challenge any official, agency or personnel of this state or county, city or town of this state that adopts or implements a policy that limits the enforcement of federal immigration laws to the full extent permitted by federal law. If there is a judicial finding that an entity has violated this section, the court may order either of the following:

1.  That the person who brought the action recover court costs and attorney fees.

2.  That the entity pay a civil penalty not to exceed an amount equal to five thousand dollars for each day that the policy has remained in effect after it has been found to be in violation of this section.

Sec. 2.  Title 13, chapter 15, Arizona Revised Statutes, is amended by adding section 13-1509, to read:

13-1509.  Trespassing by illegal aliens; assessment; classification

A.  In addition to any violation of federal law, it is unlawful for a person who is a citizen of any country other than the United States to enter into or be on any public or private land in this state if, at the time of the commission of the offense, the person is in violation of 8 United States Code section 1325.

B.  For a first offense, the arresting authority has discretion to transfer the person to the federal agency with jurisdiction or refer the person for prosecution.

C.  A violation of this section is a class 1 misdemeanor, except that a second or

9/19/2011

subsequent violation is a class 4 felony.  The person is not eligible for suspension or commutation of sentence or release on any basis until the sentence imposed is served.

D.  In addition to any other penalty prescribed by law, the court shall order the person to pay jail costs and an additional assessment in the following amounts:

1.  At least five hundred dollars for a first violation.

2.  Twice the amount specified in paragraph 1 of this subsection if the person was previously subject to an assessment pursuant to this subsection.

E.  A court shall collect the assessments prescribed in subsection D of this section and remit the assessments to the department of public safety, which shall establish a special subaccount for the monies in the account established for the gang and immigration intelligence team enforcement mission appropriation. Monies in the special subaccount are subject to legislative appropriation for distribution for gang and immigration enforcement and for county jail reimbursement costs relating to illegal immigration.

F.  Notwithstanding subsection C of this section, if the person violates this section while in possession of any of the following, the violation is a class 2 felony:

1.  A dangerous drug as defined in section 13-3401.

2.  Precursor chemicals that are used in the manufacturing of methamphetamine in violation of section 13-3404.01.

3.  A deadly weapon or a dangerous instrument, as defined in section 13-105.

4.  Property that is used for the purpose of committing an act of terrorism as prescribed in section 13-2308.01.


http://www.azleg.gov/legtext/49leg/1r/bills/sb1175o.asp


| | |
|---|---|
| Kevin Myers | |
| United for A Sovereign America (USA) | Riders United for a Sovereign America, Corp. |
| Wikipedia | YouTube |


Intellectually I know that America is no better than any other country; emotionally I know she is better than every other country.
          -- Sinclair Lewis


9/19/2011

**Administrator**

| | |
|---|---|
| **From:** | russellpearce [russellpearce@cox.net] |
| **Sent:** | Tuesday, September 15, 2009 8:35 AM |
| **To:** | Russell K. Pearce; Karen Smith |
| **Subject:** | Fw: From the District Chairman of LD-13, very disappointed! |

- To the legislators who failed to do your job, and represent the people:
-
- I can't believe you voted no, or didn't vote on HB 2280, Sen. Pearce's anti-sanctuary and trespass bill. How dare you! With skyrocketing unemployment, we need to employ every measure that makes it harder for illegal aliens to remain in the state and compete for jobs with citizens and legal immigrants.

- It's not "officer discretion" that HB 2280 seeks to remove, as some have suggested, but rather "police management discretion" as influenced by open-borders politicians. Recent *Arizona Republic* news stories say that the Phoenix PD's new policy of giving officers discretion on holding illegal aliens has failed because officers know that swift retaliation by superiors will follow. The goal is not to "handcuff" police; it is to handcuff police chiefs and city councils that do not want to engage in immigration enforcement. That's why the bill was endorsed by rank-and-file officers as represented by the Arizona Fraternal Order of Police and Arizona Highway Patrol Association.
- Some who voted no or didn't vote on HB 2280 say they preferred another anti-sanctuary measure - HB 2331 – but I don't consider supporting the status quo in sanctuary cities to be a good alternative. HB 2331 was watered down to include an "intent" clause that would allow sanctuary-minded politicians to put conditions on when and where police can ask about status. Status checks also were limited to instances when illegal aliens were arrested for another crime. Maybe that's why Sen. Boone, the Senate sponsor of HB 2331, withdrew the bill from consideration.
- HB 2280 would have put some real teeth in immigration enforcement by creating a prosecutable offense for "trespass." The prospect of having a criminal record is a powerful deterrent for illegal aliens. Future arrests mean prosecution as a repeat offender and exclusion from future legal entry. That's the kind of deterrent we need, just like under Arizona's human smuggling law.
- Every Border Patrol agent carries around a list of what constitutes "probable cause" for a "reasonable suspicion" that a person is an illegal alien. The bill's trespass provision could have been implemented by requiring all police to use the Border Patrol's criteria, which have already passed judicial review. That way, there would have been no guess work involved and certainly no racial profiling.
- No legislation should be considered sacrosanct but there is one legislator who has a perfect track record in having immigration-related legislation upheld by the courts – Sen. Pearce. You missed your opportunity to join the vast majority of Republicans (26) who supported a bill that would have truly made a difference in Arizona. It is time for you to stop practicing the politics of accommodation with open-borders groups and the cheap labor lobby.

9/19/2011

**Ex. I-40, p. 25**

## Addendum: Rebuttals for Legislator Responses

**Response From Rep. John McComish**

- There was a Tom Boone HB2331, supported by all of us, and opposed by most democrats, that was simple, clear and effective to prohibit Sanctuary cities.  This bill passed the House with 38-21, and was killed by Russell Pearce in the Senate.

It stated:

A CITY OR TOWN OR A LAW ENFORCEMENT AGENCY OF A CITY OR TOWN SHALL NOT ENACT AN ORDINANCE OR RESOLUTION OR ADOPT AN IMMIGRATION POLICY THAT IS INTENDED TO PROHIBIT OR EFFECTIVELY PROHIBITS THE LAWFUL ENFORCEMENT OF THE UNITED STATES IMMIGRATION LAWS.

That sure beats a four page clumsily written bill.

Rebuttal: Sen. Pearce did not kill HB 2331. It was not even sent to his committee. The Senate sponsor (Boone) of that bill withdrew it. Perhaps that's because he was a co-sponsor of Sen. Pearce's HB 2280 and preferred it to HB 2331.

HB 2331 was watered down to include an "intent" clause that would allow sanctuary-minded politicians to put conditions on when and where police can ask about status. It also limited checks to instances when illegal aliens were arrested for another crime. If you consider voting for the status quo in sanctuary cities a good vote, I completely disagree.

Sen. Pearce's bill was longer because it sought to put some real teeth in immigration enforcement, such as creating a prosecutable offense for "trespass." Do you remember how Arizona's human-smuggling law has been so powerful in jailing both the smuggler AND the illegal alien. That is what HB 2280 would have given prosecutors, and what HB 2331 lacked.

You only need to look at Sen. Pearce's track record to know his bill wasn't "clumsily written." No one has a better track record than he in having the courts uphold legislation. Don't you remember? Sen. Pearce won seven out of seven court challenges on Prop. 200 and won five out of five challenges – in the 9th Circuit – on his employer sanctions legislation.

- The Pearce bill says that no policy can be adopted that LIMITS the enforcement of immigration laws "to the full extent permitted by federal law."

The Chiefs of Police are worried that they will not be able to prioritize investigations

among their officers because that could be interpreted to "limit" immigration law.  For example, if they say they are keying on organized crime first, then car theft second, drug dealing third, and then immigration forth, that could be viewed as "limiting" immigration law.

Rebuttal: Police Chiefs are "worried" because they desperately want to continue refusing to engage in ANY immigration enforcement, just like the city council members, mayors and city managers who appoint them to office.  These political animals have long pandered to open-borders groups and the cheap labor lobby. That they opposed HB 2280 is not surprising at all. On the other hand, the bill was endorsed by the Arizona Fraternal Order of Police and Arizona Highway Patrol Association. That's the rank-and-file.

Your argument is a red herring meant to scare people into believing that police would no longer be able to focus first on serious criminal activity. The bill does not skew their priorities. "Worries" also were raised by others about the use of E-Verify in the state – that it would take too much time and money or that it would be ineffective – but those worries are gone now that it's being used without problem by businesses.

- Mandate Galore!  Bill states that for "ANY LEGITIMATE CONTACT" made by a law enforcement officer, where "A REASONABLE SUSPICION" exist regarding the status of the person, a "REASONABLE ATTEMPT" SHALL be made to determine the status of the person.

Then the person apparently needs to be arrested and their status verified with ICE.

Remember the data base only has information of legal permanent residence and others who have been previously detained by ICE. There is no database for American citizens, so it is very possible that American citizens without ID will regularly be detained because they are not in ICE's database.

What is "a reasonable suspicion" that someone is illegal, which is required to trigger the mandate? Will officers suspect based on race? Speaking with an accent? Clothes being worn? Who they are hanging out with? This is a lawsuit waiting to happen against the state.

NO DISCRETION for officers, THEY HAVE TO ENFORCE.  If there is a bank robbery in progress, they can't go.  There is no statute that mandates bank robbery cases.

Rebuttal:  Every Border Patrol agent carries around a list of what constitutes "probable cause" for a "reasonable suspicion" that a person is an illegal alien. This list has already passed judicial review. Maricopa County deputies carry the same list. The prudent way to implement this provision would have been for all police to use the Border Patrol's criteria, so that no guess work is involved. Why reinvent the

9/19/2011

wheel when those criteria are readily available and used by 287(g) participants around the country?

The fact that you are dragging out "racial profiling" arguments here confirms for me that you are a certified member of the open-borders crowd who wants to paint a draconian picture of how ANY immigration enforcement would occur. It is ludicrous to think the intent here was to make police ignore a bank robbery just to arrest an illegal alien. And there is no reason to think that officers would have no discretion or that citizens will be caught up in this net if they do not happen to have their ID when first questioned. Who write this interpretation of HB 2280 for you? It sounds like something the state Chamber of Commerce would say.

- No possible exceptions to aid public safety, i.e., victims of crimes and witnesses of crimes.  If there is a woman who is raped, she will not call officers if she thinks she will be deported.  So this bill prioritizes that deporting aliens is more important than catching at-large rapists.  This is a big issue for Police Chiefs and Prosecutors.

Rebuttal: This is another red herring often used by those who oppose local enforcement under the Federal 287(g) program. There are no statistics on how many illegal aliens report crimes, and no reason to think that a failure to report crimes has materialized. If this is truly a problem, a hotline can be set up to report crimes. If need be, the police can request a federal U visa for victims, which allows them to avoid deportation and obtain lawful status as a condition of cooperation. In the end, however, HB 2280 does it preclude cooperation with police. They will still have discretion to work with witnesses.

- There is a private right of action. Page 2, line 8.  It is likely assumed as the bill states that the person may bring action in Superior Court to challenge "ANY OFFICIAL" or agency … that implements a policy that limits enforcement.  There is no reason to have this language in this statute.

Rebuttal: The primary reason this is necessary is to hold elected officials personally accountable for their continued refusal to cooperate with federal immigration laws. Elected officials, not law officers, have been abusing the public trust by only enforcing the laws they want to enforce. Federal law already forbids sanctuary policies, only to have state and local officials ignore the law.  Americans who have been injured or lost family members because of local sanctuary policies will appreciate another tool against politicians who ignore immigration law and pander to cheap labor business and/or illegal alien lobbies. Would Sheriff Joe Arpaio object to this provision?  Not likely, because he DOES enforce immigration laws under the 287(g).

Under the law, I believe these cases will move to Federal Court, because there will be a Federal Question. So the cases won't be in Superior Cases, as specified by the bill's language.

Where is the legal analysis by a qualified expert that makes you believe a Federal

9/19/2011

question is involved? If it's just your personal belief, what legal experience makes you qualified to reach this conclusion? The original author of the trespass language was Rep. John Kavanagh, a former prosecutor from New York who introduced and passed related legislation in recent years. He should know if his bill is on sound constitutional ground.

Besides, doesn't legal precedent require that a challenge to a state law be first brought in a state court? If a challenge was brought in Federal court, wouldn't it just be remanded to a state court for consideration?

- The bill has not had a hearing in the House or been COWed.  This is a perfect example of what is wrong with our using Strike Everything Amendments to avoid hearings in one of the legislative chambers.

Rebuttal: This is not the first time the House Judiciary Committee has seen anti-sanctuary or criminal trespass legislation. Rep. John Kavanagh's trespass bills, for example, were considered and passed only to die under former Gov. Janet Napolitano's poison pen.

Rep. Driggs, the chair of that committee, opposed SB 1175 so he refused to hold a hearing on it. In reality, he was afraid to have to go on record as opposing it. Sen. Pearce chose the route of placing the language of SB 1175 on HB 2280 so Riggs could not kill his bill. It is interesting to note that Riggs was one of the legislators who left the Capitol so he did not have to vote on HB 2280.

- For effective immigration enforcement, we need local and federal law enforcement to work together.  This is already happening under the 287(g) program which we all support.

What if a city law enforcement agency turns over an illegal to ICE and ICE doesn't accept them?

Rebuttal: State law can't obligate Federal law enforcement.  HB 2280 seeks to codify the obligation ICE has under Section 287(g) to cooperate with participating localities and remove the barriers erected by state and local agencies to cooperation with federal immigration authorities.

Remember that localities got involved in enforcement because the feds were NOT doing their job. Now, ICE is showing a willingness to try harder. If for whatever reason ICE cannot accept, or chooses to release, the illegal alien, then at least the locality has done its job. Continued pressure on Congress is needed to ensure ICE has the resources to follow through.

- Courts will likely find this violates Federal Preemption.  This isn't an area I am attacking too much because it seems that our people don't like to hear about how the Federal Government has jurisdiction over all immigration issues like

9/19/2011

this.  It is true, but they don't like to hear it.

Rebuttal: Where is the legal analysis by a qualified expert that says a Federal court will find that this provision is preempted? If the provision is challenged, so be it. There are areas of the law that have not been, but need to be, adjudicated. Remember that no one has a better track record in having courts uphold legislation than Sen. Pearce. Don't you remember, Sen. Pearce won seven out of seven court challenges on Prop. 200 and won five out of five challenges -- in the 9th Circuit -- on his employer sanctions legislation?

Some people constantly say we need to take the handcuffs off law enforcement. The irony is that this bill actually goes to the opposite extremes. This bill handcuffs them by forcing them to perform certain duties. This bill takes officer discretion away. It says SHALL.

Rebuttal: The bill is not "extreme." It simply carves out a legitimate area of enforcement. It may set a higher standard but it is still leaves discretion in the handling of such cases. Recent *Arizona Republic* news stories say that the Phoenix PD's new policy of giving officers discretion on holding illegal aliens has failed because officers know that swift retaliation by superiors will follow. It's not "officer discretion" that HB 2280 seeks to remove but rather "police management discretion" influenced by open-borders politicians. That's now, and has always been, the root of the problem.

One more thing, this is very big government, as far as the Trespass charge is concerned. Not only will this take up prosecutor and Court time, but it will also make the state pay for a public defender for the defendant. Huge cost, but also unnecessary. We don't need state criminal charges, what a waste.

Rebuttal: A waste? On the contrary, prosecution and imprisonment under Arizona's human smuggling laws has eliminated the illegal aliens' ability to hide or adopt new identities.  A criminal record is a powerful deterrent - future arrests mean prosecution as a repeat offender and exclusion from future legal entry. HB 2280 would have provided a similar deterrent. Besides, prosecutors would have discretion to turn the person over to DHS for deportation rather than prosecute, so HB 2280 doesn't necessitate more "big government."

We want to deport them.

We've learned that deportation alone is no deterrent, but the prosecution + imprisonment + deportation is a strong one.

That is what the Feds do.  Just turn them over to the Feds and let them do their thing.

9/19/2011

That's exactly the idea—after state and local law enforcement has done their job. Whenever I hear a politician say "Just turn them over to the feds," he is really saying "Pass the buck." It's what state and local elected officials have been doing for years, and it's what Americans are sick of hearing.


**Response From Rep. Nancy Barto**


Thank you for your e--mail in response to my missing a key immigration vote – outlawing Sanctuary cities in the state – HB 2280.  I did, and for good reason. What is it about Sen. Russell Pearce's 2280 that caused so many of his own party to come down on the opposite side of this bill that it failed in a majority-controlled Legislature?  Are we open borders bleeding hearts?

Rebuttal:  The majority of Sen. Pearce's party in the House (26 Republicans) voted for HB 2280. Six did not vote and three voted against it. You say you left at 5 am, but that is just after it came up for a vote at 4:45 am. I still believe you were one of those who simply did not want to go on record as voting against it.


Quite the opposite.  Since 2006 I and others who oppose this bill voted for key legislation aimed at stopping illegal immigration in the state including two bills prohibiting Sanctuary Cities (read more below), employer sanctions to end illegal hiring in Arizona, ending public benefits, laws requiring proof of citizenship to operate a business in Arizona, stopping illegal day laborer hiring, putting resources and the AZ Nat'l Guard on the border and others.   So accusations that I am "soft on illegal immigration" are false on their face.  I'm interested in solving the problem, not making it worse.
I oppose HB 2280 and would have voted "no" had I chosen to be present on the floor but my absence was a silent protest in it coming to the floor in the first place.

Rebuttal:  I will applaud your voting for good bills when I see it happen. Your vote for HB 2331 does not qualify because that bill did not go far enough. That bill was watered down to include an "intent" clause that would allow sanctuary-minded politicians to put conditions on when and where police can ask about status. It also limited checks to instances when illegal aliens were arrested for another crime. If you consider voting for the status quo in sanctuary cities a good vote, I completely disagree.


Secondly, my duty to protect citizens' health care decisions, promoting the AZ Healthcare Freedom Act, conflicted with final votes as I had four national TV and radio interviews later that day.  Part of my job as a legislator is to represent my constituents on this issue, as well, so I left the Capitol at about 5:00 a.m. to rest and prepare for a 7:30 am. FOX interview.

Rebuttal:  I understand your desire to do TV and radio interviews (what politician doesn't?), but staying to vote on bills is manner in which most legislators represent

9/19/2011

their constituents.

HB 2280 is an example of poorly conceived public policy and here is why:

1.    The bill removes officer discretion.

Supporters claim HB 2280 will "take the handcuffs off" local law enforcement wishing to enforce federal immigration laws.  The irony is that this bill actually goes to the opposite extreme.  The bill handcuffs them by forcing them to perform certain duties by taking away officer discretion.

It is mandate-heavy and leaves individual officers and agencies at high risk of legal action for not enforcing "to the fullest extent of the law," since anyone can file a private cause of action against them for perceived "non-enforcement."

Rank and file officers are not calling for this bill – they want and need true discretion to perform their duties.

Rebuttal: HB 2280 did not seek to remove "officer discretion." It sought to remove the discretion of police management and politicians with an order-borders agenda. The Police Chiefs, who are appointed by elected officials, do not want to engage in ANY immigration enforcement just like their city-council or city-manager sponsors. These political animals have long pandered to open-borders groups and the cheap labor lobby. It is not surprising that they opposed HB 2280. On the other hand, the bill was endorsed by the Arizona Fraternal Order of Police and Arizona Highway Patrol Association. That's the rank-and-file

The bill would not have "handcuffed" police. Every Border Patrol agent carries around a list of what constitutes "probable cause" for a "reasonable suspicion" that a person is an illegal alien. This list has already passed judicial review. Maricopa County deputies carry the same list. The prudent way to implement this provision would have been for all police to use the Border Patrol's criteria, so that no guess work is involved. Why reinvent the wheel when those criteria are readily available and used by 287(g) participants around the country?

The only ones who would be handcuffed are the police chiefs and city councils that do not want to engage in immigration enforcement. The bill was, and still is, necessary to stop officials from abusing the public trust by only enforcing the laws they want to enforce.

2.    HB 2280 elevates enforcement of federal immigration law above other crimes.  The state of Arizona does not mandate law enforcement limit or prohibit enforcement of any other crime, ie there is no statute mandating bank robbery cases.

In effect, law enforcement will not be able to prioritize investigations among their

9/19/2011

officers because that could be interpreted to "limit" immigration law.  For example, if they say they are keying on organized crime first, car theft, second, drug dealing third, and then immigration fourth, that could be viewed as "limiting" immigration law.

Public safety is the primary responsibility of law enforcement.  Elevating immigration enforcement to #1 thwarts that mission.

Rebuttal: This argument is a red herring meant to scare people into believing that police would no longer be able to focus first on serious criminal activity. The bill does not skew their priorities. It simply "raises the bar" by making it AN issue to deal with during the course of routine duties. It is ludicrous to think the intent here was to make police ignore a car theft just to arrest an illegal alien.

3.    Crime victims and witnesses will not report serious crimes.

This bill prioritizes deporting aliens over that of catching at-large rapists by not including an exception for crime victims and witnesses. Again, all of our safety is at risk when illegal aliens, fearing deportation, do not cooperate with law enforcement.

Rebuttal: Saying that illegal-alien crime victims and witnesses will not report crimes is another red herring often used by those that oppose local enforcement under the Federal 287(g) program. Again, the bill does not skew police priorities, nor does it preclude cooperation with police who have the discretion to work with witnesses. If need be, a federal U visa can be requested for crime victim, which allows them to avoid deportation and obtain lawful status as a condition of cooperation. There are no statistics on how many illegal aliens report crimes, and no reason to think that a failure to report crimes has materialized. If this is truly a problem, a hotline could also be set up to report crimes.

4.    Border Security is still an unresolved issue.

Supporters of HB 2280 often claim that more officers will die without this law, and cite Phoenix P.D.'s Nick Erfle as an example of this.  The fact is Officer Erfle's killer, an illegal alien, had been deported at least once after having being arrested on theft charges  before he again crossed the border and murdered the Officer, which means Phoenix P.D. had been doing their job.  The problem is that our border is still porous.

In addition, ICE is limited in their detention capacity in Arizona.  They have about 5,000 beds and they are full.  When they receive non-dangerous criminals, they often release them pending a hearing in which cases they receive a temporary work permit and SS # to work!

Increasing local law enforcement's role will not force ICE to detain illegal aliens unless they have committed another serious crime.  But it will dramatically increase the workload for local law enforcement and stress their limited resources.

Rebuttal: The borders are not under control; that's why state and local police on the

9/19/2011

border's front lines have to be a part of the solution, irrespective of how quickly
Congress acts. If the feds release an illegal alien targeted for deportation under 287
(g), then at least we have done our job and can continue work to ensure the feds
have the resources to do their jobs.

The real value of HB 2280, like that of our human smuggling law, is in its potential
deterrent effect. A criminal record is a powerful deterrent – future arrests mean
prosecution as a repeat offender and exclusion from future legal entry. We've
learned that deportation alone is no deterrent, but the prosecution + imprisonment +
deportation is a strong one.

5.     HB 2280 had not received a hearing in the House or been heard in Committee
of the Whole before this vote.  This is what is wrong with our using Strike Everything
Amendments to avoid hearings in one of the legislative chambers.

The bill went around the legislative process to get to a final vote on the last night of
session.

Rebuttal: This is not the first time the House Judiciary Committee has seen anti-
sanctuary or criminal trespass legislation. Rep. Driggs, the chair of that committee,
opposed SB 1175 so he refused to hold a hearing on it. In reality, also did not want
to have to go on record as opposing it. Sen. Pearce chose the route of placing the
language of SB 1175 on HB 2280 so Riggs could not kill his bill. It is interesting to
note that Riggs was one of the legislators who left the Capitol so he did not have to
vote on HB 2280.

6.     I supported alternative bills outlawing Sanctuary cities this session and last.

HB 2331, sponsored this year by Rep. Tom Boone, passed the House 38-21 and, if
it had been allowed a hearing in the Senate, would have certainly enjoyed majority
support there, as well.  How do I know?  A nearly identical bill, HB 2807, sponsored
by Rep. John Nelson in 2008, passed both chambers and was vetoed by former
Governor Napolitano.

Both bills were simple, clear and effective to prohibit Sanctuary cities.  Either of
these bills would have prohibited a city or town or a law enforcement agency from
enacting an ordinance or adopting a policy intended to prohibit or effectively prohibit
the enforcement of Federal immigration laws.  They would have given rank and file
law enforcement the authority plus the necessary discretion to enforce Federal
immigration laws while ensuring the public safety.

The truth is, perception trumps reality on illegal immigration and other issues.
 Perception often gets in the way of good, careful lawmaking.

Some common examples:  if legislation has the word "military" or "veteran" in its title,
no matter how flawed the legislation may be, lawmakers will likely be labeled anti-
military if they oppose it.  Include the word "child" or "children" and the same
perception applies.  Lawmakers are obviously heartless and unfeeling not to vote for

whatever is contained in the bill since it will, no doubt, benefit or protect "the children"!

In the same way, bills sponsored by certain lawmakers on this issue are considered sacrosanct when they may simply be poor public policy or need more work to make them effective legislation.

This year we had another chance to pass a really good sanctuary bill and have it signed by a willing Governor.   But because of politics, we missed our opportunity.

Please let me know if you have questions regarding this legislation and/or my actions.  I will gladly speak with you about it further.

In the meantime, thank you, again, for contacting me and for your involvement in this important public safety issue.

Rebuttal: The Senate sponsor of HB 2331 (Boone) withdrew his bill from committee consideration. Perhaps that was because he was a co-sponsor of Sen. Pearce's HB 2280, which put some real teeth in immigration enforcement, such as creating a prosecutable offense for "trespass." Again, HB 2331 was watered down to include an "intent" clause and limited checks to instances when illegal aliens were arrested for another crime. It was unenforceable and not worthy of your support.

No legislation should be considered sacrosanct but there is one legislator who has a perfect track record in having immigration-related legislation upheld by the courts – Sen. Pearce. You missed your opportunity to join the vast majority of Republicans (26) who supported a bill that would have truly made a difference in Arizona. It is time for you to stop practicing the politics of accommodation with open-borders groups and the cheap labor lobby

9/19/2011

**Administrator**

| | |
|---|---|
| **From:** | Russell K. Pearce |
| **Sent:** | Thursday, February 04, 2010 2:20 PM |
| **To:** | Russell K. Pearce |
| **Subject:** | RE: Previously deported illegal alien charged with slashing girlfriend's throat |
| **Attachments:** | greydot.gif; resized_bildegm.jpg |

Previously deported illegal alien charged with slashing girlfriend's throat



greydot.gif (450 B)

<u>Immigration Reform Examiner</u>                    Dave Gibson



·resized_bildegm.jpg
(14 KB)

Valenzuela with an interpreter at his first court appearance
Telegram.com

On Sunday morning, Aaron Noe Camey Valenzuela, 23, walked into the United Solutions plastics factory in Leominster, Massachusetts, grabbed his girlfriend from behind, and slashed her throat.

The woman, Elba Monges, was taken to the University of Massachusetts Memorial Medical Center, where emergency surgery was performed, and is currently in stable condition.

Another woman, Mary Machado, was also stabbed by Valenzuela when she came to the aid of her co-worker. Her injuries were not serious.

According to Leominster police Lt. Michael Goldman, a plant supervisor wrestled Valenzuela out of the building, at which time the assailant produced a another knife and began cutting himself. Valenzuela slashed at his own wrists, neck, and abdomen, but his wounds were apparently not serious.

The Guatemalan national fled the scene and was captured four hours later in a nearby apple orchard.

Valenzuela, was charged with attempted murder, two counts of assault and battery with a dangerous weapon, as well as one count of assault and battery.

Lt. Goldman told reporters that Valenzuela was angry with his girlfriend because he believed she was going to break up with him.

Valenzuela was deported in 2006. He is being held on $100,000 bail.

In another case, which should serve as an indictment of the Department of Homeland Security, U.S. District Judge David Cercone sentenced an illegal alien to probation in November 2009, after his 10th illegal crossing into the United States.

**Ex. I-40, p. 36**

U.S. Attorney Robert Cessar said that between 1998 and 2007, Uziel Jesus Lopez-Jiminez, 28, had been deported back to Mexico nine times.

His last arrest and deportation came as a result of a DUI conviction in Beaver County, PA.

The Mexican national has committed at least nine felonies in this country.

The court proceeding came only a few days after Department of Homeland Security Secretary Janet Napolitano told a crowd gathered at the Center for American Progress, that border enforcement was now much tougher and we can now proceed with an Amnesty for the millions of illegal aliens inside this country.

Citing the supposed improvements in border enforcement, Napolitano said: "I've been dealing hands-on with immigration issues since 1993, so trust me: I know a major shift when I see one, and what I have seen makes reform far more attainable this time around."

And the beat goes on…

**Ex. I-40, p. 37**

## Administrator

**Folks the Arizona Chamber, the Phoenix Chamber and the Farm Bureau have peresonally told me they were not going to oppose the bill and were ok with it.  East Valley Chamber has supported this kind of legislation in the past and I assume still do, as do many other Arizona chambers and businesses. About 70% to 80% of the public continue to support enforcement and secure border efforts.**


**"If it be asked, what is the most sacred duty and the greatest source of our security in a Republic? The answer would be an inviolable respect for the Constitution and Laws" — Alexander Hamilton.**

**"This country has lost control of its borders. And no country can sustain that kind of position." - President Ronald Reagan**

**We are a nation of laws. We must have the courage – the fortitude – to enforce, with compassion but without apology, those laws that protect the integrity of our borders and the rights of our lawful citizens.**

2/15/10 SB1070 passed out of the Senate with 17 votes (along party lines). As you can see our list of supporters continues to grow.  The voting public (citizens) continues to overwhelmingly support this legislation.  Arizona Police Association representing thousands of Police officers, along with many other law enforcement groups (boots on the ground) have endorsed this legislation, along with 9 of our 15 Sheriff's, citizens groups, political organizations, Unions, and many others have all joined us to end all policies that restrict law enforcement from enforcing our immigration laws and in fact specifically endorsed "Support Our Law Enforcement and Safe Neighborhood Act".

End Arizona's "Catch & Release" policies.

If you really want lower taxes, less crime, less congestion, lower health insurance, not to mention saving American jobs.  With a 26 year high in unemployment, along with record foreclosures it is about time we demand American jobs be saved for Americans.  Then Enforce Our Laws.

This bill will go the House where it will be exchanged for Rep. David Gowan's identical bill HB2632 and then go to the Governor, where I expect her to sign this legislation.  This will be the most comprehensive immigration enforcement legislation in the nation.

We need to contact every single legislator and encourage them to support this legislation SB1070/HB2632. *You can use www.LifeLibertyFreedom.com to contact all the Legislators at once.*

- **Endorsements:** "Support Our Law Enforcement and Safe Neighborhood Act"
  Arizona Police Association (representing over 9,000 police officers)
  Polls show 75/80% of Arizonans
  Arizona State Republican Party (by Resolution)
  Maricopa County Republican Party (by Resolution)
- Maricopa County Guidance Committee Maricopa County Sheriff Joe
  Maricopa County Attorney Andrew Thomas
  Pinal Co. Sheriff Babeu

Mohave Sheriff Sheahan
Yavapai Sheriff Waugh
Cochise Sheriff Dever
Gila Sheriff Armer
Navajo Sheriff Clark
Graham Sheriff Allred
Greenlee Sheriff Tucker
AZ Fraternal Order of Police (FOP)
Phoenix Law Enforcement Association (2600 members)
Maricopa Deputy's Law Enforcement Association (representing 800 officers)
Maricopa County Detention Officers Association
Glendale Police Officers Association
Mesa Police Officers Association
Chandler Police Officers Association
Border Patrol Officers Association
Arizona Highway Patrol Association
Col. Albert Rodriguez - You Don't Speak for Me
Arizona African American Republican Club
Arizona Republican Assembly
The Pachyderms
Anna Gaines - American Citizens United
Arizona's Liberty Caucus
Life Liberty Freedom
NAILEM
Arizona's Sheet Metal Union
NumbersUSA
F.A.I.R.
Team America (Bay Buchanan & Congressman Tom Tancredo)
9-11 Families
ALIPAC
American Legislative Exchange Council (the largest national organization of conservative legislators)
United for Sovereign America
- Arizona Plasters & Cement Masons Union, and many more.

## "SUPPORT OUR LAW ENFORCEMENT AND SAFE NEIGHBORHOOD ACT" SB1070/HB2632

1. Illegal Sanctuary Policies: Eliminate ALL sanctuary cities in this state and allow law enforcement to enforce our laws.  No more "Catch & Release" policies that virtually require an additional crime, an additional victim before our laws can be enforced.

2. Trespass: Makes entering or remaining in Arizona in violation of federal law a state crime and "allows" law enforcement to arrest them on trespass violation or just call ICE and turn them over to ICE (law enforcement's choice).  If they need to, this new law allows them to hold those that are being investigated for serious crimes and prevent them from being deported before the investigation is completed and appropriate charges filed.

3. Day Laborer Enforcement:  Makes it illegal for an illegal alien to solicit work (day laborers) and makes it a misdemeanor for anyone with a business license to do business in Arizona to pick up any day laborer without filling out a employment application.  Makes it a state crime to aid, harbor, conceal transport or attempt to aid, harbor, conceal or transport an illegal alien for work with a

mandatory impoundment of their vehicle under 28-3511 for 30 days.  Also adds a mandatory $1000 fine per illegal alien being transported.

Closing our borders is a must; however it must be coupled with interior enforcement.  **Attrition by enforcement**.  It is time to renew our efforts to end ALL sanctuary policies in our states and our nation: Require officials to fully enforce federal immigration laws of the United States. NO MORE TAXPAYER BENEFITS, No Amnesty, No retreat, No surrender.  We will take back America one state at a time.   It starts here!!!!!
Current Federal Law: Illegal entry is a crime:

- •     8 USC Sec. 1325:   (ILLEGAL ENTRY)
- •     8 USC Sec. 1324:   (Hiring an ILLEGAL)
- •     8 USC Sec. 1644:   ("No local ordinance, rule, or measure shall stop law enforcement officers from enforcement of this section") "Any person who knowingly hires/harbors/transports any illegal alien is guilty of a felony punishable by:
- •     10 years in prison
- •     $2000 fine per illegal alien
- •     Forfeiture of the vehicle or property used to commit the crime."

**"All officers whose duty it is to enforce criminal laws shall have authority to make arrests for a violation of any provision of this section" (affirmed US v Perez-Gonzalez 2002 Fed App 0360, 6th Circ.).**

"We Don't Need No 'Stinkin' 287g;" Local Law Enforcements Has Inherent Authority to Enforce Immigration Law:

Today we will take the "political handcuffs off from our law enforcement officers;" the only reasons our immigration laws are not enforced are Political, not a lack of Authority.

We the legal and lawful citizens demand the enforcement of our laws.
Enforcement not Reform is what is needed.

I know it is strictly political and I believe constitutes malfeasance of office on the part of our local law enforcement agencies to ignore those in this country "illegally".

Not only do they have the authority we have the   moral obligation.  This "illegal" invasion is one of the greatest threats to America (neighborhoods) facing us today.  Why would we gnore the damage, the violence, the economic destruction to this nation and to our citizens.

Why would we not use the most effective laws we have to protect our neighborhoods is beyond me?  Public Safety is our #1 job!!!   It was intended and has always been a partnership in enforcing our laws and protecting our communities.  Once they cross the border it is no longer JUST a federal issue, It is OUR citizens, it is OUR Healthcare system, it is OUR educational system, it is OUR criminal justice system, it is OUR jobs being taken, it is OUR welfare system, IT IS OUR TAX DOLLARS AND OUR NEIGHBORHOODS!!  It is the LAW and we must enforce it.

- •     *9,000 are killed "each" year at the hands of illegal aliens.  25 each day, 12 by stabbings and shootings and 13 by DUI and related crimes.    This is from Congressional Homeland Security Report. (4 to 10 million illegals crossed into the U.S. last year alone)*

Death and maimings of police officers and citizens in Arizona by illegal aliens

- Phoenix Officer Shane Figueroa (killed)
- Phoenix Officer Nick Erfle (Murdered)
- Phoenix Office Glidewell (shot in chest)
- Child serial rapist in Chandler
- 15 year old raped in Scottsdale by school janitor
- 15 year old kidnapped and raped in Guadalupe
- Phoenix Officer Marc Atkinson (murdered)
- Phoenix Officer Robert Sitek (murdered)
- Kris Eggle-park ranger in southern Arizona (murdered)
- Border Patrol Agent James Epling (murdered)
- Deputy Sean Pearce (shot by homicide suspects)
- Deputy Lew Argetsinger (shot my homicide suspects)
- Sgt. Manuel H. Tapia was shot by a drug suspect
- DPS Officer Robert K. Martin, 57, was shot to death – his assailant, Ernesto Salgado Martinez, a 19-year-old ex-convict
- Agent Richard Fass, 37, of the United States Drug Enforcement Agency, murdered
- Agent Alexander Kirpnick, 27, Border Patrol, murdered
- Jason Schechterle suffered fourth-degree burns when his patrol care went up in flames after being struck by a taxi – the driver was an illegal alien.
- Gilbert mother killed by illegal alien fleeing from police in Mesa
- Jason, Decorated Iraq war veteran stabbed in his own front yard by illegal alien
- Mother "legal immigrant" killed by illegal alien trying to ram Sheriff's Deputy's car in Phoenix
- Tracy "17 year old" killed by drunk illegal alien

**Study: 1 million sex crimes by illegals More than 100 sex predators crossing border daily**

Deborah Schurman-Kauflin:  Based on a one-year in-depth study, a researcher estimates there are about 240,000 illegal immigrant sex offenders in the United States who have had an average of four victims each.

Deborah Schurman-Kauflin of the Violent Crimes Institute in Atlanta analyzed 1,500 cases from January 1999 through April 2006 that included serial rapes, serial murders, sexual homicides and child molestation committed by illegal immigrants.

Most offenders were in states with the highest numbers of illegal immigrants. California had the most offenders, followed by Texas, Arizona, New Jersey, New York and Florida.

The burden of blind-eye police department policies and open-border philosophies were paid for with the lives of not only our police officers throughout our state. The danger clearly spread beyond law enforcement into our communities with more lives being lost. The quality of life in our state is being sacrificed for political correctness; let's continue the Tea Party Express to take back our country from those who continue to ignore the damage to this nation.

Russell

## Administrator

| | |
|---|---|
| **From:** | laura [laura427@cox.net] |
| **Sent:** | Wednesday, March 24, 2010 10:50 PM |
| **To:** | Laura |
| **Subject:** | [Fwd: Fwd: SB1070: Important to read.] |
| **Attachments:** | Letter to Pearce re SB1070.pdf |

-------- Original Message --------
**Subject:** Fwd: SB1070: Important to read.
   **Date:** Wed, 24 Mar 2010 00:42:56 -0700
   **From:** Admin. <ann1acu@gmail.com>

---------- Forwarded message ----------
From: **russellpearce** <russellpearce@cox.net>
Date: Tue, Mar 23, 2010 at 11:16 PM
Subject: SB1070:
To: russellpearce <russellpearce@cox.net>

Dear Friends;

SB1070 is the most comprehensive enforcement bill in the nation, it will remove all "illegal" sanctuary policies that exist in many of our cities, and it will allow law enforcement to enforce our immigration laws as intended. I guarantee this will save American jobs, reduce the cost of government, improve neighborhood safety, improve congestion, move toward smaller classrooms, shorter lines in emergency rooms, reduce rapes and molestations and reduce the number of deaths and maimings of our citizens and more. Please note that Phoenix has had a more than 50% reduction in homicides this year over last, after we passed employer sanctions and other illegal alien legislation, and our illegal alien population has decreased by twice the national average in the past two years. SB1070 will add a "trespass" provision to law enforcement giving them the ability to hold an illegal alien under state law if need be or to just call ICE and turn them over to ICE. This provision will allow our law enforcement folks to complete investigations on a suspect and not allow them to be deported before the investigation can be completed. It alsot goes after illegal employers and illegal aliens soliciting work and provides for law enforcement to more easily enforce public safety issues on busy streets.

**Today:** I decided to take SB1070 to committee and amend a couple of portions of the bill to clarify and enhance the bill, instead of exchanging HB2632 and SB1070 on 3rd read as planned and that House and Senate leadership had committed to do. This does slow down the process, however, I want to make sure my good friends that have expressed concerns have those concerns eliminated on this bill before we move it to the Governor for signature. I have had several people call with concerns over issues/language that I do not

9/9/2011

**Ex. I-40, p. 42**

believe exists in this legislation.  To be sure, I have asked for additional legal opinions and have been assured by several competent independent Constitutional attorneys, legislative council attorneys and the Maricopa County Attorney's Office that my interpretation is correct.  However, I want to be very clear and will add language to eliminate those concerns as best as I can.

We have already passed legislation to prohibit the State of Arizona from participation in any kind of National ID or Real ID Act.  It is the law today and will remain the law.  This bill did not and does not change that.  Having said that, I will put language in the bill that enhances the clarity on these issues of concern and make it very clear that nothing in this bill will allow Arizona to be a part of any national ID program.  There will be similar language to deal with concerns over improper or prolonged detention.  I have had Legislative Council and the Maricopa County Attorney's Office examine this legislation and both have assured me it does allow for any kind of National ID or expand ID requirements in any way.  I have also attached the letter from the MCAO that answered my questions.  I am also pasting the legal opinion from the Arizona Legislative Council at the bottom of this email.

Under federal law, emergency responders and emergency rooms are exempt under EMTALA, a federal law requiring us to transport and treat everyone including illegal aliens, in case of emergencies.  I will make some minor changes to the first responders so that those good Samaritans transporting illegal aliens (little old ladies taking someone to church) are not in jeopardy in any way.  They are not now under this bill, because they must be committing an additional criminal offense to the state law to be so charged, but I will make it even clearer in the new language.

Finally, the Governor's Office is working with me on this legislation to make sure it gets to her desk in a manner that does not weaken any of the enforcement provisions that we are trying to accomplish.  We should be able to have this bill heard the first of next week in Military Affairs and Public Safety Committee and then to the floor for COW and 3rd Read before sending it to the Governor all in the same week.

I will keep you appraised on our progress.

## ARIZONA LEGISLATIVE COUNCIL

## MEMO (legal opinion)

A.R.S. section 11-1051, subsections B through E essentially empowers state agencies and employees with law enforcement authority to determine the status of illegal aliens, transfer aliens already determined to exist in the United States illegally to federal custody and arrest anyone believed to have engaged in an offense warranting legal removal from the United States. The bill section does not grant authority, either explicitly or implicitly, to detain a person indefinitely.

A.R.S. section 11-1051 states well established legal concept in the context of immigration enforcement; however, there are a few points worth noting. Subsection B allows a law enforcement entity, where reasonable suspicion exists, to presumably detain a suspected illegal alien for the purpose of determining immigration status. This is simply a restatement of the federal law already in place. *See Brown v. Texas*, 443 U.S. 47 (1979); *see also Ramirez v. Webb*, 719 F.Supp.

9/9/2011

610, 616 (W.D. Mich. 1989) (holding that law enforcement authorities "may detain an individual for a brief period of interrogation here the circumstances create a reasonable suspicion that the individual is engaged in illegal activity. In this case, the relevant illegal activity is that the individual is illegally present in this country."). There is nothing in this subsection that would permit a law enforcement entity to go beyond this allowance and indefinitely detain someone.

Subsection E provides that a law enforcement officer "may arrest a person if the officer has probable cause to believe that the person has committed any public offense that makes the person removable from the United States." Again, as with subsection B, this is simply a restatement of the established constitutional protections and does not go so far as to permit indefinite detention. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

Subsection C requires the immediate transfer of an illegal alien to federal custody once state sanctions expire. Subsection D allows a law enforcement agency to transport an illegal alien in the agency's custody to a federal facility at other points in the process.

Neither subsection authorizes indefinite detention.

The other issue presented in this memorandum focuses on whether A.R.S. section 11-1051 functionally implements the REAL ID Act of 2005 ("RIDA"). The bill would not implement RIDA. RIDA states that "a Federal agency may not accept, for any official purpose, a driver's license or identification card issued by a State to any person unless the State is meeting the requirements of this section." Further, RIDA states that the Secretary of Homeland Security "may make grants to a State to assist the State in conforming to the minimum standards set forth in this title." Other than allowing the Secretary to make grants to assist states in conforming to the minimum standards, it is an all or nothing policy: a state either conforms or it is in violation of the Act.

The fact that A.R.S. section 11-1051 allows for the sending, receiving, maintaining or exchanging of immigration status information with any federal, state or local agency does not in any way invoke the application of RIDA in Arizona. Arizona, If a law enforcement entity did detain a person indefinitely, it would violate federal and constitutional law. There is nothing in A.R.S. section 11-1051 that attempts to override these federally mandated procedural protections.

Pursuant to federal and state law currently in place, could easy exchange information with any federal entity and maintain its "sovereignty" with regard to RIDA.

Finally, A.R.S. section 11-1051 narrowly restricts when a public agent can access status related information. Subsection F states four limiting "official purposes." If a public agent or bureaucrat cannot demonstrate that he accessed a person's information pursuant to subsections F's official purposes, that agent would not find asylum in section 11-1051. This subsection is apparently causing some people confusion, because they are reading the paragraphs as a new requirement for governmental entities to seek information. SB 1070 does not create new mandates to seek information. These paragraphs must be read with the whole subsection. They limit the purposes for which immigration status information may be exchanged.

**CONCLUSIONS**

A.R.S. section 11-1051 does not allow for the indefinite detention of an individual. A.R.S. section

9/9/2011

11-1051 is not a de facto implementation of the REAL ID Act of 2005. A.R.S. section 11-1051 limits access to information to four narrowly constructed official purposes.

9/9/2011



# Maricopa County Attorney
### ANDREW P. THOMAS

301 W. JEFFERSON, SUITE 800
PHOENIX, AZ 85003
www.maricopacountyattorney.org

PH.  (602) 506-3411
TDD (602) 506-4352
FAX (602) 506-8102

March 22, 2010

The Honorable Senator Russell Pearce
Arizona State Senate
Capitol Complex
1700 W. Washington
Phoenix, AZ 85007

Dear Senator Pearce,

Per your request we have examined the language in the Support Our Law Enforcement and Safe Neighborhoods Act [SB1070] and the bill with the same language in the House of Representatives [HB2632] to determine if it allows indefinite detention of individuals or advances Arizona's participation in the "Real ID" system proposed by the Federal Government. While everyone should be encouraged to read proposed legislation carefully and ask questions about legislative proposals the Maricopa County Attorneys Office has reviewed the plain language of the Bill and it is our opinion that the legislation does not create either of the scenarios claimed by detractors who are circulating rumors about the Bill.

Regarding the first suggestion, that individuals may be detained indefinitely under the language of the Bill. As a first principle, no legislation may stand if it violates the Constitution. Both the Constitution of the United States and the Constitution of the State of Arizona have language coupled with years of case law interpreting that language that prevents such an eventuality. There are additional laws contained in Title 13, the criminal code in Arizona Revised Statutes regarding when an arrest may be made and mandating procedural safeguards for both pre-trial detention of an arrested person as well as post-conviction incarceration of the individual. Finally, the Arizona Rules of Criminal Procedure, adopted by the Supreme Court and applying to all of the criminal courts of the State, contain similar rules that have the effect of law, ensuring that there are checks and balances to review the reason for an arrest, the pre-trial detention of the person accused of an offense and the imposition of a sentence of incarceration if the person is convicted of the offense.

In all cases, any enforcement action under Arizona statute by law enforcement is reviewed by an Arizona court to ensure that arrests are supported by probable cause and that conditions of release are determined by that court, this includes the Bond amount if Bond is appropriate. These safeguards include the requirement that a detained or arrested person have a review of the facts of the arrest by an Arizona court

**Ex. I-40, p. 46**

where the State has the burden to present evidence allowing for an objective determination of probable cause by a court of proper jurisdiction [Preliminary Hearing] or by a Grand Jury. Included in these safeguards are set time limits for these hearings, time limits are also provided to ensure the person's right to a speedy trial. The trial provides the forum for a determination of the law and facts applied to the allegations by the State. After the trial there is a right of Appeal for review by two levels of appellate court in Arizona followed by the potential for a review in the federal court system. Finally, nothing in your legislation alters a person's right under the doctrine of *habeus corpus*.

MCAO has concluded that there is no language in the proposed legislation which alters the rights of an accused under current Arizona law and therefore indefinite detention is not allowed or facilitated by the language in the Bills.

The second assertion encountered by some opponents of this legislation is that the proposed provisions of A.R.S. §11-1051, section F., somehow create a backdoor for the federal proposal sometimes referred to as Real ID. They further make the claim that your legislation will lead to the establishment of a national identity card. As you well know, Arizona already opted out of participating in the Real ID proposal of the federal government in the first year it was proposed. Nothing in this Bill revives our participation in the program.

Critics of your legislation may not understand that current federal law already requires that all legal visitors to the United States [non-citizens physically present within the boundaries of the United States] must carry the documentation proving that they entered the United States properly in the first place and that they are within the time limits for their authorized length of stay. Unless Arizona authorities are given the legal ability to request information from the federal government about the immigration and citizenship status of a person they have encountered, there will be no way for Arizona authorities to enforce the rest of the provisions of your legislation. Immigration and Customs Enforcement [ICE] already possesses all of the pertinent data on every non-citizen who entered legally and obtained authorization to remain legally in the US.

This legislation does not alter the procedures used by law enforcement for the arrest and identification of persons suspected of breaking the law. The legislation does not remove the requirement that involuntary detention of a person by law enforcement not amounting to an arrest may be for only a limited period of time and only if supported by reasonable suspicion, nor does it alter the requirement that probable cause exist before an arrest may be made.

The provision for an immunity clause for law enforcement officers enforcing these provisions should be no surprise to anyone who has followed the efforts of state and local governments to address the millions of people illegally entering or remaining in their own state or these United States. The threat of lawsuit is an intimidating factor. A successful assertion of immunity from civil suit does not alter the requirement that any actions of Arizona's state or local law enforcement officials taken pursuant to the legislation must be based on a good faith interpretation of the facts.

Under this legislation, law enforcement action must be based on a legal threshold of voluntary encounter, reasonable suspicion or probable cause by the law enforcement officers and may not be based on any impermissible factors, such as race or ethnicity or religion [or any other unconstitutional basis]. The communications provisions which prevent bureaucratic roadblocks to implementation of this legislation

**Ex. I-40, p. 47**

ensures that Arizona authorities have the ability to complete the evidence collection necessary to convict persons violating the provisions of the legislation.  This will allow formal charges to be brought against the non-citizen who illegally entered or who illegally remains in the United States in violation of the new trespassing offense created under Arizona law or, when appropriate, to refer that person to ICE.

We have worked on this issue too long for it to be derailed by inaccurate descriptions of the effects of these Bills. We have a real opportunity to take action at a time when the federal government appears to be faltering in its duty to preserve the security and the future of this nation. Elected officials have sworn an oath to protect the Constitutions and laws of the United States and the State of Arizona. Please urge your fellow legislators to pass SB 1070. Ask them to preserve our security and our future, for those newly sworn citizens who expended their time and treasure to obey the law and for those citizens blessed by birthright to be a part of this great nation.

This letter does not represent a Formal Legal Opinion of the Maricopa County Attorney's Office on the Support Our Law Enforcement and Safe Neighborhoods Act [SB1070/HB2632]. This letter is based on a legal review of two specific concerns provided by Arizona Senator Russell Pearce to the legislative liaisons for MCAO.

Sincerely,

Mark C. Faull
Special Counsel