1
2
3
4
5
6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Valle Del Sol, et al., | No. CV-10-01061-PHX-SRB |
| Plaintiffs, | **ORDER** |
| v. | |
| Michael B. Whiting, et al., | |
| Defendants, | |
| and | |
| Douglas A. Ducey and the State of Arizona, | |
| Intervenor Defendants. | |

At issue are Plaintiffs' and Intervenor Defendants' ("Arizona") motions for partial summary judgment. (*See* Doc. 1215, Intervenor Defs.' Mot. for Summ. J. re: Counts One, Two, Four, Five, Six, and Seven of the FAC ("Arizona's Mot."); Doc. 1223, Pls.' Mot. for Partial Summ. J. and for Permanent Inj. ("Pls.' Mot.") & Doc. 1223-1, Pls.' Mem. of Points and Authorities in Supp. of Mot. and Permanent Inj. Req. ("Pls.' Mem.").)

## I.    BACKGROUND

This case is a facial challenge to the Arizona law commonly known as S.B. 1070, a set of statutes and statutory amendments enacted in 2010 to address immigration-related issues in Arizona. (*See* Doc. 447, Oct. 8, 2010 Order at 1-4 (summarizing S.B. 1070's historical background and provisions)); *United States v. Arizona*, 703 F. Supp. 2d 980, 985-91 (D. Ariz. 2010) (same), *aff'd*, 641 F.3d 339 (9th Cir. 2011), *aff'd in part, rev'd in*

*part*, 132 S. Ct. 2492 (2012).[1] The enactment of S.B. 1070 led to this suit and the related pre-enforcement facial challenge in *United States v. Arizona*, in which the United States filed suit to enjoin S.B. 1070 as preempted. (*See Arizona*, No. 10-CV-01413-PHX-SRB, Doc. 1, Compl.) The *Arizona* case is now resolved. Plaintiffs' challenge to S.B. 1070 includes, but is not limited to, preemption theories. (*See* Doc. 511, First Am. Compl. for Declaratory and Injunctive Relief ("FAC") ¶¶ 177-82 (Count One – Supremacy Clause), 183-88 (Count Two – Equal Protection Clause), 189-91 (Count Three – First Amendment), 192-96 (Count Four – Fourth Amendment), 197-200 (Count Five – Article II, § 8 of the Arizona Constitution), 201-04 (Count Six – Due Process Clause), 205-08 (Count Seven – 42 U.S.C. § 1981).) (The federal constitutional claims are brought under 42 U.S.C. § 1983.)

Five years of rulings in these cases has narrowed the unresolved issues concerning S.B. 1070's facial validity. In *Arizona*, the Supreme Court held that although Section 3 of S.B. 1070 was field preempted and that Sections 5(C) and 6 were conflict preempted, Section 2(B) was not preempted on its face. *See Arizona v. United States*, 132 S. Ct. 2492, 2501-10 (2012). The Court permanently enjoined Sections 3, 5(C), and 6. (*See Arizona*, Doc. 180, Sept. 18, 2012 Order.)[2] The Court later permanently enjoined Section 4, which amended the crime of human smuggling under A.R.S. § 13-2319. (*See id.*, Doc. 215, Nov. 7, 2014 Order.) Like the United States, Plaintiffs moved to enjoin various provisions of S.B. 1070. The Court preliminarily enjoined the portions of Section 5 codified under A.R.S. § 13-2929, which created a separate crime for certain smuggling activities. (Doc. 757, Sept. 5, 2012 Order); *Valle del Sol v. Whiting*, 2012 WL 8021265

---

[1] The Court refers to Senate Bill 1070 and House Bill 2162 collectively as "S.B. 1070," describing the April 23, 2010 enactment as modified by the April 30, 2010 amendments.

[2] Section 3 made the failure to comply with federal alien registration requirements a state misdemeanor. A.R.S. § 13-1509. Section 5(C) made it a misdemeanor for an unauthorized alien to seek or engage in work in Arizona. A.R.S. § 13-2928(C). Section 6 authorized the warrantless arrest of a person where there was probable cause to believe the person had committed any public offense that made the person removable from the United States. A.R.S. § 13-3883(A)(5).

(D. Ariz. Sept. 5, 2012), *aff'd*, 732 F.3d 1006 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1876 (2014). A.R.S. § 13-2929 is now permanently enjoined after the United States and Arizona reached a stipulation in *Arizona*. (*See Arizona*, Doc. 200, June 9, 2014 Order.) The Court also preliminarily enjoined the portions of Section 5 codified under A.R.S. § 13-2928(A) and (B) involving day labor prohibitions. (Doc. 604, Feb. 29, 2012 Order); *Friendly House v. Whiting*, 846 F. Supp. 2d 1053 (D. Ariz. 2012), *aff'd sub nom. Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013). The portions of S.B. 1070 that are not enjoined are now in effect.

The parties filed motions for partial summary judgment after the close of discovery. *See* Fed. R. Civ. P. 56(a). Together the partial summary judgment motions cover all counts in the First Amended Complaint. Arizona moves for summary judgment on each count except for Plaintiffs' First Amendment challenge to the day labor provisions (Count Three). (*See* Arizona's Mot. at 2.) Plaintiffs move for summary judgment on their First Amendment challenge to the day labor provisions and their preemption challenge to Section 2(D) (Count One). (*See* Pls.' Mot. at 1; Pls.' Mem. at 5-29.) Plaintiffs ask the Court to permanently enjoin these provisions. (*Id.*)[3]

## II.    LEGAL STANDARDS AND ANALYSIS

Under Federal Rule of Civil Procedure 56, summary judgment is properly granted when: (1) there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In considering a motion for summary judgment, the court

---

[3] Because the Section 5 smuggling provisions are already unenforceable due to the permanent injunction order in *Arizona*, the Court denies as moot Plaintiffs' other request to permanently enjoin A.R.S. § 13-2929. (*See* Pls.' Mot. at 1; Pls.' Mem. at 29-33.)

1    must regard as true the non-moving party's evidence if it is supported by affidavits or

2    other evidentiary material, and "all inferences are to be drawn in the light most favorable

3    to the non-moving party." *Eisenberg*, 815 F.2d at 1289; *see also Celotex*, 477 U.S. at 324.

4    The non-moving party may not merely rest on its pleadings; it must produce some

5    significant probative evidence tending to contradict the moving party's allegations,

6    thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that

7    the plaintiff must present affirmative evidence to defeat a properly supported motion for

8    summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289

9    (1968).

10                **A.    Arizona's Motion**

11          Arizona contends that after the rulings in this case and in *Arizona* Plaintiffs'

12    remaining claims are that: Section 2 of S.B. 1070 violates the Supremacy Clause, the

13    Equal Protection Clause, and 42 U.S.C. § 1981; Section 2(B) violates the Fourth

14    Amendment, the Due Process Clause, and Article II, § 8 of the Arizona Constitution; and

15    the Section 5 day labor provisions codified under A.R.S. § 13-2928(A) and (B) violate

16    the First Amendment. (Arizona's Mot. at 2.) Arizona argues that Plaintiffs' First

17    Amendment challenge is the only claim that involves triable issues that cannot be

18    resolved on summary judgment. (*Id.*) Plaintiffs do not dispute Arizona's contentions

19    about what claims remain against S.B. 1070, except Plaintiffs contend that their claims

20    alleging violations of the Equal Protection Clause and 42 U.S.C. § 1981 are not limited to

21    Section 2 but challenge S.B. 1070 in its entirety. (*See* Doc. 1252, Pls.' Memo. of Law in

22    Opp'n to Arizona's Mot. ("Pls.' Opp'n") at 9.) Plaintiffs note that the Court allowed

23    these claims to proceed past the pleading stage in ruling on Arizona's motion to dismiss.

24    (*Id.* at 9-10; *see* Oct. 8, 2010 Order at 15-18.) Plaintiffs acknowledge the Court's prior

25    statement that it cannot "declare an entire statute unconstitutional if the constitutional

26    portions can be severed from those which are unconstitutional," but Plaintiffs argue

27    "there will be nothing to sever if [they] ultimately prove that discriminatory intent was a

28    motivating factor for the law in its entirety." (Pls.' Opp'n at 10 n.12 (citing Oct. 8, 2010

Order at 2 n.2).)[4]

1.      **Section 2(B) (Counts One, Four, Five, and Six)**

Arizona argues that the Supreme Court's opinion in *Arizona* prevents further facial challenges to Section 2(B). (*See* Arizona's Mot. at 9-12.) Arizona moves for summary judgment on the counts challenging Section 2(B), which include part of Count One (Supremacy Clause) and all of Counts Four (Fourth Amendment), Five (Article II, § 8 of the Arizona Constitution), and Six (Due Process Clause). (*Id.*; *see* FAC ¶¶ 177-82, 192-204; Joint Proposed Case Management Plan at 3-4 (clarifying that Plaintiffs' claims alleging violations of the Fourth Amendment and Due Process Clause are based on Section 2(B)).)[5] Section 2(B) requires state law enforcement officers or agencies to make a "reasonable attempt . . . to determine the immigration status" of any person they stop, detain, or arrest on some other legitimate basis if "reasonable suspicion exists that the person is an alien and is unlawfully present in the United States." A.R.S. § 11-1051(B). The law also provides that "[a]ny person who is arrested shall have the person's immigration status determined before the person is released." *Id.*

In *Arizona*, the Supreme Court held that Section 2(B) was not preempted on its face. *See Arizona*, 132 S. Ct. at 2507-10. After holding that "the mandatory nature of the status checks" under Section 2(B) did not interfere with federal immigration law, the

---

[4] Plaintiffs have also alleged that S.B. 1070 in its entirety violates the Supremacy Clause, but in *Arizona*, the Court refused "to enjoin S.B. 1070 as an integrated statutory enactment with interlocking provisions" on preemption grounds and "evaluate[d] the constitutionality of the individual provisions of S.B. 1070 challenged by the United States." *Arizona*, 703 F. Supp. 2d at 992-93; (*see also* FAC ¶ 180; Doc. 799, Joint Proposed Case Management Plan at 2.) (In addressing Arizona's motion to dismiss, the Court "d[id] not address Plaintiffs' claim alleging a violation of the [S]upremacy [C]lause as the Court already thoroughly addressed this issue in the [*Arizona*] Order." (Oct. 8, 2010 Order at 14 n.6.)) Consistent with *Arizona*, the Court must evaluate Plaintiffs' preemption challenges in terms of "the individual provisions of S.B. 1070 challenged by Plaintiffs." (*See id.* at 2 n.2.) Plaintiffs' pleadings and papers have only identified Section 2(B) and Section 2(D) as being preempted.

[5] Although the Joint Proposed Case Management Plan does not mention the claim under Article II, § 8 of the Arizona Constitution, this claim, like Plaintiffs' Fourth Amendment challenge, is based on allegations that S.B. 1070 authorizes unconstitutional warrantless seizures and arrests. (*See* FAC ¶¶ 192-96); Ariz. Const. Art. II, § 8 ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law.").

Supreme Court addressed the second "constitutional concern" of "prolonged detention while the checks are being performed." *Id.* at 2508-09. The opinion described the ways by which Arizona courts could interpret Section 2(B) to avoid the "constitutional concern" that "state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status." *Id.* at 2509 ("The state courts may conclude that, unless the person continues to be suspected of some crime for which he may be detained by state officers, it would not be reasonable to prolong the stop for the immigration inquiry.") ("State courts may read [the second sentence of Section 2(B)— that '[a]ny person who is arrested shall have the person's immigration status determined before [he] is released'—]as an instruction to initiate a status check every time someone is arrested, or in some subset of those cases, rather than as a command to hold the person until the check is complete no matter the circumstances."). The Supreme Court reasoned that "if [Section] 2(B) only requires state officers to conduct a status check during the course of an authorized, lawful detention or after a detainee has been released, the provision likely would survive preemption—at least absent some showing that it has other consequences that are adverse to federal law and its objectives." *Id.* The Supreme Court did not address "whether reasonable suspicion of illegal entry or another immigration crime would be a legitimate basis for prolonging a detention, or whether this too would be preempted by federal law." *Id.* The opinion advised that "[t]he nature and timing of this case counsel[ed] caution in evaluating the validity of [Section] 2(B)." *Id.* at 2510. Noting the "basic uncertainty about what the law means and how it will be enforced" at this stage, the opinion did not "foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect." *Id.*

The issue of whether the *Arizona* opinion forecloses Plaintiffs' facial challenges to Section 2(B) is not new. The Court addressed this issue when it denied Plaintiffs' request to preliminarily enjoin Section 2(B) on preemption, Fourth Amendment, and Equal Protection grounds. (*See* Sept. 5, 2012 Order); *Valle del Sol*, 2012 WL 8021265.[6]

---

[6] Plaintiffs initially appealed the denial of their preliminary injunction request, but

Plaintiffs argued that the *Arizona* opinion did not foreclose their facial challenges to Section 2(B) because the Supreme Court did not have before it the record that exists in this case. *Valle del Sol*, 2012 WL 8021265, at *2. Plaintiffs interpreted their evidence to show that state officials would implement Section 2(B) in the same manner the Supreme Court deemed unconstitutional. *Id.* The Court rejected this argument and refused to "ignore the clear direction in the *Arizona* opinion that [Section] 2(B) cannot be challenged further on its face before the law takes effect." *Id.* at *3 ("As the Supreme Court stated, Plaintiffs and the United States may be able to challenge the provision on other preemption and constitutional grounds 'as interpreted and applied after it goes into effect.'" (quoting *Arizona*, 132 S. Ct. at 2510)). The Court denied Plaintiffs' request to certify "a question to the Arizona Supreme Court as to whether [Section] 2(B) authorizes additional detention beyond the point a person would otherwise have been released, in order to determine that person's immigration status." *Id.* The Court explained that "[g]iven the Supreme Court's ruling, the Arizona Supreme Court would be faced with the same issue that bars this Court's consideration of Plaintiffs' facial challenges to [Section] 2(B). Without a set of as-applied facts, the Supreme Court has held that it would be speculative to decide as a matter of law that [Section] 2(B) will be enforced in an unconstitutional manner." *Id.*; (*see also* Doc. 1233, Apr. 6, 2015 Order at 1-4 (denying a second certification motion regarding Section 2(B) because it was an untimely motion for reconsideration of the preliminary injunction request denial).)

In responding to Arizona's motion, Plaintiffs have not addressed the Court's prior interpretation of the *Arizona* opinion. Plaintiffs generally make the same arguments the Court has already considered and rejected in the preliminary injunction stage. (*See* Pls.' Opp'n at 1-3.) Plaintiffs narrowly interpret the *Arizona* opinion to address only whether the United States could prevail in its facial challenge to Section 2(B). (*Id.* at 2.) As in the

---

later withdrew their Ninth Circuit appeal. Arizona cross-appealed the Court's grant of a preliminary injunction against the Section 5 smuggling provisions, A.R.S. § 13-2929. The Ninth Circuit affirmed on grounds that A.R.S. § 13-2929 was void for vagueness and preempted. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1019-29 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1876 (2014).

preliminary injunction stage, Plaintiffs argue that the Supreme Court could not determine Section 2(B)'s constitutionality based on the record at the time. (*Id.* at 5.) Plaintiffs interpret their evidence to show that Section 2(B) authorizes law enforcement officers to detain and arrest individuals solely to verify their immigration status. (*Id.* at 7-8 (citing Arizona Peace Officer Standards and Training Board ("AZ POST") training materials, a 2010 Arizona Legislative Council legal opinion, former Arizona State Senator Russell Pearce's testimony and statements, and three county sheriffs' interpretations of Section 2(B)); *see* Doc. 1253, Pls.' Resp. to Intervenor Defs.' Statement of Material Undisputed Facts in Supp. of Mot., and Pls.' Statement of Additional Facts Precluding Summ. J. ("Pls.' Resp. and Statement of Additional Facts") ¶¶ P1-18.)

The Court will not depart from its prior analysis. Plaintiffs are attempting to challenge a law that is not preempted on its face and could be interpreted to avoid the constitutional concerns mentioned in the *Arizona* opinion, including potential violations of the Fourth Amendment and the privacy protections in Article II, § 8 of the Arizona Constitution. *See Arizona*, 132 S. Ct. at 2509-10 (explaining that Arizona courts could interpret Section 2(B) on its face to avoid the "constitutional concern" that "state officers will be required to delay the release of some detainees for no reason other than to verify their immigration status"). The Supreme Court held there is a "basic uncertainty about what the law means and how it will be enforced . . . [, and] without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [Section] 2(B) will be construed in a way that creates a conflict with federal law." *Id.* at 2510; *see also City of L.A. v. Patel*, 135 S. Ct. 2443, 2450 (2015) ("[C]laims for facial relief under the Fourth Amendment are unlikely to succeed when there is substantial ambiguity as to what conduct a statute authorizes: Where a statute consists of 'extraordinarily elastic categories,' it may be 'impossible to tell' whether and to what extent it deviates from the requirements of the Fourth Amendment." (quoting *Sibron v. New York*, 392 U.S. 40, 59-60 & n.20 (1968))).[7] If state law enforcement agencies

_____

[7] The parties dispute how the standards in *United States v. Salerno*, 481 U.S. 739

1   implement policies or practices that raise constitutional concerns, the *Arizona* opinion

2   contemplates as-applied challenges to Section 2(B) now that the law is in effect, not

3   additional facial challenges. *See Arizona*, 132 S. Ct. at 2510.

4       The Court grants summary judgment in favor of Arizona on Count One

5   (Supremacy Clause) to the extent the count challenges Section 2(B) and Counts Four

6   (Fourth Amendment), Five (Article II, § 8 of the Arizona Constitution), and Six (Due

7   Process Clause).

8                **2.      Equal Protection Clause and 42 U.S.C. § 1981 (Counts Two and**

9                          **Seven)**

10      Arizona moves for summary judgment on Plaintiffs' claims alleging violations of

11  the Equal Protection Clause and 42 U.S.C. § 1981. (*See* Arizona's Mot. at 12-17.) These

12  claims are based on allegations that S.B. 1070 "was enacted with the purpose and intent

13  to discriminate against racial and national origin minorities, including Latinos, on the

14  basis of race and national origin . . . [and] impermissibly and invidiously targets

15  Plaintiffs[,] who are racial and national origin minorities." (FAC ¶¶ 185-86; *see also id.*

16  ¶ 208.) "The Equal Protection Clause of the Fourteenth Amendment commands that no

17  State shall 'deny to any person within its jurisdiction the equal protection of the laws,'

18  which is essentially a direction that all persons similarly situated should be treated alike."

19  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Title 42 U.S.C.

20  § 1981 prohibits discrimination under color of state law based on race, "ancestry[,] or

21  ethnic characteristics." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see*

22  *also Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389-90 (1982)

23  _____

24  (1987), apply to Plaintiffs' Section 2(B) facial challenges. (*See* Pls.' Opp'n at 3-5; Doc.
    1264, Intervenor Defs.' Reply in Supp. of Mot. ("Arizona's Reply") at 4); *see United*

25  *States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of
    course, the most difficult challenge to mount successfully, since the challenger must

26  establish that no set of circumstances exists under which the Act would be valid."); *Sprint*
    *Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en

27  banc) ("The Supreme Court and this court have called into question the continuing
    validity of the *Salerno* rule in the context of First Amendment challenges. In cases

28  involving federal preemption of a local statute, however, the rule applies with full force."
    (citations omitted)). The Court does not need to find that *Salerno* precludes Plaintiffs'
    Section 2(B) facial challenges when the *Arizona* opinion already does that.

1    (purposeful discrimination that violates the Equal Protection Clause will also violate 42
2    U.S.C. § 1981).

3         Arizona argues it is entitled to summary judgment because Plaintiffs cannot
4    establish that S.B. 1070, on its face, will have a discriminatory effect. (Arizona's Mot. at
5    12-15.) Arizona also argues that there is a lack of admissible evidence that S.B. 1070 was
6    enacted with a discriminatory purpose. (*Id.* at 16-17; *see also* Doc. 927, Dec. 11, 2013
7    Order at 5 (explaining that "[t]o succeed on their Equal Protection challenge, Plaintiffs
8    will have to show, among other things, '[p]roof of racially discriminatory intent or
9    purpose' in the enactment of S.B. 1070" (second alteration in original) (quoting *Arlington
10   Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977))).) Arizona's argument on
11   discriminatory purpose is based on a discovery dispute ruling that precludes Plaintiffs
12   from opposing the summary judgment motion with facts that were not part of their
13   interrogatory responses. (Arizona's Mot. at 16-17; *see* Doc. 1192, Feb. 2, 2015 Minute
14   Order at 1-2.) Arizona contends that because Plaintiffs provided only conclusory
15   allegations without supporting facts, the ruling precludes all of Plaintiffs' factual support
16   involving the discriminatory purpose element. (Arizona's Mot. at 16-17.) If the evidence
17   supporting these facts is admissible, Arizona does not argue that it is insufficient to create
18   triable issues. (*See* Arizona's Reply at 5-6.)

19        It is undisputed that S.B. 1070 is a facially neutral law. Plaintiffs contend that S.B.
20   1070 will have a disparate impact on Latinos in Arizona based on evidence that people
21   from Mexico and Latin America comprise more of the foreign-born and undocumented
22   immigrant population than other races. (*See* Pls.' Opp'n at 12-13 (citing Doc. 1217, Decl.
23   of Stephanie Elliott in Supp. of Arizona's Mot., Ex. C, Pls.' Third Supplemental Resp.
24   and Objections to Intervenor Defs.' Interrogs. at 7-8 (stating that S.B. 1070 was expected
25   and intended to have a disparate impact on, *inter alia*, Mexicans and Latinos)); Pls.'
26   Resp. and Statement of Additional Facts ¶¶ P19-22 (citing evidence estimating that
27   29.9% of all Arizona residents are Latino; that 64.7% of its foreign-born population is
28   from Latin America; and that over 90% of undocumented immigrants in Arizona are

from Mexico).) Plaintiffs argue that this evidence, paired with their evidence under the discriminatory purpose element, is sufficient to raise triable issues under the *Arlington Heights* analysis to preclude summary judgment on their Equal Protection and 42 U.S.C. § 1981 claims. (*See* Pls.' Opp'n at 12-13.)

Under the discriminatory effect element of an Equal Protection claim, the parties dispute whether Plaintiffs must identify a "similarly situated" group that will be treated differently under S.B. 1070—i.e., Plaintiffs must demonstrate that state law enforcement officials will enforce the law differently for Latinos than a similarly situated person of another race or ethnicity. (*See id.* at 11; Arizona's Reply at 8.) Plaintiffs argue that Arizona is attempting to import irrelevant concepts from "selective prosecution" or "selective enforcement" cases to their claims. (*See* Pls.' Opp'n at 11); *see United States v. Armstrong*, 517 U.S. 456, 465 (1996) ("The requirements for a selective-prosecution claim draw on ordinary equal protection standards. . . . To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." (citations and internal quotation marks omitted)). However, none of the authority Plaintiffs cite supports their argument that they do not have to show that a similarly situated group will be treated differently under S.B. 1070. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1106 (9th Cir. 2012) ("To state an equal protection claim of any stripe, . . . a plaintiff must show that the defendant treated the plaintiff differently from similarly situated individuals.").

In *Arlington Heights*, the issue was whether the defendants acted with proscribed discriminatory intent. *Arlington Heights* involved allegations that the plaintiffs had allegedly suffered discriminatory treatment through the denial of a zoning permit request, but the absence of discriminatory purpose "end[ed] the constitutional inquiry," making it unnecessary for the Supreme Court to address whether the challenged ordinance had "a discriminatory 'ultimate effect.'" *See Arlington Heights*, 429 U.S. at 271; *see also Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (invalidating a provision of the Alabama Constitution under the *Arlington Heights* analysis because it was enacted with a

discriminatory purpose and it had a discriminatory effect by disenfranchising African-Americans at a higher rate than whites convicted of certain non-felony offenses). Plaintiffs also rely on the recent Ninth Circuit decision in *Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015), in which the court applied the *Arlington Heights* analysis to a law that eliminated a Mexican American Studies program in the Tucson public schools. (*See* Doc. 1269, Not. of Supp. Authority.) Plaintiffs claim it is instructive that the Ninth Circuit relied on the fact that "sixty percent of all [Tucson Unified School District] students [are] of Mexican or other Hispanic descent, but also ninety percent of students in the [Mexican American Studies, or 'MAS'] program were such." (*Id.* at 1 (alteration in original) (quoting *Arce*, 793 F.3d at 978).) Plaintiffs compare these statistics to their own evidence. (*Id.* at 1-2.) Critically, however, the law's enactment and enforcement had a discriminatory effect on similarly situated students, namely Mexican-American students as opposed to other students. *Arce*, 793 F.3d at 978.[8]

Because Plaintiffs have admittedly not produced any evidence that state law enforcement officials will enforce S.B. 1070 differently for Latinos than a similarly situated person of another race or ethnicity, the Court grants summary judgment in favor of Arizona on Counts Two (Equal Protection Clause) and Seven (42 U.S.C. § 1981). The Court does not address Arizona's alternative argument for summary judgment on these claims.[9]

---

[8] Plaintiffs also cite *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 436 (2014), which involved a challenge to an ordinance that "had the practical effect of prohibiting new group homes from opening in most residential zones." *Pacific Shores*, 730 F.3d at 1147. *Pacific Shores* involved disparate treatment claims based on statutory laws. *Id.* at 1158 ("[Plaintiffs] who allege disparate treatment under statutory anti-discrimination laws need not demonstrate the existence of a similarly situated entity who or which was treated better than the plaintiffs in order to prevail."). That case did not purport to change the usual standards of proof for Equal Protection claims.

[9] Plaintiffs move to strike the responsive statement of facts Arizona filed with its reply. (Doc. 1280, Pls.' Mot. to Strike Intervenor Defs.' Resps. and Objections to Pls.' Statement of Additional Facts Precluding Summ. J. ("Pls.' Mot. to Strike"); *see* Doc. 1265, Arizona's Resps. and Objections to Pls.' Statement of Additional Facts Precluding Summ. J.) Plaintiffs argue the filing violates the local rules. (Pls.' Mot. to Strike at 1-2); *see* LRCiv 7.2(m)(2) ("Any response to an objection [in an opposing party's controverting statement of facts] must be included in the responding party's reply

### B.      Plaintiffs' Motion

Plaintiffs move for summary judgment on their First Amendment challenge to the Section 5 day labor provisions, A.R.S. § 13-2928(A)-(B), and their preemption challenge to Section 2(D). (*See* Pls.' Mot. at 1; Pls.' Mem. at 5-29.) Plaintiffs ask the Court to permanently enjoin these provisions. (*Id.*) In addition to prevailing on the merits, a plaintiff seeking a permanent injunction must show: "(1) that [he or she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

### 1.      Section 5 – A.R.S. § 13-2928(A) and (B) (Count Three)

Plaintiffs argue that the day labor provisions under A.R.S. § 13-2928(A) and (B) impose impermissible content-based restrictions on First Amendment protected speech and are not narrowly tailored to promote Arizona's interest in traffic safety. (*See* Pls.' Mem. at 5-20.) Plaintiffs contend that the record is virtually unchanged from when the Court preliminarily enjoined the day labor provisions. (*Id.* at 5; *see* Feb. 29, 2012 Order); *Friendly House*, 846 F. Supp. 2d 1053. The Ninth Circuit affirmed the preliminary injunction order. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013).

A.R.S. § 13-2928(A) makes it unlawful for an occupant of a motor vehicle that is stopped on a street, roadway, or highway and is impeding traffic to attempt to hire a person for work at another location. A.R.S. § 13-2928(B) provides that it is unlawful for a person to enter a motor vehicle in order to be hired if the vehicle is stopped on a street, roadway, or highway and is impeding traffic. In the preliminary injunction stage, the Court and Ninth Circuit analyzed the day labor provisions as content-based commercial

memorandum for the underlying motion and may not be presented in a separate responsive memorandum."). The Court denies the motion as moot. None of the dispositive issues involving Arizona's partial summary judgment motion required the Court to consider the objections Arizona raised in the responsive statement of facts when the reply fully addressed those issues.

speech restrictions under the four-prong test the Supreme Court set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). *Friendly House*, 846 F. Supp. 2d at 1056-58; *Valle Del Sol*, 709 F.3d at 818-20. The *Central Hudson* test first evaluates "whether the affected speech is misleading or related to unlawful activity. If not, the government bears the burden of showing that it has a substantial interest, that the restriction directly advances that interest and that the restriction is not more extensive than necessary to serve the interest." *Valle Del Sol*, 709 F.3d at 816 (citations omitted).[10] It is undisputed that the day labor provisions are subject to First Amendment scrutiny as restrictions on lawful, non-misleading speech and that Arizona has a substantial interest in traffic safety. (*See* Pls.' Mem. at 8-9; Doc. 1245, Arizona's Resp. in Opp'n to Pls.' Mot. ("Arizona's Resp.") at 2); *Valle Del Sol*, 709 F.3d at 823. Even if the day labor provisions directly advance Arizona's substantial interest in traffic safety—an issue the parties disputed in the preliminary injunction stage and dispute now on summary judgment—the restrictions "'must not be more extensive than . . . necessary to serve' a substantial government interest—i.e., [they] should not be *overinclusive*." *Valle Del Sol*, 709 F.3d at 825 (quoting *World Wide Rush, LLC v. City of L.A.*, 606 F.3d 676, 684 (9th Cir. 2010)); *see also Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 341 (1986) ("The last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between the legislature's

---

[10] The Court applied the standards in *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011), to the day labor provisions, a case the Court interpreted as modifying *Central Hudson*'s fourth prong to impose more demanding requirements on the state. *Friendly House*, 846 F. Supp. 2d at 1057-58 ("[I]f a ban on commercial speech is content-based, *Sorrell* instructs that it must be 'drawn to achieve' 'a substantial governmental interest,' whereas the *Central Hudson* test requires that the regulation not be 'more extensive than is necessary to serve that interest.'"). The Ninth Circuit declined to address "[w]hether *Sorrell* intended to make the commercial speech test more exacting for the state to meet . . . because . . . [P]laintiffs [we]re likely to succeed even under *Central Hudson*'s formulation of the standard and [the Ninth Circuit] cases interpreting it." *Valle Del Sol*, 709 F.3d at 825; *see id.* at 821 ("[We] defer extended discussion of *Sorrell* for a more appropriate case with a more fully developed factual record."). The Ninth Circuit still has had no occasion to clarify the application of *Sorrell* through an extended discussion; however, in this current posture, the day labor provisions are still deficient under the pre-*Sorrell Central Hudson* standards.

1    ends and the means chosen to accomplish those ends.").[11] Because the day labor

2    provisions are not narrowly tailored to serve Arizona's substantial interest in traffic

3    safety, it is unnecessary to address whether Arizona's evidence is sufficient to create

4    genuine issues of material fact about whether the day labor provisions directly advance

5    that traffic safety interest. This finding is consistent with the Ninth Circuit's analysis

6    addressing the preliminary injunction order on appeal.

7         The Ninth Circuit held that "[P]laintiffs [we]re likely to succeed on the merits of

8    their claim that the day labor provisions are overinclusive because they restrict more

9    speech than necessary to serve Arizona's interest in traffic safety." *Valle Del Sol*, 709

10   F.3d at 827 (emphasis omitted). Arizona had not produced evidence that existing laws or

11   other potential laws were insufficient to address "the traffic problems that may attend in-

12   street employment solicitation." *Id.* (emphasis omitted). The opinion listed specific

13   examples of traffic laws from the Ninth Circuit decision in *Comite de Jornaleros de*

14   *Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) (en banc), "that

15   were broad enough to address the traffic concerns attending in-street employment

16   solicitation without implicating speech." *Id.* (listing California traffic laws from *Redondo*

17   *Beach* that "prohibit[ed] jaywalking, stopping in traffic alongside a red-painted curb,

18   stopping a car so as to obstruct the normal movement of traffic, standing in a roadway if

19

20         [11] As in the preliminary injunction stage, Arizona identifies several other
21   substantial interests beyond traffic safety, including crime reduction, economic
     development, and protecting the aesthetics of its communities, but does not argue that the
22   day labor provisions are narrowly tailored to achieve them. (*See* Arizona's Resp. at 6-7.)
     The Court will therefore not consider these interests in the analysis. *See Valle Del Sol*,
23   709 F.3d at 823 n.4 (declining to address these proffered interests for the same reason).

24         Regarding *Central Hudson*'s third prong, the Court previously found that the day
     labor provisions, while "underinclusive to some degree," still banned enough traffic-
25   blocking solicitation that they directly advanced Arizona's interest in traffic safety.
     *Friendly House*, 846 F. Supp. 2d at 1059. Although most of the evidence in the record
26   was "nonprobative" on the issue of whether the particular traffic problems caused by day
     laborer solicitation were "more acute than the traffic safety concerns caused by other
27   types of roadside communication," "[o]ne officer did, however, represent that day laborer
     interactions require the parties to negotiate multiple terms, and so take longer than other
28   types of in-street solicitation." *See Valle Del Sol*, 709 F.3d at 824-25. The Ninth Circuit
     called this evidence "weak," but concluded that the Court's finding was not an abuse of
     discretion. *Id.* at 825.

1    such action interferes with the lawful movement of traffic and standing or stopping

2    except as near as is physically possible to the building line or the curb line" (internal

3    quotation marks omitted)). The Ninth Circuit found "[n]othing in the record show[ing]

4    that Arizona could not effectively pursue its interest in traffic safety by enforcing or

5    enacting similar kinds of speech-neutral traffic safety regulations." *Id.*

6        The Ninth Circuit also held that "[t]he day labor provisions are a poor fit with

7    Arizona's interest in traffic safety because, in this context, they are also underinclusive."

8    *Id.* at 827-28 ("That the day labor provisions are underinclusive is . . . relevant . . . to

9    whether they satisfy *Central Hudson*'s no-more-extensive-than-necessary prong."). The

10   Ninth Circuit explained that the Court properly "emphasized S.B. 1070's purposes

11   clause,[12] the fact that the day labor provisions provide penalties drastically out-of-

12   proportion to those for other traffic violations[,] and the legislative record"—"factors all

13   support[ing] the [C]ourt's conclusion that the day labor provisions are underinclusive

14   because they are 'structured to target particular speech rather than a broader traffic

15   problem.'" *Id.* at 828. The Ninth Circuit concluded the analysis by noting that

16       Arizona could have advanced its interest in traffic safety directly, without
         reference to speech. The availability of such obvious and less-restrictive
17       alternatives makes the day labor provisions overinclusive. They are also
         underinclusive because they draw content-based distinctions that appear
18       motivated by a desire to eliminate the livelihoods of undocumented
         immigrants rather than to address Arizona's interest in traffic safety.
19

20   *Id.*

21       Arizona argues that there are factual disputes about whether Arizona traffic laws

22   sufficiently address the "unique safety concerns" arising from in-street employment

23   solicitation. (Arizona's Resp. at 7-8.) Arizona lists a number of state traffic laws and

24   relies exclusively on one officer's declaration about the purported shortcomings of these

25   laws to "address the hazards of in-street employment solicitation." (*Id.*; *see* Doc. 1246,

26

27       [12] The purposes clause in Section 1 of S.B. 1070 states that "the intent of [S.B.
         1070] is to make attrition through enforcement the public policy of all state and local
28       government agencies in Arizona" and that "[t]he provisions of this act are intended to
         work together to discourage and deter the unlawful entry and presence of aliens and
         economic activity by persons unlawfully present in the United States."

1    Arizona's Controverting Statement of Facts and Supplemental Statement of Undisputed
2    Material Facts ¶¶ 26-31 (citing Doc. 553-3, Second Decl. of Daniel Boyd).) This
3    declaration was part of the record in the preliminary injunction stage and not all of the
4    statements in it specifically address "*the traffic problems* that may attend in-street
5    employment solicitation." *See Valle Del Sol*, 709 F.3d at 827 ("The question is . . . not
6    whether existing laws are sufficient to deal with in-street employment solicitation, but
7    rather whether existing laws are sufficient to deal with *the traffic problems* that may
8    attend in-street employment solicitation."). Even if existing traffic laws are insufficient to
9    address the traffic problems in-street employment solicitation may cause, there is no
10   evidence that Arizona could not effectively pursue its interest in traffic safety by enacting
11   other speech-neutral traffic safety regulations. *Id.* ("[O]ur consideration is not limited to
12   Arizona's actual traffic safety regulations, but includes any potential or actual traffic
13   safety regulations that are obviously available."). As the Ninth Circuit explained, "[the]
14   government must consider pursuing its interests through conduct-based regulations
15   before enacting speech-based regulations." *Id.* The Court must find "that the day labor
16   provisions are overinclusive because they restrict more speech than necessary to serve
17   Arizona's interest in traffic safety." *See id.* The Court does not need to address if Arizona
18   has offered sufficient controverting evidence to create factual issues about whether the
19   day labor provisions are underinclusive.

20        Arizona does not dispute that the other permanent injunction requirements are met.
21   *See id.* at 828-29 (affirming the preliminary injunction findings that Plaintiffs would
22   suffer irreparable harm without an injunction, the equities favored Plaintiffs, and an
23   injunction was in the public's interest); *see also Winter v. Natural Res. Def. Council, Inc.*,
24   555 U.S. 7, 32 (2008) (citing case law for the rule that issuing a permanent injunction is
25   essentially the same as for issuing a preliminary injunction except for the requirement to
26   show actual success on the merits instead of a likelihood of success). The Court grants
27   summary judgment in favor of Plaintiffs on Count Three (First Amendment) and
28   permanently enjoins the Section 5 day labor provisions, A.R.S. § 13-2928(A)-(B).

**2.      Section 2(D) (Count One)**

Section 2(D) of S.B. 1070 provides:

Notwithstanding any other law, a law enforcement agency may securely transport an alien who the agency has received verification is unlawfully present in the United States and who is in the agency's custody to a federal facility in this state or to any other point of transfer into federal custody that is outside the jurisdiction of the law enforcement agency. A law enforcement agency shall obtain judicial authorization before securely transporting an alien who is unlawfully present in the United States to a point of transfer that is outside of this state.

A.R.S. § 11-1051(D). Plaintiffs argue that Section 2(D) is conflict and field preempted based on their interpretation that the law authorizes state officials to detain and transport individuals based on civil removability without federal direction and supervision. (*See* Pls.' Mem. at 21-29); *United States v. Arizona*, 641 F.3d 339, 344 (9th Cir. 2011) ("The federal preemption doctrine stems from the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the fundamental principle of the Constitution that Congress has the power to preempt state law." (alteration incorporated) (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000))), *rev'd on other grounds*, 132 S. Ct. 2492 (2012).[13] Because Plaintiffs compare Section 2(D) to the conflict preempted Section 6 provisions, and their preemption challenge centers on whether the law conflicts with the federal removal system, it is appropriate to consider this challenge under the conflict preemption analysis, not the field preemption analysis. (Pls.' Mem. at 21); *see Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009) (explaining that conflict preemption occurs "when either 'compliance with both federal and state regulations is a physical

---

[13] The United States did not challenge Section 2(D) in *Arizona. See Arizona*, 703 F. Supp. 2d at 986 ("[T]he United States has not made any argument to preliminarily enjoin . . . A.R.S. § 11-1051(C)-(F)[,] requiring that state officials work with federal officials with regard to unlawfully present aliens[.]"). The Court previously dismissed Plaintiffs' claim that Section 2(D) violated the Fourth Amendment by authorizing state law enforcement agencies to "transport individuals into federal custody," but did not address whether Plaintiffs could state a claim against Section 2(D) under a preemption theory. (*See* Oct. 8, 2010 Order at 14 n.6, 32 ("Plaintiffs do not address this [dismissal] theory in their Response and cite no authority stating that state law enforcement agencies may not transport a lawfully-detained person in their custody.").) The Court will not consider Plaintiffs' untimely and procedurally improper request for reconsideration of the dismissal. (*See* Pls.' Mem. at 25 n.14); LRCiv 7.2(g)(2).

impossibility,' or where 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982))), *aff'd sub nom. Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011).

The general rule is that "it is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona*, 132 S. Ct. at 2505 (citation omitted). In *Arizona*, Section 6 was held to be conflict preempted because the law authorized state officials to make arrests for civil immigration violations, which would have "provide[d] state officers even greater authority to arrest aliens on the basis of possible removability than Congress . . . g[ave] to trained federal immigration officers." *Id.* at 2506; *see also* A.R.S. § 13-3883(A)(5) (authorizing the warrantless arrest of a person "if the officer ha[d] probable cause to believe . . . [t]he person to be arrested ha[d] committed any public offense that ma[de] the person removable from the United States").[14] The law did this by authorizing "officers who believe[d] an alien [wa]s removable by reason of some 'public offense' . . . [to] arrest on that basis regardless of whether a federal warrant [w]as issued or the alien [wa]s likely to escape. This state authority could be exercised without any input from the Federal Government about whether an arrest [wa]s warranted in a particular case." *Arizona*, 132 S. Ct. at 2506.

Plaintiffs argue that Section 2(D) operates like Section 6 to authorize the detention and transportation of individuals to federal immigration facilities for civil immigration violations. (Pls.' Mem. at 21.) Plaintiffs interpret the phrase "[n]otwithstanding any other

---

[14] The opinion summarized the removal system Congress created and the circumstances in which an individual can be arrested and detained during the removal process. *See Arizona*, 132 S. Ct. at 2505-06. "[T]he Attorney General can exercise discretion to issue a warrant for an alien's arrest and detention pending a decision on whether the alien is to be removed from the United States, . . . [a]nd if an alien is ordered removed after a hearing, the Attorney General will issue a warrant." *Id.* (internal quotation marks omitted) (citing 8 U.S.C. § 1226(a) and 8 CFR § 241.2(a)(1)). "If no federal warrant has been issued, . . . [federal officers] may arrest an alien for being in the United States in violation of any immigration law or regulation, for example, but only where the alien is likely to escape before a warrant can be obtained." *Id.* (citing 8 U.S.C. § 1357(a)).

- 19 -

law" in Section 2(D) as instructing state officials to discard all state or federal limitations on their authority, and argue the only limitation on state officials' authority occurs when an individual is transported out of Arizona. (*Id.* at 22.) Plaintiffs support their interpretation with evidence from many of the same sources they relied on in the earlier Section 2(B) analysis, including the AZ POST training materials and interpretations of the law from state law enforcement officials, including county sheriffs. (*Id.* at 23-24; *see* Doc. 1224, Pls.' Statement of Facts in Supp. of Mot. ¶¶ 179-90.) Plaintiffs read too much into the law.

Section 2(D) requires that verification of an individual's unlawful presence in the country be obtained and that the person be in state custody before being transported to a federal facility. A.R.S. § 11-1051(D). Unlike the preempted Section 6 provisions, which expanded the statutory list of offenses for which state officials were authorized to make a warrantless arrest, Section 2(D) addresses circumstances after an individual is already in custody. The law is not a source for state officials' arrest or detention powers, consistent with its placement with other so-called cooperation provisions in Section 2. *See* A.R.S. § 11-1051(C)-(F); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." (citations and internal quotation marks omitted)). Whether state officials have legal custody is determined by laws outside of Section 2(D). The introductory phrase "[n]otwithstanding any other law" in Section 2(D) cannot mean that all other applicable laws are displaced. Section 2(D) cannot be read on its face as authorizing detention for civil immigration violations.

Plaintiffs also argue that Section 2(D) is preempted because it authorizes state officials to transport individuals to federal facilities without federal direction or supervision. (Pls.' Mem. at 25-26.) Putting aside the inherent authority that state officials have to enforce federal criminal immigration laws, *see Gonzales v. Peoria*, 722 F.2d 468, 475-76 (9th Cir. 1983) (concluding that Arizona officers have authority to enforce the criminal provisions of federal immigration law), *overruled on other grounds*, *Hodgers-*

*Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999), federal law authorizes state and local officials to perform immigration enforcement duties under cooperation agreements and in other circumstances, *see, e.g.*, 8 U.S.C. § 1357(g)(1) (authorizing the federal government to enter into formal agreements with states and municipalities under which their officers may perform certain duties of a federal immigration officer); *id.* § 1252c (authorizing arrest and detention of previously removed aliens convicted of a felony); *id.* § 1324(c) (authorizing arrests for violations of the federal smuggling statute); *accord Arizona*, 132 S. Ct. at 2506 (citing these statutes). These duties can include transporting detainees. *See* 8 U.S.C. § 1357(g)(1) (noting that delegated state officials are "qualified to perform a function of an immigration officer in relation to the investigation, apprehension, or detention of aliens in the United States (including the transportation of such aliens across State lines to detention centers)"). Plaintiffs acknowledge the circumstances in which state officials can enforce federal immigration law, but their argument presumes that Section 2(D) must be read to exclude them. The verification and transport process the law recognizes is consistent with state officials' enforcement actions taken under cooperation agreements and as authorized under the federal statutes listed above.[15] Like Section 2(B), if state law enforcement agencies implement policies or practices based on Section 2(D) that raise constitutional concerns, that enforcement can be challenged in an as-applied case; however, the law is not facially preempted by federal immigration law.[16]

Because Plaintiffs cannot prevail on their preemption claims against Section 2(B)

---

[15] The verification process in Section 2(D) contemplates cooperation agreements between Arizona and the federal government. *See* A.R.S. § 11-1051(E)(1) ("[A]n alien's immigration status may be determined by . . . [a] law enforcement officer who is authorized by the federal government to verify or ascertain an alien's immigration status.").

[16] This analysis also applies to Plaintiffs' argument that Section 2(D) authorizes state officials to unilaterally act without federal direction. (*See* Pls.' Mem. at 24 (relying on several state officials' interpretations of Section 2(D)).) Because Section 2(D) can be interpreted to cover situations in which federal officials request state officials' assistance—a situation that does not implicate the constitutional concerns Plaintiffs identify—the law is not facially preempted.

- 21 -

and Section 2(D), the Court grants summary judgment in favor of Arizona on Count One (Supremacy Clause). Plaintiffs have not identified any other provision of S.B. 1070 they are challenging under Count One that is not enjoined. *See supra* n.4.

**III.  CONCLUSION**

Arizona is entitled to summary judgment on the remaining claims in Counts One (Supremacy Clause), Two (Equal Protection Clause), Four (Fourth Amendment), Five (Article II, § 8 of the Arizona Constitution), Six (Due Process Clause), and Seven (42 U.S.C. § 1981). Plaintiffs are entitled to summary judgment on Count Three (First Amendment). The Section 5 day labor provisions, A.R.S. § 13-2928(A)-(B), are permanently enjoined.

**IT IS ORDERED** granting Intervenor Defendants' Motion for Summary Judgment re: Counts One, Two, Four, Five, Six, and Seven of the FAC (Doc. 1215).

**IT IS FURTHER ORDERED** granting in part and denying in part Plaintiffs' Motion for Partial Summary Judgment and for Permanent Injunction (Doc. 1223).

**IT IS FURTHER ORDERED** denying as moot Plaintiffs' Motion to Strike Intervenor Defendants' Responses and Objections to Plaintiffs' Statement of Additional Facts Precluding Summary Judgment (Doc. 1280).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment in favor of Arizona on Counts One (Supremacy Clause), Two (Equal Protection Clause), Four (Fourth Amendment), Five (Article II, § 8 of the Arizona Constitution), Six (Due Process Clause), and Seven (42 U.S.C. § 1981).

**IT IS FURTHER ORDERED** directing the Clerk to enter judgment in favor of Plaintiffs on Count Three (First Amendment).

/ / /

/ / /

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED** permanently enjoining the Section 5 day labor provisions, A.R.S. § 13-2928(A)-(B).

Dated this 4th day of September, 2015.

Susan R. Bolton
United States District Judge